## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CONSOLIDATED UNDER
CASE NO. 05-10155 PBS**

| | | |
|---|---|---|
| YISEL DEAN, et. al., | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.: 05 CV 10155 PBS |
| RAYTHEON COMPANY, et al., | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| LISA A. WEILER, et. al., | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.: 05 CV 10364 PBS |
| RAYTHEON COMPANY, et al., | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE AND OPPOSITION TO DEFENDANT RAYTHEON MOTION FOR A PROTECTIVE ORDER, PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND TO EXTEND DISCOVERY

Comes now the Plaintiffs, in response and opposition to defendants Motion for Protective Order, and move to compel discovery, to extend discovery and for further orders of this court.

### DEFENDANTS FILED A FALSE Rule 7.1 CERTIFICATE

Defendants filed a false Rule 7.1 Certification. On Friday, January 13, 2006, at 3:44 and 3:50 pm (copies of notices attached), defendants filed an Emergency Motion for a Protective Order and a  Local Rule 7.1 Certification. Defendants had 10 days before the duly noticed

depositions to call and confer with plaintiff's counsel. They did not. Plaintiff's counsel Mary Schiavo called defendant's counsel Mike Jones on Monday, January 16, 2006, after receiving defendants baseless and misleading pleadings. In that call Mr. Jones admitted they never conferred with plaintiff, or gave any notice whatsoever that they were opposing the depositions and other discovery before filing the motion. Instead, defendant's counsel Jones said defendant's Massachusetts local counsel (Peter Knight or Gary Harvey) did the filing, not him.

Plaintiff's counsel Schiavo told defendant's counsel Jones she would give defendants an opportunity to correct their record with the court and advise the court of their errors, correct the record and withdraw the motion, but they have not. Instead, this afternoon Gary Harvey sent a letter saying they did not confer and the issues remain. Therefore, plaintiff will correct the record and move this court for appropriate orders.

## THE FACTS ON LOCAL RULE 7

On January 17, 2006, at 4:53, after someone for the defendants filed the motion, Jones' assistant emailed Schiavo. At 11:54 pm Knight sent an e-mail advising of the filing—after the fact and after making the false Rule 7 certification. Copies attached as Exhibit 1. Defendants had due legal notice of the dates for a full week (from January 6 to January 13) for depositions commencing on January 17, and a cover letter from the undersigned counsel offering to look for other dates if the selected dates were not convenient for defendants' counsel. Plaintiff's counsel asked counsel for defendants to advise if they were not available on the dates duly noticed. Defendants never so advised, called, emailed, or corresponded in any way. A non-party witness was also served with a subpoena duces tecum and counsel for defendants were provided with a copy and a letter, copy attached as Exhibit 2. On Monday, January 16, 2006, counsel for plaintiff confirmed in a call to defendant's counsel Jones that Jones was available and in Wichita at the time of the notice of depositions, but simply refusing discovery. See attached Exhibit 3.

## THE FACTS ABOUT DEFENDANTS REFUSAL TO PARTICIPATE IN
## LAWFUL DISCOVERY

In a related case in the U.S. District Court for the Eastern District of Virginia (Alexandria) of which this court has been apprised, Colgan Airlines sued Raytheon over the defective drawings and instructions in their manual which were relied upon, but were erroneous and led to the fatal crash. In this Massachusetts case, the estates of the pilots sued Raytheon and Colgan. Colgan moved to consolidate this instant action on behalf of the pilots into the action in Alexandria, Virginia against Raytheon. The Massachusetts cases were not consolidated into the Alexandria, Virginia case, but this court on July 27, 2005, did request that the plaintiffs herein in the Massachusetts case attend the depositions scheduled in Colgan v. Raytheon, so to the extent possible, to avoid duplication and expense of discovery.

Until this Massachusetts court's request to allow plaintiff herein to attend those depositions, Raytheon had objected to and obtained a court order from the Virginia court barring plaintiffs' counsel from attending discovery, alleging the parties and issues in the Massachusetts case were different  As requested by this court, counsel for plaintiff attended the remaining depositions in the Virginia case which included depositions of some Raytheon employees. Plaintiff had no input into the selection of persons deposed, and had no access to any discovery before the depositions.

In fact, plaintiff requested at those depositions not once, nor twice, but repeatedly that Raytheon counsel make available to counsel for plaintiff, the documents and discovery produced to that date in the Colgan v. Raytheon case. The history of those repeated requests is as follows:

    a.   August 1-4, 2005- Verbal request at depositions to Raytheon counsel in Wichita, Kansas

    b.   September 8, 2005-Letter via hand delivery to Raytheon counsel in Virginia

c. September 28, 2005-Formal Requests for Production of Documents

d. November 11, 2005- Email to Mike Jones about the status of their producing and providing an inventory of documents assembled by plaintiffs to help defendants (and Jones) answer the plaintiff's formal discovery requests

e. November 28, 2005-Responses received from defendant with objections to most requests

Responsive documents were partially provided on September 23, 2005 and on November 28, 2005. Some are still outstanding and a heretofore undisclosed (but requested) insurance policy was just provided on January 13, 2005 after defendants filed the motion to prohibit any further discovery.

Raytheon repeatedly failed to produce requested discovery. When it did agree to produce, Raytheon instead required plaintiff to pre-pay a local copy service, and make arrangements to have the documents sent to a copy center for reproduction even further and greatly delaying the production of documents in this case. Thereafter, plaintiffs received some documents, on September 23, 2005 and an insurance policy on January 13, 2006. Again plaintiff served a Request for Production of Documents on Raytheon. Defendant Raytheon objected to almost every request despite the court's compelling production to the same requests in the Virginia case. The defendants took as long as possible to deliver the responses to plaintiff and they sent them not to the undersigned counsel's office, but to a branch office of the plaintiff's law firm. They surface mailed via regular mail the response on November 18, 2005. But, defendants did not email it to counsel for plaintiff, despite email filing and correspondence in this case to date. The responses did not arrive until Nov. 28, 2005. It is strange indeed that on other service defendants used email, but on the Response to Request for Production, it was only "snail-mailed" to a branch office, and it took 10 days to arrive. Conversely on the filing of the "emergency" motion

(although filed a week after depositions noticed and then at close of business on Friday with a Federal holiday on the Monday before depositions were to commence on Tuesday) defendant's e-mailed and express mailed to plaintiff's counsel Schiavo at the correct address. Obviously they know the correct e-mail and addresses, but failed to use it for Responses to Request for Production. They also failed to pick up the phone to advise they were not appearing for duly notice depositions.

In the interim, while awaiting and repeatedly requesting Raytheon's production of documents, plaintiff proceeded with the Colgan production of documents. However, Colgan was dismissed from this Massachusetts case on November 16, 2005. Meanwhile the Colgan vs. Raytheon case was set for trial on December 5, 2005, in Virginia and Colgan turned to its own trial preparation (but did subsequently produce some documents).

While sitting on plaintiff's requests for discovery, Raytheon served interrogatories on the plaintiffs, and after a 10-day extension of time due to health problems of the undersigned counsel, plaintiffs responded to defendant's requests on December 29, 2005 and January 6, 2006, and produced several hundred pages of discovery (plaintiff did not make defendants pre-pay a copy service nor sent the documents to a third party and has since agreed with Jones as to a method for copying the outstanding pilot logs). Along with the damages books plaintiff made a policy demand because the policy information provided by the defendants was a policy produced in response to formal requests was a $10 million "wasting" policy. Only after plaintiffs sent a policy demand did defendants produce another policy on January 13, 2005 at 4:53 pm via email. They never mentioned the existence of another policy in their responses to discovery and explained their behavior by saying that since they didn't have the policy they had no obligation until they got it. Such a ludicrous position is clearly contrary to the Federal Rules of Civil Procedure.

**WHAT IS BEHIND THE DEFENDANT'S MISLEADING AND OUTRAGEOUS**

**ACTIONS**

Plaintiffs learned of a former Raytheon employee and whistleblower. His name is Donovan Havnen. He was a Vice President at Raytheon at all times relevant herein. That whistleblower surfaced just before trial in December 2005 in the Virginia case. He admitted he possessed information relevant to the crash of this plane. He advised counsel for Colgan and Colgan Airlines about stunning revelations about the behavior of Raytheon in this case, on the manuals and related to the Beech 1900 aircraft which crashed.

The whistleblower advised that Raytheon had ordered its employees to do or expend as little as possible in support of the Beech 1900 aircraft (as well as another aircraft). Havnen is not your run-of-the-mill whistleblower. He was a Raytheon Vice President. This stunning development was further compounded by the fact that according to court pleadings in the Colgan v. Raytheon case, Raytheon attorneys and another Raytheon employee (a Raytheon President) who was already deposed in this case attempted to threaten or intimidate the witness. They got a protective order from a local Kansas court instead of in the Virginia court where the case was pending to prohibit this individual from testifying. Attached as Exhibits 4-7 are the affidavits of Tom Almy, (attorney for Colgan), Michael Scheidt, (a previously deposed Raytheon witness), Michael Jones and Jeff C. Spahn, Jr. The affidavit Mr. Tom Almy of whom this court is familiar as being counsel for Colgan Airlines also provides stunning revelations.

Nonetheless, it was not until January 13 at 4:58 pm that counsel for defendant sent to plaintiff's counsel an ex parte order defendants obtained on December 16, 2005 from a Kansas court barring Havnen from testifying about certain matters occurring at Raytheon. See Exhibit 8. The clear purpose of the order is to intimidate, terrify and silence a witness. There were <u>no</u> similar objections raised in the depositions of eleven other Raytheon employees on such issues. None. Never in any depositions. Defendant's counsel never advised plaintiff of the injunction

until after the depositions were noticed and witness Havnen was served with a subpoena. Obviously, the revelation of an individual and the new information is a new line of evidence that was not heretofore disclosed. A timely notice to take depositions and a lawful subpoena on the deponent, were all served in time and within the discovery period established by this court, and almost a month before discovery closes.

It has further come to light in light of the startling revelations by the whistleblower, that there were many more incidents and accidents than previously disclosed. For example, most recently in December 2005, another mistake in the maintenance manual related to the trim control on this airplane was revealed. Raytheon's own releases in December 2005 warn of more manual errors which could lead to mis-rigging. See Exhibit 9. Obviously undersigned counsel needs to depose the defendants as to these recently revealed errors in the maintenance manuals which were not previously disclosed in the depositions. This is a highly significant discovery because maintenance manual errors lead to mis-rigging of the trim system at issue herein. Furthermore, the whistleblower mentioned there were three accidents—and only two have thus far been disclosed. The three are significant because they caused maintenance manual errors on the Beech 1900 plane to surface and they continue to surface.

## VIRGINIA COURT FINDS ERRONEOUS MANUALS ARE PART OF THE PLANE

This information is now particularly important because on December 7, 2005, the Virginia court ruled the manual is part of the plane. See attached Memorandum of Opinion Exhibit 10. That ruling ended Colgan's case. In order for Colgan to recover they had to prove the plane and manual were separate products. Their lease agreement with Raytheon prohibited them from bringing suit on the plane. In this instant case however, whether the manuals are separate or part of the plane is not dispositive, but if the manual and plane are one and the same, all maintenance manual errors are very relevant to our claims herein of a defective plane as well as a defective manual. Plaintiffs however only sought errors related to trim and control systems

## DEFENDANT'S ARGUMENT THAT THE LAST MONTH OF DISCOVERY IS TOO LATE FOR DISCOVERY IS FRIVILOUS, SANCTIONABLE  NONSENSE

Defendant inexplicably argues that discovery is not to occur in the last month of allowable discovery.  That is a very curious position because every lawyer knows that not only is discovery allowed in the last month of the discovery period, this is usually the busiest time.  Counsel for plaintiff clearly set forth in proper and timely notices and in an accompanying letter by plaintiffs to defendants asking defendant's to advise if the days were not convenient or if they wanted other dates.  What is even more mystifying is that defendants have asked counsel for plaintiffs to produce plaintiffs' representatives in the month of January.  If January is too late for plaintiffs to take any depositions in this case, then it should be too late for defendants to take depositions.  Even now, defendants are still producing and asking for discovery.  Yesterday, defendant's counsel, Jones, admitted to plaintiff's counsel Schiavo, that plaintiff's notices were indeed timely and that they have no issue with the form or timeliness of notices.

## INTERROGATORIES

Defendant's objection to the interrogatories is misleading.  First of all, plaintiffs served only two interrogatories.  Defendants claim of 533 is absolutely false.  The two interrogatories only ask the defendant to produce information that has not already been produced about individuals who have knowledge in this case.  See the two interrogatories attached as Exhibit 11.  These two interrogatories were necessitated by bad behavior of defendants Raytheon in the pre-trial procedures herein and in the related case, Colgan v. Raytheon.  In our case, instead of filing a Rule 26 disclosure, Raytheon only referenced to the Rule 26 disclosures in the Virginia case.  Yet, when it came time to file a trial witness and exhibit list in the Virginia case, there were far more persons and exhibits listed on the pre-trial exhibit and witness list than disclosed by Rule 26 disclosure.  Raytheon attempted to qualify such discrepancy in the disclosures by arguing

Colgan did not file interrogatories requiring Raytheon to list any other individuals that they might know of with knowledge in this case (other than the ones already disclosed) pursuant to Rule 26. In other words, they argued Colgan could not rely on the Rule 26 disclosures unless they filed an interrogatory requiring Raytheon to name all individuals who might have knowledge. Therefore, in this case plaintiff filed two interrogatories requiring Raytheon to list any other witnesses not disclosed and to state the extent of their knowledge hardly objectionable, and necessitated by Raytheon, failure to fully comply with Rule 26.

## CONCLUSION

In conclusion, it is blatantly obvious that these motions are not in good faith because discovery has not closed and we had the entire month of January to complete depositions. Defendant's actions were aimed at wasting the last 30 days of discovery so plaintiff will not have access to this newly discovered evidence. Plaintiff clearly specified that the depositions sought in January would not be duplicative and short in nature and were to explore the astonishing new information. Defendant has completely mischaracterized the request, obviously in their attempt to avoid any further discovery from former Vice President Havnen and about the latest discovery of errors in the maintenance manual. The revelations by Mr. Havnen, and the news that in December 2005, Raytheon was still finding manual errors pertaining to the rigging of the airplane's trim control system are clearly new facts. Obviously counsel for plaintiff is extremely interested in why Raytheon is still discovering in December 2005, errors in its manuals related to the rigging of controls, which errors were also present in the manual at the time of the crash herein, and in hearing from the whistleblower who Raytheon has worked so hard to silence. If in Massachusetts as ruled in December 2005 in Virginia, the plane and its manuals are the same product, then indeed these are even more relevant to our claims.

## **REQUESTED ORDERS**

Given the recent discoveries, and Raytheon's outrageous behavior herein, plaintiff requests the following order of the court:

1.  The requested depositions of Mr. Havnen be compelled at a time and location of Mr. Havnen's choice.

2.  Defendants and their counsel be enjoined from any further contact, intimidation or threats of Mr. Havnen.

3.  Discovery be extended from January 30, 2006, to February 28, 2006.

4.  Defendants are required to amend their Rule 26 disclosures within 5 days to fully comply and make all required disclosures, and answer the 2 interrogatories about any other witnesses and relevant information.

5.  Defendants will produce Peay, Rosenberg, Crow, Green, Ramey, Jaerger, Pedroja, Ernzen, Jolicoeur, and McCarthy for deposition or re-deposition on the newly discovered information. The depositions in this case will not duplicate the Virginia case questioning.

6.  Such further orders as the honorable court deems just and necessary.

January 17, 2006                          Respectfully Submitted,


                                           /s/ Robert McConnell_____
                                          Robert McConnell, Esq.
                                          (BBO No. 550625)
                                          Mary Schiavo, Esq.
                                          Motley Rice LLC
                                          321 South Main St.
                                          P.O. Box 6067
                                          Providence, RI
                                          (401) 457-7700

## CERTIFICATE OF SERVICE

I hereby certify that on the 16 day of January, a true and correct copy of the above and foregoing **PLAINTIFFS' RESPONSE AND OPPOSITION TO DEFENDANT RAYTHEON MOTION FOR A PROTECTIVE ORDER, MOTION TO COMPEL DISCOVERY, AND TO EXTEND DISCOVERY** was served electronically through filing with the ECF system on January 17, 2006 to the following attorneys of record.

Michael G. Jones
MARTIN, PRINGLE, OLIVER, WALLACE
 & BAUER, L.L.P.
100 North Broadway
Wichita, KS 67202

Peter Knight
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210


   /s/ Mary Schiavo

## Schiavo, Mary

**From:** Harvey, Gary [GHarvey@morrisonmahoney.com]
**Sent:** Friday, January 13, 2006 11:54 PM
**To:** Schiavo, Mary

Mary:

This afternoon we sent to you correspondence meant encourage the plaintiffs to provide to the defendants appropriate discovery responses to their requests. Further, the defendants' letter was meant to explain fully the defendants' basis as to why they feel compelled to move for a protective order to bar the Raytheon depositions which now seek.

