UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**CONSOLIDATED UNDER
CASE NO. 05-10155 PBS**

| | | |
|---|---|---|
| YISEL DEAN, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 05 CV 10155 PBS |
| | ) | |
| RAYTHEON COMPANY, a Delaware corporation, | ) | |
| RAYTHEON AIRCRAFT HOLDINGS, INC. a | ) | |
| Delaware Corporation, RAYTHEON AIRCRAFT | ) | |
| COMPANY, a Kansas Corporation, RAYTHEON | ) | |
| AIRCRAFT CREDIT CORPORATION, a Kansas | ) | |
| Corporation, COLGAN AIR, INC., | ) | |
| a Virginia Corporation d/b/a US Air Express | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| LISA A. WEILER, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05 CV 10364 PBS |
| | ) | |
| RAYTHEON COMPANY, a Delaware corporation, | ) | |
| RAYTHEON AIRCRAFT HOLDINGS, INC. a | ) | |
| Delaware Corporation, RAYTHEON AIRCRAFT | ) | |
| COMPANY, a Kansas Corporation, RAYTHEON | ) | |
| AIRCRAFT CREDIT CORPORATION, a Kansas | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF ITS
MOTION FOR A PROTECTIVE ORDER AND
RESPONSE TO PLAINTIFFS' MOTION TO COMPEL AND EXTEND DISCOVERY**

On January 13, 2006, defendants filed their Emergency Motion for Protective Order to

seek the Court's guidance on massive discovery that was served by plaintiffs six business days

earlier, including dozens of depositions otherwise scheduled to commence on the next business

day.  On January 17, 2006, plaintiffs' counsel filed plaintiffs' Response to defendants' Motion and plaintiffs' own Motion to Compel and Extend Discovery.  This Reply Brief is intended to meet the arguments of plaintiffs' filing, and correct the inaccurate picture painted by plaintiffs of this discovery dispute.

## I.    <u>Introduction.</u>

As an initial matter, defendants acknowledge that the Motion for Protective Order was filed without a phone call actually having been first placed to plaintiffs' counsel to confer.  This was the result of a mix-up between counsel about who was to call, and defendants have already apologized to the Court and plaintiffs' counsel personally for this oversight.  However futile such an effort to confer may have been given the nature of the disputes, the courtesy of such an effort was owed, and it did not happen.

Even with counsels' subsequent effort to confer, it is clear that the bulk of the issues of the Motion will remain in need of Court resolution.  Note, also, that the letter sent to plaintiffs' counsel (attached as Exhibit "1") with the copy of the Motion for Protective Order (<u>see</u> document No. 62) starts with a detailed effort to confer about inadequacies in plaintiffs' responses to defendants' discovery requests served in November.  The parties are in fact conferring on those issues, and they are not the subject of the current motion.

The Court may also notice the submission by plaintiffs' counsel of an affidavit characterizing the contents of a phone call between counsel on January 16, 2006.  While great issue is taken with a number of the liberties if not outright inaccuracies of the affidavit, Raytheon will not resort to the submission of counter-affidavits of counsel and engage in a distasteful swearing match between the lawyers involved.  Rather, in this Reply, Raytheon, through its undersigned counsel, as officers of the court, will state the relevant events, facts, and arguments that reflect Raytheon's consistent positions regarding the current discovery dispute and the

necessity of Court direction on the limits and scope of any remaining discovery that may be allowed.

In their response, plaintiffs seek to characterize this discovery issue as one solely related to timing. They then argue because counsel acknowledged in a phone call that the deposition notices were timely served in advance of scheduled dates that defendants' concede that the motion is unfounded. Quite the contrary, Raytheon's consistent position has been that it is the extreme and inappropriate scope of the requested discovery, exacerbated by the late and short timing that is objectionable. If a notice for a reasonable number of depositions of relevant witnesses who had not already been deposed were served instead of the overbroad notices received, the motion relating to the depositions would not have been filed. This is quite a different story, with initially dozens and now apparently 11 additional depositions, 10 of which are re-takes without leave on wholly irrelevant new lines of inquiry including separate and unrelated accidents.

## II.    Plaintiffs' Response Apparently Retracts Some of the Discovery Initially Requested, but also Adds New Demands.

Plaintiffs' notice purported to set the depositions of seven current or former Raytheon employees (Crowe, Jolicoeur, Jaearger, Peay, Scheidt, Pedroja and Ernzen). Two of these employees are no longer with Raytheon. The notice also includes Havnen, and "all Raytheon employees and former employees listed on your witness list, attached." That last part alone would have amounted to approximately 23 additional depositions. Perhaps now conceding the excessive scope of this unnecessary request, plaintiffs' response appears to retract the request for those depositions from the witness list, as they are not mentioned in plaintiffs' detailed prayer for relief. On the other hand, plaintiff's prayer for relief requests that 10, not seven specific

Raytheon people now be produced for deposition. Specifically, plaintiffs now add Ramey, Green and Rosenberg to the lineup, even though they were never noticed.

**III.    Plaintiffs' Have Already Deposed the Seven Raytheon Employees Noticed, as well as the Three Added in the Response Brief.**

All 10 of these people were already deposed in the Colgan case. Not only was plaintiffs' counsel in these cases given access to those depositions by order of this court in order to avoid duplication, she actively participated and cross examined each one of them.[1] Moreover, all 10 depositions plaintiffs seek to re-take were completed under the caption of this case. Under F. R. Civ.P. 30(a)(2)(B), a party seeking to re-take the deposition of a witness already deposed must seek and obtain leave of court before noticing the depositions. See Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 244 F.3d 189 (1st Cir. 2001) (a party must obtain leave of court if a person to be examined already has been deposed). No such effort was made. Plaintiffs unilaterally noticed 7 depositions of people already deposed and then inexplicably added three more in the response to the motion for protective order.