In short, Raytheon is seeking the Court's protective order to bar any further depositions of Raytheon on a number of grounds more fully described in the defendants' letter to you and Raytheon's motion for a protective order.

Given the short amount of time within which to respond to your discovery, we have provided you with our precise position on these matters. We now ask that you (a) withdraw your depositions notices, (b) fully and properly respond to the defendants' discovery requests and (c) restructure your interrogatories so as to comply with the Federal Rules regarding interrogatories. Your current set does not comply with the Rules.

Of course, the defendants will be happy to discuss these issues with you any time. To that end, please contact me at any of the following telephone numbers during this long weekend: 617-439-7576 (work), 617-834-5274 (cell) or 978-526-4882 (home).

Given the late hour which we were forced to file Raytheon's motion, we were not able to reach you during our normal working hours. We ask that you confirm for us that you have received Raytheon's letter, motion and this e-mail so that we are assured that you have received them prior to making any final arrangements for a flight to Kansas.

We look forward to a meaningful, good faith discussion regarding the merits of Raytheon's motion and are hopeful that such discussion will obviate the need for the Court's involvement in this discovery matter.

Regards,

Gary



**Mary F. Schiavo**
**Licensed in MO, DC, MD**
DIRECT DIAL 843.216.9138
DIRECT FAX 843.216.9440
MSchiavo@motleyrice.com

January 6, 2006

Michael Jones
**Martin, Pringle, Oliver**
**Wallace & Bauer L.L.P.**
100 North Broadway, Suite 500
Wichita, KS 67202

Re: Civil Action 05-10155-PBS

Dear Mr. Jones,

Thank you for your email relative to depositions. I believe you wanted the estate representatives who are Yisel Dean and Lisa Weiler. I asked each to check their calendars.

As concerns our additional depositions, there are quite a few, although I anticipate each to be brief. They are necessitated by the fact that I recently received from the Alexandria court additional information disclosed relative to this crash which was not included on the Rule 26 disclosures nor in previous depositions nor productions. Also, we have found on the web announcement that Raytheon has recently discovered more errors in its manuals. Therefore, I will need to depose each current or former Raytheon employee listed on your Rule 26 disclosures or disclosed in your pre-trial filings in the Alexandria, Virginia court.

Further, in perusing filings obtained from your Virginia proceeding, and reviewing the information and role of Mr. Donovan Havnen, I request his deposition as well, despite the fact he is not listed on the Rule 26 disclosure in this case nor your witness list in the Virginia case. He clearly has knowledge and evidence relative to this case. As a person with knowledge he cannot be prohibited from testifying. I assume the protective order was due to the communications with/by/to/from Colgan counsel, not me. Please make sure the protective order you obtained in a Kansas court relative to the Colgan v. Raytheon case is lifted or limited to the Virginia case before his deposition and so advise Mr. Havnen.

www.motleyrice.com

Motley Rice LLC
Attorneys at Law

| Mt. Pleasant | Barnwell | Providence | Hartford |
|---|---|---|---|
| 28 Bridgeside Blvd.<br>P.O. Box 1792<br>Mt. Pleasant, SC 29465<br>843-216-9000<br>843-216-9450 FAX | 1750 Jackson St.<br>P.O. Box 365<br>Barnwell, SC 29812<br>803-224-8800<br>803-259-7048 FAX | 321 South Main St.<br>P.O. Box 6067<br>Providence, RI 02940<br>401-457-7700<br>401-457-7708 FAX | One Corporate Center<br>20 Church St. 17th Floor<br>Hartford, CT 06103<br>860-882-1681<br>860-882-1682 FAX |

Michael Jones
January 6, 2006
Page 2

In the event it is your position he is not a person which you can produce, I have attached a subpoena which I will serve if necessary.

Either way, the gag order is inappropriate in our case and must be lifted or modified prior to his deposition. If you are not willing to do so, please advise before I travel to Wichita for the depositions so I may file the appropriate motion with Judge Saris, compelling his testimony.

As pertains to the persons with knowledge revealed in filings in the Virginia court but not on your Rule 26 disclosures, I have enclosed interrogatories relative to their knowledge and any other persons who may subsequently discovered or revealed.

I have also noted that the illustration at issue herein (figure 201) was used in other places in the manual, and also that many recent manuals correction have been issued. A sampling of a few such corrections issued in October, November, and December 2005, are attached. These additional instances were not revealed or perhaps not discovered at the previous depositions. Therefore interrogatories related to these drawings and errors are being prepared and I will need to re-take the depositions of the following persons relative to these previously undisclosed uses of the illustration and the newly discovered manual errors.

1. Willard Crowe

2. Ronald Jaerger

3. Mike Jolicoeur

4. Tom Peay

5. Michael Scheidt

6. Robert Pedroja

7. Kimberly Ernzen

I anticipate each supplemental deposition to be very short and not repetitive of prior examinations. I would like to conduct these depositions on January 17-19, in Wichita. I have also included a 30(b)(6) notice relative to the newly discovered information and financial condition and management of the companies.

Michael Jones
January 6, 2006
Page 3

Finally, given the recent revelations, a demand for the policy seems to be appropriate and timely. Enclosed please find the same.

To assist in the evaluation, and as stated in the interrogatory answers, enclosed please find the Dean demand book. For purposes only of the policy demand and not for any subsequent settlement demands or discussions should the policy demand be rejected by your carrier, please be advised the combined demand is for the total of the $10 million policy, as opposed to the $11,750,000.00 each we demanded in the books.

I proposed dates for the depositions in Wichita because the rules so require, but of course they are flexible. I will work with you to find mutually convenient dates. Other than January 9-10, January 20, and January 27-28, I am available for depositions for the entire month. Lisa Weiler is available on January 23-26, or January 30-31 in Cincinnati, Ohio and Yisel Dean is available on the same dates in Euless, Texas.

Thank you for your cooperation in this matter. I look forward to seeing you soon.

Sincerely,

Mary Schiavo

MS/ll
Enclosures

Cc: Peter Knight

AO88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ KANSAS _____

Yisel Dean, et al., V. RAYTHEON COMPANY, et al.,

V.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  05 CV 10155 (PBS) USDC MA

TO:   Donovan K. Havnen
      615 N. Westchester Dr.
      Andover, KS 67002-9317

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Kelley, York & Assoc., 200 North Broadway, Suite 220, Wichita, Kansas 67202 | DATE AND TIME   1/17/2006 9:00 am |
|---|---|

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE   1/6/06 |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |

Mary Schiavo, 28 Bridgeside Blvd., P.O. Box 1792, Mt. Pleasant, SC 29465

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

# ΛΙΝ*alerts*

From the editors of *Aviation International News*

---

**This issue sponsored by <u>Rockwell Collins</u> and <u>AvFuel</u>.**
**December 20, 2005**

## Wing Separated before Mallard Crashed

The NTSB has begun recovering the wreckage of the Chalk's Ocean Airways Turbo Mallard that crashed off the coast of Miami yesterday afternoon, killing all 18 passengers and two crewmembers. The 1947 Grumman G-73T had taken off from the airline's Watson Island seaplane base shortly before 2:40 p.m. for a flight to Bimini in the Bahamas, when only seconds later it broke apart in an inferno and fell into Government Cut. Amateur video appeared to show the right wing breaking away from the fuselage. Recovery crews have now turned their attention to finding the airplane's cockpit voice recorder while investigators pore over maintenance logs and operations records. The crash ended Chalk's 86-year record of no fatal accidents involving passengers, although two Chalk's pilots died when their Mallard crashed during takeoff near Key West, Fla., on March 18, 1994. The NTSB determined the cause of that accident to be an excessive aft c.g. because the crew failed to ensure that the aircraft's bilges were pumped free of water.

## Raytheon Issues 1900D Maintenance Alerts

Raytheon issued a new safety communiqué to advise Beech 1900 operators of another misleading illustration in the type's maintenance manuals. The notice represents the latest in a series of manual revisions prompted by the crash of two Beech 1900D airliners that killed 23 people in 2003. The communiqué, mailed to operators on December 5, warns that an illustration incorrectly depicts the position of the trim cable terminal ends during an installation of a forward rudder-trim cable. After installing the cable, a 1900C operator found the rudder tab to move in the direction opposite that commanded by the rudder-trim cockpit control. After investigating the incident, Raytheon found that the 1900D manual contained the same discrepancy. The company recommends that all 1900 operators who have installed a forward rudder-trim cable since November 2004 perform a rudder-trim operational check.

## EASA Certifies Ae270 Turboprop

On December 15, the European Aviation Safety Agency awarded the type certificate for the Ibis Aerospace Ae270 turboprop single to Aero Vodochody, the Czech partner in the joint venture with Taiwan's Aerospace Industries Development. FAA approval is expected shortly. Ibis said its expects to receive additional financing next year that will fund development to the production phase. However, the current version of the aircraft has not met its performance targets and the manufacturer now intends to develop an improved Ae270 that will go into production. The Ae270B will have a larger, lighter wing that will be longer and deeper than the existing design. Repositioned flaps and ailerons will provide greater range and improve stall characteristics. The Ae270B is not expected to receive certification until mid-2007 at the earliest.

## Dassault and Honeywell Settle Lawsuit

Dassault Aviation has reached a settlement with Honeywell over a $60 million lawsuit filed against the avionics manufacturer by the French business jet builder in October. The complaint stemmed from software integration delays with Honeywell's Primus Epic avionics platform, the baseline system behind the EASy cockpits in the Falcon 900EX and 2000EX, as well as several in-development Falcons. In its lawsuit, Dassault claimed that the setbacks postponed certification of the two models and damaged its reputation for delivering airplanes on time. Terms of the settlement were not disclosed. In a statement, Honeywell said it reached a "mutually satisfactory

# Raytheon Aircraft Company

## Technical Publications—Recently Mailed Publications

| Part Number | Mail Description | Revision Date | Mail Date |
|---|---|---|---|
| MC 73 | 1900 Series Model Communique | Nov 23, 2005 | 12/5/2005 |
| 114-590021-9B16 | 1900 SERIES STRUCTURAL REPAIR MANUAL REV | 31 OCT 2005 | 11/17/2005 |
| 114-590021-9B TR 55-2 | 1900 SRM TR | 16 SEPT 2005 | 9/23/2005 |
| 114-590021-7B20 | 1900/1900C MAINTENANCE MANUAL REV | 31 OCT 2005 | 11/16/2005 |
| 114-590021-7B TR 27-14 | 1900/1900C MAINTENANCE MANUAL TEMP REV | NOV 2005 | 11/14/2005 |
| 114-590021-7B TR 27-13 | 1900/1900C MAINTENANCE MANUAL TEMP REV | 23 SEPT 2005 | 9/23/2005 |
| 114-590021-7B TR 5-10 | 1900/1900C MAINTENANCE MANUAL TEMP REV | 23 SEPT 2005 | 9/23/2005 |
| REPS-1900/C REV 20A | 1900/1900C REPS MAINTENANCE LIBRARY | SEPT 2005 | 9/30/2005 |
| REPS-1900/C REV 21 | 1900/1900C REPS MAINTENANCE LIBRARY | NOV 2005 | 11/14/2005 |
| 114-590021-5F3 | 1900/C ILLUSTRATED PARTS CATALOG REVISION | 31 OCT 2005 | 11/16/2005 |
| 114-590021-59D3 | 1900C ILLUSTRATED PARTS CATALOG REVISION | 31 OCT 2005 | 11/16/2005 |
| 129-590000-3E14 | 1900D FLIGHT MANUAL REVISION | SEPT 2005 | 10/19/2005 |
| 129-590000-11D3 | 1900D ILLUSTRATED PARTS CATALOG REVISION | 31 OCT 2005 | 11/17/2005 |
| 129-590000-15A39 | 1900D MAINTENANCE MANUAL REV | 31 OCT 2005 | 11/16/2005 |
| 129-590000-15 TR 27-19 | 1900D MAINTENANCE MANUAL TEMP REVISION | NOV 2005 | 11/14/2005 |
| 129-590000-15 TR 27-18 | 1900D MAINTENANCE MANUAL TEMP REVISION | 16 SEPT 2005 | 9/23/2005 |
| 129-590000-15 TR 5-18 | 1900D MM TR | 16 SEPT 2005 | 9/23/2005 |
| REPS-1900D REV 22A | 1900D REPS MAINTENANCE LIBRARY | SEPT 2005 | 9/30/2005 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CONSOLIDATED UNDER
CASE NO. 05-10155 PBS**

YISEL DEAN, et. al.,

        Plaintiff,

    vs.

RAYTHEON COMPANY, et al.,

    Defendants.

Case No.: 05 CV 10155 PBS

---

LISA A. WEILER, et. al.,

        Plaintiff,

    vs.

RAYTHEON COMPANY, et al.,

    Defendants.

Case No.: 05 CV 10364 PBS

---

## AFFIDAVIT OF MARY SCHIAVO

Personally appeared before the below-listed Notary Public comes Mary Schiavo who affirms the truth of the following statements and representations made upon her own personal knowledge.

1.      On the afternoon of January 16, 2005, I telephoned Counsel for Defendants, Michael Jones in Wichita, Kansas, and asked him to explain his or his co-counsel's actions in filing a Rule 7 Certification when there had been no contact with me at all before the filing, and no call until I called him. I told him the Rule 7 Certification was false, and that all of the Noticed

Discovery was properly noticed and in time and within the time prescribed for Discovery, and I asked him to explain himself.

2.     Michael Jones confirmed that in fact they had not conferred with me before filing the Rule 7 Certification, as alleged in the Certification. He stated that he was very displeased with his Boston local counsel, Peter Knight at Morris & Mahoney for doing that.

3.     I also confirmed with Mr. Jones that he didn't call me when discovering what had been done.

4.     I also inquired of Mr. Jones of the meaning of his complaining that discovery can not be had in the last month of discovery and reminded him that he had asked for discovery against Plaintiffs including Plaintiffs' depositions in January and it seemed rather unusual that he could ask for depositions in January but when Plaintiffs asked for depositions in January he argued they were not timely.

5.     Mr. Jones admitted indeed the notices were timely, they were properly filed, that the subpoena was proper, and he was not complaining about the timeliness at all. I reminded him that is not what his pleadings said.

6.     He confirmed that his issue was not with how the depositions were noticed, but that the depositions should not occur at all. I asked him why, and he said because the Raytheon employees were already deposed, and because Mr. Havnen is under an injunction from a Kansas Court.

7.     I reminded Mr. Jones that several other employees of Raytheon had testified about those very same matters, and none of those employees had been gagged, that Jones never raised the issue of proprietary or other protected information and testified about the manual, the Beach 1900, and the crash, and that it is inconsistent to argue that Mr. Havnen is subject to an injunction and the other employees were not.

8.     Jones then states that he had no control over Havnen and that I would have subpoena him anyway and I said that I had, and he said that he was going to continue to take the position that Mr. Havnen's testimony was barred by the Protective Order.

9.     We both agreed that we were going to agree to disagree on that point, and that I would move the Court to compel the timely filed, and properly noticed, and properly subpoenaed deposition of Mr. Havnen.

10.     As concerns the other depositions, Mr. Jones' position is that they are re-takes of depositions already taken.  A quick look at the record reveals that those depositions were not taken at the request of Plaintiff herein, nor ever in this case, and in fact occurred before any discovery order was entered herein.

11.     In fact what had occurred is that Judge Saris asked counsel for a Plaintiff to attend those depositions with only a couple of days notice, and without opportunity for counsel for Plaintiff to see any of the documents.

12.     Plaintiff never agreed to waive any rights to take deposition and now with the discovery of new information it is clear that a very short deposition of those persons (or re-take of those depositions) is in order.

13.     Mr. Jones and I have also agreed to disagree on these Raytheon depositions.

14.     Finally, Mr. Jones and I have disagreements over the completeness of the responses to paper discovery thus far.  We have agreed to further discuss those differences, and should have further requests for the Court on those further differences of discovery.

15.     I then advised Counsel Jones that I was going to call Witness Havnen and advise him that the depositions were off because Raytheon was taking the position that upon their filing for a protective Order that they did not have to appear for the depositions and would not appear for the depositions.

3

16.     I advised Mr. Jones that my reading of the Rules is exactly the opposite, that the mere filing of a Motion does not protect them from appearance and that the deposition should go forward, but he advised he was not appearing.

17.     There was therefore little reason for me to appear and expend the two days in travel to go to a deposition that was not going to occur.

18.     With Mr. Jones' knowledge and consent, I called Mr. Havnen and told him that his deposition would not occur the following morning, because Raytheon was opposing his deposition.