The stated basis for the need to re-take these 10 depositions is that plaintiff now wants to ask them about budgeting and resource allocation for fleet support in the years prior to this accident. Such topics, while already touched upon generally in the depositions already taken (see Scheidt deposition excerpt attached as Exhibit "2"), are wholly irrelevant and unrelated to the central inquiry of this case: whether the manual at issue, and in particular the chapter relating to the service performed, is defective and unreasonably dangerous. Indeed, the issue in a product liability action such as this one is whether the product was defective at the time that is was sold, not prior resource allocation, which is an entirely collateral and irrelevant matter. See generally Wadja v. R. J. Reynolds Tobacco Co., 103 F. Supp. 2d 29, 34 (1st Cir. 2000); Hayes v. Ariens,

---

[1] Except Rosenberg, whose deposition was very short, as he clearly had no relevant information.

391 Mass. 407 (1984) (liability issue in product liability cases is whether was defective when sold). The level of resources generally allocated to fleet support of an entire line of aircraft is no more relevant to the issue of the defectiveness of a manual excerpt than the pedigree of a doctor's medical school is to whether he operated on the wrong leg.

The requested discovery is therefore not reasonably calculated to lead to the discovery of admissible evidence and should not be allowed. Stuart v. United States, 1998 U.S. Dist. LEXIS 13313. Moreover, Judge Saris specifically granted plaintiffs access to discovery in the Colgan case to avoid re-taking depositions, and allowing these unnecessary and redundant depositions on irrelevant matters would clearly contravene that purpose. See Advisory Committee Notes, 146 F.R.D. at 662 (counsel have a professional obligation to develop a mutual cost-effective plan for discovery).[2]

Also entirely misplaced is the argument that recent manual revisions in 2005 need further study by re-taking these depositions. Maintenance manuals are constantly updated and improved by virtually all aircraft manufacturers. The fact that there have been revisions since this accident means nothing. Moreover, this case is about a maintenance manual section regarding replacement of a cable on an elevator trim tab system. The specific manual revision that plaintiffs claim is a basis to re-take depositions is an entirely separate system of the aircraft. It relates not to an elevator instead but to a rudder. Furthermore, the manual revised in 2005 was a manual version that had been issued over a year after the accident that is the subject of this case and is entirely different in layout and artwork than the prior versions.[3] It is an entirely different and unrelated set of instructions. The scope of discovery should not be expanded into later

---

[2] It is Raytheon's understanding that Judge Saris' purpose for her order regarding Colgan discovery was to avoid duplication, and that, therefore, all of the depositions (28) and other discovery from that case are to be available for use in this case, subject, of course, to rules of admissibility.

[3] Interestingly, if the section of the manual revised in late 2005 were the same section at issue in this case, use of it in this case would be barred by the subsequent remedial measures rule. F.R.Civ.P. 407.

manuals on unrelated systems, and certainly not to allow the re-taking of depositions already completed. Additional discovery on this issue should therefore not be allowed.

Plaintiffs also suggest that unidentified other accidents need to be further studied, and that these 10 witnesses need to be interrogated about them. The implication is also made that defendants wrongfully withheld information about other incidents and accidents. Most interesting, however, is that plaintiffs do not identify what the other incidents or accidents are. The closest clues they give are requests to depose someone about a 1995 incident involving an aircraft with tail number N118UY[4] and a reference in an affidavit of a Virginia lawyer about something Don Havnen supposedly said about UC-127.[5]  *If* these are the additional accidents plaintiffs have a compelling need to re-depose these 10 witnesses about, they have nothing whatsoever to do with this case.

Note also that plaintiffs have said nothing about whether any of these 10 witnesses actually possess any knowledge beyond what they've already testified about regarding these ancillary topics. The purpose for the rule requiring leave to re-take depositions should require such a showing, and plaintiffs have made no effort to do so. See Wright & Miller, § 2104.

Plaintiffs also make the interesting argument that Judge Ellis' ruling in the Colgan case that a maintenance manual is a part of the aircraft, somehow justifies throwing open the doors to discovery on every aspect of the manual, regardless of the system involved. This would presumably include every word, diagram and table in a two-volume set of instruction over 2500 pages long, and weighing probably 30 pounds in its paper form. This idea is absurd, and its very assertion reveals the purposes of these latest discovery demands: simple harassment and a good old-fashioned fishing expedition.

---

[4] No aircraft with a tail number of N118UY could be found, but it was found that aircraft N118UX suffered a cable break in the tail of the aircraft in 1995. This clearly has nothing to do with this case.
[5] UC-127 crashed into mountains in Arkansas on approach in bad weather and has nothing to do with manuals whatsoever.

Defendants' motion for protective order also sought to prohibit that portion of plaintiffs' deposition notice purporting to set "all Raytheon employees and former employees listed on your witness list, attached" for deposition, all at the same time.  The attached document was a witness list filed in the Colgan case in Virginia, which, in order to comply with local practice, required the identification of all witnesses each party expected to call at trial under a "will call" heading, and also the identity of any other witnesses that could theoretically appear under a "may call" heading.  The names on the "may call" list were largely gleaned from all the documents and names mentioned in other discovery in the Virginia case.  That portion of the list therefore included a large number of names.

The "may call" list included approximately 23 Raytheon people, most of whom had no substantive relationship to the case.  Plaintiffs in this case nonetheless demanded to depose every one of them on 11 days notice, at the same time as potentially 20 other deponents otherwise noticed.  When defendants sought protection from this excessive demand, plaintiffs respond in their brief by suggesting that defendants acted improperly in not identifying all of the people on the "may call" list in Rule 26 disclosures.  Not only do plaintiffs in this case mischaracterize arguments made in the Virginia case, they misstate or misunderstand the requirements of Rule 26.  To suggest Rule 26 would require the identification of every person on the "may call" list is to overstate both the purpose and terms of the rule.

Moreover, since defendants herein have produced to plaintiffs everything they produced in the Colgan case, the very source for the identity and any relevant information about the Raytheon people on the "may call" portion of the list, is already in plaintiffs' possession.  A demand to depose each one of them is therefore improper.  As noted above, however, since plaintiffs appear to have abandoned this request by omitting it from the detailed prayer of their

briefing, this issue may be moot. To the extent, however, that plaintiffs continue to demand those depositions, the court should order that they not occur.