19.     With no further prompting from me whatsoever Mr. Havnen then said the following: These guys have me scared, they scared the crap out of me. I have information relevant to this case and I will tell you the information relative to this case and this plane, but I am absolutely scared crapless. I am being squashed. Raytheon is squeezing me hard and trying to prevent me from talking. If the Judge orders this deposition, I will testify, I will give you the deposition, and I will tell you the truth, if the Judge enters the Order for me to talk. Raytheon is trying to blacklist me. I am not trying to hurt them or help anyone else, but I will testify and do what is ordered by the Court.

20.     In order to get the deposition done and still preserve Raytheon's alleged (but vigorously disputed) argument that the information from former Raytheon vice president Havnen is proprietary (even though the president of Raytheon didn't seem to have any proprietary information -- that objection was never raised in his or any other Raytheon depositions) counsel for plaintiffs is willing to take the deposition under a standing objection preserving all of Mr. Jones' objections relative to proprietary information of Raytheon as he alleged in their Kansas County Court injunction. Plaintiff vigorously denies defendants allegations of entitlement to

4

protection, but this way we can complete the deposition and this honorable Court can then rule on the objections to specific pieces of information before trial.

**FURTHER, THE AFFIANT SAYETH NOT.**

MARY SCIAVO

STATE OF SOUTH CAROLINA    )
                                 ) SS:
COUNTY OF CHARLESTON      )

    SUBSCRIBED AND SWORN to before me this 17th day of January, 2006.

_____
Holly C. Hansen, Notary Public

My Appointment expires:

_July 10, 2010_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

COLGAN AIR, INC.,                         *
                                          *
              Plaintiff,                   *
                                          *
                                          *    Civil Action No: 1:05 CV 213
v.                                        *
                                          *
RAYTHEON AIRCRAFT COMPANY                 *
                                          *
              Defendant.                   *

### AFFIDAVIT OF THOMAS B. ALMY

I, Thomas B. Almy, do declare and state that:

1. I am over the age of 18 years, and have personal knowledge of the facts contained within this Affidavit.

2. I am a partner with the firm of Dombroff & Gilmore, P.C.

3. On the morning of November 15, 2005, Affiant and Mark Dombroff from the firm of Dombroff & Gilmore, PC, spoke with Don Havnen as a result of Mr. Havnen's call to Mike Colgan volunteering to give information concerning the above claims.

4. Mr. Havnen advised Affiant and Mr. Dombroff that he had information concerning Raytheon Aircraft relating to RAAS operations prior to the Hyannis accident. He further advised that he had spoken to lawyer who had told him it was "okay to talk to" counsel for Colgan Air.

5. Prior to further any further discussions, it was agreed that counsel for Colgan Air would contact the lawyer to confirm that Mr. Havnen was able to speak to counsel for Colgan Air, and Mr. Havnen provided his name, Brian Burris, and telephone number.

Page 1 of 6



6. Affiant and Mr. Dombroff then called and spoke to Mr. Burris. Mr. Burris advised that he was not employed at that time, but prior to that had been employed as a lawyer by Raytheon Aircraft and prior to that employment had been a partner at Martin, Pringle, counsel for Raytheon Aircraft in this action.

7. Mr. Burris advised that he had spoken to Mr. Havnen concerning whether he could speak with counsel for Colgan Air, and had told Mr. Havnen that it was not necessary for Mr. Havnen to go to Raytheon Aircraft counsel first, before talking to Colgan's counsel. He had further advised Mr. Havnen not to talk about privileged material.

8. Following the telephone call with Mr Burris, Affiant and Mr. Dombroff called and spoke with Mr. Havnen the same afternoon, November 15, 2002. Mr. Havnen was specifically told that we had spoken to Mr. Burris and that we did not want him to tell us anything relating to communications with Raytheon lawyers. Mr. Havnen stated he understood.

9. Mr. Havnen advised that:

    a. he was part of RAAS from its inception;

    b. he was responsible for the RAAS budget, and that spending on the 1900 was minimal;

    c. RAAS' purpose was to "workout and liquidate" the 1900 and Starship, prior to three crashes occurring, UC-127, Charlotte and Hyannis;

    d. the three crashes "changed things," and he was directed to create a "world class support organization."

    e. Prior to the accidents, Mr. Havnen and others were complaining to management about problems not being addressed

10.  On November 28, 2005, during a telephone conversation, Don Havnen suggested to counsel for Colgan Air that he should meet with counsel to explain in detail the factual information and knowledge he possessed that he believed was pertinent to the litigation between Colgan Air and Raytheon Aircraft Company. It was agreed that Mr. Havnen would travel to the Washington area on November 29, 2005, to meet with counsel for Colgan Air the morning of November 30, 2005.

11.  The morning of November 29, 2005, Affiant was called by Mr. Havnen to confirm the travel arrangements.

12.  At approximately 2:15 p.m. on November 29, 2005, Mr. Havnen called counsel for Colgan Air while counsel were in a meeting. Mr. Havnen's call was taken on the speaker-phone with Mark Dombroff, Thomas Almy and Andre Gregorian present.

13.  Mr. Havnen related the following during the telephone call:

(a) While waiting for his aircraft to depart that morning, he was approached at the gate by counsel for Raytheon Aircraft, Mike Jones of the firm of Martin, Pringle, Oliver, Wallace & Bauer, LLP;

(b) Mr. Jones asked Mr. Havnen to speak to Michael Scheidt, President of RAAS and Mr. Havnen's former boss, while Mr. Jones sat across from Mr. Havnen;

(c) "they [Mr. Scheidt and Mr. Jones] convinced me not to get on the airplane;"

(d) Mr. Scheidt told Mr. Havnen:

(i) "Make damn sure you understand that we're not intimidating you;"

(ii) "You're not blackballed yet;" and

(iii) "We will bring our full forces to bear on you [Mr. Havnen]," if Mr. Havnen

testified;

(e) Mr. Havnen advised that since being let go by RAAS, his "entire future" was dependent on representing clients, many of which were Raytheon Aircraft customers;

(f) Mr. Havnen indicated that Wichita is a small town, and that he felt "totally intimidated" and that Mr. Scheidt had him "convinced I would be blacklisted;"

(g) Mr. Havnen advised that "I can't do it [meet with counsel or testify]" because he had to "make a living;"

(h) Mr. Havnen advised that counsel for Colgan Air had "no idea what I know" about problems at RAAS, including:

    (i) current problems with the 1900D maintenance manual relating to rigging problems with the rudder;

    (ii) prior to the Charlotte and Hyannis accidents in 2003, corporate policy was to do the minimum necessary to support the 1900D.

    (iii) following the Charlotte and Hyannis accidents, Mr. Havnen was directed to create a "world class" support structure for the 1900D;

14.  The telephone call ended when the cell phone connection was lost.  However, a second call was initiated at approximately 3:12 p.m., when Mr. Havnen apparently got home. Mr. Havnen advised counsel of the following during the second call:

(a) Raytheon is a "big company in a small town;"

(b) Mr. Jones told Mr. Havnen that counsel for Colgan would "subpoena you as soon as you get off the airplane."

15.  Issuing a subpoena to Mr. Havnen, a witness who had come forward voluntarily, was

never considered by counsel for Colgan.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this 3̲0̲t̲h̲ day of November, 2005, at McLean, Virginia.

_____
Thomas B. Almy

## CERTIFICATION

I, R Crystal Cowan, a Notary Public in and for the County of Fairfax in the Commonwealth of Virginia, DO HEREBY CERTIFY that Thomas Almy, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and signed, sealed and delivered the said instrument as a free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this ___th day of November, 2005.

R. CRYSTAL COWAN
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES MAY 31, 2009

R. Crystal Cowan
Notary Public

My Commission expires on: 5/31/2009

822129

Page 6 of 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| COLGAN AIR, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05 cv 213 |
| | ) | |
| RAYTHEON AIRCRAFT COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT

I, Michael J. Scheidt, of lawful age, being duly sworn, depose and say that the following facts are true and correct based upon my personal knowledge:

1.   I am a resident of the State of Kansas. My address is 38 Norfolk Drive, Wichita, Kansas 67208.

2.   I am an employee of Raytheon Airline Aviation Services ("RAAS"). My job position is President. The principal office of Raytheon Airline Aviation Services is 101 S. Webb Road, Suite 300, Wichita, Kansas 67207.

3.   I am not an officer of Raytheon Aircraft Company ("RAC").

4.   On Tuesday, November 29, 2005, I received a telephone call from our attorney, Michael G. Jones, of Martin, Pringle, Oliver, Wallace & Bauer, LLP. He placed the call on his cellular phone.

5.   Mr. Jones explained that he had been visiting with former RAAS employee, Donovan Havnen, at the Wichita airport. Mr. Jones asked me to speak with Mr. Havnen at that time.

6.   It was explained to me by Mr. Jones that Mr. Havnen was apparently en route to meet with Plaintiff's counsel in the Washington, D.C. area.

7.   It was further explained that Mr. Havnen wanted to speak to me about his concern that I had "blacklisted" him amongst potential future employers.

8.   I reluctantly spoke with Mr. Havnen and explained that I had, in fact, not blacklisted him with any potential employer, nor had I even discussed Mr. Havnen with anyone other than Raytheon personnel and Raytheon's attorneys.

ALL-STATE LEGAL®

9.   I expressed my concern that Plaintiff's counsel had alleged in a court filing that Mr. Havnen had contacted them and offered to assist them in certain litigation against Raytheon.

10.  I further explained this allegation was troublesome because Mr. Havnen had, in fact, signed certain agreements with Raytheon.

11.  We discussed the fact that David Williams, Vice President – General Counsel of Raytheon Aircraft Credit Corporation and Raytheon Airline Aviation Services, had sent him a letter explaining the fact that certain agreements had been executed. Mr. Havnen stated he received such correspondence and understood it.

12.  Mr. Havnen also indicated that Plaintiff's attorneys had contacted him and that Mr. Havnen did not contact Plaintiff's attorneys. He told me Plaintiff's attorneys had told him they would report that the contact was initiated by Mr. Havnen, however.

13.  Mr. Havnen then stated, "that as I well know, [he] gets thoughts going in his mind that aren't true." He said while sitting at home and wondering where he was going to find employment, his mind led him to believe I was blacklisting him. When I explained I had not blacklisted him, he said it was reassuring to speak with me. He said he was sure I would not do such a thing and, as he had stated in the past, I am "a stand-up guy and the best boss [he] ever had."

14.  I did tell Mr. Havnen that, if he did turn on Raytheon, he could no longer count on my civility and patience. I explained this was in no way a threat—veiled or otherwise.

15.  I told Mr. Havnen to do the right thing as he saw things but to consider the agreements he had signed with Raytheon. I suggested he not do anything to conflict with what he had previously agreed to in writing.

16.  Mr. Havnen stated this had all been blown out of proportion. He stated all he meant to do was to help Colgan to be a safer, more compliant airline from a maintenance standpoint. He reminded me he has had concerns about Colgan's maintenance practices for some time. He said Colgan had misinterpreted his intentions to mean Mr. Havnen wanted to testify against Raytheon.

17.  I strongly emphasized to Mr. Havnen that, when remembering this conversation, he should recall that I did not try to talk him out of meeting with Plaintiff's attorneys, nor did I threaten him. He said he understood; it was his choice, and he was going to "turn around, go back through security, and go home."

18.  I closed by telling Mr. Havnen it was his choice, and the conversation ended.

19.   The conversation lasted approximately four to five minutes.  I made a record of
      the call shortly after it occurred, and a copy of that is attached.

      FURTHER AFFIANT SAITH NAUGHT.

      _Michael J. Scheidt_
      Michael J. Scheidt, individually

STATE OF KANSAS    )
                 ) SS:
COUNTY OF SEDGWICK  )

SUBSCRIBED AND SWORN to before me this 2nd day of December, 2005.

_____
Jane L. Tibbs, Notary Public

My Appointment expires:

February 7, 2007

JANE L. TIBBS
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 2/7/07

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

2005 DEC -1  A II: 10

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

COLGAN AIR, INC.,                )
                                 )
            Plaintiff            )
                                 )
    v.                           )    Civil Action No.  1:05 cv 213
                                 )
RAYTHEON AIRCRAFT COMPANY,       )
                                 )
            Defendant.           )


## AFFIDAVIT OF MICHAEL G. JONES


I, Michael G. Jones, do declare and state that:

1.  I am over the age of 18 years, and have personal knowledge of the facts contained within this Affidavit.

2.  I am a partner with the firm of Martin, Pringle, Oliver, Wallace & Bauer, LLP.

3.  After hearing Colgan seeks Don Havnen as a witness, I called his house on November 21, 2005 to ask him what the situation was.  I left a message on his machine.  He called me back that afternoon. I made notes of the conversation, on which this affidavit is based.  During the call, he explained that after he was laid off he thought about going into the consulting business.  Having been aware of the troubles at Colgan, he decided to contact Mike Colgan to see if he could help make sure nothing like Hyannis happens again.  He said Mike Colgan may have misconstrued the overture and the next thing Don knows, Colgan's lawyers are calling him.

He says he never wanted to testify in this case, but when talking to the lawyers told them he would listen to them, partly because he was still just trying to decide how he was going to make a living.  He called Brian Buris to get some advice because he felt awkward about calling David Williams (in house RAC counsel).  He said he knew calling Brian would lead to a call to David Williams or me, and that if he'd had my number he would have called me first.

Basically, he characterizes this as a big misunderstanding and clearly said he has no intention of appearing at trial.  I told him that unless this was cleared up, we'd have no choice other than to file our response to Colgan's motion, and file other papers of our own.  I said that kind of distraction is the last thing we need as we get ready for trial.  He said he understood and agreed.  He then agreed to send Mike Colgan a letter explaining the misunderstanding and indicating that he did not intend to appear at trial and did not want to testify.  He was supposed to copy me on that letter, but never did.

I spoke with him again a few days later and he said his flu had delayed him but that he would send the letter immediately. He did not.

On November 29, 2005, I ran into Don Havnen at the Wichita airport while on my way to Virginia for pretrial hearings. He had promised me last week a copy of a letter he said he'd planned to send to Colgan explaining that his prior contact with Mike Colgan had been misconstrued and that it was not his intent to testify against Raytheon.

I asked him if he'd still be able to get me a copy of that, and he said he was on his way to meet with Colgan's attorneys. He said he'd told them he'd spoken to me and was planning to write the letter and copy me. He said Dombroff asked him to wait and first come visit with them in person.

He said nothing had changed and that he was not planning to testify.

He also mentioned that he'd told Dombroff the only information he has on this case is attorney-client privileged.

He mentioned he was just concerned about making a buck. I told him he would need to make his own decisions but should know that while in Virginia they could serve him with a subpoena. He was surprised at first but then said he was going to DC. I asked if he was meeting them in the lawyers' office, and he said yes. I told him that was in Virginia.

He asked me if I thought he should turn around and go home, and I told him he needed to make his own decisions.

He then started talking about how he thought maybe Mike Scheidt had blacklisted him in the business after all this came up, and I asked him whether he'd talked to Mike. He said he had wanted to but had been unsure about calling and said he didn't have his cell phone with him. I offered up mine and placed a call to Mike. I explained the situation and then they talked.

After their talk Don told me he was going to go home and write Colgan that he didn't want to be involved. I again said he needed to make his own decisions and wished him well. He seemed happy to hear from Scheidt that he hadn't been blacklisted. He thanked me for talking to him and made clear he didn't want to be subpoenaed. He called it a lucky coincidence that he ran into me and said he'd have never thought of going if he knew he could be subpoenaed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed December 1, 2005, at Reston, Virgina.

_____
Michael G. Jones

2

COMMONWEALTH OF VIRGINIA
COUNTY OF FAIRFAX, to-wit:

I, Stella A. Buck, a Notary Public in and for the County of Fairfax in the Commonwealth of Virginia, I DO HEREBY CERTIFY that Michael G. Jones, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and signed, sealed and delivered the said instrument as a free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarized seal this 1st day of December, 2005.

_Stella A. Buck_
Notary Public

My commission expires:  __4|30|06__

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

COLGAN AIR, INC.,                               )
                                                )
            Plaintiff                           )
                                                )
    v.                                          )        Civil Action No. 1:05 cv 213
                                                )
RAYTHEON AIRCRAFT COMPANY,                      )
                                                )
            Defendant.                          )
_____ )

### DECLARATION OF JEFF C. SPAHN, JR.

I, Jeff C. Spahn, Jr., being of lawful age, states:

1.      My name is Jeff C. Spahn, Jr. I am legally competent to make this declaration.
All matters stated herein are true and correct and within my personal knowledge. If called as a
witness, I would testify as set forth herein.

2.      I am an attorney with the law firm of Martin, Pringle, Oliver, Wallace & Bauer,
L.L.P. and counsel for Raytheon Aircraft Company.