## IV.    Interrogatories.

The same is true as to plaintiffs' interrogatories. The interrogatories ask three questions (identity, substance of knowledge and list of documents) relating to *each person, whether related to Raytheon or not*, on the witness list from the Colgan case. This amounts to three questions about 91 different people, or the equivalent of 273 interrogatories. Plaintiffs' "second" interrogatory then goes on to ask at least 7 more questions, making the total 280.

Not only are these excessive by number and clearly beyond what the rules allow, they are wholly unnecessary since plaintiffs already have the information in their possession from which the list of names was compiled. Those on the "will call" list are already well-known to plaintiffs. Indeed they have already deposed most of them. As noted above, the others were gleaned from the documents and other discovery performed throughout the Colgan case in Virginia. Plaintiffs here actively participated in depositions in that case and have been provided all of the documents Raytheon produced therein. Plaintiffs have also had similar access to Colgan's production in the Virginia case.

The interrogatories should therefore be prohibited as late, too many in number and as entirely unnecessary. If they had to be answered, the answers would be references to the documents already produced, as is allowed by F.R.Civ.P. 33(d). The court should recognize the interrogatories as mere harassment and order them quashed, as the exercise of answering them by reference to documents plaintiffs already have is wasteful and unnecessary.

## V.    Don Havnen.

Finally, plaintiffs completely mischaracterize the Havnen situation. After Havnen and many others were laid off in late November, he contacted Colgan Air, ostensibly to look for a job

helping them get their maintenance act together.  Whether his overture was misinterpreted or twisted into something different, or whether he truly wanted to get back at Raytheon for letting him go, the situation evolved into him meeting privately with Colgan's counsel and suggestions by Colgan that Havnen would appear at the trial of that case to testify against Raytheon.

The situation was troubling for Raytheon, as Havnen, while not a witness in the case, had participated in the defense of the Colgan case by consulting with counsel about Colgan's actions and maintenance procedures.  He had also signed confidentiality agreements with Raytheon and promised therein not to divulge company proprietary information to third parties.  His repeated ex parte meetings with opposing counsel in the Virginia case, even after they learned of his involvement in the defense of the case, coupled with filings by counsel suggesting that Havnen was speaking with them regarding Raytheon proprietary financial and budgeting information, were both inconsistent with Havnen's comments to Raytheon that his overtures to Colgan were misinterpreted and that he was not interested in appearing at trial to testify against Raytheon.

Raytheon therefore sought and obtained a restraining order and ultimately an agreed permanent injunction requiring Havnen to honor his confidentiality agreements to the company.  Those measures were intended to safeguard against risks associated with Havnen's ex parte communications with Colgan's counsel and other Colgan officials.  Those measures were **not** intended as a basis to avoid Havnen testifying in response to a valid subpoena.

Plaintiffs in this case suggest that defendants' objections to Haven's deposition here are because of the injunction or the confidentiality agreements.  This is not so.  Raytheon recognizes that no confidentiality agreement, standing alone, can be the basis to prohibit testimony pursuant to a proper subpoena.  Nor can an injunction that merely requires the confidentially agreements be honored be the sole basis to avoid a deposition.  To the contrary, defendants' reason to oppose Havnen's deposition is that the proposed topics of his deposition are patently irrelevant to the

claims of this case and therefore not reasonably calculated to lead to the discovery of admissible evidence. As discussed above, budgeting and resource allocation are not relevant to the legal issue of this case, which is the content of a particular maintenance manual section at the time of service. To the extent there is any tangential relevance, such matters were already discussed at the prior deposition of RAAS/RACC President Mike Scheidt. (See Exhibit "2"). Manual revisions issued after this accident are patently irrelevant, and other unstated incidents or accidents cannot be the basis for more discovery unless and until they are shown to have some relevant link to this case. None of that exists here, and there is no reason to think Havnen possesses any relevant information.

In the event, however, that Havnen's deposition is allowed to go forward, defendants request that the court make specific rulings about the topics and scope of inquiry to be allowed. It should be limited to matters specific to the issues of this case, including this accident, Colgan's actions and maintenance procedures, and the maintenance manual version in place at the time of the relevant service. Allowing the plaintiffs to go into historical budgeting and resource allocation for fleet support or other unrelated accidents as vaguely alluded to in their papers would be improper. Such matters are not relevant to this case and plaintiffs' pursuit of them is inappropriate.

Plaintiffs are fond of inflammatory rhetoric and like to call Havnen a "whistleblower." Havnen is no "whistleblower."[6] Plaintiffs also suggest that Raytheon has attempted to intimidate Havnen. There has been no witness intimidation. To the contrary, Raytheon has repeatedly implored Havnen to seek his own counsel about these matters and has responded to Havnen's

---

[6] Presumably, the plaintiffs are referring to the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(b)(1)(A), which would require, as a prerequisite, an assertion by Mr. Havnen of retaliatory termination. The plaintiffs have not, and indeed cannot, support this assertion. There is no evidence whatsoever to which the plaintiffs can cite that indicates that Mr. Havnen is the subject of retaliatory termination. The plaintiffs' loose use of the term whistleblower is unfounded and utterly mistaken.

concerns about being blackballed in the business with assurances that nothing of the sort has happened.    In fact, this very issue was decided by Judge Ellis in the Colgan case, and he specifically found there was no witness intimidation.  See excerpt of Judge Ellis' ruling dated December 5, 2005, which is being obtained and will be provided upon receipt. Judge Ellis saw the Havnen situation for what it was.  This court should do the same and prohibit his deposition.