3.      I made several phone calls to Don Havnen ("Havnen") on November 30, 2005, to
notify him of Raytheon's intent to seek a temporary restraining order to enforce his
confidentiality agreements and give him an opportunity to be heard when we presented the
temporary restraining order to the court. I was unable to reach him so I left messages for him to
call me. On December 1, 2005, at 3:45 p.m., Mr. Havnen returned my call.

4.      Mr. Havnen said that on November 30, 2005, he was back on the east coast
meeting at a hotel, which he declined to identify, with Mark Dombroff ("Dombroff"), counsel
for plaintiff, in the above-captioned matter, and others. He said local counsel for plaintiff have
not served him with a subpoena, and did not ask him to come back and testify. He talked about
the need to make a buck. He claimed that he told Mike Colgan he could assist in the lawsuit, but
that he really didn't know anything that would be of use.

5.    Mr. Havnen mentioned the legal opinions he received from Brian Burris and David Williams. He believes this matter has been blown out of proportion and he is worried. At the meeting on November 30, 2005, he showed Mr. Dombroff a copy of David Williams' letter reminding Mr. Havnen of his agreement not to divulge confidential information. Mr. Dombroff didn't want a copy of it. Mr. Havnen said that Mr. Dombroff was pushy and he didn't like it. Mr. Havnen said he also spoke with Mr. Dombroff the morning of December 1, 2005.

6.    Mr. Havnen and Mr. Dombroff discussed what the case was about, i.e., an insurance dispute, and he asked Mr. Dombroff why it couldn't be settled. Mr. Havnen said he is scared, mentioned his wife working for the company, and that he still has a lot of loyalty to the company.

7.    I informed Mr. Havnen that I filed an action on November 30, 2005, to make sure he would comply with his contractual commitments and wanted to give him the paperwork. Mr. Havnen asked that the pleadings be e-mailed to him. We ended our conversation cordially.

8.    On December 1, 2005, I e-mailed the Summons, Petition, Plaintiff's Verified Application for Ex Parte Temporary Restraining Order and the Temporary Restraining Order to Mr. Havnen.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2005.

Jeff C. Spann, Jr.

MARTIN, PRINGLE, OLIVER, WALLACE & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, Kansas 67202
Telephone: (316) 265-9311
Facsimile: (316) 265-2955

FILED _____

2005 DEC 16  AM 9 47

CLERK OF DIST. COURT
18TH JUDICIAL DISTRICT
SEDGWICK COUNTY, KS

IN THE EIGHTEENTH JUDICIAL DISTRICT
DISTRICT COURT, SEDGWICK COUNTY, KANSAS
CIVIL DEPARTMENT

RAYTHEON AIRCRAFT COMPANY,    )
RAYTHEON AIRCRAFT CREDIT      )
CORPORATION AND RAYTHEON      )
AIRLINE AVIATION SERVICES, L.L.C., )
                             )
                Plaintiffs,   )
                             )
v.                           )        Case No. 05 CV 4505
                             )
DONOVAN K. HAVNEN, JR.,      )
                             )
                Defendant.    )
_____)

PURSUANT TO K.S.A. CHAPTER 60

**AGREED PERMANENT INJUNCTION**
*AND JOURNAL ENTRY OF JUDGMENT*

NOW, on this *16th* day of December, 2005, this matter comes before the Court upon a

hearing for Permanent Injunction. Plaintiffs appear by and through their counsel, Jeff C. Spahn

and Lora M. Jennings of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P. Defendant, Donovan

K. Havnen, Jr., does not appear but has consented to this injunction.

WHEREUPON, the Court after being duly advised in the premises and that defendant

consented, granted the plaintiffs' Motion.

IT IS, THEREFORE, CONSIDERED, ORDERED, ADJUDGED AND DECREED that a

Permanent Injunction is herein entered against the defendant, Donovan K. Havnen, Jr., or any

other persons acting on his behalf, as follows:

1.     That upon his employment, Mr. Havnen signed an Employee Confidentiality Agreement, dated August 17, 1998 in which he agreed, with certain exceptions, that after his employment with RAAS was over, he would not reveal any Company Confidential information which was defined as:

> (1) trade secrets, including but not limited to proprietary business, technical, or engineering information owned or possessed by RAC, but generally not known or made available to others outside the RAC organization; (2) sales figures, projections, or estimates pertaining to RAC products and services; (3) personnel information pertaining to RAC employees; (4) information relating to any program or project on which RAC is working, participating or competing; (5) RAC accounting, financial, cost or tax information; (6) RAC customer or prospect lists; or (7) any other information owned or possessed by RAC which is not routinely disclosed to the general public.

The Employee Confidentiality Agreement further provided that Mr. Havnen understood that "a failure to comply with the Agreement could result in losses to RAC for which monetary damages would not be an adequate remedy, and that RAC could suffer irreparable harm by such failure." Accordingly, pursuant to the Employee Confidentiality Agreement, RAC, in addition to any other remedies that may exist, is entitled to seek injunctive relief upon an impending or anticipated breach of the agreement.

2.     That upon leaving his employment, Mr. Havnen signed a Termination Statement of Raytheon Employee Legal Obligations as to Proprietary Information, which recognized Mr. Havnen's obligations under his Employee Statements and Agreements not to disclose proprietary information. Mr. Havnen signed this document on November 11, 2005.

3.     That on December 5, 2005, Mr. Havnen signed a Release of All Claims agreement, which states that by signing the Release, Mr. Havnen agrees that he "shall not use any confidential or proprietary information or trade secrets acquired during [his] employment

2

with the Releasees for any other business or employment without the prior written consent of the appropriate Releasee."

4.      That Mr. Havnen possesses both confidential and proprietary information regarding RAC and RACC.  Mr. Havnen is required to obey the terms of the Employee Confidentiality Agreement, the Raytheon Aircraft Company Termination Statement of Raytheon Employee Legal Obligations as to Proprietary Information, and the Release of All Claims agreement, which prohibit Mr. Havnen from disclosing or revealing any and all confidential and proprietary information.

5.      That plaintiffs and or their clients will be irreparably damaged if Mr. Havnen is not enjoined from disclosing or revealing in any way any and all confidential or proprietary information according to the terms of the Employee Confidentiality Agreement, the Termination Statement of Raytheon Employee Legal Obligations as to Proprietary Information, and the Release of All Claims agreement.

6.      That it appears defendant has met with representatives of a party in litigation with Raytheon, and may have violated his agreements with plaintiffs.  Defendant has been advised of his right to have counsel, and has waived that right and consents to the entry of this injunction.

WHEREFORE, the Court orders as follows:

1.      Defendant Havnen is enjoined from disclosing or revealing to any person, firm, corporation, or other entity, including any future employer, whether verbally, in writing, or otherwise, any Company Confidential information in accordance with the terms of the Employee Confidentiality Agreement.

2.      Defendant Havnen is enjoined from publishing, disclosing, or making use of any proprietary information to which he may have had access or which had been acquired or

3

developed by him in the course of his employment with RAC without prior written agreement of Raytheon in accordance with the terms of the Raytheon Aircraft Company Termination Statement of Raytheon Employee Legal Obligations as to Proprietary Information.

3.  Defendant Havnen is enjoined from using any confidential or proprietary information or trade secrets acquired during his employment with the Releasees without the prior written consent of the appropriate Releasee in accordance with the terms of the Release of All Claims agreement.

4.  Defendant Havnen is hereby ordered to obey the express terms of the Employee Confidentiality Agreement, the Termination Statement of Raytheon Employee Legal Obligations as to Proprietary Information, and the Release of All Claims agreement.

THE COURT FURTHER FINDS that no injunction bond need be issued by the plaintiffs.

This Court shall continue to retain jurisdiction over the parties in the event there is any violation of the Permanent Injunction by the defendant or any other persons acting on his behalf.

Each party shall bear their own costs.

IT IS SO ORDERED.

_____
DISTRICT COURT JUDGE

APPROVED:

MARTIN, PRINGLE, OLIVER,
   WALLACE & BAUER, L.L.P.

By _____  #22044
for : Jeff C. Spahn, Jr. (#11775)
   *Attorneys for the Plaintiffs,*

_____
DONOVAN K. HAVNEN
Defendant

4

Raytheon Aircraft Company

# Raytheon Aircraft Company

**Service/ Support**

▼ Home    ▼ About Us    ▼ Aircraft    ▼ Government    ▼ Service/ Support    ▼ Jobs    ▼ Investor Relations    ▼ Press Office    ▼ Contact Us

Home
Register/Log-In
Service Information
REPS
Technical Data
Non Technical Data
Kit Catalog
REPS Online SBL
REPS Online Manuals
User Maintenance
Forms
Binders
FAQ'S
Airworthiness Directives

Log In

# Technical Publications
## Recently Mailed Pubs

**Note:** Click a Heading Once for Ascending Order
Click the same Heading again for Descending Order

| Part Number | Mail Description | Rev Date | Mail Date |
|---|---|---|---|
| SB 24-3713 | (M) Electrical Power - Generator Control Unit Installation (Beechjet) | Nov 2005 | 11/7/2005 |
| SB 25-3689 | (M) Equipment/Furnishings - Cabin Swiveling Chair Frame Seat Modification (Beechjet) | Nov 2005 | 11/7/2005 |
| SB 53-3734 | (M) Fuselage - Inspection for Drainage at Frame 17A (Hawker 800XP) | Nov 2005 | 12/5/2005 |
| SB 53-3765 | (M) Fuselage - Spigot Fitting Bearing Inspection (Premier) | Nov 2005 | 11/18/2005 |
| SB 29-3759 | (M) Hydraulic Power - Inspection of Hydraulic Lines for Possible Chafing (1000 Series) | Dec 2005 | 12/19/2005 |
| SB 33-3755 | (M) Lights - Inspection of Emergency Lighting Fuses (Hawker 800XP) | Nov 2005 | 11/16/2005 |
| SB 01-3392 Rev 7 | (O) Certification Documents - To Introduce the Conversion of Series 800B to Series 800A Aircraft | Nov 2005 | 11/23/2005 |
| SB 24-3712 Rev 1 | (O) Electrical Power - Alternator Control Relay Jumper (Baron) | Nov 2005 | 11/1/2005 |
| SB 34-3766 | (O) Navigation - F1000 Flight Data Recorder (FDR) Modification (1900D) | Dec 2005 | 12/12/2005 |
| SB 22-3764 | (R) Autoflight - Modification of FCC-4007 Cards (Beechjet/Hawker 400XP) | Dec 2005 | 12/30/2005 |
| SB 33-3748 | (R) Lights - Emergency Lighting Wire Modification (Hawker 800XP) | Dec 2005 | 12/1/2005 |
| CM-1000-V3 REV 5 | 1000 CREW MANUAL - FLYING/HANDLING | SEPT 2005 | 10/13/2005 |
| MS-125-I/400 REV 5 | 125 SERIES 1 THRU 400 MAINTENANCE SCHEDULE REVISION | NOV 2005 | 12/27/2005 |
| REPS-125-1 REV 8 | 125-1 SERIES REPS MAINTENANCE LIBRARY | DEC 2005 | 12/20/2005 |
| REPS-125-3 REV 8 | 125-3 SERIES REPS MAINTENANCE LIBRARY | DEC 2005 | 12/20/2005 |
| REPS-125-400 REV 8 | 125-400 SERIES REPS MAINTENANCE LIBRARY | DEC 2005 | 12/20/2005 |
| MS-125-600 REV 7 | 125-600 MAINTENANCE SCHEDULE | NOV 2005 | 12/22/2005 |
| CD16900015G5 | 19/23/24 SHOP MANUAL | NOV 2005 | 11/23/2005 |
| CD114021-11B8 | 1900 SERIES COMPONENT MAINTENANCE MANUAL | OCT 2005 | 11/17/2005 |

| Part Number | Description | Date | Posted |
|---|---|---|---|
| 114-590021-11B8 | ON CD 1900 SERIES COMPONENT MAINTENANCE MANUAL REV | 31 Oct 2005 | 11/16/2005 |
| MC 73 | 1900 Series Model Communique | Nov 23, 2005 | 12/5/2005 |
| 114-590021-9B16 | 1900 SERIES STRUCTURAL REPAIR MANUAL REV | 31 OCT 2005 | 11/17/2005 |
| 114-590021-7B20 | 1900/1900C MAINTENANCE MANUAL REV | 31 OCT 2005 | 11/16/2005 |
| 114-590021-7B TR 27-14 | 1900/1900C MAINTENANCE MANUAL TEMP REV | NOV 2005 | 11/14/2005 |
| REPS-1900/C REV 21 | 1900/1900C REPS MAINTENANCE LIBRARY | NOV 2005 | 11/14/2005 |
| 114-590021-5F3 | 1900C/ILLUSTRATED PARTS CATALOG REVISION | 31 OCT 2005 | 11/16/2005 |
| 114-590021-59D3 | 1900C ILLUSTRATED PARTS CATALOG REVISION | 31 OCT 2005 | 11/16/2005 |
| 129-590000-3E15 | 1900D FLIGHT MANUAL REVISION | DEC 2005 | 1/5/2006 |
| 129-590000-3E14 | 1900D FLIGHT MANUAL REVISION | SEPT 2005 | 10/19/2005 |
| 129-590000-11D3 | 1900D ILLUSTRATED PARTS CATALOG REVISION | 31 OCT 2005 | 11/17/2005 |
| 129-590000-15A39 | 1900D MAINTENANCE MANUAL REVISION | 31 OCT 2005 | 11/16/2005 |
| 129-590000-15 TR 27-19 | 1900D MAINTENANCE MANUAL TEMP REVISION | NOV 2005 | 11/14/2005 |
| REPS-1900D REV 23 | 1900D REPS MAINTENANCE LIBRARY | OCT 2005 | 10/21/2005 |
| CD10100097-9A28 REV 4 | 300/300LW MAINT MANUAL ADDING TR 27-3 | OCT 2005 | 11/4/2005 |
| 36-590001-9A28 | 33, 35, 36 MAINTENANCE MANUAL REV | 31 AUG 2005 | 11/14/2005 |
| 36-590001-1H2 | 36 SERIES ILLUSTRATED PARTS CATALOG REVISION | 30 SEPT 2005 | 11/10/2005 |
| REPS-36/58 REV 15 | 36/58 REPS MAINTENANCE LIBRARY | NOV 2005 | 11/3/2005 |
| 128-590001-237 REV 2 | 400A FMS - OPERATION WITH TYPE I, TYPE II AND/OR TYPE IV DEICING/ANTI-ICING FLUID (APPLIES TO AFMs: 128-590001-91, 128-590001-95, 128-590001-107, 128-590001-109, 128-590001-167, 128-590001-169) | 19 SEPT 2005 | 10/13/2005 |
| 140-590032-0053 REV 1 | 800XP PRO LINE 21 AFM SUPPLEMENT - COLLINS FMS-6000 FLIGHT MANAGEMENT SYSTEM VERSION 3.0.3 | 17 NOV 2005 | 12/27/2005 |
| 140-590032-0013A10 | 800XP PRO LINE 21 AMM (V1-V2-V3) REVISION | NOV 2005 | 12/22/2005 |
| CD1400032-0005A3 REV 1 | 800XP PRO LINE 21 FAA AFM ON CD (INCLUDES TC 1, TC 12, TC & TC 13 - ADDS TC 14) | NOV 2005 | 11/23/2005 |
| 140-590032-0005 TC 12 ISS 2 Z123 | 800XP PRO LINE 21 FAA AFM TEMP CHANGE - APPROVED FOR AIRCRAFT REGISTERED IN EU COUNTRIES, BRAZIL AND CANADA | 08 NOV 2005 | 12/9/2005 |
| 140-590032-0005 TC 14 | 800XP PRO LINE 21 FAA AFM TEMP CHANGE - REVISED TEXT FOR THE DEFINITION OF V MCG AND V 1 SPEEDS. | 03 NOV 2005 | 11/15/2005 |
| 140-590032-0005 TC 12 ISS 2 | 800XP PRO LINE 21 FAA AFM TEMP CHANGE - REVISED THE REQUIRED OPERATIONAL EQUIPMENT INSTALLATION FOR OPERATIONS IN EUROPEAN P-RNAV AIRSPACE | 08 NOV 2005 | 11/15/2005 |
| 140-590032-0005 TC 15 | 800XP PRO LINE 21 FAA AFM TEMPORARY CHANGE | 15 DEC 2005 | 1/3/2006 |
| CD1400032-0009B1 | 800XP PRO LINE 21 PILOTS CHECK LIST ON CD | SEPT 2005 | 10/27/2005 |
| 140-590032-0009B1 | 800XP PRO LINE 21 PILOTS CHECK LIST REVISION | SEPT 2005 | 10/27/2005 |
| CD990014F5 | 99 SERIES AIRLINER ILLUSTRATED PARTS CATALOG (MANUAL DATED 10 APR 1987) | OCT 2005 | 10/20/2005 |
| CD990028A5 | 99 SERIES AIRLINER WIRING DIAGRAM & ELECTRICAL SYSTEMS MANUAL ON CD (MANUAL DATED 7 APR 2000) | OCT 2005 | 10/19/2005 |
| 35-590102-11C3 | A36/B36TC WIRING DIAGRAM MANUAL REVISION | 31 AUG 2005 | 11/8/2005 |
| AFMS-1000 REV 8 | AIRCRAFT FLEXIBLE MAINT SCHEDULE REVISION 8 | NOV 2005 | 12/22/2005 |
| AFMS-125-700 REV 5 | AIRCRAFT FLEXIBLE MAINTENANCE SCHEDULE | NOV 2005 | 12/27/2005 |