## VI.    <u>Conclusion</u>.

For the foregoing reasons, defendants request that the court grant their motion for protective order and prohibit the requested discovery.  In the alternative, if any of the requested discovery is allowed, the court should strictly limit its scope and the particular topics of discussion allowed at any deposition.  Plaintiff's motion to compel and to extend discovery should also be denied.

|  |  |
|---|---|
|  | Respectfully submitted,<br>Raytheon defendants,<br>RAYTHEON COMPANY,<br>RAYTHEON AIRCRAFT HOLDINGS, INC.,<br>RAYTHEON AIRCRAFT COMPANY, AND<br>RAYTHEON AIRCRAFT CREDIT<br>CORPORATION, |
| and | By Counsel, |
| William L. Oliver, Jr., KS #05969<br>Michael G. Jones, KS #14511<br>MARTIN, PRINGLE, OLIVER,<br>   WALLACE & BAUER, L.L.P.<br>100 N. Broadway, Suite 500<br>Wichita, Kansas  67202<br>Phone:  (316) 2652-9311<br>wloliver@martinpringle.com<br>mgjones@martinpringle.com | /s/ Gary W. Harvey<br>_____<br>Peter C. Knight, BBO #276000<br>Gary W. Harvey, BBP #547993<br>MORRISON, MAHONEY, LLP<br>250 Summer Street<br>Boston, Massachusetts  02210<br>Phone:  (617) 439-7500<br>gharvey@morrisonmahoney.com |

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on January 24, 2006, a true copy of the above document was served upon each counsel of record electronically through filing with the ECF system.


                         /s/ Gary W. Harvey

00277958

# EXHIBIT "1"



**MARTIN | PRINGLE**
ATTORNEYS AT LAW

**MARTIN, PRINGLE, OLIVER, WALLACE & BAUER, L.L.P.**

| Wichita | Overland Park | Kansas City, Missouri |
|---|---|---|
| 100 N. Broadway, | 6900 College Boulevard, | 4700 Belleview, |
| Suite 500 | Suite 700 | Suite 210 |
| Wichita, KS 67202 | Overland Park, KS 66211 | Kansas City, MO 64112 |
| T 316.265.9311 | T 913.491.5500 | T 816.931.1133 |
| F 316.265.2955 | F 913.491.3341 | |

www.martinpringle.com

**MICHAEL G. JONES**
**Wichita Office**
mgjones@martinpringle.com

January 13, 2006

Mary F. Schiavo
Motley Rice LLC
P.O. Box 1792
Mt. Pleasant, SC 29465

<u>VIA E-MAIL AND
DHL OVERNIGHT</u>

Re:    Dean/Weiler v. RAC
        Our File No. 62003-48

Dear Ms. Schiavo:

I am writing in response to your letters of December 29, 2005, and January 6, 2006.

1.    <u>**Plaintiffs' Responses to Defendants' Discovery**</u>.

As you know, the Raytheon defendants served plaintiffs with interrogatories and requests for production of documents on November 18, 2005. On the due date, you called and asked for another ten days, to which I agreed. You then sent your responses on December 29, 2005. Both plaintiffs' answers were essentially the same, and our comments and requests for further responses apply to both.

Your cover letter with the responses suggested that a "settlement book" for the Dean case was on its way. I e-mailed you on December 30, 2005, asking about that and seeking information about the number of other documents being produced and costs for copying. I received the Dean "settlement book" on January 9, 2006, with your other answers but have not heard anything further on the request for copying and production of the other responsive documents. Please let me know the status of that at your earliest convenience.

This portion of the letter is intended to be an effort under Massachusetts Local Rules 7.1(a)(2), 26.2(c) and 37.1(b) to undertake a good faith effort to reach agreement before filing a motion to compel. As stated more specifically below, we believe that many of the objections and responses provided are inappropriate or inadequate, especially given the length of time this litigation has been pending and the additional time to respond that was granted by agreement.

In particular, Interrogatories 2, 4, 8, 9, 10, and 11 and related Request for Production 1 are standard contention interrogatories requesting a statement of the bases for your claims and identification and production of documents and witnesses supporting them. As it

January 13, 2006
Page 2

relates to documents and witnesses, we understand a reference to the Rule 26 disclosures, but the purpose of the interrogatories is to obtain more specific articulations of the claims under each count. These types of requests are allowed under Massachusetts law. Accordingly, your objection that the interrogatories seek legal theories, work product, and other privileged material is not a valid method for avoiding the questions. Moreover, to the extent any responsive material was withheld on the basis of a privilege, a privilege log must be prepared and produced. The same is true for the various requests for production of documents that received a like objection. No such log was produced. Please therefore provide answers to these interrogatories and any related responsive documents not previously produced, and provide a privilege log of anything withheld on the basis of any privilege.

Interrogatories 3 and 5 and Request for Production 12 ask for information and documents regarding your clients' claimed damages. We understand that some of the components of damage will be the subject of expert witness reports, but that does not relieve the plaintiffs of the obligation to provide the requested information. In fact, this is the kind of information that should have been provided with the initial disclosures under Rule 26, as a key purpose of that provision is to get out in the open early exactly what the damages claimed are and the bases for them. In addition, to suggest that at this late date your clients can still not even produce numbers or receipts for funeral and burial expenses is to highlight the inadequacy of these responses. Please therefore supplement these answers. Simply put, Raytheon is entitled to rely upon the answers to know the parameters of the total damages claimed and the bases for each component.

Specifically regarding Interrogatory 5, we understand also that punitive damages are within the province of the jury, but the question is appropriate and asks for the amount your clients claim and the facts on which they claim entitlement to punitive damages. Your answer provides no authority for your refusal to provide such information, and we request that you provide answers for both of your clients.

Interrogatories 6 and 7 and Request for Production 20 ask about life insurance, workers compensation and other benefits received. You object on an admissibility basis, but as you know, the scope of discovery is broader. You also purport to answer but do not provide the requested information. You mention that the only benefits received were paid by the employer but you do not provide the amounts, dates, and insurance company and policy information requested by the interrogatories. Please provide that information at your earliest convenience.

Interrogatory 12 asks simply what state's law you claim applies to your claims under each count. This is basic information we are entitled to know, and we see no reason why it should be secret. You took positions of seeking to apply Texas or Ohio law for other purposes which may now be moot. This is not privileged information nor does it call for expert testimony as your objection suggests. In addition, the reference to your Rule 26 disclosures is not helpful since there is nothing in those disclosures which relates to this topic. Please provide an answer,

January 13, 2006
Page 3

as knowing the law plaintiffs seek to apply to their claims is central to how these cases should further proceed.