Raytheon Aircraft Company

| | | | |
|---|---|---|---|
| 101-590010-465 | B200 & B200C POH SUPPLEMENT - WING FATIGUE LIMITATIONS (ROYAL NEW ZEALAND AIR FORCE) - FOR POH/AFM 101-590010-147C | SEPT 2005 | 10/24/2005 |
| 101-590010-425A3 | B200/B200C AFM/POH REVISION | OCT 2005 | 12/27/2005 |
| 130-590031-215 | B300/B300C MAINTENANCE MANUAL REV | 31 OCT 2005 | 11/30/2005 |
| 130-590031-11A19 | B300/B300C SUPPLEMENT FOR JACB | DEC 2005 | 1/3/2006 |
| 58-590000-19F2 | B55/E55, 58 IPC REVISION | 30 SEPT 2005 | 11/4/2006 |
| CD580000-19F2 | B55/E55/58 ILLUSTRATED PARTS CATALOG ON CD | 30 SEPT 2005 | 11/23/2005 |
| 58-590001-1 | BARON G58 SHOP MANUAL SUPPLEMENT | 30 NOV 2005 INITIAL ISSUE | 12/20/2005 |
| 90-590024-11C9 | C90A/B & C90GT WIRING DIAGRAM MANUAL REV | 28 OCT 2005 | 11/30/2005 |
| 98-38100E | C90B/C90SE (MODEL C90A) PASSENGER BRIEFING CARD | NOV 2005 | 11/3/2005 |
| 90-590024-115 | C90GT PASSENGER BRIEFING CARD | NOV 2005 | 11/3/2005 |
| 90-590024-111 | C90GT PILOTS OPERATING HANDBOOK AND FAA APPROVED AIRPLANE FLIGHT MANUAL | DEC 2005 | 12/20/2005 |
| CD990031-1B5 | C99 AIRLINER ILLUSTRATED PARTS CATALOG (MANUAL DATED 6 MAR 1987) | OCT 2005 | 10/19/2005 |
| CD990030-5B2 | C99 AIRLINER WIRING DIAGRAM MANUAL ON CD (MANUAL DATED 13 FEB 1987) | OCT 2005 | 10/20/2005 |
| 101-590037-101 REV 1 | FMS - WING FATIGUE LIMITATIONS | DEC 2005 | 1/3/2006 |
| 128-590001-303 | FMS OPERATION ON WET OR CONTAMINATED RUNWAYS FOR AIRPLANES OPERATING IN ACCORDANCE WITH JOINT AVIATION REQUIREMENTS (JAR-OPS 1) FOR 16,300 POUND GROSS TAKEOFF WEIGHT AIRCRAFT. | 6 SEPT 2005 | 10/14/2005 |
| 128-590001-291 REV 1 | FMS OPERATION ON WET OR CONTAMINATED RUNWAYS FOR AIRPLANES OPERATING IN ACCORDANCE WITH JOINT AVIATION REQUIREMENTS (JAR-OPS 1). | 6 SEPT 2005 | 10/14/2005 |
| 36-590002-71 | G36 BONANZA AVIONICS WIRING DIAGRAM MANUAL (INITIAL ISSUE) | 31 AUG 2005 | 11/8/2005 |
| 36-590001-15 | G36 FAA APPROVED FLIGHT MANUAL/PILOTS OPERATING HANDBOOK WITH GARMIN AVIONICS. NOTE: THIS MANUAL HAS NOT BEEN APPROVED FOR AIRCRAFT REGISTERED IN THE EUROPEAN UNION COUNTRIES OR BRAZIL | 18 OCT 2005 | 10/24/2005 |
| 36-590001-11A1 | G36 MAINTENANCE MANUAL REVISION FOR SUPPLEMENT FOR A/C WITH GARMIN G1000 EQUIPMENT INSTALLED. NOTE: THIS MANUAL HAS NOT BEEN APPROVED FOR AIRCRAFT REGISTERED IN EU COUNTRIES, BRAZIL OR CANADA. | 28 OCT 2005 | 11/8/2005 |
| 36-590001-13 | G36 WIRING DIAGRAM MANUAL (INITIAL ISSUE) | 31 AUG 2005 | 11/8/2005 |
| 58-590001-3 | G58 BARON ELECTRICAL WIRING DIAGRAM | INITIALISSUE / 30 NOV 2005 | 12/20/2005 |
| 58-590000-67 | G58 FAA APPROVED AIRPLANE FLIGHT MANUAL/PILOTS OPERATING HANDBOOK | NOV 2005 INITIAL ISSUE | 12/8/2005 |
| 58-590000-67 TC 1 | G58 POH & AFM TEMPORARY CHANGE | DEC 2005 | 12/20/2005 |
| H.S.1.22-229 | H.S. 1.22 FLIGHT MANUAL TEMPORARY REVISION 29 | NOV 2005 ISSUE 1 | 12/22/2005 |
| REPS-1000 REV 8 | HAWKER 1000 REPS MAINTENANCE LIBRARY | DEC 2005 | 12/15/2005 |
| REPS-600/700 REV 9 | HAWKER 600/700 REPS MAINTENANCE LIBRARY | DEC 2005 | 12/20/2005 |
| REPS-800/800XP REV 30 | HAWKER 800/800XP REPS MAINTENANCE LIBRARY | DEC 2005 | 12/15/2005 |

Raytheon Aircraft Company

| | | |
|---|---|---|
| 140-590032-0063 Z123 | HAWKER 800XP PRO LINE 21 AFM IFIS-5000 SUPPLEMENT (APPROVED FOR AIRPLANES REGISTERED IN EU COUNTRIES | 17 AUG 2005 |
| REPS-200 REV 24 | KING AIR 200 SERIES REPS MAINTENANCE LIBRARY | NOV 2005 |
| 101-590010-467 | KING AIR 200 SIRM SUPPLEMENT (ROYAL NEW ZEALAND AIR FORCE) | 30 SEPT 2005 |
| 101-590010-473 | KING AIR 200T STRUCTURAL INSPECTION REPAIR MANUAL SUPPLEMENT | 30 DEC 2005 |
| REPS-300 REV 22 | KING AIR 300 REPS MAINTENANCE LIBRARY | NOV 2005 |
| REPS-90 REV 21 | KING AIR 90 SERIES REPS MAINTENANCE LIBRARY | NOV 2005 |
| MC 2005-04 | King Air Communique - Ultra Quiet System Software | Nov 4, 2005 |
| 98-39006C1 | KING AIR STRUCTURAL INSPECTION & REPAIR MANUAL REVISION | OCT 2005 |
| MC 32-40 | Model Communique - Landing Gear Overhaul (Hawker) | 12/22/2005 |
| CDMODCOMM-12/05 | MODEL COMMUNIQUE CD | DEC 2005 |
| 390-590001-0081C | PREMIER 390 AIRWORTHINESS LIMITATIONS MANUAL REISSUE | OCT 2005 |
| REPS-390 REV 16 | PREMIER 390 REPS MAINTENANCE LIBRARY | DEC 2005 |
| 390-590001-0021B | PREMIER CRASH, FIRE & RESCUE SAFETY CARD | NOV 2005 |
| 390-590001-0003C TC 2 | PREMIER FAA APPROVED AFM TEMPORARY CHANGE | 15 OCT 2005 |
| 390-590001-0039 REV 2 | PREMIER FMS - A/C OPERATING ON THE GERMAN REGISTRY | DEC 2005 |
| 390-590001-0095 | PREMIER FMS - PIA AVIONICS SUPPLEMENT FOR AIRCRAFT REGISTERED INTERNATIONALLY | DEC 2005 |
| 390-590001-0015A15 | PREMIER MAINTENANCE MANUAL REVISION | OCT 2005 |
| MC 15 | Premier Model Communique | September 2005 |
| 390-590001-0009C | PREMIER PASSENGER BRIEFING CARD | SEPT 2005 |
| 390-590001-0019A2 | PREMIER SRM REVISION | DEC 2005 |
| SC 262 | Safety Communique - Aisle Width & Emergency Egress (Hawker) | Oct 2005 |
| SC 265 | Safety Communique - Inspection of Flight Control System & Rigging (King Air) | Nov 2005 |
| SC 263 | Safety Communique - Inspection of Hydraulic Lines for Possible Chafing (Hawker 1000 Series) | Oct 2005 |
| SC 266 | Safety Communique - Rudder Trim Tab Forward Cable Installation (1900 Series) | Nov 2005 |
| CDSAFECOMM-11/05 | SAFETY COMMUNIQUE CD | NOV 2005 |
| CD98-39006C1 | STRUCTURAL INSPECTION AND REPAIR MANUAL ON CD | OCT 2005 |
| 101-590010-447B | STRUCTURAL INSPECTION AND REPAIR MANUAL SUPPLEMENT | 30 DEC 2005 |
| SRM-125-800 REV 33 | STRUCTURAL REPAIR MANUAL REV | NOV 2005 |

| | |
|---|---|
| | 12/9/2005 |
| | 11/29/2005 |
| | 10/27/2005 |
| | 1/3/2006 |
| | 11/28/2005 |
| | 11/29/2005 |
| | 11/8/2005 |
| | 12/1/2005 |
| | 1/4/2006 |
| | 12/9/2005 |
| | 12/21/2005 |
| | 12/16/2005 |
| | 11/3/2005 |
| | 10/20/2005 |
| | 12/20/2005 |
| | 12/20/2005 |
| | 12/22/2005 |
| | 10/17/2005 |
| | 11/3/2005 |
| | 12/21/2005 |
| | 10/31/2005 |
| | 11/8/2005 |
| | 10/24/2005 |
| | 11/14/2005 |
| | 11/2/2005 |
| | 12/1/2005 |
| | 1/3/2006 |
| | 12/22/2005 |

Copyright © 2005 Raytheon Aircraft Company. All rights reserved.

FILE COPY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

FILED

DEC - 7 2005

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| COLGAN AIR, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:05cv213 |
| | ) | |
| RAYTHEON AIRCRAFT COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This negligence and breach of warranty action arises out of the crash of a Beech 1900D aircraft, FAA Registration No. N240CJ ("Aircraft N240CJ"), off the Massachusetts coast on August 26, 2003. It is brought by Colgan Air, Inc. ("Colgan"), the air carrier that leased the aircraft, against Raytheon Aircraft Company ("Raytheon"), the manufacturer of the aircraft and the issuer of the aircraft's maintenance manual. Although not named, the real plaintiff in interest is AIG, the entity that, pursuant to the lease arrangement, issued a policy insuring against the loss of the aircraft and then, when the aircraft crashed, paid the proceeds of the policy to the lessee. AIG thereby became subrogated to any rights Colgan might have with respect to the loss of the aircraft.

Raytheon has moved for summary judgment, and Colgan has moved for partial summary judgment. The essential dispositive questions presented are:

(1)    whether the waiver of right contained in the Used Airliner Warranty provided by Raytheon to Colgan pursuant to the lease agreement is effective to bar claims for

-1-

loss of the aircraft; and

(2)    if so, whether the waiver of rights also precludes Colgan's claims based on a defective maintenance manual on the ground that the maintenance manual is an integral part of the aircraft.

## I.[1]

The plaintiff, Colgan, is a regional air carrier incorporated and headquartered in Virginia. It seeks to recover damages allegedly sustained as a result of the crash of an aircraft it leased from Raytheon Aircraft Credit Corporation ("RACC"), and RACC's wholly owned subsidiary Raytheon Airline Aviation Services LLC ("RAAS"). The aircraft was manufactured by the defendant, Raytheon, a Kansas corporation, which also issued the maintenance manuals for the aircraft. RACC is sister company of Raytheon as both are wholly owned subsidiaries of Raytheon Holdings, Inc. RAAS is a wholly owned subsidiary of RACC.

On August 25 and August 26, 2003, Colgan's maintenance employees replaced Aircraft N240CJ's forward elevator trim tab cable after the existing cable had come off of the drum and kinked as a result of earlier maintenance performed on the aircraft. While the parties dispute the cause, it is undisputed that Colgan's maintenance personnel, using the aircraft maintenance manual then in effect, incorrectly installed the trim tab cable such that the trim tabs operated in reverse. As a result, when cockpit controls were used to set the trim tabs at a nose up position, the trim tabs actually moved to a nose down position. This dangerous condition was not discovered by Colgan's maintenance crew during their post-maintenance operational checks, nor was it discovered by Colgan's pilots in their checks before attempting their ill-fated flight. Thus,

---

[1]The material facts set forth here are undisputed. Where the parties dispute facts, they are either immaterial or construed in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

when the pilots attempted take-off, the reversal of the trim tabs caused the aircraft to crash off the coast of Hyannis, Massachusetts, killing both of the pilots and destroying the aircraft.

Colgan assigns the blame for the accident to an allegedly defective maintenance manual provided to it by Raytheon. The manual at issue, Revision 9 of the Raytheon Electronic Publications Program Maintenance Library for the Beech 1900 Aircraft ("REPS Manual"), was provided in electronic format and received by Colgan on or about May 23, 2003.[2] The REPS Manual contained a section within Chapter 27 entitled "Flight Controls-Description and Operation" which included the following language:

> Proper winding of the cables on the pedestal and actuator drums, is shown in . . . the Elevator Tab Control Cable Winding illustration in Chapter 27-30-04 for elevator tabs, ensures against crossing the cables and causing improper trim tab movement. (underline in original)

Clicking on the underlined portion of the language above led to Figure 201 of Chapter 27-30-04, which depicted the forward trim cable drum backwards, or 180 degrees from the installed position, and shows the open, keyed side of the drum, instead of the flat side. Colgan claims that its maintenance crew followed the REPS Manual's directions as depicted in Figure 201 resulting in the reversal of the action of the elevator manual trim system.

Colgan also asserts that the table of contents for Chapter 27 failed to contain a reference

---

[2]Raytheon issued both paper maintenance manuals and maintenance manuals in electronic format, and Colgan used both types of manuals in connection with maintaining their fleet of approximately seventeen 1900 Series aircraft. The substantive content of the electronic and paper manuals was identical. With respect to the maintenance performed on the trim tab cables at issue here, Colgan contends that the REPS Manual was used exclusively and the analysis proceeds on that assumption.

or hyperlink to an operational check that would have revealed the problem with the trim tabs.[3]
Because Colgan's maintenance personnel did not locate or find the appropriate operational
check, which was included in both the paper and REPS versions of the manual, they proceeded to
devise their own check. Their check was not sufficient to disclose the problem with Aircraft
N240CJ's elevator trim system. Colgan contends that these two alleged defects with the REPS
Manual—the reverse drawing and the missing hyperlink—proximately caused the crash.[4] It is
worth noting that these alleged defects appeared in all relevant versions of the manual, both
electronic and paper.

Raytheon disputes that these alleged defects in the manual caused the crash, and argues
that the blame for the reversed trim tab controls rests squarely on the shoulders of Colgan's
maintenance and flight crews. The error in Figure 201, Raytheon claims, should have been

---

[3]A hyperlink is a reference in a hypertext file such as the REPS Manual to another
location in the file. Hyperlinks are typically activated by clicking on the highlighted text, which
will cause the display of the target link. Revision 10 of the REPS Manual, which Colgan had not
yet received, did contain a hyperlink to the operational check.

[4]Subsequent to the crash, the Federal Aviation Administration ("FAA") issued
Airworthiness Directive 2003-20-10, which made the following comment on the maintenance
manuals used to service Beechcraft 1900 series aircraft:

> The figures in the applicable maintenance manuals depict the elevator trim cable
> drum at 180 degrees from the installed position and show the open, keyed side of
> the drum instead of the flat side of the drum. Following these figures when
> installing the control cables on the forward control cable drum could reverse the
> action of the elevator manual trim system; and

> The existing procedure can be enhanced by visually confirming the trim wheel
> position and the trim tab position are consistent. Such a check would detect and
> correct any problems with the elevator trim system installation before problems
> occur during operation.