Some of your other responses, including Interrogatories 13 and 14, refer to employee records that you imply Colgan still owes you. Please advise as to the status of your efforts to compel the production of those records and when we can expect to have them produced to us.

Request for Production 6 asks for medical records for five years preceding the accident. Your answer references medical records to be produced in the damages book, but it seems highly unlikely that those are the only medical records in existence for the five years preceding the accident. If you are not in possession of Mr. Dean's or Mr. Knabe's medical records for this period, please have the enclosed HIPAA-compliant medical record releases executed and forwarded to us at your earliest convenience with the identity of all healthcare providers so that we may obtain the records ourselves.

Request for Production 10 asks for income tax returns. Your answer speaks of production "if there are any, if and then we receive any from the IRS." This response is insufficient, and we ask that the specified returns be obtained and produced. They are clearly within your possession, custody or control.

Please provide these requested supplemental answers within ten (10) days so that we can avoid the need to file a motion to compel. Please also provide verifications for the answers provided, as they did not come with your production.

## 2.    Plaintiffs' Recent Discovery Demands.

As you know, we had made our paper discovery requests on a schedule that should have permitted production of that material in advance of the depositions of your clients. Consistent with that, we asked for available dates for their depositions before the close of discovery at the end of this month.

Otherwise, as you know, Judge Saris had ordered that you be provided access to the discovery in the Colgan case for use in this case so as to avoid duplication. Toward that end, we consented to your participation in the depositions of that case and also provided you with essentially everything we had produced in that case, all in keeping with Judge Saris's effort to avoid duplication of discovery in these cases. We understand also that you were obtaining from Colgan like material and therefore have the benefit of essentially everything done in that case, and it was substantial.

As you know, these cases have been pending for over a year now, and scheduling orders have been in place for some time, setting the close of fact discovery for the end of this

January 13, 2006
Page 4

month. Standard practice, and to our understanding also Judge Saris's expectation, is that discovery will be served and undertaken in time to be *completed* by the stated discovery cutoff.

The immense scope of the discovery demands served at the eleventh hour before the discovery deadline flies in the face of that practice and expectation. It is particularly inconsistent with the notion that the discovery performed in the Colgan case would be available for use in this case in order to avoid duplication. Besides being grossly excessive and late, these discovery demands are entirely redundant of the discovery already completed in the Colgan case. Copies of all such documents were shared with you or available to you from Colgan, and you participated in the depositions of essentially everyone you now wish to re-depose. This is improper, and we believe the discovery should not be allowed. Interestingly, your January 6, 2006, settlement demand also speaks of you potentially raising your demands "once discovery in this case commences." Discovery commenced in this case several months ago and should have been winding down by now, not ramping up.

      a.    <u>Interrogatories.</u>

The interrogatories you served approximately three weeks before the close of discovery can obviously not be answered by rule within the deadline. Paper discovery should be served in time to be answered by the deadline, and it is therefore untimely.

Moreover, F. R. Civ. P. 33 and Massachusetts Local Rule 33.1 limit the number of interrogatories to 25, including subparts. Your interrogatories ask at least three types of questions (identification and contact information, a summary of their knowledge or involvement, and identification of documents) for every one of 91 different people listed on a witness list filed in the Colgan case showing both people who would likely be called as witnesses and those who could potentially be called.

The people on the "will call" list should be ones with whom you are already quite familiar and have already been deposed. The other names were largely gleaned from the mass of documents that were exchanged in the Colgan case, which you should already have received.

Accordingly, not only does this interrogatory alone equate to 273 different interrogatories, far outstripping the limits in the rules, the information sought is already essentially in your possession. Interrogatory 2 is also seven interrogatories in one, thus bringing the total to 280 questions. The information sought through Interrogatory 2 can also be gleaned from the same documents and other discovery in the Colgan case to which you already have access. Accordingly, this discovery is not only too late and far beyond the scope allowed by the rules, it is redundant of discovery already completed, in which you participated or to which you have access, and which Judge Saris has already ordered is available for use in these cases. Accordingly, one questions whether the purpose of its service is to obtain the information already in your possession or rather to harass and inconvenience Raytheon for strategic gain at the tail-end of the discovery period.

January 13, 2006
Page 5

     b.    <u>Depositions</u>.

       Your clients' demands for additional and repeat depositions are likewise improper, especially given the incredible number demanded only three short weeks from the close of discovery.  Specifically, you notice the depositions of seven individuals whose depositions you had already taken.  In addition, you demand depositions on 12 different 30(b)(6) topics, virtually all of which either were or could have been covered in the depositions you already attended.

       Perhaps most incredibly, however, is that your deposition notice also requests Don Havnen and "all Raytheon employees or former employees listed on your witness list, attached."  There are approximately 23 other current or former Raytheon employees listed, and adding those to the others you noticed, that is approximately 43 depositions that you purport to schedule on 11 days' notice.  Your deposition notice also purports to require the deponents to produce documents when they appear, but under the Rules of Civil Procedure, they obviously cannot be compelled to do so unless given the full 30 days provided for document requests.

       Given the extreme scope of these discovery demands, the question again arises whether the purpose is truly to seek new information or rather harass the defendant.  This is simply improper.

       You purport to justify the re-taking of many of these depositions by claiming that new issues have surfaced.  Specifically, you claim that these repeated depositions are "necessitated by the fact that I recently received from the Alexandria court additional information disclosed relative to this crash."  You do not state, however, what that additional information is, how it is relevant, and how it leads to the need for these additional depositions.  Rather, you move on to suggest that a recent amendment to a more recent version of the maintenance manual is a justification for re-taking the depositions.  The recent amendment to which you refer, however, is to a portion of the maintenance manual relating not to elevator trim tabs, but rather the rudder of the aircraft.  In addition, it is an amendment to a version of the manual that came out well over a year after the Colgan accident.  It therefore has no bearing or relationship whatsoever to these cases and cannot possibly serve as a basis to re-take depositions already completed.