-4-

immediately apparent to Colgan's maintenance crew as the drum depicted in Figure 201 is patently backwards from the actual drum, which shows the flat side, and cannot be reversed in the aircraft itself. In addition, Raytheon contends that Colgan's maintenance crew committed independent error in crossing the cables through the back of the aircraft, without which the error in the manual would have been obvious. Further, Raytheon argues that the failure of Colgan's mechanics to perform an adequate operational check cannot reasonably be ascribed to the missing hyperlink, since Colgan's mechanics knew that they needed to perform the operational check, and indeed had done so in the past. Raytheon also argues that the missing hyperlink is irrelevant because the section of the manual describing the correct operational check could have been located without the hyperlink. Moreover, Raytheon argues that the pilots were also negligent in not discovering the defective trim tabs in their pre-flight check.

In resolving Raytheon's motion for summary judgment, it is unnecessary to reach and decide the parties' dispute about the cause of the accident. This is so because Raytheon's summary judgment motion contends that the terms of the warranty and waiver of rights provided pursuant to the lease of Aircraft N240CJ releases any claims Colgan may have against Raytheon for loss of the aircraft. Accordingly, the analysis herein proceeds on the premise that the alleged defects in the maintenance manual existed and caused the crash. The facts material to the disposition of Raytheon's summary judgment motion are set forth in greater detail in the following enumerated paragraphs.

**The Definitive Agreement**

1.  Aircraft N240CJ was leased to Colgan pursuant to a definitive agreement ("Definitive Agreement") signed by Colgan, RACC, and RAAS on August 1, 2002.

2.       Article 3 of the Definitive Agreement provided for the lease of certain identified used

Beechcraft 1900D Airliner aircraft, and requires that certain support items were "to be

provided to Colgan as part of this transaction." Accordingly, RAAS was required to

deliver one copy of the following support items: a Pilot's Operating Handbook, an FAA

Approved Aircraft Flight Manual, a Parts Catalog, an Electrical Wiring Diagram Manual,

a Radio and Electronic Wiring Diagram, a Structural Repair Manual, a Structural

Inspection Manual, a Component Maintenance Manual, and most importantly for present

purposes, a Maintenance Manual. As discussed more fully below, Colgan disputes ever

having received a maintenance manual in relation to the Definitive Agreement.

3.       Article 10.16 of the Definitive Agreement contained a clause entitled "Entire Agreement"

which provided:

> This Agreement contains the entire agreement of the parties and
> supercedes any and all prior agreements between the parties,
> written or oral, with respect to the transactions hereby
> contemplated, and specifically supercedes the comprehensive lease
> proposal given by RACC and RAAS to Colgan, dated March 15,
> 2002. There are no verbal understandings, agreements,
> representations or warranties between the parties which are not
> expressly herein set forth. This Agreement may not be changed or
> terminated orally but may only be changed by an agreement in
> writing signed by the party or parties against whom enforcement of
> any waiver, change, modification, extension, discharge or
> termination is sought.

4.       In addition to the lease of certain identified aircraft, Article 4.1 of the Definitive

Agreement grants to Colgan the option to lease up to fifteen additional used Beechcraft

1900D aircraft. These aircraft would not be specifically identified until Colgan exercised

this option.

5.   Thereafter, Colgan did exercise this option and the aircraft here in issue—Aircraft N240CJ—was the 8th or 9th option aircraft.

**The Lease Agreement, Side Letter Agreement and Used Airliner Warranty for Aircraft N240CJ**

6.   With certain exceptions not at issue in this case, these aircraft were to be leased pursuant to the terms and conditions of a form lease attached to the Definitive Agreement, and a lease agreement ("Lease Agreement") identical to this form was in fact signed by Colgan and RACC on January 3, 2003 for Aircraft N240CJ.

7.   The Lease Agreement provided that Colgan would lease Beechcraft 1900D Airliner aircraft from RACC in accordance with the terms and conditions set forth in the Definitive Agreement.

8.   Article 5 of the Lease Agreement was titled "Warranties and Lessor's Disclaimer." It provided the following relevant disclaimer:

> **5.2** LESSEE ACKNOWLEDGES AND UNDERSTANDS THAT ANY MANUFACTURER'S WARRANTY COVERAGE OFFERED OR AVAILABLE ON THE AIRCRAFT SHALL BE THE SUBJECT OF A SEPARATE CONTRACTUAL AGREEMENT BETWEEN LESSEE AND THE AIRCRAFT MANUFACTURER.

9.   In addition to this reference to the manufacturer's contract, Article 5 of the Lease Agreement made clear that Colgan and not RACC was to bear the risk for any loss of aircraft N240CJ.[5]

---

[5]The remainder of Article 5 provided as follows:

5.3 LESSEE ACKNOWLEDGES AND UNDERSTANDS LESSOR IS NOT THE MANUFACTURER OF THE AIRCRAFT TO BE LEASED

-7-

10.   Importantly, Article 10 of the Lease Agreement specifically addressed "Loss or Damage"

to Aircraft N240CJ, and states in 10.1 in pertinent part that Colgan "assumes and shall

bear the entire risk of loss, destruction, theft, taking of or damage to the Aircraft *from*

*any cause whatsoever.*" (emphasis added)

11.   The separate manufacturer's warranty referenced in Article 5.2 of the foregoing was

provided to Colgan pursuant to a Side Letter Agreement between RAAS and Colgan

---

HEREUNDER.  THEREFORE, LESSOR LEASES THE AIRCRAFT TO
LESSEE IN AN "AS IS" AND "WITH ALL FAULTS" CONDITION.  LESSOR
MAKES NO WARRANTIES OR REPRESENTATIONS TO LESSEE, EITHER
EXPRESS OR IMPLIED, AS TO:

(A)   THE CONDITION, DESIGN, OPERATION, FITNESS FOR USE OR
      MERCHANTABILITY OF THE AIRCRAFT;

(B)   THE FITNESS OF THE AIRCRAFT FOR ANY PARTICULAR
      PURPOSE OF LESSEE;

(C)   THE AIRWORTHINESS OF THE AIRCRAFT; OR

(D)   ANY OTHER MATTER WHATSOEVER, IT BEING EXPRESSLY
      AGREED BY THE PARTIES THAT ALL RISKS RELATING TO OR
      ARISING FROM LESSEE'S USE AND OPERATION OF THE
      AIRCRAFT SHALL BE BORNE AND ASSUMED SOLELY BY
      LESSEE.

5.4 WITHOUT LIMITING THE GENERALITY OF THE FOREGOING,
LESSOR SHALL NOT BE LIABLE FOR ANY DEFECTS, EITHER LATENT
OR PATENT, IN THE AIRCRAFT NOR FOR ANY GENERAL,
CONSEQUENTIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT
LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE,
LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR FOR ANY
INTERRUPTION IN LESSEE'S BUSINESS OCCASIONED BY ITS
INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER.
LESSOR SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY
LESSEE OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF
NEGLIGENCE OR STRICT LIABILITY IN TORT.

-8-

which was signed on January 9, 2003. This side letter agreement confirmed that:

> In lieu of the standard 30-day Used Airliner Warranty, Lessee will be provided with an extended warranty, which shall start on the Lease Commencement Date and will end the earlier of: (a) ninety (90) days from the Lease Commencement Date, or (b) the date the A and B structural inspection ("Inspection") is commenced on the Aircraft. The Inspection will be paid for by Lessee and is not covered under the Used Airliner Warranty.

12.   The Side Letter Agreement further provided that with the exception of the above language the standard Used Airliner Warranty would apply to the transaction.

13.   Though the Side Letter Agreement was signed by RAAS, consistent with Article 5.2 of the Lease Agreement, the standard Used Airliner Warranty was provided by Raytheon. The Used Airliner Warranty expressly stipulates that the "law of Kansas applies to this warranty," and provides the following limited warranty:

> Subject to the limitations and conditions hereinafter set forth, Raytheon warrants, at the time of the delivery by Raytheon, each part of the Aircraft, except avionics equipment and engines . . . , to be free from (i) defects in materials or workmanship, and (ii) defects in design that in view of the state-of-the-art as of the date of manufacture should have been foreseen; provided, however, that the defect must be discovered and reported to Raytheon within thirty (30) days from the date of delivery of the Aircraft to Buyer.

Obviously, the 30 day warranty would have been extended to 90 days pursuant to the Side Letter Agreement, but otherwise the language is operable.

14.   Further, section B of this warranty makes the following limitations on Raytheon's liability:

> 3.   TO THE EXTENT ALLOWED BY APPLICABLE LAW, BUYER WAIVES AS TO RAYTHEON AND SELLER ALL OTHER WARRANTIES, WHETHER OF MERCHANTABILITY, FITNESS OR OTHERWISE. THERE ARE NO WARRANTIES WHICH EXTEND

BEYOND THE DESCRIPTION ON THE FACE HEREOF.

4.    TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE
OBLIGATIONS OF RAYTHEON SET FORTH HEREIN SHALL BE
THE EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY
HEREUNDER, AND, TO THE SAME EXTENT, NEITHER
RAYTHEON NOR SELLER SHALL BE LIABLE FOR ANY
GENERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES,
INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR
DIMINUTION OF MARKET VALUE, LOSS OF USE OR LOSS OF
PROFITS, OR ANY DAMAGES TO THE AIRCRAFT CLAIMED BY
BUYER OR ANY OTHER PERSON OR ENTITY UPON THE
THEORIES OF NEGLIGENCE OR STRICT LIABILITY IN TORT.

This warranty language was capitalized in the original to comply with any

conspicuousness requirement.

15.    The Operating Lease Proposal, which had served as the draft Definitive Agreement, had

contained an exhibit entitled 1900D Airliner Specifications.  This exhibit listed in great

detail the component parts of the 1900D Airliner series, and included under the "Service"

subheading, the following items: all available records and logbooks; service information

materials; avionics wiring diagrams; passenger briefing cards; pilots check list; and pilots

operating handbook and FAA approved airplane flight manual.

16.    Article 7 of the Lease Agreement concerned "Maintenance and Records," and provided

generally that Colgan was under an obligation to maintain Aircraft N240CJ and comply

with the regulations of the Federal Aviation Administration ("FAA").  Article 7.3

specifically addressed Colgan's obligation regarding maintenance manuals by providing

that:

> Lessee will maintain the Aircraft in accordance with the Manufacturer's
> operating, inspection and maintenance manuals or Lessee's FAA-approved
> maintenance and inspection program, and in compliance with all

applicable FAR requirements set forth under Title 14 of the Code of
Federal Regulations . . . .

17.  Article 9 concerned "Insurance" and required Colgan to obtain and carry certain specified
types of insurance coverage, including "all risk" hull insurance, insurance on Aircraft
N240CJ's engines, passenger liability, public liability and property damage liability.  Any
insurance proceeds were to be payable jointly to Colgan and RACC, however, Articles
10.2 and 10.3 set forth the procedure for payment of insurance proceeds to RACC should
there have been a "total loss" of the airplane.

**Evidence Concerning the Purchase of Maintenance Manuals by Colgan**

18.  The parties dispute whether maintenance manuals, in either paper or electronic format,
were ever received in conjunction with the lease of the aircraft, and whether Raytheon
provided any manuals free of charge pursuant to the Definitive Agreement and the Lease
Agreement.  Colgan contends that between early 2001 and the date of the accident,
Raytheon did not provide a single free maintenance manual in either paper or REPS form,
and that all manuals had been ordered and paid for independent of the Definitive
Agreement and Lease Agreement.  Colgan supports this contention with affidavits and
documents.[6]  Raytheon, too, submits affidavits and documents in support of its contrary
contention that the maintenance manuals were provided free of charge in connection with
the Lease Agreement.[7]

---

[6]Specifically, Colgan has provided three affidavits, as well as copies of purchase orders,
invoices, and check stubs said to reflect payment for a subscription of REPS Manuals in 2001
and then payment again for subscription renewals in May 2003.

[7]Raytheon supports its contentions with affidavits from its employees stating that while
Colgan did pay for some manuals, these were manuals ordered prior to the Definitive Agreement

-11-

**Colgan's Complaint**

19.  Colgan claims that defects in the REPS Manual were responsible for the crash of Aircraft N240CJ.  Though this assertion is heavily disputed, it is assumed to be true for purposes of Raytheon's summary judgment motion.  Colgan's complaint contains counts for negligence, strict liability, and breach of warranty.  They seek the following damages: (i) damages for the destruction of the aircraft; (ii) damages for expenses incurred due to the unavailability of the aircraft; (iii) lost profits due to the unavailability of the aircraft; (iv) losses due to accident cleanup expenses; (v) expenses incurred in the accident investigation; (vi) losses not covered under the insurance contract with AIGG Aviation; and (vii) legal fees and expenses.

## II.

As this is a diversity suit, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), requires that forum state law, including forum state choice of law rules, governs the substantive claims.  And, as the aircraft crashed in Massachusetts, it follows that under Virginia choice of law rules, Massachusetts law governs the claims for negligence, strict liability, and breach of express and implied warranty.  But this conclusion does not hold for any question concerning the validity and effect of the Used Airliner Warranty and the waiver of rights it contains.  On these questions, Kansas law governs, as the warranty explicitly provides that the "law of Kansas applies to this warranty."  And, Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances, none of which exist here.  *See,*

---

and that any subscriptions paid for after the signing of the Definitive Agreement were for the renewal of these manuals.

-12-

*e.g., Hitachi Credit America Corp. v. Signet Bank* 166 F.3d 614, 624 (4th Cir. 1999).

Accordingly, the validity and effect of the United Airliner Warranty will be construed according to Kansas law.

Under both Kansas and Massachusetts law, an insurer's right of subrogation is derived from the insurance contract. *Farmers Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 227 Kan. 533, 539, 608 P.2d 923, 928 (1980); *Travelers Ins. Co. v. Cremin*, 2002 WL 206357 (Mass.App.Div. 2002). An insurer claiming the right of subrogation–here, AIG–stands in the shoes of its insured–here, Colgan–and any defenses against the insured are likewise good against the insurer. *Western Motor Co., Inc. v. Koehn*, 242 Kan. 402, 405, 748 P.2d 851, 853 (1988); *Home Owners' Loan Corp. v. Baker*, 299 Mass. 158, 162, 12 N.E.2d 199 (1937).

## III.

The essential question presented by Raytheon's summary judgment motion is whether the Used Airliner Warranty, with its attendant waiver of rights, bars Colgan's claims in this case. And, the starting point in this analysis is the language of the warranty itself. By its clear terms, the warranty limits all warranty coverage to the ninety (90) day period set forth in the Side Letter Agreement[8] and further states that Colgan "WAIVES AS TO RAYTHEON AND SELLER ALL OTHER WARRANTIES, WHETHER OF MERCHANTABILITY, FITNESS OR OTHERWISE" and that "THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF."[9]

---

[8] *See supra*, Part I, paras. 11-13.

[9] This language appears here, as it did in the Used Airliner Warranty, in all capital letters to ensure its conspicuousness. *See, e.g., Geo. C. Christopher & Son, Inc. v. Kansas Paint & Color Co., Inc.*, 215 Kan. 185, 191, 523 P.2d 709, 715 (1974) (warranty disclaimers must be both

-13-

Thus, the terms of the Used Airliner Warranty make clear that Colgan may assert no warranty against Raytheon other than the explicit warranty provided for the 90 day period. To underscore this point, Section 4 of the Used Airliner Warranty explicitly provided that Colgan waived all rights to seek general, consequential, or incidental damages relating to the loss of the leased Aircraft based on any negligence or strict liability theory. This provision is central to the analysis and deserves to be set out in full, as follows:

> TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE OBLIGATIONS OF RAYTHEON SET FORTH HEREIN SHALL BE THE EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY HEREUNDER, AND, TO THE SAME EXTENT, NEITHER RAYTHEON NOR SELLER SHALL BE LIABLE FOR ANY GENERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OR LOSS OF PROFITS, OR ANY DAMAGES TO THE AIRCRAFT CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF NEGLIGENCE OR STRICT LIABILITY IN TORT.[10]

Thus, the Used Airliner Warranty makes unmistakably clear (i) that Colgan has no warranty rights against Raytheon except the 90 day express warranty (which had expired by the time of the crash); and (ii) that Colgan waived all claims based on negligence or strict liability in tort it might have had against Raytheon. In so doing, the Used Airliner Warranty is fully consistent with other aspects of the Lease Agreement that embody the parties' intent, as reflected in Article 10.1 of the Lease Agreement, that Colgan alone bore the risk of loss of the aircraft

---

in writing and conspicuous).

[10] *See supra* Part I, para. 14.