       Furthermore, local rules limit the number of depositions per side to ten, and if the depositions already taken in the Colgan case are intended to be used in these cases, the depositions you request exceed that limit.  It would therefore be your obligation to seek leave of the court to take additional depositions.

January 13, 2006
Page 6

       c.     <u>Don Havnen</u>.

      Your letter also mentions former Raytheon employee Don Havnen and seeks his deposition. Your letter also references the injunction Raytheon obtained obligating Havnen to honor his confidentiality obligations to the company, and you demand that we have it lifted or modified. Perhaps you have not seen the text of the order, a copy of which is enclosed. There is no need to modify anything, as all it does is state that Havnen is not to violate the terms of his confidentiality obligations to the company. Nothing about the injunction order prohibits him from testifying in response to an appropriate subpoena within the confines of his obligations to the company. Like the other depositions requested, however, we believe it to be improper and one for which you should seek leave in order to take. You are also correct that he is not within our control to produce and would need to be subpoenaed if the deposition were allowed.

       d.     <u>Motion for Protective Order</u>.

      While we believe the appropriate burden would be upon plaintiffs to seek leave to request this additional discovery, under the circumstances, we have decided to file our own motion for protective order to bring these matters to the court's attention. Enclosed you will find a courtesy copy. Note that we do not seek any adjustments to the fact discovery deadline or the case in general.

**3.**    **<u>Plaintiffs' Policy Limits Settlement Demand</u>.**

      In one of your January 6, 2006, letters, you make a combined demand for $10 million to settle both cases on the stated premise that you believe that to be the policy limits for this particular occurrence. The Rule 26 disclosures provided in these and the Colgan cases complied with Rule 26(a)(1)(D) and provided a copy of the only insurance policy we had possession of that could respond to this claim. You are correct that the limits on that policy are $10 million per occurrence. We do not wish to mislead you, however, as there is in fact excess coverage beyond the $10 million afforded to RAC under a blanket excess policy from a collection of London underwriters. I have now obtained a copy of that excess policy and the first two pages showing the relevant excess coverage are attached.

      Accordingly, to the extent you premise your demand on policy limits, we wanted to make sure you knew this additional information. Whether that causes you to change your demand or not, however, we are not currently in a position to respond to your settlement demands, whether they be $10 million or the combined $23.5 million from your settlement books, other than to reject them.

      While your letter suggests that this is a "clear case of liability," we could not disagree more. This terrible accident was caused by a series of unfortunate errors by Colgan's mechanics and flight crew. It was not caused by the maintenance manual or any other matter attributable to Raytheon. To the contrary, had the mechanics followed the maintenance manual

January 13, 2006
Page 7

and their training, and had the flight crew performed the required checks before flying the aircraft, this accident would never have happened.

As you know, we were prepared to defend these same issues in the Colgan case and appeared for trial ready to do so. We will do the same in this case unless your clients drastically change their expectations for resolution by agreement.

### 4. <u>Plaintiffs' Depositions</u>.

You proposed two different windows of time for the taking of the depositions of Lisa Weiler and Yisel Dean. I am unavailable on January 30 and 31, as I am taking depositions in another case where discovery closes at the end of the month. Your proposal for January 23 through 26 should work, but I need first to confirm the movement of a trial that I otherwise had set for January 23 and 24 and that we will receive from you the supplementation of your discovery responses outlined in Section 1 above before the depositions. Please reserve those dates and once that is confirmed, we will issue notices for them. We can of course arrange for law firms or court reporters' offices where these can occur in Dallas and Cincinnati, but if you have a preference for where you would like to produce them in those locations, please let me know.

Very truly yours,

MARTIN, PRINGLE, OLIVER,
WALLACE & BAUER, L.L.P.

By:    Michael G. Jones

MGJ/jh
Enclosures
c:    Gary Harvey / Peter Knight

# EXHIBIT "2"

EXCERPTS FROM
DEPOSITION OF MIKE SCHEIDT
AUGUST 4, 2005

COLGAN AIR v. RAC

LINE OF QUESTIONING:

MODEL 1900 BUDGETING &
RESOURCE ALLOCATION

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company

8/4/2005

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

COLGAN AIR, INC.,                         )
                                          )
                                          )
                    Plaintiff,            )
                                          )
                                          )
        vs.                               )Civil Action No.:
                                          )1:05 CV 213
                                          )
RAYTHEON AIRCRAFT COMPANY,                )
                                          )
                                          )
                    Defendant.            )
                                          )


D E P O S I T I O N

    The videotape deposition of MICHAEL J. SCHEIDT taken

on behalf of the Plaintiff, Colgan Air, pursuant to the

Federal Rules of Civil Procedure before:

            VESTA L. YORK, CSR, CRR
            KELLEY, YORK & ASSOCIATES, LTD.
            Suite 220, 200 North Broadway
            Wichita, KS    67202


a Certified Shorthand Reporter of Kansas, at Suite 500,


100 North Broadway, Wichita, Sedgwick County, Kansas, on


the 4th day of August, 2005, at 3:03 p.m.

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company

8/4/2005

Page 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


YISEL DEAN, Independent          )
Administratrix of the Estate of  )
Steven Dean, Deceased, and on    )
behalf of all statutory          )
beneficiaries,                   )
                                 )
                                 )
                    Plaintiffs,  )
                                 )
                                 )
        vs.                      )Case No. 05 CV 10155 PBS
                                 )
                                 )
RAYTHEON COMPANY, a Delaware     )
corporation; RAYTHEON AIRCRAFT   )
HOLDINGS, INC., a Delaware       )
corporation; RAYTHEON AIRCRAFT   )
COMPANY, a Kansas corporation;   )
RAYTHEON AIRCRAFT CREDIT         )
CORPORATION, a Kansas           )
corporation; COLGAN AIR, INC.,   )
a Virginia corporation, d/b/a    )
US Air Express,                  )
                                 )
                                 )
                    Defendants.  )
                                 )