-14-

"from any cause whatsoever."[11]  The parties' intent in this regard is further confirmed by the

Article 10.2 and 10.3 requirement for Colgan to purchase an insurance policy payable to RACC

in the event of "total loss" of the aircraft.  In sum, the plain terms of the Used Airliner Warranty

bar Colgan's claims here, and in so doing give full effect to the parties' risk allocation bargain.[12]

This does not end the analysis, however, because Colgan contends that its claims are not

based on the defect in Aircraft N240CJ, but rather on defects in the aircraft's maintenance

manuals.  Specifically, Colgan contends that the aircraft's maintenance manual is a separate and

distinct product from the aircraft because it was purchased and paid for separately.  Given this,

Colgan argues that the Warranty waiver is ineffective to bar claims based on alleged defects in

the maintenance manual.  Raytheon responds with the argument that the manual and the aircraft

are an integral, single product, as (i) the aircraft cannot be used as an airliner without the manual;

and (ii) the manual has no use other than making possible the use of the aircraft.  In other words,

Raytheon argues the aircraft cannot be flown or used as an airliner unless it is maintained

---

[11] The Used Airliner Warranty's waiver of claims based on negligence or strict liability rights applies "to the extent allowed by applicable law," as the Warranty itself notes.  The parties have cited no Kansas law nor advanced any argument that Kansas law would not allow these provisions of the Used Airliner Warranty to be given full effect.

[12] A different conclusion might obtain, however, had the alleged defects in the maintenance manual occurred for the first time in a revision issued by Raytheon subsequent to the lease of the aircraft in question and the issuance of the Used Airliner Warranty.  This is so because under Kansas law, Colgan could not waive its right to sue over defects of which, by definition, it could not have been aware at the time of the waiver.  *See City of Topeka v. Watertower Place Development Group*, 265 Kan. 148, 158, 959 P.2d 894, 901 (1998) ("Waiver implies that a party *voluntarily and intentionally gives up a known right* or takes some action inconsistent with the contractual right.") (emphasis added); *D.M. Ward Const. Co., Inc. v. Electric Corp. of Kansas City*, 15 Kan.App.2d 114, 117, 803 P.2d 593, 596 (Kan. App. 1990) (same).  As already noted, however, because these defects long preceded the Lease Agreement and Used Airliner Warranty, Kansas law presents no obstacle to the enforcement of the parties bargained-for risk allocation.

-15-

pursuant to Raytheon's maintenance manual.

The validity and effect of Colgan's waiver of tort and warranty rights in the Used Airliner Warranty must be governed by Kansas law as it pertains to the scope and nature of that warranty. As it happens, no Kansas court has yet has addressed this issue.[13]  Although Kansas courts have been silent on this issue, other courts have addressed this essential issue, virtually all of which have reached the conclusion that a product, such as an aircraft, and its maintenance or other operational manuals are a single, integrated product.[14]  The rationale for this result is obvious: Flight and maintenance manuals for aircraft are indispensable to maintain the aircraft's

---

[13]This is also an issue of first impression under Massachusetts law.

[14]*See, e.g., Schamel v. Textron-Lycoming, a Div. of Avco Corp.*, 1 F.3d 655, 657 (7th Cir. 1993) ("The provision of service manuals and other sources of service information is not a separate and discrete, post-sale undertaking ...; rather, such information is generally necessary to satisfy the manufacturer's duty to warn."); *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1219-20 (10th Cir. 1991) (The Indiana Products Liability Act "does not apply to a transaction that, by its nature, involves wholly or predominantly the sale of a service rather than a product. We feel ... that the instructions [in the flight manual] are not a product as defined by the act."); *Alter v. Bell Helicopter Textron, Inc.*, 944 F.Supp.531, 540 (S.D. Tex. 1996) (helicopter manual same product as helicopter under Texas products liability law).  Courts addressing this issue outside the aviation context have reached the same conclusion.  *See Jordan v. Sandwell*, 189 F.Supp.2d 406, 416-17 (W.D. W.Va. 2002) (dealing with instruction manual for contaminated water cleaning system, the court stated that "[t]he great majority of the cases find that a manual is an inseparable part of the system or product that the plaintiff complains was defective."); *Kochins v. Linden-Alimak, Inc.*, 759 F.2d 1128, 1134-35 (6th Cir. 1986) (manual for hoist not separate product from hoist itself); *Sea-Land Service, Inc. v. General Electric Co.*, 134 F.3d 149 (3d Cir. 1998) (replacement engine rod not separate product from engine even though rod was purchased after engine).

The sole case holding that an airplane manual is a separate product from its corresponding aircraft is *Driver v. Burlington Aviation, Inc.*, 110 N.C.App.519, 430 S.E.2d 476 (2002).  That case is neither controlling nor persuasive.  It is not controlling because it interpreted North Carolina law, not Kansas law.  It is not persuasive because the *Driver* court did not even acknowledge, let alone distinguish either the pertinent FAA regulation or any of the myriad of cases reaching the contrary result that an aircraft's manuals are inseparable from the aircraft itself for liability purposes.

-16-

airworthiness certificate without which the aircraft cannot be flown or used. Indeed, these

manuals have no other use than to allow the aircraft to qualify for an airworthiness certificate and

to be flown. Moreover, these manuals are highly specific to particular aircraft models. The

Ninth Circuit in *Caldwell v. Enstrom Helicopter Corp.* expressed this single-product rationale in

the following terms:

> [A] flight manual is an integral part of the general aviation aircraft product that a
> manufacturer sells. It is not a separate, general instructional book (like a book on
> how to ski), but instead is detailed and particular to the aircraft to which it
> pertains. The manual is the 'part' of the aircraft that contains the instructions that
> are necessary to operate the aircraft and are not separate from it. 230 F.3d 1155,
> 1157 (9th Cir. 2000).

Similarly, the Tenth Circuit reached the same result in a case involving a flight manual,

holding that the flight manual and an aircraft were a single product for liability purposes under

Indiana law. *See Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220 (10th Cir. 1991)

There, the Tenth Circuit found persuasive on this point a Sixth Circuit decision applying

Tennessee law and holding that an instruction manual for a hoist was inseparable from the hoist

itself for product liability purposes. Quoting the Sixth Circuit, the Tenth Circuit held that *"the*

*instructions themselves are not a 'product' [separate from the aircraft] as defined by the act."*

(emphasis in original). *Id.* (quoting *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1135 (6th

Cir. 1986)).

Further support for the conclusion that Raytheon's 1900C-D maintenance manuals are

part of the aircraft is found in the pertinent Federal Aviation Regulations. These regulations,

promulgated by the Federal Aviation Administration ("FAA"), require operators to obtain

airworthiness certificates for aircraft before they can be flown. The aircraft airworthiness

standards, which are codified at 14 C.F.R. § 23, *et seq.*, apply to a broad range of aircraft and require any person or entity seeking to operate an aircraft, *inter alia*, to obtain an airworthiness certificate. *See* 14 C.F.R. § 23.1 (requiring operator of "normal, utility, acrobatic, and commuter" aircraft to obtain airworthiness certificates). This certificate certifies that the aircraft in issue has met certain threshold requirements to be able to be flown safely. The regulations further provide that, as a condition of maintaining an airworthiness certificate, an aircraft operator must take steps to ensure the continued airworthiness of the aircraft for which the certificate was issued. *See* 14 C.F.R. § 23.1529, Appx. G. This means that airworthiness is contingent on the operator's demonstration that the aircraft has been maintained in accordance with the latest revision and changes to the manufacturer's maintenance manual. In other words, an aircraft's maintenance manual is essential to maintaining an aircraft's airworthiness: No aircraft can lawfully be flown and used as an airliner unless it is maintained, as required by FAA regulations, in accordance with the manufacturer's maintenance manual.

Given this, an aircraft's maintenance manual is analogous to an "on-off" switch that must be turned on before the aircraft can be flown. To be sure, the aircraft's maintenance manual need not be carried on board during flight, nor is it physically attached to the aircraft as is the electrical power "on-off" switch. Nonetheless, before the electrical power switch may be turned on, the "on-off" switch represented by the maintenance manual must be activated first by the aircraft's operator demonstrating that the aircraft has been maintained in accordance with the maintenance manual and is worthy of an airworthiness certificate. In sum, then, it is reasonable, as courts have found, to view an aircraft's maintenance manual as part of the aircraft and together as a single integral product.

-18-

Yet, even this does not end analysis of the question presented, because Colgan contends

that the maintenance manuals used in connection with Aircraft N240CJ cannot be part of the

aircraft since Colgan paid for or received these maintenance manuals in transactions separate

from the Lease Agreement.  The parties sharply dispute whether Colgan ever purchased manuals

separately from the Lease Agreement.  In essence, Colgan contends that between early 2001 and

the date of the accident, Raytheon did not provide any free maintenance manuals in either paper

or REPS form, and that all manuals were ordered and paid for in separate transactions.[15]

Raytheon, by contrast, claims, with affidavit support, that it provided maintenance

manuals at no extra charge for each of the 1900 series aircraft leased by Colgan pursuant to the

Definitive Agreement, including Aircraft N240CJ.  Raytheon further contends that the

subscription renewal Colgan paid for in 2003 concerned a subscription for a variety of manuals

for both 1900C and 1900D aircraft, and that this subscription predated the Definitive Agreement.

Yet, in the end, it is immaterial whether Colgan received the maintenance manuals

pursuant to a subscription it paid for in 2001 and renewed in 2003, or whether the particular

manuals in issue were provided by Raytheon free of charge.  This is so because the rationale for

holding that the aircraft's maintenance manual is a part of the aircraft does not depend upon

whether the manual is provided free with the aircraft; hence, the single product conclusion holds

true whether the manual is purchased or provided free with the aircraft.  Nor does it matter that

the manuals in question may have been received by Colgan pursuant to a subscription purchased

by Colgan from Raytheon in 2001, long before the Definitive Agreement and the lease of Aircraft

N240CJ in January 2003.  This, too, does not affect the validity of the single product rationale

---

[15]*See supra*, para. 18.

underlying the conclusion that the aircraft's maintenance manual and the aircraft are a single, integral product, or, put another way, that the aircraft's maintenance manual is simply another part of the aircraft. The Third Circuit's decision in *Sea-Land Service, Inc. v. General Electric Co.*, 134 F.3d 149, 154 (3d Cir. 1998), while not factually identical, is nonetheless instructive on this point. There, a defective engine rod was held to be the same product as the engine for economic loss doctrine purposes. In other words, the rod and the engine were the same product notwithstanding that the rod was purchased separately.

It also bears repeating at this point that Colgan was operating a fleet of at least 17 Beech 1900 C and D aircraft and that it doubtless had a number of maintenance manuals in paper and electronic format which it used to maintain this fleet.[16] And, the parties agree that the defects Colgan alleges existed in Revision 9 of the manuals—the revision in issue—were also present in previous versions of the manuals issued prior to the Definitive Agreement and the Lease Agreement for Aircraft N240CJ. Thus, the allegedly erroneous illustration of the front trim tab cable drum did not change from the 2001 manuals to the Revision 9 REPS Manual used by Colgan's maintenance personnel immediately prior to the August 2003 crash. Similarly, the alleged missing hyperlink defect is also not new; no version of the REPS Manual contained a hyperlink to the relevant operational check from the time the check first appeared in Revision 6. Nor is there any evidence that the particular Revision 9 REPS Manual used by the Colgan mechanics differed from any other Revision 9 REPS Manual. In other words, there is no allegation that a "one-off" typographical error or a software glitch peculiar to the specific manual

---

[16] The parties agree that Colgan was free to make as many copies of the paper manual or to burn as many copies of the REPS manual as it wished.

used by Colgan maintenance personnel in August 2003 is to blame for the defect; rather, the parties agree that the maintenance manual errors Colgan alleges led to the crash, were the same in every Revision 9 REPS manual issued by Raytheon.

Because (i) the defects remained constant throughout the various versions of the maintenance manual; and (ii) both defects on which Colgan seeks recovery predated the Lease Agreement, in which Colgan relinquished its right to sue on any ground after the 90 day warranty period, it follows that Colgan waived its right to recover on these defects when it entered the Lease Agreement and received the attendant Used Airliner Warranty in January 2003. To reach a different result on the basis that the manuals were received pursuant to a separately-paid subscription would ignore the essential nature of the manuals as a part of the aircraft akin, as noted, to an "on-off" switch; the aircraft engines cannot be started, the aircraft cannot be taxied and flown unless Colgan obtains an airworthiness certificate, which it cannot do without first maintaining the aircraft pursuant to Raytheon's maintenance manuals. Moreover, a different result would also free Colgan to undo the parties' negotiated allocation of risks associated with the lease by simply renewing a previous subscription. Colgan's 2001 payment for a subscription for the maintenance manuals and its 2003 payment renewing this subscription does not alter either the nature of the manual as a part of the aircraft, or the nature of the parties' risk allocation bargain in which Colgan assumed "the entire risk of loss ... to the Aircraft from any cause whatsoever." Accordingly, the Used Airliner Warranty with its attendant waiver of rights against Raytheon bars Colgan's claims in this case.[17]

---

[17]This result was reached as a matter of Kansas law, but it is important to note that the same result would be reached for the same reasons were Massachusetts law to govern this issue.

## IV.

In the alternative, should the warranty not bar Colgan's claims, it also appears from the record and the governing law that Colgan's express warranty and strict liability claims are nonetheless barred.  Under Massachusetts express warranties are governed by M.G.L.A. 106, § 2-313(1), which provides that express warranties are created by:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; or
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Colgan contends that the following statements by Raytheon in the aircraft's maintenance manual created an express warranty:

> Title Page, 00-00-00: This manual includes the maintenance information required to be available by 14 C.F.R. Part 23.
>
> Chapter 27-00-00-001, FLIGHT CONTROLS– DESCRIPTION AND OPERATION: Proper winding of the cable on the pedestal and actuator drum, is shown in the Aileron Tab Control Cable winding illustration in Chapter 27-10-05 for aileron tabs, the Rudder Tab Control cable winding illustration in Chapter 27-20-05 from rudder table and the <u>Elevator Tab Control cable winding illustration in Chapter 27-30-04</u> for elevator tabs, ensures against crossing the cables and causing improper trim tab movement.

Representations such as these made in a manual provide instruction; they do not rise to the level of affirmation of fact or promise. *Jones v. Walter Kidde Portable Equipment, Inc.*, 183 F.3d 67, 70 (1st Cir. 1999) (holding that statement in instructional manual does not constitute express warranty).  Were a contrary result to obtain, express warranties would be superfluous, as every

statement in an operational manual would constitute a promise regarding the product's performance.

Colgan's claims on the basis of strict liability also fail as a matter of law because Massachusetts does not recognize a cause of action for strict liability in tort.  *See Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 89 (D. Mass. 1998).  For these reasons, Colgan's claims based on breach of express warranty and strict liability in tort are barred under Massachusetts law independent of the Used Airliner Waiver's prohibition.

An appropriate order will issue.

Alexandria, Virginia
December 7, 2005

T. S. Ellis, III
United States District Judge

-23-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**CONSOLIDATED UNDER
CASE NO. 05-10155 PBS**

| | | |
|---|---|---|
| YISEL DEAN, et. al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Case No.: 05 CV 10155 PBS |
| RAYTHEON COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

| | | |
|---|---|---|
| LISA A. WEILER, et. al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| | ) | Case No.: 05 CV 10364 PBS |
| RAYTHEON COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS FIRST SET OF INTERROGATORIES
## TO RAYTHEON DEFENDANTS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, plaintiffs hereby serve the following interrogatories upon the Raytheon defendants to be answered in writing under oath.

## **DEFINITIONS**

Plaintiffs incorporate by reference Defendants' definitions put forth in Defendants' Interrogatories to Yisel Dean and Lisa A. Weiler.

## INTERROGATORIES

1. For each person listed in the attached defendant Raytheon witness list (see Exhibit A), please provide the full name, home and office address, home office mobile and Blackberry or other phone numbers, email, job and/or professional title, the substance of their knowledge and/or involvement in this matter and list any documents which they wrote, edited, provided, commented upon or were custodians therefore or were to testify about at the Colgan vs. Raytheon trial.

2. Besides those disclosed above, please list to your knowledge any other persons and include the full name, home and office address, home and office mobile and Blackberry or other phone numbers, email, job and/or professional title (in addition to those listed in response to the previous interrogatory) who have information or knowledge concerning:

    a.    Errors or corrections in any Beech 1900 maintenance or flight manuals, whether paper or electronic;

    b.    Figure 201 and all uses thereof in any Beech/Raytheon maintenance manual;

    c.    Investigation of the crash of US Airways Express 9446;

    d.    The accident aircraft;

    e.    All persons taking or making phone calls, e-mails, or any other communications from or to Colgan concerning maintenance of Beech 1900. Describe all records of any such contact;

    f.    Any person who heard, saw, reviewed, witnessed or has any information about the accident CVR;

    g.    Any person who attended simulations or recreations of this crash, whether or not with the National Transportation Safety Board (NTSB).

## VERIFICATION

I hereby certify, under penalty of perjury, that the following Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

Dated this _____ day of _____ , 2006.