Page 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


LISA A. WEILER, Administratrix    )
of the Estate of Scott A.         )
Knabe, Deceased, and on behalf    )
of all statutory beneficiaries,   )
                                  )
                                  )
            Plaintiffs,           )
                                  )

                                  )

    vs.                           ) Case No. 05 CV 10364 PBS

                                  )

                                  )

RAYTHEON COMPANY, a Deleware      )

corporation; RAYTHEON AIRCRAFT    )

HOLDINGS, INC., a Delaware        )

corporation; RAYTHEON AIRCRAFT    )

COMPANY, a Kansas corporation;    )

RAYTHEON AIRCRAFT CREDIT          )

CORPORATION, a Kansas             )

corporation; COLGAN AIR, INC.,    )

a Virginia corporation, d/b/a     )

US Air Express,                   )

                                  )

                                  )

            Defendants.           )

                                  )

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

```
                                                                      Page 4
                   A P P E A R A N C E S
PLAINTIFF COLGAN AIR:
        DOMBROFF & GILMORE, P.C.
        Mr. Thomas B. Almy
        Mr. Andre M. Gregorian
        Penthouse
        1676 International Drive
        McLean, VA 22102
        (703) 336-8723
        talmy@dglitigators.com

PLAINTIFFS YISEL DEAN and LISA A. WEILER:
        MOTLEY RICE LLC
        Ms. Mary F. Schiavo
        P. O. Box 1792
        28 Bridgeside Boulevard
        Mt. Pleasant, SC 29465
        (843) 216-9138
        mschiavo@motleyrice.com

DEFENDANTS RAYTHEON AIRCRAFT COMPANY, RAYTHEON COMPANY,
RAYTHEON AIRCRAFT HOLDINGS, INC., RAYTHEON AIRCRAFT
CREDIT CORPORATION and COLGAN AIR, INC.:
        MARTIN, PRINGLE, OLIVER, WALLACE & BAUER, LLP
        Mr. Michael G. Jones
        Suite 500
        100 North Broadway
        Wichita, KS 67202-2205
        (316) 265-9311
        mgjones@martinpringle.com
        HALL, SICKELS, FREI & KATTENBURG
        Mr. Robert T. Hall (For Colgan v. Raytheon only)
        Suite 150
        12120 Sunset Hills Road
        Reston, VA 20190
        (703) 925-0500
        robert.hall@hallandsickels.com

VIDEOGRAPHER:
        Advanced Document Imaging
        Ms. Julie Speer
        Suite 220
        200 North Broadway
        Wichita, KS 67202
        (316) 267-0800
        adi@adocimaging
```

Olender Reporting, Inc.              (888) 445-3376              WORLDWIDE
Washington, D.C.                     Baltimore, MD               Ft. Lauderdale, FL

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

Page 5

I N D E X

                                                                    Page

MICHAEL J. SCHEIDT

  Direct Examination By Mr. Gregorian                          6

  Cross-Examination By Ms. Schiavo                            36

  Redirect Examination Mr. Gregorian                          80


E X H I B I T S

No.        Description                                        Page

  51    Probable cause report for the NTSB                    48
        (15 pgs.)


  Signature of Witness                                        83


  Certificate                                                 84

DIRECT EXAMINATION
BY ANDRE GREGORIAN

(PAGES 11, 12, 17, 18, 34, and 35)

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

Page 11

```
 1          of the company do anything with respect to
 2          the manuals?
 3   A.     The manuals are functionally part of Raytheon
 4          Aircraft Engineering, a subsidiary of
 5          Publications.  Having said that, Raytheon
 6          Airline Aviation Services will be a catalyst,
 7          if you will, to cause cross-functional teams
 8          to meet and bring focus on things that we
 9          want to do in the areas of continuous
10          improvement anywhere on the airplane, not
11          just manuals.  My area will control -- since
12          we've been -- since we stood up, we will
13          direct the budget, if you will, on support of
14          the airplane.
15   Q.     I meant to ask this earlier, did you review
16          any documents in preparation for your
17          deposition?
18   A.     Specifically for this, I perused the
19          depositions of many of the Colgan employees
20          that were afforded, and I don't know -- I
21          didn't bounce it against a list, if I saw the
22          complete list, but I perused through a stack
23          of depositions.  I briefly read through the
24          NTSB's factual findings packet.
25   Q.     Did you speak to anyone other than your
```

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

Page 12

```
 1        attorneys?
 2   A.   Could you be more specific?  I've spoken to a
 3        lot of people.
 4   Q.   In preparation for your deposition, did you
 5        talk to anyone about, you know, what was
 6        going to go on today?  And did you get any
 7        further information on what you might be
 8        asked, anything like that?
 9   A.   Well, I obviously had some conversations with
10        counsel.  Prior to us being deposed, I did
11        visit with Willard Crowe.  Willard wanted to
12        ask my recollection of travel boards.  The
13        person that we probably would have had you
14        interview on the travel boards is a gentleman
15        named Larry Robinson.  He's had very serious
16        surgery in the last week or two.  And Willard
17        came to me last week and said that Larry's
18        associate, Chris Bergquist, was out on
19        holiday, and he said, "Could you just tell me
20        what you recall about the travel boards."
21   Q.   Okay.  And what did you recall about that?
22   A.   Well, he wanted to know, you know, why I
23        decided to afford travel boards to the
24        industry on our nickel, and it was nothing
25        more complex or more simple than, I had heard
```

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

Page 17

```
 1        what ideas they might have.  And they

 2        explained a concept to me called V & V.  And

 3        you'll have to excuse me, I don't know if

 4        it's validate and verify, or if it's verify

 5        and validate; but, in essence, you write a

 6        procedure where you observe a mechanic, but a

 7        nontrained mechanic on your airplane.  And

 8        you have them follow your procedures.  And

 9        then you adjust your procedures, as best you

10        can, to ensure that the mechanic can follow

11        it.  And so we've been doing that in what we

12        deem to be the most critical systems on our

13        airplane, and that is an ongoing effort

14        today.

15   Q.   In your subsequent meetings with the NTSB

16        following the Charlotte crash, what -- what

17        were those meetings about?

18   A.   Well, again, I only recall having one meeting

19        with the NTSB about all this.

20   Q.   Okay.

21   A.   If by chance I did have another one, I'm not

22        trying to obfuscate the truth, I just recall

23        that I met with them once, so I haven't had

24        subsequent meetings with the NTSB.

25   Q.   Okay.  And as far as your level of
```