_____

STATE OF                                    )

COUNTY/CITY OF                              )        To-wit:

Personally appeared before me this ____ day of _____, 2006, the undersigned, a Notary Public in and for the aforesaid State and County, _____ known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

[SEAL]

_____

Notary Public

My Commission Expires:

January 6, 2006                                 Respectfully Submitted,

                                                Robert McConnell, Esq.
                                                (BBO No. 550625)
                                                Mary Schiavo, Esq.
                                                Motley Rice LLC
                                                321 South Main St.
                                                P.O. Box 6067
                                                Providence, RI
                                                (401) 457-7700


### CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of January, a true and correct copy of the above and foregoing PLAINTIFFS FIRST SET OF INTERROGATORIES TO RAYTHEON DEFENDANTS was served by e-mail and U.S. Mail, postage prepaid on January 6, 2006 to the following attorneys of record.

    Michael G. Jones
    MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
    100 North Broadway
    Wichita, KS 67202

    Peter Knight
    MORRISON MAHONEY LLP
    250 Summer Street
    Boston, MA 02210


                                                Nicole A. Archambault
                                                Legal Assistant

THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COLGAN AIR, INC.,                    )
                                     )
        Plaintiff,                   )
                                     )
RAYTHEON AIRCRAFT COMPANY,           )    CIVIL ACTION NO. 1:05 cv 213
                                     )
        Defendant.                   )

## DEFENDANT RAYTHEON AIRCRAFT COMPANY'S WITNESS LIST

Defendant, by counsel, pursuant to the Court's scheduling order, identifies the

following witnesses who may offer testimony on its behalf at the trial of this action:

**Experts:**

Law, Dwight Dean

Nelson, Richard, J.

**WILL CALL:**

Crowe, Willard

Davis, Casey

Elsenrath, Jenny

Green, Tim

Kriegler, Pete

Lusch, A.J.

Jolicouer, Mike

McCarthy, Matt

Peay, Tom

Ramey, Robert

Scheidt, Mike

Thompson, Dean M.

**Colgan Employees/Agents**

Barrett, John E.

Barth, Patti

Battaglia, Dominick Jr.

Callender, Matt

Colgan, Michael

Cunningham, Marcus (AJ report)

Desmond, James

Elkins, Thomas (AJ report)

Scott Gebauer

Gonzalez, Kevin

Ham, James (AJ report)

Lemos, Dennis

Kinan, Daniel Robert

Moorehead, Robert

Ratliff, Larry

Rodriguez, Miguel

Sarluca, Perry

Shutrump, Gerry

Servis, Scott

Vallejo, Thomas Jeffery

Vance, David

Vilchez, Ed (AJ report)

**MAY CALL:**

Armstrong, P (Director of Recreation town of Yarmouth - witnessed plane taking off)
RAC 00224

Berger, Jackie

Berquist, Chris

Berthe, Thomas (Pratt & Whitney Canada)

Bischoff, Tim (saw accident) RAC 000227

Brazy, Douglass P. (NTSB) RAC 000374

Bramble, William PH.D. (NTSB)

Bunker, Richard (MA Aeronautics Commission)

Burris, Brian

Busto, Robert (FAA)

Carbone, Stephen (NTSB)

Clark, John (NTSB)

Crider, Dennis (NTSB) RAC 000234-252

Demko, Stephen

Dieker, Tim

Door, Les (FAA)

Earleywine, Jerry

Ernzen, Kim

Page 3

Falvey, John D. (RAC 000222) was fishing when plane took off

Goglia, John (NTSB)

Gretz, Robert J., (NTSB)

Grossi, Dennis (NTSB) Flight Data Recorder Study RAC 000253-

Grota, Stephen (FAA)

Hartman, Bob

Hogan, Bob

Houghton, Rob

Jackson, Conrad

Jaerger, Ron

James, Tony (FAA)

James, Floyd, A. (FAA)

Jenkins, Karen

Johanssen, Lou

Joshi, Deepak (NTSB)

Kittredge, Jim (heard airplane didn't sound normal) RAC 000228

Koch, Regan

Matthews, Andrew

Mahoney, Gary

Magladry, Stephen H. (NTSB)

Moore, Bryan interviewed by Gretz heard fightcrew report a runaway trim. (RAC 000226)

Nunn, LaDonn James (CA)

Peck, Richard I., Inspector FAA (RAC 000276)

Pedroja, Bob

Riddle, Charles D. (RAC 000667)

Robinson, Larry

Rhodes, Lee

Rooney, Paul, Lt (Yarmouth Police Department)

Rosenberg, David

Spade, Kate (RAC)

Staab, Jerry

Tigue, John (RAC)

Schulze, Dana (NTSB)

Thummel, Mike

Tuha

Van Kirk, Emory

West, Eric (FAA)

Records Custodian for Colgan Air

Any witness as permitted for rebuttal purposes

Any fact or expert witness identified by Colgan Air

Defendant reserves the right to call any witness listed by the plaintiff, not objected to by
defendant.

Raytheon Aircraft Company
By Counsel

_____
Robert T. Hall, Esquire VSB # 4826
Holly Parkhurst Essing, Esquire VSB # 17538
HALL, SICKELS, FREI & KATTENBURG, PC
12120 Sunset Hills Road, Suite 150
Reston, VA 20190-3231
Phone: 703-925-0500
Fax:    703-925-0501

and

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS 67202
Phone:  (316) 265-9311
Fax:     (316) 265-2955

## Certificate of Service

I hereby certify that a true and correct copy of the forgoing document was served

on August 18, 2005, as follows:

| Morgan W. Campbell, Esquire | [ ] | First class U.S. mail postage prepaid |
| Mark A. Dombroff, Esquire | [ ] | Facsimile |
| Thomas B. Almy, Esquire | [X] | Hand-delivery |
| 1676 International Drive, Penthouse | [X] | Email |
| McLean, VA  22101 | | |

_____
Holly Parkhurst Essing

# THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

COLGAN AIR, INC.,          )

               )

     Plaintiff,         )

               )

               )

RAYTHEON AIRCRAFT COMPANY,   )     CIVIL ACTION NO. 1:05 cv 213

               )

     Defendant.        )

MAY 1 1 2005

## DEFENDANT'S RULE 26(a)(1) INITIAL DISCLOSURES

Defendant, Raytheon Aircraft Company, by and through its undersigned counsel, makes the following initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1):

**A**    **Persons Likely to Have Discoverable Information that Defendant May Use to Support its Defenses**

The following potential witnesses are employees of Raytheon and are to be contacted, if at all, only through counsel.

| | |
|---|---|
| Rob Ramey | Accident Investigator |
| Mike Scheidt | Raytheon relationship with Colgan and lease of UE-40 |
| Brian Burris | Raytheon relationship with Colgan and lease of UE-40 |
| Tom Peay | Raytheon relationship with Colgan and lease of UE-40 |
| Karen Jenkins | Raytheon relationship with Colgan and lease of UE-40 |
| Andrew Matthews | Raytheon relationship with Colgan and lease of UE-40 |
| Tim Dieker | Raytheon relationship with Colgan and lease of UE-40 |
| Willard Crowe | Elevator trim controls and manuals |
| A. J. Lusch | Proper repair techniques |
| Lee Rhodes | Colgan maintenance issues |
| Dean Thompson | Accident Investigator |
| Lou Johnson | CVR review |
| Tim Green | Technical representative interacting with Colgan |
| Chris Berquist | Technical representative interacting with Colgan |
| Matt McCarthy | Technical representative interacting with Colgan |
| Mike Jolicouer | Technical representative interacting with Colgan |
| Mike Johnson | Technical representative interacting with Colgan |
| Gregory Thummel | Parts issues |

**EXHIBIT**

**A**

**Colgan Employees/Agents**

| Michael Colgan | Company President |
| Robert Moorehead | NTSB participant |
| LaDonn James Nunn | VP-Operations, NTSB participant |
| Dave Vance | NTSB participant |
| Dan Kinan | Lead mechanic, replaced cable |
| Scott Servis | Replaced cable |
| Gerry Shutrump | Current director of maintenance |
| Dominick Battaglia, Jr. | Colgan mechanic |
| Perry Sarluca | Colgan mechanic |
| Jimmy Desmond | Colgan mechanic |
| Kevin Gonzales | Colgan mechanic |
| Jeff Vallejo | Colgan Mechanic |
| Miguel Rodriguez | Past director of maintenance |

**Miscellaneous**

| Robert J. Gretz | NTSB Investigator in Charge |
| Floyd A. James | FAA participant in FAA investigation |

In addition, the individuals listed in the documents produced with the voluntary

disclosures are also potential witnesses Raytheon may use to present its case.

**B.**   **Documents in Possession/Control of Defendant That May Be Used To Support its Defenses:**

1.   Documents relating to the lease of UE-40

a.      Used Airliner Airplane Warranty Effective 1999 and After

b.      January 9, 2003 Side letter agreement between Colgan and RAAS.

c.      January 3, 2003 letter from Karen Jenkins to Distribution and Lease Agreement between Colgan and RACC dated January 3, 2003. Not produced is the signed list of "Loose Equipment Check List and Manuals & Records" referenced in the Certificate of Final Acceptance.

d.      Definitive Agreement between Colgan and RACC and RAAS dated August 1, 2002.

e.      August 12, 2002 Letter from Brian Burris transmitting Definitive Agreement

    f.     Operating Lease proposal between Colgan and RAAS and RACC dated March 15, 2002.

2.   Chain of Title documents

3.   Beech 1900D Airliner Maintenance Manuals. The manual is not being produced at this time as Defendant is currently working on ensuring that the revisions of manuals in effect and used by Colgan at the time of the accident are produced. Defendant will produce those portions of the manual upon which it will rely.

4.   Part's Manuals. The manual is not being produced at this time as Defendant is currently working on ensuring that the revisions in effect and used by Colgan at the time of the accident are produced. Defendant will produce those portions of the manual upon which it will rely

5.   Flight Manual. The manual is not being produced at this time as Defendant is currently working on ensuring that the revisions in effect and used by Colgan at the time of the accident are produced. Defendant will produce those portions of the manual upon which it will rely.

6.   Raytheon Aircraft Company Mandatory Service Bulletin SB 27-3202; Title: Flight Controls- Elevator Trim Tab Actuator Inspection/Modification, issued July, 2003

7.   NTSB Materials

    a.     Brief of Accident adopted 8/13/2004 from the NTSB website.

    b.     History of Flight, NYC03MA183, from the NTSB website.

    c.     NTSB Factual Report- Aviation, from the NTSB website.

    d.     NTSB Docket Contents dated 3-15-2004 and numerous attachments.

    e.     NTSB Aircraft Maintenance and Records Group Factual Report, dated March 16, 2004.

    f.     NTSB Airworthiness Group Chairman's Field Notes. This document will be produce when received.

    g.     NTSB Airworthiness Group Chairman's Factual Report. This document will be produced when received.

h.    NTSB Safety Board Office of Marine Safety; Subject: Major Investigation Accident, NYC03MA183 Investigation Interviews dated August 27, 2003. Interviewee Dominick Battaglia.

i.    NTSB Safety Board Office of Marine Safety; Subject: Major Investigation Accident, NYC03MA183 Investigation Interviews dated August 27, 2003. Interviewee Dan Kinan.

j.    NTSB Safety Board Office of Marine Safety; Subject: Major Investigation Accident, NYC03MA183 Investigation Interviews dated August 27, 2003. Interviewee Jeff Vallejo.

8.   RAC Letter 940-2004-05-133 to NTSB dated May 6, 2004; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003 produced.

9.   Party Submission of Colgan Air to the NTSB.

10.  RAC Letter 940-2004-07-191 to NTSB dated August 12, 2004; Subject: 1) Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) Raytheon Aircraft Company letter 940-2004-05-133, dated May 6, 2004; 3) Colgan Air, Inc., Submission to the NTSB.

11.  Colgan Air-Beechcraft 1900 Normal Checklist Volume XXX Revision 5 dated March 14, 2003

12.  Telephone Contact Reports

     Chronology of contact between Colgan Air and RAC during period August 23-26, 2003.

     Telephone contact reports will be produced when received.

13.  Miscellaneous

     a.    RAC letter 940-2003-10-175 to NTSB dated October 7, 2003; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003.

     b.    RAC letter 940-2003-10-576 to NTSB dated October 27, 2003; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003.

c.    RAC letter 940-2003-11-085 to NTSB dated November 4, 2003;
Subject: Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003.

d.    RAC letter 940-2003-11-088 to NTSB dated November 6, 2003;
Subject: Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003.

e.    RAC letter 940-2003-11-337 to FAA dated November 14, 2003;
Subject: Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003.

f.    RAC letter 940-1003-11-418 to NTSB dated November 20, 2003;
Subject: Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003.

g.    RAC letter 940-2003-12-050 to NTSB dated December 1, 2003;
Subject: Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003.

h.    RAC letter 940-2003-12-476 to NTSB dated December 22, 2003;
Subject: 1) Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003; 2) Model 1900D, Serial Number UE-247, Registration
Number N11014, accident in Kwajalein, Marshall Islands, on
November 2, 2003; 3) Your email dated September 2, 2003.

i.    FAA letter to RAC dated January 9, 2004; Subject: Compliance
Review Beech 1900 Series Flight Control Trim System.

j.    FAA letter to RAC dated January 13, 2004; Subject: Raytheon
Model 1900C/D Aileron and Rudder Trim System Control
Authority.

k.    RAC letter 940-2003-01-221 to NTSB dated January 14, 2004;
Subject: Model 1900D, Serial Number UE-40, Registration
Number N240CJ, accident in Yarmouth, Massachusetts, on August
26, 2003.

l.    RAC letter 940-2004-02-055 to NTSB dated January 23, 2004;
Subject: 1) Model 1900D, Serial Number UE-40, Registration

Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) Draft Group Chairman's Factual Report NYC03MA183.

m.    RAC letter 940-2004-04-097 to NTSB dated April 5, 2004; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003.

n.    RAC letter 940-2004-04-420 to NTSB dated April 21, 2004; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003.

o.    RAC letter 940-2004-04-471 to NTSB dated April 22, 2004; Subject: 1) Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) NTSB Draft Airworthiness Group Chairman's Factual Report of Investigation NYC03MA183.

p.    RAC letter 940-2004-05-079 to NTSB dated May 4, 2004; Subject: 1) Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) NTSB Draft Factual Report NYC03MA183.

q.    RAC letter 940-2004-05-207 to NTSB dated May 11, 2004; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003.

r.    RAC letter 940-2004-05-425 to NTSB dated May 21 2004; Subject: 1) Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) RAC letter 940-2004-04-471 to Steven H. Magladry, dated April 22, 2004; 3) RAC Letter 940-2005-05-133 to Bob Gretz, dated May 6, 2004.

s.    RAC letter 940-2004-05-510 to NTSB dated May 27, 2004; Subject: Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003.

t.    RAC letter 940-2004-06-074 to NTSB dated June 2, 2004; Subject: 1) Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) Beech Model 1900D, Serial Number UE-233,

Registration Number N233YV, accident in Charlotte, North Carolina, on January 8, 2003; 3) NTSB Safety Recommendation Letter A-04-4 through -24.

u.      RAC letter 940-2004-09-441 to NTSB dated September 22, 2004; Subject: 1) Model 1900D, Serial Number UE-40, Registration Number N240CJ, accident in Yarmouth, Massachusetts, on August 26, 2003; 2) NTSB Factual report NYC03MA183.

14.  Factual Aircraft Accident Investigation Report.
      This document is not being produced as this time as it has not been completed.

**C      Computation of Damages Claimed by Disclosing Party**

Not Applicable

**D:    Insurance Agreements:**

15.  Attached is a copy of the Manufacturers Products/Grounding Liability Policy.


Discovery in this case is in its infant stages. Defendant will update the Rule 26 disclosures as additional information is learned through discovery. There will likely be additional documents and witnesses identified throughout the course of discovery. Those documents and witnesses will be disclosed when they become known to counsel.

Raytheon Aircraft Company

By Counsel

Robert T. Hall, Esquire VSB # 4826
Holly Parkhurst Essing, Esquire VSB # 17538.
HALL, SICKELS, ROSTANT, FREI
    & KATTENBURG, PC
12120 Sunset Hills Road, Suite 150
Reston, VA 20190-3231
Phone: 703-925-0500
Fax:    703-925-0501

and

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS 67202
Phone:  (316) 265-9311
Fax:    (316) 265-2955

## Certificate of Service

I hereby certify that a true and correct copy of the forgoing Defendant's Initial 26(a)
Disclosures was served, this 11th day of May, 2005, as follows:

| | | |
|---|---|---|
| Morgan W. Campbell, Esquire | [ ] | First class U.S. mail postage prepaid |
| Mark A. Dombroff, Esquire | [ ] | Facsimile |
| Thomas B. Almy, Esquire | [X] | Hand-delivery |
| 1676 International Drive, Penthouse | [X] | Email |
| McLean, VA  22101 | | |

Holly Parkhurst Essing

8