Colgan Air, Inc v. Raytheon Aircraft Company                                         8/4/2005

Page 18

```
 1            involvement with the V & V process, the

 2            revising of the manuals, what level of

 3            involvement did you have?

 4    A.      Well, I think my involvement was to ensure

 5            that we had the budget to go do that, and I

 6            would, and to this day, endeavor to attend

 7            weekly manual -- what we call manual

 8            meetings, our integrated product team on

 9            manuals, to check the progress of the team,

10            show interest on behalf of senior management.

11            Common questions I would ask:  What kind of

12            obstacles do you have?  Do you need any help?

13            And we might -- you know, it's not just

14            money.  Sometimes it's man-loading.

15            Sometimes, well, we need to get this airplane

16            put into a hangar so that we can go test the

17            airplane.  So that would -- that would be my

18            past and ongoing involvement.

19    Q.      Would you have regular meetings with anyone

20            from Raytheon regarding the progress?

21    A.      Yes.

22    Q.      Who would you regularly meet with?

23    A.      Again, it's this cross-functional product

24            team.  I mean people like Ron Jaerger, Larry

25            Robinson, Chris Bergquist, Willard Crowe,
```

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

Page 34

```
 1          be from -- or a letter from Matt McCarthy to

 2          Dave Rosenberg.  Have you seen that before?

 3     A.   I haven't read it yet.  Let me push through

 4          it and then I'll let you know.

 5     Q.   Okay.

 6     A.   Okay.  I don't recall having seen this before

 7          today.

 8     Q.   The e-mail is apparently about the

 9          availability of actuators for the 1900

10          aircraft; is that correct?

11     A.   Yes.

12     Q.   And then the second paragraph here,

13          Mr. McCarthy states that he understands that

14          Raytheon is "trying to purge stock but

15          shouldn't we have an adequate supply of the

16          newest actuator?"  Are you aware of a problem

17          like this at this point in time regarding the

18          availability of actuators?

19     A.   Only from a cursory standpoint.  I -- could

20          you be more specific?

21     Q.   Well, sure.  Was Raytheon purging its stock

22          of actuators in August of 2003?

23     A.   No.  My understanding of the actuator dash

24          numbers, and I'm not your resident expert,

25          was we had different dash numbers because we
```

Olender Reporting, Inc.                     (888) 445-3376                     WORLDWIDE
Washington, D.C.                            Baltimore, MD                  Ft. Lauderdale, FL

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                          8/4/2005

Page 35

```
 1        were having product improvements, and they

 2        had a kit, and we had kits available.  But I

 3        think the customers wanted the actuators, not

 4        the kits is basically what I had heard.

 5             And we were doing what we do when

 6        components or items become in short supply,

 7        we do whatever we can to ensure that we can

 8        get the airplanes back in the air safely by

 9        leveraging our technical resources to either

10        say yea or nay or find the parts that they

11        need.

12   Q.   Okay.  So you don't know why Mr. McCarthy

13        would have said that Raytheon was purging its

14        supply?

15   A.   No.

16   Q.   Okay.

17             MR. GREGORIAN:  I believe I'm

18        done, at least for now.  She may have some

19        questions for you.

20             MS. SHIAVO:  I do, but like

21        before, can we take a couple minutes and get

22        the exhibits --

23             MR. JONES:  Sure.

24             MS. SHIAVO:  -- all pulled out

25        because I think that will be faster, and then
```

# CROSS EXAMINATION BY MARY SCHIAVO

## (PAGES 71 and 72)

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company

8/4/2005

Page 71

```
 1        this?
 2   A.   Let me try and give you the most accurate
 3        answer I can give you.
 4   Q.   Okay.  Sure.
 5   A.   It may not be exactly correct, and again I
 6        don't mean to obfuscate it.  For all 1900
 7        piloting type manual things, during my tenure
 8        at Raytheon, an engineering test pilot named
 9        Lou Johansen --
10   Q.   Okay.
11   A.   -- is our resident expert on this.  So
12        Mr. Johansen, to my knowledge and
13        recollection, always weighs in on any manual
14        change, improvement or deletion or what have
15        you.  That's not to say that there haven't
16        been others, but he has been our resident guy
17        that would assist tech pubs and engineering
18        on pilot stuff.
19   Q.   Okay.  We heard about one fellow yesterday
20        who was no longer with you, but Mr. Johansen
21        is still with you?
22   A.   Yes, ma'am.
23   Q.   Okay.  One of the other witnesses told us
24        about when the production stopped on the 1900
25        that it was spun off into a cost center.
```

MICHAEL J. SCHEIDT

Colgan Air, Inc v. Raytheon Aircraft Company                                    8/4/2005

Page 72

```
 1          That must not be the name of it.  What is
 2       this cost center that is now the 1900?
 3    A.  Well, since I wasn't there, I don't know what
 4       somebody was referring to.
 5    Q.  I understand.
 6    A.  In -- in the summer of 2001, it was pretty
 7       obvious that 19 seaters were not as much in
 8       vogue as they were ten years prior.  We were
 9       really assessing, "Were we going to keep
10       building the airplanes?  Were we not going to
11       be building the airplanes?"
12          When 9-11 happened, it certainly
13       didn't make things better for our airline
14       customers, and we indicated that we would put
15       the airplanes out of production.  Now at this
16       juncture, back then -- I told you today we
17       have 270 airplanes.  We have 515 airplanes
18       that we had either parked or we had loaned
19       money on those airplanes.
20          So we had a lot of stakes in the game
21       that the value of these airplanes would not
22       be perceived by our customers as falling off
23       the cliff when you stop production.  We
24       tended to put all the 1900 resources under
25       one roof, and that was me --
```