# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

|  |  |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>          Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>          Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>          Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>          Defendants. | DOCKET NO: 05cv10364 PBS |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME the defendants, Raytheon Company, Raytheon Aircraft Company, Raytheon Aircraft Credit Corporation, Raytheon Airline Aviation Services, LLC and Raytheon Aircraft Parts Inventory and Distribution Company, LLC ("defendants"), and hereby respectfully request pursuant Fed. R. Civ. P. 56 that this Court grant the defendants summary judgment on the entirety of the plaintiffs' claims. As grounds therefore, the defendants state that the plaintiffs cannot prove their claims as a matter of law.

Specifically, the plaintiffs' claims are barred because the sophisticated user defense precludes the plaintiffs' claims of negligence, breach of implied warranty, and violations of M.G.L. c. 93A, as the Colgan mechanics did not reasonably rely on the Airliner Maintenance Manual and the actions of the Colgan mechanics and the pilots broke the chain of causation. Additionally, the peripheral Raytheon defendants should be dismissed because they are not proper parties to this lawsuit. Plaintiffs' breach of express warranty claim is barred because the defendants did not provide any express warranty to plaintiffs. Also, plaintiffs' purported claims for res ipsa loquitor and pre-impact conscious pain and suffering have been dismissed by this Court, and otherwise, fail as a matter of law. Plaintiff Weiler's loss of consortium fails as a matter of law because she was not married at the time of the incident. Lastly, plaintiffs' claims for "grief, anguish, bereavement and emotional trauma" are not recoverable as a matter of law.

The defendants hereby incorporate and reference Defendants' Memorandum in Support of Their Motion for Summary Judgment and the exhibits attached hereto.

WHEREFORE, the defendants, Raytheon Company, Raytheon Aircraft Holdings, Inc., Raytheon Aircraft Company, Raytheon Aircraft Credit Corporation, Raytheon Airline Aviation Services, LLC, and Raytheon Aircraft Parts and Inventory Distribution LLC, respectfully request that their Motion for Summary Judgment be **ALLOWED**.

1028982v1

## <u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)</u>

Pursuant to LR 7.1(A)(2), defendants' undersigned counsel hereby certifies that prior to filing this motion, defendants' counsel conferred with plaintiffs' counsel and attempted in good faith, but without success, to resolve the matters in issue.

Raytheon Defendants
RAYTHEON COMPANY, RAYTHEON
AIRCRAFT HOLDINGS, INC., RAYTHEON
AIRCRAFT COMPANY, RAYTHEON
AIRCRAFT CREDIT CORPORATION
RAYTHEON AIRLINE AVIATION
SERVICES, LLC and
RAYTHEON AIRCRAFT PARTS AND
INVENTORY DISTRIBUTION LLC
By Counsel,


/s/ Peter C. Knight

_____

Peter C. Knight, BBO # 276000
Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439- 7500


and

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS 67202
(316) 265-9311

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing  (NEF) and paper copies will be sent to those indicated as non registered participants on  **October 27, 2006**

/s/ Peter C. Knight

_____

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>        Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>        Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>        Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>        Defendants. | DOCKET NO: 05cv10364 PBS |

**EXHIBITS TO DEFENDANTS' MEMORANDUM
<u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

| | |
|---|---|
| 1. | NTSB Aircraft Maintenance and Records Group Factual Report dated March 16, 2004 |
| 2. | Fred Leonelli Deposition taken in *Dean v. Raytheon Aircraft Company* |
| 3. | James Desmond Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 4. | Dominick Battaglia Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 5. | Thomas Jeffrey Vallejo Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 6. | Daniel Kinan Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 7. | Scott Servis Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 8. | NTSB Report dated December 29, 2003 |
| 9. | Dwight Law Colgan Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 10. | John Goglia Deposition taken in *Dean v. Raytheon Aircraft Company* |
| 11. | Michael Maddox Deposition taken in *Dean v. Raytheon Aircraft Company* |
| 12. | Donald Sommer's Expert Report submitted for the plaintiffs |
| 13. | Peter Sarluca Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 14. | Affidavit of Willard Crowe |
| 15. | Larry Ratliff Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 16. | Miguel Rodriguez Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 17. | REPS, 27-30-04 |
| 18. | NTSB Factual Report (RAC000204 – 218) |
| 19. | Colgan's Responses to Requests for Admissions, No. 20, submitted in the *Colgan Air v. Raytheon Aircraft Company* Case |
| 20. | Colgan's General Maintenance Manual |

| | |
|---|---|
| 21. | REPS 27-30-05 |
| 22. | REPS 27-30-09 |
| 23. | Fred Leonelli Deposition taken in *Colgan Air v. Raytheon Aircraft Company* |
| 24. | Colgan's First Flight of the Day Checklist |
| 25. | NTSB Group Chairman's Factual Report, Cockpit Voice Recorder (RAC000373 – 408) |
| 26. | Richard Nelson's expert report submitted in *Dean v. Raytheon Aircraft Company* |
| 27. | NTSB's Probable Cause Report |
| 28. | Lisa Weiler Deposition taken in *Dean v. Raytheon Aircraft Company* |
| 29. | Wayne W Wallace Affidavit |

# EXHIBIT 1

**NATIONAL TRANSPORTATION SAFETY BOARD**
**OFFICE OF AVIATION SAFETY**
**WASHINGTON, D.C. 20594**

March 16, 2004

<u>Aircraft Maintenance and Records Group Factual Report</u>

**NYC03MA183**

A:     <u>ACCIDENT</u>

Location:        Yarmouth, Massachusetts

Date:            August 26, 2003

Time:            1529 Eastern Standard Time

Aircraft:        Colgan Air, Flight 9446, Beech 1900D, N240CJ

B:     <u>AIRCRAFT MAINTENANCE AND RECORDS GROUP</u>

Group Chairman:                Stephen M. Carbone
                               National Transportation Safety Board
                               Washington, D.C.

Member:                        Eric West
                               Federal Aviation Administration
                               Washington, D.C.

Member:                        Robert Moorhead
                               Colgan Air Inc.
                               Manassas, Virginia

C:     <u>SUMMARY</u>

On August 26, 2003, at 1540 eastern daylight time, a Beech 1900D, N240CJ, operated by Colgan Air Inc. as flight 9446 (d.b.a. US Airways Express), was substantially damaged when it impacted water near Yarmouth, Massachusetts. The certificated airline transport pilot and certificated commercial pilot were fatally injured. Visual meteorological conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA), Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New York. An instrument flight rules flight plan was filed for the repositioning flight conducted under 14 CFR Part 91.

1

RAC 000409

On August 27, 2003, the Aircraft Maintenance and Records Group convened at the Colgan Air maintenance facility in Barnstable, Massachusetts, to interview maintenance personnel who worked on the tab actuators and trim tab control system of the accident airplane. On August 28, 2003, the Aircraft Maintenance and Records Group met at the Colgan Air corporate office in Manassas, Virginia, to examine the Colgan Air maintenance program and the airplane records of N240CJ. This facility houses the Maintenance Control, Training, and company officers for Colgan Air. The Aircraft Maintenance and Records Group completed the examination of the records on August 29, 2003.

The Aircraft Maintenance and Records Group Chairman performed a review of airworthiness directives, maintenance programs, weight and balance, supplemental type certificates, maintenance discrepancies, service difficulty reports, and contracts.

All interviews are attached to Appendix A of this report.

**D:**   **DETAILS OF INVESTIGATION**

**1.0**   **Aircraft History**

Per Federal Aviation Administration (FAA), Civil Aviation Registration records, the Raytheon Aircraft Company sold the accident aircraft, serial number UE-40, to Champlain Enterprises, Inc, operating as CommutAir on March 29, 1993.

On October 10, 2000, the aircraft was sold back to Raytheon Aircraft. For twenty-eight months the aircraft was kept at the Raytheon Aircraft facility in Wichita, Kansas awaiting sale.

The aircraft was leased to Colgan Air, Incorporated (Colgan Air) by Raytheon Aircraft Credit Association of Wichita, Kansas, on January 3, 2003 for a period of 84 months, through a lease contract. The aircraft entered service for Colgan Air on January 4, 2003 with the registration number, N240CJ.

**1.1**   **Aircraft Summary**

| | |
|---|---|
| FAA Registration Number: | N240CJ |
| Manufacturer Serial Number: | UE-40 |
| Manufacturer Line Number: | 40 |
| Original Delivery Date: | March 29, 1993 |

RAC 000410

Total Hours at Time of Accident: 16,503.5 hours
1,219.1 hours generated by Colgan.

Total Cycles at Time of Accident: 24,637 cycles
1,765 cycles generated by Colgan.

## 2.0   Aircraft Maintenance

### 2.1   Maintenance Summary Program - Raytheon BE 1900D

As per the Colgan Air Maintenance Program Manual (MPM), Colgan Air has a Continuous Airworthiness Maintenance Program (CAMP). The CAMP is broken down into a series of checks and inspections, which incorporates guidance from the Beech 1900D Airliner Maintenance Manual. As stated in the Colgan Air General Maintenance Manual, Volume Ten, Colgan Air is responsible for revising the MPM and CAMP.

Colgan Air utilizes a Continuing Analysis and Surveillance Program (CASP) as per Federal Aviation Regulation (FAR) 121.373. This program requires Colgan Air to examine the maintenance and inspection program.

The various inspections performed on the aircraft in the Colgan fleet are: Preflight Inspections, Routine Inspections, Detail Inspections, and Structural Inspections.

The Preflight Inspection is accomplished every four (4) flight-days. The inspection is performed according to workcard #05-20-07.

The Routine Inspection is accomplished every eight (8) flight-days. The inspections are conducted per workcard #05-20-00. Routine Inspections are performed in conjunction with the Detail Inspections.

The Detail inspections are broken down into six different phases. Subsequent phases are accomplished every 220 flight-hours. The completion of Detail One through Six is one full cycle. Only a subset of the aircraft's components is inspected each phase, resulting in the complete aircraft being inspected within the 1320 flight-hour cycle. The following is a list of specific major component areas covered under each phase:

| First | Workcard #05-20-01 | Wings |
| Second | Workcard #05-20-02 | Powerplant and Nacelles |
| Third | Workcard #05-20-03 | Flight Compartment/Cabin |
| Fourth | Workcard #05-20-04 | Environmental Systems/Nose |
| Fifth | Workcard #05-20-05 | Landing Gear |
| Sixth | Workcard #05-20-06 | Aft Fuselage/Empennage |

RAC 000411

The checks and inspection times can be exceeded by the use of an Extension Authorization form. Preflight inspections can be extended by one flight day, Routine checks can be extended by two flight days, and Detail checks can be extended by 10% of the inspection interval.

Breakdown of Colgan Air's Maintenance Program (attachment 1):

| | |
|---|---|
| Preflight Inspection: | Every four (4) Flight-Days |
| Routine Inspection: | Every eight (8) Flight-Days and with Detail Check |
| Detail Check: | Every 220 Flight-Hours |
| Structural Check: | As set forth by the manufacturer |
| Engine Program: | Continuous Airworthiness Maintenance Program. |

Each inspection phase of the Detail Inspection also includes General Service Items and Operational Inspection Procedures that require functions necessary to guarantee the aircraft's continued airworthiness.

Structural inspections are performed in accordance with guidelines set down by the manufacturer (attachment 2). The inspection schedule is:

| | |
|---|---|
| A Check: | 12,000 flight-hours |
| B Check: | 15,000 flight-hours |
| C Check: | 18,000 flight-hours |
| D Check: | 17,500 flight-hours |
| E Check: | 20,500 flight-hours |
| F Check: | 24,000 flight-hours |
| G Check: | 30,000 flight-hours |

4

RAC 000412

The previous checks for aircraft N240CJ were accomplished as follows:

Preflight Inspection:

August 23, 2003
Flight Hours: 16,499.1
Cycles: 24,627

Routine Inspection:

August 24, 2003
Flight Hours: 16,503.5
Cycles: 24,637

Detail Inspection:

Check 6:

August 24, 2003
Flight Hours: 16,503.5
Cycles: 24,637

Check 5:

July 15, 2003
Flight Hours: 16,287.8
Cycles: 24,340

Check 4:

June 6, 2003
Flight Hours: 16,079.5
Cycles: 24,052

Check 3:

April 29, 2003
Flight Hours: 15,889.1
Cycles: 23,773

Check 2:

March 18, 2003
Flight Hours: 15,653.1
Cycles: 23,476

Check 1:

February 6, 2003
Flight Hours: 15,470.5
Cycles: 23,142

Structural Check:

March 22, 2003
Flight Hours: 15,706
Cycles: 23,493

5

RAC 000413

## 2.2    Weights and Balance Summary

An aircraft weigh is done every three years or when the aircraft is repainted. The aircraft was last weighed December 17, 2002 in Bethany, Oklahoma (attachment 3).

| | |
|---|---|
| Empty Weight | 10,300 pounds |
| Empty Weight Arm | 282.1 inches |
| Basic Empty Weight | 10,370 pounds |
| Basic Empty Weight Arm | 282.3 inches |
| Basic Empty Weight Moment | 2,927,460.4 inch-pounds |

A Revised Weight and Balance sheet was filed for installation of the Digital Flight Data Recorder Upgrade Kit on December 20, 2002, in Bethany, Oklahoma.

| | |
|---|---|
| New Weight added | 6.7 lbs. at 282.3 inches |
| New Basic Empty Weight | 10,376.7 pounds |
| New Basic Empty Weight Arm | 282.3 inches |
| New Basic Empty Weight Moment | 2,930,240.9 inch-pounds |

## 2.3    Engines: PT6A-67D

| SECTION | SERIAL NUMBER | INSPECTION/ OVERHAUL FREQUENCY (HOURS) | LIMIT (CYCLES) | HOURS at LAST OVERHAUL/ INSPECTION | CYCLES at LAST OVERHAUL/ INSPECTION | DATE of LAST OVERHAUL/ INSPECTION |
|---|---|---|---|---|---|---|
| #1    GAS GENERATOR OVERHAUL | 114052 | 8000 | N/A | 12125.5 | 19726 | 10.25.00 |
| #2    GAS GENERATOR OVERHAUL | 114111 | 8000 | N/A | 14942.2 | 21731 | 10.30.00 |
| #1    HOT SECTION INSPECTION | N/A | 4000 | N/A | 14007.9 | 21889 | N/A |
| #2    HOT SECTION INSPECTION | N/A | 4000 | N/A | 14942.2 | 21731 | N/A |
| #1    POWER SECTION OVERHAUL | 114052 | 8000 | N/A | 12287.6 | 19947 | 10.25.00 |
| #2    POWER SECTION OVERHAUL | 114111 | 8000 | N/A | 14942.2 | 21731 | 10.30.00 |

6

RAC 000414

At the time of the accident:

**#1 Engine**    Part Number: P&W PT6A-67D    Serial Number: PCE-114052

GAS GENERATOR:    Hours: 15,245.5    Cycles:    23,662
POWER SECTION:    Hours: 15,407.6    Cycles:    23,883

**#2 Engine**    Part Number: P&W PT6A-67D    Serial Number: PCE-114111

GAS GENERATOR:    Hours: 15,245.5    Cycles:    23,662
POWER SECTION:    Hours: 15,407.6    Cycles:    23,883

## 2.4    Engine Monitoring System

Per the Colgan Air MPM, the engines are part of the Engine Continuous Airworthiness Maintenance Program (CAMP) (attachment 4). The CAMP is based on the life cycle limits of the rotating components. Pratt and Whitney Canada Service Bulletins and engine teardown data determine these limits. The CAMP consists of fixed hour and cycle limits at which the Power Section and Gas Generator Modules will be overhauled. These overhauls are performed at the Pratt and Whitney Canada Overhaul Service Center or at a Pratt and Whitney Canada PT6A-67D authorized Certified Repair Station.

## 2.5    Propellers

At the time of the accident:

**# 1 Propeller:**    Part Number:  HC-E4A-3I  Serial Number:  HJ-123A

Time Since New:    9871.0 hours
Time Since Major Overhaul:    2483.5 hours

**#2 Propeller:**    Part Number:  HC-E4A-3F  Serial Number:  HJ-88A

Time Since New:    15,906.4 hours
Time Since Major Overhaul:    109.8 hours

Per the Colgan Air MPM, the propellers are maintained under an approved Colgan Air CAMP program. The program provides guidelines for maintenance items and requirements to inspect, service, and replace life limited components. Overhauls are performed in accordance with the Hartzell 143 Overhaul Manual.

RAC 000415

## 2.6    Aircraft Status

### 2.6.1  Minimum Equipment List (MEL)

Per Colgan Air records, there was one open MEL item at the time of the accident: *Flight Data Recorder Inoperative (Elevator Trim Tab Parameter)*. An "A" category item due to be repaired by August 29, 2003.

### 2.6.2  Aircraft Condition Report

Per the records supplied by Colgan, the Aircraft Condition Reports were reviewed. No open items were found.

### 2.6.3  Supplemental Type Certificates

Supplemental Type Certificates[1] (STC), supplied by Colgan were reviewed. One Supplemental Type Certificate, #SA00968NY, was recently issued. This STC authorized the installation of a Flight Data Recorder and sensors.

### 2.6.4  Airworthiness Directive (AD) Summary and Service Bulletins (SB)

Colgan Air provided AD and SB summaries, which were reviewed. All listed Airworthiness Directives and Service Bulletins have been complied with.

Four AD/SB items are of note:

*AD 2002-23-11: Prevent Balance Weight Attachment Screws from Becoming Loose, Which Could Restrict Elevator Movement.* The item was complied with as a Service Bulletin #27-3187R1 on December 19, 2002. No defects were noted (attachment 5).

*AD 99-09-15: Flight Controls – Inspection for Control Column Interference with Wiring Behind the Instrument Panel.* This was accomplished on July 6, 1999 (attachment 6).

*AD 2003-09-12: Replacement of Missing Rivets.* This AD was not accomplished, but required accomplishment by June 27, 2004 or 1200 hours time-in service from June 27, 2003. The accident aircraft never reached these two compliance points.

*AD 2003-04-26: Inspection of AC Inverter and Modification of Inverter and Inverter Wire Shield.* This AD was not accomplished, but required accomplishment by October 21, 2003. The aircraft never reached the compliance date.

---

[1] The FAA issues Supplemental Type Certificates. They authorize a major change or alteration to an aircraft, engine, or component that has been built under an approved Type Certificate.

8

RAC 000416

*Emergency AD 2003-03-18: Elevator Rig Check.* This Emergency AD was accomplished as part of a Fleet Campaign Directive (FCD) #1900-27-03-01 revision one, on January 31, 2003. *AD 2003-03-18: Elevator Rig Check.* A follow-up AD was accomplished on February 2, 2003 as part of FCD #1900-27-03-02.

### 2.6.5  Prior Related Discrepancies Involving N240CJ

August 25, 2003 – Right Tab Actuator replaced and Forward Trim Cable replaced.
August 24, 2003 – Left and Right Tab Actuators replaced.
July 9, 2003 – Removed and replaced Elevator Trim Tab Servo.
April 29, 2003 – Pitch Trim Chain re-tightened due to excessive slack.

### 2.6.6  Logbook Forms

The maintenance paperwork from January 2003 through August 2003 was reviewed for discrepancies specifically related to elevator or pitch control. No trends or discrepancies were noted.

### 2.6.7  Service Difficulty Reports[2]

The FAA Service Difficulty Reports were reviewed for the accident aircraft. No flight control maintenance trends or discrepancies were noted.

### 2.6.8  Major Repairs and Alterations

A review of the records for Colgan Air revealed one Major Repair on June 2, 1999. The previous owner, Champlain Enterprises, recorded this repair on a FAA Form 337[3]:

"Replaced damaged left Horizontal Stabilizer structural parts with new manufacturer supplied items duplicating original installation." The parts were used to repair the leading edge of the left horizontal stabilizer. Work was performed per the Structural Repair Manual 114-590021-9B7.

---

[2] A Service Difficulty Report (SDR) is a report of the occurrence or detection of each failure, malfunction, or defect as required by 14 CFR 121.703 and 121.704.
[3] A FAA Form 337 is used to record and document a major repair or a major alteration to an airframe, powerplant, propeller, or appliance. Block three of this form is used by an FAA Aviation Safety Inspector to approve data for a major repair or major alteration.

9

RAC 000417

## 3.0    Colgan Air Incorporated

The Colgan Air Director of Quality Assurance stated that the carrier operates as a Part 121 Operator, a domestic air carrier operator, operating under certificate number NSVA 519S. Colgan Air operates nine Saab 340B aircraft and fifteen BE1900 aircraft. The BE1900 aircraft are divided into five "C" and ten "D" models. Colgan Air maintains a contract with US Airways to supply regional airline support. The aircraft are flown under the US Airways Express livery through line maintenance facility destinations in Connecticut, Maine, Massachusetts, New Hampshire, New York, Ohio, Pennsylvania, Rhode Island, Vermont, and West Virginia.

The Colgan Air General Maintenance Manual (GMM) states that Colgan Air operates three base maintenance facilities: Albany, New York; Hyannis, Massachusetts; and Manassas, Virginia. There is one Main Base Maintenance Facility[4], located in Manassas, Virginia in the Broad Run airport (HEF). The Manassas station is strictly fly-in scheduled maintenance and houses the home office.

By the GMM, Albany (ALB) and Hyannis (HYA) are considered Sub Base Maintenance Facilities[5]. ALB and HYA are also utilized as passenger destination cities, where the scheduled maintenance can be performed and passenger service is available.

Colgan Air employs its own maintenance technicians (MTS) that perform all the necessary scheduled and phase maintenance on its fleets. The training for these MTS is accomplished with both On the Job Training (OJT) and classroom familiarization training. The OJT tasks are compiled by aircraft model and broken down by Air Transport Association (ATA) chapter and sub-chapter. The classroom training for the 1900D is broken out into two phases: Phase One and Phase Two, each consisting of aircraft specific instruction.

---

[4] The Colgan Air GMM describes a Main Base Maintenance Facility: "adequate facilities support and personnel are available to accomplish major repairs and all scheduled and unscheduled maintenance and inspections. Alterations may be performed on aircraft and related equipment, within the limits of the facility".

[5] The Colgan Air GMM describes a Sub Base Maintenance Facility: "adequate facilities support and personnel are available to accomplish the work assigned by the Director of Maintenance. This work may include major repairs, all scheduled and unscheduled maintenance and inspections and alterations of aircraft and related equipment, within the limits of the facility".

RAC 000418

Line Maintenance Facilities[6], or line stations, provide unscheduled maintenance support and the dispatch of revenue aircraft. Several line stations for Colgan Air utilize contract maintenance personnel for support. Contract maintenance communicates to Colgan Air through the Maintenance Control department for assignments, necessary paperwork, and/or instructions.

## 3.1     Hyannis Maintenance Facility

The Colgan Air GMM shows the HYA sub base maintenance facility is located at the Barnstable airport in Hyannis, Massachusetts. Phase (Detail) checks, Routine checks, and scheduled maintenance are accomplished in HYA as part of the Colgan Air maintenance program. The hangar has the equipment, parts, manpower, and tools to support the various scheduled maintenance performed there.

HYA is provided with one Quality Assurance (QA) inspector, 16 maintenance technicians (MTS), and three lead technicians/delegated QA inspectors (DQI) to perform the scheduled maintenance assigned to the station. Two maintenance supervisors are on-site to oversee the station and its operation.

The Director of Quality Control for Colgan Air stated that MTS and lead technicians (leads) are scheduled between three different shifts: one daytime shift, one afternoon shift and one nighttime shift. Each shift is covered seven days per week. The employees on the day and afternoon shifts work an eight-hour per day shift with five days on and two days off. The nighttime shift employees work a ten-hour per day shift with four days on and three days off. The supervisors work shifts that allow contact with all three shifts during the workweek.

The QA Inspector works an eight-hour per day shift for five days per week on a late evening shift and is supported by the three DQI inspectors. The DQI assumes the inspection duties for the QA inspector on his days off.

---

[6] The Colgan Air GMM describes a Line Maintenance Facility: "adequate facilities support and personnel are available to accomplish the work assigned by the Director of Maintenance. This work may include scheduled and unscheduled maintenance, inspections, checks, repairs, alterations, and adjustments in accordance with the directions of Colgan Air, Inc. procedures in this manual".

11

RAC 000419

## 4.0    Training

According to information provided by the Director of Quality Control (DQC) for Colgan Air, their training program is maintained in compliance with FAR 121.375. The Vice President of Maintenance (VPM) has the ultimate responsibility for training. The DQC reports to the VPM for all aspects of required training. The oversight of the DQC includes: assuring that training records are properly recorded, development of training and testing programs, and assuring that OJT is recorded in a timely manner.

As per the VPM, prior to and following the accident, a Maintenance Instructor (MI) was employed for maintenance training. His duties included training records documentation along with a Maintenance Administrative Assistant (MAA). The MAA was also responsible for training records documentation. In July 2003 the then current instructor left the company, a replacement was actively looked for. During the period when a full time instructor was not employed the DQC maintained personal oversight of the training program. Colgan found and hired a replacement instructor in early September 2003.

The DQC stated that Indoctrination training precedes an employee's start date and consists of Ground Handling and Airworthiness Release training. The employee is given a 16-hour introduction course on Colgan Air's paperwork, policies, safety, and procedures. The employee is required to demonstrate their knowledge with oral testing and a workbook. The MI conducts the indoctrination training at the HEF facility and re-qualifies the maintenance technician annually.

The aircraft systems training for the A&P mechanics, manager, leads, and QA Inspectors is accomplished through both formal systems training and OJT. Formal, or familiarization (FAM), training for the fleet is provided by the MI. FAM training for each aircraft is divided into two phases: Phase One and Phase Two.

According to the DQC, Phase One training is an eight-hour class that is predominantly classroom training. Some time is spent visiting an aircraft for hands-on familiarization. The MI provides instruction for the course, which is conducted at HEF. The course consists of the basic introduction and aircraft familiarization training. Differences between the BE1900 C and D are taught, to make the technician aware of physical dissimilarities between the two aircraft.

As attested to by the DQC, Phase Two is a 40-hour classroom-training course combined with hands-on instruction at the aircraft. The MI teaches the lessons, which is comprised of Systems training for each applicable Air Transport Association[7] (ATA) chapter. The course is designed to expand upon the lessons taught in Phase One, with differences training for the BE1900 C and D models.

---

[7] The Air Transport Association (ATA) has separated the various systems, structures, powerplant, and propeller components into numbered ATA chapters to simplify the referencing of aircraft parts, repairs, modifications, and inspections.

RAC 000420

Previously trained MTS and/or lead, acting as instructors, provide OJT training to untrained technicians. This form of training is strictly hands-on using the manual as the guideline and controlled on the shop floor by the Lead technician. Each technician is provided with a workbook for each aircraft type.

The workbook's pages are divided in order by ATA chapter, sub-chapter, and task (attachment 7). As the technician completes a task, the instructor signs the technician off and a copy is made for the technician's training records. The technician's supervisor is responsible for assuring the records for each technician is current.

The DQC stated that Colgan Air maintains a computerized tracking system for training. Annual indoctrination and other required re-qualification training are followed by the computer. The technician's supervisor is alerted to necessary training for his reporting MTS. The MI oversees the computer tracking to assure it is complied with. A review of the MTS training records shows that the mechanics involved in this job had the proper training as defined by the FAA accepted Colgan Air Manual System.

## 5.0    Maintenance Performed

### 5.1    Detail Six

According to Colgan Air's maintenance records, on August 23, 2003, aircraft N240CJ underwent a Detail Six (D6) phase check (attachment 8) as part of its approved phase maintenance program using guidance from the Beech 1900D Airliner Maintenance Manual. The D6 check was performed at the Hyannis, Massachusetts (HYA) station beginning on August 23 at 1647[8].

The MPM states that the emphasis of the D6 check is on the empennage and aft fuselage, which includes visual inspections, lubrications, free play checks, engine borescopes, engine mount torque checks, servicing, operational checks, and cable tension checks.

The check was interrupted mid-stream (procedures for interrupting checks are contained in the GMM section 3.5.3) and the remaining work was deferred on August 24, 2003 at 0800. Ten revenue flight legs were conducted on Sunday August 24, and the D6 check was continued that night at 2030. The check was completed on Tuesday August 26, 2003 at 1100.

---

[8] 1647 – all times reported are in local military hours.

RAC 000421

## 5.2    Unscheduled Maintenance

According to Colgan Air's maintenance records, on August 24, the maintenance technicians (MTS) performed workcard # 27-30-01 (attachment 9) as part of the D6 work package. Section two of this workcard requires a free play check of the elevator trim tab actuators. The MTS accomplished the 19 steps for this check and found both left and right elevator trim tab (ETT) actuators to have failed this check. Failure of the actuators by this check requires replacement before further flight. Two actuators were ordered and four MTS were assigned - two to each actuator - to replace them.

As per the BE1900D maintenance manual, replacement of the ETT Actuators requires accomplishment of all the manual procedures per the BE1900D maintenance manual (MM), 27-30-06 (attachment 10). Interviews were conducted with: a maintenance technician, who replaced the left actuator the first day and the right actuator the second day; the lead technician (LT) on duty; and the Quality Assurance (QA) inspector who performed the required item inspection (RII). Per the interviews, the maintenance manual procedures were followed.

According to the interviews, the MTS chose to omit step (c) of the *Elevator Trim Tab Actuator Removal* and step (i) of the *Elevator Trim Tab Actuator Installation*. Omission of these steps discounts nineteen maintenance steps required by the manufacturer's MM in the process of accomplishing the ETT actuator replacements. These steps guide the maintenance technician through the removal and installation of the elevator control surface(s) and are the MM procedures 27-30-02 (attachment 11).

As per interviews with the maintenance technician who replaced the actuators, the ETT system cables were not blocked[9] during the actuator replacements. According to MM 27-30-06, blocking is not a required step within the maintenance procedures. Blocking of cables is not referenced in Chapter 7 of Advisory Circular 43.13-1B as part of recommended best practices.

According to the interviews with the maintenance technician, the two ETT actuators were replaced and an operational check was conducted. In the process of performing operational checks, the ETT cable system seized. The maintenance technician took the pedestal panels loose to ascertain the problem with the cable system. The maintenance technician documented that the "Elevator trim tab cable fell off drum under pedestal" on Maintenance Work Order # 08477.

---

[9] Blocking is a practice, not a standard that maintains minimum pressure on a cable system. The pressure prevents the cables from coming off the system's pulleys or drums due to excessive slack. Blocking is accomplished in different ways and through several methods. Cable blocking, by assuring proper tension on the cable during maintenance, secures the integrity of the cable routing.

RAC 000422

The maintenance technician discovered that the ETT forward cable became kinked[10] and ordered out a replacement cable. The necessary floorboards and access panels were opened to gain entry to the forward cable. The LT stated during an interview that management at Colgan Air had been in discussion with Raytheon Aircraft to determine if the part number of the right hand (R/H) ETT actuator was correct. It was found that the part number was incorrect and the R/H ETT actuator had to be replaced. This part was also ordered out under the correct part number.

The ETT actuator and forward cable were delivered to the hangar the following afternoon, August 25, 2003. That night two MTS were assigned to replace the recently installed R/H ETT actuator and two MTS were assigned the ETT forward cable change. The forward cable was replaced per MM 27-30-04 (attachment 12), while the R/H ETT actuator was replaced per MM 27-30-06. The steps (c) and (i), removal and installation of the right elevator, were omitted.

As per interviews with the two MTS that performed the forward cable replacement, the drum assembly was removed in the cockpit during the dayshift, prior to their assignment to the forward cable change. The turnover from day shift to night shift did not contain written turnover notes of explicit work performed. Non-routine discrepancies on the Detail check were open that indicated that work was not complete.

Per interviews, the two MTS did not use a lead wire[11] when routing the cable through the forward cable pulley system. Attaching lead lines as part of the cable replacement is addressed in MM 27-30-04. Step (g) states, "attach lead lines to the aft ends of the forward cables and properly identify them to facilitate reinstallation." One of the maintenance technicians marked the topmost cable pulleys with a letter "T" to facilitate re-assembly. Following the re-assembly both MTS checked the routing of the forward cable by referring to MM 27-30-04, figure 201.

The BE1900D maintenance manual does not contain an Elevator Trim System Operational check. The MTS stated that testing of the system was based on what they determined to be proper tests for properly testing the system components.

---

[10] Kinked – the cable in this instance became caught between the forward drum and structure. When the cable was moved between the drum and structure, it became damaged and an imperfection was introduced into the cable, weakening the integrity of the cable.
[11] Lead wires are used to assure the proper routing of cables and electrical wiring when being removed during maintenance. A thin wire or string is attached to the cable and "follows" the cable as it is pulled out of the pulley system (electrical wire out of the conduit). The lead wire becomes a visual guide for the removed cable's route and is attached to the replacement cable. It is then pulled back through the system to assure the replacement is properly routed back.

15

RAC 000423

According to interviews with the QA inspector and the LT, the ETT system was re-checked following the cable replacement performed. The system had been run full up and down travel several times, both electrically and manually. The QA inspector performed the RII function and was present at both the tail and the cockpit pedestal during all phases of the operational checks. The QA inspector was satisfied with the performance of the ETT cable system and the two ETT actuators and complied with the RII functions of the job.

During interviews, the two MTS working the forward ETT cable stated there was no confusion in the handling of the cable drum or how the manual illustration was interpreted. The MTS admitted to winding the cable and installing the drum to agree with the depiction in the manual. They further stated that the job went normally and that the operational checks were good.

At the conclusion of the ETT system work, the D6 check was closed and the aircraft released for service on August 26th at 1100. After work on the ETT system, the AMM requires that a null check be performed on the Elevator Trim Tab sensor that provides data to the Flight Data Recorder (FDR) after cable rigging and tensioning. Because of time and the lack of availability of the vendor, who has the equipment and specialists to accomplish this task, the ETT parameter was deferred in the Aircraft Maintenance Logbook prior to flight in accordance with the Minimum Equipment List (MEL) 31-3, control number 8173.

Stephen Carbone
Aircraft Maintenance and Records Group Chairman

RAC 000424

*Dean vs. Raytheon Aircraft Company, Case No. 05-CV-10155-PBS*
*Defendants' Memorandum in Support of Motion for Summary Judgment*

# EXHIBIT 2

Frederick J. Leonelli   October 3, 2006

Page 1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
     YISEL DEAN, et al.,
 3              Plaintiffs,
            vs.
 4                        Case No. 05 CV 10155 PBS
     RAYTHEON COMPANY, a Delaware
 5   corporation, RAYTHEON AIRCRAFT
     HOLDINGS, INC., a Delaware
 6   Corporation, RAYTHEON AIRCRAFT
     COMPANY, a Kansas Corporation,
 7   RAYTHEON AIRCRAFT CREDIT
     CORPORATION, a Kansas Corporation,
 8              Defendants.
     _____
 9   LISA A. WEILER, et al.
            Plaintiffs,
10        vs.             Case No. 05 CV 10364 PBS
11   RAYTHEON COMPANY, a Delaware
     corporation, RAYTHEON AIRCRAFT
12   HOLDINGS, INC., a Delaware
     Corporation, RAYTHEON AIRCRAFT
13   COMPANY, a Kansas Corporation,
     RAYTHEON AIRCRAFT CREDIT
14   CORPORATION, a Kansas Corporation,
              Defendants.
15
     DEPOSITION OF:  FREDERICK J. LEONELLI
16   DATE:           October 3, 2006
     TIME:           8:51 a.m.
17   LOCATION:       A. William Roberts, Jr. & Associates
                     6047 Tyvola Glen Circle
18                   Charlotte, North Carolina
19   TAKEN BY:       Counsel for the Defendants
20   REPORTED BY:    CINDY A. HAYDEN, RMR, CRR
21   _____

22        A. WILLIAM ROBERTS, JR., & ASSOCIATES

     Charleston, SC              Columbia, SC
23   (843) 722-8414              (803) 731-5224
                   Myrtle Beach, SC
24                 (843) 839-3376
     Greenville, SC              Charlotte, NC
25   (864) 234-7030              (704) 573-3919
```

Frederick J. Leonelli   October 3, 2006

Page 26

1    Q.  So you have two?
2    A.  Yeah.  Yeah.  I have both.
3    Q.  Is that it?
4    A.  Yes.
5    Q.  What about Colgan's CAMP, did you
6  review that?
7    A.  Maintenance program?  No.
8    Q.  What's a CASS, C-A-S-S?
9    A.  That's a requirement under the Part 121
10  that requires -- is a continuing analysis
11  surveillance system.
12    Q.  Okay.  What's that about?
13    A.  Well, under Part 121, every airline,
14  121 operator, and also scheduled 135 operators have
15  to have a continuing analysis and surveillance
16  system.  That system is an internal -- it has two
17  functions, provides internal auditing and analysis.
18  It's supposed to -- the system's supposed to be
19  established to set up and be able to measure the
20  performance and effectiveness of the maintenance
21  program -- maintenance and inspection program.
22    Q.  Is it a method for improving systems in
23  place?
24    A.  It's a quality assurance system that's
25  there for the two purposes, to detect problems and

Page 27

1  also, through analysis, implement or recommend
2  improvements in different procedures.
3    Q.  So, to detect problems in place in the
4  operation itself?
5    MS. SCHIAVO:  Object to the form.  It's
6  beyond the scope of the testimony in what he was
7  called to testify about.  But you can go ahead.
8    THE WITNESS:  Okay.
9    A.  It's in -- in relationship to
10  maintenance departments.  So, for instance, I would
11  do an internal audit of my quality control
12  organization to make sure that they are doing --
13  they're posting their technical manuals when
14  required.  They get the revisions and they're
15  properly posted.  The organization, the CASS
16  organization, would be the people that go and do
17  internal audits.  They also do monitoring of any
18  contracted facilities that the company uses.
19    Q.  So the CASS program people, as you say,
20  are they typically within the operator or are they
21  FAA or government people?
22    A.  They are within the operator.
23    Q.  Okay.  So under a CASS, the operator
24  sets up a group that will monitor the operations of
25  the company itself, right?

Page 28

1    MS. SCHIAVO:  Object for the record.
2  Go ahead.
3    A.  Yeah.
4    Q.  And they're looking for ways to improve
5  their operations?
6    A.  They're looking for ways to improve
7  their operations, they're looking for ways to
8  detect problems and correcting them, and they're
9  also looking at contracts.  For instance, I
10  contract out to a repair station.  They would go
11  out to that repair station to make sure that that
12  repair station, when I had my aircraft there, would
13  do the maintenance in accordance with the airline's
14  maintenance program.  So it provides a mini
15  oversight.  It's the internal oversight system for
16  the airline.
17    Q.  So why is the FA a requirement?
18    MS. SCHIAVO:  Object to the form.  Go
19  ahead.
20    A.  They -- the intent of it is, is to make
21  sure that air carriers operating in the -- in the
22  air transportation system or higher level system
23  have means and mechanisms to monitor their own
24  operations for, you know, proper performance and --
25  and the effectiveness of it.

Page 29

1    Q.  And when you say higher levels, are you
2  talking about 121 operators?
3    A.  Yes.
4    Q.  Which are airline-type carriers, right?
5    A.  Yes.
6    Q.  And then you said also some 135
7  operators?
8    A.  Yeah.  You have the ones that are still
9  between the 121 and the 135 air taxi.  Those, if
10  they are in air transportation -- scheduled air
11  transportation and still considered 135, they have
12  to have a CASS system also.  Air taxis, the charter
13  operators, things like that, under 135 do not have
14  to have that.
15    Q.  When did the CASS system come into
16  place?
17    A.  1963.
18    Q.  So it was there when you were with the
19  FA?
20    A.  Before, yeah.
21    Q.  Did you have any dealings with it when
22  you worked with the FA?
23    A.  Well, my organization, the one I
24  left -- the one I retired out of was the
25  organization that developed regulations, policies,

8 (Pages 26 to 29)

Frederick J. Leonelli    October 3, 2006

Page 114

1  pedestal tab control drum to the right-hand threads
2  cable of the actuator drum.
3      Q.  So the left-hand threads are to come
4  off the forward side of the cable --
5      MS. SCHIAVO:  Objection.
6  BY MR. JONES:
7      Q.  -- following that forward as-installed
8  arrow, correct?
9      MS. SCHIAVO:  Object to the form.  Go
10 ahead.
11     A.  According to this picture --
12     Q.  Okay.
13     A.  -- this illustration, yeah.
14     Q.  All right.  So once that -- once this
15 gets installed with the cables wrapped backwards,
16 the right-hand threads are, in fact, coming off the
17 front instead of the left-hand, correct?
18     A.  Yeah.  Yes.
19     Q.  So you're saying that the fact that the
20 right-hand threads coming off the front instead of
21 the left-hand threads caused there to be a crossing
22 downstream somewhere --
23     A.  Yes.
24     Q.  -- of these cables?
25     A.  As far as I made out, yeah.

Page 115

1      Q.  Okay.  Why?  Why does this right-hand
2  thread coming off the front instead of the back
3  cause there to be a crossing downstream?
4      MS. SCHIAVO:  Object to form.
5      A.  I don't know.
6      Q.  But that's your opinion?
7      A.  Yes.
8      Q.  All right.  So we've established that
9  the system is installed in such a way that it is
10 operating the elevator trim in reverse?
11     A.  Yes.
12     Q.  So when you take the wheel -- and you
13 are a pilot, correct?
14     A.  Yes.
15     Q.  And you roll it forward toward the
16 nose, what are you doing, are you giving it nose
17 down trim or nose up trim?
18     A.  Down.
19     MS. SCHIAVO:  Object to form.
20 BY MR. JONES:
21     Q.  I'm sorry?
22     A.  Nose down.
23     Q.  Nose down.  So, when this was rigged
24 the way it was rigged, as you roll forward, what
25 are you doing to the tab in the back, in fact?  Are

Page 116

1  you doing --
2      A.  The tab goes up when you're nosing
3  down.
4      Q.  When it's rigged properly?
5      A.  Yes.
6      Q.  Okay.  Let's make clear we're straight
7  on that.  The relationship between --
8      A.  Okay.
9      Q.  -- tab and nose up and down when it's
10 rigged properly.
11     MS. SCHIAVO:  Object to the form.  Go
12 ahead
13 BY MR. JONES:
14     Q.  You roll -- you roll forward, you're
15 wanting nose down?
16     A.  Yes.
17     Q.  What's happening to the tab when it's
18 rigged properly?
19     A.  When it's rigged properly, it's -- the
20 tab's up, the elevator's going down, which puts the
21 nose down.
22     Q.  So nose down means elevator tab up?
23     A.  Right.
24     Q.  It's an opposite relationship?
25     A.  Yes.

Page 117

1      Q.  Okay.  The mechanics know that, don't
2  they?
3      MS. SCHIAVO:  Object to the form.
4      A.  I would think they know that.
5      Q.  Well, they're A&P licensed mechanics.
6  They're taught that, aren't they?
7      MS. SCHIAVO:  Object to the form.
8      A.  Somewhere in their backward, yes.
9      Q.  So they ought to know that--
10     MS. SCHIAVO:  Object to the form.
11 BY JONES:
12     Q.  -- is that -- is that correct?
13     A.  If they do it enough -- I mean, you
14 know, if you don't do it enough, it's a
15 confusing -- it's a confusing thing, I mean.
16     Q.  But they're taught that in A&P school,
17 aren't they?
18     MS. SCHIAVO:  Object to form.
19     A.  I was taught in A&P school 40 years
20 ago.  I don't know if I remember it from there or
21 if I remember it from work.
22     Q.  Well, they're tested on that, aren't
23 they?
24     A.  I don't know.  Then we've got to go
25 look at the 147 which we --

30 (Pages 114 to 117)

Frederick J. Leonelli    October 3, 2006

Page 118

1      Q.  Have you ever been a DME, a designated
2   maintenance inspector?
3      A.  No.  Examiner, no.
4      Q.  That's right.  I'm sorry.
5      A.  Well, actually, I was.  When I was an
6   FA inspector, I was an examiner.  I could issue the
7   same licenses as the DMEs do.
8      Q.  Well, can we agree, though, that
9   aircraft mechanics are taught to know the
10   relationship between tab movement on a trim tab for
11   the elevator and nose up or nose down?
12         MS. SCHIAVO:  Objection for the record.
13   Go ahead.
14      A.  It's in the curriculum.  They're taught
15   the basic fundamentals of the flight controls.
16      Q.  All right.  So when this trim system
17   was tabbed so it operated backward and you roll the
18   wheel forward, what's happening with the tab?
19      A.  It's going down.
20      Q.  Which is the wrong way?
21      A.  Yes.
22      Q.  Do you know how the electric trim works
23   in this aircraft?
24         MS. SCHIAVO:  Object to the form.
25      A.  I don't -- I don't understand that

Page 119

1   question.
2      Q.  Are you aware that the electric trim is
3   operated by a Servo motor in the tail that has a
4   bridle clamp on the cables and pulls -- pulls them
5   back and forth?
6      A.  Okay, yeah.
7      Q.  Did you know that?
8      A.  I know it's a basic-type system.
9      Q.  Do you know when you operate the
10   electric trim in the -- in the cockpit, when the
11   system was rigged the way this was, backward, which
12   way is the manual wheel going to go if you push the
13   thumb switch forward to go nose down?
14         MS. SCHIAVO:  Objection, for the
15   record.  You can answer.
16      A.  It's going to go opposite.
17      Q.  And, in fact, if you use the electric
18   trim all by itself and don't touch the manual
19   wheel, the trim will go the direction you're
20   directing it to go, won't it?
21      A.  It's going to give you an indication
22   that it's proper.
23      Q.  Now say that again.  It's going to give
24   you an indication it's proper; what do you mean by
25   that?

Page 120

1      A.  That it's doing what it's supposed to.
2   It's not opposite.
3      Q.  It's going to work properly?
4      A.  Right.
5      Q.  And the indication you're getting that
6   it's working properly is it's doing what you ask it
7   to do.  In other words, the plane's flying the way
8   you want it to fly, right?
9         MS. SCHIAVO:  Object to the form.
10      A.  That's the way the system works, yes.
11      Q.  But if you look at the manual wheel as
12   you're operating the electric trim, you're going to
13   see that the wheel's moving in the opposite
14   direction than the input you're giving on the
15   electric, correct?
16      A.  I don't know.  I'd have to check that
17   out.  I mean, I don't remember what it did when I
18   did it in the cockpit of the Colgan plane.
19      Q.  Well, you indicated that, when you did
20   it in the cockpit, it was properly trimmed -- or
21   properly rigged, right?
22      A.  Right.  I don't remember which way the
23   wheels were going then.
24      Q.  Well, if you push the trim switch
25   forward to go nose down, the wheel's going to go

Page 121

1   nose down, roll forward, right --
2      A.  Yeah.
3      Q.  -- if it's rigged properly?
4         And we just established that if it's
5   rigged the way this one was, you go thumb forward
6   to go nose down.  The trim wheel's going to spin
7   backwards in a nose up direction, right?
8      A.  See, that's what I don't know because I
9   wasn't able to do that on the airplane because it
10   was rigged properly.
11      Q.  I thought you just answered my question
12   by acknowledging that it would go opposite?
13      A.  It's supposed to.  That's what I read
14   in the manuals.  I don't know if that one did.  I
15   don't know.
16      Q.  Do you have any reason to believe that
17   it wouldn't have gone backward?
18         MS. SCHIAVO:  Objection, asked and
19   answered.
20      A.  Something made something go wrong.
21      Q.  Is it your belief that it moved
22   opposite of the electric input, the manual wheel?
23         MS. SCHIAVO:  Objection, asked and
24   answered.
25      A.  I don't know.  I don't have a belief

31 (Pages 118 to 121)

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Frederick J. Leonelli    October 3, 2006

Page 122

1  that it did or it didn't.  All I know, that it was
2  rigged opposite, based on the end result.
3      Q.  So you just don't know one way or the
4  other whether the electric trim being thumb forward
5  when it was rigged the way Colgan rigged it had the
6  wheel moving nose up or nose down?
7      A.  On that airplane, no.
8      Q.  You don't know?
9      A.  I know what it should do.  I don't know
10  what it did on that airplane.
11      Q.  Okay.  What should it do?
12      A.  It should go opposite.
13      Q.  Okay.  So let's accept, for purposes of
14  the rest of our discussion here, that it would have
15  moved opposite than the electric input --
16      A.  All right.  I'll accept that.
17      Q.  -- fair?
18          All right.  Let's look at 27-30-09
19  then, which is Number 97.  Where this started was
20  your first subopinion under 1 where you first said
21  that there was no operational trick -- operational
22  check for the trim.  We've already identified the
23  yes, there was.  It just wasn't in the table of
24  contents, and it's 27-30-09.  From there the
25  question becomes whether the anomaly we're talking

Page 123

1  about here would have been discovered if 27-30-09
2  had been performed.  Okay.  Are you with me?
3      A.  Um-hum.  Yes.
4      Q.  Looking at 27-30-09, Exhibit 97, one of
5  the checks here -- well, let's just go through the
6  whole thing.  It's not very long.  A is putting the
7  power to the aircraft, right?
8      A.  Correct.
9      Q.  B is just turning on the electric trim
10  so it works, right?
11      A.  Right.
12      Q.  C, you're checking there that the half
13  switch system is correct, right?
14      A.  Yes.
15      Q.  Describe that, if you could.
16          MS. SCHIAVO:  Objection to form.  He
17  wasn't called to testify on the procedures.  But go
18  ahead and answer, if you can.  Just note the
19  objection for the record.
20  BY MR. JONES:
21      Q.  In other words, you have a split
22  switch, right?
23      A.  Right.
24      Q.  And the test is, you push one of those
25  two switches and make sure that nothing's

Page 124

1  happening, right?
2          MS. SCHIAVO:  Objection for the record.
3          THE WITNESS:  Okay.
4      A.  Yeah, it's a fail-safe type thing.
5      Q.  And the purpose is, you want to make
6  sure you're meaning to activate the trim, so you
7  better push both switches, right?
8      A.  Right.
9      Q.  That's what C's about?
10      A.  I don't know.
11      Q.  Okay.
12      A.  I mean, I take your word on that.  It
13  sounds reasonable.
14      Q.  All right.  Looking at D now, it says,
15  actuate both trim switches on the pilot's control
16  wheel to the nose up position and note the trim
17  wheel movement in the proper direction as well as
18  full travel.  Verify visually that the trim tab
19  itself travels to the proper position, trim tab
20  full down.
21      A.  Okay.
22      Q.  Did you read that?
23      A.  Yes.
24      Q.  Had the mechanics performed this check,
25  should this anomaly have been evident to them?

Page 125

1          MS. SCHIAVO:  Object for the record.
2  Go ahead.
3      A.  I can't say.  I don't -- I mean, it's a
4  check that should have been done.  It's a check
5  that, depending on -- you know, the mechanic would
6  have picked up.  I don't know if they -- I don't
7  think they had this check.
8      Q.  I'm not asking whether they had the
9  check.
10      A.  Okay.
11      Q.  I'm starting with the premise we've
12  already established which is that if the aircraft
13  was rigged the way the NTSB said it was rigged,
14  backwards, that when you give an electric input on
15  the electric trim, the wheel moves opposite, all
16  right?
17      A.  All right.
18      Q.  That's premise number one, and we agree
19  on that, right?
20      A.  Yes.
21      Q.  Premise number two is that they perform
22  this Step D which means push the electric trim
23  forward, both switches, so that you should be
24  going -- I'm sorry -- I got -- I stated that wrong.
25  Nose up means pull back on the switches, right?

32 (Pages 122 to 125)

Frederick J. Leonelli   October 3, 2006

Page 142

1  it's moving, right?
2      A.  Right.
3          MS. SCHIAVO:  Objection, misstates
4  Exhibit 97.
5  BY MR. JONES:
6      Q.  And when you look at the wheel to
7  realize it's moving, you know you're pulling back
8  on the thumb and it's moving forward, that exhibits
9  the anomaly, doesn't it?
10         MS. SCHIAVO:  Objection for the record.
11     A.  I mean, it doesn't really -- it says
12 the wheel's going to move.  Which way, it doesn't
13 say.
14     Q.  We've already talked quite a lot about
15 whether the mechanics should know which way it
16 moves, right?  And we've already established that
17 if you pull back on the electric switch the
18 mechanic should expect that the wheel's going to
19 roll back, correct?  It's going to correspond?
20     A.  Yeah.
21     Q.  You'd expect that and you'd expect the
22 mechanic to know that, right?
23         MS. SCHIAVO:  Objection for the record.
24 BY MR. JONES:
25     Q.  Isn't that right?

Page 143

1      A.  Well, the -- I'm not even certain if
2  the same mechanic did both checks or was it two
3  different guys.
4      Q.  I'm not asking that.  I'm just asking
5  whether you should expect the mechanic to know that
6  when you pull the thumb switch back to go nose up
7  that the wheel's going to roll back in the nose up
8  direction, if everything's right?
9          MS. SCHIAVO:  Objection.  Are you
10 talking generally or are you talking specifically
11 when performing this step?  I mean, now I'm
12 confused, so I'm going to object for the record.
13 Go ahead and answer it, if you can.
14 BY MR. JONES:
15     Q.  Do you need me to restate it?
16     A.  Yeah, please.
17     Q.  Should the manufacturer be able to
18 expect that a licensed mechanic in the field would
19 know that when you pull the thumb switch back on
20 the electric trim that the manual trim wheel will
21 roll back in a corresponding nose up direction?
22         MS. SCHIAVO:  Objection for the record.
23     A.  I would think, you know, technicians
24 are trained that way, so --
25     Q.  So the manufacturer should be able to

Page 144

1  expect the mechanic knows that --
2          MS. SCHIAVO:  Objection.
3  BY MR. JONES:
4      Q.  -- right?
5      A.  I would think.
6      Q.  Okay.  Having established that, if you
7  perform this check in 27-30-09 to verify pilot
8  override, you start by pulling the thumb switch
9  back on the co-pilot.  You look to see if the
10 wheel's moving, right?
11     A.  Right.
12         MS. SCHIAVO:  Objection.  It misstates
13 Exhibit 97.  Forward motion, that's right, not
14 directional.  That's right.  Sorry.  Now I'm
15 confused.  You check -- you -- you see the wheel
16 begins moving.  Okay.  I'll object --
17         THE WITNESS:  Right.
18         MS. SCHIAVO:  -- withdraw the
19 objection.
20 BY MR. JONES:
21     Q.  Okay.  We have that established, you
22 pull the thumb switch back, you look to see if the
23 wheel is moving, right?
24     A.  If it's moving, yes.
25     Q.  You need to look at it to verify that,

Page 145

1  right?
2          MS. SCHIAVO:  Oh, objection for the
3  record.  It doesn't say look at it.  Go ahead.  You
4  can answer, if you want -- I mean, if you can.
5          MR. JONES:  Okay.  Let's just stop for
6  a second.  We've had a lot of speaking objections,
7  and please just make your objection for the record.
8          MS. SCHIAVO:  Okay.  I mean, it's just
9  we've been over this so many times.  He's answered
10 and asked it, like, 30 times.  I could just say --
11         MR. JONES:  No problem.
12         MS. SCHIAVO:  -- asked and answered,
13 move on.
14         MR. JONES:  If that's your objection,
15 go ahead and make it, because we'll get there
16 faster.
17         MS. SCHIAVO:  All right.  All right.
18 BY MR. JONES:
19     Q.  Okay.  You're performing this step, you
20 pull the thumb switch back.  You look to see if the
21 wheel's moving, right?
22         MS. SCHIAVO:  Same objection for the
23 record.
24 BY MR. JONES:
25     Q.  Where do you look?  What do you look at

37 (Pages 142 to 145)

# EXHIBIT 3

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - -x

                            :

COLGAN AIR, INC.,                :

                            :

           Plaintiff,       :

                            :

       vs.                 :   Civil Action

                            :   No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,    :

                            :

           Defendant.       :

                            :

- - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Friday, June 24, 2005

Videotaped deposition of JAMES DESMOND, witness,

called for examination by counsel for the defendant,

pursuant to notice, at the offices of Thomas B. Almy, Esq.,

Dombroff & Gilmore, P.C., 1676 International Drive,

Penthouse, McLean, Virginia, before Malynda D. Whiteley, a

Registered Professional Reporter and a notary public in and

for the State of Virginia, beginning at 9:21 a.m., when

were present on behalf of the respective parties:

**Page 10**

1   A   No, sir.
2   Q   What did you do initially?
3   A   I went to a technical school.
4   Q   And did you obtain employment in that field?
5   A   Yes, sir.
6   Q   What was that?
7   A   Mechanic.
8   Q   What type mechanical work was it?
9   A   A and P mechanic.
10  Q   Oh, you got your A and P at your technical school
11  you mentioned?
12  A   Correct, yes.
13  Q   Okay.  Where did you get your A and P school?
14  A   East coast Aero Technical in Lexington,
15  Massachusetts.
16  Q   And when was that?
17  A   1968; '67, '68.
18  Q   How long of a class or course is -- was that back
19  then?
20  A   That was a (sic) 18-month continuous course.
21  Q   And what types of things did they teach you in A
22  and P school?

**Page 11**

1   A   From A to Z.
2   Q   Do they assume just zero familiarity in the
3   aviation field?
4   A   Yes, they do.  They start you from the basics
5   right on up.
6   Q   Do they teach you some of the federal aviation
7   regular regulations?
8   A   Of course.
9   Q   Do they teach you how maintenance manuals work?
10  A   Yes, sir.
11  Q   And they teach you that when you're dealing with
12  maintenance manual to complete a particular task, you're
13  supposed to do each one of the items in the list; is that
14  right?
15  A   Correct.
16  Q   And after you were done with that, did you have
17  to take a test to get your license?
18  A   Yes, sir.
19  Q   And how -- have you held your A and P license
20  ever since then?
21  A   Yes, sir.
22  Q   Have you ever had any enforcement actions against

**Page 12**

1   you?
2   A   No, sir.
3   Q   Well, once you got your A and P, where did you
4   start working?
5   A   My first job was with TWA in Long Island,
6   New York.
7   Q   This --
8   A   That was my firsts job.
9   Q   This is in the late '60s?
10  A   Oh, boy, you're really -- was it '68?  About '68,
11  around there.
12  Q   What did you do for them?
13  A   Mechanic.
14  Q   And where -- where were you based?
15  A   It was JFK.
16  Q   How long did you work with them?
17  A   About six months.
18  Q   And where did you go from there?
19  A   I walked out the front door, packed up my
20  Volkswagen, and went home.
21  Q   Why did you leave?
22  A   Not my style of life.

**Page 13**

1   Q   What -- what didn't you like about it?
2   A   I'm not a city boy.
3   Q   Oh.
4   A   And I was a country boy moving from the country
5   to the city, and it was quite a cultural shock.
6   Q   And where was home?
7   A   Hyannis, Mass.
8   Q   Okay.  And what did you do when you got back to
9   Hyannis?
10  A   Well, let's see.  I took a job driving an oil
11  truck.
12  Q   Had you tried to get a job in the aviation
13  business?
14  A   In Hyannis?
15  Q   Yes.
16  A   Yes, sir, I did.
17  Q   Was there anything available?
18  A   Well, at that time I think they had three cows
19  and a pasture there; and there -- there was -- you know, it
20  was impossible.  But times change, you know.
21  Q   Sure.
22      So how long did you drive the oil truck?

**Page 14**

1    A   Oh, off and on I think I drove it for a year,
2  year and a half, after school.
3    Q   Okay. When —
4    A   I -- I was also employed by those people while I
5  was in school.
6    Q   Oh.
7    A   So it was an ongoing six- or seven-year
8  relationship, you know.
9    Q   So what did you do after you were done driving
10  the oil truck?
11    A   What did I do?  I think I went to work for my
12  father tending bar.
13    Q   How long did you do that?
14    A   Oh, thirteen years.
15    Q   Did you do anything to maintain your aviation
16  training during this time when you were driving an oil
17  truck and bartending?
18    A   No.
19    Q   Did you do anything else while you were
20  bartending, any other jobs?
21    A   No.
22    Q   What did you do when you were finished

**Page 15**

1  bartending?
2    A   Got a job with PBA -- Canal -- Canal Marine, I
3  believe; worked for a while; and got a job with PBA in --
4    Q   And that stands --
5    A   -- in the parts department.
6    Q   That stands for?
7    A   Provincetown Boston Airlines.
8    Q   And what type of airline were they?  Were they --
9    A   They were a regional carrier.  They had a total
10  of about 280 aircraft at one time.
11    Q   Were they under contract with a --
12    A   No.
13    Q   -- bigger name --
14    A   No.
15    Q   -- airline?
16    A   Well, in the end they were, yes.  They were under
17  the umbrella of People's Express at one time.
18        Do you remember People's Express?
19    Q   No.
20    A   No?
21    Q   So this was roughly when that you joined PBA?
22    A   Oh, '85; about '85 I think.

**Page 16**

1    Q   So there had been at least a fifteen-year gap
2  when you went to PBA, between then and when you had last
3  work in the aviation business?
4    A   Thirteen, fourteen, fifteen, in that range.
5    Q   When you joined PBA, did you have to do anything
6  to get back up to speed in the aviation business?
7    A   Yes, sir, I did.
8    Q   What'd you do?
9    A   Well, I was under the scrutiny of the maintenance
10  supervisor during the night; and I would go out and fulfill
11  jobs that he'd have me do over the course of a year.
12    Q   So it was essentially on-the-job training at PBA?
13    A   Correct.
14    Q   Did you have to do anything to renew your A and
15  P?
16    A   No, the A and P is good for life.
17    Q   Once you get it, you've got it --
18    A   Yes, sir.
19    Q   -- unless they take it away?
20    A   Correct.
21    Q   What type of work did you do at PBA?
22    A   Mechanic.

**Page 17**

1    Q   On what type of aircraft?
2    A   Oh, boy, they had a variety of aircraft.  They
3  had -- I used to work on a Stetson up the Provincetown that
4  did the sight-seeing jumps.  I worked on Douglas's DC-3s,
5  402 Cessnas, YS-11s, E- and B-110s, Embraer Air's.
6        I worked a couple other aircraft that they had.
7  Let's see what it was.  Cherokee 6 -- I worked Cherokee 6s.
8  They had also one of those also for sight-seeing.  They
9  used to like to send me up to Provincetown from Hyannis and
10  let me work on the aircraft and then just drive back.
11    Q   Any Beechcraft aircraft -- airplanes you worked
12  on there?
13    A   There no.  But it was ongoing thing -- they
14  finally -- people's Express got assumed by Eastern
15  Continental -- slash, Continental.  And then that's where I
16  got my Beech experience.  They brought in -- first they
17  brought in B-99s, then they brought in C-99s, and then they
18  brought in B-1900s.
19    Q   And this was all while you were at PBA, People's
20  Express?
21    A   Well, all while I was employed in that one
22  building because legally I don't know how the names were

## Page 18

1  changed as they went along.  And it's -- but, you know --
2  it's -- I'm below that, you know.
3      Q    But near the end, at least, when you said, I
4  think, Eastern or Eastern Continental had it, they brought
5  in some Beech planes.  Is that right?
6      A    I think when it was still Bar Harbor Airways,
7  they were the ones that brought in the aircraft.
8      Q    So during your time at PBA and its other forms,
9  you had occasion to deal with a number of different
10  manufacturers' maintenance manuals, didn't you?
11      A    Yes, sir.
12      Q    Your systems there at PBA, did they involve
13  actually taking the maintenance manual itself and using
14  that as a checklist for a given task, or did they have a
15  system like --
16      A    They --
17      Q    -- these work cards?
18      A    They had the work cards.  They had their own
19  system set up.  You know, it's not a duplicate, you know,
20  per se; this is this and this and this.  It doesn't work
21  that way.  Everybody wrote their own programs, you know; so
22  they varied.

## Page 19

1      Q    While at PBA and its various forms, were you ever
2  involved in the process of creating the work cards for the
3  company --
4      A    No.
5      Q    -- from the maintenance manual?
6      A    No, sir.
7      Q    That was someone else's job?
8      A    Yes, sir.
9      Q    Have you ever done that for anybody?
10      A    No, sir.
11      Q    When did you leave PBA or its last version?
12      A    Well, they left me.  They moved out of Hyannis.
13  And like I said, I'm a country boy; and I don't like the
14  city; so I stayed in Hyannis.
15      Q    And when did that happen?
16      A    Oh.  '91?  '91, I think.
17          (The training report was marked Defendant's
18          Exhibit No. 31 for identification.)
19      BY MR. JONES:
20      Q    Mr. Desmond, I'm handing you what we've marked
21  Exhibit 31, and that is a document that was produced by
22  Colgan's counsel in response to our request for documents

## Page 20

1  relating to the mechanics that were involved and worked on
2  this aircraft.
3          And these we've seen for each person, and they
4  appear to be training logs or training reports of the
5  different types of training you guys have received there at
6  Colgan during your employment, and they typically have
7  tracked with the beginning of someone's employment there.
8          And I hand you this, really as much anything, to
9  give you a frame of reference to perhaps understand exactly
10  when you joined Colgan and what training you got while you
11  were there.
12          Do you recognize or understand this document as
13  doing that?
14      A    Well, I'd have to scrutinize it and study it.  It
15  seems like the dates, you start off March '03, '03 --
16      Q    Actually it goes bottom up.
17      A    September '90, September '90, PT-6 heavy
18  maintenance.
19          See, I had PT-6 heavy maintenance when I was with
20  Bar Harbor Airways, slash, whatever.  I received a
21  certificate from Pratt Whitney Canada, which is recognized
22  by Colgan Air.

## Page 21

1      Q    So when --
2  (Proceedings participants speaking at the same time.)
3      A    So you've got --
4      Q    -- you came over --
5      A    Yeah.
6      Q    You got credit, if you will, for training --
7      A    Correct.
8      Q    -- you had already done?
9          So you weren't at Colgan in June of '90 ye ?
10      A    No; that's correct.
11      Q    Does the --
12      A    I started with Colgan in '92.
13      Q    The next entry is July of '92 showing a couple of
14  other -- three other items; an initial airworthiness
15  release, ground handling release.
16          Does that square your --
17      A    Yes, sir --
18      Q    -- recollection of when you --
19      A    -- it does.
20      Q    -- started?
21      A    Yes, sir.
22      Q    Just work your way up quickly with me through

| Page 22 |
|---|

1  that list and describe for me the things that -- the types
2  of training you got at Colgan.
3      A   What do you want me to start with?  The initial
4  Phase II --
5      Q   Yes.
6      A   -- Phase III?
7      A   I think that's Beech --
8      Q   Is that --
9  (Proceedings participants speaking at the same time.)
10     A   -- Beech --
11     Q   -- to learn -- is that to learn about the 1900?
12     A   Phase II; correct.
13         I went to flight safety for that.  What year is
14  this?  This is --
15     Q   May of '96.  Well --
16     A   '96.  I think that's when I went to flight
17  safety.  I'm not quite sure really.
18     Q   There are actually two entries there.  There's an
19  initial Phase II in January of '96 and another one in May
20  of '96.
21     A   I think I went to Saab's -- oh, wait.  I went to
22  Beech school someplace -- I've got the records at home, you

| Page 23 |
|---|

1  know -- and flight safety.
2      Q   To learn about the Beechcraft 1900, aren't there
3  two phases to that program?
4      A   From flight safety?
5      Q   Well, whomever might be presenting it.
6      A   I believe there is, yes.
7      Q   Did you ever get a Phase I part of the -- of the
8  class?
9      A   That I'm not sure of.  I -- I don't know how
10  they're putting this all together.  I'm sure I did.
11     Q   When you were with Bar Harbor --
12     A   Yes.
13     Q   -- had you already with the 1900 for a while?
14     A   Yes, sir.
15     Q   The C or the --
16     A   B.
17     Q   B?
18         So might you have gotten the Phase I version of
19  that training while back there?
20     A   Yes, sir.
21     Q   I see.
22         The rest of these just -- we don't need to spend

| Page 24 |
|---|

1  a lot of time with this, but move on up the list.
2      A   Just to add to it, I -- when I was with Bar
3  Harbor, slash, Continental, slash, whatever, I received
4  training in all the aircraft.  It was quite intensive.  The
5  training courses were quite intensive; 99s, 1900s, ATRs.
6  They were quite thorough.
7      Q   Were those in-house classes --
8      A   Yes, sir --
9      Q   -- typically?
10     A   -- yes, sir, they were.  They were two --
11  two-week courses given in Bar Harbor -- oh, actually,
12  Bangor, Maine, with an R, Bang--- not "Banga" but
13  "Bangor," with an R.
14     Q   Working on up, what else do we have?
15     A   You know, this is so long ago, I really -- it's
16  not real fresh in my memory.
17     Q   Well, just looking at this list -- list
18  generally, can you remember any other specific training you
19  received while at Colgan that's not reflected here?
20     A   No, not really.  I mean everything's reflected.
21     Q   During your time in A and P al school and these
22  various training classes about specific aircraft, were --

| Page 25 |
|---|

1  was it stressed to you in the teachings that the flight
2  controls are of the most critical aspect of the aircraft?
3      A   Well, they're the primary controls.
4      Q   And are you taught that whenever's there's any
5  work done on a flight control surface, that you need to do
6  an operational check?
7      A   Of course.
8      Q   And a functional check, to the extent that's any
9  different?
10     A   Operational -- it's terminology, I suppose.
11     Q   And the purpose of that is what?
12     A   To make sure it's correct.
13     Q   You want to make sure that the surface -- when
14  you move the controls move through its full range of
15  motion?  Is that part of it?
16     A   Yes, sir.
17     Q   And that's it's moving in the correct direction
18  of the control input?
19     A   Yes, sir.
20     Q   So that's something that a mechanic is going to
21  know to do just inherent from his training?
22     A   Yes.

**Page 26**

1  Q  While at A and P school or in any of your other
2  training, were you ever taught about the practice of
3  blocking cables when you're disconnecting a flight control
4  part like an actuator, for example, so that the tension
5  that was originally on the cables from that point
6  throughout the rest of the run stays on?
7  A  The answer to that question is yes.  But the way
8  you're wording it, the tension won't stay on, the tension
9  isn't going to stay on, not to get into it.  But you'll
10  keep the perspective routing correct.
11  Q  By keeping —
12  A  By blocking.
13  Q  By blocking —?
14  So how do you go about blocking?
15  A  You clamp the cable against a stationary
16  object --
17  Q  And —
18  A  -- like a pulley.
19  Q  And you do that before you disconnect the part?
20  A  Correct.
21  Q  Because by the time you disconnect the part,
22  you've already got slack in the system; right?

**Page 27**

1  A  You're going to have get slack anyhow because
2  you're going to have to disconnect it.  And the natural
3  tendency is -- you know, of anything that you disconnect is
4  to relax a little bit; so, therefore, your tensions aren't
5  going to be correct.
6  Q  But -- but you block before you disconnect,
7  because otherwise you --
8  A  Correct.
9  Q  -You introduce more --
10  A  Correct.
11  Q  -- slack?
12  A  Yes, sir.
13  MR. JONES:  Okay.  We need to work on not
14  speaking over each other.
15  I know.
16  THE WITNESS:  I'm sorry.
17  MR. JONES:  It's okay.  I do it too.
18  BY MR. JONES:
19  Q  Has it ever been a practice at Colgan to block
20  cables when disconnecting things like actuators?
21  A  Yes, sir.
22  Q  Is it in the GMM?

**Page 28**

1  A  I -- I -- I don't think the GMM so much addresses
2  how to do a -- a -- a step, you know.  I -- I -- it might
3  be.  I don't know.
4  Q  In your work as a supervisor, at least at one
5  point in Colgan, if not also as a mechanic, were you
6  required to become familiar with the contents of the GMM?
7  A  Yes, sir.
8  Q  Well, if -- if the GMM doesn't specifically
9  identify how you go about blocking, is that just something
10  that you expect that a mechanic knows how to do by virtue
11  of his training?
12  A  Well --
13  (Proceedings participants speaking at the same time.)
14  Q  -- and --
15  A  -- usually --
16  THE WITNESS:  I'm sorry.
17  A  Usually the maintenance manual itself will
18  address that, where a GMM just -- is just steps to
19  generalize the practices of what they want done.  You know,
20  I -- I believe.  That's the best of my terminology, I can
21  gets out of it, you know.
22  BY MR. JONES:

**Page 29**

1  Q  So the GMM is not really there to serve that type
2  of detailed purpose?
3  A  I -- I don't believe so; but it may be in -- I
4  don't know how they interact really.  But I'm sure there's
5  interactions, but I don't think they -- they don't go down
6  the line and say, "Remove this elevator Step A, Block A,
7  Step B.  Do you know what I'm saying?
8  Q  You look to the work cards or the maintenance
9  manual for the step-by-step actions?
10  A  Yes, sir.
11  Q  But as far as the general practice of blocking
12  cables when loosening things, that's something you would
13  expect a mechanic to do by virtue of his training?
14  A  Yes, sir.
15  Unless --
16  Q  You --
17  A  -- let's say it's a little short run where it's
18  not required.  You know, I mean sometimes maybe you're --
19  you're going to be inducing more of a problem than if you
20  blocked it versus you hadn't blocked it or if you had
21  blocked it versus hadn't blocked it.
22  Let's say you have a very short run and there's

## Page 42

1    A   There's --

2    Q   -- to be changed?

3    A   There's been -- there's been many.

4        I went to I a Beech conference, and I asked for

5    access pants to be employed to get to the number 1, 2, 3,

6    and 4 flap actuators they just laughed at me, blew it away.

7    Q   Can you remember any other specifics?

8    A   Oh, no.  I'm not -- no, I don't want to go there

9    anymore.  Thank you.  I mean --

10   Q   Well, I have to ask you --

11   A   You know, I mean I'm not here to complain, you

12   know.  I'm just trying to answer your questions --

13   Q   I know.

14   A   -- as best I can.

15   Q   And I have to ask you:  Do you remember any

16   others?

17   A   No, I -- no.  It's -- I just remember the

18   general -- generality of it all, you know.  That's what I

19   remember.

20       I've seen -- I've seen screwups before in the

21   manuals but --

22   Q   When you come upon a discrepancy or something you

## Page 43

1    believe to be an error in the -- in the manual of any

2    manufacturer, is there a procedure within Colgan you're

3    supposed to follow?

4    A   With Colgan's manuals we would call the

5    inspection department and point it out.

6    Q   Well, actually I'm asking about OEM's manuals,

7    but is there --

8    A   I'm not --

9    Q   -- some --

10   A   -- really sure what we have in place, you know.

11   Like, it's been two or three years since I've really gotten

12   into the GMM myself, you know.  I used to be involved in

13   that more, but it's been quite few years since I've really

14   gotten involved into it heavily.

15       So I have -- so you're asking me a direct

16   question, This, this, this?  I'd have to go and look --

17   Q   That is a fair answer.

18   A   -- you know.

19   Q   If there ways such a policy, is the place to look

20   in the GMM?

21   A   Of course, yeah.

22   Q   And when you would find a discrepancy in a

## Page 44

1    manual, your practice personally was to write up the issue

2    and send it to the manufacturer?

3    A   Well, I always talked with the Beech reps quite

4    regularly; and I would bring it up with them.  And they

5    would have -- they would have -- there was a form with

6    Beech.  But you'd fill a form out -- I did it three or four

7    times, and I never got any satisfaction from them.

8    Q   Did any of the suggested changes you ever turned

9    in get implemented?

10   A   Not that I know of.

11   Q   On any topic?

12   A   No.

13   Q   Did you ever go back and check to see if

14   subsequent revisions made changes --

15   A   No, because --

16   Q   -- to the topic?

17   A   -- I'm not employed by Beech.  I've got so much

18   to do for myself, you know.  I always tried to point it out

19   to someone but --

20   Q   But for those things that you raised concerns

21   about, you didn't go back later at the next revision to see

22   if it was changed?

## Page 45

1    A   No -- well, yeah, I would go back and see if it

2    changed.  But, you know, that would be -- that might be a

3    year later.

4    Q   And do you remember --

5    A   And by that time, you know -- my memory's not

6    good that good.

7    Q   So you might not remember exactly --

8    A   I -- that's true; I might not.

9    Q   You might not remember exactly what you had asked

10   them to change?

11   A   Correct, that's correct.

12   Q   So you wouldn't be in a position to be able to

13   check if they had?

14   A   No, no.

15   Q   Do you remember that any that you did request to

16   be changed that were --

17   A   No --

18   Q   -- that you noticed?

19   A   -- not specifically, no.

20   Q   Who did you mainly deal with at Raytheon when you

21   had questions?

22   A   Oh, you guys had three or four people that would

## Page 106

1  (Proceedings participants speaking at the same time.)
2  **Q**  — I'm trying to understand the tool better.
3    Does it have a moving part? —
4  A  No, no.
5  **Q**  — or does it read —
6  A  No, no.
7  **Q**  — with a —
8  A  No.
9  **Q**  — a —
10  A  No.
11  **Q**  How does it read?
12  A  Degrees.
13  **Q**  Well, how does it — how does it read the
14  **movement of the tab?  Does it bounce a lighted off it and**
15  **read that?  Does it have an — an arm that moves with it up**
16  **and down?  How does that work?**
17  A  It -- it has an increment where it reads out the
18  degrees; 3, 4, 5, 6.
19  **Q**  Right.  That's what you read on the screen.
20    But what I'm saying:  How does the instrument
21  take note of the movement of the tab?  How does it see the
22  movement of the tab?

## Page 107

1  A  It's like a level.  It's -- it's like a level.
2  You know --
3  **Q**  All right.
4  A  -- when you -- the bubble's going to move.  Well,
5  in this particular case your degrees move, you know, a
6  printout, a read-out.  Your degrees will move.  Is that
7  what you're asking me.
8  **Q**  Kind of.
9    So you sit the instrument on the elevator itself
10  **or the tab itself?**
11  A  It depends.  What are you reading?
12  **Q**  You're trying to read the travel of the tab.
13  A  You set it on the tab itself.
14  **Q**  All right.  And does it attach somehow?  Does it
15  **stick —**
16  A  Well --
17  **Q**  — down or get clamped on?
18  A  You could if you wanted to.
19  **Q**  Do you need to hold it in place with your hand if
20  **you don't —**
21  A  You could do that also.
22  **Q**  So you assume, then, that you are at zero when

## Page 108

1  **you set it on the —**
2  A  You're --
3  **Q**  — tab —
4  A  -- zeroing out the tab.  Then you set it at
5  the -- the protractor on the tab, and you zero the
6  protractor so they're both starting at zero.
7  **Q**  And the way you zero tab in the first place is
8  **just to put the wheel at zero up front?**
9  A  No.  You have -- boy, you're quizzing the hell
10  out of me, aren't you?
11  **Q**  I'm trying to understand.
12  A  They paying you a lot of money for this?
13    You would -- you would put rig pins in.  They
14  have different holes that you can rig pins in which will
15  give you a neutral.
16  **Q**  On the elevator —
17  A  Everything does.
18  **Q**  — and the trim —
19  A  Everything's --
20  **Q**  — tab?
21  A  -- everything's got a rig hole, rig pin hole.
22  **Q**  All right.  So once you get either the travel or

## Page 109

1  the digital protractor, what's the general process for
2  checking the operation of the tab?  What do you do?
3  A  Run it up, run it down.
4  **Q**  And you check that it goes —
5  A  Degrees up, degrees down.
6  **Q**  When you —
7  A  Because it's going tell you degrees down; it's
8  going to tell you degrees up.
9  **Q**  And you check that against the specs in the
10  **maintenance manual —**
11  A  Sure.
12  **Q**  — for the correct travel, the right distance?
13  A  Yes.
14  **Q**  And the right direction when you give the control
15  **input at the wheel; right?**
16  A  The right direction, when you give control in for
17  the -- on the wheel?
18  **Q**  Right.  In other words, if in you want to go nose
19  **up, let's say, at the wheel —**
20  A  I --
21  **Q**  — you turn the wheel towards the nose-up —
22  A  I --

**Page 110**

1    **Q**  — direction —

2    **A**  You know, I don't know how the book states that.

3 Does the book state that, or does to book say, "Up travel,

4 up tab travel"? I think the book -- I think your book --

5 you represent Beech. I think your book states, "Up tab

6 travel". It doesn't state, "nose up", "nose down". I

7 think it just relates to --

8    **Q**  **The tab itself?**

9    **A**  -- the relative degrees that you were taking of

10 whatever you are doing. It doesn't revert to the aircraft

11 itself.

12    **Q**  **But as a part of your check, having done some**

13 **work on a control surface, you want to -- you want to be**

14 **sure, don't you, that when you turn the wheel to go nose**

15 **up, the control surface is the moving in the correct**

16 **direction to go nose up?**

17    **A**  Oh, yeah.

18    **Q**  **Okay. So you try and do that as a part of**

19 **your -- your check?**

20    **A**  If my ass is sitting in the seat in here.

21 Absolutely.

22    **Q**  **But you did not participate at all in the checks**

**Page 111**

1 **of the --**

2    **A**  No.

3    **Q**  **-- trim tab system following this --**

4    **A**  No, sir --

5    **Q**  **-- service?**

6    **A**  -- I did not.

7    **Q**  **You relied upon Mr. Kinan, Mr. Battaglia,**

8 **Mr. Servis, and others who were involved in that; correct?**

9      **MR. ALMY: Object to the form.**

10      **But you can answer, if you can.**

11    **A**  Did I reply upon them?

12      BY MR. JONES:

13    **Q**  **In your process of approving - --**

14    **A**  I --

15    **Q**  **-- the package.**

16    **A**  -- I don't really rely -- in approving the

17 package, yes.

18    **Q**  **Okay. Did you later become aware of what the**

19 **NTSB's finding was as to why the aircraft accident**

20 **occurred?**

21    **A**  Did I become aware of it? Yeah, at some point I

22 did, yes.

**Page 112**

1    **Q**  **And what's your understanding of the NTSB's --**

2    **A**  They're --

3    **Q**  **-- findings?**

4    **A**  -- saying that the cable was in backwards or the

5 drum was in backwards, causing the deflection to work

6 opposite of what it should. I believe. I guess.

7      I don't really like to read that. I have the

8 whole report at home I took off the Internet, but I don't

9 really like to read that because you just saw me break

10 down. And, you know I'm going to do -- you -- you keep

11 this up, I'm going to break down again.

12    **Q**  **I certainly don't mean to have that happen.**

13    **A**  You know, I mean it was a rough thing, you know.

14    **Q**  **If --**

15    **A**  I take things pretty hard sometimes. People

16 don't think I do, but I do.

17    **Q**  **If the cable was rigged such that the system was**

18 **operating in the opposite direction, should the checks we**

19 **just discussed have caught it?**

20    **A**  No, because, like, what I'm saying to you -- I

21 don't -- as far as if the book does say just relative to

22 the tab -- I don't know the verbiage in the book. I'm not

**Page 113**

1 sure of the verbiage, how -- what they're saying in the

2 book. Are they saying, "tab up," or "nose up," or -- you

3 know. I'm not sure what they're saying -- how they're

4 stating it in the book.

5      Like, they'll give you, let's say, six degrees up

6 travel limit for you to check, up tab travel limit. I

7 believe that's way the book is written. They're not

8 stating -- I don't think they're stating, "up travel limit

9 nose down". I don't think they're saying it like that.

10    **Q**  **Well, didn't we just agree that part of the**

11 **process of checking the flight control system after having**

12 **worked on it is to be sure that the control surfaces are**

13 **moving in the correct direction for the input given?**

14    **A**  I would, yeah. I said I would.

15    **Q**  **So if -- if this --**

16    **A**  But I'm not referring to the book. I'm not

17 quoting out of the book. I don't know what the book says.

18 I don't the book here in front of me. I would have to

19 refer to book to see that what the book says to answer that

20 specific question the way you're asking it.

21    **Q**  **You just --**

22    **A**  You know, what I'm saying?

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - -x
                                     :
COLGAN AIR, INC.,                    :
                                     :
            Plaintiff,               :
                                     :
      vs.                            :  Civil Action
                                     :  No. 1:05 cv 213
RAYTHEON AIRCRAFT COMPANY,           :
                                     :
            Defendant.               :
                                     :
- - - - - - - - - - - - - - - - - - -x


                    McLean, Virginia

                    Thursday, June 23, 2005


      Videotaped deposition of DOMINICK BATTAGLIA, JR.,

witness, called for examination by counsel for the

defendant, pursuant to notice, at the offices of

Mark A. Dombroff, Esq., Dombroff & Gilmore, P.C.,

1676 International Drive, Penthouse, McLean, Virginia,

before Malynda D. Whiteley, a Registered Professional

Reporter and a notary public in and for the State of

Virginia, beginning at 4:48 p.m., when were present on

behalf of the respective parties:

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
MARK A. DOMBROFF, ESQ., Dombroff & Gilmore, P.C.,
1676 International Drive, Penthouse, McLean,
Virginia 22102

FOR THE DEFENDANT:
MICHAEL G. JONES, ESQ., Martin, Pringle, Oliver,
Wallace & Bauer, L.L.P., 100 North Broadway,
Suite 500, Wichita, Kansas 67202
and
ROBERT T. HALL, ESQ., Hall, Sickels, Frei &
Kattenburg, P.C., 12120 Sunset Hills Road, Suite
150, Reston, Virginia 20190-3231

ALSO PRESENT:
William Sale, videographer

**Page 3**

I N D E X

EXAMINATION BY COUNSEL FOR:
DEFENDANT,
MR. JONES
WITNESS

Dominick Battaglia, Jr.                    4

E X H I B I T S

DEFENDANT'S                              FOR IDENT.
No. 28 (Employee Counseling Form)          11
No. 29 (Employee Counseling Form)          14
No. 30 (Time list)                         17

**Page 4**

PROCEEDINGS

THE VIDEOGRAPHER: This is the fourth in a series

of depositions. Today is Thursday, June 23rd, 2005. The

time is 4:48 p.m.

This is the case captioned Colgan Air, Inc.,

versus Raytheon Aircraft Company.

Would the court reporter please swear the

witness.

Whereupon,

DOMINICK BATTAGLIA, JR.,

witness, was called for examination by counsel for the

defendant, and after having been duly sworn, was examined

and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. JONES:

Q   Mr. Battaglia, my name is Mike Jones. I'm an

attorney from Wichita, Kansas. I represent Raytheon

Aircraft Company in some litigation brought here in

Virginia by Colgan Air.

Are you familiar with that situation?

A   Yes.

Q   We've asked you to come here today to provide

**Page 5**

some testimony about some mechanic work you had performed

on the aircraft that crashed that became the subject of

this lawsuit.

Are you aware of that?

A   Yes, I am.

Q   Have you ever had your deposition taken before?

A   No.

Q   It's very simple. It's a question-and-answer

format. I'll put a question to you; you provide me an

answer. We need to try to not to talk over one another.

If you need a break, let me know; and we'll try

and do that —

A   Okay.

Q   — okay?

What's your full name?

A   Dominick Battaglia, Jr.

Q   Where do you live?

A   In Albany, New York, Stillwater.

Q   What's your street address?

A   ████████████████lwater, New York

████████

Q   Social Security number?

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  A  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.

2  **Q  Where do you work?**

3  A  At Colgan Air in Albany, International Airport.

4  **Q  How long have you worked for Colgan?**

5  A  A total of three years and a couple of months

6  right now.

7  **Q  So you started in what?**

8  A  2002.

9  **Q  April of 2002?**

10  A  '02, yes.

11  **Q  How long have you been working out of the Albany**

12  **location?**

13  A  Since last May.

14  **Q  Where have you worked for Colgan previously?**

15  A  In Hyannis.

16  **Q  Did you start with Colgan in Hyannis?**

17  A  Yes, I did.

18  **Q  Where did you do your initial training while at**

19  **Colgan?**

20  A  Before I went to the hangar, I had done training

21  in Manassas in the class and then on-the-job training for

22  some other stuff.

**Page 8**

1  where we lived and watch the planes come in and out of

2  LaGuardia actually, and I always wanted to do something

3  with them.

4  **Q  So how did you end up in Florida for your A and P**

5  **school?**

6  A  Me and my girlfriend, wife now, we decided to

7  move down there for a little while and see how we can --

8  see how we do.

9  And I just happened to talk to my neighbor, and

10  he said he had two of his relatives go through the school.

11  And he said, "Why don't you try it?"

12  So I did.  I went to the school and talked to

13  them about what -- you know, how long the classes are and

14  what days and, you know, how long the time frame is.

15  And -- and I decided within three days, and I went.  And

16  that was what I wanted to do for my career.

17  **Q  Generally speaking what do they teach you at A**

18  **and P school?**

19  A  There were six courses.  Basic was just a power

20  plan, familiarizing with technical terms, familiarizing

21  yourself with the manuals and the computers, how to use

22  them, how to find stuff.

| Page 7 | Page 9 |
|---|---|

**Page 7**

1  **Q  At Manassas?**

2  A  No, at the hangar, after I got to the hangar.

3  **Q  In Hyannis?**

4  A  Yes.

5  **Q  Tell us about your background and training as an**

6  **aviation mechanic, including your A and P school and any**

7  **other work you've done in the aviation field.**

8  A  My first aviation was with the National Aviation

9  Academy school in Clearwater, Florida.  That was actually

10  my first hands on any plane down there.  That was 14

11  months --

12  **Q  Was your A and P school?**

13  A  -- of class.

14  Yes.

15  Then graduated my class in 2001, I believe.

16  **Q  Prior to going to A and P school, had you had any**

17  **mechanical background?**

18  A  Yes, I worked with cars for a -- a while.

19  **Q  What led you to get into the aviation mechanic**

20  **business?**

21  A  Bigger and better things, more exciting.  Me and

22  my father used to sit on the end of the -- over in New York

**Page 9**

1  **Q  Did they teach you how to read and follow**

2  **maintenance manuals?**

3  A  Yes.

4  **Q  And do they teach you generally that when you're**

5  **working with a maintenance manual and it gives you**

6  **step-by-step instructions on what to do, you do every step?**

7  A  Yes.

8  **Q  And you do them in the order you're given?**

9  A  Yes.

10  **Q  And are you taught that you have discretion to**

11  **depart from those steps, or are you supposed to stick with**

12  **them?**

13  A  They drilled it into our heads that we have to go

14  by the maintenance manual.

15  **Q  And when you got training at Colgan, did that**

16  **notion change?  In other words, did Colgan treat you -- or**

17  **teach you differently on that topic?**

18  A  No, not -- not necessarily that topic.  It was

19  just getting familiarized with the aircraft before I had

20  went out into the hangar and actually touched the aircraft.

21  **Q  So you needed to get familiar with the 1900**

22  **airliner because that's what they flew at Colgan?**

**Page 10**

1   A   Right.

2   Q   And that was a part of your -- your Phase I and

3   your Phase II training that you got once you joined Colgan?

4   A   Yes.

5   Q   So was Colgan your first job in the aviation

6   business?

7   A   Yes, it was.

8   Q   How did you come upon Colgan as an employer?

9   A   I actually filled out an application for Colgan

10  before I graduated school, with the other airlines that was

11  out there; and they just called up one day.

12  Q   And you've been there ever since?

13  A   Yes, I have.

14  Q   Your first title was what?

15  A   As an A and P mechanic.

16  Q   Is that still your title?

17  A   Yes.  And also I have a lead position now that I

18  just got about a week and a half ago.

19  Q   So when the work was done on 240 in August of

20  '03, you were a mechanic but not a lead yet?

21  A   Right.

22  Q   Who was your supervisor?

**Page 11**

1   A   Perry.

2   Q   Perry Sarluca?

3   A   Yes.

4       (The Employee Counseling Form was marked

5       Defendant's Exhibit No. 28 for identification.)

6       BY MR. JONES:

7   Q   I'm handing you what we've marked as Exhibit 28.

8   We had asked Colgan to produce documents that relate to the

9   employment of the various mechanics who worked on the

10  aircraft preceding the accident, and this was amongst the

11  papers that related to you.  This speaks of an event in

12  March of 2003 where an aircraft was damaged in an improper

13  jacking event.

14      Do you remember that?

15  A   Yes, I do.

16  Q   What happened?

17  A   We performed the maintenance that night, I

18  believe, so that it required to jack the aircraft off the

19  floor.  I can't recall what it was for exactly.  But I do

20  remember that morning we took the aircraft off the jacks,

21  and the tail stand was still attached to it.

22      We proceeded to -- one -- the one other mechanic

**Page 12**

1   decided to take the bolt out of the -- out of the tail

2   stand to let the tail stand fall in it's -- in itself.  But

3   the acting supervisor said not to do it that way.  He said,

4   "Take the pin out of top here and just hit it," and the

5   tail stand would fall back and the plane would come down.

6       And I didn't think quick enough to stop the

7   mechanic and to, I guess, question the supervisor at the

8   time and say, "No, it's not going to work that way."  And

9   he had hit it out and did what he did.  And when it came

10  out, it fell out and then went into the plane as the plane

11  came down.

12      So I went to stop it; but I thought -- when I was

13  thinking, I was thinking too slow, I guess; and I couldn't

14  grab the situation quick enough.

15  Q   So who were the other two people involved in

16  this?

17  A   Sean McCarthy and -- I can't think of his name.

18  He was only there for a short time.

19  Q   Who was the supervisor?

20  A   He was an acting supervisor at the time, and I

21  can't remember his name.

22  Q   And you were reprimanded over this event.  That's

**Page 13**

1   what 28 is about; is that right?

2   A   Yes.

3   Q   Were the other two?

4   A   Yes, they were.

5   Q   And your role in this was what exactly?

6   A   That's what I tried to ask the supervisor that

7   was writing me up, which was -- wasn't there that night.

8   And in another paper there was said that I would -- didn't

9   have any take in that situation actually.  I can't

10  remember --

11  Q   Another paper?

12  A   Yeah.

13  Q   What --

14  A   It was -- it was actually from Miguel, a letter.

15  No.  I'm sorry.  I'm thinking of something else.

16  Q   Okay.  So you were given a written warning, and

17  was that the end of this issue?

18  A   I was telling him at that time that I actually

19  didn't have hands on it.  And he said, "I got to write you

20  up anyway."  And I was like, "Oh, okay".

21  Q   And who was this you were talking to?

22  A   To Perry, the person that was writing me up.

**Page 14**

1    Q    And he's the one who signed this?

2    A    Yes.

3         (The Employee Counseling Form was marked

4         Defendant's Exhibit No. 29 for identification.)

5         BY MR. JONES:

6    Q    I'm handing you now what we've marked as 29.

7    This is another document that Colgan's counsel produced to

8    us in response to our request for employment documents on

9    mechanics.  And this is a -- another Employee Counseling

10   Form relating to you for an event that occurred in May of

11   2003.

12        Can you tell me about this one.

13   A    Yes.  There was a few things going on that night;

14   hot section, the Detail Number One, fuel nozzles, other

15   repairs that we had to do and other checks.

16        I got taken off the hot section to do a flap

17   because there was found to be a crack in the flap, went to

18   put it together, and turned around to the -- one of the

19   mechanics and said, "Do you remember how this went on a

20   turnbuckle?"  And he said, "No."  And I said, "All right

21   let's go to the maintenance manual."

22        Went to the maintenance manual, and the way the

**Page 15**

1    maintenance manual said to put it in is the way I put it

2    in.  I read the description, also looked at the picture.

3    And when I put it all together, we -- I went up in the

4    cockpit, ran the flaps.  And by the time they could tell me

5    to stop, it was already damaging the flap and the cove

6    inside where that flap sits.

7    Q    So it was attached wrong?

8    A    Yes, it was attached backwards actually.  The

9    picture was very -- not very -- but it actually wasn't

10   clear.  After we decided that the picture was wrong in that

11   section of the maintenance manual.

12   Q    And you were written up for this?

13   A    Yes.

14   Q    And one of corrective actions was that you would

15   be retrained on the use of maintenance manuals.  What did

16   you do to be retrained in the use of maintenance manuals?

17   Or were you?

18   A    Yes, I was.  I can't recall what exactly was

19   taken to -- I guess, talked to me about it.  I can't

20   recall.

21   Q    So do you remember what you did to -- to do any

22   retraining?

**Page 16**

1    A    They just talked to me about the maintenance

2    manuals and, you know, went over with me about a couple of

3    things on maintenance manuals; asked me how do I use them

4    and stuff.  And I told them how I do it and -- you know,

5    "Do you have it with you when you do your job?"  And I

6    said, "Yes."

7    Q    And who was overseeing this retraining of you?

8    Was that Perry?

9    A    I can't recall who it was.

10   Q    Once you talked to them and explained to them how

11   you -- explained to them how you do things, were they

12   satisfied?

13   A    I think we talked for an hour, somewheres around

14   in that area.

15   Q    And at the end of that were they satisfied that

16   you were properly trained in the use of maintenance

17   manuals?

18   A    Yes.

19   Q    Did the fact that this reprimand on your

20   record -- or these two actually came within a few months of

21   each other cause you any other problems with your

22   employment?  Did they suspend you or have any other action

**Page 17**

1    against you?

2    A    No, they haven't.

3    Q    Other than those two events, were there any other

4    events at Colgan while you've been there where you've been

5    written up or reprimanded?

6    A    No.

7    Q    How have your performance evaluations been in

8    general?

9    A    Average, a little over average.

10   Q    And who -- who does those performance evaluations

11   of you?

12   A    The --

13   Q    Has it always been the same person?

14   A    When I was at Hyannis base, Perry has done them

15   because he's the supervisor at the time.  And he worked the

16   nights, so that's who did that.  And the base manager in

17   Albany has done my last one, which is -- was this April --

18   this past April.

19        (The time list was marked Defendant's Exhibit No.

20        30 for identification.)

21        BY MR. JONES:

22   Q    Mr. Battaglia, I'm handing you Exhibit 30.  This

## Page 18

1  is another document that Colgan's counsel produced to us in
2  response to requests for information about mechanics. And
3  this shows your clocking in, clocking out time and the
4  hours on the clock up to the day of the accident.
5       And do you remember the day of the accident?
6  A   The exact date of the accident, or what are
7  you --
8  Q   I'm just asking you if you remember. If you
9  don't, that's fine. It was August 26th, 2003.
10      Does that square with your rough recollection?
11 A   Yes, it was in August; I know that.
12 Q   What was your typical schedule in this time
13 frame?
14 A   I worked 8:30 to 7:00 -- it was the third
15 shift -- sunday to Wednesday, with three days off. It was
16 a 10-hour workday.
17 Q   So the week before this accident, you were on
18 vacation on Sunday, the 17th. Am I reading that right?
19 A   Yes.
20 Q   So you worked Monday through Thursday that week?
21 Is that right?
22 A   Yes.

## Page 19

1  Q   And then Sunday, the 24th, you came back to work
2  after having been off for two days; right?
3  A   Yes, I have.
4  Q   And that day, on Sunday, the 24th, you put in a
5  16.4-hour day; is that right? 16.38 to be precise?
6  A   Yes.
7  Q   Was that an unusually long day for you?
8  A   No.
9  Q   Do you typically work 16-hour days?
10 A   Not all the time. It was every once in a while
11 actually.
12 Q   We'll go through it in detail. But describe for
13 me first just generally what maintenance you require having
14 been -- or recall having been involved in on aircraft 240
15 in the days leading up to the accident.
16 A   I walked into work Sunday night, and the lead
17 mechanic came up to me and gave me a rundown of that the
18 elevator trim tab actuators had failed their free play
19 check the night before. He proceeded to hand me a
20 left-side elevator trim tab actuator and asked me to go up
21 there with another mechanic and replace that one, which he
22 entailed -- gave the other actuator, the other side, to two

## Page 20

1  other mechanics.
2  Q   So who is the mechanic helping you?
3  A   The gentleman was Jimmy Bowes.
4  Q   Jimmy Bowes?
5  A   Yes.
6  Q   Was he junior or senior to you?
7  A   Junior to me.
8  Q   Was he a mechanic or a mechanics' helper?
9  A   He was a mechanic.
10 Q   So he had his A and P license?
11 A   Yes, he has.
12 Q   To your knowledge, is he with Colgan any longer?
13 A   Yes, he is.
14 Q   And between the two of you, did one of you take a
15 larger or smaller role in the task or were you working
16 evenly?
17 A   I guess I did most of the removal of the
18 left-hand trim tab actuator the first night.
19 Q   And what did -- I'm sorry. Tell me his name
20 again.
21 A   Jimmy Bowes.
22 Q   What did Jimmy do while you were removing it?

## Page 21

1  A   He was helping position it and hold in it place
2  while I got the bolts in and put the cables back on and
3  pretty much helping me out up there with a second hand.
4  Q   Let me hand you what we've previously marked
5  Exhibit 4 and ask if that's the maintenance work order that
6  you were given for replacing the actuator.
7  A   The first night or the second night? because this
8  is the right-hand, and it was -- the right-hand was the
9  second night that I signed off.
10 Q   So you would have been given a separate one of
11 these for the first job of replacing the left-hand side?
12 A   Right.
13 Q   And who gave you that task?
14 A   Dan Kinan.
15 Q   When you removed the actuator, did you -- well,
16 when you did the job to remove and replace it, what do you
17 do? Do you get some sort of checklist to do the job with?
18 A   We actually have the maintenance manual outside
19 down on the table because we were up on a -- a scaffolding,
20 so the maintenance manual is sitting outside in the hangar.
21 Q   Did you have the whole manual, or did you have a
22 printout of the REPS chapter of the manual?

**Page 22**

1     A   No; it was -- it was a binder with other
2   procedures in of other things.  But we had it open to that
3   chapter.
4       Q   So you had the paper maintenance manual you were
5   working with --
6     A   Yes.
7       Q   -- to remove the left-hand actuator?
8     A   Yes.
9       Q   Now, you've used both the REPS manual and the
10   paper manual before; right?
11     A   Yes.
12       Q   And they're the same content, just different --
13   one's a computer and one's paper; is that right?
14     A   Right.
15       Q   When you go to the computer version of it, do you
16   print off the pages and take it back to your workspace?
17     A   Yes, we do.
18       Q   Exhibit 20 is a printout from the REPS manual.
19   Does -- is it the set of procedures for removing and
20   replacing the actuator?
21   (The witness reviewed document.)
22     A   Yes, it is.

**Page 23**

1       Q   Item C of that list for removal calls for the
2   removal first of the entire elevator.
3         Do you see that?
4   (The witness reviewed document.)
5     A   Yes, in Step C.
6       Q   And that wasn't done, was it?
7     A   No, it wasn't.
8       Q   Why not?
9     A   I have asked the lead that night if we should
10   remove them.  He said to hold on and he would ask the
11   supervisor.  And the supervisor came back to him and said,
12   "No."  He came back to me and said, "No."
13       Q   So who was the lead who asked the supervisor?
14     A   Dan Kinan.
15       Q   And who was the supervisor?
16     A   Perry Sarluca.
17       Q   So is it normally your procedure before you
18   depart from a step in the maintenance manual to get
19   approval from a supervisor?
20     A   We've done them that way, and that's the way I
21   was trained on the job to do it.
22       Q   At Colgan?

**Page 24**

1     A   Yes, in the hangar.
2       Q   Now, to do "it" what do you mean?
3     A   To do the removal of the trim tab actuators.
4       Q   So you had taken out actuators before?
5     A   Yes, I have.
6       Q   And in previous occasions you left the elevator
7   in place as well?
8     A   Yes.
9       Q   And who taught you to do that?
10     A   I believe it was Dan on -- you know, maybe a
11   couple -- couple other times it was somebody else that I
12   was helping out to get on-the-job training.
13       Q   Did it concern you that you were skipping steps
14   in a maintenance manual?
15     A   Yes and no.  Since it wasn't a bad flight
16   surface, I didn't ask why not to remove it.  Because it was
17   a good flight surface, I didn't see forth (sic) of taking
18   it off and accidentally damaging it or damaging components
19   while removing it.
20       Q   What was your understanding for the purpose of
21   taking it off?
22     A   For -- it said better access, which there was

**Page 25**

1   already two holes in the forward part of the elevator.  And
2   it had access panels for it, so that's why I never
3   questioned it any further.
4       Q   Were you ultimately reprimanded for not having
5   removed the elevator to do this task?
6     A   I'm not understanding the question.  From who or
7   what?
8       Q   Did Colgan ever reprimand you for not having
9   removed the el-- -- the elevator as Step C in this procedure
10   that is Exhibit 20?
11     A   No.
12       Q   Are you aware of anyone else being reprimanded
13   for that?
14     A   No.
15       Q   So once you removed it, you put a new actuator
16   on; correct?
17     A   Yes.
18       Q   Were you involved in the process of acquiring the
19   actuator, or was it acquired previously?
20     A   No; IT was acquired previously before I walked
21   in.  So when I walked in the door, that was handed to me --
22   you know, within an amount of reasonable time of walking in

## Page 26

1 the door.

2    Q   Were you aware as you were installing it that —
3 installing it that there was an open question about whether
4 the actuator you were installing on the left-hand side was
5 a proper match with the one on the right-hand side?

6    A   I'm not understanding when you say "match" the
7 other side.

8    Q   Are you aware of actuators of a given part number
9 needing to match up with a (sic) actuator of a different
10 part number on the left- or right-hand side of the plane?
11 Ever seen that happen before?

12    A   The same part number? Is that -- I'm sorry. I'm
13 not still understanding your -- on part numbers.

14    Q   Do you know what the part number was of the part
15 you put on?

16    A   No, I don't --

17    Q   Was there --

18    A   -- recall.

19    Q   Was there any discussion as you were putting it
20 on about whether it was the right part number?

21    A   No, there was no discussions.

22    Q   Do you remember any discussion about whether the

## Page 27

1 part being put on the other side was the right part number?

2    A   No.

3    Q   Who was involved in the right-side part number?

4    A   It was Larry Ratliff and Scott Gebauer.

5    Q   Did you guys consult with one another as you were
6 doing essentially the same task on separate sides of the
7 plane?

8    A   I did lean over my should to ask them if they
9 were doing okay, because I had removed a dozen before that.

10    Q   And they hadn't done it before?

11    A   I can't recall if Larry has done any because I'm
12 not usually on his days. We only overlapped on one day, so
13 I don't know if he ever did one, so I can't recall that.

14    Q   You say you've done a dozen of these before?

15    A   Pretty much.

16    Q   Have you replaced other actuators for other
17 flight controls on aircraft besides trim tabs like this
18 prior to this point in time, August of '03?

19    A   Have I did them since?

20    Q   No. Before.

21    A   Before the crash?

22    Q   Yes.

## Page 28

1    A   Yes. I've done the -- the actuator and the trim
2 tab -- actuators up at the top on several planes.

3    Q   When you disconnect an actuator — a trim tab
4 actuator, the tension that was on the cable before you
5 disconnected it would loosen up if you didn't otherwise
6 block it down; right?

7    A   Right.

8    Q   Were you taught when you were in A and P school
9 that to avoid slack being introduced into the rest of the
10 cable run as you disconnect something, that you should
11 block it to keep the tension on it?

12    A   Yes.

13    Q   And why wasn't that done here?

14    A   We didn't have the blocks. We taped it to the
15 side of the inside of the aircraft.

16    Q   So since you didn't have blocks, you did the next
17 best thing, which was using tape?

18    A   Right.

19    Q   In the times you had replaced trim tab actuators
20 before on 1900Ds or Cs, had you blocked the cables then?

21    A   No.

22    Q   So you've never had the blocks available to you?

## Page 29

1    A   No.

2    Q   Did you ever ask to get some?

3    A   Yes.

4    Q   Who'd you ask?

5    A   I believe it was the supervisor before Perry.

6    Q   What were you told?

7    A   The last words, I believe, were, "We'll" -- "I'll
8 see if I can get them."

9    Q   And they just didn't?

10    A   Yeah.

11    Q   How long was that before this work in
12 August of '03?

13    A   I can't remember.

14    Q   Have you been supplied with them since the
15 accident?

16    A   No.

17    Q   After you replaced the left-hand actuator that
18 first time, what did you do to rig it up and check it?

19    A   The one on the left side that --

20    Q   Yes.

21    A   -- that night?

22    Q   Yes, that night.

Page 42

1  can do the tension to the cables and check the rigging.
2      Q  So looking back, it -- I think it's Exhibit 4. I
3  had it a second ago.  It's probably this one.
4      A  Yes.
5      Q  Yeah.  This is the maintenance work order that
6  was filled out and completed for the replacement of the
7  right-hand elevator that we're just now talking about;
8  right?
9      A  Right-handed -- yes.
10     Q  Excuse me.  The actuator, if I didn't say that.
11         This does indicate the time of day you finished
12  it, does it?
13     A  No.
14     Q  And it typically wouldn't?
15     A  Actually the date right here.
16     Q  You see the date but not the time on your shift?
17     A  No, not to time, no.
18     Q  So once you completed it, what were you doing as
19  you waited for the guys to finish the cable work?
20     A  I don't recall, that night.
21     Q  Once they finished the cable work, did they get
22  you to come help them with the rigging --

Page 43

1      A  Yes.
2      Q  -- and the operational checks?
3      A  Yes.
4      Q  Who came to get you; do you remember?
5      A  No, I don't recall.
6      Q  Who was involved in the operational checks and
7  rigging of the elevator trim tab system after the cable was
8  replaced and the right-hand actuator was replaced?
9      A  Myself; Dan Kinan; and the inspector, which was
10  Jeff Vallejo.
11     Q  Who was stationed where at the aircraft as this
12  was done?
13     A  I was up on the tail with the inspector, and Dan
14  was inside the plane.
15     Q  And you used the procedures in 14 for doing that
16  again, just as you had when it bound up the time before?
17     A  Yes.
18     Q  And does a person at the back call out, "Move it
19  all the way up"; and then the person in the -- in the
20  cockpit does that?  Is that part of the process?
21     A  We didn't -- we didn't --.
22     Q  Well, just describe --

Page 44

1      A  He --
2      Q  -- the process.
3      A  We -- he said he was going down, and I was taking
4  the digital protractor.  And it was on the trim tab, and
5  myself and Jeff were looking at the degrees of what it was
6  doing.  And it was deflecting in its -- within its range of
7  degrees the way it was supposed to, where it was supposed
8  to deflect to, and to be at zero and also on the down side
9  of it.
10     Q  So you used a digital protractor to measure the
11  deflection of the tab up and down?
12     A  Yes.
13     Q  And how do you set zero on a digital protractor?
14  How do you figure out your baseline?
15     A  The -- rudder has -- the elevators has been
16  pinned in the vertical part of the tail, and then you would
17  go from that point.  I'd have to read more about it because
18  I haven't done them in so long.
19     Q  Well, let me point out that at Step F it
20  instructs you to use a travel board.  What's a travel board
21  as compared to a digital protractor?
22     A  The travel board gets positioned on the tail at a

Page 45

1  certain point, inboard or outboard of a certain area.  If
2  you don't have that, we can use a digital protractor in
3  place of that.  I can't recall where it was found that you
4  can use in place of the travel board.
5      Q  But your preferred tool is the travel board; is
6  that right?
7      A  Yes.
8      Q  And did you have them available?
9      A  I -- I don't recall if we did have it or not.
10     Q  But you used a digital protractor?
11     A  Yes.
12     Q  When you use a digital protractor, do you set it
13  on the elevator to start at zero?  In other words, how do
14  you set it to zero to begin your measuring?
15     A  I can't recall.  I have to -- I haven't done it
16  for so long.  It's not on -- I know it's not on the
17  elevator.  It's actually on the trim tab it's zeroed out.
18     Q  But what you're measuring is the movement of the
19  trim tab in relation to the elevator; is that right?
20     A  When you say "in relation to the elevator" -- the
21  elevator's pinned at this point --
22     Q  Right.  So --

| Page 46 |
|---|

1    A   -- to do this check.

2    Q   -- it's -- it's static.  It's not supposed to

3  move --

4    A   Right.

5    Q   -- because it's pinned; right?

6       And what you're trying to do in this check is to

7  determine how many degrees up from the elevator or down

8  from the elevator the tab moves; is that right?

9    A   Right.

10    Q   So you need to start with your measuring device,

11  which is your protractor --

12    A   Right.

13    Q   -- at a point of zero, right --

14    A   Right.

15    Q   -- which is straight out flush with the elevator.

16       What I'm trying to ask first is:  How do you make

17  sure you're starting with a digital protractor at that

18  point?  Do you just lay it across the upper surface of the

19  elevator and tab with its joint right there at the tab

20  line, or do you do something else?

21    A   The trim wheel is set at zero, and the protractor

22  is set it -- at zero also when the trim tab was called out

| Page 47 |
|---|

1  that it's at that point on the wheel.  And we would go from

2  there and see if it deflects in the right degrees up and

3  down --

4    Q   So in doing --

5    A   -- at that point.

6    Q   -- that, you're assuming that the trim tab -- or

7  the trim wheel at zero means that the tab is at zero?

8  You're -- you're banking on that relationship being

9  accurate; right?

10    A   Yes.

11    Q   Is there anything else you do to confirm you're

12  starting at true zero with your digital protractor, besides

13  what you've just described?

14    A   No, I don't recall.

15    Q   Are you a pilot?

16    A   No, I'm not.

17    Q   The wheel up front has markings for nose up or

18  nose down of the aircraft; right?

19    A   Yes.

20    Q   Do you know which direction that the trim tab

21  travels as you turn the wheel toward nose up?

22    A   Nose up, the tabs should go down.

| Page 48 |
|---|

1    Q   So if someone in the cockpit would announce, "I

2  am turning it nose up" and -- you at the back are looking

3  at what?

4    A   The trim tabs.

5    Q   And how far they go down?

6    A   I'm not recalling the -- not understanding the

7  question when you said "down".

8    Q   Well, if he's turning the wheel up front to nose

9  up --

10    A   Right.

11    Q   -- which way should the tab be traveling?

12    A   The tab should be -- go down.

13    Q   So has he says, "I'm turning the nose" -- "the

14  wheel nose up," you're looking at how far -- well, first of

15  all, whether the tab travels down; right?  You're supposed

16  to be looking at that?

17    A   Yes.

18    Q   Because if it's traveling up when he says, "I'm

19  going nose up," you know you're backwards?

20    A   Yes.

21    Q   So you're looking at whether it's going down, and

22  then you're also looking how far down it's supposed to go

| Page 49 |
|---|

1  and whether it complies with these steps in the REPS

2  manual?

3    A   Yes, with the digital protractor.

4    Q   And how did it check out?

5    A   Everything was in -- within its range of up and

6  down deflection.

7    Q   And how did you confirm that it was traveling the

8  correct direction as the wheel was moved?

9    A   I said a few times where the trim tab was, and he

10  didn't come back to me saying that it was wrong actually.

11    Q   So you were looking to the person in the cockpit

12  to check that issue?

13    A   He would -- he wouldn't sit in the pilot's seat.

14  He would stand in the doorway of it; and he would come back

15  and walk two steps out the doorway; and, you know, we'd

16  talk -- talk that way --

17    Q   So you --

18    A   -- instead of yelling.

19    Q   -- you were within earshot then?

20    A   Yes.

21    Q   And, again, this was you, Dan, and Jeff?

22    A   Yes.

## Page 50

1    Q   Was anyone else there?

2    A   No.

3    Q   And then after that check was completed, did you

4  sign off on Exhibit 4?

5  (The witness reviewed document.)

6    A   Yes, I have.

7    Q   And this is an RII respection -- required

8  inspection item?  Is that what RII stands for?

9    A   Yes.

10    Q   Who did that check?  Is that Jeff?

11    A   Yes, it was Jeff.

12    Q   And did he go from front to back and check what

13  both sides of the -- what both of you were doing, or did he

14  stay put in one location?

15    A   As we were doing travel; is that what you're --

16    Q   As you were doing the rigging and operational

17  checks.

18    A   Yes; he stayed up on the scaffolding.

19    Q   He stayed on the back of the tail with you?

20    A   Yes.

21    Q   He wasn't in the cockpit at all?

22    A   No.

## Page 51

1    Q   Do you know whether the electric trim was also

2  used to test the travel and direction?

3    A   Yes, we did.

4    Q   So when he -- when whoever was up front -- when

5  Dan was up front and was running the system, would he tell

6  you he was doing it electrically or manually each time?

7    A   Yes, he would tell me electrically; and also you

8  could hear the motor running in the tail part of it.

9    Q   And to your knowledge, everything checked out

10  okay?

11    A   Yes.

12    MR. JONES:  Let's all take a break.  I think I

13  might be able to wrap up fairly quickly --

14    MR. DOMBROFF:  Okay.

15    MR. JONES:  -- if you let me do a few things.

16    THE VIDEOGRAPHER:  Off the video record at 5:46.

17  (Whereupon, a brief recess was taken.)

18    THE VIDEOGRAPHER:  We're back on the video record

19  at 5:52.

20    Go ahead, sir.

21    BY MR. JONES:

22    Q   Do you remember whether the control wheel had to

## Page 52

1  be reindexed after the actuator or cable work was done?

2    A   No, I don't recall if it was.

3    Q   Do you know what it means to reindex that wheel?

4    A   Yes, I do.

5    Q   What does that mean?

6    A   Take the wheel completely off, move the bolt,

7  take the wheel off, and reposition it on the spline shaft,

8  and put the bolt back on.

9    Q   Have you had to do that before?

10    A   No.

11    Q   Under what set of circumstances might that become

12  necessary?

13    A   I don't recall any.

14    Q   Looking again at Exhibit 14, the checklist for

15  doing the rigging to determine the proper travel and

16  direction of the tab after this work, how far in degrees is

17  the trim tab supposed to deflect up?  And I'll refer you to

18  Item F.

19  (The witness reviewed document.)

20    A   The deflection should be five and a half degrees

21  with plus half a degrees (sic) and without zero degrees

22  minus of the up travel --

## Page 53

1    Q   What --

2    A   -- of neutral.

3    Q   What does that plus one-half degree and minus

4  zero degree mean?

5    A   The half means it can have more travel of the up

6  deflection than it would the degrees of the down from the

7  negative.

8    Q   So was that a margin of error, acceptable error,

9  that they're telling you?

10    A   Yes.

11    Q   So when you did the check following the cable

12  replacement and the act- -- and the right-hand actuator

13  replacement, did you confirm that the trim tabs both

14  traveled five and a half degrees up from neutral?

15    A   I can't recall the exact measure.  Yes, it was

16  within its range of that --

17    Q   So if you --

18    A   -- five and a half --

19    Q   -- were using --

20    A   -- to half.

21    Q   If were you using this REPS chapter as a

22  reference and you were going through this list, you would

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - -x

                      :

COLGAN AIR, INC.,           :

                      :

          Plaintiff,    :

                      :

      vs.             :  Civil Action

                      :  No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,    :

                      :

         Defendant.    :

                      :

- - - - - - - - - - - - - - - - - -x

McLean, Virginia

Friday, June 24, 2005

Videotaped deposition of THOMAS JEFFREY VALLEJO,

witness, called for examination by counsel for the

defendant, pursuant to notice, at the offices of

Thomas B. Almy, Esq., Dombroff & Gilmore, P.C., 1676

International Drive, Penthouse, McLean, Virginia, before

Malynda D. Whiteley, a Registered Professional Reporter and

a notary public in and for the State of Virginia, beginning

at 11:43 a.m., when were present on behalf of the

respective parties:

| Page 6 | Page 8 |
|---|---|

**Page 6**

1    A    Thomas Jeffrey Vallejo.

2    **Q    What's your address —**

3    A    14 --

4    **Q    -- residential address?**

5    A    ████████████, Centerville, Massachusetts.

6    **Q    Social Security number?**

7    A    ██████████.

8    **Q    By whom are you employed?**

9    A    Colgan Air.

10    **Q    What do you do there?**

11    A    I'm an aircraft inspector.

12    **Q    How long have you been there?**

13    A    Since June of 2002.

14    **Q    Have you been an aircraft inspector all that**

15    **time --**

16    A    Yes.

17    **Q    -- with Colgan?**

18    A    With Colgan.

19    **Q    Give us a sketch of your history in the aviation**

20    **business staring with A and P school.**

21    A    I went to A and P school in 1985 and graduated in

22    1986 and went to work for a -- a small commuter airline.

**Page 7**

1    **Q    Where did you do your A and P training?**

2    A    At Myrtle Beach, South Carolina.  It was North

3    American School of Aviation.

4    **Q    What made you decide to go get an A and P**

5    **license?**

6    A    It was kind of a family business.  My father was

7    into it; my grandfather was into it.  I've been around

8    aviation my whole life.

9    **Q    So were your father and grandfather were A and**

10    **Ps?**

11    A    My father was.  My grandfather wasn't.  My

12    grandfather was an engineer.

13    **Q    Before going to A and P school, were you in any**

14    **other business?**

15    A    Automotive repair.

16    **Q    So you had a mechanical background already?**

17    A    Yes.

18    **Q    So had you decided you're done with auto repair;**

19    **you're going to move on to aviation work?**

20    A    Yes.

21    **Q    How did you choose the particular A and P school**

22    **you went to?**

**Page 8**

1    A    It was actually in the local newspaper.  It was a

2    Sunday ad.

3    **Q    Did you find it to be a good program?**

4    A    Yeah, it was a good program.

5    **Q    How long did it take?**

6    A    Thirteen months.

7    **Q    And you written materials you had to work with?**

8    A    Yes.

9    **Q    Just generally speaking, what did they teach at A**

10    **and P school?**

11    A    The basic course of study for -- to past the exam

12    and practical testing.

13    **Q    What sort of subject matter are we talking about**

14    **here?**

15    A    General, electrical, hydraulics, engines,

16    structures, things like that.

17    **Q    Not particularly aircraft-specific but just**

18    **generally --**

19    A    Right, generally.

20    **Q    Do they assume their new students have any**

21    **particular experience in the aviation world?**

22    A    I wouldn't know if they would or not.

**Page 9**

1    **Q    Do they teach you in A and P school that flight**

2    **controls are an especially critical aspect of an aircraft?**

3    A    Not really.  I don't think they focus on it as

4    a -- in a general curriculum it just seems to be included

5    in as part of how the airplane works.

6    **Q    So was it ever stressed to you that the flight**

7    **control systems of an aircraft are especially critical?**

8    A    No, not like -- not presented as -- as anymore

9    focus of anything else like the engine, propeller, the

10    flight controls, the landing gear.  I think the entire

11    airplane was focused as the entire -- I don't know the word

12    I'm looking for.  The entire structure of the whole thing

13    was important, piece of airplane, not more -- one more than

14    the other.

15    **Q    Were you taught in A and P school that whenever**

16    **you did any work on a flight control system, that you**

17    **wanted to run it through its paces to make sure it was**

18    **operating properly when you were done?**

19    A    Yes.

20    **Q    And would that generally include making sure it**

21    **reaches its complete motion of travel in each direction?**

22    A    Yes.

**Page 10**

1    Q    And that it's moving in the proper direction for
2    the input given?
3    A    Yes.
4    Q    That's something that basically any mechanic
5    would -- went through in his training know is an important
6    thing to do?
7    A    Right, yes.
8    Q    After you got your A and P, you said you went to
9    work where?
10   A    Atlantis Airlines.
11   Q    Where's that?
12   A    It was in Florence, South Carolina.
13   Q    What did you do there?
14   A    I was mechanic started, as a -- as a junior
15   mechanic.
16   Q    What type of aircraft did you work on?
17   A    Jetstream 31s and SA-227s.
18   Q    What sort of an operation was that?
19   (Mr. Hall entered the conference room.)
20   A    It was a commuter airline for Eastern Airlines at
21   the time, Eastern -- Eastern Express.
22   Q    So was this in the late '80s?

**Page 11**

1    A    Yeah.
2    Q    How long were you there?
3    A    I was there -- I don't remember the exact time
4    frame. A year to eighteen months, two years at the most.
5    Q    So when you started there, did they put you
6    through any other specific training?
7    A    Yeah, I went to the factory school for the
8    engines, to Garrett.
9    Q    The engines that were on the planes they were
10   operating?
11   A    Right. I went to Garrett.
12   Q    What about any training for air frame that they
13   were flying?
14   A    No, didn't go to the air frame training.
15   Q    Did they fly any Beechcraft products there?
16   A    No.
17   Q    Where did you go when you left there?
18   A    I went to CC Air.
19   Q    Where are they?
20   A    They were in -- Hickory, North Carolina, was the
21   maintenance facility.
22   Q    Now, why did you leave the first place?

**Page 12**

1    A    I had a better job offer from CC Air operating
2    the same airplane. They were operating the Jetstream 31.
3    Q    Did they operate any Beechcraft planes there?
4    A    Yes.
5    Q    What did they operate?
6    A    The Beechcraft 99.
7    Q    Did you do work on those at all?
8    A    No.
9    Q    So you didn't go to any Beechcraft training for
10   the 99 while were you at CC?
11   A    No.
12   Q    How long were you there?
13   A    Till almost ten years.
14   Q    And why did you leave there?
15   A    Went to work for Boeing.
16   Q    Located where?
17   A    In Seattle, Washington.
18   Q    What did you do for them?
19   A    I was a functional tests technician.
20   Q    What does that involve?
21   A    I was on Slant 3 of the 747 final assembly.  I
22   was in hydraulics.

**Page 13**

1    Q    How did you get hooked up with that job?
2    A    I met a guy in a laundromat, believe it or not.
3    Q    Really?
4    A    Sure did.
5    Q    Someone from Boeing?
6    A    Yes.  Retired functional test engineer that was
7    in a laundromat. And I had -- I went to -- I was working
8    with CC Air and went to work -- actually went to work for
9    B.F. Goodrich, what which Tramco at the time. It was a --
10   a large airplane depot maintenance facility.
11        And that's what brought me to Seattle, but I had
12   every intention of going to work for Boeing. That's where
13   my focus was. And I had to take this job until my Boeing
14   job opened up. I was going to get into Boeing one way or
15   another.
16        But I met this guy in a laundromat. And he asked
17   me, you know, what I -- he saw the uniforms that I had.
18   And we got into a discussion about aviation, and he said
19   that retired from Boeing and that he knew people there that
20   could maybe something, give him my name and Social Security
21   number. And two days later I got a call from Boeing.
22   Q    So that's what you got you interested in Boeing,

**Page 14**

1  or were you already thinking --
2    A  No, I was already thinking Boeing.
3    Q  Oh.
4    A  Oh, yeah. I was already going out to Seattle to
5  go work for Boeing. I had it in my mind to work to big
6  airplanes.
7    Q  And was that your purpose or reason for thinking
8  of going to Boeing; you wanted to work on big planes?
9    A  Right, yeah.
10   Q  And how long did you work for Boeing?
11   A  I worked for Boeing for about 15 months.
12   Q  And why did you leave there?
13   A  Well, the impending layoffs where everything
14  started going downhill. Boeing just started -- started
15  laying off and laying off, and the line number started
16  getting smaller and smaller, which meant that their --
17  their orders were being canceled.
18   Q  Was this in the wake of 9/11?
19   A  No, this was before 9/11.
20   Q  So then what did you do?
21   A  I went to work for Horizon Air.
22   Q  Where is that?

**Page 15**

1    A  In Seattle, Washington.
2    Q  Doing what?
3    A  I was a line mechanic there, doing line
4  maintenance.
5    Q  Working on what type of aircraft?
6    A  Dash 8s and F28 Focker -- F28 Focker.
7    Q  What sort of operation did they run?
8    A  They were a commuter airline.
9    Q  Did you work on any Beechcraft airplanes there?
10   A  No, they didn't have any Beechcraft.
11   Q  Did you undergo any additional aircraft-specific
12  training while at that operation?
13   A  Yes.
14   Q  Just for the ones you worked on there?
15   A  Yes.
16   Q  How long were you there?
17   A  I was there about 15 months.
18   Q  Why did you leave there?
19   A  My wife at the time became diagnosed with -- I
20  can't remember the exact terminology of it, but she
21  couldn't stand the weather. Depression, clinical
22  depression is exactly what it was. And we had no choice

**Page 16**

1  but to move back to the south.
2    Q  Cloudy in Seattle, isn't it?
3    A  Yeah, it was cloudy and rainy.
4    Q  Kind of -- kind of dreary?
5    A  And she grew up her whole -- spent her whole life
6  in the South, and it just really took a toll on her. She
7  went into a major depression.
8        We tried everything; doctor, psychologist. We
9  went and got light therapy and all kinds of stuff. It just
10  didn't work out.
11   Q  So headed back where?
12   A  I went back to North Carolina.
13   Q  So did you line up a job back in -- in this area
14  before you headed back over here?
15   A  No. I had intentions of finding a job when I got
16  back here -- or back in -- in North Carolina.
17   Q  Where did you find a job in North Carolina?
18   A  I looked in North Carolina and ended up working
19  for Mesa Airlines in Birmingham, Alabama.
20   Q  When did that begin?
21   A  In November of '99, November of '99.
22   Q  How long were you with Mesa?

**Page 17**

1    A  Almost two years.
2    Q  What type of aircraft did you work on there?
3    A  Canadair regional jet and the Embraer regional
4  jet.
5    Q  Did you work on any Beechcraft aircraft there?
6    A  No.
7    Q  Were you -- you were a mechanic there, I take it?
8    A  No, I was an inspector there.
9    Q  When did you achieve inspector status along your
10  career progression?
11   A  The first year I was with CC Air.
12   Q  And did you remain an inspector at each place you
13  went to thereafter?
14   A  No.
15   Q  Where were you not an inspector?
16   A  I was not an inspector at Boeing, and I was not
17  an inspector at Tramco, and I was not an inspector at
18  Horizon.
19   Q  And why did you leave Mesa?
20   A  I left Mesa over an -- an incident that happened
21  and the CRJ, and me and the director of quality of
22  assurance didn't agree on the -- on the cause, so I -- I

| | Page 18 |
|---|---|

1  resigned.
2    Q   What happened?
3    A   It was an overflight of a door, a repair on a
4  door that supposed to repaired, and it overflew by
5  5,000 hours.
6    Q   Was there an incident or accident associated with
7  this?
8    A   No.
9    Q   It's just a -- something overflew its incremental
10  time for some work?
11    A   Right.
12    Q   And did the company or someone at the company
13  purport to lay that problem at your feet?
14    A   Yeah, that's pretty much how it happened, yeah.
15    Q   And you disagreed that?
16    A   I disagreed with it.
17    Q   So you left?
18    A   So I left.
19    Q   Where did you go?
20    A   I went to Colgan Air.
21    Q   When was that?
22    A   In June of 2002.

| | Page 19 |
|---|---|

1      (The training record was marked Defendant's
2      Exhibit No. 39 for identification.)
3    BY MR. JONES:
4    Q   Sir, I'm handing you what we've marked Exhibit
5  39.  This is a document that was produced by counsel for
6  Colgan in response to requests that Raytheon made for
7  documents associated with the mechanics' employment.
8      And we've seen this document for basically
9  everybody, and it seems to track the training that you
10  received while at Colgan.  It also typically seems to start
11  about the time you began working there.
12      And it works actually from the bottom up.
13    A   Oh, okay.
14    Q   Do you recognize this document as that type of
15  thing?
16    A   Yes.
17    Q   Does that track with your recollection of when
18  you started with Colgan?
19    A   Yes.
20    Q   And what sort of training did you get while at
21  Colgan?  And you can use that as a guide if you need to.
22    A   Well, I got the initial Phase I for the Saab and

| | Page 20 |
|---|---|

1  the Beech, airworthiness release training, ground handling
2  training, avionics Phase I.
3    Q   So what did Phase 1 consist of for the Beech?
4  And that was -- and that was specific to the 1900; is that
5  right?
6    A   Yes.
7    Q   What did that involve?  Did you do it at Colgan,
8  did you go somewhere for it, or what?
9    A   We did it at Colgan.
10    Q   Who taught it?
11    A   They brought a guy in from -- a contractor.  I
12  can't remember his exact name, who did it.
13    Q   And was it much like the other training you had
14  gotten at other places you worked as far as being
15  aircraft-specific?
16    A   Yes.
17    Q   It just gets you familiar with that particular
18  air flame and its fire plan (phonetic)?
19    A   Yes.
20    Q   And then working on up the through the rest of
21  this, you got as far as requalification airworthiness
22  release July '03?

| | Page 21 |
|---|---|

1    A   Right.
2    Q   That's the last item shown here.  Is that right?
3    A   Yes.
4    Q   Other than what's listed here, are you aware of
5  any other formal maintenance you -- or excuse me -- formal
6  training you received while working at Colgan?
7    A   Yeah, the Phase -- the Phase IIs are not on here
8  for the -- for the Beech and the Saab.
9    Q   When did they happen?
10    A   I don't remember the exact dates, but somewhere
11  in 2003.  It was about a year -- I was there about a year
12  and had been transferred to the Hyannis base from Manassas,
13  and I was in Manassas about six months.
14    Q   What do you learn at the Phase II step of the
15  training as distinct from what they teach at the Phase I?
16    A   It's -- it's a little more in-depth systems
17  rather than just standard air framing.  It goes into
18  in-depth -- in-depth about systems.
19    Q   And do you remember that the air -- the
20  maintenance that was done on this aircraft preceding the
21  accident was performed in August of 2003?
22    A   I don't understand.  Say that again.

**Page 22**

1    Q   Well, I'm trying to get -- find out if you have
2   an independent recollection of when the maintenance was
3   performed on the accident aircraft before the accident
4   happened.
5       A   2003.  Oh, yeah.
6          I'm still not following to question.  It's --.
7       Q   Do you know when -- when did the accident occur;
8   do you know?
9       A   I don't remember the exact date.  August, August
10  of 2003.  Yeah, okay, in August of 2003.
11      Q   And what's your recollection of when the
12  maintenance was done on the plane before the accident?  Was
13  it immediately before, days before, weeks before, or what?
14      A   Days before.
15      Q   And we'll get more detail into this as we talk.
16  But just give me a thumbnail sketch of what your role was
17  in the maintenance on Aircraft 240 in the days preceding
18  the accident.
19      A   My job was to basically perform the ins- --
20  the -- the inspection, the Number Six detail that was due
21  on that airplane.
22      Q   And describe briefly for us what a Number Six

**Page 23**

1   detail inspection is.
2       A   It comprises of inspection of the tail of the
3   airplane, the empennage.
4       Q   And it's a regularly scheduled inspection?
5       A   Right, regularly scheduled inspection.
6       Q   Comes due at a given increment of hours flown --
7       A   Yes.
8       Q   -- or cycles?
9       A   Yes.
10      Q   So the Detail Six came due on Aircraft 240, and
11  it got listed on your schedule of maintenance.  It came up,
12  and you were assigned to be the inspector for that work?
13      A   Yes.
14      Q   Who actually performed the Detail Six?
15      A   I did some of it, and Dan Kinan did some of it.
16      Q   And then for the work that followed the Detail
17  Six itself, what was your general role?
18      A   To ensure that it was done satisfactorily.
19      Q   But not necessarily to perform the tasks
20  yourself?
21      A   No, not to perform the task myself.
22      Q   You were an inspector of other mechanics' work?

**Page 24**

1       A   Right.
2       Q   So before August of 2003 had you performed
3   services as an inspector of work on 1900D aircraft?
4       A   No.
5       Q   Was August of 2003 the first time you were
6   serving?
7       A   Oh, no.  The first time that I inspected worked
8   as the inspector on the 1900Ds is when I was hired with
9   Colgan.
10      Q   So you did that from the get-go?
11      A   From the get-go; right.
12      Q   Even before you took the Phase I.
13      A   Phase 1 was on my hire date.  When I was hired, I
14  had to go to the Phase 1 class before we even started on
15  the floor, before I even went to work.
16      Q   So you had completed the Phase 1 before you did
17  any services as an --
18      A   Right --
19      Q   -- inspector of work?
20      A   -- right.  I went through the Phase 1 with the
21  chief inspector and lead inspector; right.
22      Q   So for that full year and month or two leading up

**Page 25**

1   to the accident, you were serving as a -- as an inspector
2   on work on 1900Ds?
3       A   Right.
4       Q   As of the service performed on 240 in late August
5   2003, you had not yet completed your Phase II training on
6   the 1900D, had you?
7       A   No.
8       Q   Is there any requirement within Colgan's GMM that
9   inspectors inspecting the work of mechanics on a given
10  aircraft need to first complete both phases of that
11  aircraft's training?
12      A   I don't know.  I don't remember.  I'd have to
13  look at the GMM.
14      Q   But in any event, you were being -- you were
15  serving as an inspector without having gotten the second
16  half of the 1900 specific training; correct?
17      A   I think so, yeah.
18      Q   Do you remember when you completed the --
19      A   No.
20      Q   -- or took the --
21      A   I --
22      Q   -- the Phase II?

**Page 26**

1    A   -- can't remember the exact date of the Phase II.
2    Q   Are you a pilot?
3    A   Yes.
4    Q   What ratings do you hold?
5    A   Just a private pilot license.
6    Q   Besides your A and P and your private pilot's
7  license, do you hold any other certifications in the
8  aviation field?
9    A   No.
10   Q   Have you ever had any enforcement actions against
11 you as an airman?
12   A   No.
13   Q   Never had --
14   A   Not until this incident.
15   Q   What -- we'll talk about it now.  What -- what
16 specific enforcement action was instituted against you as a
17 result of this situation?
18   A   Certificate suspension for 30 days.
19   Q   And the reason was?
20   A   Failure to follow maintenance manual procedures.
21   Q   And specifically what maintenance manual
22 procedures were not followed?

**Page 27**

1    A   The removal of the elevator for installation of
2  the trim tab actuator.
3    Q   Was there any other aspect of -- or was there any
4  other reason given for your suspension, other than the
5  failure to make sure that step occurred, removal of the
6  elevator?
7    A   No.
8    Q   None of it had anything to do with the cable
9  work?
10   A   No.
11   Q   It had nothing to do with the proper performance
12 of the operational check following --
13   A   No.
14   Q   -- the work --
15   A   No.
16   Q   -- on the plane?
17       When you got to Colgan, did you have to become
18 familiar with their GMM?
19   A   Yes.
20   Q   And how did you go about doing that?
21   A   I went through a training class with the director
22 of quality assurance.

**Page 28**

1    Q   Do you then take a test?
2    A   I took a couple of tests.  I can't remember if
3  they were GMM-specific.  I just -- I just don't remember if
4  they were GMM-specific.  But they gave us a couple of
5  tests.
6    Q   But you completed your training of the GMM --
7    A   Yeah.
8    Q   -- satisfactorily?
9    A   Yes.
10   Q   Do inspectors have to get more familiar with the
11 GMM than regular mechanics?
12   A   No.
13   Q   Explain briefly the work card system in place at
14 Colgan.
15   A   The work cards are a series of written
16 instructions to perform certain tasks.
17   Q   Now, is there a work card at Colgan for every
18 single task done on every airplane?
19   A   No.
20   Q   Is it typical that you have a work card for
21 things that occur over and over as opposed to rare repairs?
22   A   Yes.

**Page 29**

1    Q   Who at Colgan is in charge of creating the work
2  cards?
3    A   The --
4  (Proceedings participants speaking at the same time.)
5       MR. ALMY: Objection.  Excuse me.  Objection.
6  Now or --
7       MR. JONES: I'm asking how -- I'm asking now, but
8  I'll for a separate time frame.
9    A   The director -- director of quality control.
10      BY MR. JONES:
11   Q   So whoever had that at the various times
12 throughout the history of the company would be the one
13 responsible for that?
14   A   Right.
15   Q   Who has that role now?
16   A   I would still say the director of quality
17 control.
18   Q   What person holds that position?
19   A   Tony -- I can't pronounce his last name.  Galub
20 (phonetic).  I'm not sure how to pronounce his last name.
21   Q   During time you joined Colgan up to the date of
22 the accident, who held that position?

**Page 42**

1    A    -- him up --
2    Q    -- and said --
3    (Proceedings participants speaking at the same time.)
4    A    It's small company; it's easy to pick up the
5    phone and say, Hey, look I saw this or -- or that.
6    Q    And then do you try and -- and make sense of it
7    together and go on, or do you need to take some other
8    action when that happens?
9    A    We try to make sense of it together, what the
10   best route of action is.
11   Q    And if you find a discrepancy that caused you
12   some confusion, do you typically also inform the
13   manufacturer that publishes the manual?
14   A    No, I don't.
15   Q    Do you know whether the company typically does?
16   A    No, I don't know if they do or not.
17   Q    So you personally have never informed, for
18   example, Raytheon that you found a problem in one of its
19   maintenance manuals?
20   A    No.
21   Q    Have you had interaction directly with tech
22   support at Raytheon?

**Page 43**

1    A    No.
2    Q    You've not spoken with anyone there?
3    A    No, not -- no, I really don't.
4    Q    Who typically has communications with tech
5    support when questions arise?
6    A    The supervisor on duty.
7    Q    Do you work the day shift or the night shift.
8    A    Night shift.
9    Q    Still?
10   A    Still.
11   Q    When you were in A and P school, were you taught
12   about the practice of blocking cables to keep tension on
13   them before you disconnects a part so that all of the
14   downstream run of the cable keeps tight?
15   A    No.
16   Q    You were never taught that?
17   A    No.
18   Q    Have you ever seen that done?
19   A    Yes.
20   Q    Where?
21   A    In the manufacturing plant at Boeing.
22   Q    At Boeing?

**Page 44**

1    A    Yeah.
2    Q    And did you actually do that there?
3    A    No.
4    Q    When you saw it being done, what did you
5    understand its purpose to be?
6    A    To keep the cables in place.
7    Q    And if you didn't keep them in place, what
8    problems might arise?
9    A    They could fall off the pulley.
10   Q    Have you ever seen -- seen that done at Colgan,
11   blocking the cables?
12   A    No.
13   Q    Have you ever heard the topic discussed at
14   Colgan?
15   A    Yes.
16   Q    When?
17   A    After this incident.
18   Q    But not prior to?
19   A    No.
20   Q    Has Colgan instituted a practice of blocking
21   cables since the accident?
22   A    Yes.

**Page 45**

1    Q    Who instituted that practice?
2    A    The director of quality control.
3    Q    How was that change implemented?
4    A    How was it implemented?
5    Q    Was it put in the GMM?
6    A    I don't know if it was written in the GMM or not.
7    But he specifically told me on the phone that it would be
8    done.
9    Q    And why was he explaining to you it was needing
10   to be done?
11   A    Why was he explaining?  That's what he wanted
12   done.
13   Q    Well, what was your understanding as to why
14   blocking was now determined to be a good practice?
15   A    Well, that's something that they said that they
16   had called for in the maintenance manual and that they
17   wanted done.  They wanted the maintenance manual followed
18   letter for letter.
19   Q    So Colgan's decision to begin blocking was in
20   response to a change in the maintenance manual to
21   specifically call for it as well?
22   A    I'm not following you there.

**Page 50**

1    A    No.

2    Q    Well, what would you do, then?

3    A    I would go up and look at the job that he

4    completed --

5    Q    And --

6    A    -- to make sure that it was -- the presentation

7    was right.

8    Q    Everything looked in --

9    A    Everything --

10    Q    -- place?

11    A    -- looked in place, everything looked right.

12    Q    Would you have done any sort of rigging or

13    operational check to see that it was operating properly?

14    A    Yes.

15    Q    And what does that involve?

16    A    Looking for whatever the maintenance manual

17    called out for.

18    Q    So in that instance you would have looked at the

19    page of -- of the maintenance that would tell you how to

20    do --

21    A    Yes --

22    Q    -- that --

**Page 51**

1    (Proceedings participants speaking at the same time.)

2    A    -- the maintenance manual would already be there.

3    It's there from the start of the job to completion.  The

4    maintenance manual's available.

5    Q    Do you remember doing or being present for the

6    rigging and operational check of the elevator trim tab

7    system after the first two actuators were replaced?

8    A    No.

9    Q    Were you present or involved in the rigging and

10    operational check of that system after the front cable was

11    replaced and the left ac- -- or excuse me -- the right

12    actu- -- actuator was replaced the second time?

13    A    Yes.

14    Q    Were you involved at all in the process of

15    replacing the forward cable system?

16    A    Yes.

17    Q    What was your role there?

18    A    I looked at the job after it was completed.

19    Q    When you looked over the forward cable

20    replacement job, what was your understanding as to why that

21    cable had to be replaced in the first place?

22    A    They told me that they had replaced the trim tab

**Page 52**

1    actuator and that the travel was longer than the cable had

2    allowed and it caused the cable to come off the drum.

3    Q    The travel was longer than the cable had allowed.

4    What does that mean?

5    A    On the actuator.  It moved -- it moved more -- I

6    can't remember if it was more or less that caused --

7    something that actuator -- in that right-hand actuator

8    caused the cable to come off the drum.

9    Q    Who had formed that opinion?

10    A    Perry Sarluca.

11    Q    Did he tell you it had something to do with

12    the -- the differential in travel limits, one side to the

13    other?

14    A    Not until after they called Raytheon and Raytheon

15    told them that that was going -- that's what would happen

16    if that actuator was put in there.

17    Q    And who called Raytheon?

18    A    Perry.

19    Q    Were you at all involved in the previous

20    discussions with Raytheon about whether a dash 6 and a dash

21    7 could be used together?

22    A    No.

**Page 53**

1    Q    But by the time you participated in the

2    functional check and the rigging check after the cable and

3    the right-hand was replaced again, you learned that

4    Raytheon had reported back that, No, you can't pair those

5    two together; you have to pair dash 7 and dash 9; right?

6    A    Right.

7    Q    Now, you mentioned that you thought that someone

8    at Raytheon had said that there was something about the

9    dash 6 right-hand actuator that would cause it to come off

10    the drum.

11    Were you -- were you directly involved in those

12    communications with Raytheon?

13    A    No.

14    Q    You didn't speak with Raytheon, did you?

15    A    No.

16    Q    Who did?

17    A    Perry Sarluca.

18    Q    And who did you hear from that Raytheon had said

19    something like this?

20    A    Perry Sarluca.

21    Q    What precisely did Perry tell you that he had

22    heard?

Page 70

1  aspect of the work; and then when the other finished, you'd
2  check their aspect of work; and then after you checked both
3  of those visually, you would be do the operational check?
4  Would that be the order?
5     A    Yes.
6     Q    Who was present for the operational check?
7     A    Dan Kinan, Dominick, and myself.
8     Q    And where were each of you positioned around the
9  aircraft?
10    A    Dominick and I were on the tail, and Dan was in
11 the cockpit.
12    Q    And how did the check go?
13    A    It went -- it went perfect.  The numbers were
14 right on the money.
15    Q    And what did you do use, a travel board or a
16 digital protractor?
17    A    We used a digital protractor.
18    Q    And who operated that?
19    A    Dominick did.
20    Q    And were you looking over his shoulder to check
21 the readings?
22    A    Yeah, I was watching the numbers.

Page 71

1     Q    Were you holding Exhibit 14 to know the numbers?
2     A    We had already established the numbers previously
3  from reading the maintenance manual and knew what we were
4  looking for.
5     Q    What sort adjustments do you make for temperature
6  in the -- in the hangar when you do this?
7     A    I'm not following you.  I mean --
8     Q    On the front page here there's a chart that
9  has --
10    A    Uh-huh.
11    Q    -- temperatures against pounds of tension.
12    A    Uh-huh.
13    Q    And I believe it was Dominick yesterday was
14 trying to explain to us how you needed to find out what the
15 temperature was in the hangar because it could impact this
16 test.
17    A    Right.
18    Q    How does that work?
19    A    We used a digital thermometer placed in the belly
20 of the airplane, and that will tell us what the
21 temperature -- that ambient temperature is, and then we use
22 the chart corresponding to that.

Page 72

1     Q    So what does a variation in temperature do to the
2  system?
3     A    It's going to change the tension that's applied
4  in the cable.
5     Q    Will it change the extent of travel of the flight
6  control surface?
7     A    I don't know if it would or not.  I would think
8  it would.
9     Q    Did you check the stops on the cable to see where
10 they were located as a part of your inspection work?
11    A    Yes.
12    Q    What did you do to check those?
13    A    We visually inspected them.
14    Q    Is there anything you could do to make sure they
15 were in the right spot along the cable?
16    A    No.
17    Q    Were you just looking to see that they were
18 there?
19    A    To see that there were there, yes.
20    Q    Would they have been taken off as a part of this
21 work?
22    A    I don't think they were because they were on the

Page 73

1  upper end of tail and the cable that was changed was in the
2  forward end.
3     Q    When you were inspecting the work done on the
4  actuator, were you aware that the step calling for the
5  removal of the elevator had been skipped?
6     A    Yes.
7     Q    Did you discuss that with your mechanics --
8     A    No.
9     Q    -- as you were doing the inspection?
10    A    No.
11    Q    But you knew they had skipped that?
12    A    Yes.
13    Q    And you were okay with that?
14    A    Yes.
15    Q    And why is that it was okay, in your mind, to
16 skip that?
17    A    That's the way we had been shown how to do it.
18    Q    By whom?
19    A    By the other mechanics.  And -- and -- and when I
20 came -- when I started in Manassas, that's the way that we
21 were showed (sic) how to do it in Manassas by the
22 supervisor then.

**Page 74**

1  Q  When you were first shown how to do it by leaving
2  the elevator in place, did you raise a question of, "Hey,
3  you know, this is a step in the maintenance manual.
4  Shouldn't we be doing it?"
5  A  No.
6  Q  You just figured since that's the way they did it
7  at Colgan, it was okay to skip that step?
8  A  Yeah.
9  Q  So you and Dominick were at the back; dan was in
10 the front.
11      Would one or the other you say, "Either move it
12 this way," or, "I'm moving it this way," you know, "Which
13 way is it going?"
14      MR. ALMY:  Object to the form of the question.
15      BY MR. JONES:
16  Q  It's a poor question, but what I'm trying to
17 filling out is:  Who was leading the check?
18  A  I don't remember.  I don't remember who was
19 actually leading it.
20  Q  Would you have been actively involved —
21  A  Yes --
22  Q  -- in that?

**Page 75**

1  A  -- but I wouldn't say that I was leading it.  I
2  would think that Dan would have prob- -- more -- more
3  likely than not Dan would have been leading it.  I'm
4  witnessing it.
5  Q  How -- how was the digital protractor set to its
6  near zero or neutral position?
7  A  In Reference to the elevator, set pins at zero.
8  Q  So you set the digital protractor on what?
9  A  The elevator.
10  Q  The elevator itself or the tab?
11  A  The elevator itself.
12  Q  And then how does it measure movement of the tab?
13  A  How does what -- the protractor?
14  Q  Yeah.  How does it see movement and register it?
15  A  Then you move the protractor onto the tab and
16 operate the tab, and it -- the protractor moves with the
17 tab in preference to the elevator.
18  Q  Okay.  So you first set it on the elevator to get
19 it to understand the top of the elevator is a fixed surface
20 at that point because it's pinned?
21  A  Right.
22  Q  It's zero; right?

**Page 76**

1  A  Right.
2  Q  So you move it over to the tab?
3  A  Right.
4  Q  So it knows now it's moving in relation to this
5  spot over here?
6  A  Right.
7  Q  It goes up or down and measures degrees —
8  A  Yes.
9  Q  -- change?
10     Is there a particular place along the tab that
11 you set it?  At the outer edge, at the front edge, in the
12 middle?
13  A  In the middle.
14  Q  Do you clamp it down, or do you hold it down with
15 your finger?
16  A  It's taped.
17  Q  Were travel boards available?
18  A  Not to my knowledge.
19  Q  Are you familiar with the use of travel boards?
20  A  Yes.
21  Q  Is there a reason that the digital protractor was
22 used instead of the travel boards?

**Page 77**

1  A  I don't know why the difference was.  I don't
2  know why.
3  Q  Have you used travel boards before?
4  A  Yes.
5  Q  Do you find them understandable?
6  A  Yes.
7  Q  Relatively easy to use?
8  A  No.
9  Q  What's difficult about their use?
10  A  In the placement on the surface in the actual
11 reading that you're going to get can vary depending on the
12 angle that you're looking at the travel board in reference
13 to the control surface as much as a couple of degrees.
14 It's not as accurate.
15  Q  And have you found that be to the case with
16 travel boards on elevator trim tabs or on other surfaces?
17  A  It would apply to all surfaces, not any one
18 specific.
19  Q  So that same issue exists, in your mind, with all
20 travel boards?
21  A  Well, yeah, yeah.
22  Q  So when you're doing this check after the forward

**Page 78**

1  cable and the right-hand actuator was replaced again,
2  you're in the back with Dominick, Dan's up front.
3      How many times was it run through its full range
4  of motion?
5      A  I don't remember the exact number of times.
6      Q  Was someone holding the list that is the Exhibit
7  14 to note steps?
8      A  No.
9      Q  Were you and Dominick up on scaffold?
10     A  Yes.
11     Q  You need be up there to meet and see that tail,
12  don't you?
13     A  Right.
14     Q  It's way up in the air?
15     A  Right.
16     Q  But in your recollection was -- was it run
17  through its full travel more than once?
18     A  Yes.
19     Q  Would you call it several times?
20     A  Yes.
21     Q  And it checked out as far as the degrees each
22  direction; correct?

**Page 79**

1      A  Yes.
2      Q  And it checked out in terms of moving in the
3  proper direction given the input given at the wheel; right?
4      A  I wasn't in the cockpit; I didn't see that.
5      Q  Did Dan say, "I'm going nose up"; and, therefore,
6  you confirm that the tab's traveling in the proper
7  direction?
8          MR. ALMY: Object to the form again.
9      A  No, I can't say that either. I don't remember
10  him saying that.
11         BY MR. JONES:
12     Q  So how is it that you confirmed that the tabs
13  were moving in the proper direction given the input
14  provided?
15     A  We didn't know -- we were measuring -- we were
16  looking for travel. We were measuring for travel
17  distance -- is what our primary focus was on --
18     Q  When you finish --
19     A  -- moving the control surfaces.
20     Q  When you finished work on a flight control
21  systems, you want to do a check to make sure that the
22  surface is moving to the right direction, don't you?

**Page 80**

1      A  Right.
2      Q  As well as making sure it's going as far as it's
3  supposed to go?
4      A  Right.
5      Q  So how is it that you confirmed that the elevator
6  trim tab was moving in the right direction given -- given
7  the input?
8      A  I couldn't because I wasn't in the cockpit.
9      Q  Were you leaving that to Dan --
10     A  Yeah --
11     Q  -- to do?
12     A  -- yeah, that would have been up to Dan.
13     Q  Were you and Dominick in the back indicating what
14  you were seeing in terms of it being -- going up or down,
15  the tab?
16     A  Yes.
17     Q  Such that Dan could hear you?
18     A  Yes.
19     Q  And how did you report that? Just yell it at
20  him?
21     A  Yeah, yes, yelling it at him.
22     Q  And he confirmed, said, "Okay. I got that"?

**Page 81**

1      A  Right.
2      Q  And then you move it again to check a different
3  form of travel?
4      A  Right, the opposite direction.
5      Q  Was it electrically for the same purpose?
6      A  Yes.
7      Q  You're aware that the NTSB ultimately concluded
8  that the cable was rigged in such a way it caused the
9  system to operated backwards; right?
10     A  Yes.
11     Q  If the cable was rigged in such a way it caused
12  the system to operate backwards and you ran the systems
13  through its paces using its electrical motor and you took
14  the electric motor and went nose up, what would the wheel
15  be doing for the manual system?
16         MR. ALMY: I'm going to object to the form of
17  that.
18         If you understand it, you can -- he can answer
19  it.
20         BY MR. JONES:
21     Q  Do you --
22     A  Yeah --

## Page 82

1    Q   -- understand?

2    A   -- yeah.

3        When you're moving the -- the trim switch up,

4    the -- trim wheel's going to be moving forward.

5    Q   Forward?

6    A   Towards forward. It's toward the front of the

7    airplane.

8    Q   Even if the cable is rigged such that the manual

9    system's running backwards?

10   A   I wouldn't know what it would do if it was

11   running backwards.

12   Q   Do you agree or disagree with the NTSB that the

13   cable was rigged such that the system operated backwards?

14   A   I disagree.

15   Q   So given the checks you did, you're confident

16   that it was operating properly not only as far as the

17   extent of travel but the proper direction of travel?

18   A   Yes.

19   Q   After the accident did you have conversations

20   with Dan or Scott or Dominick about whether there could be

21   any question on that topic?

22   A   Yes.

## Page 83

1    Q   And what were those conversations?

2    A   I don't remember -- remember anything real

3    specific about -- specific conver- -- conversations.

4    Q   Then just start with generally. Did you talk to

5    each one of them, or do you remember just talking to one of

6    them?

7    A   I think it was more as a group. We -- we only

8    had the opportunity to really discuss it -- I guess it was

9    the next night, the night of the -- the NTSB was last time

10   that we were really all together. And that's about the --

11   the only time that we really had discussed it --

12   Q   And you have --

13   (Proceedings participants speaking at the same time.)

14   Q   -- not since?

15   A   Not really, no.

16   Q   Tell us as much as you can remember about that

17   discussion.

18   A   We -- the major emphasis was we knew that we had

19   done everything right and the -- that the travels were

20   perfect and in the proper direction. And we couldn't

21   understand how could it be any different. That was

22   basically the gist of it.

## Page 84

1        We didn't -- at that point it was pure

2    speculation on what had happened to that airplane. We had

3    no idea what had happened to that airplane. We were

4    looking for something totally different than what was

5    found.

6    Q   What were you thinking it might be?

7    A   We were thinking it was some type of engine

8    problem that he had had with the airplane.

9        But the thing was they kept saying something

10   about a runaway rudder -- a runaway trim is what they said,

11   that he said on the radio.

12   Q   Which would have meant what?

13   A   I have no idea what that would mean --

14   Q   Do --

15   A   -- to me.

16   Q   Do you know what runaway trim is?

17   A   That the trim's -- what I think it means is that

18   the trim stayed stuck in one position or the other, in one

19   direction or the other.

20   Q   And that's for the electrical component --

21   component of the system, right --

22   A   Right.

## Page 85

1    Q   -- not the manual portion?

2    A   Right.

3    Q   What do you know what about the pilot's procedure

4    was for using manual or electric trim on take-off?

5    A   I don't know. I don't know. I haven't read

6    the operation --.

7    Q   So from your work you were confident, number one,

8    that the -- the drum was wrapped properly with the correct

9    threaded cable coming off the front versus the back?

10   A   Yes.

11   Q   And you were confident that there was no crossing

12   of the cables between the drum and the turnbuckles?

13   A   Yes.

14   Q   And you were confident from having done your

15   operational check that the system was moving correctly to

16   its proper limits and in the proper direction?

17   A   Yes.

18   Q   Once you assured yourself of that, is that when

19   you would have signed off on 4 for the actuator replacement

20   and 7 for the cable replacement?

21   A   Yes.

22   Q   Where is there a sign-off on the replacement of

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - -x

                       :

COLGAN AIR, INC.,             :

                       :

        Plaintiff,      :

                       :

    vs.                :  Civil Action

                       :  No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,  :

                       :

        Defendant.      :

                       :

- - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, June 23, 2005

    Videotaped deposition of DANIEL ROBERT KINAN, witness,

called for examination by counsel for the defendant,

pursuant to notice, at the offices of Mark A. Dombroff,

Esq., Dombroff & Gilmore, P.C., 1676 International Drive,

Penthouse, McLean, Virginia, before Malynda D. Whiteley, a

Registered Professional Reporter and a notary public in and

for the State of Virginia, beginning at 1:07 p.m., when

were present on behalf of the respective parties:

**Page 6**

1    Q   We've asked you to come here today to ask you
2    some --
3        MR. DOMBROFF:  I think you have that backwards.
4    Colgan has brought the suit against Raytheon.
5        MR. JONES:  I just said -- I thought I said it
6    just was pending between them.  Sorry --
7        MR. DOMBROFF:  That's okay.
8        MR. JONES:  -- if I misspoke.
9        MR. DOMBROFF:  That's okay.
10       THE WITNESS:  Okay.
11       BY MR. JONES:
12   Q   It's litigation that Colgan has brought against
13   Raytheon.  All right?
14   A   Okay.
15   Q   We've asked to you come here today to answer some
16   questions about your role in some maintenance done on the
17   aircraft that crashed and that is the subject of this
18   lawsuit.
19       Do you understand that?
20   A   Yes.
21   Q   Tell us your full name, please.
22   A   Daniel Robert Kinan.

**Page 7**

1    Q   Where do you live?
2    A   Weymouth, Massachusetts.
3    Q   What's your street address?
4    A   Oh.  It's ████████████████
5    Q   What's your Social Security number?
6    A   ██████████
7    Q   And you work at Colgan; is that right?
8    A   I do not.  I no -- I no longer work at Colgan.  I
9    work --
10   Q   Where do you work now?
11   A   I work for Hunter Engineering.
12   Q   And what sort of outfit is that?
13   A   It's an automotive diagnostic equipment company.
14   Q   The format here is just a simple, you know,
15   question-and-answer format.  I'll ask you a question; you
16   provide me an answer.  We got into a little bit of trouble
17   on the last one, speaking over one another.  So if you can,
18   please wait till I finish the question before you give an
19   answer; and, likewise, I'll try and wait till your answer
20   before I give the next question.
21       Is that fair?
22   A   Yes, sir.

**Page 8**

1    Q   If you need a break, let me know; and we'll do
2    that.  No problem at all.
3        Tell us about your background in the mechanic
4    business starting from the first you've done through your
5    time in the aviation business and what you're doing now.
6    Sort of walk through that, if you would.
7    A   Well, I guess I've been doing mechanical things
8    since I was probably 13, 14 years old.
9        As far as my first job goes, I worked as an auto
10   mechanic for Sullivan Tire Company from '96 to '98.  And I
11   went from that field over actually to a materials testing
12   company, engineering company and worked in that type of
13   construction materials testing just to try something
14   different for a while.
15   Q   When was that?
16   A   That was from about '98 to 2000.
17       And then from that point, I decided to go back to
18   school and attended East Coast Aero Tech.  I believe it was
19   from the -- the beginning of 2000 to about July 2001, I
20   think it was.
21   Q   So what made you want to get into the aviation
22   business?

**Page 9**

1    A   I always loved working with my hands -- and I
2    still do; I still work with my hands -- and always had a
3    good -- great interest in aircraft.  So I put the two
4    together; and then, you know, you can do the math.
5    Q   Is -- is this school something you did while you
6    were otherwise employed?
7    A   I was employed during school at a restaurant,
8    just making some money to pay the bills.
9    Q   So was the schooling pretty much your full-time
10   thing?
11   A   Yes, it was, Monday through Friday.
12   Q   How much were you spending working during the
13   week?
14   A   I was probably working, I think, three nights a
15   week at the time.
16   Q   And this was an eighteen-month course, roughly;
17   is that about right?
18   A   Around fifteen.
19   Q   Fifteen?
20   A   Correct.
21   Q   And where was it again?  I'm sorry.
22   A   East Coast Aero Tech, new Bedford, Massachusetts.

Page 10

1    Q    And did you pick that place because it was close
2    by?
3    A    Yes.
4    Q    And just generally what types of things did you
5    learn at your -- your aviation mechanics school?
6    A    Pretty much every -- every system in a -- in a
7    general sense as far as hydraulics; pneumatics;
8    electronics; air frame; you know, you name it.  In a
9    generally sense as far as aircraft go, they cover a little
10   bit of everything.
11   Q    But it's generally all aircraft, not just
12   specific to a given model; right?
13   A    Correct.
14   Q    And they teach you how to follow maintenance
15   manuals, for example, when you do repair work?
16   A    Yeah, they -- they definitely do, yes.
17   Q    You learn about flight controls on an airplane?
18   A    Yes.
19   Q    What they are and what they do?
20   A    Sure do.
21   Q    Were you taught that flight controls are a
22   critical aspect of an aircraft?

Page 11

1    A    The most critical.
2    Q    Is it part of that when you trained that every
3    time you do some work on a flight control of an aircraft,
4    that you do an operational check afterward?
5    A    That's -- yeah, absolutely.
6    Q    It makes sense?
7    A    Makes -- it just makes perfect sense.
8    Q    And you're trying to determine that the flight
9    surfaces travel their complete distance of travel; right?
10   A    Yeah.
11   Q    And that they're traveling the right direction;
12   right?
13   A    Correct.
14   Q    Those are the two critical things you're trying
15   to figure out when you do operational checks after work on
16   a flight control system?
17   A    Oh, you're -- you're basically trying to see that
18   everything works as it is -- as it was when it came in; or
19   if not, to its altered state.  I mean, just -- it -- it
20   needs to be absolutely correct.
21   Q    And when you completed that course, did you have
22   to take a test?

Page 12

1    A    Yes, I did.
2    Q    To get your A and P?
3    A    Yes, I did.
4    Q    And you took that?
5    A    I sure did.
6    Q    Passed it the first time?
7    A    Yes.
8    Q    When did you receive your A and P?
9    A    The exact date --
10   Q    Roughly.
11   A    Is probably -- I want to say August of '01.
12   Q    A month before 9/11?
13   A    Correct.
14   Q    Where did you go to work?
15   A    Colgan Air was -- actually I had applied to a few
16   places.  I was going to go to American Eagle; and they
17   called me after 9/11 and said, "Sorry.  No way."
18        So I called up Velma Valentine, who was the
19   hiring manager at that time.  And she said, "No, we're not
20   hiring; but yes, we have a spot in Hyannis, because we
21   can't get anyone to work down there."  And I said, "Well,
22   I'd love to work there; and I do not mind working on the

Page 13

1    Cape.  I'd like to work on the Cape."  And so it worked out
2    great.  So --
3    Q    And you were from where originally?
4    A    I was from Pembroke, Massachusetts.  That's about
5    half an hour south of Boston.
6    Q    What did you do when you started at Colgan?
7    A    I worked as a mechanics' helper, the first thing.
8    They call you to work as a mechanics' helper for a certain
9    period of time -- I don't recall what it is -- before you
10   can actually sign anything off.
11   Q    But you were already an A and P when you became a
12   mechanics' helper?
13   A    Yes.
14        MR. JONES:  Let's mark that.
15        (The training report was marked Defendant's
16        Exhibit No. 8 for identification.)
17        BY MR. JONES:
18   Q    Mr. Kinan, we're handing you what we've marked as
19   Exhibit 8.  This is a document that was produced by
20   Colgan's counsel in response to a request that we had made
21   to receive information about the mechanics that were
22   involved, and this appears to be a table of training that

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  you received.
2      Have you ever seen this document before?
3      A   No, I haven't.
4      Q   Well, working through it, just help me understand
5  what sort of training you received once you joined Colgan.
6  If you can use it as a frame of reference, great.  If you
7  just can give it to me from memory, that's fine too.
8      Like, for example, you were hired in when
9  exactly?
10     A   September of '01.
11     Q   The first entry on this chart showing training
12  you'd received was in January of '02.
13     A   Right.
14     Q   Do you believe you received some training from
15  Colgan before that date or not?
16     A   Absolutely.
17     Q   What's the first training you remember having
18  received?
19     A   Oh.  Are you talking -- you're not talking OJT;
20  you're talking on paper-wise, certificate, initial,
21  Phase I?
22     Q   Right.

**Page 15**

1      A   No.  Before this initial Phase I, which you see
2  here, it was just on-the-job training.
3      Q   Okay.  Describe, then, for me the initial
4  on-the-job training you received.
5      A   Well, just, you know, they -- while I'm working,
6  you know, running me through what a preflight is and what a
7  routine is.  But before that -- and just basically
8  familiar- -- familiarizing me what the airplane -- you
9  know, what systems and what's what.  I mean you just have
10  to learn what's where and, you -- you know.
11     Q   At the time you joined Colgan, were they
12  operating the 1900 and Saab?
13     A   At the time I joined they -- I think they had
14  probably two Saabs at the time.
15     Q   The rest were 1900s?
16     A   1900s were primary, yeah.
17     Q   So you were getting familiar with the 1900s from
18  the get-go?
19     A   Yes.
20     Q   And the initial part of that was on-the-job
21  training?
22     A   Yes.

**Page 16**

1      Q   So what's the Phase I we see here in
2  January of '02?
3      A   That was -- that was -- they -- that was the
4  initial -- you know, Phase I is -- is -- Beech Phase I is
5  what it is, is you're going in and you learn about the
6  Beechcraft and systems and where things are.
7      But when I had -- when I went there, I actually
8  had a good step up and a step ahead because I had already
9  been -- usually when you get hired, only you will go right
10  to that training immediately before you would go out and do
11  anything else.  So that's -- that's what that is.
12  That's -- that's just, you know, Beech Phase I.  And --
13     Q   So --
14     A   -- you're required to go through it, so they just
15  didn't have a class at the time when I first came on.
16     Q   So you had a step up because you'd had some
17  on-the-job training and, therefore, some familiarity with
18  the 1900s?
19     A   Yes.
20     Q   We're just working up the list quickly.  And I
21  don't want to spend a great deal of time on this; but just
22  walk through what the rest of these items are, if you

**Page 17**

1  could.
2      A   Well, at the same time when you're in -- after
3  you take Phase I, you get your airworthiness release.  I
4  believe there's one on the Beech and on the Saab because
5  you're touching the Saab too.
6      Q   That's why there's two?
7      A   Yes.  I believe that's what this is.
8      And the ground handling is you would get --
9  you're taught how to -- how to, you know, taxi, tow the
10  air -- not taxi, but tow the aircraft properly, hand
11  signals, things like that.
12     Q   Is that a class taught at Colgan?
13     A   This is a -- I believe this is a -- yeah, is a
14  class.  I can't recall if that was a class or not.  I see
15  there's two here.  This is probably Beech and Saab.
16     Q   Okay.  Moving on up to initial taxi and run-up in
17  April of '02.
18     A   April '02, this was -- you have someone at the
19  base, which is actually with Scott at the time,
20  run-qualified and actually a -- a teacher who signed off to
21  teach someone to run -- to run and taxi this -- the
22  Beechcraft.  And that's what that -- that's what this is

## Page 18

1  here. I was taught at -- I learned with him by riding with
2  him in the -- how to run the -- run the Beech.
3      Q   And then he signs off on you having done that,
4  and that's why it goes in your record like this?
5      A   Correct.
6      Q   And the Phase II, is that a follow-up training on
7  the Beech?
8      A   That's a Beech, and that's -- actually Phase II
9  is after you -- after you've worked on the Beech for a
10  while, they'll bring you back in and -- and actually put
11  you in a deeper system so you can really learn how
12  everything ticks. That's what Phase II is.
13      Q   And that was in January of '03 --
14      A   Correct.
15      Q   -- a year after you took the Phase I?
16      A   Right.
17      Q   Okay. Now, what were the requalification
18  releases?
19      A   I believe every -- I probably I'm -- I'm not
20  sure. I think it's every year you need to just -- it's a,
21  you know -- a -- a -- mer- -- or every year they have a --
22  a retraining of the -- they go over the maintenance manual,

## Page 19

1  or GMM. So that's what that is. You needed to know all
2  the proper procedures pretty much. I think once a year you
3  needed to be resigned off on them to get airworthiness
4  release in aircraft.
5      Q   So does this lay out pretty much all the
6  formalized training you received while at Colgan?
7      A   I -- I believe it does, yes.
8          I mean everything but OJT, which we had -- also
9  had OJT books in the hangar that we were filling out on a
10  regular basis.
11      Q   You fill out, actually complete them --
12      A   Correct.
13      Q   -- as you work through them?
14      A   As you learn -- as you learn them, you -- you
15  will learn them and your trainer would sign them.
16      Q   How do you work through those? Just at your own
17  pace in the areas you want to, or are you led through them?
18      A   What do you mean? Get a -- what do you mean by
19  the question?
20      Q   Well, I'm trying to understand whether the -- the
21  books that you used for on-the-job training -- are they
22  things you systematically worked through to make sure you

## Page 20

1  get them all done, or are they just things that you learn
2  because you had to do this task?
3      A   You -- well, you would work with someone on the
4  task. And when you work with someone on the task, not
5  necessarily that time, but maybe the time after or -- or it
6  could be a few times, depending on how quickly you learn --
7  if that -- the person that's your trainer, who would
8  usually be, like, your lead mechanic at the time, I think
9  pretty much, you know, would be -- Scott had taught me
10  everything -- would sign me off on the book as he feels
11  comfortable that you could do it on your own.
12      Q   So generally in your training at the A and P
13  school and in these different classes that you took while
14  at Colgan, were you taught when you follow a maintenance
15  manual or a work card, that you do every step that's on the
16  list?
17      A   Yes.
18      Q   Are you ever allowed to deviate from the list?
19      A   Well, it's -- I mean it's -- well, there's -- you
20  know, there is -- as far as the maintenance manual goes,
21  there's some discretion you needed because if you didn't
22  have discretion in the Beech manual, then you would

## Page 21

1  probably never get most of the things done in there.
2      Q   Now, why do you say that as -- as to the Beech
3  manual in particular?
4      A   It's very vague.
5      Q   And which manual are you talking about
6  particularly?
7      A   The 1900 manual.
8      Q   The 1900D maintenance manual?
9      A   Both of them, C and D.
10      Q   C and D.
11          So there are things that you need to do in
12  addition to what's in the listing in the maintenance manual
13  typically? Is that what you're saying?
14      A   Yes.
15      Q   But if it's there, you need to do it; right?
16      A   Yes.
17      Q   So it -- I guess what I'm hearing you say is that
18  there are things that an A and P has to employ -- or there
19  is discretion you have to employ to get things done that
20  aren't necessarily covered by the maintenance manual? --
21      A   That's --
22      Q   -- is that fair?

**Page 42**

1    A    This form is to -- is -- is -- is for us, the
2    maintenance department, to check the aircraft and the
3    packet.  This is a checklist Colgan has come up with to
4    check the aircraft and the packet to make sure we can sign
5    the log book.
6    **Q    And who signs the log book itself?**
7    A    Who -- who signs the log book?
8    **Q    Yes.**
9    A    It would be -- on this case it's the person that
10   does the release checklist.
11   **Q    So that would have been you for this particular**
12   **task that's reflected in 13?**
13   A    Right.
14   **Q    And your -- your name would be in the log book**
15   **itself?**
16   A    Right.
17   **Q    Now, is this item, No. 13, only for the free play**
18   **check itself and not any of the work that flowed from it?**
19   A    No.  Why would -- what -- the question -- the
20   question -- I don't understand the question.
21   **Q    Okay.  Let me try --**
22   A    I don't --

**Page 43**

1    **Q    -- and --**
2    A    -- know what you're saying by that.
3    **Q    Let me try and explain better.  The first task**
4    **that you were given to do on this aircraft was the Detail**
5    **Six inspection; right?**
6    A    Yes.
7    **Q    The documentation we've just been walking through**
8    **here with these various checklists, including Exhibit 13,**
9    **do these documents deal only with the Detail Six inspection**
10   **or the things that flowed from it such as the replacement**
11   **of the actuators, the ultimate replacement of the cable; or**
12   **were those separate packages of documentation?**
13   A    This -- this checklist is just to check that the
14   package is complete and that the -- the -- you know, the
15   panels are on the plane and the circuit breakers are on.
16   There's no -- it's -- I -- I mean I -- I don't understand
17   where else you're going with this.  This -- that's all this
18   is -- that's all this is for.
19   **Q    So this doesn't necessarily speak to the scope of**
20   **the job?  It just --**
21   A    It does not.
22   **Q    Okay.  So let's set the picture again of the --**

**Page 44**

1    of the various tasks in which you were involved on 240 in
2    **August of 2003.**
3    **You performed the free play check; correct?**
4    A    I performed the inspection of the free play
5    check.
6    **Q    Okay.  Perry actually did the -- the free play**
7    **check; right?**
8    A    Correct.
9    **Q    Once that was done, the actuators needed to be**
10   **replaced; right?**
11   A    Correct.
12   **Q    Were you involved in the replacement of the**
13   **actuators?**
14   A    No.  Well, at the -- at the point where -- I'm
15   sorry.  I was.  But it was the -- it was the replacement of
16   the second actuator on the right side.  It was removal of
17   the initial actuator that caused the problem in the front
18   of the airplane.
19   **Q    The problem in the front of the airplane being**
20   **the cable --**
21   A    Yes.
22   **Q    -- needing replacement?**

**Page 45**

1    A    Yes.
2    **Q    And then you were involved in the replacement of**
3    **the forward cable too; correct?**
4    A    Yes, I was.
5    **Q    And then you were involved in the operational**
6    **checks that followed both the forward cable replacement and**
7    **the actuator replacement; correct?**
8    A    Correct.
9    **Q    Anything else you were involved in?**
10   A    That's -- that was it.  No.
11   **Q    All right.  Let's walk through those one at a**
12   **time.**
13   **What was your role in the actuator replacement?**
14   A    My role in the actuator replacement was the first
15   night I assigned the -- I assigned two guys to each
16   actuator, where there would be a tech on the job and then a
17   helper.  And that was my only role the first night, was to
18   just make sure the work was going smoothly.
19   **Q    Do you remember whether the first night that**
20   **you're talking about here would have been the same shift**
21   **when the free play check was done and it was discovered**
22   **that the actuators needed to be changed?**

## Page 46

1    A   I don't recall if I did that day.  I believe it
2   was the same -- I believe it was the same night, yes.
3       Q   So who did you choose to do that?
4    A   Put the actuators in?
5       Q   Yeah.
6    A   I had -- I know I had Dominick and -- and Scott
7   on one side, I believe it was, and Larry and -- geez, I
8   think it was -- I -- I don't recall who I -- I don't recall
9   the other people.  I really don't.
10      Q   Is it Larry Ratcliff?
11   A   Ratliff.
12      Q   Ratliff?
13   A   Right.
14      Q   And was on -- and so you had two on each side?
15   A   Yeah.
16      Q   There's one actuator on each side, so you have --
17   A   Two people --
18      Q   -- two men working --
19   A   -- yes.
20      Q   -- on each one?
21          And you say on one side it was Perry and Scott.
22   Which Scott?

## Page 47

1    A   Scott Geb- -- he was a -- a new -- one of the new
2   guys, Scott Gebrauer or Scott Gebauer, something like that.
3       Q   Is that the Scott with a G?
4    A   With a G; right.
5          He was just primarily a helper; hold tools, hold
6   a -- you know, hold whatever and get the book for me.
7       Q   He was a pretty new guy?
8    A   Yeah.  I believe it was -- was probably his
9   second night.  He was just there to help -- assist Dominick
10   with an extra hand.
11      Q   Perry had a fair amount of experience in what he
12   was doing, didn't he?
13   A   Yeah.
14      Q   Now, were you senior to these guys in terms of
15   hierarchy within the company?
16   A   To the guys working on the actuators?
17      Q   (Counsel moves head up and down.)
18   A   Yes, I was.
19      Q   You were the guy who was assigning the work?
20   A   Yes.  Well, I was the lead mechanic on -- yes.
21      Q   You were a lead.
22          Were any of them also leads?

## Page 48

1    A   No.
2       Q   So as it relates to the initial work on the
3   actuators, you assigned people to do it; but did you
4   participate at all in the work itself?
5    A   On the initial night, no.
6       Q   And do know what was done the initial night, what
7   got accomplished?
8    A   The actuators were changed --
9       Q   So --
10   A   -- and the --
11      Q   -- the job was done?
12   A   And the -- I -- well, I'm sorry.  I said -- I was
13   assisting in the -- the rigging checks at the end, at the
14   end of the actuator installation.  I -- I jumped in at that
15   point to assist and make sure the rigging checks were done
16   correctly.
17      Q   And were all four of the guys you assigned to it
18   plus yourself participating in the rigging checks?
19   A   I believe there was once -- there was at -- at
20   least -- at least three of us, yes, three.  I think all
21   four were there, yeah.
22          (The REPS No. 27-30-05 was marked Defendant's

## Page 49

1          Exhibit No. 14 for identification.)
2          BY MR. JONES:
3       Q   We've handed you now what's marked as Exhibit 14.
4          MR. JONES:  Counsel, I do have an extra copy of
5   that.
6   (Document presented.)
7          MR. DOMBROFF:  Thank you.
8          BY MR. JONES:
9       Q   This a printout from the REPS 1900D maintenance
10   manual of the steps for doing elevator tab control rigging;
11   is that right?
12   A   Yes.
13      Q   Now, when you would have gone to do the rigging
14   check following the actuator work, is this the document you
15   would go get to know the steps to do the rigging?
16   A   This is it, yes.
17      Q   Now, is this a -- a procedure that would also
18   have a work card like we've already looked at?
19   A   I don't -- I don't think this has a work card,
20   no.
21      Q   So when you don't have a work card to refer to,
22   you go to the REPS system and print out the pages from the

**Page 78**

1    A    In the morning, if that -- I mean this was after
2  the cable, yeah.  I guess it -- at least there was a "No"
3  answer.
4    Q    We had previously marked Exhibit 7 as the work
5  order card for replacement of the cable -- the forward
6  cable.  And I had asked Mr. Servis about turnover notes
7  since the drum, at least, had already been removed before
8  he started in on this.  And he said he couldn't remember
9  any turnover notes and said they would have been on the
10  back.  Well, we didn't have the back, so we asked your
11  counsel to find it.
12    And 16 now is the same document with the back.
13    A    Uh-huh.
14    Q    Is it right that there were no turnover notes?
15    A    No turnover notes because there was no turnover.
16    Q    What do you mean?  Why do you say there was no
17  turnover?
18    A    Because I can't turn something over to myself.  I
19  mean I guess I could.  But at this point, you know, why
20  would I?
21    Q    Did you actually remove the drum?
22    A    I removed the cable in the drum.

**Page 79**

1    Q    No.  I -- I mean --
2    A    So I mean -- I did not -- yeah -- no, I did not
3  remove the drum.
4    Q    The first day?
5    A    Right.
6    Q    That was Perry?
7    A    Yeah.
8    Q    So Perry started that work; right?
9    A    I guess so, yeah.
10    Q    And Perry turned that over essentially to the
11  next shift to finish the job of replacing the cable; right?
12    A    Well, I -- I guess you could -- I don't know.  I
13  don't -- I guess you could say that.  I don't --
14    Q    Perry was not involved on the 25th in the
15  replacement of the cable; correct?
16    A    Right.
17    Q    Was he working back on the actuator?
18    A    No.
19    Q    Where was he?
20    A    I don't think -- I think he was just -- he was
21  either not there or he was supervising that night.  He
22  was -- I think he was there.

**Page 80**

1    Q    But --
2    A    But he wasn't performing work.
3    Q    But for some of -- reason wasn't available for
4  this task?
5    A    Right.
6    Q    Would it have been preferable to have Perry on
7  this task because he had been involved in the drum coming
8  out in the first place?
9    A    No.  Because like I said before, there was no --
10  there was -- it was no help from what we were looking at.
11  It's -- this sits in a certain way with the gear and the --
12  and the shaft.  And from the way the cable was, it wouldn't
13  have helped us one way or another.  If the cable was out or
14  the cable was in on the drum, it didn't make a difference.
15    Q    It wouldn't help you know which cable end was
16  coming off the front or the back of the drum?
17    A    No; it wasn't on the drum.  It had unspun.  It
18  was --
19    Q    Was it -- was it coming out of these respective
20  gaps in the guard, or was it all the way off the end?
21    A    I don't recall.
22    Q    So the next day when the cable was there and the

**Page 81**

1  actuator was there, who assigned the various work that
2  needed to be done to replace the cable and the actuator?
3    A    I assigned the actuator to Dominick, and I took
4  on the cable with Scott myself.
5    Q    What about work to provide access to do the cable
6  replacement?  Who'd you give that to?  Or -- or was it you
7  assigning that, I guess, is the first question?
8    A    If I had access?
9    Q    Let me help you with a document or two.
10    (The Work Order Nos. 09631, 09632, and 09633 were
11    marked Defendant's Exhibit Nos. 17, 18, 19,
12    respectively, for identification.)
13    BY MR. JONES:
14    Q    We've handed you 17, 18, and 19.  These are
15  maintenance work orders for work done on 240 on
16  August 25 or 26, 2003.
17    17 has to do with removing the captain's seat and
18  a partition. -
19    A    Uh-huh.
20    Q    -- 18, floorboards and pedestal sides; and 19, a
21  fuselage access panel.
22    Are those all tasks that were needed to be done

| | |
|---|---|
| **Page 82** | **Page 84** |

**Page 82**

1  to facilitate the cable replacement?

2  A   Right.

3  Q   And were those something that you would have

4  needed to assign to someone?

5  A   No. I could do them myself, or I could assign

6  them.

7  Q   Did you do these?

8  A   Yes, I did.

9  Q   And then on the -- on the bottom side of each one

10  of these, we have the replacement of each of those items;

11  is that right?

12  A   Uh-huh.

13  Q   And were each of those done by Dominick?

14  A   No, that's my name of there.

15  Q   Oh, I'm sorry.

16       So you did both; you took them out and put them

17  in?

18  A   Yes.

19  Q   Did you remove them the day the drum was taken

20  out or the day the cable was replaced?

21  A   I removed them the day -- the shift the cable was

22  replaced.

**Page 84**

1  might have taken this stuff out end of shift and said:  Let

2  me get ahead of the game so when I come in tonight, these

3  panels are out and I can do the cable change.

4       So -- and then I -- and when I take them out, I

5  generate a job card so then -- that -- so that they know

6  something's open, there's job cards open.  I believe I

7  opened these up that morning. --

8  Q   And if it helps --

9  A   -- the following --

10  Q   -- Mr. Servis testified that the access points

11  were open when he started at the next shift to replace the

12  cable.

13  A   Okay.  So I took them out -- I took them out end

14  of shift.

15  Q   These sequence boxes on these work order

16  documents, what are they designating?  We got a 5; 4,

17  taking out the captain's seat.  6 was --

18  A   Just the -- just the number of the job cards,

19  just -- it -- it's -- they keep track of job cards.  So --

20  you need a sequence number on all that so if you have six

21  job cards, you know you have six to -- six -- there's a --

22  a tally sheet that we fill out too; job card made out, job

**Page 83**

1  Q   And that, of course, would have had to be done

2  before you can replace the cable, getting the access;

3  right?

4  A   Now, you know, I can't remember if I generated

5  these job cards that morning and took them out or I took

6  them out that night.  I mean that's -- it's basically

7  irrelevant.  I don't know.  Because if I took them out that

8  night, then it's an open job card signed off on the 26th

9  to -- say I took them out on the 25th, I generated these

10  job cards, take them out.

11       All right.  So that's -- I don't -- I think I --

12  I might have taken them out that morning; I might have

13  taken them out that night.  I don't know when I took them

14  out, you know.

15  Q   I get messed up on nights and mornings because

16  you're working --

17  A   When I say "nights" -- when I say "morning" --

18  all right.  So let me use "end of shift" --

19  Q   Yeah.

20  A   -- or "beginning of shift".  Okay?

21  Q   I think that's fair.

22  A   So I might have taken these -- I think I possibly

**Page 85**

1  card completed, checked off.  So that's just to keep a

2  tally of the job cards.

3  Q   Does it denote anything about the progression of

4  the work?

5  A   It doesn't.  It -- it's -- it sometimes will fall

6  in that order just because that's way the write-ups are

7  being formed.  But it's just -- it doesn't -- doesn't have

8  any significant relevance to order of performance.

9  Q   Let me show you Exhibit 4, which we marked

10  earlier with Mr. Servis, and just confirm that this was the

11  job card that related to the replacement of the actuator

12  from the failure of the free play check.

13  A   Uh-huh.

14  Q   Is that what it is?

15  A   (No response.)

16  Q   Did you understand my question?  I'm just asking

17  if that's --

18  A   I --

19  Q   -- what it is.

20  A   Yes, it is.  Yes.  That's what it is.

21  Q   Sorry if I missed your answer.

22  A   Yeah, it's --.

**Page 86**

1    Q   The top part of it, is that something you filled
2    out?
3    A   Yes.
4    Q   The bottom part, is that yours too?
5    A   No, that's Dominick.
6    Q   Now, when he says, "Installed right-hand elevator
7    trim tab actuator in accordance with the Beech manual
8    number" --
9    A   Uh-huh.
10   Q   -- "pages and rig in accordance with the other
11   chapter," it says, "All checks good".
12        Is this the same check when we had it bind up?
13   A   No, this is after the fact.
14   Q   This is after the second replacement of the
15   right-hand actuator?
16   A   Right.
17   Q   And you and Dominick were both involved in that;
18   right?
19   A   Right.
20   Q   Okay.  Going back to the replacement of the
21   cable, tell me about your role in that.
22   A   Well, I worked with Scott.  And we first -- I

**Page 87**

1    think before we took out the old one, we marked at the
2    pulleys that one -- one was the left-hand threaded cable
3    and we marked at the pulleys -- at each pulley -- at each
4    bracket, at each pulley the top cable, the one that was --
5    with a T, I think, so that we could keep track of which
6    side or -- and which route the left-hand cable ran on.
7    Q   So did the T match with the left-hand side
8    turnbuckle?
9    A   I can't recall which turnbuckle it was.  It was
10   one of the two that we marked so that we knew it -- that it
11   would go in.
12   Q   So your purpose in doing the Ts along the -- the
13   pulleys was to know which cable was the right-hand or the
14   left-hand threaded turnbuckle; right?
15   A   That's correct.
16   Q   Whose idea was to it keep track of it that way?
17   A   Scott's.
18   Q   Did you object to that at all?
19   A   No, I thought it was a great idea.
20   Q   You knew that doing it that way instead of using
21   the lead lines, as called for in the maintenance manual,
22   was a departure from the maintenance manual, didn't you?

**Page 88**

1    A   Yes, but the -- the lead lines were just to help
2    you get it through all the small holes, which we fig- --
3    you know, we were able to do anyways.  It was basically
4    just to help you.
5        You know, the lead lines wouldn't even get it to
6    the pulleys because you need to remove the pins in the
7    pulleys anyways to hold the cable in.  So the lead lines at
8    that point wouldn't have been helpful so --.
9    Q   But they would have been helpful in -- in
10   threading the -- the cable back through the system; right?
11   A   Uh-uh, no, because the turnbuckles wouldn't --
12   with the -- with the leads lines on and the turnbuckles,
13   it -- they wouldn't have made it through there.  With the
14   lead lines attached to the turnbuckles, they would have
15   never made it through the pulleys.
16   Q   What is it about the attachment of a lead line
17   through a turnbuckle that would keep it from going through
18   the pulleys?
19   A   It's not that the -- it's not that the lead line
20   would keep it from going through the pulleys, but the lead
21   lines just wouldn't have been helpful.  A lead line usually
22   in the field is -- is safety wire.  Safety wire gets caught

**Page 89**

1    up, snagged on everything.  So it just wasn't a good -- it
2    wasn't -- it just wasn't going to be helpful at all.
3    Q   When you depart from the -- the methods called
4    for in a maintenance manual checklist, are you required by
5    your training at Colgan or through your A and P training to
6    get any sort of approval from someone above?
7    A   I don't know.  I mean it's -- you know, we're
8    not -- we're not departing through -- we're not departing
9    from a step, you know.  We're not departing from a step
10   that we -- of running the cable.  We still ran the cable.
11       We just didn't use the lead lines to
12   facilitate -- which that word is used in the manual,
13   "facilitate" -- which is helping you get them through the
14   small little holes.  And that's all those ca- -- that lead
15   lines were used for.  We didn't need them to help us get
16   them through the small holes at that point.
17   Q   So you and Scott employed discretion to determine
18   that it was a better method to mark the pulleys with Ts
19   than to use lead lines --
20   A   Yes.
21   Q   -- is that correct?
22   A   Yes, we did.

**Page 90**

1    Q   Did you discuss that with anyone before deciding
2  to do that?
3    A   No, we just discussed it with each other.
4    Q   What exactly did you discuss about it before
5  making the decision?
6    A   Well, that the -- we just didn't -- we just
7  didn't need the lead lines to get it through the run we had
8  to go through. You know, there was two of us there. It
9  was -- it wasn't going to be a problem.
10       But the lead line -- a lead line would probably
11  even make it more confusing. You got a 50-50 shot of
12  getting it on the right pulley if you use a lead line. If
13  you use your hands, go one pulley at a time, you know
14  you're -- you're putting it on the right pulley.
15       Do you agree with that?
16    Q   Were you involved in feeding the new cable back
17  through?
18    A   Yes.
19    Q   And that was done by just pulling them together,
20  two -- two ends of it doubly all the way through without
21  any effort to put it on the pulleys initially, wasn't it?
22    A   No. I think what we did is we had the -- we had

**Page 91**

1  the center point marked that was wrapped on drum, and we
2  threaded one cable through at a time.
3    Q   One cable through at a time?
4    A   I believe that's what we did, yeah.
5    Q   Who marked the pulleys with the Ts?
6    A   Scott.
7    Q   And were you involved at all in that process?
8    A   Well, yeah. We discussed -- he discussed with me
9  what -- what he -- what his intention was of doing that.
10  And I agreed it was a really good idea, yes.
11    Q   So you did you participate in any way in him
12  marking those?
13    A   No.
14    Q   He took care of that part of it?
15    A   Yeah. I was right there; but, yeah, he -- he did
16  the writing.
17    Q   Were you working the cables at all while he was
18  doing this?
19    A   Well, after the marks were made -- well, what we
20  did is he would tug a -- he would tug on a cable. I -- you
21  know, and I would right there. He would tug on the cable
22  and say, "Is this the one that you're feeling?" "Yes, it

**Page 92**

1  is." Because you can't always see through bulkhead where
2  that one goes, he would tug it and I'd be on the other end
3  and give it a tug. "Yeah, that's it. Okay. I agree this
4  is the one that's on that side." Go to the next spot.
5  Give a little tug. "Okay. I agree it's" -- and we'd mark
6  them as we go.
7       So I -- I don't remember if I wrote the mark or
8  he wrote the mark. That's -- that's what I don't remember.
9    Q   So do you remember starting with one and saying,
10  "All right. This is the left-hand or it's the right-hand,"
11  and you figured out which one it was and said, "We're going
12  to mark this one with a T"?
13    A   Right.
14    Q   So you were focused on whether it's a left- or
15  right-hand threaded turnbuckle because you want to match it
16  to the one on the back; right?
17    A   Well, we're focused on it coming out of the --
18  coming out in this -- we're focused on -- in this drawing
19  coming out in the correct orientation, which would be, I
20  believe -- see, I -- see, I think he come up with top from
21  this, top. Top, stayed at the top, still at the top, top,
22  top. We made sure it's the top one -- is this cable,

**Page 93**

1  whatever one that was coming out on the --
2    Q   "Top," meaning the one that comes out of the
3  front side of the drum as it's mounted in the -- in the
4  cockpit?
5    A   Right. I believe that's what we came up with
6  from the picture. We just called it the top.
7    Q   So you'd want to figure out which --
8    A   It's on top of this pulley here instead of --
9  opposed to being underneath it. I think that's how we came
10  up with the T.
11    Q   Oh. So we can have a clean record, when you say
12  "this pulley," you're talking about the first pulley set
13  below the drum; right?
14    A   No. We might have -- I -- you know, like I said,
15  I can't remember how we came up with the T. But it was
16  a -- it was a way to remember that -- that one would
17  stay -- this one cable would be the same one all the way
18  through and so on and so forth.
19    Q   So you don't remember whether you or Perry made
20  those marks -- or not Perry. I'm sorry -- Scott?
21    A   Right. No, I don't.
22    Q   Once you got that marked, what did you do?

Page 94

1    A    Once that was marked, we removed the old cable --
2  well, before we moved the old cable, I made marks on the
3  FDR. There was a small little bracket on the FDR clamped
4  on the cable on a spool-type -- spring-loaded spool-type of
5  device, which I believe was a -- some type of a
6  tensiometer.
7         And I marked on each side of the cable with some
8  nail polish just so that we could -- I'll get to that
9  later.
10        And then at the front where that little Z was, I
11 put a little -- a little dab of nail polishing there so
12 that we could tell where the center of the cable was.
13   Q    You're talking about on the old or the new?
14   A    The old, on the old.
15        Then -- we then brought the cable outside of the
16 airplane, stretched it out, and took the new cable and
17 stretched that next to it because the cable obviously are
18 all wound up from the drum and --
19   Q    You had to disconnect the turnbuckles, though,
20 didn't you?
21   A    Right.
22   Q    When did you do that?

Page 95

1    A    That was at the point we removed the cable after
2  making all the markings.
3    Q    Before or after you put nail polish at the FDR?
4    A    That was after. After we made all the markings,
5  we undid the turnbuckles.
6    Q    And when you say "markings," you're talking about
7  not just the markings on the --
8    A    The mail polishing markings, the T markings --
9    Q    Okay.
10   A    -- right.
11   Q    When you got it out of the aircraft and you
12 spread it out next to the other one, what did you do?
13   A    We verified the length. It was -- it was pretty
14 much right there. And it was -- it was basically so we
15 could put the left-hand threads with the left-hand threads,
16 which are marked with a -- I think there's a -- they're
17 marked -- I forget what the mark is on turnbuckle.
18        There's a -- and then we match up the right with
19 right and then go down on the floor with them stretched out
20 and make a mark where the FDR -- an approximation where the
21 F- -- right next to where that mark was, FDR would go right
22 about here.

Page 96

1         And the item was going to be MEL'd anyways.
2    Q    MEL'd?
3    A    MEL'd.
4    Q    What's that?
5    A    It's a -- a -- a -- MEL stands for "minimum
6  equipment list," which means that it needs to go and get
7  calibrated. So you could MEL it until it goes and gets
8  calibrated, which is, like -- they give you, I think, ten
9  days on an MEL to go get that done.
10   Q    It's like an interim status for it?
11   A    What do you mean?
12   Q    A temporary status for it till it gets approved?
13   A    Well, it has to go get calibrated; and we don't
14 have the calibration equipment to calibrate an FDR.
15   Q    I see.
16   A    So the only thing that I was concerned with when
17 I put this block on there or -- or this mark on the block
18 is that nothing would -- it wouldn't hit anything. Yeah.
19 I didn't want it to go too far and hit the spool or too far
20 and pull the spool too far out. So as long as I know it
21 was, you know, within a -- a millimeter or -- or a couple
22 of -- very, very close to where the old one was, it

Page 97

1  wouldn't cause any interference.
2    Q    When you disconnected the turnbuckles from the
3  aft cable --
4    A    Uh-huh.
5    Q    -- were those turnbuckles square to one another
6  or were they offset?
7    A    The aft? Oh, in the plane?
8    Q    Yes.
9    A    They were -- I can't recall if they were square
10 or offset. I know they were coming out of -- they were
11 inside of conduits --
12   Q    Uh-huh.
13   A    -- so I had to slide the conduits back. And I
14 can't remember if they were squared or offset. I don't
15 think they're squared. I -- I'm guessing, you know. I
16 don't even want to say because it's a guess. I guess
17 they're offset. That's --.
18   Q    And what would make you think they're more likely
19 offset?
20   A    So they wouldn't rub each other. But they're in
21 the conduits anyways.
22   Q    Right.

**Page 98**

1    A    That's what keeps them from rubbing together.
2    Q    At the time you disconnected the turnbuckles,
3    were the aft cables still connected to actuators in place
4    or were -- was one of the actuators out?
5    A    The right actuator was being replaced, so they
6    were unhooked. It was unhooked in the rear on the right
7    side.
8    Q    The left side was still replaced?
9    A    The left side was still installed.
10    Q    So was there tension on the aft portion of the
11    cable running on the left side?
12    A    On the left side, there was -- well, there was no
13    tension because it's all one intertwined system. No
14    tension on the left side because of that right side was
15    unhooked.
16    Q    Once you marked the old cable with the nail
17    polish, pulled it out, and got it outside with the other
18    one, what did you do?
19    A    We lined it up to next to the new one, marked the
20    new one in the same spots with a little dab of nail polish,
21    and then -- then cleaned the cable up with some type of
22    solvent to remove any type of grease or anything that was

**Page 99**

1    on it -- basically a corrosion preventative was on there --
2    and then proceeded to install -- well, then -- well,
3    actually we had to wrap -- we wrapped the drum first, where
4    I had made the Z mark was wrapped the drum -- we wrapped
5    the drum. I don't know.
6    Q    And to wrap the drum, you need to be sure that
7    the correct threaded end of the cable comes off of the
8    forward or the back; right?
9    A    Right.
10    Q    Because as it turns one way, it's going to push
11    or pull the tabs one direction versus the other --
12    A    Right.
13    Q    -- right?
14        So did you use Exhibit 6 to do any of that?
15    A    Yeah, we used this exhibit right here. But what
16    we did was -- I mean obviously you're aware of now. But we
17    looked at the picture as obviously this side of the drum.
18    That's pretty different. I mean that's what -- we used the
19    picture, you know --.
20    Q    Did you notice the forward as installed arrow?
21    A    I don't recall if we noticed that or not. You
22    know, I don't -- I don't recall if we noticed that or not.

**Page 100**

1    Q    Did you ever --
2    A    We just used -- we used -- I mean the picture's
3    cut and dry. They put that note of right-hand thread, they
4    put that note of left-hand thread coming off. And then
5    this side is just -- it's just very obvious. You know,
6    it's just very obvious so --.
7    Q    If you follow the forward as installed arrow, the
8    language of this document, Exhibit 6, first page, would
9    indicate that the left-hand threaded cable needs to come
10    off the forward end of the drum; right?
11    A    That would be -- yes. If you follow the picture
12    with this, yes.
13    Q    As you finished your job and wrapped it, which
14    threaded cable came off the front of the drum toward the
15    nose of aircraft?
16    A    Well, I suppose it would be -- this is against
17    a --.
18    (The witness reviewed document.)
19    A    My God, it's been -- it's been a couple years
20    since I did this so --.
21    Q    That's fine. Take your time.
22    (The witness reviewed document.)

**Page 101**

1    A    Well, I guess if you flip this thing around, then
2    from the picture, there's just a -- they say the right-hand
3    threads will come off.
4    Q    Off the front?
5    A    Uh-huh.
6    Q    Toward the nose?
7    A    Right.
8    Q    And is that what happened?
9    A    No, because, you know, whether we depicted it
10    wrong or maybe read the forward install, I can't remember
11    how it went. But, see, the thing -- the thing with this is
12    that if it did -- if it did -- if the -- if the left-hand
13    thread or the right -- the right-hand thread came off the
14    wrong side, then the cables would have to cross at some
15    point.
16    Q    To be able to attach to the turnbuckles --
17    A    Absolutely.
18    Q    -- in the back?
19    A    They wouldn't attach. They wouldn't attach.
20    Q    So are you saying that somewhere along the lines
21    they got crossed?
22    A    No, I'm saying that they weren't crossed.

**Page 102**

1    Q    You're confident that they were not crossed?

2    A    I'm positively confident.  I -- I mean it was

3    checked and double-checked, the routing of this thing.

4    Q    So if the NTSB's factual finding was that the

5    right-hand thread came off the front of the drum and the

6    cables were crossed to enable the turnbuckles to connect,

7    you take issue with that?

8        MR. DOMBROFF:  Object to the form.

9        Go ahead.

10   A    Do I take issue with that?

11       BY MR. JONES:

12   Q    Yes.

13   A    Of course, I do.

14   Q    You disagree with that completely?

15   A    I absolutely disagree.  What -- what -- whatever

16   they say is whatever they say.  What I know is correct.

17   When I left the -- left to go home that day, it was

18   correct.

19   Q    So you --

20   A    I know when I check something, triple-check,

21   double-check, whatever it is, look at it once more before I

22   walk out the door again because I feel strongly about it,

**Page 103**

1    then -- then I -- then I totally disagree and am very

2    baffled when I wake up to a phone call of what happened,

3    very baffled, you know.

4    Q    So you're confident that when this cable was

5    installed, the left-hand threaded side of the cable came

6    off the -- the forward side of the drum; correct?

7    A    Yes.

8    Q    And that there were no crosses between the drum

9    and the turnbuckles?

10   A    I'm confident that there was no crosses between

11   the drum and the turnbuckles.

12   Q    Who threaded the cables back through once you

13   wrapped the drum?

14   A    Back through the pedestal and down through?

15   Q    Yes.

16   A    Scott and myself together.

17   Q    How'd you go about doing that?

18   A    I believe we -- I -- I believe he was just -- I

19   was -- would be with on other side of where we were, the

20   bulkhead or whatever; and he would hand it through and make

21   sure that it was -- you know, "Hand this one through.

22   Okay.  Run that over this pulley on the T." I believe we

**Page 104**

1    did it that way, one at a time, one section at a time.

2    Q    So you started at the pedestal and worked back?

3    A    Yes.

4    Q    Then did you send one side through first, then

5    the other?

6    A    I -- I can't -- I definitely don't remember if we

7    did them -- I believe we did it them one at a time.  I

8    can't remember if we did them one at a time or not.

9    Q    And what would be the purpose of doing them one

10   at a time, as opposed to together?

11   A    Well, you can't mix it up that way. --

12   Q    So --

13   A    -- make sure you're on -- by looking at this

14   picture, make sure you're on the right side of that one

15   looking from this way and make sure you go over to the back

16   side of this one and make sure you go to the bottom of this

17   one and things like that.

18   Q    So when you started one of them down, you say,

19   "All right.  I'm on the front of the drum.  This is the

20   left-hand threaded cable.  Here it comes."

21   A    Okay.

22   Q    Put it on the right one --

**Page 105**

1    A    Right.

2    Q    -- or the correct pulley?

3    A    Right.

4    Q    That's how you did it?

5    A    Right.

6    Q    And you were careful to say, "All right.  This is

7    the left-hand thread, and this is the right-hand thread,"

8    as you put them through?

9    A    Yeah.

10   Q    And he said, "All right.  I've a got the left.

11   I'm going on this set of pulleys or this side of the

12   pulleys," and worked all the way back to the turnbuckle?

13   A    Right.

14   Q    And then you came back and did the same thing

15   with the other threaded side?

16   A    That's correct.

17   Q    And did you stay in the -- in the pedestal area

18   that whole time?

19   A    No, we had to have move around, both of us, in

20   order to work with each other threading them through those

21   different little areas.

22   Q    So once you got it into the pedestal through the

**Page 114**

1  on the right side, the initial one.
2    Q   Following -- following the failure of the free
3  play check?
4    A   No, following the -- the cable coming off the
5  drum.
6    Q   Who took it out after the free play check failed?
7    A   Dominick.
8    Q   Item C of this checklist on Exhibit 20 calls for
9  the removal of the entire elevator before you remove the
10  actuator; correct?
11    A   Yes.
12    Q   Why was that not done?
13    A   Well, it was -- it wasn't done because it was
14  just -- it was just -- you know, it was just -- basically
15  it's there as a convenience factor.  You got to use a lot
16  of discretion, you know, in this manual.  And we just --
17  there's access panels you don't need; it's out of the way.
18  It comes out fine and, you know -- and I mean that's about
19  it.
20    Q   So basically you employed discretion as a
21  mechanic to skip Item C?
22    A   Yes.

**Page 115**

1    Q   Were you reprimanded for that?
2    A   Yes, I was.
3    Q   Was anyone else?
4    A   Yes, Dominick was and -- and, I believe, Jeff.
5    Q   Vallejo?
6    A   Yes.
7    Q   And what form of reprimand were you given?
8    A   We were suspended for a week without pay.
9    Q   What were you told was wrong with having skipped
10  that step?
11    A   Just that we didn't -- the only thing that was
12  wrong with it is that -- well, basically, you know, you
13  can't stray from manual; we didn't follow proper procedure,
14  manual procedures.
15    Q   Not using the lead lines to replace the cable was
16  also straying from the manual, wasn't it?
17    A   Well, that was -- you know, the -- the lead lines
18  are just -- it was -- it was a piece of a step and not --
19  we weren't deferring from a step.  It was just to
20  facilitate, like I said.  It was just a -- to facilitate
21  ease of cable installation.
22    Q   The maintenance manual directs you to use lead

**Page 116**

1  lines when pulling out the forward cable; correct?  Exhibit
2  6, page 3, item G.
3  (The witness reviewed document.)
4    A   Okay.
5    Q   Correct?
6    A   Okay.
7    Q   You departed from that step; correct?
8    A   Correct.
9    Q   Does that departure differ from your departing
10  from the -- the step that told you to remove the elevator
11  before the actuator change?
12    A   Well, the -- if you were -- all right.  In this
13  manual the way it's set up, if you didn't use a lot of
14  discretion at time and a lot of good judgment, you
15  probably -- I mean you just -- you wouldn't get -- you
16  know, you wouldn't be able to make it through a lot of
17  these things, a lot of these procedures in here because
18  it's so vague.
19    So what -- what -- what difference is there if
20  you -- Raytheon skips a step?  It doesn't put something in
21  there with me omitting a step.  What's -- what is -- is
22  there -- I mean that's -- that's the thing.  Is -- is it --

**Page 117**

1  if they were that -- if it were -- if they were that
2  concerned about the step, then they wouldn't miss steps and
3  they wouldn't have pictures drawn wrong in this thing too.
4    Q   Let me ask my question again:  Did you skip
5  Item G?
6    A   Yes, I did.
7    Q   And you skipped Item C in the removal of the
8  elevator when you changed the actuator; correct?
9    A   Yes.
10    Q   You were reprimanded for skipping Item C on the
11  actuator removal; correct?
12    A   Yes.
13    Q   The reason given for reprimanding you for doing
14  that is you did not follow the maintenance manual --
15    A   Right.
16    Q   -- correct?
17    Were you reprimanded for not following the
18  maintenance manual in failing to use the lead lines under
19  Item G?
20    A   No.
21    Q   Were you reprimanded for anything else associated
22  with this maintenance, other than the failure to remove the

**Page 118**

1  elevator?

2  A  No.

3  Q  Did the failure to remove the elevator have

4  anything to do, in your opinion, with the accident?

5  A  No.

6  (The REPS No. 27-30-07 was marked Defendant's

7  Exhibit No. 21 for identification.)

8  BY MR. JONES:

9  Q  Exhibit 21 is a printout from the REPS manual of

10  27-30-07. Can you tell me what this chapter is about?

11  A  It looks like the trim tab servo system.

12  Q  And that's the electric portion of the trim tab

13  control; right?

14  A  Right.

15  Q  Did you do any work on the electric trim tab

16  system?

17  A  No.

18  Q  Did you make use of this section in any way in

19  doing some of the operational checks after the work that

20  was done?  And if you need time to take a look at the

21  steps, that's fine.

22  (The witness reviewed document.)

**Page 119**

1  A  No, I didn't use this at all.

2  Q  When you checked the operation of the trim tabs

3  after the work that was completed, did you run it manually

4  and electrically?

5  A  Yes.

6  Q  And what was the reason for doing both?

7  A  Well, I mean, it's just kind of a common sense

8  type of thing.

9  Q  You wanted to make sure that both are working?

10  A  Absolutely.

11  Q  And that both are working together properly?

12  A  Right.

13  Q  How did you go about running the electric version

14  of it?  Did you just run it through your paces because you

15  knew how to operate it, or did you use some sort of a list?

16  A  I just ran it through the -- I just knew the

17  procedure to check the disconnect and the pilot override

18  and the -- the operation of it.

19  Q  And did your knowledge of that procedure come

20  from having done work on that component of -- of the 1900

21  before?

22  A  Yes.

**Page 120**

1  Q  Would you look briefly again at Exhibit 16.  This

2  is the maintenance work order that was filled out and

3  signed off on for the replacement of the cable; is that

4  right?

5  A  Right.

6  Q  And did you fill out that whole thing or just

7  part of it?  I mean the front, top and bottom?

8  A  Yeah, top and bottom.

9  Q  And you signed off on it?

10  A  Yeah.

11  Q  And Jeff signed off as an inspector?

12  A  Right.

13  Q  And what's the bottom part say, I mean, in

14  substance?  What are you attesting to there?

15  A  I removed and replaced the forward section of the

16  trim tab cable, and the operational check was okay.  And I

17  rigged it in accordance with the maintenance manual, and

18  then the checks were okay.

19  Q  And how do you go about confirming what chapters

20  of the maintenance manual you're using?  You just look at

21  the ones you're already printed off and were working with?

22  A  No.  You just -- you would -- well, I mean

**Page 121**

1  because the operational check isn't in the one that you are

2  working with, which usually it is right at the end -- I

3  mean that's -- I guess --

4  Q  Sometimes it's in a different chapter?

5  A  No, they wouldn't put it in a totally different

6  chapter.

7  Q  Or a different section of that chapter, I guess.

8  A  No.  You wouldn't have an operational check of a

9  trim cable in another section of the chapter, no.

10  Q  Well, what I guess I'm getting --

11  A  It would be --

12  Q  -- to here --

13  A  -- in the same section --

14  Q  -- is your reference the process for re- --

15  replacing the cable was 27-30-06; right?  And then you talk

16  about the check you used was 27-30-05?

17  A  Okay.

18  Q  Is that right?

19  A  Right.

20  Q  Now, is --

21  A  That's -- well, rigged.  Rigged.  Rigged in

22  accordance with 27-30-05.

**Page 122**

1    Q    Okay.

2    A    So I rigged it in accordance with this chapter.

3    Q    Your operational check was in accordance with

4    what?

5    A    Well, it's -- the operational check was just a

6    standard practice, just a -- a regular standard operational

7    check of the system. Just kind of a use -- you know, use

8    your good judgment that the system works correctly.

9    Q    And what did you do to operationally check the

10   flight control -- or the trim tab system after the cable's

11   replaced and the second actuator was replaced?

12   A    Well, we did a -- did a rigging on it and checked

13   the rigging for proper deflection and proper direction and

14   then ran it through several times back and forth just

15   manually, make sure things are smooth and then ran it

16   through the whole electronic trim actuator check; the

17   disconnect, the copilot-pilot override, and trim-on,

18   trim-off type of thing.

19   Q    This was you and Dominick?

20   A    Yes.

21   Q    Scott had gone home; right?

22   A    Yes.

**Page 123**

1    Q    Where were you and where was Dominick?

2    A    I was in the cockpit and Dominick was on the

3    tail.

4    Q    So was it a similar system to what you had

5    described when you did this rigging the first time where

6    someone stood in the back and said, "Show me full down,"

7    and the person in the cockpit would go full down?

8    A    No. I would -- at this -- well, yeah. It was

9    very similar. But I was in the cockpit, and I ran the

10   wheel all the way to one direction and asked him for the

11   reading on that deflection and ran the wheel the other way,

12   or to zero, verified zero again and then ran the wheel the

13   other way and asked him for the reading on that deflection.

14   Q    Did you have to reindex the wheel?

15   A    No.

16   Q    What's it mean to reindex the wheel?

17   A    Reindex the wheel would mean, to me, that you

18   would have to take it off and put it back on.

19   Q    And under what circumstances does that become

20   necessary?

21   A    I don't think it would ever be necessary.

22   Q    So when you ran the wheel manually to all the way

**Page 124**

1    nose down, is one of the things you'd want to confirm is

2    that the wheel stops at the proper place on the scale?

3    A    Oh, right, yeah, make sure it's -- yeah. On

4    the -- on the wheel itself it has to stop at the proper

5    place; and --

6    Q    If --

7    A    -- there's preestablished lines on the wheel.

8    Q    If the cable were rigged such that the left-hand

9    thread came off the front of the drum and the cables were

10   switched somewhere along the way back so that they could be

11   connected, as the NTSB says was the case, what would your

12   operational check show when you tried to go all the way one

13   direction?

14        MR. DOMBROFF: Object to the form.

15        You can answer.

16   A    What would my operational check show if it was

17   rigged like they said --

18        BY MR. JONES:

19   Q    Yes.

20   A    -- backwards?

21   Q    Yes.

22   A    It would go probably in one direction past the

**Page 125**

1    lines that were there and in the other direction wouldn't

2    make it anywhere, wouldn't go to the required limit, if it

3    was rigged incorrectly.

4    Q    And you didn't see that?

5    A    No.

6    Q    That was not the case?

7    A    Not the case.

8    Q    Would it also run the tab in the opposite

9    direction that you were turning the wheel?

10   A    If you ran the -- if you were running the

11   wheel -- yes, it would run in the opposite direction if it

12   was rigged backwards.

13   Q    And you're confident that when you did your check

14   and your rigging, that it was moving in the right

15   direction; correct?

16   A    Yeah.

17   Q    And the right distance?

18   A    Yeah.

19        MR. JONES: We need --

20   A    I would see the wheel wrong; and I would hear the

21   wrong type of deflection reading, which was totally

22   opposite for up and down, very different from Dominick.

Page 130

1    A   No.
2    Q   It's only back there --
3    A   Right.
4    Q   -- at the cable stop --
5    A   Right.
6    Q   -- or the actuator itself that would bottom out;
7  right?
8    A   Right.
9    Q   Now, does the actuator ever bottom out at the end
10  of its travel; or is it being stopped from hitting the end
11  of its travel by the cable stop?
12   A   I believe it's being stopped by the cable stop
13  from hitting that if it's traveling.
14   Q   Now, if that cable stop were out of place, do you
15  know how much further the actuator will take the surface
16  before the actuator bottoms out?
17   A   No, I don't know.
18   Q   You've never seen that or done that?
19   A   No.
20   Q   No reason to, is there?
21   A   No.
22   Q   When you did the test of the trim tab system

Page 131

1  after the replacement of the cable and the second actuator,
2  you say you used the electric trim system as well; right?
3    A   Right.
4    Q   When you ran the electric system, did you watch
5  the manual wheel to see which direction it went?
6    A   Ran the electric system, I watched -- yeah,
7  that's how I see which direction.  I mean other than that,
8  there's no indication.
9    Q   Well, someone in the back could tell you which
10  way the tab's going?
11   A   Right.  But if you're -- right.  But when you're
12  just checking with the manual system, you're watching the
13  wheel.
14   Q   Do you remember specifically having run the
15  electric system and looking at the wheel?
16   A   Yes.
17   Q   To confirm that when you went up with the
18  electric, the wheel went up?
19   A   When you're up with the electric, the wheel went
20  back, which is up.  Well, up -- up on the -- up is up.  I'm
21  not going to confuse button decisions and --
22   Q   I know what you mean.

Page 132

1    A   -- wheel positions.
2        Yes.  Exactly.
3    Q   If the cable had been rigged as the NTSB says it
4  was and you ran the electric trim up, which way would the
5  wheel turn?
6        MR. DOMBROFF:  Object to the form.
7    A   The opposite direction.
8        BY MR. JONES:
9    Q   When you used the electric system, did you run it
10  all the way through its range of motion, up and down?
11   A   Yes.
12   Q   And confirm the correct degrees' deflection back
13  on the surface?
14   A   Yes.
15   Q   And you used Dominick to do that, reading the
16  digital protractor?
17   A   Right.
18   Q   And you're doing that, using the steps in the
19  REPS manual for the rigging check, right, which is --.
20  (Counsel reviewed documents.)
21   Q   -- in Exhibit 14; is that right?
22   A   14.

Page 133

1    Q   Refer to me the -- the page where the steps are
2  for checking the -- the degree deflection in the travel.
3    A   This is the degree deflection in Step F.
4    Q   Page 2 of 14?
5    A   Right, page 2 of Exhibit 14.
6    Q   Now, when you work down a checklist like this, do
7  you -- do you check it on off on the one you've printed?
8    A   I think sometimes I would, depending on what I
9  was working on.  I -- I don't -- you know --
10   Q   Do you --
11   A   -- if I was stepping away from it.  But in the
12  case of this, I wasn't stepping away from the whole rigging
13  procedure; so I didn't check off.
14   Q   Oh, you remember not having checked off these
15  items?
16   A   I believe I didn't checked off these items.
17   Q   In the event when you do check off items on a
18  REPS page as distinct from a work card, are you to keep for
19  the maintenance package the paperwork?
20   A   This?
21   Q   The copy that has the check-off?
22   A   No.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - -x

                                   :

COLGAN AIR, INC.,                  :

                                   :

            Plaintiff,       :

                                   :

       vs.                  :  Civil Action

                                 :  No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,     :

                                 :

           Defendant.       :

                                 :

- - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, June 23, 2005

Videotaped deposition of SCOTT SERVIS, witness, called

for examination by counsel for the defendant, pursuant to

notice, at the offices of Mark A. Dombroff, Esq., Dombroff

& Gilmore, P.C., 1676 International Drive, Penthouse,

McLean, Virginia, before Malynda D. Whiteley, a Registered

Professional Reporter and a notary public in and for the

State of Virginia, beginning at 9:14 a.m., when were

present on behalf of the respective parties:

Page 6

1    Q   Well, it's a pretty simple format.  I just ask
2  you questions; you provide me an answer.
3        We're obviously taking it by videotape today.
4  Since I'm sitting next to you, you're naturally going to
5  look at me.  But to the extent you can at least keep some
6  bit of your attention toward the camera, that might be
7  helpful too to allow us to have a better record when we're
8  done.
9        Is that fair?
10   A   Right.
11   Q   We're going to be moving pretty quickly today
12  because we've got several people we want to take, so we'll
13  probably not be a long time with you.  But if you need a
14  break, let me know; and we'll just -- we'll deal with that
15  as it goes.
16       Is that fair?
17   A   Yes.
18   Q   Tell us your full name, please.
19   A   Scott Neil Servis.
20   Q   Where are you employed?
21   A   Colgan Air.
22   Q   What do you do there?

Page 7

1    A   Aircraft mechanic.
2    Q   What's your residential address?
3    A   It's 2███████████e, Plymouth,
4  Massachusetts.
5    Q   Social Security number?
6    A   ███████████
7    Q   How long have you worked at Colgan?
8    A   I think it's about 12 years.
9    Q   Doing the same thing the whole time pretty much?
10   A   Pretty much, yes.
11   Q   Tell us a little bit about your background in
12  aviation before having come to Colgan, including your
13  training.
14   A   I've worked for Continental -- Continental
15  Express, which also used to be Bar Harbor Airways, which
16  when -- the company went through several name of changes
17  when I first started in aviation.  I also worked for an
18  overhaul facility in between, Atlantic Aerosport.
19       I'm not sure what you want for training.
20   Q   Before you started with either one of those, did
21  you get your -- your license, your mechanic's --
22   A   Yeah --

Page 8

1    Q   -- license?
2    A   -- I went to East Coast Aerotech in Lexington,
3  Massachusetts.
4    Q   And when did you do that?
5    A   When?
6    Q   Yeah, when?
7    A   That was '86.
8    Q   Tell us a little bit about that process.  What's
9  it take to become an aviation mechanic?
10   A   It's a -- not quite -- I think it's 18 -- at the
11  time it was an 18-month school that you had to go through.
12   Q   Is it full-time, or is it something you can do
13  while you're working?
14   A   Technically it's -- I went full-time and also
15  worked.
16   Q   What types of things did they teach you there,
17  just generally?
18   A   Everything to do with aviation from A to Z.  I
19  guess they -- you know, they take anyone off the street.  I
20  mean they can -- because they run you through everything so
21  you can get your license.
22   Q   Did you have previous mechanical experience

Page 9

1  before you started in on that?
2    A   Yes.
3    Q   What kinds of work?
4    A   In automotive.
5    Q   Had you had any exposure to the aviation world
6  before seeking your --
7    A   No --
8    Q   -- license?
9    A   -- no.
10   Q   And what sort of license do you end up with?
11  What's it called?
12   A   Air framing, power plant.
13   Q   That's what they call an A and P?
14   A   Right.
15   Q   When did you get that?
16   A   It was '88.  I forget the exact -- it was about 6
17  of '88, I believe, but -- somewhere in there.
18   Q   Any other formalized training besides your A and
19  P school that you received before reaching Colgan as an
20  employer?
21   A   It's -- for colleges per se, no.  I mean like
22  with -- with Bar Harbor and Continental Express, I've done

## Page 10

1  several company schools over the year (sic). I mean
2  company schools and factory training schools for different
3  aircraft that are -- that Colgan doesn't fly but --.
4      Q  Had you had any training in Beechcraft 1900
5  airliners prior to coming to Colgan?
6      A  Yes.
7      Q  Where did you have that?
8      A  That would be Bar Harbor Airways.
9      Q  What training on the 1900 did you take?
10     A  It's the -- I believe at the time it was a -- it
11  was a two-week -- it was, like, an 80-hour class that
12  everyone had to do, you know, through the company.  They
13  had a -- a trainer inside the company that would, you
14  know --
15     Q  Inside Bar Harbor --
16     A  It's --
17     Q  -- or was it a Raytheon --
18     A  That was -- that was on the site of Bar Harbor.
19  It was the company's own training class that they had that
20  everyone had to go through.
21     Q  How long of a class was that?
22     A  It was 80 hours, I believe.

## Page 11

1      Q  What types of things did it cover?
2      A  Everything, all systems of the aircraft.
3      Q  So it was specific to the 1900?
4      A  Specific to the 1900.  And at the time it was --
5  I think at the time it was 1900B and C models, at the time
6  frame because Ds didn't exist.
7      Q  And the plane we're talking about here today is a
8  1900D; right?
9      A  Correct.
10     Q  So this training you got back with Bar Harbor on
11  the 1900, it was specific to the 1900; so it assumed that
12  you had some base level experience and knowledge as an A
13  and P; right?
14     A  Correct.
15     Q  At A and P school what do they teach you just
16  generally about completing a given task of maintenance when
17  you have a maintenance manual you're to be working with?
18         MR. DOMBROFF:  I'm going to object; the
19  question's vague.
20         If you're able to understand it, go ahead and
21  answer it.
22     A  I mean it's -- I mean can you rephrase it or

## Page 12

1  just --
2         BY MR. JONES:
3      Q  Well, do they teach you anything at A and P
4  school about how you perform a given repair task when you
5  have a maintenance manual to follow?
6      A  If they -- generally they say it's -- you have to
7  you know -- you read the manual and work out of the manual
8  if there's a procedure for it.
9      Q  And the manual typically gives you step-by-step
10  instructions about what to do?
11     A  Usually.
12     Q  And if it's in the manual, do they teach you at A
13  and P school to do the step -- each step in the list?
14     A  Yes.
15     Q  So if it's there, you're supposed to do it?
16     A  Right.
17     Q  Now, when you work with a maintenance manual to
18  perform a given task, is everything you need to do always
19  in the list?
20     A  No.
21     Q  So are you needing to employ some discretion as a
22  mechanic or some just know-how as a mechanic to do the

## Page 13

1  things that aren't in the list?
2      A  Yes, you do.
3      Q  Can you describe for me some of the things that
4  typically aren't on the list that you have to employ your
5  own discretion for?
6      A  Not offhand.
7      Q  It's going to vary depending on the type of task
8  you're doing, isn't it?
9      A  Correct.
10     Q  What do they teach you at A and P school about
11  when you're working on flight controls in an aircraft --
12  and I guess first let's start with this:  Explain to the
13  jury what -- what the flight controls on a plane are.
14     A  Flight controls control the altitude of the
15  aircraft, roll, pitch, yaw, depending on which control
16  system you're referring to.
17     Q  So could airelons -- what do they control?
18     A  If you just give me a manual or something so I
19  can look at it.  I'm not --
20     Q  Okay.  You're --
21     A  -- you know --
22     Q  -- you're not a pilot; is that right?

**Page 14**

1    A   I'm not a pilot, no.

2    Q   You're a mechanic.

3        You have airelons; you have rudders, elevators —

4    A   Elevators and trim tabs.

5    Q   -- and trim tabs?

6    A   Different surfaces.

7    Q   And trim tabs could be on the tail or on the

8  wings; right?

9    A   Right.

10   Q   Those are typically control surfaces?

11   A   Right.

12   Q   And a control system is those surfaces attached

13  to the different components of the plane that move them; is

14  that fair?

15   A   Correct.

16   Q   In your training as an A and P, are you told that

17  the control systems of an aircraft are especially critical?

18   A   Yes.

19   Q   What do they tell you about that?

20   A   It means it's obviously a critical -- a part of

21  the aircraft is what controls your -- it's the only control

22  you have of the aircraft so --.

**Page 15**

1    Q   So are you taught that whenever you do repairs to

2  a flight control system on an airplane, you want to make

3  sure when you're done that it functionally works the way

4  it's supposed to?

5    A   Yes.

6    Q   So you know as an A and P going in, without

7  having been told in a given manual, that you're supposed to

8  do a functional check of that control system after working

9  on it; right?

10   A   That sounds right.

11   Q   And where do you go to decide what functional

12  check to do once you work on a control system?

13   A   To the maintenance manual for that type of

14  aircraft.

15   Q   In a 1900 the flight controls are typically moved

16  by cable and pulley systems, aren't they?

17   A   Yes.

18   Q   Mechanical systems?

19   A   Yes.

20   Q   And from time to time you have to disconnect some

21  of the those cables to do work on the systems?

22   A   Yes.

**Page 16**

1    Q   Are you taught in A and P school that there's

2  some value when you disconnect cables to keep tension on

3  the rest of the cable system when you disconnect them so

4  that you don't cause problems elsewhere down the line?

5    A   Yes.

6    Q   They -- they teach that at the very beginning,

7  huh?

8    A   That's -- they might have.  It's a -- it's a

9  general thing.  I mean it's -- if you ask me specifically

10  do I remember from A and P school 15 odd years ago, no I

11  don't.  But --

12   Q   Well, I'm sure?

13   A   -- I mean it's a general practice.

14   Q   But it makes sense?

15   A   Yeah --

16   Q   You --

17   A   -- you don't want cables --

18   Q   You don't want cables loose elsewhere along the

19  run?

20   A   Right.

21   Q   What can happen, for example, if they are loose

22  along the run?

**Page 17**

1    A   It could come off a pulley theoretically.

2    Q   So what's the process that you use to keep the

3  tension on the cable?  Let's say if you're working the far

4  back of plane on a cable that runs all the way to the

5  front.  You need to disconnect it back here to do

6  something.  What's the process you use to keep the tension

7  toward the front of the plane on the cable?

8    A   You have to -- you -- you pinch of cables in

9  between usually two wooden or phenolic type blocks.  You --

10   Q   Phenolic?  Could you tell us what that is?

11   A   It's -- it's a material that's -- I don't even

12  know.  I couldn't tell you the chemical composition.

13  It's -- it's --

14   Q   Well —

15   A   -- it's kind of like plastic, but it's not.  I

16  really don't know what it is.  You know, it's a -- it's

17  phenolic.

18   Q   Just in a very basic level.

19   A   It --

20   Q   We're using terms here that the —

21  (Proceedings participants speaking at the same time.)

22   A   It looks --

## Page 18

1    THE COURT REPORTER:  Excuse me.
2    MR. DOMBROFF:  Whoa, whoa.
3    MR. JONES:  Yes, ma'am.
4    Yeah.  We need to —
5    (Proceedings participants speaking at the same time.)
6    MR. DOMBROFF:  Let me —
7    MR. JONES:  — talking over each other, if we
8  can.
9    MR. DOMBROFF:  Yeah.  You've got to let him
10  finish his answers.
11    Go ahead.
12  A  It's — it looks like brown plastic.
13    BY MR. JONES:
14  Q  Okay.
15  A  That's the best I can describe it.
16  Q  That's all I'm really after because the jury's
17  not necessarily going to understand when we use terms like
18  that.
19    But okay.  You use a piece of word or a phenolic
20  block or somebody to — what? — clamp against?
21  A  Right.
22  Q  Somewhere downstream or upstream of where you're

## Page 19

1  working?
2  A  Correct.
3  Q  And the materials and equipment to do that are
4  available to you as a mechanic at Colgan?
5  A  Yes.
6  Q  And always have been?
7  A  Yes.
8  Q  And would be also to the other mechanics —
9  A  Yes, it. --
10  Q  — right?
11  A  -- would be.
12  Q  In A and P school did they teach you any of the
13  detail of federal aviation regulations that you need to
14  follow and comply with?
15  A  Yes.
16  Q  Are you familiar from your A and P training with
17  any federal aviation and regulations that speak to work on
18  flight controls systems?
19  A  It's — I know there's stuff there.  I couldn't
20  quote you specifically.
21  Q  In your work as an A and P, are you — do you
22  have access to the regulations to go see, if you need them

## Page 20

1  to complete your work?
2  A  Yes.
3  Q  How often do you do that?
4  A  You don't -- you don't have to refer to the FARs
5  themselves.  You don't usually need to.
6  Q  What materials are you typically looking at
7  instead?
8  A  The aircraft maintenance manual.  Or company also
9  has work cards for certain procedures, not all of them
10  but --.
11  Q  Now's a good time to talk about that generally.
12  I want to help us understand, if you can, the systems
13  within Colgan; the manuals used, the terminology used
14  internally with the company, the forms and whatnot.
15    And what I've done to begin with is I've set in
16  front of you what we've marked as Exhibit No. 1.  And that
17  is a copy of the first three sections of the -- of the
18  Colgan Air general maintenance manual, which we've seen --
19  called GMM --
20  A  Right.
21  Q  — here and there.
22    MR. JONES:  I've got a copy here.  I'm sorry,

## Page 21

1  counsel, this is one --
2    MR. DOMBROFF:  That's okay.
3    MR. JONES:  I don't have a copy here for you.
4  It's pretty bulky, and we only copied part of it.
5    BY MR. JONES:
6  Q  Something that your counsel produced to us.  Its
7  first page is C00087.
8    Can you tell us what this document is?
9  A  It's the GMM.  It's the general operating rules
10  for the company, for the maintenance.  It has most what of
11  you need for -- you know, for maintenance of aircraft; you
12  know, policies, procedures.  And the forms are in there too
13  for certain things.
14  Q  So these are intercompany policies about how you
15  perform maintenance at Colgan?
16  A  Yes.
17  Q  In addition to this reference, what else do you
18  use there to get your job done?
19  A  The aircraft maintenance manual, which is
20  actually -- it's not paper; it's on a CD; it's on a
21  computer, which is just -- it's just the aircraft
22  maintenance manual.  It has all the chapters in it for all

## Page 66

1  workdays like that.

2      Q   Had you had any issues going on at home during

3  this time frame, any particular stresses in your life?

4      A   No.

5      Q   All right.  You came to work about 3:40 in the

6  afternoon on Monday, the 25th.  Someone, perhaps Perry,

7  told that you this task was in front of you to deal with,

8  the fact that the cable had come off this drum -- which is

9  an elevator trim cab cable --

10     A   Correct.

11     Q   -- right?

12         How did you set out to go about dealing with this

13  problem?

14     A   This was -- when I came in, this was -- these

15  components were already removed from the pedestal that are

16  mounted --

17     Q   "These" being --

18     A   The --

19     Q   -- the drum itself?

20     A   The drum, the cover --

21     Q   The guard too?

22     A   The guard.  There's a shaft that -- there's a

## Page 67

1  common shaft that it all sets on.  I don't recall the rest

2  of the components.  There's some shims and bolts and

3  stuff that --

4      Q   Sprockets and a chain that goes to the trim

5  wheel?

6      A   Yeah.  The chain is -- was in place.  The chain,

7  I don't believe, was ever removed because the chain is --

8  it's -- it's a solid loop.  The actual -- there's a little,

9  miniature bicycle chain.  And that -- that was still in the

10  pedestal.  That chain itself was not removed from the

11  aircraft.

12     Q   But it was loose from the shaft --

13     A   Right --

14     Q   -- because it had to be --

15     A   -- it had.

16     Q   -- right?

17     A   Right, because there's a sprocket on it.  Right.

18     Q   And just for example -- example purposes, since

19  we've got the part here, this is string; this isn't the

20  regular cable that goes in there.  But can you describe

21  what the cable is like that goes in there?

22     A   It's a -- it's a stainless steel cable.  I don't

## Page 68

1  know what the exact winding on it is.  I --.

2      Q   Is it -- it's certainly stiffer than the string;

3  right?

4      A   Yes, much stiffer than the string.

5      Q   Is it of a nature that wants to spread out --

6      A   Yes.

7      Q   -- when it's loose?

8      A   Yes.

9      Q   So if tension is let up on it, it's going to want

10  to spring out off the cable --

11     A   Right.

12     Q   -- or off the drum?

13     A   Correct.

14     Q   And was there any discussion when you learned

15  that this had become kinked about how it had become kinked?

16     A   I'm not sure they -- they thought it had

17  something to do with an actuator they put in.  But I

18  wasn't -- I wasn't sure of what -- what -- how that would

19  cause the problem.  I was -- I really didn't investigate

20  it.

21     Q   Your task was not to figure out why it happened,

22  but rather to fix it?

## Page 69

1      A   Correct.

2      Q   Did you form any opinion about how else it could

3  have happened?

4      A   No.

5      Q   Does it make sense that it could have happened

6  with tension coming off of here and binding up between the

7  grooves of this and the inside of the guard?

8      A   Possibly.

9      Q   What then did you do to take on the task?

10     A   I believe -- I think they -- I believe they had

11  already ordered the part, but they must have -- they had to

12  have already ordered because this -- this cable isn't

13  something we've normal have in stock in the parts room.

14     Q   The cable itself?

15     A   The cable itself, yeah.  It's -- it's not a

16  common -- you know, it's not something you normally change.

17         And the part was there, so they must have already

18  ordered the part, and it was physically in the building.

19         And then they we started working on removing the

20  cable from the aircraft.

21     Q   And who is "we"?

22     A   Myself and Dan.

Page 70

1    Q   Dan Kinan?
2    A   Yes.
3    Q   And what's his -- what was his title at the time?
4    A   I don't recall. He's a mechanic. And I -- I
5    don't know if he was lead mechanic or not at that -- at
6    that point.
7    Q   Now, "lead" just denotes a level of mechanic, not
8    necessarily who's leading a particular task; is that right?
9    A   Correct.
10   Q   Were you a lead mechanic at the time?
11   A   Yes.
12   Q   So you two together may have been leads?
13   A   Right.
14   Q   Now, is there one of you on a task like this
15   that's in charge of it; or are you both on equal plane?
16   A   We were both just working together.
17   Q   So what do you start with? Do you get go get a
18   work card?
19   A   There is no -- there's no work card in the book
20   for changing this --
21   (Proceedings participants speaking at the same time.)
22   Q   This is --

Page 71

1    A   -- pulling a work card.
2    Q   Because this isn't done very often?
3    A   Correct.
4    Q   So you go to the -- to the REP system?
5    A   Right; go to the manual.
6    Q   And then you do what?
7    A   We printed off the section -- I don't recall what
8    it says. But there's a section that says -- for changing
9    the trim cable. I believe it refers to the entire system;
10   but they break it down into, like, fore and aft. But it's,
11   like -- but it is in there somewhere.
12   MR. JONES:  Let's pause to mark one of them.
13   (The REPS No. 27-30-04 was marked Defendant's
14   Exhibit No. 6 for identification.)
15   BY MR. JONES:
16   Q   Mr. Servis, we've now marked Exhibit 6, which is
17   the printout from REPS of the Revision 9, which was the one
18   in use at the time.
19   First of all, let's make sure we're in agreement.
20   Was Revision 9 the one that was in -- in place at the time
21   you did this work?
22   A   Yes.

Page 72

1    Q   And you can confirm from looking at this document
2    that is from Rev. 9?
3    A   Yes.
4    Q   This is a print out of chapter 27-30-04 of the
5    REPS manual in the 1900D?
6    Is this what you would have gone to the computer
7    system to print off?
8    A   Yes.
9    Q   So these -- these five pages you would have taken
10   back with you to your work space; is that right?
11   A   Correct.
12   Q   Do you have a -- a podium or something you set
13   them on as you're doing work?
14   A   Typically I just -- mostly -- most guys just put
15   it on top of their toolbox. You know, you roll your
16   toolbox to the area of the aircraft you're working on. And
17   mine happens to be just a large flat area. The way it's
18   set up, I just put the paperwork on top of it.
19   Q   So between you and Dan was it you or was it him
20   who went to get the REPS manual -- information?
21   A   I don't remember.
22   Q   Between you and him, which one of you would have

Page 73

1    been following the paperwork?
2    A   Both of us were.
3    Q   Do you sit down when you get one of these and
4    read it from front to back before you start work?
5    A   Yeah, we read through it. I mean -- I mean I
6    remember us getting this and, you know -- you know, looking
7    at the pictures in it and then reading through the section,
8    you know, and then just starting on the job.
9    Q   Now, this is a task that requires you to get
10   access to parts of the plane that you wouldn't ordinarily
11   be able to reach --
12   A   Correct.
13   Q   -- right?
14   So things have to be taken out?
15   A   Yes.
16   Q   Did you perform that work?
17   A   Yes.
18   Q   And what types of things were taken out?
19   A   I'm trying -- the only -- I think the only thing
20   that really had to be removed was -- I believe it's one --
21   it's been so long, I just -- I don't recall. It's either
22   one pulley or one set of pulleys that have to be unbolted

**Page 106**

1 method of removing the cable those that you've already
2 expressed, the fear of cracking a pulley --
3    A   Yes.
4        And pulling the lead lines back through, because
5 it's -- it's very easily (sic) for the wires to get tangled
6 up in them because the pulleys are -- they're bolted
7 together; they're very close together, you know, because --
8 it's two independent pulleys, but there's a very small gap
9 in between the two of them.
10       And the wire -- you know, this -- this is a
11 16th-inch diameter wire that runs the trim system. I don't
12 believe it will fall in between the pulleys. But if you're
13 using just a guide wire to pull through with, it's much
14 smaller diameter typically. They could easily fall in
15 between the jamb in between the pulleys.
16    Q   When you utilize lead lines, do you typically use
17 smaller gauge safety wire?
18    A   Typically yes.
19    Q   Do you have anything else available to you?
20    A   Nah, there's -- there's no --
21    Q   Could you have used string?
22        MR. DOMBROFF: Wait, wait, wait a minute. Let

**Page 107**

1 him finish --
2        MR. JONES: I'm sorry.
3        MR. DOMBROFF: -- his --
4        MR. JONES: I apologize.
5    A   There's no -- there -- there is no -- there is no
6 larger gauge wire available to use for lead lines. I mean
7 This is not -- the company -- I've never worked at a place
8 where they stocked, you know, lead line the same size as
9 the cable you're pulling because it's -- it kind of defeats
10 the purpose. I mean you're pulling twice the weight and
11 twice the -- you know, you're -- you're trying to move
12 smaller cable through just because it's easier -- excuse
13 me -- it's just easier to work with.
14       BY MR. JONES:
15    Q   Does this string that we're using as an example
16 approximate the diameter of the cable itself?
17    A   Yes.
18    Q   So could you have used string like this?
19    A   I suppose you could have.
20    Q   And it being this wide wouldn't have fallen
21 between the pulleys; right?
22    A   Being soft string it would because it stretches.

**Page 108**

1    Q   Meaning its diameter might shrink as it -- as it
2 stretched?
3    A   Yeah. I mean if you -- you pull the string in
4 between two tight pieces, you can easily pull it between
5 the pulleys; whereas, the steel, the stainless cable that
6 we use, you can't do that.
7    Q   Had you ever cracked pulley using wire as a lead
8 line before?
9    A   I don't think so.
10    Q   Had you ever talked to anybody at Colgan who had?
11    A   At Colgan? No.
12    Q   All right. Having decided to not use the lead
13 lines, what method did you employ to ensure that you got
14 the cables back in there right?
15    A   Let's see. Before -- because before I ever
16 pulled any of the pins on the cables, I went back and at
17 every -- every junction where there's a pulley I put a
18 letter T denoting the top. And I forget exactly which
19 pulley I started with.
20    Q   What did "top" mean to you?
21    A   Whatever pulley I had started with had a --
22 there -- there must have been an orientation sideways like

**Page 109**

1 this where there was a top and a bottom, very obvious. And
2 I put a T on that one.
3        And then because -- Dan had disconnected the
4 cables, the turnbuckles. And then he'd pull on one end of
5 the cable; and I had my hand on the other end of the cable;
6 so we were -- we were verifying that we were moving the
7 same cable, you know, when we came to each junction.
8    Q   Which end did you start at?
9    A   I was up towards the pedestal, up here because --
10    Q   Were you not, then, with this first set of
11 pulleys? because it's not oriented -- stacked on top of
12 each --
13    A   No, it's -- I believe it's -- I want to say I
14 believe you start -- I -- I believe this is the one I
15 started with just inside the cabin door -- was this one
16 right here.
17    Q   Is that the one, two, three, four, fifth one?
18    A   I believe so, yeah, because, like, this one's at
19 an angle. It's about a 45-degree angle.
20    Q   "This one" being the fourth one?
21    A   That -- the fourth one. And this one here is 90
22 degrees, I believe.

**Page 110**

1    Q    So you marked --

2    A    It's hard to see from this picture.

3    Q    So you marked the top --

4    A    Of this one here. It's just -- it's, like, just

5    inside the -- as you step in the -- in the -- this picture

6    here not very -- it doesn't give you a real good reference

7    as far as in the aircraft.

8         But just inside the -- when you go just inside of

9    the cabin doors, you enter into the aircraft; and a little

10   bit -- maybe, you know, 2 or 3 feet down the run -- because

11   just as you come in the cabin door of the aircraft, this --

12   this pulley here, which would be the fourth one, which is

13   at an angle -- it's, like, almost a 45-degree angle.

14        And then the next one is 90 degrees. I believe

15   that's just for convenience. It's just where I happened to

16   be at that time.

17   Q    So that's where you started?

18   A    That's where I just happened to start, yes.

19   Q    And since you decided to use the top-bottom

20   approach --

21   A    Right.

22   Q    -- was your assumption starting this job that all

**Page 111**

1    of the put- -- pulleys forward and aft of that position

2    would be oriented the same way?

3    A    No. I mean I -- I knew they were at different

4    angles. I mean I just used -- I used the letter T to

5    denote the top cable at the very first position. And then

6    at each subsequent pulley Dan would pull on one end and I

7    would pull on the other end to verify that we were moving

8    the same -- same pulley from the same location from where I

9    had started and then put a letter T next to that pulley.

10        So the T on this pulley lined up with the T on

11   this pulley as far as the cable run where they were going

12   from. --

13   Q    But --

14   A    -- pulley --

15   Q    -- if the --

16   A    -- to pulley.

17   Q    -- pulley stack had rotated, you'd be moving from

18   a top-bottom distinction to a left-right distinction?

19   A    It's possible, yes. I mean it's --.

20   Q    Are the pulleys numbered?

21   A    No.

22        I'll say for purpose of --.

**Page 112**

1         MR. JONES: Oh, I got you (addressing Mr. Hall.)

2    A    I mean if you look in the aircraft flight manual,

3    I mean there might be. Like this here, I think it lays out

4    flight stations. But there is no, like pulley -- there's

5    nothing in the manual that I know of that says, like, you

6    know, pulley 1, 2, 3 or 4.

7         BY MR. JONES:

8    Q    Well, for discussion here today let's number them

9    so we can be straight and have a clear record.

10        We have the drum first.

11   A    Right.

12   Q    Then -- there's two diagrams for the first part?

13   A    Right, it's just a little clearer picture of it.

14   Q    The clearer one is detail F, and it shows the

15   first three pulley sets --

16   A    Correct.

17   Q    -- after the drum.

18   A    Right.

19   Q    Let's call the first one 1 --

20   A    Yep.

21   Q    -- the second 2 --

22   A    2.

**Page 113**

1    Q    -- the third --

2    A    3.

3    Q    -- 3.

4         And let's -- let's try and not talk over each

5    other. We're -- we're getting worse on that.

6         And then this longer diagram picks up from there.

7         So 4 would be the one you described as being at a

8    45-degree angle?

9    A    I believe it is.

10   Q    5 is the one you first marked with the T?

11   A    I believe so.

12   Q    Now, did the T cable on the top part of that

13   pulley set correlate with the right-hand or the left-hand

14   turnbuckle?

15   A    I do not recall.

16   Q    Were you trying to keep that straight? The T

17   meant one or the other?

18   A    The T meant one or the other. I mean my main

19   concern at that point was to make sure the T -- that the

20   cable -- because, like I said, I hadn't removed the -- the

21   guide pins yet, the safety pins; so the cables were still

22   in their respective pulleys.

**Page 114**

1    And I put a T on whatever -- like I said, the
2  first pulley, which happened to be on the top as you're
3  looking at it, I put a T.  And then next cable, you know,
4  we physically followed to wherever it went through a
5  pulley -- whatever orientation it was in, the same cable
6  had a letter T put next to it so I could put that cable
7  back into that same pulley.
8    **Q    So you were you doing this after Dan had already**
9  **disconnected the turnbuckles?**
10    A    Yes, I believe so.
11    **Q    And what you're doing at this point is Step C to**
12  **remove the retaining pins and fairleads.  And while you're**
13  **doing that is when you're marking?**
14    A    And I marked it before I pulled any of the pins.
15  The first thing I was mark -- I got a permanent marker, a
16  little, you know, Sharpie black marker and put a letter T
17  on all the pulleys.
18    **Q    Did you and Dan discuss whether top or bottom or**
19  **left or right was the best way to -- to the mark things?**
20    A    I don't think so.  I think I -- I believe I told
21  him because, you know, I -- I marked with a letter T, and I
22  suppose -- and I -- I think -- I believe I told him that I

**Page 115**

1  just used the letter T because that one was top.
2    I mean after I started marking them, you could
3  see that they were obviously not the top pulley if it was a
4  sideways pulley -- I mean, you know, if it was vertical or
5  something but --.
6    **Q    Did you write down on your notes or on your copy**
7  **of the REPS paper which cable, the left- or right-hand**
8  **thread top corresponded to?**
9    A    No.
10    **Q    You just kept that straight in your head?**
11    A    At that -- at that time because I said -- you
12  know, at this particular step that we were doing, I
13  wasn't -- I wasn't looking at which cable was attached to a
14  left- or right-hand thread at the other end.  I hadn't even
15  gotten to that point.  I would just mark whatever cables in
16  that run, that position, you know, back to the -- just
17  after the rear spar split is.
18    **Q    So your purpose in marking these top or bottom**
19  **was not to keep track of --**
20    A    Well, I --
21    **Q    -- which cable --**
22    A    It is -- it is eventually.  I mean --

**Page 116**

1    **Q    At what point does it become that?**
2    A    Where the cables split in the back here, there's
3  a -- and I don't remember which side of the cable it was on
4  but the -- excuse me.  It's on the forward side of the
5  cables.
6    There's an FDR bracket that was clamped to one of
7  the cables.
8    **Q    What's that?**
9    A    Flight data recorder.
10    And before we had -- and actually before the
11  cables were disconnected, we had marked with fingernail
12  polish on either -- on the cable itself on either side of
13  the brackets for the flight data recorder so we knew where
14  to put the bracket back on.
15    And as I -- I don't recall right now exactly what
16  the bracket looks like.  But it basically clamps to one and
17  lets the other cable slide through it.
18    And when that cable -- because once you go past
19  this pulley right about here, these cables are --
20    **Q    And let's get a frame of reference.  That would**
21  **be cab-- -- pulley set 6?**
22    A    Pulley 6, yes.

**Page 117**

1    **Q    Okay.**
2    A    Like, once you go past pulley 6, you know, the
3  cables are very obvious straight-run through the aircraft
4  towards the tail.  You know, they don't change, you know,
5  direction or any -- they don't rotate left or right or
6  anything.
7    And where we -- because when we marked the one
8  cable with fingernail polish, which is what the FDR
9  attached to -- and I don't remember if it's a left- or
10  right-hand thread side of the cable.  That denoted to us
11  that that cable had to lay on -- and I believe it was
12  towards the outer of the fuselage.
13    That cable would have to line up with -- with
14  that side.  I mean when you -- when you would lay the cable
15  back in, it would have to be right there.  In other words,
16  the red marks would have to line up to match the other half
17  of the cable for the flight data recorder to hook up again.
18    **Q    So your marking on the cable at the FDR point was**
19  **to assist you in determining whether that run of the cable**
20  **was right- or left-hand thread?**
21    A    It was -- it's a combination of as to where the
22  cable was positioned and also where to put the FDR back on

**Page 118**

1  because the FDR bracket only fits on one way where you
2  can't -- if you -- because if you switch the cables, the
3  FDR bracket won't go on the other direction because the way
4  that it fits on the cable.
5     Q   Had you ever prior to this time in August of 2003
6  replaced a run of cable using this procedure you just
7  described?
8     A   Probably similar, I mean, in the past.  I mean
9  it's -- it's -- it's common to mark what cables and what
10 pulley, you know, before you pull the pins out.
11    Q   In addition to using lead lines or in lieu of
12 using lead lines?
13    A   Probably in lieu of using lead lines.
14    Q   And you had done this before?
15    A   To mark cables -- I mean to mark pulleys?
16    Q   In lieu of using --
17    A   Yes.
18    Q   -- lead lines?
19    A   Yes.
20    Q   Had you done that on your own initiative, or had
21 you been taught to do that?
22    A   I don't recall.  It's -- it was probably

**Page 119**

1  something I was shown over the years.
2     Q   But you don't remember someone --
3     A   I don't remember anyone specifically.
4     Q   But to be clear, this procedure you're describing
5  is a departure from the procedure called out for in the
6  REPS manual; correct?
7     A   Yeah, only as far as not attaching the lead
8  lines.
9     Q   Well, there's nothing about marking pulleys T or
10 not T or putting nail polish on the clamp at the FDR called
11 for in the REPS manual, is it?
12    A   No, it doesn't call out for it; but it needs to
13 be done because if you don't, you have no reference for
14 putting the FDR back on other or as to where the cables
15 were originally sitting, which was my concern because where
16 the pedestal was already taken apart, I wanted to the best
17 of my ability to get the cables back to the position that
18 they were in.
19    Q   So were you handicapped a bit in the fact that
20 the pedestal was already apart and the drum already off?
21    A   I would have preferred to have taken it apart
22 myself.

**Page 120**

1     Q   So are you saying that the use of the lead lines
2  would not have assisted you in getting the FDR back where
3  it belonged?
4     A   No, it would not have.
5     Q   Now, when you started with cable set -- or pulley
6  set 5 --
7     A   Right.
8     Q   -- and marked it T, which direction did you work
9  from there, fore or aft?
10    A   I believe I did the aft section first just
11 because it's easier.
12    Q   And there's only one set there; right?
13    A   Yeah -- I'm trying to remember.  There's one -- I
14 don't believe this picture's correct.  I believe there's
15 actually -- without looking at the aircraft, I couldn't say
16 for certain.  But I believe there's another set of pulleys
17 somewhere in this run here.  I think there is, but I don't
18 know for certain.
19    Q   Well, let's be clear for the record.  We've got
20 between the drum and the turnbuckle one, two, three, four,
21 five, six pulley sets on this diagram --
22    A   On that diagram --

**Page 121**

1     Q   -- right?
2     A   -- yes.
3     Q   You're thinking there might be another set?
4     A   I think there might be one more set but I'm not
5  certain because I can't see the rear of this -- the spar of
6  the aircraft isn't depicted on this diagram here.
7     Q   This little bracket right here between the sixth
8  pulley set and the turnbuckle, what's that?
9     A   I believe that's a fairlead.
10    Q   Now, is that something you would have removed?
11    A   Yes, I believe -- I don't recall if we had to or
12 not because -- I mean generally speaking the fairleads in
13 the Beechcraft, it's like a phenolic block where, like, two
14 U shapes come into with the cable to, like, you know,
15 chatter against.
16       If there was enough room to pass the turnbuckle
17 through when we removed it, we wouldn't have had needed to
18 remove it.  I just don't recall if we had to or not.  I
19 know there was -- there were several of them.  I know we
20 had to remove, you know, one or two of them; but I don't
21 know -- that one in particular I don't remember.
22    Q   So for Item C of this list where it says remove

1  sprocket stays in place on its own on the side of the
2  pedestal or if it's actually -- I mean I know the shaft
3  is -- or if it's key common -- I just don't recall how it
4  fits together right there without looking at it a little
5  bit further.
6      **Q   When you say IPC, you mean illustrated --**
7      A   Illustrated parts catalog. It has a little bit
8  more detailed picture than what this does here.
9      **Q   The sprocket itself mates to this key side of the**
10 **drum?**
11     A   It's -- it's either to that side, or it mates to
12 the shaft itself. I just don't recall. I know it mates to
13 what -- in some fashion with the shaft right there.
14     **Q   But this key side has to face the sprocket?**
15     A   I believe so.
16     **Q   All right. We're onto Item M, "Withdraw the**
17 **cable from the airplane drawing the lead lines through the**
18 **pedestal."**
19     So if you're using lead lines, you pull the whole
20 cable out --
21     A   Right.
22     **Q   -- and it pulls lines all the way through the**

1  pulley --
2      A   Right.
3      **Q   -- up and out of the pedestal?**
4      A   Right.
5      **Q   So since you weren't using lead lines, you just**
6  **pulled the cable out; and there was nothing along the run?**
7      A   Correct.
8      **Q   Now, Item N relates to the aft cable; right?**
9      A   Yes, I believe so.
10     **Q   Does O relate to the aft or forward cable?**
11     A   This is all for the aft.
12     **Q   O does?**
13     A   Yes.
14     **Q   What about P?**
15     A   Yeah, this -- this is all for the aft of the
16 aircraft.
17     **Q   Okay. So all these steps -- P, Q, and R. --**
18 **which finish the removal part of this --**
19     A   Right.
20     **Q   -- task are all aft the issues?**
21     A   Yes, they are.
22     **Q   So you didn't deal with those?**

1      A   No.
2      **Q   Now we'll move on to the installation part?**
3      A   All right.
4      **Q   You've got it out and you're going to put a new**
5  **one in. What did you do?**
6      A   Well, we had the -- once we had the old air --
7  cable out of the aircraft, we stretched it out along the
8  hangar floor because it was really long cable. And we laid
9  the cables side by said and -- to make sure that, you know,
10 left was left and right was right; so they were -- when
11 they were laying on the floor, they had the same ends, you
12 know, matching each other.
13     And because the cables in the plane were -- had
14 been kinked where it came off the pulley --
15     **Q   Help us by showing us where --**
16     A   Like I said --
17     **Q   -- that would happen here. If you can take -- if**
18 **you want to take that string off there --**
19     A   Like I said, I don't know exactly how they did it
20 because I didn't see it when they took it apart. But in
21 some fashion this cable had come off and it -- against the
22 cover here and it kinked itself.

1      And when -- you had this whole cable removed
2  laying on the ground. The cable would -- it was pulled up
3  into a knot. It wouldn't just lay flat because there was,
4  like, bends in the wire. This wire is not meant to be
5  bent, you know. I mean it can take curves; but if you bend
6  it, it puts a permanent setup that it's not supposed to
7  have.
8      So, like I said, when we had the cable out, we
9  had to physically pull the old cable taut. You know, if
10 you stood -- I think, you know, one of us stood on one end,
11 one stood on the other end to pull it tight, to get the
12 slack out of it so we could -- to make sure we were --
13 because where the marks we had put on -- because if we
14 removed the cable from the --.
15     No, let's see. If the cable's already out of the
16 drum. And we used the -- when you put this cable into
17 here -- if you look at this one, you can see the -- the
18 very first thing you do is -- it has a hard, like, Z
19 pattern.
20     **Q   Go ahead and unwrap it so we can see that. And**
21 **I'm not expecting we're necessarily going to be able to see**
22 **it on the video; but if it helps you explain, that's good.**

**Page 138**

1    Q   -- you know where to start?
2        And that's essentially so you end up with the
3    right lengths at the back?
4    A   Exactly right because you need to have even
5    cables at the turnbuckles.
6    Q   So then you need to orient it so that you --
7    you're sure that the right-hand thread is coming off the
8    corrected side, front or back --
9    A   Right.
10   Q   -- right?
11       So you need to wrap it in such a way that the
12   correct end is coming off -- let me get this in the right
13   order.
14       This one, for example, has a red mark in the
15   center.
16       You start like that --
17   A   Correct.
18   Q   -- with your finger on it, and you turn?
19   A   Right, turn 90 degrees.
20   Q   Before you turn, you have to figure out which end
21   is coming off of the front or back?
22   A   As far as -- yeah -- I mean there's a diagram in

**Page 139**

1    the book here that shows which side of the --
2    Q   Is that the first page of Exhibit 6?
3    A   Yes, it is.
4    Q   And you also have the second page which shows you
5    the orientation of the cable?
6    A   The cables themselves as they pass through.
7    Q   So you know this goes in the plane with the keyed
8    side toward the left plane, right --
9    A   Right.
10   Q   -- because it mates to the --
11   A   To the sprocket.
12   Q   Right.
13       So you know that left-hand thread has to come off
14   of the forward part toward the nose; right?
15   A   I'd have to look at the diagram again but --
16   Q   If look at the diagram, if you look at the
17   left-hand threads coming off the drum on the forward side.
18   So this is forward; right?
19   A   Yeah, but this -- but this picture is actually --
20   you know, it's backwards, the way they show the picture.
21   Q   On the keyed side?
22   A   Right.

**Page 140**

1    Q   But looking at the words, if this is forward,
2    this means the left-hand thread comes off the forward side
3    of drum; is that right?
4    A   Right.
5    Q   So if -- if this goes in the plane with the keyed
6    side to the left, the left-hand side has to come off the
7    front.
8        Do you start wrapping that way?
9    A   It's -- I'd have to hold -- we wrapped it as per
10   the picture here, you know.
11   Q   Trying to focus on getting the left-hand to come
12   off the front; right?
13   A   I believe how they show the diagram, it says
14   left-hand threads holding the pulley like this, wrap --
15   would wrap around towards this direction.
16   Q   But if this is front, left-hand has to come off
17   the front; is that right?
18   A   Yeah -- well, the picture is -- but the problem
19   is the picture of this pulley is reversed.
20   Q   Did you use this diagram?
21   A   Yes, we did.
22   Q   Did you read the whole thing?

**Page 141**

1    A   We did at the time, yes.
2    Q   Did you read the forward as install part?
3    A   I must have.
4    Q   So if you read that and you read that the left
5    was the forward --
6    A   No, because the -- but the picture of the pulley
7    very clearly shows this -- I mean the pulley, if you look
8    at it, on one side it's very flat.  I mean --
9    Q   This side is flat?
10   A   It's totally flat.
11       And they're showing this picture here as
12   obviously being the keyed side, which is towards the
13   sprocket.
14   Q   So did you notice any discrepancy in the diagram
15   as you did the work?
16   A   It's -- I just don't recall.  I mean as -- I
17   remember we looked at the picture, and I mean I know it
18   says forward is installed here.  But I just remember
19   wrapping this, you know, as per the picture.
20       MR. JONES:  All right.  Let's take a break and
21   change the tape.
22       THE VIDEOGRAPHER:  We're off the video record at

**Page 154**

1  shaft and the sprocket and whatnot, what did you do next?
2      A   Once that was -- that was tightened down in
3  place, I went under the pedestal, I went under the nose of
4  the aircraft and started this pulley right here and, you
5  know, following the diagram, you know, made sure the --
6  made sure that the pulley run was matching how this diagram
7  goes.
8          And I laid -- I'd go to each set of pulleys, and
9  I'd lay each cable into it matching this picture and then
10 put the safety pin back in, the cable retaining pin.
11     Q   So starting with the first set of pulleys --
12     A   Like I said --
13     Q   -- you're not --
14         THE COURT REPORTER:  Wait --
15         MR. JONES:  I'm sorry.
16         Let's not talk over each other.
17         BY MR. JONES:
18     Q   -- you're not using your T system to determine
19 which one goes in which pulley; you're using this diagram?
20     A   Using this diagram, yes.
21     Q   So what's the -- what's the use of having had a T
22 on this pulley if you're not using it for that purpose?

**Page 155**

1      A   Well, when you get further back, it matches
2  the -- like, the F -- because it -- I just -- I don't
3  recall.  It has to be -- it was either the FDR cable that
4  had the marks on it or the one that didn't -- or the other
5  one that didn't have any marks on it was the one the
6  corresponded to letter of C.  And I don't recall which was
7  which.
8      Q   So that helps you back here from --
9      A   Right.  It helps back in this area here.
10     Q   It doesn't help up here in the first few pulleys?
11     A   Right --
12     Q   And to do that --
13     A   -- because --
14     Q   -- you're just --
15     A   Following --
16     Q   -- following this diagram?
17     A   -- following the diagram.
18         So I laid the pull -- -- the cable back over the
19 pulleys, you know, per the diagram, detail F here; put the
20 safety pin in at each location.  And then we worked our way
21 back, I think, to the where the turnbuckles were.
22         At that point -- and one of these pulleys -- and

**Page 156**

1      I believe it was one, two, three, four, five -- according
2  to this diagram, I believe it was the sixth pulley had to
3  be removed because it's -- the cable won't physically pass
4  through -- the crimped-on end of it does not fit underneath
5  the pulley.  You have to unbolt it and take the stack of
6  pulley out, run the cables under it, and then put it back
7  in.
8          You know, we had removed it earlier.  And I think
9  we had loosely kind of set it back in place because we knew
10 we were going to have to remove it again to run the new the
11 cable underneath it.
12     Q   So for that pulley set that had to be
13 disassembled, was the T on the pulley itself?
14     A   No, not on the -- it was on the brack- -- the
15 aluminum bracket that holds the pulleys.
16     Q   And the bracket didn't come out?
17     A   No, the bracket never came out.
18     Q   All right.  Coming back to our list of what
19 you're doing, page 4 of Exhibit 6 again, you've already
20 wrapped it --
21     A   Yeah.
22     Q   -- which was B.

**Page 157**

1      C, "Set the tab indicator at zero.  Refer to
2  figure 202."  What's that?
3      A   That was -- on the control -- on the -- the
4  elevator control wheel that you really can't see it from --
5      Q   Is that this?
6      A   That's this here.  It's a big plastic wheel.  You
7  really -- this picture you can -- you cannot see what
8  they're talking about it.  But there's a -- a scale printed
9  on the -- side of this drum here that has, you know,
10 zeros through whatever.  It was a degree range marked on
11 it.
12     Q   And what's the purpose for putting that back to
13 zero?
14     A   So when you rig the whole system, the tab on the
15 elevator is at zero.
16     Q   So you're planning for doing a rigging all along?
17 Of course, you have to.
18     A   You have to, yeah.  I mean it's obvious that it
19 has to be -- the rigging is going to have to be done.
20     Q   And operational check too?
21     A   You -- I mean normally, yes.
22     Q   And this part of that process is to get all set

**Page 158**

1  up so that the checks will be right?

2     A   Right.  This is just initial setup to -- so when

3  you -- because it's -- because it's -- this is -- basically

4  all this setup is for is when you do the tensions,

5  everything is still at zero, you know, so it's lined up so

6  you can do your actually, you know, functional check at the

7  end.

8     Q   So to perform Step C, are you just turning the

9  wheel or do you have to disassemble the wheel at all?

10    A   I -- we did not have to move it at all.  It was

11 already set at zero.  I never moved the trim wheel.

12        I mean because the trim wheel -- you know, like I

13 said, when I came in, the cable was already off.  And this

14 scale here -- this wheel was at attached because this --

15 the large outside wheel is geared to the inside one where

16 the scale is.

17        This was on the aircraft already; it was not

18 removed.  And the Indicator was reading zero.  It was,

19 like, a little white arrow pointing at zero when I -- so I

20 didn't have to put it at zero when I assembled it; it was

21 already there.

22    Q   So C was already taken care of?

**Page 159**

1     A   Yeah, it was already at that point so --.

2     Q   D is "Assemble the cable guard over the drum.

3  Install the sprocket on the shaft.  Carefully position the

4  staff assembly in the pedestal, installing the lower end of

5  the chain over the sprocket."

6     A   Right.

7     Q   And that's what you described a minutes ago in

8  terms --

9     A   Right.

10    Q   -- of --

11    A   Right.

12    Q   -- putting everything back in?

13        E, "Install and safety-wire the bolts."

14        Did you do that?

15    A   We put the bolts in.  And I don't know if we

16 safetied them right at that point because typically you

17 usually you do a safety at the very end of a job after the

18 inspector's looked at it because if there's something wrong

19 and we had to take it out, it's kind of counterproductive

20 to safety everything up when it could be wrong, you know,

21 so --

22    Q   So you don't know if you did that then?

**Page 160**

1     A   I don't know if that was done right then.

2     Q   You believe it was done eventually?

3     A   Yes.

4     Q   Is it in order in this list for a particular

5  reason?

6     A   I'm sure they do -- they have them -- I'm sure

7  it's in the list just for -- to make sure it's done, you

8  know, because once you put the side panels back on the

9  pedestal, you don't see it.  You know, it's just to make

10 sure it's safetied.

11    Q   Do you as a mechanic typically have discretion to

12 change order of -- of items in a task list like this?

13    A   For something like that, yes --

14    Q   It's a --

15    A   -- either --

16    Q   -- matter of -- of judgment as to whether it's

17 important in order or not?

18    A   Yeah.  I mean because it's -- it's a matter of --

19 especially with a cable system rigging, if we had to take

20 something back apart, which was quite likely, I mean,

21 because so much had been worked on -- I mean it's -- it's

22 like turnbuckles.  I mean you don't safety the turnbuckles

**Page 161**

1  until after you tensioned them.  I mean it's the same type

2  of a thing.

3     Q   What's the next step, Item F, about?

4     A   The little chain that wraps around -- it goes up

5  from the main wheel down through a little -- it's, like, a

6  little idler gear that it runs through.  It wraps around

7  the sprocket down bottom.

8        And basically you just -- the idler -- idler

9  sprockets on an arm that pivots; and it has a bolt, like,

10 in the center that tightens it.  So you loosen the bolt,

11 you put tension on it, and you tighten the bolts.  And that

12 keeps the proper tension on that chain, keep it in place.

13    Q   And did you do that in this order?

14    A   I believe so.  That was done.

15    Q   The next item is G, "After identifying the cable

16 ends".  Does that mean left-hand, right-hand?

17    A   Yeah, you just -- I mean you look at them, and

18 it's -- you can physically -- they -- they're stamped left

19 and right.

20    Q   "Attach the proper leads lines to the cable."

21        And those would have been would the lead lines

22 that came up through had you used them?

# EXHIBIT 8

# NATIONAL TRANSPORTATION SAFETY BOARD
Office of Aviation Safety
Washington, D.C. 20594

December 29, 2003

**Group Chairman's Factual Report**

**NYC03MA183**

**A.    Accident**

    Operator:    Colgan Air, Inc.
    Location:    Yarmouth, Massachusetts
    Date:    August 26, 2003
    Time:    1540 Eastern Daylight Time (EDT)
    Airplane:    Beech 1900D, N240CJ

**B.    Operational factors Group**

Stephen M. Demko
Senior Air Safety Investigator (NER-A)
National Transportation Safety Board
Parsippany, NJ

Louis I. Johansen
Engineering Test Pilot
Raytheon Aircraft
Wichita, KS

Richard Peck
Inspector
FAA Albany FSDO-01
7 Airport Park Boulevard
Latham, NY  12110-1439

Richard I. Bunker
Aeronautics Inspector
Commonwealth of Massachusetts Aeronautics Commission

RAC 000276

Boston, Massachusetts

Jeb Barrett
Director of Flight Standards
Colgan Air, Inc.
Manassas, Virginia

## C.    Summary

On August 26, 2003, at 1540 eastern daylight time, a Beech 1900D, N240CJ, operated by Colgan Air Inc. as flight 9446 (d.b.a. US Airways Express), was substantially damaged when it impacted water near Yarmouth, Massachusetts. The certificated airline transport pilot and certificated commercial pilot were fatally injured. Visual meteorological conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA), Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New York. An instrument flight rules flight plan was filed for the positioning flight conducted under 14 CFR Part 91.

## D.    History of Flight

According to a representative of Colgan Air Inc., after scheduled maintenance, the flightcrew was dispatched to fly the accident airplane on a positioning flight. The flightcrew was aware that maintenance was performed on the airplane; however, it was unknown if the flightcrew was aware of the type of maintenance.

According to data from Federal Aviation Administration (FAA) air traffic control (ATC), the flight departed runway 24 at Hyannis about 1538. Shortly after takeoff, the flightcrew declared an emergency and reported a "runaway trim." The airplane initiated a left turn and reached an altitude of approximately 1,100 feet. The flightcrew subsequently requested to land on runway 33, and ATC cleared the flight to land on any runway. No further transmissions were received from the flightcrew.

Witnesses observed the airplane in a left turn, with a nose-up attitude. The airplane then pitched nose-down, and impacted the water at an approximate 30-degree angle.

According to data from the flight data recorder (FDR), the airplane began the flight at a pitch trim control position of approximately 2 degrees negative (nose down). Shortly after takeoff, the pitch trim control moved to approximately 3 degrees negative, where it remained for a period of about 10 seconds. The pitch trim control then moved to an approximate 7 degree negative position, where it remained for the duration of the flight. The data also revealed that after takeoff, the airspeed continued to increase to approximately 250 knots.

RAC 000277

The accident flight was the first flight after maintenance had been performed on the airplane; which included replacement of both elevator trim actuators and the forward elevator trim cable.

Excerpts of the cockpit voice recorder (CVR) transcript revealed the following:

At 1523:30, the captain called for the Before Start checklist.

At 1523:43, the first officer stated, "preflight's complete. cockpit scan complete." The captain replied, "complete."

At 1523:58, the first officer stated, "maintenance log, release, checked the aircraft." The captain replied, "uhhhh. maintenance and release on aircraft. The captain subsequently identified that the FDR was inoperative, and confirmed that the MEL was still open.

At 1525:11, the captain began to start the right engine, before being interrupted by an individual outside the airplane. Approximately 1 minute later, after a conversation with maintenance personnel, the captain resumed the starting of the right engine.

At 1529:29, as the captain was starting the left engine, the flightcrew began non-pertinent conversation, which lasted about 30 seconds.

At 1530:04, the captain called for the after start checklist. After completing the after start checklist items, the first officer announced the checklist "complete" 15 seconds later.

At 1530:21, the captain continued the previous non-pertinent conversation, followed 10 seconds later with, "all right we're ready to taxi with HOTEL."

At 1530:50, the flightcrew began a conversation about the flightplan to ALB, taxiing the airplane, and which pilot would fly the airplane. The conversation lasted for about 4 minutes.

At 1534:48, the captain stated, "all right, run the checklist." The items that followed were similar to the items that were required to be completed on the Taxi Checklist.

At 1535:14, the first officer stated, "flaps are zero indicating zero, three trims are set." The captain replied, "roger."

At 1535:18, the first officer called the taxi checklist "complete."

At 1535:26, the flight crew began a non-pertinent discussion about a landing airplane. The discussion lasted about 1 minute and 27 seconds.

At 1537:17, the captain stated, "all right. forty six is ready."

RAC 000278

The flightcrew then began to announce several item which were identified as being on the Before Takeoff checklist; however, the checklist was not called for.

At 1537:48, the first officer radioed the HYA tower controller and announced that the flight was ready to depart. The flight was subsequently cleared for takeoff.

At 1538:40, the first officer stated, "V1... rotate." About 6 seconds later, the captain stated, "we got a hot trim, Steve... roll back Steve  roll back  roll back  roll back  roll back."

At 1538:53, the captain stated, "I got it... (pull) back... she's heavy buddy...  roll it back roll my trim Steve."

At 1539:00, the captain stated, "do the electric trim disconnect... hold...  all right, Steve... hold back Steve"

At 1539:04, the captain stated, "no go on the controls with me Steve." The first officer replied, "I got it."

At 1539:14, the captain requested that the landing gear be raised, followed by the CVR recording sounds similar to landing gear motor noises.

At 1539:18, the captain requested that the flaps be raised, which the first officer conformed that they were "up."

At 1539:21, the captain radioed the HYA tower controller, requesting an emergency return to the airport, which the tower controller approved.

At 1539:33, the first officer queried the captain, "you want the power back?" The captain replied, "pull the power back.  pull the power back."

At 1539:36, the first officer stated, "slowly," followed by the CVR recording sounds similar to a decrease in engine/propeller speed.

At 1539:40, the captain stated, "all right, were gonna need both of us on this Steve."

At 1539:48, the first officer stated, "(could) I pull the breaker?"

At 1539:49, the CVR recorded a sound similar to an altitude alerter.

At 1539:49, the captain stated, "pull the breaker Steve... pull the breaker...  I got it if you've got the trim baby."

At 1539:54, the first officer stated, "where is it?"  The captain replied, "find it...  look left of the silver thing, Steve.  look left of the silver thing."

RAC 000279

At 1540:02, the first officer stated, "left of the silver thing?" The captain replied, "left of the silver thing Steve... don't let go of the st- control Steve, just stay with me... you pull back for all your worth, baby... just keep (pulling/holding) back for all your worth.... Steve (pull/hold) back."

At 1540:39, the CVR recorded, "terrain terrain. * pull up."

At 1540:47, the CVR recorded, "woop woop pull up pull-"

The recording ended at 1540:47

### E.    Flight Crew Information

**Summary**

The captain was a company line pilot and he was certificated, current and qualified in the Beech 1900D in accordance with Colgan Air Inc., and FAA requirements. The first officer was current and qualified for his position in the Beech 1900D in accordance with Colgan Air Inc., and FAA requirements. A review of FAA accident/incident and enforcement records of both flight crewmembers indicated that there was no history of certificate actions filed against either pilot.

On the day of the accident, both crewmembers had completed their assigned flight schedule, and were proceeding to their domiciles, when Colgan Air operations personnel called them back to the airport to fly the airplane to Albany.

**Details**

Captain:

Date of hire with Colgan Air, Inc.: July 16, 2001

Airman Certificates / Ratings and Limitations:

Airline Transport Pilot (issued 01/08/03)
Airplane Multiengine Land
BE-1900

Commercial Privileges
Airplane Single Engine Land and Sea
BE-1900 Second-in-Command Required

Mechanic (issued 01/28/97)

RAC 000280

Airframe and Powerplant

Medical Certificate:

First Class (issued 03/18/03)
Limitations:  Holder Must Wear Corrective Lenses

A review of FAA records indicated that on April 24, 2000, the captain was issued a notice of disapproval of application for a commercial multi-engine rating.  He subsequently passed the test and was issued a temporary airman certificate on April 25, 2000.

A review of FAA records indicated that on January 6, 2003, the captain was issued a notice of disapproval of application for an airline transport rating, and BE-1900 type rating.  The notice of disapproval stated that upon reapplication, the applicant was to be reexamined on non-precision approaches, and normal and abnormal procedures.  The captain subsequently passed the test and was issued a temporary airman certificate on January 8, 2003.

A review of FAA records indicated that the captain had no record of airplane accident, incident, or enforcement actions.

According to Colgan Air Inc. employment and flight records, the captain had accumulated/completed the following flight times and training prior to the accident:

| | |
|---|---|
| Total flight time: | 2,891 hours |
| Total time with company: | 1,364 hours |
| Total pilot-in-command (PIC) time: | 1,836 hours |
| Total PIC with Company: | 451 hours |
| Total BE-1900 PIC flight time: | 1,179 hours |
| Total BE-1900 flying time last 90 days: | 211 hours |
| Total BE-1900 flying time last 30 days: | 76 hours |
| Total BE-1900 flying time last 24-hour period: | 7.3 hours |

Total duty time (day of accident):     10.6 hours

Most recent recurrent ground training prior to the accident:  1/24/03
Most recent proficiency check prior to the accident:     6/05/03

First Officer:

Date of hire with Colgan Air, Inc.:  October 4, 2002

Airman Certificate / Ratings and Limitations:

RAC 000281

Commercial Pilot (issued 10/18/00)
Airplane Single and Multiengine Land
Instrument Airplane

Flight Instructor
Airplane Single Engine Land
Instrument Airplane

Medical Certificate:

First Class (issued 08/22/03)
Limitations: Must Wear Corrective Lenses for Near and Distant Vision.

A review of FAA records indicated that on July 10, 1998, the first officer was issued a
notice of disapproval of application for a commercial pilot rating. The first officer failed
the test again on July 13, 1998, and was issued a notice of disapproval of application. He
subsequently passed the test on the third attempt, and was issued a temporary airman
certificate on July 13, 1998.

A review of FAA records indicated that the first officer had no record of airplane
accident, incident, or enforcement actions.

According to Colgan Air Inc. employment and flight records, the first officer had
accumulated/completed the following flight times and training prior to the accident:

| | |
|---|---|
| Total flight time: | 2,489 hours |
| Total flight time with company: | 689 hours |
| Total pilot-in-command (PIC) flight time: | 1,667 hours |
| Total PIC with Company: | 0 hours |
| Total BE-1900 second-in-command (SIC) flight time: | 689 hours |
| Total BE-1900 flying time last 90 days: | 222 hours |
| Total BE-1900 flying time last 30 days: | 52 hours |
| Total BE-1900 flying time last 24-hour period: | 8.7 hours |

Total duty time (day of accident):        10.7 hours

Most recent recurrent ground training prior to the accident:   1/24/03
Most recent proficiency check prior to the accident:   11/03/02

**F.    Training**

RAC 000282

The following references were extracted from the FAA Approved Colgan Air Crew Member and Dispatcher Training Program VOL IV, which identified the training Colgan Air Beech pilots received specific to elevator trim malfunctions.

Paragraph 4.4.0 Advanced Simulation Training Syllabus Initial New-Hire, Transition and Upgrade from SIC to PIC Pilot Simulator Training-Appendix H: Beech 1900 Series-Abnormal and Emergency Procedures, Lesson 4, Appendix 4-15 Revision 17 Dated 01 November 02 item 6 "Emergency Procedures" specified training for trim failure.

Paragraph 4.4.0 Advanced Simulation Training Syllabus Initial New-Hire, Transition and Upgrade from SIC to PIC Pilot Simulator Training-Appendix H: Beech 1900 Series-Abnormal and Emergency Procedures, Lesson 7, Appendix 4-22 Revision 17 Dated 01 November 02 item 3, "Emergency Procedures" –Flight Controls sub item Trim Run Away.

Paragraph 4A.1.3, Initial New Hire, Upgrade, Transition, Recurrent and Re-qualification Aircraft Ground Training 121.419 and 121.427 4A-A/C Ground-10 Revision 5 Dated 30 August 98 item I, Flight Controls included "Unscheduled Electric Elevator Trim" as Flight Control elements to be trained.

The preceding Beech 1900 training elements provided for class room training discussions and practical simulator training on dealing with a runaway trim condition.

## G.    Airplane Information - Weight and Balance

The following weight and balance scenarios were developed to determine the gross weight of the airplane, and its operating envelope at that weight. Scenario number 1 was determined using information provided by Colgan Air Inc., and using FAA standard weights. Scenario number 2 was determined by using information provided by Colgan Air Inc., and using the known weights of the pilots.

Scenario 1

| | |
|---|---|
| Basic Empty Weight (BEW) | 10,370.0 |
| FDR Upgrade | 6.7 |
| New BEW | 10,376.7 |
| 2 Crew Flight Crewmembers @ 180# | 360.0 |
| Crewmember Flight Gear | 20.0 |
| Basic Operating Weight (BOW) | 10,756.7 |
| Fuel | 3,271.0 |
| Ramp Weight | 14,027.7 |
| Fuel Burn During Taxi | (-75.0) |
| Takeoff Weight | 13,952.7 |

RAC 000283

Scenario 2

| | |
|---|---|
| Basic Empty Weight (BEW) | 10,370.0 |
| FDR Upgrade | 6.7 |
| New BEW | 10,376.7 |
| 2 Crew Flight Crewmembers | 454.0 |
| Crewmember Flight Gear | 20.0 |
| Basic Operating Weight (BOW) | 10,850.7 |
| Fuel | 3,271.0 |
| Ramp Weight | 14,121.7 |
| Fuel Burn During Taxi | (-75.0) |
| Takeoff Weight | 14,046.7 |

Both weight and balance scenario results revealed that the airplane was within the operating envelope for the flight.


**H.    Standard Operating Procedures (SOPs)**

**Sterile Cockpit Concept**

Review of the Colgan Air, Inc, Flight Operations Policy and Procedures Manual (FOPP), revealed that during the periods of taxiing, takeoff, and altitudes below 10,000 feet indicated, the "flight crewmembers will not participate in any activity which could distract any flight crewmember from the performance of their duties or which could interfere in any way with the proper conduct of those duties." Examples given by the manual, of activities that were to be avoided, included "engaging in non-essential conversations."

**Aircraft Maintenance and Flight Log**

The FOPP also detailed the pilot's responsibilities for determining the airplanes airworthiness. It stated;

A.    The aircraft must be airworthy in all respects as specified in the type certificate. All instruments and equipment required for the safe operation of the aircraft must be operable. Prior to any flight, the Pilot-in-Command will complete the following:

   1.    Ensure the Airworthiness Certificate, Registration Certificate, Aircraft Maintenance & Flight Log, and a MEL Control Log are onboard. Ensure the above items are for the assigned aircraft. Ensure an additional Aircraft Maintenance & Flight Log and a MEL Control Log is onboard to record discrepancies found during the flight day. Ensure MEL "inoperative" stickers are in the maintenance can.

RAC 000284

2. Review/Verify the Aircraft Maintenance & Flight Log back to the latest valid Airworthiness Release and ensure that all discrepancies between that Airworthiness Release and the current log page are corrected or properly deferred. If the Captain determines that the aircraft status is other than listed on the release, the Captain will inform System Control and correct the inconsistency.

3. Review the previous flights for Captain's signature. If the previous Captain's signature is missing, attempt to locate the Captain. If unable to locate the previous Captain, the new Captain will verify that there are no open discrepancies, and notify System Control. System Control will attempt to locate the previous Captain and verify no open discrepancies.

Review the MEL Control Log for items that have been deferred in accordance with the approved MEL procedures. Compare open MEL's listed on the MEL Control Log with the Dispatch Release. If any differences are found the PIC must contact System Control to correct the differences.

Perform the preflight inspection of the aircraft. If any discrepancies are noted they must be documented in the Aircraft Maintenance & Flight Log and System Control notified.

Airworthiness Release is valid as follows:

a. Beech 1900 - four (4) flight days and may be extended on a daily basis, if authorized by maintenance control. Enter the extension in the aircraft maintenance logbook.

b. Saab 340 - three (3) calendar days and may be extended on a daily basis, if authorized maintenance control. Enter the extension in the aircraft maintenance logbook.

No aircraft may be operated with inoperable equipment or instruments unless the operation is in accordance with an approved Minimum Equipment List (*MEL*) for the aircraft type and/or Colgan Air's DMI procedures.

Review of the Aircraft Maintenance and Flight Log for the accident flight revealed a discrepancy, which stated, "Flt. Data Recorder needs downloading due to mx. Replacement of Elevator trim cable (Fwd. Most)." The discrepancy was entered and signed by a mechanic. The discrepancy was released and signed by the same mechanic, in accordance with an approved Minimum Equipment List, and supporting control number.

**Checklists**

RAC 000285

Review of Colgan Air's Beech 1900 Company Flight Manual revealed that it was FAA approved and contained the expanded normal checklist procedures, as well as abnormal and emergency procedures, policies and procedures; all of which applied to Colgan Air flight operations.

The manual had specific guidance on the use of normal checklists and procedures, and was to be used to "ensure all safety items are accomplished." All of the checklists were to be accomplished using a challenge and response method (except for the climb and after landing checklists). The manual also gave guidance in the event that the checklist flow was interrupted. It stated;

"Interruptions to checklists increase the possibility of items being missed, which in turn may create hazards to flight operations. When interruptions occur, the crew must give consideration to restarting the checklist from the beginning, taking into consideration such factors as the length and type of interruption."

The following checklist excerpts, which were included in Colgan Air's Beech 1900 Company Flight Manual, were to have been accomplished by the accident flightcrew. The details of the checklists are focused on the elevator trim system and its related components and systems.

Preflight Inspection (Pilot Walk Around)

"A preflight inspection will be accomplished prior to every flight. A comprehensive 'Preflight Inspection – Detailed' must be accomplished on the aircraft's first flight of the day, after significant maintenance has been performed or anytime the aircraft's condition is in question."

"The Detailed Preflight Inspection will normally be accomplished by the first officer, although either or both crewmembers may complete the inspection."

The Detailed Preflight Inspection of the empennage and tail section of the airplane required that the "[Trim] Tabs are in Neutral Position."

Cockpit Scan & Origination Safety Crew Check

The Cockpit Scan provided an organized sequence for moving through the various panels within the cockpit, to ensure proper configuration of the aircraft prior to engine start. The sequence of steps was only recommended, not mandatory.

RAC 000286

The Origination Checks appeared as boxed items in the cockpit scans. They needed only to be accomplished prior to the aircraft's first flight of the day, return to service after maintenance, or if First Flight items had not been signed off in the maintenance log book.

The captain's cockpit scan was to include the verification that the elevator trim was "SET." The first officer's cockpit scan was to include the verification of the trim indicators.

Before Start Checklist

The Before Start Checklist required that the captain review the dispatch release and sign it. He was also required to review the maintenance release and the dispatch release with the first officer.

First Flight of the Day Checklist

After the engines had been started the checklist required that a "First Flight of the Day" check be performed by the flightcrew. The expanded items of the "Electric Pitch Trim" check included;

ELEV TRIM Switch.................................................................................ON
Pilot's and Copilot's Trim Switches...........................................................CHECKED

      1) Pilot's trim will override copilot's trim.
      2) Movement of only half switch will not activate trim.

Trim Disconnect Switch...........................................PRESS TO 2ND LEVEL AND RELEASE

      1) PITCH TRIM OFF Annunciator - ILLUMINATED
      2) Electric Pitch Trim - DEACTIVATED

ELEV TRIM Switch...............................................................OFF then ON

      PICH TRIM OFF Annunciator - EXTINGUISHED

Electric Pitch Trim.................................................................SET FOR TAKEOFF

Taxi Checklist

RAC 000287

According to the expanded procedures for the TAXI CHECKLIST, it instructed the Captain to "Verify proper trim indicator positions (UP 2 Units UC & 3 Units UE, Roll 0, Yaw 0) and state 'SET'." Procedures also instructed the First Officer to complete the same task.

For informational purposes of this report, the following checklists, which dealt with the elevator trim system, were available to the flightcrew.

Abnormal Checklist

The Colgan Air Beech 1900 Company Flight Manual section for abnormal procedures (UE Airplanes) included a checklist for "ELECTRIC PITCH TRIM INOPERATIVE (PITCH TRIM OFF Annunciator)." The checklist item was;

- ELV TRIM Switch CYCLE OFF and BACK to ELEV TRIM

The checklist was a command and response checklist, with the corrective task being accomplished by the NFP at the direction of the captain.

Emergency Checklist

The Colgan Air Beech 1900 Company Flight Manual section for emergency procedures (UE Airplanes) included a checklist for "UNSCHEDULED ELECTRIC ELEVATOR TRIM (IF INSTALLED)."

The memory items (to be performed by the flying pilot) were;

1. Airplane Attitude........................................................MAINTAIN (using elevator control)

2. Control Wheel Disconnect Switch....................DEPRESS FULLY (PITCH TRIM OFF Annunciator ILLMINATED)

The checklist items were;

3. Manually re-trim airplane

4. Elev Trim Switch (located on the pedestal)...........................OFF (PITCH TRIM OFF Annunciator EXTINGUISHED)

The checklist was a command and response checklist, with the corrective task being accomplished by the NFP at the direction of the captain.

RAC 000288

I.    **Manufacturer Approved Flight Manual Procedures**

According to a Beech 1900D Airliner FAA Approved Airplane Flight Manual, Normal Procedures section, it provided procedures by flight phase, which included preflight inspection procedures.

The preflight inspection process was to be initiated in the cockpit area, and the pilot performing the inspection was to assure that the elevator trim was "SET 1 1/2 UNITS NOSE UP." The pilot was to then proceed outside the airplane, where the elevator trim tabs was verified in the "NUETRAL POSITION." The elevator trim tab neutral position was determined by observing that the trailing edge of the elevator trim tab aligns with the trailing edge of the elevator, when the elevator is resting against the downstops with the elevator trim wheel set 1 1/2 units up.

The Beech 1900D Airliner FAA Approved Airplane Flight Manual, Normal Procedures section, also provided guidance to set the elevator trim for take off. It included:

Elevator Trim...SET FOR TAKEOFF

    - Set trim in FWD range for C.G.'s in forward half of envelope.
    - Set trim in AFT range for C.G.'s in aft half of envelope.

I.    **Simulator Evaluations**

Members of the Operational Factors Group convened at Flight Safety International (FSI), Flushing, New York, on November 25, 2003, to observe company procedures in a Beech 1900 simulator.

The FSI simulator was an FAA certified Level "D" Beech 1900 full motion simulator. It had cockpit controls and displays similar to the accident airplane with some minor differences. The Operations Group agreed that 1 unit of trim movement on the manual trim wheel, would equal 1.6 degrees of trim tab movement on the elevator. Due to the limitation of the simulator trim system, the maximum downward trim setting was about 5 units. The trim system was not reversed for the tests.

The simulator was pre-programmed with the following parameters:

            Departure Airfield - HYA runway 24
            Takeoff weight - 13,907 pounds
            Fuel - 3,200 pounds
            C.G - 281 inches
            Flaps - 0 degrees
            Power Setting - 3,500 pounds of torque

RAC 000289

Temperature - 23 degrees Celsius
Wind - 240 degrees at 5 knots

A simulator plan was developed by the Operational Factors Group that would incorporate the use of ATC communications, FDR data, recorded weather data, and Colgan Air SOPs. The goal of the plan was to observe the performance of the simulator as it was flown though pre-determined scenarios, and to observe pilot reactions.

The Operations Group agreed to the following:

The takeoff trim setting would be set to .5 units down prior to application of power, based upon the FDR data, as opposed to 3 units UP as specified in the taxi checklist. About 5 seconds after rotation, the pilots control wheel trim switch would be deactivated, and the manual trim wheel would be rotated an additional 1.5 units down. About 20 seconds after rotation, the manual trim wheel would be rotated downwards to it's stop. About 30 seconds after rotation, the airplane would be turned to the left, increasing the turn to about 30 degrees of bank. After the 90-degree point of the turn, the power would be decreased to idle. The turn would be continued until the 180-degree point.

An FSI instructor operated the simulator during the evaluations.

A pilot from Colgan Air Inc. occupied the left seat as the flying pilot, and a representative from the FAA, who had extensive experience in Beech 1900's, occupied the right seat and would perform the duties of NFP. The captain was assumed to have been the flying pilot.

During the first test flight, the airplane was positioned onto the approach end of runway 24. Power was applied to the pre-determined setting of 3,500 pounds of torque, and the brakes were released. Upon liftoff, the pilot flying commented that the airplane was extremely heavy during and after the rotation. About 5 seconds after the rotation, the NFP rotated the manual trim wheel about 1.5 degrees downward. The pilot noticed an increase in downward pressure. About 20 seconds after rotation, the NFP rotated the manual trim wheel to it's full nose down position. The airplane continued to climb to an altitude of about 1,200 feet indicated. Upon reaching the 90-degree point in the turn, the NFP decreased the power to idle. The airplane instantly began a descent, and the pilot attempted to maintain control. The airplane continued the descent and impacted the water at a nose down attitude; however, the simulators hydraulic limits were exceeded during the pilot's attempt to pull after power reduction. The pilot's were not able to arrest the descent.

The second test flight was performed using the same profiles. All of the same findings were noted as the first test.

RAC 000290

Additional test flights were performed to observe the simulators performance to different pilot inputs. All of the same flight control, power, and timing settings were used for the tests, unless noted.

On the third test flight, after the 90-degree point, the power was reduced in increments, about 400 pounds of torque at a time, until the power was at the idle position. The airplane continued the descent, and with both pilots pulling on the yoke, the pilot's were not able to arrest the descent.

On the fourth test flight, the power was reduced to the idle position, and then gradually increased to maintain an IAS of 170 knots IAS, +/- 10 knots. The airplane continued the descent, and was unrecoverable.

On the fifth test flight, the right seat occupant flew the airplane. As the power was reduced at the 90-degree point, the airplane began a decent. The airplane continued the descent, and was unrecoverable.

On the sixth test flight, the power was reduced gradually to maintain an IAS of 170 knots, +/- 10 knots. The airplane continued the decent; however, the airplane was flown to the ground, touching down at an IAS of 180 knots.

The group elected to discontinue the testing due to fatigue of the test pilots, and the fact that the test pilots were becoming to familiar with the flight control malfunction.

The Operational Factors Group concluded simulator evaluations and observations on November 25, 2003.

Submitted by:

Stephen M. Demko
Senior Air Safety Investigator, NERA
January 12, 2004

RAC 000291

# EXHIBIT 9

DWIGHT LAW

Colgan Air, Inc v. Raytheon Aircraft Company                    9-13-2005

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3               ALEXANDRIA DIVISION

4

5   - - - - - - - - - - - - - - - X

6   COLGAN AIR, INC.,                    :

7                Plaintiff,              :

8        vs.                    : No.

9                            : 1:05CV213

10  RAYTHEON AIRCRAFT COMPANY,           :

11               Defendant.              :

12  - - - - - - - - - - - - - - - X

13                   Reston, Virginia

14                   Tuesday, September 13, 2005

15        Deposition of DWIGHT LAW, called for

16  examination by the counsel for the Plaintiff,

17  pursuant to notice, at the offices of Hall,

18  Sickels, Frei, Kattenburg, 12120 Sunset Hills

19  Road, Suite 150, Reston, Virginia, before Julia

20  A. Thomas, a Registered Merit Reporter and a

21  Notary Public in and for the District of

22  Columbia, beginning at 10:10 a.m., when were

23  present on behalf of the respective parties:

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                                9-13-2005

82

1          Q      Do the left-hand threads cable from

2     the pedestal tab control come off the aft side

3     or the forward side of the barrel?

4          A      Aft side.

5          Q      That's what this figure depicts?

6          A      Yes.

7          Q      That the left?

8          A      With reference to the cable that you

9     just --

10         Q      The left-hand threads cable comes off

11    the aft?

12         A      Excuse me, I'm looking at this upside

13    down.  Do you mind if I turn it around?  The

14    left-hand threads are off of the forward section

15    of the cable.  I'm used to looking at this right

16    side up.

17         Q      Okay.  So the left-hand threads cable

18    from the pedestal tab come off the forward side

19    of the barrel?

20         A      Yes.  Shown here.  This arrow shows

21    forward, this is the forward cable.  And

22    left-hand thread cable from the pedestal tab.

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                              9-13-2005

125

1    steps in the procedure.

2         A    That's what it says.

3         Q    Am I correct in understanding that

4    each of the steps in there is sufficiently

5    important that it might cause injury or death if

6    not followed?

7         A    If the warning states perform all

8    steps of this procedure, comma, in the order

9    listed, do not skip any steps of this procedure.

10        Q    Looking down to step U on that page,

11   then, it talks about installing a cable block?

12        A    Yes.

13        Q    Are you familiar with what a cable

14   block is?

15        A    Yes.

16        Q    What is it?

17        A    It's a block of wood or phenolic

18   that's used to clamp a cable or a series of

19   cables together so that it would hold them in

20   position and keep them from being moved during

21   maintenance operations and replacements, cable

22   maintenance in general and for rigging purposes

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company

9-13-2005

126

1    from time to time.

2        Q    And looking on the second page of your

3    report, you indicate the cable elevator trim

4    cables were not properly blocked resulting in

5    the cable unwinding off the forward drum.  How

6    do you know the cable unwound because of a

7    failure to properly block?

8        A    It slacked.  If you didn't block them,

9    you disconnected them, the cables go to slack.

10   If any movement to the trim quadrant were to

11   occur, the potential for the cable coming off of

12   the drum is very high.

13       Q    Do you have any basis in the record

14   for that conclusion, for that possibility, I

15   guess?

16       A    Well, it's known because of the

17   documents that I've read that that did not

18   occur.  And, in fact, that the cable did come

19   off the drum on the first attempt to repair the

20   airplane and it was danged as a result of that.

21   So they had to replace it.

22       Q    Okay.  Did you give any consideration

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                                    9-13-2005

128

1    to the forward cable coming off of its drum.

2    BY MR. ALMY:

3         Q     You didn't read anything about it?

4         A     No.  I don't recall reading anything

5    about it.  I overheard a conversation from an

6    engineer that indicated that there was no way

7    that that could happen.

8         Q     Which engineer?

9         A     I don't recall his name right now.  He

10   was a Beech engineer that was assigned to assist

11   with the processes when we were in Wichita doing

12   the filming.

13        Q     So you're assuming it was a result of

14   slack in the system that resulted in the cable

15   coming off the drum?

16        A     No, I'm not assuming that at all.

17        Q     What evidence do you have that it came

18   off?

19        A     It was reported that the first cable

20   that they were -- when they were doing

21   maintenance on the tail of the airplane, it's my

22   understanding that the first cable came off of

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                              9-13-2005

129

1    the drum.  It's also my understanding that it

2    had nothing to do with the trim actuators.  It

3    had everything to do with the fact that they had

4    not blocked the cables when they were performing

5    the maintenance.

6          Q    And where did that understanding come

7    from?

8          A    I have read a lot of documents in

9    this.  It was probably depositions of mechanics

10   that stated that they hadn't blocked them.

11         Q    Okay.  Where is it -- did you come to

12   your understanding that the failure to block

13   caused the elevator or the elevator trim drum,

14   forward trim drum cable to come off the drum?

15         A    Well, if they were blocked correctly,

16   then somebody was moving the trim while the

17   cables were disconnected in order to achieve

18   that derailment of that forward cable.  The fact

19   of the matter is the cable is damaged and it had

20   to be replaced.

21         Q    So other than what somebody said you

22   don't know whether the blocking resulted in the

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                    9-13-2005

134

1    to personnel and damage to the equipment?

2              MR. JONES:  Object to the form.

3    Vague.

4              THE WITNESS:  Could you rephrase the

5    question for me?  I know it was a pretty good

6    question.

7              Can you read it back to me?

8    BY MR. ALMY:

9         Q    Are you in agreement with Raytheon

10   Aircraft that the blocking, failure to block the

11   cable may result in injury to personnel and

12   damage to the equipment?

13        A    Well, I'd have to say I probably would

14   disagree in one way.  Without blocking the

15   cables you can damage equipment.  But if you

16   don't block the cables, and if you do damage

17   equipment, then certainly aircraft technicians

18   with the capability of performing the task

19   correctly would have to find the problems and

20   correct those problems before the airplane was

21   put back into service.

22              The blocking is a good idea.  It makes

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                    9-13-2005

135

 1    a lot of sense.  Blocking is one method of

 2    holding the cables into position.  It's

 3    acceptable.  It's taught in the very basics of

 4    trying to achieve an A and P license.  And in

 5    all the courses that I've ever taught in

 6    airframe, blocking was an extremely important

 7    part of the general knowledge of an A and P

 8    mechanic.

 9         Q    It's your opinion, then, that removing

10    the elevator cables or the mechanic removing the

11    elevator cables should have reinstalled them or

12    been available at the time of the reinstallation

13    of the elevator trim cables; is that correct?

14         A    I want to read along with you.  Could

15    you tell me what page?

16         Q    Page two, second dot from the bottom.

17         A    You didn't read that in the entirety

18    did you?  Do you want me to read that in its

19    entirety?

20         Q    Just answer the question.  Did the

21    mechanic removing the elevator cables, should

22    have reinstalled them or been available at the

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                          9-13-2005

139

1    already been critical of the blocking.

2        Q    So we got marking and blocking.

3    Anything else relating to the sequence?

4        A    They didn't use lead lines when they

5    removed them.

6        Q    You refer to marking.  What markings

7    are you referring to?

8        A    To identify the cables so that when

9    the lead lines are pulled through you can

10   transfer the markings to the new cable, mark

11   them, pull them back through and make a

12   reconnection to the aft cables.

13       Q    Do you know what markings are on the

14   cables, premarked?

15       A    Premarked on the --

16       Q    Yes.

17       A    It varies.  Some of the cables have

18   just an MS or an AN number.  I have seen some of

19   them have no MS or AN but they do have an L or

20   R.  I think it depends on the vendor on the --

21       Q    What's the L or the R?

22       A    Left-hand thread, right-hand thread.

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                    9-13-2005

152

1    BY MR. ALMY:

2        Q      Yes or no?

3              MR. HALL:  I'm not sure it can be yes

4    or no.  You talked about the figure with the

5    arrow forward as installed.

6    BY MR. ALMY:

7        Q      You can look at it.  It's Figure 201.

8        A      They're stating, of course, which is

9    installed that way that it will be reversed.

10       Q      Correct.  That's the way A.J. did it?

11       A      No.  Because you can't install it that

12   way.  You have to turn it 180 degrees to get it

13   into the system.  You have to do that.  And

14   there is nothing that says to rotate this thing

15   180 degrees before you put it on.

16       Q      If you install the cable the way

17   Figure 201 indicates and then turn the drum

18   around 180 degrees and install it, you will get

19   reverse trim operation?

20       A      That's correct.

21       Q      And what A.J. did was wrap the cable

22   on in accordance with Figure 201 and then turn

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                                    9-13-2005

163

1    **different than the Colgan mechanics did?**

2          A    I'm not sure that he did or didn't.  I

3    don't remember whether Colgan actually marked

4    that at the bend.  But the bend is a pretty good

5    reference.  So I think that's why the note

6    indicates that it can be.  When the cable is

7    installed on the drum it sets a very slight

8    permanent bend at the center point.  If you

9    stretch the old cable out with the new cable,

10   it's an acceptable way to prepare the other

11   cable for installation on the drum.

12             Colgan didn't comply with M.  They

13   withdrew the cables from the airplane.  There

14   was no lead lines attached.

15         Q    **You indicated that he marked the**

16   **pulleys with a T.  When did he do that?**

17         A    That was done before we got there.

18         Q    **Well, you don't know who did it?**

19         A    I don't know who did it.

20         Q    **What was your understanding of what**

21   **the markings meant?**

22         A    I have no idea what they meant.  They

180

1    it was installed incorrectly.  And the airplane

2    was released with a trim system that was not

3    functional.

4         Q    I think you just said that the

5    inspections were not done properly.  I know

6    that's not precisely what you said.

7         A    Well, the operational checks to

8    confirm that the system operated as intended

9    could not have been accomplished.

10        Q    But the reason the aircraft wasn't

11   airworthy was because the trim system wasn't

12   operating properly, isn't that correct?

13        A    That's correct.

14        Q    Were there some inspections that were

15   not done or that you have some criticism with?

16        A    The operational check of the trim

17   system was not accomplished or it was not

18   accomplished properly or it would have indicated

19   that there was a complete reversal of this

20   flight control.

21             The aircraft was released with the

22   trim system operating reverse, in reverse from

**DWIGHT LAW**

Colgan Air, Inc v. Raytheon Aircraft Company                          9-13-2005

193

1        Q     Okay.  43.  Both of those require that

2    the information be provided on the aircraft log

3    for use by the pilots?

4        A     No.  The information has to be

5    recorded in the aircraft's logs, an appropriate

6    entry has to be completed before the aircraft is

7    released and returned to service.

8        Q     I guess I'm just not clear.  You said

9    they had to provide this information to the

10   pilots.

11       A     This was the first flight after

12   maintenance.  Their procedures manuals require

13   that the pilot review the maintenance that had

14   been performed on the aircraft before they take

15   this airplane into the air.

16       Q     Which?

17       A     It was first flight of the day, first

18   flight after maintenance.

19       Q     Where does it require that in the

20   Colgan procedures that the pilots review the

21   maintenance?

22       A     If I could have another short break,

Colgan Air, Inc v. Raytheon Aircraft Company                    9-13-2005

195

1          The airworthiness release or log entry

2     required by paragraph A of this section must,

3     one, be prepared in accordance with the

4     procedures set forth in the certificate holder's

5     manual including a certification that the work

6     was performed in accordance with the

7     requirements of the certificate holder's manual,

8     all items required to be inspected were

9     inspected by an authorized person who determined

10    that the work was satisfactorily completed, no

11    known conditions exist that would make the

12    airplane unairworthy, and, so far as the work

13    performed is concerned, the aircraft is in a

14    condition for safe flight, and be signed by an

15    authorized certificated mechanic or repairman

16    except that the certificated repairman may sign

17    the release or entry only for the work for which

18    he is employed or certificated.

19          Notwithstanding paragraph B3 of this

20    section, after maintenance, preventative

21    maintenance, or alterations performed by a

22    repair station certificated under the provisions

# EXHIBIT 10

Page 1

Vol. 1, Pgs. 1-328                     Exhibits 1-11

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - CONSOLIDATED UNDER

YISEL DEAN, et al.                    CASE NO. 05-10155 PBS

        Plaintiffs

v.                                    CA No. 05 CV 10155 PBS

RAYTHEON COMPANY, a Delaware

corporation, et al.

        Defendants

- - - - - - - - - - - - - -

LISA A. WEILER, et al.

        Plaintiff

v.                                    CA No. 05 CV 1034 PBS

RAYTHEON COMPANY, a Delaware

corporation, et al.

        Defendants

- - - - - - - - - - - - - -

DEPOSITION of JOHN J. GOGLIA

Monday, September 18, 2006 - 9:20 a.m.

Dwyer & Collora, LLP

600 Atlantic Avenue

Boston, Massachusets

Reporter:  Jill K. Ruggieri, RMR/CRR

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 78

1   A   Ultimately?
2   Q   Yes.
3   A   We went to the tail, because the airplane
4       was having control problems.  The flight
5       data recorder, while we were still on scene,
6       gave us some valuable information that led
7       us back there.
8   Q   Okay.
9   A   So while all the other things continued to
10      be done, a special focus will start zeroing
11      in on that area.
12  Q   And eventually, the probable cause of the
13      accident was determined by the NTSB?
14  A   Yes, yes.
15  Q   What was the probable cause?
16  A   Oh, it was misrigging the airplane, as a
17      broad statement.  I don't remember verbatim
18      what it said.
19  Q   Do you know what portion of the tail was
20      misrigged?
21  A   It was an elevator.
22  Q   Not elevator trim?
23  A   Well, it could have been the trim.  I don't
24      remember.

Page 79

1   Q   You don't remember?
2   A   (Witness shakes head.)
3   Q   And in connection with your investigation in
4       this case, did you ever go back and look at
5       the Charlotte accident?
6   A   No.  Other than what my memory provided.
7   Q   Well, this case involves elevator trim?
8   A   Mm-hmm.
9   Q   Which is certainly different rigging from
10      elevator trim, right?
11          MR. BUNIS:  Objection.  I think you
12      may have misspoken.
13  A   Yes, you said the same thing twice.
14          MR. BUNIS:  I think you said this
15      case involves elevator trim which is
16      certainly different from elevator trim.
17          MR. KNIGHT:  Oh, did I say that?
18      Well, let me correct it.
19  Q   The case involving Hyannis involves elevator
20      trim, right?
21  A   Yes.
22  Q   The case involving Charlotte, do you know
23      whether or not that involved elevator
24      rigging as opposed to trim?

Page 80

1   A   I believe it was elevator rigging.
2   Q   So that's a different set of system?
3   A   Different cables.  Related but different.
4   Q   Well, it's in the -- it's connected to the
5       elevator, but it's --
6   A   Yes.
7   Q   It works differently?
8   A   Yes.
9   Q   And you indicated that you were responsible
10      for that investigation as the designated
11      NTSB member for Charlotte?
12  A   Responsible's not the right word, probably.
13  Q   Okay.
14          Why don't you --
15  A   Because the IIC is responsible for the
16      investigation.
17  Q   Right.
18  A   The board member is responsible for
19      communications in a number of different
20      areas, and in a general sense to ensure that
21      the IIC has everything necessary to
22      accomplish the job.
23  Q   Okay.
24          You went down to Charlotte once?

Page 81

1   A   Correct.
2   Q   Do you remember when that was?
3   A   The very day of the accident.  That happened
4       in the morning, and I believe we left
5       Washington, DC at noontime.
6   Q   As part of the Go Team?
7   A   As part of a Go Team.
8   Q   And you stayed down there for three days?
9   A   Roughly.
10  Q   Following that, do you ever remember having
11      conversation with anybody from Raytheon
12      about any aspect of the Charlotte accident?
13  A   Oh, yes.
14  Q   Okay.
15          Who did you talk to?
16  A   I think very early on, it was Mike Scheidt.
17  Q   Do you remember what conversation you had
18      with him?
19  A   It was just in a general sense about the
20      accident.  I had -- I consider Mike Scheidt
21      to be a friend.  We had developed a
22      relationship because of my work with
23      Raytheon around the accident at Quincy,
24      Illinois where when that accident

21 (Pages 78 to 81)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 122

1  would be reasonable in expecting that the
2  mechanic would follow it?
3  A  Yes.
4  Q  And the manufacturer would likewise be
5  reasonable in expecting that the maintenance
6  mechanic would stop if there were any
7  confusion or ambiguity or any question about
8  how to carry out the task, right?
9  A  Yes.
10  Q  This -- what you called a super-find
11  discovery of validation, do you --
12       (Pause.)
13  A  Okay.
14  Q  Do you have in mind my -- the beginning of
15  my question?  I'll repeat it.
16  A  Please repeat it.
17  Q  You're going to send me a note there?
18  A  I have -- I wrote down something that I
19  would like to follow on with what you just
20  said.
21  Q  Well, would you do it right now so we don't
22  lose our train of thought?
23  A  Okay.
24       When you talked about the

Page 123

1  manufacturer reasonably being expected and
2  so on and so on, there was two questions
3  there.
4  Q  Yes.
5  A  On the flip side of that, it's also
6  reasonable for the mechanic to expect that
7  the maintenance manual will be accurate and
8  that it will be correct.
9       Because as an FAR requirement under
10  121/135, he has to follow the manual.  If
11  the manual isn't accurate and he does
12  something, he's committed a violation.
13       So he gets nailed by the FAA by
14  violating and not following the manual, but
15  the manufacturer has given him instructions
16  that are not adequate to have him accomplish
17  the task.
18       So they're partners at this point in
19  time.
20  Q  Mm-hmm.
21  A  If the manual is not accurate, they're going
22  to serve the mechanic up to the FAA.
23  Q  Yes?
24  A  And that's the area that I've been working a

Page 124

1  lot in.
2  Q  But in terms in aviation safety, you don't
3  dispute the notion that if there's any
4  doubt, any confusion, that the mechanic
5  should stop?
6  A  That's correct.
7  Q  Because he has to follow the manual?
8  A  Yes.
9  Q  And if the manual doesn't make it clear to
10  him, he should stop?
11  A  Yes.
12  Q  All right.
13       Now, this -- what you call this
14  super-find discovery of validation, which
15  Mr. Scheidt discussed with you regarding
16  manuals and keeping those manuals accurate
17  and up to date, do you know of any other
18  aircraft manufacturer that has such a system
19  in place?
20  A  Oh, yes, they all have it, a validation
21  process, yes.
22  Q  Okay.
23       And do you know specifically which
24  ones do?

Page 125

1  A  Well, I'm very familiar with Boeing's.
2  Q  Boeing?
3  A  Boeing's process of validation.
4  Q  How does that work?
5  A  They actually take the manuals beforehand --
6  in the year --
7       Let's back up a second.
8       In the year that the manufacturers --
9  about a year -- the manufacturer flies the
10  finished product in its certification
11  trials, what they will do is --
12  Q  The year before?
13  A  Before they give it to an airline to fly, so
14  let's take the 777, for example.  United
15  got -- I think United got the first one.
16       For a year before that, they flew
17  that airplane all around the world.  Some of
18  it was sales tours.  Some of it was
19  operating experience, ETOPS experience.
20       And what they did was all the
21  maintenance they performed on that airplane
22  they did in accordance with the manual.
23  They actually took the manual with them.
24       The manufacturer doesn't have to do

7a12d1e8-0180-4dbb-808c-f31ebff863a2

| | Page 150 |
|---|---|

1  A   About proceeding to do some work.
2  Q   What work?
3  A   Continuing with this repair.  They kept
4      calling -- they called Raytheon three times
5      that night.  I don't know how many times
6      they stopped --
7  Q   What was the subject matter of those
8      telephone calls?
9  A   All I know is that they called.  I don't
10     know.
11 Q   You don't know if it was about part numbers
12     and actuators?
13 A   I know some was part numbers and actuators.
14     All part of the job.
15 Q   Did any of it in your understanding have
16     anything to do with how to wrap the cable
17     around the drum?
18 A   I have no knowledge of that.
19 Q   Okay.
20         Anything with any of the basics of
21     the procedures, about blocking, using lead
22     lines, anything like that?
23 A   Not that -- I'm not aware of any of that.
24 Q   All right.

| | Page 151 |
|---|---|

1          So you are aware of what's in the
2      deposition?
3  A   Right.
4  Q   And that had to do with actuators; is that
5      correct?
6  A   That's the only questions that were asked.
7  Q   All right.
8          But, again, let's be more -- let me
9      be more specific with respect to the
10     maintenance people.
11         Putting aside the use of the
12     actuators and which part numbers would be
13     the proper actuator to be used, just the
14     procedure for replacing the cables for the
15     elevator trim system --
16 A   Okay.
17 Q   -- would you agree that it's basic practice
18     that they would know that the elevator trim
19     system is under tension?
20 A   Yes.
21 Q   And if the elevator trim system is under
22     tension, then you would expect them to know
23     that if they released the tension, it could
24     very easily come off the drum?

| | Page 152 |
|---|---|

1  A   Yes.
2  Q   And if it came off the drum --
3  A   Off the pulleys, is probably what they would
4      know.
5  Q   Off the pulleys?
6  A   Mm-hmm.
7  Q   Well, if the tension was released off the
8      pulleys, it would be -- the tension would
9      also be released off the drum; isn't that
10     correct?
11 A   Yes, but the drum is a lot -- the cables in
12     the drum are more tightly controlled than on
13     a pulley.
14 Q   Okay.
15         But in any event, they would know
16     that by releasing the tension, the cables
17     could very well come off the drum?
18 A   Yes.
19 Q   And they would know that they could get
20     kinked when they came off the drum, right?
21 A   Well --
22 Q   Possible?
23 A   One of the possibilities.
24 Q   Right.

| | Page 153 |
|---|---|

1          And so one of the first things that
2      they had to be aware of as a certified A&P
3      is to block the cables, right?
4  A   Yes.
5  Q   What is blocking the cables?
6  A   It just means capturing them, keeping some
7      tension on them.
8  Q   Keeping the tension on them?
9  A   You can't keep a lot of tension but just a
10     little bit.
11 Q   Enough to keep them on the drum and the
12     pulleys?
13 A   Yes.
14 Q   And they would know that as a certified A&P?
15 A   Yes, but if it doesn't call that out in the
16     manual, they can't do it legally.
17 Q   You're saying because something isn't in the
18     manual such as blocking, they can't legally
19     do it?
20 A   Yes.  You have to follow the instructions
21     for continued -- in a 121 environment.
22 Q   Are you saying that under 121, they could
23     not block the cables because it -- because
24     blocking the cables was not part of the

39 (Pages 150 to 153)

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 158

1 opinion, was the manufacturer in this case,
2 Raytheon, reasonable in expecting that
3 certified maintenance mechanics would use
4 lead lines in this case?
5 A    I think the manufacturer was reasonable in
6 expecting anybody to perform maintenance to
7 follow the manual.
8 Q    What about the use of lead lines?
9 A    That's in the manual.
10 Q    The manual says to use lead lines?
11 A    Yes.
12 Q    And they didn't use lead lines?
13 A    That's correct.
14 Q    And as a result, they crossed the cables?
15 A    Correct.
16 Q    And as a result, the accident happened?
17 A    Correct.
18 Q    So do you fault the maintenance personnel in
19 not using lead lines in this case?
20 A    I fault a number of people, including the
21 maintenance people.
22 Q    Because certainly the maintenance people, if
23 they had used lead lines, this accident
24 wouldn't have happened?

Page 159

1 A    They would have not crossed those cables,
2 which made it convenient to put the drum in
3 by the picture instead of the way it should
4 have been.
5      It helped facilitate that.
6 Q    What helped facilitate --
7 A    By crossing the cables, it helped facilitate
8 their ability to put the cable on the
9 drum --
10 Q    Right.
11 A    -- the way it was depicted in the diagram as
12 compared to the way it should have been.
13 Q    Because the only way to get the cables to
14 connect on the drum the way they wrapped it
15 is to cross the cables?
16 A    Somewhere.
17 Q    All right.
18      Does virtually every maintenance
19 mechanic know that when the trim tab goes
20 up, the nose of the airplane goes down?
21 A    When they focus on it, yes, but I'll tell
22 you what, once you get away from it, you've
23 got to really stop and think again.
24 Q    You said you've learned -- you don't have a

Page 160

1 pilot's license, but you've learned how to
2 fly, right?
3 A    I was a student pilot.
4 Q    What airplane?
5 A    J2, J3.
6 Q    Does it have trim on the elevator?
7 A    No.
8 Q    Had no trim?
9 A    I don't recall the trim.
10 Q    Have you ever flown an airplane with trim?
11 A    Yes.
12 Q    Like what?
13 A    A Piper Tri-Pacer.
14 Q    Did you manipulate the trim when you flew
15 it?
16 A    I don't recall.  I'm sure I did.
17 Q    It's pretty basic how trim works?
18 A    (Witness nods.)
19 Q    Isn't it?
20 A    Well, it is pretty basic, but you really
21 just follow the arrows when you look down,
22 so you're looking nose-up or nose-down, and
23 trim accordingly, or left or right if you
24 have a rudder trim.

Page 161

1 Q    And it has an immediate effect on the yoke?
2 A    Yes.
3 Q    Or the stick?
4 A    Yes.
5 Q    Right?
6 A    Subtle but immediate, yes.
7 Q    But any maintenance mechanic understands how
8 trim works, elevator trim?
9 A    Yes, it's taught in school in the basic
10 form, yes.
11 Q    Right and so isn't it also basic to any
12 maintenance, if you make a repair on any
13 system, you test it to see if it works?
14 A    Yes.
15 Q    And with respect to aviation maintenance,
16 it's even more important, isn't it?
17 A    As compared to?
18 Q    Well, if you attempt to fix something in
19 your car and it runs out of gas or
20 something, you didn't check it, you might
21 just pull over on the side of the road with
22 no risk of harm to anybody, right?
23 A    The mechanical tasks, whether it's in a car
24 or an airplane, there's some that are very

Page 170

1    wasn't the manual.
2  Q    So getting back to our pilot, isn't it true
3    that it's just one more provision for safety
4    that a pilot will check the system that was
5    worked on as part of his preflight to make
6    sure that it works?
7  A    You can't answer that question yes because
8    you have to -- does the pilot know what was
9    worked on to check?  Does he know how to
10    check what was worked on?
11        What does the flight operations
12    manual call for him to check on?
13        So there's many pieces --
14  Q    In this case, do you know whether or not the
15    pilot knew what was being worked on?
16  A    He had some knowledge of what was going on.
17  Q    What knowledge did he have?
18  A    Well, he showed up early for the flight, and
19    it wasn't ready, so he knew they were in
20    there working.
21        Did he know which system they were
22    on?  Again, I don't know.
23  Q    All right.
24        With respect to basic requirements of

Page 171

1    maintenance, one of -- we've already agreed
2    there are at least two rules:  If you have
3    any questions, stop.  Number two, follow the
4    manual.
5        Would the third rule be that in
6    carrying out any maintenance or repair on
7    flight control systems that the maintenance
8    personnel would want to test to make sure
9    that the system worked as it was intended?
10  A    I will answer yes, with my understanding of
11    testing in the context that you just used
12    it, which is an operational check.
13  Q    An operational check.  Okay.
14        And when an operational check with
15    the elevator trim system, if the operational
16    check is to be carried out properly, you
17    would properly have a man or woman in the
18    cockpit, as well as one at the tail; is that
19    right?
20  A    That's correct.
21  Q    And then there would be some communication
22    between the two, right?
23  A    That's correct.
24  Q    And you would -- with respect to the

Page 172

1    maintenance personnel at the tail, they
2    would be in a position to see whether or not
3    the trim tab was moving up or down?
4  A    Correct.
5  Q    Right?
6        And you were able to see that on a
7    1900, right?
8  A    Yes.
9  Q    And the person in the cockpit would be able
10    to see which way the -- the trim wheel was
11    moving when the trim tab was moving at the
12    rear, at the tail, right?
13  A    Correct.
14  Q    And the person at the -- at the controls
15    would also be expected to operate the
16    electric trim system; is that correct?
17  A    That's correct.
18  Q    And he would operate the trim system with
19    his thumb; is that where it is?
20  A    Pickle switch, they call it.
21  Q    Pickle switch.
22        You push forward, and it's nose down.
23    Push back, nose up?
24  A    Correct.

Page 173

1  Q    Right?
2        And the pilot in doing that would
3    certainly see how the wheel was moving,
4    right?
5  A    He would see the wheel is moving.
6  Q    You would see which direction it was moving?
7  A    Well, if he focused on it, yes, and if the
8    FOM called for -- well, I don't know what
9    the FOM says, so...
10  Q    What is the FOM?
11  A    Flight operations manual.
12  Q    Yes.
13        And the flight operations manual also
14    requires the pilot to do a preflight; isn't
15    that also true?
16  A    Yes.
17  Q    And the -- part of the preflight is to
18    operate the trim system electrically, right?
19  A    Just to see if -- I don't think it says to
20    go full travel, but just to see if it moves.
21  Q    All right.
22  A    Yes.
23  Q    And the pilot sitting there with a copilot
24    next to him and operating the trim system,

44  (Pages 170 to 173)

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 178

```
1            But if he says I just moved it, okay,
2       and I see it up and I'll look at the
3       protractor and say I'm looking for 15
4       degrees, picking a number --
5    Q   That would be an inadequate check?
6    A   That's right.  And that's why you include
7       those checks in the manual.
8    Q   Now, getting back to the -- what basic
9       maintenance practices require in an
10      operations check, you indicated full range
11      of movement; is that correct?
12   A   Yes.
13   Q   To the stops?
14   A   Right, yes, to the stops, right.
15   Q   And you would operate -- in doing an
16      operations check, you would do that with the
17      electric trim system and the manual trim
18      system, right?
19   A   Common sense says you would do it, but
20      oftentimes you would do it maybe with the
21      manual system and make sure the electric
22      trim is running.
23   Q   Okay.
24           So if you did it with the manual
```

Page 179

```
1       system, you would want to make certain it
2       went to the designated stop points on the
3       wheel, right?
4    A   Mm-hmm.
5    Q   Yes?
6    A   Yes.
7    Q   Well, the maintenance people in this case
8       that worked on this elevator trim system
9       could not have done that, could they?
10   A   No, they could not have done that.
11   Q   So they didn't do an operations check,
12      right?
13   A   They didn't do a full check as I -- as you
14      would find it in the maintenance manual for
15      rigging.
16   Q   They didn't do --
17   A   Maybe we ought to call it a functional
18      check.
19   Q   They didn't do a functional check to
20      determine whether or not the trim system
21      went to the full range of movement?
22   A   I understood that they did do --
23   Q   Well, they could not have checked the wheel,
24      because if they had put the trim tab full up
```

Page 180

```
1       or full down, it would not -- the wheel
2       would not have had the marking on it that
3       would have been appropriate for full up or
4       full down?
5    A   Okay.  Yes.
6    Q   Right?
7    A   Yes, all right.  That's different than what
8       you asked me a minute ago.  Okay?
9    Q   So they didn't do that check?
10   A   They did not compare full travel with the
11      markings on the wheel, assuming the markings
12      were there and --
13   Q   If they had done that, they would have known
14      there was a discrepancy?
15   A   Yes.
16   Q   And they would have stopped, hopefully?
17   A   Yes.
18   Q   Right?
19   A   Yes.
20   Q   You agree that a -- an original equipment
21      manufacturer such as Raytheon is in a
22      position to reasonably expect that
23      maintenance personnel working on its
24      aircraft for repairs to flight control
```

Page 181

```
1       systems will carry out an operational check
2       which would include full range of movement
3       not only based on the electrical trim system
4       but also the manual trim system; is that
5       correct?
6    A   I would expect the instructions for
7       continued airworthiness -- I would expect
8       those to be complete and whatever was
9       required to be contained therein.
10   Q   And would you agree it is reasonable to
11      expect that maintenance personnel in
12      carrying out repairs on flight control
13      systems will carry out the customary
14      operational functional check to make sure
15      that the system works the way it's intended?
16          MR. BUNIS:  Objection.  You can
17      answer.
18   A   Yes, I would expect them to follow the
19      instructions.
20   Q   And the maintenance people for Colgan who
21      worked on this airplane could not have done
22      that; isn't that correct?
23   A   That's correct.
24   Q   Do you fault them for that?
```

46 (Pages 178 to 181)

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 190

```
 1   A   Well, they'd have a problem.  Work on it,
 2       have a problem -- when I went back, I think
 3       there was one new guy there.  He may not
 4       have been new to Colgan but new to the
 5       station.
 6   Q   Yes?
 7   A   And there was some discussions around what
 8       to do next.
 9   Q   He didn't have the experience to know?
10   A   He was trying to follow the paperwork and he
11       couldn't, so there was some verbalization of
12       the problem back.
13   Q   Yes.
14   A   And I didn't study it, but just from what I
15       saw, it had my -- had me concerned.
16   Q   You had to wonder why they didn't block the
17       cables.
18   A   There's a whole -- a bunch of steps that I
19       wonder why they didn't do.
20   Q   They didn't use lead lines.
21           You had to wonder about that?
22   A   Right.
23           I'm less concerned with the lead
24       lines than you are.  The blocking on the
```

Page 191

```
 1       cables I'm concerned with, because you're in
 2       the tail, things fall down the side, it's a
 3       pain in the neck to get to.
 4           If you've been around it and you've
 5       routed them before, that's --
 6   Q   Had they ever done a routing of the elevator
 7       trim cable before?
 8   A   I didn't see that answered directly, but
 9       there was comments ind irectly you could get
10       the cables through there, so somebody
11       obviously in that group was there.
12   Q   And then they kinked the cables and went to
13       replace it and rewrapped it on the drum and
14       wrapped it incorrectly?
15   A   Okay.  Follow the picture instead of the
16       instructions, which is common when you can't
17       read the words, you look at the picture.
18           (Exhibit No. 11 marked for
19       identification.)
20   BY MR. KNIGHT:
21   Q   Is what has been marked as Exhibit --
22   A   11.
23   Q   -- 11 the figure that you're talking about?
24   A   Yes.
```

Page 192

```
 1           What's the date on that?  What's the
 2       date on that?  Is that preaccident or
 3       postaccident?
 4   Q   This comes from one of the plaintiffs'
 5       experts' opinions.  It has some text above
 6       it which we can disregard for purposes of my
 7       question, but this is the figure --
 8   A   My question was, is that the picture
 9       preaccident or postaccident, because it
10       changed postaccident.
11   Q   The plaintiffs' expert says this is the
12       incorrect depiction of the trim drum.
13   A   Okay.
14   Q   Assume that Figure 11 shows the incorrect
15       depiction.
16   A   Okay.
17   Q   What is incorrect about that, Mr. Goglia?
18   A   Well, as you're sitting on the pedestal, if
19       you don't pay attention to what's forward,
20       in this case, forward is back, and that
21       arrow is not very prominent.
22   Q   The arrow forward as installed?
23   A   Mm-hmm.
24   Q   So --
```

Page 193

```
 1   A   So the typical layout --
 2   Q   So you think that should have been larger
 3       print?
 4   A   Definitely should have been in larger print.
 5       The arrow should have been clearer.
 6           In almost all the drawings, this type
 7       of drawing in the manuals, forward is always
 8       away from you, so it's in some ways
 9       counterintuitive.
10   Q   Is that the error of the figure?
11   A   I would say that's the most glaring one.  I
12       don't see any others.  It's pretty thin;
13       pretty skimpy drawing.
14   Q   So if they had seen the arrow forward as
15       installed --
16   A   Would have been a big clue.
17   Q   -- then they would have -- they would have
18       wrapped it correctly?
19   A   Right.
20           Because, you know, what you're going
21       to do if you have the paperwork and you're a
22       little bit unfamiliar, you're going to take
23       this out and you're going to have it at the
24       pedestal where you're doing the work; and
```

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 194

1     essentially this drum is accessible through
2     the left-hand side of the pedestal.
3         So as you're looking at this and the
4     pedestal, it's backwards; it's opposite.
5     You need to have it this way (indicating).
6  Q   And do you know if it's able to be installed
7     as it's depicted in this figure?
8  A   As --
9  Q   Can it be installed on pedestal?
10 A   No, no, it can't.
11 Q   As it's depicted?
12 A   No, it can't.
13 Q   You read the deposition testimony of the
14    maintenance people at Colgan, right?
15 A   Yes.
16 Q   And what is your basis, if any, of -- of
17    suggesting that they were confused or
18    uncertain about how to proceed with this
19    step?
20 A   Just in the way they talk about it.
21        You guys deposed them, or somebody --
22    I shouldn't say you guys. Somebody deposed
23    them.
24        And if you follow the questioning,

Page 195

1     the way they answered them, you can see
2     where they're uncertain.
3  Q   Was there anything specific in their
4     testimony that you can point to?
5  A   No. I'm trying to think through all of
6     them, because I read four or five of them.
7     I forget how many there are.
8         Did I see a sentence that said we
9     were confused or we didn't know what we were
10    doing? No.
11        It's more like a sense from the flow
12    and how they're going that it wasn't going
13    very well.
14 Q   They did make several bad judgments along
15    the line.
16        Was one of them the -- in your
17    opinion the failure to use turnover or
18    transfer notes from one shift to the next?
19 A   I looked at that. I'm a big turnover
20    person, communications, and I didn't see
21    where it would have changed anything, but I
22    would have liked to have seen the turnover.
23        And part of the reason why I say that
24    is they were actually at one point turning

Page 196

1     it over themselves, because the airplane
2     sat, and the same people came back the next
3     night.
4         So the roll of a turnover at that
5     point in time is much less than if I was
6     turning over a job to you.
7  Q   Did you see that they didn't actually have
8     the paperwork completed when the airplane
9     left Hyannis?
10 A   I did see that. I did see that.
11 Q   The paperwork would include the signature of
12    the designated inspector?
13 A   I did see that.
14        In checks, though, however, in
15    checks -- you know what a check is, A, B, C
16    or one through six, it's not uncommon for
17    the paperwork package to be totally complete
18    with the airplane is done.
19        It's a small crew of people. I
20    think there's six people there. It makes it
21    a little bit --
22 Q   Isn't the designated inspector required to
23    determine that the airplane is airworthy at
24    the time it leaves the shop?

Page 197

1  A   There is final check. He can rely upon
2     signatures for people that the work is
3     completed. You have to look through their
4     manual to determine it. Their manual does
5     say this now, or it -- or the version that I
6     looked at.
7         Like I said early on, I don't have
8     the preaccident version completely. It had
9     been revised.
10        So my comments are going to be framed
11    in that, that I could be talking about
12    postaccident manual.
13 Q   Yes.
14 A   But the manual frames what you have to do
15    and who is responsible. And it frames it in
16    such a way that says if you did the work and
17    you sign on the dotted line, that I -- I
18    have the right to rely upon that signature.
19    That's the -- as the person releasing the
20    airplane.
21 Q   Mm-hmm.
22 A   Now, there's another piece to this. The
23    airworthiness release, depending on the work
24    that is done, does not always have to be

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 274

1  Q   When you say "these errors were the cause of
2      this crash," perhaps you'd like to modify
3      that statement?
4          It was a factor?
5  A   I can say that it was a factor.  It was
6      probably one of the leading ones, but it was
7      a factor.  You're going to make me rewrite a
8      probable cause contributing to this?
9  Q   Well, the probable cause, actually -- it
10     stated what the probable cause was.
11         And then it said, "Factors were the
12     flight crew's failure to follow the
13     checklist procedures and the aircraft
14     manufacturer's erroneous depiction of the
15     elevated trim drum in the maintenance
16     manual," right?
17 A   Right.
18 Q   But the cause was really maintenance, what
19     the maintenance people did?
20 A   It's --
21         MR. ELBERG:  Object.
22 A   It's a collective maintenance failure.
23 Q   They didn't do the operational check, most
24     important?

Page 275

1  A   Properly, didn't do it properly.
2  Q   You could add up the number of errors made
3      by maintenance, and you probably --
4  A   More.
5  Q   -- five or more errors done by maintenance
6      that really caused this crash?
7  A   (Witness nods.)
8  Q   In your -- the next sentence or two, you
9      say, "The erroneous drawing could and did
10     cause the mechanic to misroute the cable
11     around the drum."
12         But, again -- and I think I've
13     already asked you about this -- they had to
14     have made the next error, which was crossing
15     the cables, in order to do this?
16 A   Right, to get it to line up.
17 Q   But you didn't mention that next error in
18     your report, did you?
19 A   I don't believe I did.
20 Q   And they have tagged, according to what you
21     said in the report and the deposition
22     testimony, they tagged the cables with tape?
23 A   Mm-hmm.
24 Q   And they still misrouted them?

Page 276

1  A   They may have routed them right up to the
2      end.
3          Remember I mentioned to you about
4      going to the -- going down there to look at
5      where they crossed them, trying to determine
6      where they crossed them?
7  Q   Yes.
8  A   They may have -- they may have crossed them
9      right there at the end, although there's
10     some feeling that that's not the case.  But
11     it's all -- it just depends on who looks at
12     it.
13 Q   But they had to have crossed them?
14 A   They crossed somewhere.
15 Q   So even with this tape that they used, it
16     clearly was an inadequate method to ensure
17     that you didn't cross them.  They crossed
18     them?
19 A   Right, they crossed them.
20         And that gets to the instructions in
21     the maintenance manual not being detailed
22     enough to mitigate all the possible mistakes
23     that people make.
24 Q   Well, you can't write a manual that will

Page 277

1      have all the possible mistakes that somebody
2      might make?
3  A   I would say that you can in the areas that
4      are critical to flight.  I wouldn't want a
5      manual, you know -- we don't want -- a
6      coffee maker is not going to bring an
7      airplane down, but flight controls certainly
8      are.
9          So you want to make sure that your
10     instructions are as detailed as they humanly
11     possibly can be and as clear and concise as
12     you can make them.
13 Q   Okay.
14         But the more things you say in a
15     manual, the less likely that it will be read
16     and understood?
17 A   Today, I think I might agree with that.
18 Q   So if you tried to foresee every possible
19     mistake that somebody might make, you're
20     going to have much too much language in
21     order to ensure that they properly
22     understand the basic steps to carry out the
23     procedure; isn't that true?
24 A   Well, routinely across the board, I would

70 (Pages 274 to 277)

7a12d1e8-0180-4dbb-808c-f31ebff863a2

*Dean vs. Raytheon Aircraft Company, Case No. 05-CV-10155-PBS*
*Defendants' Memorandum in Support of Motion for Summary Judgment*

# EXHIBIT 11

Page 1

1                   UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

2

3    YISEL DEAN, et al.,

4              Plaintiffs,

5        vs.                    Case No. 05-CV-10155-PBS

6    RAYTHEON COMPANY, a Delaware

     Corporation, RAYTHEON AIRCRAFT

7    HOLDINGS, INC., a Delaware

     Corporation, RAYTHEON AIRCRAFT

8    COMPANY, a Kansas Corporation,

     RAYTHEON AIRCRAFT CREDIT

9    CORPORATION, a Kansas Corporation,

10             Defendants.

11

12   LISA A. WEILER, et al.,

13             Plaintiffs,

14       vs.                    Case No. 05-CV-10364-PBS

15   RAYTHEON COMPANY, a Delaware

     Corporation, RAYTHEON AIRCRAFT

16   HOLDINGS, INC., a Delaware

     Corporation, RAYTHEON AIRCRAFT

17   COMPANY, a Kansas Corporation,

     RAYTHEON AIRCRAFT CREDIT

18   CORPORATION, a Kansas Corporation,

19             Defendants.

20

21   DEPOSITION OF:MICHAEL E. MADDOX, Ph.D., CHFP

22   DATE:         October 4, 2006

23   TIME:         8:59 a.m.

24

25

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 22

1  probably why I marked that.
2      Q.   Did that have any particular relevance
3  to this case?
4      A.   Well, it might in that the maintenance
5  was performed over different days by different
6  people on the aircraft.  So it could relate to
7  that.  It just depends on, you know, what you're
8  interested in knowing about that aspect of human
9  error.
10     But like I said, I tend to put Post-it
11 notes in books and then forget why I put them
12 there.
13     Q.   So was your use of this text related to
14 some particular piece of it or just the whole thing
15 as being helpful to give you some context?
16     A.   Well, the whole thing.  It basically
17 brings me up to date on what we know about
18 maintenance error, why it occurs, how it occurs,
19 some of the techniques that have been employed in
20 order to prevent maintenance error or manage it, et
21 cetera.
22     Q.   Now, when you say, what we know about
23 human error, what do you mean by that phrase?
24     A.   What we in the human factors field know
25 about human error.  Most of the human error

Page 23

1  research has been done by the people who are
2  actually human factors researchers and
3  practitioners, and so over the past 40 years or so
4  we have acquired quite a bit of collective
5  knowledge regarding human error:  Why it occurs;
6  how it occurs; what works and what doesn't work to
7  decrease the likelihood of human error; what
8  factors tend to increase the likelihood of human
9  error.  Especially in the maintenance domain, we
10 know a lot about the locus of serious human error.
11 That's been studied quite a bit.  And so that --
12 when I say we, I'm talking a collective we, the big
13 human factors we.
14     Q.   Let's talk about human factors and your
15 background in it.
16     A.   Okay.
17     Q.   I gather what you just described was
18 human factors generally.  Is that accurate?
19     A.   It's one aspect of it, certainly.
20     Q.   What other aspects are there?
21     A.   Well, human factors is basically the
22 science and practice of ensuring that human
23 capabilities and limitations are built into systems
24 and products so we make systems safe, usable and
25 within the capabilities of the people we expect to

Page 24

1  use them.  That's the general statement.
2      Q.   And that applies to all walks of life?
3      A.   Pretty much every domain in which
4  people interact with systems or products, which is
5  most domains.  There are very few domains that are
6  purely automatic.  Now, when you get into the area
7  of, say, circuit design, electronic circuit design
8  or something like that, where circuit components
9  are interacting with other circuit components, the
10 only human factors aspect of that we'd be concerned
11 about is the design activity itself, the testing
12 activity perhaps, verification of the circuit
13 components, validation that it actually does what
14 it's supposed to do and the usage of the product in
15 the end, but the individual circuit components
16 interacting don't have any human element in there.
17 But for the most part, I would be hard pressed to
18 find a domain that didn't have some type of human
19 interaction.
20     Q.   So what's been your particular
21 background in human factors, what industry?
22     A.   Well, across a variety of industries,
23 actually.  I have not specialized in a particular
24 industry, but I started -- my background is that I
25 have a bachelor's degree in physics and I started

Page 25

1  as an instrumentation engineer in the nuclear
2  industry and worked for several years.  I then went
3  back to graduate school in human factors and got
4  advanced degrees in human factors from Virginia
5  Tech.  My graduate work was primarily in the area
6  of visual perception.  In particular, how your
7  visual system processes, what it sees in the real
8  world.
9      Two years after I received my Ph.D., I
10 actually conducted day-to-day a project that looked
11 at the performance of military photo interpreters
12 with analog and digital imagery.
13     After that I started working for a
14 company called the Institute of Nuclear Power
15 Operations, which was formed after the Three Mile
16 Island accident and consisted of all of the nuclear
17 power utilities in the United States -- and in
18 fact, most of them in the world.  I worked on
19 elements reviews of nuclear power plant control
20 rooms, emergency procedures, task analysis, layouts
21 of backup control panels, just the classic kind of
22 human factors types of things of people that
23 interact with the system.
24     After that two years I worked for five
25 years with a company called Search Technology, and

7 (Pages 22 to 25)

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

|  | Page 90 |
|---|---|

1  that they had printed copies of the procedure, not
2  the electronic copy, with them when they were doing
3  them.
4      Q.  So what's your understanding as to
5  which version of the manual was being used, paper
6  or electronic, when these mechanics worked on the
7  forward cable?
8      A.  It depends on which time you're talking
9  about.  They said they had the paper copy of the
10  procedure, but it's unclear to me whether it was
11  printed from the REPS system, the CD, or whether it
12  was simply a printed copy from a printed manual.
13      Q.  So you don't know whether they were
14  using the actual book or a printed copy of the
15  electronic version?
16      MS. SCHIAVO:  Objection, for the
17  record.  Go ahead.
18      THE WITNESS:  It's my understanding
19  they were using a printed copy of the electronic
20  record.  I believe they testified to that.
21  BY MR. JONES:
22      Q.  And so you know, the one we've marked
23  here, 98, says across the top:  REPS, Raytheon
24  Electronic Publication System.  That's the
25  indicator that this came out of the electronic

|  | Page 92 |
|---|---|

1  cable and like the cable tension, that type of
2  thing.  This is referenced in the -- I believe it's
3  referenced when they talk about reinstalling the
4  cable, they reference this procedure.
5      Q.  This one being --
6      A.  I'm sorry -- referencing procedure
7  27-30-05 dash 201.
8      Q.  So in other words, 27-30-04, which is
9  the process to replace the cable, cross references
10  the mechanics to 27-30-05, the rigging check?
11      MS. SCHIAVO:  Objection.  Go ahead.
12      THE WITNESS:  Yes.  Step U, rig the
13  cables to the proper tension as indicated in Figure
14  201, and then Step -- I'm sorry, that's not Step U,
15  that was Step T.  Step U is, rig the cables as
16  outlined in elevator trim rigging, and they both
17  reference 27-30-05.
18  BY MR. JONES:
19      Q.  You say you've reviewed also the
20  elevator control cable process; is that right?
21      A.  Briefly.  I mean, I looked at it when I
22  saw it was the elevator.  I didn't bother really
23  paying that much attention to it.
24      Q.  As it relates to work done on the
25  actuator, were you aware that the mechanics were

|  | Page 91 |
|---|---|

1  version.  Is that consistent with your
2  understanding, or is that news to you?
3      A.  Yes.  It's sort of irrelevant, but yes.
4  It should be the same procedure, right.
5      Q.  Well, I understand the concept is the
6  same, but I'm asking you if you know one way or the
7  other whether they used the electronic or paper
8  version.
9      A.  My recollection is they said they
10  printed the procedure from the electronic version
11  and that's what they had with them.
12      Q.  97 is 27-30-09.  Do you recognize that
13  as one of the procedures you reviewed?
14      A.  Yes.
15      Q.  What is that?
16      A.  This is the operational check for
17  elevator trim.
18      Q.  And then 99 is another section,
19  27-30-05.  Do you recall having reviewed that?
20      A.  Yes.  This is the rigging procedure.
21      Q.  What do you understand the difference
22  to be between the rigging procedure and the
23  operational check?
24      A.  The rigging procedure is actually the
25  procedure for determining certain factors of the

|  | Page 93 |
|---|---|

1  reprimanded for not following all the steps in the
2  process of replacing the actuator?
3      MS. SCHIAVO:  Objection.  Go ahead.
4      THE WITNESS:  I might have read
5  something about that, but it didn't make an
6  impression on me.
7  BY MR. JONES:
8      Q.  Do you remember that?
9      A.  I remember several mentions of
10  reprimands for not signing off on procedures, that
11  type of thing, but I don't recall the exact context
12  of that, no.
13      Q.  Did becoming aware that the mechanics
14  involved in this process had been reprimanded for
15  skipping steps impact your analysis of how this
16  event unfolded?
17      MS. SCHIAVO:  Objection.  Go ahead.
18      THE WITNESS:  I don't recall being
19  aware that they skipped steps, but their behavior
20  and anything I read about it really didn't impact
21  my analysis other than to support it.
22  BY MR. JONES:
23      Q.  So you're not aware that the mechanics
24  in this case skipped steps in the procedures
25  involved?

24 (Pages 90 to 93)

Page 130

1  BY MR. JONES:
2      Q.  What's that?
3      A.  Well, they didn't testify to that level
4  of detail, that they went from one set of pulleys
5  to the next set of pulleys.  They simply said the
6  turnbuckles won't pass through some of these
7  pulleys, we need to remove them, which is what they
8  did.
9          So to answer your initial question as
10  to how that would defeat the use of lead lines,
11  these pulleys are sometimes grouped into a single
12  bracket so the pulleys are right next to each other
13  with nothing really between them, nothing physical
14  between them.  If I pull those two pulleys out of
15  the bracket, then regardless of whether I have lead
16  lines or I don't have lead lines, it would be
17  possible to confuse which side of -- which lead
18  line or which side of the cable went through each
19  pulley when I reinstalled the pulleys or
20  reinstalled the cables because there are just two
21  pieces of line going through a single bracket.
22  There is nothing to distinguish which pulley side
23  it should attach to.
24      Q.  Other than Figure 202, which shows the
25  routing of the cable, right?

Page 131

1      A.  Yeah.  I mean, if you can figure it out
2  from that, yeah, that would help.
3      Q.  That's what its purpose is, Figure 202,
4  is to show you that routing, isn't it?
5          MS. SCHIAVO:  Objection.
6          THE WITNESS:  I have no idea what its
7  purpose is.  I mean, one would hope there would be
8  something to show you routing, but this is very
9  circuitous routing, not nearly so clear as in this
10  diagram.
11  BY MR. JONES:
12      Q.  Part of the process of using lead lines
13  under Step G of 27-30-04 is to mark the cables to
14  identify which end is which, right?
15          MS. SCHIAVO:  Objection.  Go ahead.
16          THE WITNESS:  It doesn't say that.
17  BY MR. JONES:
18      Q.  What it says specifically is attach
19  lead lines to the aft ends of the forward cables
20  and properly identify them to facilitate
21  reinstallation.
22          Do you know what the options are for
23  how you would identify the ends?
24          MS. SCHIAVO:  Objection.  Go ahead.
25          THE WITNESS:  I don't know.  I know

Page 132

1  that the turnbuckles themselves are already marked
2  at the manufacturer, so the left-hand thread
3  turnbuckle is already -- there is a different
4  physical configuration on the right-hand
5  turnbuckle.  There's a little dimple on it.
6  BY MR. JONES:
7      Q.  And that's what marks it, is a dimple?
8      A.  It's a dimple or a little colored dot.
9  I was shown the difference.  They are different.
10      Q.  And you can look at a thread of
11  something and know whether it's right-hand or
12  left-hand threads, can't you, just by observing it?
13          MS. SCHIAVO:  Objection.
14          THE WITNESS:  Not necessarily.  I mean,
15  you don't typically relate it to that type of
16  thing.
17  BY MR. JONES:
18      Q.  You wouldn't expect an experienced
19  mechanic to make those kinds of observations?
20          MS. SCHIAVO:  Objection.
21          THE WITNESS:  Depends on where that
22  mechanic is observing, what the conditions are
23  like, how big the threads are.
24  BY MR. JONES:
25      Q.  But if you can see them and the

Page 133

1  lighting is good, you should be able to determine
2  whether it's left-hand or right-hand threads?
3          MS. SCHIAVO:  Objection.
4          THE WITNESS:  Not necessarily.  That's
5  why they mark the turnbuckles, because it's not
6  obvious just looking at the threads.
7  BY MR. JONES:
8      Q.  And these mechanics replacing this
9  forward cable did not use lead lines, did they?
10      A.  That's my understanding, that they did
11  not.
12      Q.  Now, they employed a different system
13  of trying to keep track of where the cables should
14  end up in the pulleys, right?
15          MS. SCHIAVO:  Objection.  Go ahead.
16          THE WITNESS:  My understanding is they
17  did, yes.
18  BY MR. JONES:
19      Q.  Do you know what the system is that
20  they devised?
21      A.  I'm still not quite sure I understand
22  it, but apparently they marked the pulleys
23  themselves with a T to designate one side or the
24  other of the cable that should be routed through
25  there.

34 (Pages 130 to 133)

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 134

1    Q.  Did it make sense to you how that
2    procedure would help them keep track of which is
3    left-hand and right-hand threads?
4        A.  It didn't necessarily makes sense to
5    me.  It apparently made sense to them.
6        Q.  Are there any other criticisms you have
7    of the written steps in 27-30-04 besides the lead
8    line step?
9        MS. SCHIAVO:  Objection, for the
10   record.  Go ahead.
11       THE WITNESS:  If you look at page four,
12   the elevator trim cable installation, Step H,
13   reinstall the pulleys that were removed for
14   routing, I can't find any -- well, it's two things.
15   I can't find any step in the removal steps that
16   said to remove pulleys, if you need, to for
17   routing.  The other thing is, the presence of the
18   step says that whoever wrote this procedure was
19   aware at some point that pulleys might have to be
20   removed.  If you're aware that pulleys might have
21   to be removed, then using lead lines is not a
22   logical routing job aid, if you will, without some
23   other ancillary process in place, or ancillary
24   tool.
25

Page 135

1    BY MR. JONES:
2        Q.  Like the use of 202, the routing
3    diagram?
4        A.  Well, whether or not you can follow
5    202 -- I mean, that's still an open issue, but if
6    you look in the pedestal of the airplane versus
7    Figure 202 where everything is really nice on a
8    white sheet of paper, you can see inside the
9    pedestal of the airplane.  We have photographs that
10   show what it looks like in the pedestal.
11       Q.  But in any event, Figure 202 does show
12   the routing of the cable across the pulleys from
13   the pedestal to the turnbuckles, correct?
14       A.  It purports to do so.  I don't have any
15   idea.
16       Q.  You don't have any information that
17   it's inaccurate in that regard, do you?
18       A.  I do not know.
19       Q.  So what's your criticism of Step H on
20   page four?
21       A.  Well, there are two.  There is no
22   corresponding step in the cable removal process.
23   It's telling me to put stuff back together that it
24   never told me to take apart.
25       Q.  What about Item C, the first note on

Page 136

1    page three?
2        A.  Okay.  Cool.  So you know the pulleys
3    are going to be removed -- so I missed that --
4    which provides even more of a question in my mind
5    as to why lead lines would ever be --
6        Q.  Let's deal with your first criticism of
7    H, though.  You first say that it's there without a
8    prior step speaking about taking out pulleys.  You
9    retract that opinion now, correct?
10       A.  Well, this isn't actually -- it's a
11   note, it's not a step, okay, so --
12       Q.  But it's there, right?
13       A.  Well, there is a caution there.
14   There's other notes.  A note is not a step in the
15   procedure.  Procedures -- there's very strict rules
16   about how procedures should be written and about
17   how notes and cautions should be put in there.  If
18   you want somebody to do something, you put it in a
19   step.
20       Q.  So should the manufacturer not be able
21   to expect the mechanic will read the note?
22       MS. SCHIAVO:  Objection.
23       THE WITNESS:  The note -- I would be
24   perfectly legitimate to go through this procedure
25   and not read the notes.  If you want me to do

Page 137

1    something, put it in a step that tells me I have to
2    do it.  For example, if this were in a job card
3    format, there would be no place for me to initial
4    this note, which says, okay, I did that much.
5        However, I will grant you that it does
6    say here that, yeah, you can remove pulleys because
7    they can't be cleared by the turnbuckles.  So given
8    that the procedure recognizes that, why would you
9    worry about attaching lead lines?
10   BY MR. JONES:
11       Q.  That goes back to your criticism about
12   the lead line step, right?
13       A.  Yeah.  It's simply -- the fact of the
14   matter is, the cables only attach -- the ends of
15   the forward cable only attach to the aft cable one
16   way.  So regardless of how you have to route that
17   cable, if you get it back through the fuselage and
18   you've got the right turnbuckle on the right side,
19   regardless of what's happened on those pulleys up
20   front, you're going to assume that you've got the
21   right part of the forward cable attaching to the
22   right part of the aft cable.
23       Q.  And conversely, if you get back to
24   those turnbuckles and your threads don't match what
25   they're supposed to match, you know something is

35 (Pages 134 to 137)

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 166

1  tabs so they measured the deflection. They
2  essentially did the ops check on an ad hoc basis;
3  that is, they had a person in the cockpit change
4  the analog trim position and they measured it at
5  the tail. There was an inspector and one of the
6  mechanics who measured it at the tail using a
7  digital protractor.
8      Q.  I'm sorry to cut you off. We'll talk
9  about that process in detail, but right now I was
10  just asking what was your understanding of what was
11  to be done next, and what I understood you to say
12  was they needed to do an ops check?
13      A.  That's correct.
14      Q.  Now, taking this in pieces and stepping
15  back in part, there is a difference between a
16  rigging check and an ops check, right?
17      A.  I would assume there would be. An
18  ops check is a functional check. A rigging check
19  is a detailed check of tensioning, et cetera.
20      Q.  We talked earlier about how 27-30-04
21  refers the mechanic over to 27-30-05, the rigging
22  checks, right?
23      A.  Yes, at one point it does.
24      Q.  Did you study 27-30-05 to determine
25  whether, if it were performed properly, it would

Page 167

1  have revealed the anomaly of the reversed rigging?
2      A.  Well, it's unclear, actually. I think
3  it's unclear whether it would have because of the
4  use of the travel board and the communication
5  between the tail and the cockpit. Assuming -- let
6  me just read this part of the -- the --
7      Q.  I'm sorry to interrupt again, but I'm
8  trying to do this in really small pieces. My first
9  question is, did you undertake to try and determine
10  whether the performance of 27-30-05 would have
11  revealed the anomaly, not what your result was if
12  you did. I'm just trying to determine whether that
13  was part of your task.
14      A.  Yes. My task was to examine the
15  activities that took place both before and after
16  the rigging.
17      Q.  So you did review 27-30-05?
18      A.  I did read through this, yes.
19      Q.  And you analyzed it in terms of whether
20  these steps would have helped reveal the anomaly?
21      A.  Well, when you say these steps, you're
22  assuming that all of the steps are doable -- right?
23  This procedure, as far as I know, was never
24  verified by Raytheon -- and that all of the
25  communication in the different parties required to

Page 168

1  perform this check are proper. If all of that is
2  true and there is an understanding, there is a
3  communication protocol, et cetera, yes, it would
4  help reveal the reverse rigging.
5      Q.  What about the communication issue that
6  concerns you about the ability to reveal the
7  anomaly using the rigging check?
8      A.  There are two major issues I have with
9  communication. First of all, just the ability to
10  communicate from the tail to the cockpit. We saw
11  during our inspection visit that it's not easy to
12  communicate from the tail to the cockpit. We were
13  using cell phones to communicate. It's the
14  testimony of the inspector that they had no radios,
15  they had no telephones, that they were simply
16  yelling information between the cockpit and the
17  tail.
18      Q.  Now, is that an observation of the
19  situation or a criticism of the procedure?
20      A.  Well, the procedure depends on there
21  being communication between the cockpit and the
22  tail, and so to the extent that that communication
23  is typically not good, or not high quality, I
24  should say, just the simple fact of being able to
25  understand what somebody is saying or hear

Page 169

1  someone -- there is ambient noise, there is
2  distance, there is the fact that there is a person
3  in the cockpit and another person on the tail and
4  there is a fuselage between the two of them that
5  makes communication difficult, so --
6      Q.  Again, is that an observation of the
7  scenario or a criticism of the procedure?
8      A.  Well, I don't know how you separate the
9  two, but the procedure depends on communication.
10  There is nothing in this procedure that says get a
11  walkie-talkie and talk to the person in the cockpit
12  and tell them to do this, and when they do that,
13  you do this.
14      Q.  Are you suggesting that the procedure
15  should have included something like that?
16      A.  Without a communication protocol,
17  you're depending on certain factors to be in play,
18  certain things to take place, and you don't know if
19  it's possible for them to take place or not.
20  Suppose it's noisy in the hangar -- I mean, that
21  would be a classic situation -- how do I ensure
22  that those people communicate properly? And this
23  goes also to my second point. There is no
24  established communication protocol for determining
25  what position a trim tab has been moved to.

43 (Pages 166 to 169)

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 182

1   check did not find the anomaly was that the
2   electric trim switches were used to move the trim
3   instead of the manual wheel. Can you explain that?
4       A.  Yes.  The way the system is actually
5   rigged is that even with a misrigged forward
6   control cable, the electric trim motors
7   actually move the trim in the proper direction, the
8   commanded direction, using the trim switches on the
9   yoke, the pilot's and the copilot's yoke.  So if
10  I'm a technician in the cockpit and I think I'm
11  supposed to go to full nose up trim, I conceivably
12  could use the pilot or copilot's trim switch to do
13  that and move all the way, or at least as far as
14  the electric trim motors would allow me to move,
15  until it won't move any more.  If I did that, the
16  trim would actually move in the proper direction.
17  As I explained here, that doesn't fully explain how
18  you could then measure the appropriate angles that
19  you were looking for.
20      Q.  What's your issue there about the
21  appropriate angles?
22      A.  Well, if the -- assuming that the
23  forward control cables was misrigged, it puts --
24  let me go back a minute.  The trim tabs have cable
25  stops on them so that they could only move upward

Page 183

1   or downward a certain -- to a certain angle; and
2   typically they can move more nose up than nose
3   down.  They could move 16 and a half degrees nose
4   up -- yeah, 16 and a half degrees nose up, 5 and a
5   half degrees nose down.  When you misrig, you
6   reverse that and you would not be able to go to 16
7   and a half degrees nose up.  So the electric trim
8   switches, or electric trim motors -- I'm sorry --
9   if you try to go to full nose up, it would actually
10  stop somewhere before 16 and a half degrees.
11      Q.  And the source of your information for
12  that is what?
13      A.  I thought I read that somewhere,
14  actually, that the electric trim was not able to
15  move the trim all the way up -- I frankly don't
16  remember -- but it's clear that it would, in the
17  NTSB analysis, assume that since it's misrigged you
18  could actually move to 16 degrees nose down on the
19  trim.
20      Q.  Where did you find that?
21      A.  It's in one of the reports that I read.
22  I don't recall.  My point is that the electric
23  trim, even if it's rigged properly, supposedly will
24  not move the trim to the same maximum deflections
25  as the manual trim wheel.

Page 184

1       Q.  Even when rigged properly?
2       A.  Even when rigged properly.  That's my
3   understanding.
4       Q.  Where do you get that particular
5   understanding?
6       A.  I read it in some of this material.
7       Q.  But these three things we've just
8   talked about that you read in other material are
9   things that you simply read in other material, not
10  that you went out and checked on your own, right?
11      A.  Well, we didn't have a misrigged system
12  when we were out there, so I couldn't say.  Now, we
13  did run the electric trim all the way up and all
14  the way down.
15      Q.  Did it go to full deflection?
16      A.  We didn't measure, so I don't know.
17      Q.  So you go on to say in your report that
18  use of the electric trim switches to move it for
19  purposes of doing a rigging check doesn't explain
20  why the angle measurements didn't arouse suspicion.
21      A.  Right.  Why they -- because you
22  couldn't -- it's my understanding of the way -- the
23  maximum trim deflections would be different than
24  what is spelled out in the specs.
25      Q.  So why wasn't it caught?

Page 185

1       A.  Well, I don't think they used the
2   electric trim.  I was just talking about one
3   possible explanation and just going through the
4   logical possibilities.
5       Q.  So you raised one and then you found a
6   reason why it was unlikely?
7       A.  Yeah.  I found a reason that wouldn't
8   really explain how you could go through that whole
9   check and not notice it.
10      Q.  So then you move on to the next
11  explanation, which is that there was a probably a
12  miscommunication?
13      A.  That would be my best guess, yeah.
14      Q.  Again, is this in the context of the
15  rigging check, 27-30-05, or the operational check,
16  27-30-09?
17      A.  The rigging check.
18      Q.  Did you do anything to study any of
19  Colgan's internal procedures about communication
20  between mechanics?
21      A.  No.
22      Q.  Is there anything else you reviewed
23  related to 27-30-05, the rigging check?
24      A.  I don't believe so.
25      Q.  Now, moving onto 27-30-09, which is

47 (Pages 182 to 185)

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 190

BY MR. JONES:
1
2    Q.   And we've covered that one, the rigging
3    check, 05, right?
4        A.   Right.  And there is nothing here that
5    would require the mechanics to do this.
6        Q.   That's what I'm wanting to talk about.
7    If 27-30-09 had been performed -- I'm wanting to
8    know whether you studied it to determine whether
9    its performance would have revealed the anomaly.
10       MS. SCHIAVO:  Object, for the record.
11   Go ahead.
12       THE WITNESS:  I have not examined this
13   to know or to opine whether it would or would not
14   have, but the only difference that I can see
15   between this and the pilot's check is one sentence
16   in Step D and one sentence in Step E that looks at
17   direction of travel for the trim wheel.
18   BY MR. JONES:
19       Q.   Let's talk about what D and E do.
20       A.   Okay.
21       Q.   D has the mechanic actuate both trim
22   switches on the pilot's control wheel to nose up.
23   That means he's pushing both of the split
24   switches -- or pulling them back, right, to go nose
25   up?

Page 191

1        A.   Right.
2        Q.   Is that your understanding?
3        A.   Nose up, yes, the switches would go
4    back or go down.
5        Q.   Then you note the movement of the trim
6    wheel?
7        A.   Note trim wheel movement.
8        Q.   Right?  That's what you're supposed to
9    do for D?
10       A.   Yes.
11       Q.   So if you're pulling back on the trim
12   switches, if it's rigged properly the wheel is
13   supposed to rotate back, right?
14       A.   Yes, that is correct.
15       Q.   And if it's rigged the way this one is
16   rigged, backward, the wheel would actually move
17   forward, right?
18       A.   That's my understanding, that's
19   correct.
20       Q.   So if the mechanic is pulling back on
21   the thumb switch and looking at the wheel and sees
22   it going in the opposite direction, is that an
23   indication that there is something wrong?
24       A.   Assuming the mechanic knows which way
25   the wheel should travel, yes, at that moment.

Page 192

1        Q.   And you're not providing an opinion on
2    whether these mechanics knew the right direction it
3    was supposed to go or not, right?
4        A.   Well, I'm just commenting that the
5    procedure doesn't say what the proper direction is,
6    it just said the proper direction.
7        Q.   Would you expect the mechanics to know
8    that?
9        A.   I wouldn't depend on the mechanics to
10   know that.  I would put it in the procedure.
11       Q.   Is there any correlation in the human
12   factors world to the number of steps given someone
13   and the likelihood that they will follow them all?
14       A.   No.  There is not a -- I mean, there
15   may be some relationship, but there is no
16   statistical correlation that I know of.
17       Q.   That's not something that's discussed
18   in the human factors community?
19       MS. SCHIAVO:  Objection.  Go ahead.
20       THE WITNESS:  Sure.  We discuss all
21   kinds of things related to procedures, but the
22   procedure can have literally hundreds of steps --
23   and some do.  That doesn't necessarily mean that
24   you're going to increase the odds of committing an
25   error.  Mathematically, you do increase what we

Page 193

1    would call the cross section.  It increases the
2    number of opportunities for you to do something
3    wrong.
4    BY MR. JONES:
5        Q.   So the other thing that Step D asks you
6    to do is to visually verify that the tab itself
7    travels in the proper direction.  And with D, it
8    says nose up means tab down, right?
9        MS. SCHIAVO:  Objection.  Go ahead.
10       THE WITNESS:  It says visually verify
11   that the tab travels to the proper position.  I'm
12   not sure how that's --
13   BY MR. JONES:
14       Q.   It says in parentheses trim tab full
15   down, right?
16       A.   Right.
17       Q.   Which is the proper correlation, nose
18   up is tab down?
19       A.   That is correct.
20       Q.   So if this step were performed on this
21   aircraft with it rigged backwards, the anomaly
22   should have been revealed, right?
23       MS. SCHIAVO:  Objection, for the
24   record.
25       THE WITNESS:  I'm not sure.  First of

49 (Pages 190 to 193)

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 222

1    basically what I got from his version of the story.
2        Q.  From Mr. Sarluca's version?
3        A.  Yes.  And apparently he didn't very
4    much appreciate the fact that, at least in his
5    mind, that the technicians knew that this was a
6    possibility, that because of mismatched travel of
7    the two actuators that the cable could become slack
8    and then unwind from the drum.
9        Q.  Now, are you assuming it to be true
10   that there is some sort of mismatched travel
11   between the actuators that would cause the cable to
12   come off the drum?
13       A.  No, I'm not assuming that.  I'm just
14   recounting what I recall from these conversations,
15   Mr. Sarluca's account of these conversations.  But
16   the fact of the matter is that one of the actuators
17   did in fact have to be replaced again.  It wasn't
18   appropriate, apparently.
19       Q.  Did you go ahead and read Mr. Crow's
20   deposition testimony where he described this issue
21   of whether there was any differential travel
22   between the these two actuators?
23       A.  I read his deposition.  I don't recall
24   that detail in there, though.
25       Q.  I guess the bottom line is, you're not

Page 223

1    here, in this case, to provide an opinion that the
2    cable came off the drum in the first instance
3    because of a mispairing of the actuators or not.
4    That's just something that happened that you're
5    observing that there is a question about?
6        A.  Right.  And the only reason I even
7    mentioned that is that it just sort of contributes
8    to the overall environment in which the repair was
9    done, in which the maintenance was done, in that in
10   addition to the fact that the cable now has to be
11   replaced, there is talk that had Raytheon warned us
12   about this beforehand this wouldn't have happened
13   in the first place.  But I don't believe that
14   actually traveled very much past Mr. Sarluca.  I
15   think the other mechanics apparently knew about the
16   exchange, but didn't really think too much about
17   it.
18       Q.  Of course, we have the open question of
19   whether there was any differential pull that would
20   have caused it to happen which hadn't been
21   resolved.
22       A.  Yeah, from my perspective, it doesn't
23   matter.  I mean, from my perspective, it doesn't
24   even matter why or how that cable came unwound or
25   why it had to be replaced.  I mean, it could have

Page 224

1    broken in half.  It doesn't matter.  It could have
2    had termites in it.  It doesn't matter from my
3    perspective.  My perspective on the misrigging
4    error really applies to the procedures that were in
5    place that told mechanics how to install the new
6    cable.  I mean, that's really the crux --
7        Q.  You started your analysis as of the
8    time of installing the new cable, not what happened
9    before?
10       MS. SCHIAVO:  Objection.  Go ahead.
11       THE WITNESS:  No.  I looked at all the
12   events that happened before, it's just that from my
13   perspective, all the events that happened before
14   don't really have a huge impact on this thing.  It
15   just sort of establishes an environment in which
16   the repair was made.  The actual error was a
17   procedural error.  It was misrigging this cable.
18   So everything that happened up to that point and
19   why they had to install the new cable, that's not
20   so much an issue in the actual misrigging itself.
21   BY MR. JONES:
22       Q.  So as it relates to your mentioning
23   this exchange that happened between Colgan and
24   Raytheon before the forward cable was replaced,
25   you're not in a position to say whether one side is

Page 225

1    true or the other side is true, you're just
2    observing that this exchange happened and the very
3    happening of it had an impact on the environment?
4        A.  Right.  And it almost doesn't matter
5    what the true state of affairs was.  I mean, if
6    Mr. Sarluca was ticked off and communicated that to
7    the mechanics, it doesn't even matter that he had
8    the conversation.  It's just:  Okay, now everybody
9    thinks this took place.
10       Q.  So what impact might that environment
11   have on this situation?
12       A.  I think it just adds to sort of the
13   frustration level all around.  He's going, you
14   know, we've been in here three days with this
15   aircraft now and we wouldn't have -- you know, we
16   would have had it out the first night if this thing
17   hadn't occurred.  So we know that frustration and
18   time pressure increased the likelihood of errors
19   and it's just an environmental sort of thing.
20       Q.  The next section you call Consistent
21   With Human Error Research.  This starts on page 21.
22       A.  Yes.
23       Q.  And then it has some subparts in
24   Italics.  This appears to me to be an effort to
25   summarize what's been said before in the context of

57 (Pages 222 to 225)

# EXHIBIT 12

 # AEROSCOPE, INC.

11901 Allison Street
Broomfield, CO 80020
303.465.4414 • Fax: 303.465.4116
aeroscope@aeroscopeinc.com

July 21, 2006


Ms. Mary F. Schiavo
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464

Re: Dean v. Raytheon
     Colgan Air Crash
     Aircraft: Raytheon B1900D
     Date of Accident: August 26th, 2003
     Location: Yarmouth, Massachusetts

Report of Findings

Dear Ms. Schiavo:

Below is a report of my accident investigation regarding the aircraft crash that occurred
on August 26th, 2003, at 1540 Eastern Daylight Time near Yarmouth, Massachusetts.
Attached, as Appendix A, is my Curriculum Vitae, Appendix B. is a list of the documents
I have reviewed in regard to this case.  Appendix C is a listing of my trial and deposition
testimony in the last 4 years.

The NTSB report, other reports, and our investigation show that on August 26th, 2003, a
Beech 1900D, N240CJ, operated by Colgan Air Incorporated as Flight 9446 (d.b.a. US
Airways Express) was destroyed when it impacted the Atlantic Ocean near Yarmouth,
Massachusetts. The certificated airline transport pilot and certificated commercial pilot,
were the only occupants aboard the flight and were fatally injured. Visual meteorological
conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA),
Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New
York. An instrument flight rules flight plan (IFR) was filed for the repositioning flight
conducted under 14 CFR Part 91.

**EXHIBIT 11**

1

2. Powerplant and Nacelles
3. Flight Environment/Cabin
4. Environmental Systems/Nose
5. Landing Gear
6. Aft Fuselage/Empennage

Inspections/Checks conducted recently prior to the accident include:

1. Preflight Inspection-August 23, 2003, Flight hours-16, 499.1, Cycles-24, 627.
2. Routine Inspection-August 24, 2004-Flight Hours-16, 503.5, Cycles-24, 637
3. Check 6-August 24, 2003-Flight Hours-16, 503.3, Cycles-24, 637.

**Maintenance Performed:**

According to Colgan Airs Maintenance records, on August 23, 2003, aircraft N240CJ underwent a Detail 6 (D6) as part of its approved phase maintenance program using guidance from the Beech 1900D Airliner Maintenance Manual. The D6 check began at the Hyannis, Massachusetts (HYA) station beginning on August 23 at 1647 hours local.

The MPM states that the emphasis of the D6 check is on the empennage and aft fuselage, which include visual inspections, lubrications, free play checks, engine borescopes, engine mount torque checks, servicing, operational checks, and cable tension checks.

The check was interrupted partway through the inspection (procedures for interrupting checks are contained in the General Maintenance Manual (GMM) section 3.5.3) and the remaining work was deferred on August 24, 2003 at 0800. The D6 check was continued that night at 2030. The check was completed on Tuesday, August 26, 2003 at 1100.

According to Colgan Air's maintenance records, on August 24, 2003, the maintenance technicians conducted a "free play" check on the elevator trim tab actuators (ETT) as part of the D6 inspection. Maintenance found both elevator trim tab actuators to have failed the check. Failure of the actuators by this check requires replacement before further flight.

Once it had been determined the actuators needed to be replaced, a Colgan Air supervisor consulted with Raytheon's technical support by phone to verify the trim tab actuator part numbers and to ensure they had the proper actuators for installation on the accident aircraft. Raytheon's tech reps indicated Colgan Air's available spares (Part Numbers 129-526033-6 and –7) were proper for use on the aircraft (per Colgan's statement to the NTSB). Raytheon Technical Support indicated that there were Service Bulletin kits that would convert the –6 and –7 actuators to the (most recent version) –27 and –29. The Service Bulletin kits essentially modified the actuator seals and lubricant to improve cold weather operational reliability to prevent the trim tab actuators from freezing in flight.

11

While waiting for a response from engineering support, Colgan Air maintenance personnel elected, based on Raytheon's assurances, to install the –6 and –7 actuators with the understanding that engineering approval would be required before they could complete documentation of the installation. Informal verbal confirmation from Raytheon indicated that the –6 and –7 actuators would work. Colgan's mechanics subsequently installed the –6 and –7 actuators in anticipation of a formal confirmation from Raytheon engineering the following morning. It appears that insufficient technical data, the absence of timely engineering assistance, and Raytheon not having the newer –27 and –29 actuators in stock were the first of series of events resulting in the crash.

In the process of performing operational checks after the replacement actuators were installed, the Elevator Trim Tab (ETT) cable system bound and seized. The maintenance technician took the pedestal panels loose to ascertain the problem with the cable system. The maintenance technician documented that the "Elevator trim tab cable fell off drum under the pedestal" on Maintenance Work Order #08477. The maintenance technician discovered that the ETT forward cable had became kinked and ordered a replacement cable.

It was discovered, during post-accident interviews, that the MTS[6] chose to omit step (c) of the Elevator Trim Tab Actuator Removal and step (i) of the Elevator Trim Tab Actuator Installation. Omission of these steps discounts nineteen maintenance steps required by the manufacturer's maintenance manual (MM) in the process of accomplishing the ETT actuator replacements (basically, removal of the elevator for easier access to the trim tab actuators). These steps guide the maintenance technician through the removal and installation of the elevator control surface(s) and are the MM procedures 27-30-02. Skipping these steps, however, had no bearing on the crash.

Per interviews with the two MTS that performed the forward cable replacement, the drum assembly was removed in the cockpit during the dayshift, prior to their assignment to the forward cable change. Non-routine discrepancies on the Detail Check were left open, indicating that work was not complete. Following the re-assembly, both MTS checked the routing of the forward cable by referring to MM 27-30-04, **figure 201**.[7]

### Figure 201-Trim Cable Drum depiction in Raytheon's Manuals

Subsequent to the accident, it was confirmed that Raytheon's Maintenance Manual contained a figure with a deadly error. Figure 201 shows a trim drum around which is wrapped the forward most elevator trim cable. This drum is located beneath the throttle quadrant in the cockpit. The elevator trim cable is attached to this drum by laying the cable (at the cable's mid-point) at a 90-degree angle across the drum and inserting a

---

[6] MTS-Maintenance Technicians
[7] Figure 201 was determined to be incorrect in its depiction after the accident-Ramey exhibit 117. The FAA issued AD 2003-20-10 as a result of this finding. The Trim Drum for the elevator trim was found to be depicted 180 degrees from its proper orientation, leading any mechanic using this diagram to reverse the cable on the drum.

7. The incorrect instructions in the maintenance manual are further exacerbated by the lack of any specific procedure to determine if the system is installed properly following the maintenance performed.

8. The crew was further misled by the lack of information in the Flight Manual to determine that the trim system was improperly rigged.

   The emergency procedures section of the Flight Manual does not mention to pilots how to deal with a grossly out of trim aircraft or, an aircraft with a reversed trim. Electric trim emergency procedure sends you straight to using the manual trim, which only compounded the problem.

9. Nothing in Airplane Flight Manual procedures addressing the fact that increasing the airspeed of the aircraft will increase the air forces on the control surfaces which in turn increase the physical load on the pilot in a miss-rigged or out of trim situation.

10. Raytheon Aircraft Company has a history of substandard documentation regarding demonstrative figures in their maintenance manuals leading mechanics to make unnecessary mistakes.

11. Raytheon Aircraft Company was aware of the erroneous figure in the B1900D aircraft maintenance manual prior to the Colgan Air crash but failed to correct the problem in a timely manner.


I reserve the right to change these opinions as new evidence is provided and discovered.

Sincerely,

Donald E. Sommer

27

**EXHIBIT 13**

**Page 1**

```
 1          IN THE STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2               ALEXANDRIA DIVISION

 3    - - - - - - - - - - - - - - - x
      COLGAN AIR, INC.          :
 4              Plaintiff,      :
      vs.                       :  Civil Action
 5                              :  No. 1:05cv213
      RAYTHEON AIRCRAFT COMPANY, :
 6              Defendant.      :
 7    - - - - - - - - - - - - - - - x

 8
                     McLean, Virginia
 9
                Tuesday, July 12, 2005
10

11

12

13

14       Videotaped deposition of PERRY SARLUCA, a

15   witness, called for examination by counsel for

16   defendant, pursuant to notice, at the offices of

17   Dombroff & Gilmore, 1676 International Drive,

18   Penthouse, McLean, Virginia  22101, before Sandria

19   L. Cox, a notary public in and for the Commonwealth

20   of Virginia, beginning at 1:10 p.m., when were

21   present on behalf of the respective parties:

22
```

**Page 2**

```
 1   APPEARANCES:

 2

 3       FOR THE PLAINTIFF:

 4       THOMAS B. ALMY, ESQ., Dombroff & Gilmore,
         1676 International Drive, Penthouse,
 5       McLean, Virginia  22101.

 6
         FOR THE DEFENDANT:
 7
         ROBERT T. HALL, ESQ., and HOLLY PARKHURST
 8       ESSING, ESQ., Hall, Sickels, Frei &
         Kattenburg, P.C., 12120 Sunset Hills
 9       Road, Suite 150, Reston, Virginia
         20190-3231.
10

11

12

13

14

15

16

17

18

19

20

21

22
```

**Page 3**

```
 1                    I-N-D-E-X

 2               EXAMINATION BY COUNSEL FOR
                 DEFENDANT,       PLAINTIFF,
 3   WITNESS     MR. HALL:        MR. ALMY:

 4

 5   Perry Sarluca    4, 123       116

 6

 7

 8

 9

10

11

12              E-X-H-I-B-I-T-S
        (Exhibit No. 46 retained by Mr. Hall.)

13

14   SARLUCA EXHIBIT

15   No. 44 (Sarluca e-mail to Jolico)     65

16   No. 45 (Excerpt of GMM)              107

17   No. 46 (GMM in Entirety)            109

18   No. 47 (Rodriguez/Sarluca Letter)   124

19   No. 48 (Employee Counseling Form)   124

20

21

22
```

**Page 4**

```
 1           P-R-O-C-E-E-D-I-N-G-S
 2       VIDEO OPERATOR: May it please the Court,
 3   ladies and gentlemen of the jury, my name is
 4   William Sale.  I'm the video have operator and
 5   producer.  My business address is 3444 Fairfax
 6   Drive in Arlington, Virginia; area code
 7   703-527-5100.
 8       Today is Tuesday, July 12, 2005.  The
 9   time is 1:15 p.m.  We're about to take the
10   deposition of Perry Sarluca, who is a witness in
11   the matter of Colgan Air, Inc., plaintiff, versus
12   Raytheon Aircraft Company, defendant, Civil Action
13   No. 1:05 cv 213 in the Federal District Court for
14   the Eastern District of Virginia, Alexandria
15   Division.
16       The deposition is being taken at 1676
17   International Drive.
18       At this time would counsel please
19   introduce themselves and their interested parties.
20       MR. HALL: May it please the Court,
21   ladies and gentlemen of the jury, my name is Robert
22   Hall, and together with Holly Essing, we're
```

1  A. A gentleman answered and gave me Mr.
2  Joliet's number and said I needed to call him.
3  Q. So you then called a second number and
4  talked to Mr. Joliet?
5  A. Yes.
6  Q. And Mr. Joliet said that he couldn't
7  help you unless he had a PO?
8  A. He didn't say he couldn't help me. He
9  said that he needed that and he would work with me.
10  Q. What else did he need beside a PO?
11  A. He needed all the information on what I
12  was doing, the part number of the actuators I had,
13  aircraft total time, the serial number of the
14  aircraft, the parts book in which I got the part
15  numbers out of. Basic information.
16  Q. When did you provide him that
17  information?
18  A. I provided the information on the
19  e-mail. I don't recall the time.
20  MR. HALL: If you could mark this as
21  Exhibit 1 to the Sarluca deposition. I could
22  number it with a number in sequence, but I've

1  forgotten what number we were up to.
2  MR. ALMY: Why don't we just mark it "1"
3  for now and come back and change it to the number.
4  (The e-mail was marked as
5  Exhibit No. 1 for identification.
6  Same exhibit later remarked as
7  Exhibit 44.)
8  BY MR. HALL:
9  Q. Is that the e-mail that you're making
10  reference to?
11  A. Yes, it is.
12  Q. It looks like it was sent out Monday at
13  2:23 a.m.?
14  A. Yes.
15  Q. "Subject: Trim Actuators Aircraft
16  UE-40"?
17  A. Yes.
18  Q. All right, sir. One of the things it
19  says: "I am submitting a request for a
20  configuration change to UE-40."
21  So the folks watching can understand,
22  what did you mean by requesting a "configuration

1  change"?
2  A. What I meant by requesting a
3  configuration change is that these actuators are
4  installed to aircraft by the aircraft serial
5  number.
6  The IPC showed that this aircraft had
7  the 033-3 part numbers installed. The
8  configuration change that I was looking for was I
9  had a 033-7 and a 033-6 configuration change.
10  Those two particular dash numbers did
11  not fall under UE-40's serial number requirements,
12  and that's what I'm referring to by configuration
13  change.
14  Q. So the -7 and the -6 were actuators you
15  had in inventory?
16  A. Yes.
17  Q. But when you went to the IPC and looked
18  for the actuators compatible with the UE-40, you
19  did not see -7/-6 combinations.
20  A. Correct.
21  Q. And you were asking it looks like Mike
22  Jolico --

1  A. Yes. Correct.
2  Q. -- at Raytheon --
3  A. Yes.
4  Q. -- if it was okay to use the -7/-6
5  combination?
6  A. Correct.
7  Q. You conclude it, it says, "how every" --
8  I think you mean "however," don't you? -- " -- the
9  IPC usable on code will not allow me to install
10  them due to aircraft serial number requirements."
11  A. That's correct.
12  Q. And what was -- strike that.
13  Underneath this text is your
14  identification and then some more text, it looks
15  like: Remove part number -3, serial number unknown,
16  from left elevator trim and install part number -7?
17  A. Correct.
18  Q. Who typed in this text?
19  A. That is me. I was explaining to him
20  what I wanted to do. I wanted to put -7 on the
21  left side in place of that -3 and I wanted to put
22  the -6 on the right side in place of the other -3.

Page 65

1    Q. And then you alerted Mr. Jolico that the
2  aircraft was AOG?
3    A. Yes. That's correct.
4    Q. What was the response from Mr. Jolico to
5  this e-mail?
6    A. That he would have to research it.
7    Q. Okay. Did you ever hear back from him?
8    A. Yes, I did.
9    Q. Telephone or e-mail?
10   A. Telephone.
11   Q. And approximately when?
12   A. We had talked about it quite a bit.
13  Again, this other information I had to submit to
14  him: The aircraft total time, total landings and
15  all that.
16       We went back and forth with it a few
17  times. He had to go back to another building and
18  get some more information, so naturally I had to
19  wait a little while longer.
20       He called back later. He indicated to
21  me that he did not see a problem with it. However,
22  he needed to run it past his engineers.

Page 66

1    Q. Okay. What was your understanding of
2  his plan to get back to you after talking with his
3  engineers?
4    A. Yes. He was going to get back to me and
5  send me a copy of the letter -- of the terms of the
6  letter of acceptance saying that it was okay.
7    Q. Did you ever get such a letter of
8  acceptance?
9    A. I did not get such a letter.
10   Q. Nevertheless, the -7 and -6 combination
11  were installed on this aircraft?
12   A. Yes, they were.
13   Q. By whom?
14   A. By Dan Keenan.
15   Q. Under whose authority?
16   A. Under my authority.
17   Q. And why were they installed in the
18  aircraft absent a letter of acceptance from
19  Raytheon?
20   A. Because Mr. Jolico said to me that he
21  didn't see any problem with it. He was going to
22  get back with engineering. I assumed that we were

Page 67

1  going to get a letter, but I explained to Mr.
2  Keenan at the same time, We can put them in, do the
3  operational check, but be advised that we're
4  waiting on this letter and that the aircraft would
5  not go anywhere.
6       And I made that known to everyone, that
7  that aircraft would not go anywhere until we had
8  the letter.
9    Q. Do you recall at what point in time the
10  -7/-6 combination were in fact installed?
11   A. Around 5:30, 6 o'clock it was completed.
12   Q. A.M.?
13   A. A.M. Maybe a little bit later, but
14  right around that timeframe.
15   Q. I take it you didn't do the operational
16  checks until you had them installed. There wasn't
17  any operation to check until they were installed.
18   A. Correct.
19   Q. What was the operational check that you
20  or someone was, to your knowledge, performing on
21  this aircraft?
22   A. Yes.

Page 68

1    Q. What was it? How do you operationally
2  check these trim tabs after the reinstallation of
3  actuators?
4    A. I don't have the book in front of me
5  here.
6    Q. Just your best recollection.
7    A. Best recollection, it's an electrical
8  check and a manual check. You manually just spin
9  the wheel one way, and then I need the book to have
10  all the dimensions and everything of what you're
11  looking for.
12       You spin the wheel the other way and
13  look for any kind of binding, any kind of
14  mechanical difficulties.
15       And then you do an electrical check.
16       The electrical check -- those switches
17  are located on the pilot's and co-pilots yoke, and
18  depending on which way you're going, whether you're
19  going nose-up or down, you would move the switch,
20  observe operation, and also be checking the trim
21  tab actuators on the back.
22   Q. Were you involved in the operational

Page 69

1   check on this system once the -7/-6 combo was in?
2     A. I was not. My attention was on the
3   other aircraft.
4     Q. Who was doing the operational check on
5   this aircraft?
6     A. Dan Keenan.
7     Q. We may have the manual around here.
8   This isn't a memory test and I'm not going to ask
9   you to remember anything that's in it except in a
10  general sense.
11        The first operational check would be
12  manual?
13    A. I don't believe there's any set way of
14  doing an operational check.
15    Q. You could do the electric check first
16  and then the manual, or the manual first and then
17  the electric?
18    A. Correct.
19    Q. And would it include -- I'm going to
20  pull the top of the manual wheel down. That should
21  be nose-up, shouldn't it?
22    A. I don't have the book in front of me

Page 70

1   now. I don't have the aircraft here either.
2     Q. No, no. I understand that.
3         But you know from working on 1900s, do
4   you not, that nose-up trim manually is to pull the
5   top of the wheel down?
6         MR. ALMY: Objection. Vague. If you
7   understand what he's asking, go ahead. You can
8   answer the question.
9     A. I would have to be looking at it.
10        BY MR. HALL:
11    Q. In terms of Beech 1900 trim, this manual
12  wheel, what does it do?
13    A. The manual wheel?
14    Q. Yes.
15    A. The manual wheel, if you move it
16  clockwise or counter-clockwise, would cause an
17  effect on the trims.
18    Q. When a pilot is sitting looking forward,
19  the manual wheel is to his right; correct?
20    A. Correct.
21    Q. And so in terms of clockwise and
22  counter-clockwise, are you suggesting that when the

Page 71

1   pilot turns this way --.
2         Pulling it clockwise is this way?
3         I'm not describing it on camera so maybe
4   it's not working very well.
5     A. He would have to move it with his right
6   hand.
7     Q. Right.
8     A. Counter-clockwise would be this way.
9   Yeah, counter-clockwise would be this way.
10        And clockwise would be going in a down
11  position.
12    Q. So that the folks watching this can see,
13  could you bring your hand above the table and kind
14  of show them.
15    A. Sitting in the pilot's seat, the wheel
16  is here. Clockwise would be going down in a
17  clock. Counter-clockwise would be going up.
18    Q. I call that clockwise, pulling the top
19  of the wheel down.
20    A. Yes.
21    Q. Are you comfortable with that?
22    A. Yes. I'm comfortable with that.

Page 72

1     Q. Clockwise is nose-up trim?
2     A. I don't know. I don't have the wheel
3   here to look at it. I don't have the actuator in
4   my mind.
5     Q. So in terms of running this check, this
6   operations check, you would have had the book open
7   to tell you whether clockwise was nose-up or
8   nose-down?
9     A. It doesn't have any of that in the book.
10    Q. How would you know? What would you go
11  to to see if it was nose-up or nose-down clockwise?
12  ?
13    A. What are we trying to see?
14    Q. Operations check.
15    A. Uh-huh.
16    Q. Says here in the seat after installation
17  of the new actuators, pull the wheel, manual wheel,
18  clockwise. How will we know whether that's nose-up
19  or nose-down?
20    A. It's marked on the wheel.
21    Q. It's marked on the wheel?
22    A. Yes. The wheel is clearly marked.

**Page 97**

1    Q. When you went back to the parts section
2  of Colgan Hyannis and found these two actuators
3  -7/-6, did you go to the IPC to see what aircraft
4  these serial numbers went with?
5    A  Yes.  I did.
6    Q. And what did you determine?
7    A. I determined, as I had in my letter
8  here, that they didn't fall within the serial
9  number requirements.
10    Q. They didn't fall within the serial
11  number for a UE-40; correct?.
12    A. Right.
13    Q. What serial number or serial number
14  range did the -7/-6 fit?
15    A. I don't remember.
16    Q. But you did check?
17    A  Yeah.  And just knowing me and the
18  reason why I picked these two is probably because
19  they were the closest ones to UE-40.  But, again,
20  it was a long time ago.
21    Q. Do you know how -7 and -6 differed from
22  the -3's that could have been installed?

**Page 98**

1    A. I do not know how.
2    Q. After the crash, you returned to the
3  field and assisted the FAA people trying to find
4  out what happened?
5    A. Yes, I did.
6    Q. And did you speak with the mechanics who
7  had replaced the forward cable?
8    A. No, I didn't speak with them.  They were
9  physically and mentally a wreck.  I was more
10  comforting them than anything.
11    Q. Did you determine at any rate whether or
12  not -- after the installation of the new forward
13  cable whether they had done operations checks?
14    A. Again, I had not talked to them.  I was
15  just trying to be supportive.
16    Q. In terms of what was Colgan's General
17  Maintenance Manual, once you replaced a forward
18  cable, was an operational check required?
19    A. I do not know.
20    Q. The trim tabs are considered a control
21  surface, are they not?
22    A. Yes, sir.

**Page 99**

1    Q. And when maintenance is performed on a
2  control surface or its subparts, operational checks
3  are required, are they not?
4    A. Correct.
5    Q. In terms of requirements for operational
6  checks, is that required, to your knowledge, by the
7  Federal Aviation regulations?
8    A. Sorry?
9    Q. Are those checks required by the Federal
10  Aviation regulations?
11    A. If they're in the book, they are
12  required checks, period.
13    Q. And you believe they are required by the
14  Colgan General Maintenance Manual?
15    MR. ALMY:  Objection.  The General
16  Maintenance Manual or the maintenance manual?
17    BY MR. HALL:
18    Q. The Colgan General Maintenance Manual.
19    A. I would have to look at the Colgan
20  General Maintenance Manual.  There's various items
21  in there that they do list that require operational
22  checks.  I would have to see that physically.

**Page 100**

1    Q. When the -7/-6 were put in and you were
2  informed that the cable had kinked, when you came
3  to the aircraft, do you know whether prior to the
4  kinking the mechanic had run the rigging procedure?
5    A. Oh, I know all the rigging procedure and
6  all that had to be done because that's all in our
7  inspection requirements.  So the inspector would
8  have had to write off on it.
9    Q. Okay.  Just for the folks watching this,
10  when we're say "rigging procedure," what would that
11  involve, generally?
12    I know you don't have the manual in
13  front of you, but just in general what would a
14  rigging procedure involve?
15    A. A rigging procedure would involve -- in
16  this particular case we have white boards that we
17  would put up on the aircraft.  Certain -- I don't
18  know what they call them -- they're like cover
19  assemblies you put on with degrees and all that.
20    Q. Travel board?
21    A. Yeah.  You have your travel board and
22  your rigging pins and whatever else, and you set it

**Page 101**

1  up to particular points that the book tells you to
2  set.
3          And then you go to certain operational
4  checks and movements with the controls to verify
5  certain degrees or tolerances or whatever.
6      Q. Something like when the manual trim
7  wheel was at zero, that the trim tabs would be at
8  zero?
9      A. At zero. Correct. They would give you
10  a procedure to make sure that they were at zero.
11      Q. And completion of the rigging checks
12  would have been required by Colgan before the plane
13  was returned to service; correct?
14      A. Be required by the maintenance manual?
15      Q. Yes.
16      A. Yes.
17      Q. But for identifying some documents just
18  to complete our paperwork, why don't we just take a
19  few minutes? Maybe I'm done but for asking him to
20  identify a couple documents.
21          MR. ALMY: I will be happy to take a
22  break.

**Page 102**

1          MR. HALL: Okay.
2          VIDEO OPERATOR: We're off the video
3  record at 3:12.
4          (Whereupon, a recess was taken.)
5          VIDEO OPERATOR: We're back on the video
6  record at 3:24.
7          Go ahead, sir.
8          BY MR. HALL:
9      Q. Mr. Sarluca, in Mr. Service's deposition
10  we marked portions of the Colgan Air General
11  Maintenance Manual.
12          Just to give yourself some comfort, that
13  is only part of it. I wanted to show you a part
14  that hadn't apparently been marked and ask you if
15  you could identify it.
16      A. This is the Colgan General Maintenance
17  Manual. This is the changes.
18          (The Colgan GMM excerpt was marked as
19          Exhibit No. 45 for identification.)
20      Q. I show you what is pre-marked as Exhibit
21  45. Look at that.
22          (Witness examining document).

**Page 103**

1      A. Okay.
2      Q. Is that the chapter in the General
3  Maintenance Manual dealing with inspection policies
4  and procedures?
5      A. Yes, it is.
6      Q. What is an RII policy?
7      A. The RII policy is a designated
8  representative.
9      Q. I meant really what does "RII" mean;
10  what does that stand for?
11      A. I don't know.
12      Q. Okay. All right, sir. Let's go to
13  paragraph 5.3.0.
14      A. Uh-huh.
15      Q. Item A, indicating Colgan Air has
16  designated items of maintenance that must be
17  inspected by authorized personnel. These items
18  include at least those that could result in a
19  failure, malfunction or defect endangering the safe
20  operation on the aircraft if not performed properly
21  or if improper parts or materials are used.
22          Are you familiar with that paragraph?

**Page 104**

1      A. Yes.
2      Q. All right, sir. Is it correct to say
3  that any maintenance work on a control surface
4  requires an inspection?
5      A. It depends on what the GMM has dubbed as
6  a control surface. I believe we have a list in
7  here of what requires RII's and what does not.
8      Q. Do you know -- this is not a memory test
9  -- just whether or not the maintenance manual
10  required inspection of the replacement of the
11  forward trim tab cables?
12      A. I couldn't tell you. I don't know.
13          MR. HALL: Tom, I only have one copy but
14  it came from Colgan and it's the General
15  Maintenance Manual in its entirety. I'm going to
16  go ahead and have it marked as 46. I just have one
17  question concerning that documentation.
18          (The General Maintenance Manual
19          was marked as Exhibit No. 46 for
20          identification.)
21          BY MR. HALL:
22      Q. I want to show you what I believe is the

# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CONSOLIDATED UNDER
### CASE NO. 05-10155 PBS

|  |  |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10364 PBS |

## AFFIDAVIT OF WILLARD CROWE

1

I, Willard Crowe, hereby depose and state:

1.      I am a Senior Multidiscipline Engineer II, FAA, for Raytheon Aircraft Company. I am of legal age and competent to testify. I make this Affidavit based upon personal knowledge and in support of the Raytheon defendants' motion for summary judgment in the above-referenced action. The matters contained in this Affidavit are true and correct.

2.      Since 1995, I have worked on the Beech 1900 airplane, primarily in the landing gear and flight controls design.

3.      It is my understanding that the Colgan Air mechanics that replaced the actuators on the accident aircraft on August 24, 2003, used part numbers 129-526033-6 and 129-526033-7 which were the parts that Colgan Air had on hand at that time.

4.      At that time, Raytheon Aircraft Company Service Bulletin 27-3032 recommended the use of 129-526033-7 (left side) and 129-526033-9 (right side), 129-526033-27 (left side) and 129-526033-29 (right side) or actuators modified by kit 129-5043 for use in this application.

5.      Because there is no difference in the force needed to pull on control cables to cause movement of the trim actuators (no differential pull) between the 129-526033-6 and 129-526033-7, the installed pairing of the 129-526033-6 and 129-526033-7, against the recommendations of the IPC, could not have caused the cable damage that Colgan Air reported as the result of the operational check following the replacement of the actuators.

2

Signed under the pains and penalties of perjury this 27th day of October, 2006.

_Willard Crowe_
Willard Crowe
Senior Multidiscipline Engineer II, FAA
Raytheon Aircraft Company

Subscribed and sworn to before me this _27th_ day of _October_, 2006.

_Janet M. Nicholas_
Notary Public

My Appointment Expires:

_10-20-08_

JANET M. NICHOLAS
Notary Public - State of Kansas
My Appt. Expires _10-2-0-08_

3

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - -x

                      :

COLGAN AIR, INC.,              :

                      :

        Plaintiff,    :

                      :

    vs.                :  Civil Action

                      :  No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,    :

                      :

        Defendant.    :

                      :

- - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, June 23, 2005

    Videotaped deposition of LARRY RATLIFF, witness,

called for examination by counsel for the defendant,

pursuant to notice, at the offices of Mark A. Dombroff,

Esq., Dombroff & Gilmore, P.C., 1676 International Drive,

Penthouse, McLean, Virginia, before Malynda D. Whiteley, a

Registered Professional Reporter and a notary public in and

for the State of Virginia, beginning at 4:03 p.m., when

were present on behalf of the respective parties:

## Page 14

1    And I never stayed here -- well, not here -- in
2  Hyannis. I always flew back home on my days off.
3    Q   So you got tired of that and wanted to do
4  something that was -- would allow you to have one home?
5    A   Yeah, one home, because I didn't see myself
6  making -- benefiting by paying for two houses. And then
7  during the winter I started losing money because the
8  weather (sic) bad, you get stuck, then you have to pay out
9  your own pocket to rent a car to get to work that night.
10   Q   Do you remember having performed mechanic work on
11 Tail No. 240, the accident aircraft, during the month that
12 it crashed?
13   A   Yes.
14   Q   Just generally -- and we'll talk about the
15 specifics as we get more to it. But just generally what
16 was your role in that work?
17   A   Generally I -- I put (sic) actuator in on the
18 port side or the right side and did ransom (phonetic)
19 tests.
20       The cable jammed up. Then we found out that the
21 actuator wasn't the right one that -- we -- we found out we
22 couldn't use that one.

## Page 15

1    Q   So were you involved in the free play check that
2  determined that the actuator needed to be changed?
3    A   No.
4    Q   That was done by someone else?
5    A   I can't remember. I don't even know if I was
6  involved in -- we all did the inspection, and I don't
7  remember what part I did. I -- we did part of it one day,
8  and then it went out and came back in, and we did the other
9  part the next day.
10   Q   And we're talking about a -- a Detail Six
11 inspection; is that right?
12   A   Yes.
13   Q   And what part of the plane does that inspect?
14   A   That's pretty much the whole plane.
15   Q   The whole plane?
16   A   Just about. You do different sections.
17   Q   And what things do you remember checking on?
18   A   I can't remember; that was two years ago.
19   Q   Once the trim tabs were found to fail the free
20 play check, were you then given the task of replacing --
21   A   Yes.
22   Q   -- one of them?

## Page 16

1    A   Uh-huh.
2    Q   And were you working alone or with someone else?
3    A   I was working with another mechanic, a new guy.
4  I can't remember his name.
5    Q   Scott Gebauer?
6    A   I think that's his name.
7    Q   So you were the senior guy, he was the new guy --
8    A   Yes.
9    Q   -- on this task?
10   A   Yes.
11   Q   And you had been there by this point in time a
12 little less than a year?
13   A   Yes.
14   Q   And what was your title at the time?
15   A   Mechanic.
16   Q   You weren't a lead?
17   A   No.
18   Q   Had you been a help- -- a mechanics' helper at
19 some point early on, or were you a mechanic right away?
20   A   I was a mechanic right away. I had my A and P
21 license so --
22   Q   Were you involved at all in the process of -- of

## Page 17

1  obtaining the part, the actuator itself, to put on?
2    A   I'm not understanding the words you're asking me.
3    Q   Well, when you're -- when you find out that
4  the -- the actuator fails the free play test, you've got to
5  replace the actuator --
6    A   Right.
7    Q   -- right?
8        So you've got to obtain a new replacement
9  actuator?
10   A   No, I wasn't involved.
11   Q   Someone else did that?
12   A   Right; a supervisor.
13   Q   So by the time you were tasked with actually
14 changing it, you already had a part in hand?
15   A   Right.
16   Q   When you replace an actuator like that, what do
17 you do in terms of going to get a checklist or
18 documentation --
19   A   I --
20   Q   -- to do the job?
21   A   Basically you go to the computer, print out what
22 you need, bring it and set it on your toolbox, get all your

# EXHIBIT 16

Colgan Air v. Raytheon | CondenseIt™ | Miguel Rodriguez

Page 1

```
 1          IN THE STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF VIRGINIA
              ALEXANDRIA DIVISION
 3    - - - - - - - - - - - - - - - - x
      COLGAN AIR, INC.,                :
 4              Plaintiff,             :
                                       :
 5    vs.                 : Civil Action
                          : No. 1:05cv213
 6    RAYTHEON AIRCRAFT COMPANY,       :
                                       :
 7              Defendant.  :
      - - - - - - - - - - - - - - - - x
 8

 9                   McLean, Virginia

10              Tuesday, July 12, 2005

11

12

13

14      Videotaped deposition of MIGUEL RODRIGUEZ,

15    a witness, called for examination by counsel

16    for defendant, pursuant to notice, at the

17    offices of Dombroff & Gilmore, 1676

18    International Drive, Penthouse, McLean,

19    Virginia  22101, before Sandria L. Cox, a

20    notary public in and for the Commonwealth of

21    Virginia, beginning at 1:10 p.m., when were

22    present on behalf of the respective parties:
```

Page 2

```
 1    APPEARANCES:

 2

 3        FOR THE PLAINTIFF:

 4        THOMAS B. ALMY, ESQ., MARK A. DOMBROFF,
          Dombroff & Gilmore, 1676 International
          Drive, Penthouse, McLean, Virginia
 5        22101.

 6

 7        FOR THE DEFENDANT:

 8        ROBERT T. HALL, ESQ., Hall, Sickels, Frei
          & Kattenburg, P.C., 12120 Sunset Hills
 9        Road, Suite 150, Reston, Virginia
          20190-3231.

10

11        MICHAEL JONES, ESQ., Martin, Pringle,
          Oliver, Wallace & Bauer, L.L.P., 100
12        North Broadway, Suite 300, Wichita,
          Kansas  67202.

13

14

15

16

17

18

19

20

21

22
```

Page 3

```
 1                    I-N-D-E-X

 2

 3                      EXAMINATION BY COUNSEL FOR
                        DEFENDANT,
      WITNESS           MR. HALL:
 4

 5    Miguel Rodriguez        4

 6

 7

 8

 9

10

11

12                E-X-H-I-B-I-T-S

13             (No exhibits marked)

14

15

16

17

18

19

20

21

22
```

Page 4

```
 1          P-R-O-C-E-E-D-I-N-G-S
 2       VIDEO OPERATOR: May it please the Court,
 3    ladies and gentlemen of the jury, my name is
 4    William Sale. I'm the video operator and
 5    producer. My business address is 3444 Fairfax
 6    Drive in Arlington, Virginia; area code
 7    703-527-5100.
 8       Today is Thursday, July 14, 2005.
 9    The time 1:23 p.m. We're about to take the
10    third in a series of depositions involving
11    Colgan Air, Inc., plaintiff, versus Raytheon
12    Aircraft Company, defendant.
13       This is the deposition of Miguel
14    Rodriguez.
15       At this time would counsel please
16    introduce themselves.
17       MR. HALL: Mr. Rodriguez, my name is
18    Robert Hall. I'm here on behalf of Raytheon
19    Aircraft. On the telephone is Mr. Jones.
20       MR. DOMBROFF: Mark Dombroff for
21    Colgan Air.
22       VIDEO OPERATOR: Would the court
```

| Colgan Air v. Raytheon | CondenseIt™ | Miguel Rodriguez |
|---|---|---|

Page 37

1  Dombroff coming into room.)
2      Q. Were you consulted by Mr. Sarluca
3  about the decision to install -- I think the
4  record will reflect he installed a -7 and a -6
5  actuator in the tail section of the UE-40?
6      A. No.
7      Q. Is that a decision that essentially
8  you left to him and in conjunction with his
9  conversations with Raytheon technical
10  assistance?
11      A. Yes. As a supervisor he had the
12  leeway to run the operation in the evenings as
13  his mandate.
14      Q. So in terms of is there any anything
15  in Colgan policy manuals, the General
16  Maintenance Manual or any other policy manual
17  of which you're aware, that specifically gives
18  the maintenance supervisor Mr. Sarluca the
19  authority to substitute actuators for those
20  that are listed in the parts catalog?
21      A. He doesn't have the authority to
22  deviate from the manual, if that's the question

Page 38

1  you're asking.
2      If there is confusion as to which
3  one of the ones listed are required to be on
4  that specific serial number, he then proceeded
5  to do the next best thing, which is contact
6  technical services.
7      Q. I want to draw an analogy here; it
8  may not be very tight. But when I go down to
9  buy a cartridge for my computer printer and go
10  into the store, there will be a print cartridge
11  that says it is compatible with the following
12  printers.
13      Do I understand that the parts
14  catalog has got -- if you are a Beech
15  1900-Delta, serial number U-1 to U-55, let's
16  say, here are the appropriate part numbers for
17  the actuators, and there might be several?
18      A. That's kind of a simply analogy but
19  you are on the right track.
20      In other words, on the manual, the
21  IPC will list you the component that you're
22  looking for and it will list you several part

Page 39

1  numbers of that specific component and then all
2  the way to the right-hand-side of opposite page
3  you will have what is called usable on-code and
4  that code will you tell what serial number
5  range might fit.
6      Along the lines of that you might
7  have one single code or several codes for a
8  specific dash number.
9      When you to go that specific dash
10  number on the manual, it will tell you spares
11  replacement alternate number will be this or
12  superseded part number.
13      So you go from line item to line
14  item, as it keeps going superceded.
15      So it's a little more complicated
16  than just a single list of parts that fit in a
17  specific airplane.
18      Q. All right, sir. I think the record
19  will reflect that -6 and -7 actuators were
20  installed and then the cable bound up in some
21  fashion or came off the drum.
22      A. Correct.

Page 40

1      Q. And then one of the actuators was
2  replaced.
3      A. I believe the right-hand actuator
4  was replaced a second time.
5      Q. I think the record reflects that the
6  -7 actuator was put on the left-hand-side of
7  the aircraft and -6 on the right, and the -6
8  was subsequently removed and replaced with a
9  -9. Is that your understanding?
10      A. I don't recall, but I think you're
11  on the right track.
12      Q. All right, sir. Now, in terms of
13  the Colgan policies and procedures, if Mr.
14  Sarluca has looked in inventory and has a -7
15  and a -6 in inventory but he's gone to the
16  Raytheon parts catalog and it didn't say in the
17  parts catalog that a -7 may be used with a -6
18  for Uniform Echo 40, what is the procedure he's
19  supposed to follow from that point on?
20      A. If he would have done an inventory
21  of the stock and saw in the IPC that a specific
22  part number that he was required to have was

# EXHIBIT 17



Beech 1900D Airliner Maintenance Manual (UE-1 and After)
**Elevator Tab Cables - Maintenance Practices**

RIGHT HAND THREADS CABLE FROM THE PEDESTAL
TAB CONTROL DRUM TO THE LEFT HAND THREADS
CABLE OF THE ACTUATOR DRUM

CABLE LOCK
PIN



FORWARD
AS INSTALLED

LEFT HAND THREADS CABLE FROM THE PEDESTAL TAB
CONTROL DRUM TO THE RIGHT HAND THREADS
CABLE OF THE ACTUATOR DRUM

**Elevator Tab Control Cable Winding**

C9101033



**Figure 201**

Printed from REPS Airliner Revision 9 - May 2003
(P/N 129-590000-15 Revision A30 October 26 2002)



Beech 1900D Airliner Maintenance Manual (UE-1 and After)
## Elevator Tab Cables - Maintenance Practices



**Elevator Trim Tab Control System**

Printed from REPS Airliner Revision 9 - May 2003
(P/N 129-590000-15 Revision A30 October 26 2002)

**REPS**
raytheon electronic publication system

Beech 1900D Airliner Maintenance Manual (UE-1 and After)
**Elevator Tab Cables - Maintenance Practices**

# ELEVATOR TAB CABLES - MAINTENANCE PRACTICES

## *ELEVATOR TRIM TAB CABLE REMOVAL*

a. Remove all flight compartment seats (25-10-00) and all left passenger seats (25-20-00).

b. Remove the flight compartment carpet (25-10-01) and floorboards (6-50-00), the belly access plate below the pedestal (121DBC, 6-50-00), all left passenger compartment carpets (25-20-01) and floorboards (6-50-00), and all access plates on top of the horizontal stabilizer (6-50-00).

c. Remove the cable retaining pins, fairleads and pressure seals. Refer to Figure 202.

> NOTE: Some of the pulleys cannot be cleared by the stops and turnbuckles even with retaining pins removed. Remove those pulleys where necessary to provide for adequate clearance.

d. Remove the straps securing the conduit tubes both forward and aft of the brackets.

e. Slide the conduit tubes forward or aft as required to gain access to the turnbuckles.

f. Separate the forward cables from the aft cables at the turnbuckles.

g. Attach lead lines to the aft ends of the forward cables and properly identify them to facilitate reinstallation.

h. In the crew compartment, remove the front and both side access panels from the pedestal.

i. Tape the two cables together just below the cable drum to prevent backlash from the drum.

> CAUTION: IF THE FA2100 FLIGHT DATA RECORDER IS INSTALLED ON THIS AIRCRAFT, PERFORM THE PITCH TRIM CONTROL POTENTIOMETER (SENSOR) REMOVAL PROCEDURE. REFER TO **CHAPTER 31-31-23 IN THE BEECH 1900D AIRLINER FLIGHT DATA RECORDER (FA2100) MAINTENANCE MANUAL SUPPLEMENT, P/N 129-590000-109.**

j. On the left side of the pedestal, loosen the two bolts in the idler sprocket bracket to relieve tension from the elevator tab chain in the pedestal.

k. Cut and remove the safety wire from the two bolts on each end of the elevator tab drum shaft in the lower forward pedestal.

l. Remove the two bolts, lift the shaft assembly slightly to remove the chain from the sprocket and remove the shaft assembly from the pedestal with the cable attached.

> NOTE: The point where the cable is secured by the pin can be marked with a drop of paint or a piece of tape. If the cable is to be replaced with a new one, measure the new cable against the old one and mark it also. Make certain the dimensions for the tab up and tab down are the same for the new cable as on the old cable.

m. Withdraw the cable from the airplane, drawing the lead lines through the pedestal.

n. Identify and attach lead lines to the aft cables in the aft fuselage section.

27-30-04-201

Printed from REPS Airliner Revision 9 - May 2003
(P/N 129-590000-15 Revision A30 October 26 2002)

Page 3

NOTE: If you have chosen a 'selected text' print out, from REPS (Raytheon Electronic Publication System) - The selection may not include all relevant data, such as; process specifications, Warnings, Cautions & Notes that may be found elsewhere in the complete document or in other applicable service information documents. Make sure you have read and understood all associated information before performing any maintenance on the aircraft. It is the responsibility of the mechanic, repairman or inspector to understand the current instructions of the manufacturer and the manuals, for the specific operation concerned.

# REPS
raytheon electronic publication system

Beech 1900D Airliner Maintenance Manual (UE-1 and After)

## Elevator Tab Cables - Maintenance Practices

o. Working through the access openings in the top of the horizontal stabilizer, separate both cables at the turnbuckles and withdraw the cable with the lead line attached. (The other cable is still connected to the opposite tab actuator through a turnbuckle.

> NOTE: While working with the cables that are strung up through the vertical stabilizer, take precautions to avoid losing the ends of the cables down into the interior of the vertical stabilizer since recovery is difficult.

p. Attach and identify a lead line to the remaining cable that runs inboard from the turnbuckle.

q. Working up through the access openings on top of the horizontal stabilizer, disconnect the turnbuckle of the crossover cable (which has a lead line attached at the left horizontal stabilizer) and remove the cable from the airplane.

r. Disconnect the remaining cable at the turnbuckle and withdraw the remaining aft cable from the aft fuselage section.

## ELEVATOR TRIM TAB CABLE INSTALLATION

> NOTE: If a used cable is being installed, the cable should be dipped in corrosion preventive compound (4, Chart 2, 27-00-00). Excess should be removed by wiping with a clean cloth.

a. Position the cable in the slot in the cable drum (use the mark as indicated in ELEVATOR TRIM TAB CABLE REMOVAL) and install the cable lock pin. Refer to Figure 201.

b. The cable must be installed as shown in the illustration. From the pin, wrap each cable 2-1/4 turns around the drum and tape the two cables together to prevent backlash from the drum.

c. Set the tab indicator at 0. Refer to Figure 202.

d. Assemble the cable guard over the drum, install the sprocket on the shaft and carefully position the shaft assembly in the pedestal, installing the lower end of the chain over the sprocket.

e. Install and safety wire the two bolts in the ends of the shaft assembly on each side of the pedestal.

f. Adjust the idler sprocket in the pedestal to remove slack from the tab control chain and tighten the two bolts in the idler sprocket bracket on the left side of the pedestal.

g. After identifying the cable ends, attach the proper lead lines to the cables and pull them back through to the aft fuselage opening. Install the conduit tubes over the cables, but do not install the straps around the tubes at this time. Secure the cable ends to the structure with tape to prevent movement while the remainder of the cables are being strung.

h. Reinstall the pulleys that were removed for routing and reinstall the cable retaining pins.

i. Working through the access openings on the top of the horizontal stabilizer, attach the LH aft cable to the lead line and pull the cable through the vertical stabilizer to the aft fuselage area. Secure the end of the cable at the stabilizer with tape.

> NOTE: While working with the cables that are strung up through the vertical stabilizer, take precautions to avoid losing the ends of the cables down into the interior of the vertical stabilizer since recovery is difficult.

j. Attach the crossover cable to the lead line at the opening in the top of the left horizontal stabilizer and pull the cable through

Printed from REPS Airliner Revision 9 - May 2003
(P/N 129-590000-15 Revision A30 October 26 2002)

NOTE: If you have chosen a 'selected text' print out, from REPS (Raytheon Electronic Publication System) - The selection may not include all relevant data, such as; process specifications, Warnings, Cautions & Notes that may be found elsewhere in the complete document or in other applicable service information documents. Make sure you have read and understood all associated information before performing any maintenance on the aircraft. It is the responsibility of the mechanic, repairman or inspector to understand the current instructions of the manufacturer and the manuals, for the specific operation concerned.

**REPS**
raytheon electronic publication system

Beech 1900D Airliner Maintenance Manual (UE-1 and After)
## Elevator Tab Cables - Maintenance Practices

to the right horizontal stabilizer. Secure both ends of the cable with tape.

k. Attach the RH aft cable to the lead line in the aft fuselage area and pull the cable up through the access opening in the top of the horizontal stabilizer. Secure the cable with tape.

l. Identify and reconnect the turnbuckles in the right stabilizer access opening.

    *NOTE: The interior of all turnbuckles should be coated or filled with grease (1, Chart 2, 27-00-00) for corrosion protection. Check for proper installation before safetying the turnbuckles.*

m. Identify and reconnect the turnbuckles in the left horizontal stabilizer access opening.

n. Identify and reconnect the turnbuckles in the aft fuselage area.

o. Using solvent (2, Chart 2, 27-00-00), clean the cables for the length of travel through the pressure seals in the aft fuselage. Lubricate to one inch beyond the cleaned area with grease (1, Chart 2, 27-00-00).

p. Remove the tape from the cables below the cable drum in the pedestal.

q. Fill the pressure seals with grease (1, Chart 2, 27-00-00) and install them.

r. Reinstall the cable retaining pins and fairleads.

s. Seal the rubber seals to the metal with sealer (3, Chart 2, 27-00-00).

t. Rig the cables to the proper tension as indicated in Figure 201, Chapter 27-30-05 and safety all turnbuckles.

u. Rig the cables as outlined in ELEVATOR TRIM TAB RIGGING in Chapter 27-30-05.

v. If necessary, adjust the indicator in the flight compartment to 0 while the tabs are neutral to the elevator.

w. Install straps on the conduit tubes both forward and aft of the brackets.

    *NOTE: If the FA2100 Flight Data Recorder is installed on this aircraft, perform the PITCH TRIM CONTROL POTENTIOMETER (SENSOR) INSTALLATION procedure. Refer to Chapter 31-31-23 in the BEECH 1900D AIRLINER FLIGHT DATA RECORDER (FA2100) MAINTENANCE MANUAL SUPPLEMENT, P/N 129-590000-109.*

x. Replace all access panels, floor coverings and seats.

NOTE: If you have chosen a 'selected text' print out, from REPS (Raytheon Electronic Publication System) - The selection may not include all relevant data, such as; process specifications, Warnings, Cautions & Notes that may be found elsewhere in the complete document or in other applicable service information documents. Make sure you have read and understood all associated information before performing any maintenance on the aircraft. It is the responsibility of the mechanic, repairman or inspector to understand the current instructions of the manufacturer and the manuals, for the specific operation concerned.

# EXHIBIT 18

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 | Aircraft Registration Number: N240CJ |
| --- | --- | --- |
| | Occurrence Date: 08/26/2003 | Most Critical Injury: Fatal |
| | Occurrence Type: Accident | Investigated By: NTSB |

### Location/Time

| Nearest City/Place Yarmouth | State MA | Zip Code 02675 | Local Time 1540 | Time Zone EDT | |
| --- | --- | --- | --- | --- | --- |

| Airport Proximity: Off Airport/Airstrip | Distance From Landing Facility: 4 | Direction From Airport: 180 |
| --- | --- | --- |

### Aircraft Information Summary

| Aircraft Manufacturer Beech | Model/Series 1900D | Type of Aircraft Airplane |
| --- | --- | --- |

| Sightseeing Flight: No | Air Medical Transport Flight: No |
| --- | --- |

### Narrative

Brief narrative statement of facts, conditions and circumstances pertinent to the accident/incident:

HISTORY OF FLIGHT

On August 26, 2003, at 1540 eastern daylight time, a Beech 1900D, N240CJ, operated by Colgan Air Inc. as flight 9446 (d.b.a. US Airways Express), was destroyed when it impacted water near Yarmouth, Massachusetts. The certificated airline transport pilot and certificated commercial pilot were fatally injured. Visual meteorological conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA), Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New York. An instrument flight rules flight plan was filed for the repositioning flight conducted under 14 CFR Part 91.

According to data from Federal Aviation Administration (FAA) air traffic control (ATC), the flight departed runway 24 at Hyannis about 1538. Shortly after takeoff, the flightcrew declared an emergency and reported a "runaway trim." The airplane flew a left turn and reached an altitude of approximately 1,100 feet. The flightcrew subsequently requested to land on runway 33, and the air traffic control tower (ATCT) controller cleared the flight to land on any runway. No further transmissions were received from the flightcrew.

Witnesses observed the airplane in a left turn, with a nose-up attitude. The airplane then pitched nose-down, and impacted the water "nose first."

According to the cockpit voice recorder (CVR), the flightcrew completed the Before Start checklist between 1523 and 1530; however, there was no record of the First Flight Of The Day checklist being completed after engine start.

At 1523:30, the captain called for the Before Start checklist.

At 1523:43, the first officer stated, "preflight's complete. cockpit scan complete." The captain replied, "complete."

At 1523:58, the first officer stated, "maintenance log, release, checked the aircraft." The captain replied, "uhhhh. maintenance and release on aircraft. The captain subsequently identified that the DFDR was inoperative, and confirmed that the minimum equipment list (MEL) was still open.

At 1525:11, the captain began to start the right engine, before being interrupted. Approximately 1 minute later, after a conversation with maintenance personnel over the radio, the captain resumed the starting of the right engine.

At 1529:29, as the captain was starting the left engine, the flightcrew began non-pertinent conversation, which lasted about 30 seconds.

RAC 000204

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 |
| FACTUAL REPORT AVIATION | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Narrative    (Continued)**

At 1530:04, the captain called for the After Start checklist. After completing the After Start checklist items, the first officer announced the checklist "complete."

At 1530:21, the captain continued the previous non-pertinent conversation, followed 10 seconds later with, "all right we're ready to taxi with HOTEL."

At 1530:50, the flightcrew began a conversation about the flight plan to ALB, taxiing the airplane, and which pilot would fly the airplane. The conversation lasted for about 4 minutes.

At 1535:14, during the Taxi checklist, the first officer stated, "...three trims are set." The first officer then called the Taxi checklist "complete."

At 1535:26, the flight crew began a non-pertinent discussion about a landing airplane. The discussion lasted about 1 minute and 27 seconds.

At 1537:00, the airplane was holding short of runway 24.

At 1537:17, the captain stated, "all right. forty six is ready." The flightcrew then began to announce several items, which were identified as being on the Before Takeoff checklist; however, the checklist was not called for.

At 1538:07, the controller cleared Colgan flight 9446 for takeoff on runway 24.

At 1538:08, the flightcrew initiated a takeoff on runway 24.

At 1538:40, the first officer stated "V1...rotate."

At 1538:46, the captain stated, "...we got a hot trim..." At that time, according to the digital flight data recorder (DFDR), the elevator trim moved from approximately -1.5 degrees (nose down) to -3 degrees at a speed consistent with the electric trim motor.

At 1538:48, the captain stated, "kill the trim kill the trim kill the trim."

At 1538:50, the captain stated, "roll back...roll back roll back roll back roll back." According to the DFDR, the elevator trim then moved from approximately -3 degrees to -7 degrees at a speed greater than the capacity of the electric trim motor.

At 1538:56, the captain stated, "roll it back roll my trim..."

At 1539:00, the captain stated, "do the electric trim disconnect..."

At 1539:04, the captain instructed the first officer to, "go on the controls" with him.

At 1539:14, the captain instructed the first officer to retract the landing gear.

At 1539:18, the captain instructed the first officer to retract the flaps. The first officer responded that they were "up."

At 1539:21, the captain declared an emergency regarding a runaway trim and requested to return to the airport. The controller acknowledged the emergency and offered the option of the left or right downwind for runway 24.

At 1539:33, the captain instructed the first officer to reduce the engine power.

From 1539:49 to 1540:03, the captain instructed the first officer to "pull the breaker." The first

FACTUAL REPORT - AVIATION

RAC 000205

Page 1a

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Narrative    (Continued)**

officer queried the captain as to its location.

At 1540:30, the captain requested to land on runway 33.    The controller acknowledged the transmission and cleared the flight to land on runway 33.

The recording ended at 1540:47.

The accident occurred during the hours of daylight; located approximately 41 degrees, 37 minutes north longitude, and 70 degrees, 15 minutes west latitude.

PERSONNEL INFORMATION

Captain

The captain held an airline transport pilot certificate, with a rating for airplane multiengine land, and was type rated in the Beech 1900D. His most recent FAA first class medical certificate was issued on March 18, 2003. The captain was hired by Colgan Air on July 16, 2001, and initially flew as a first officer on the Beech 1900D. He received a Beech 1900D type rating on January 8, 2003.    The captain's most recent proficiency check was completed on June 5, 2003. The captain had accumulated a total flight time of 2,891 hours; of which, 451 hours were as pilot in command of a Beech 1900D, and 913 hours were as second in command of a Beech 1900D.

First Officer

The first officer held a commercial pilot certificate with ratings for airplane single engine land, airplane multiengine land, and instrument airplane.    His most recent FAA first class medical certificate was issued on August 22, 2003. The first officer was hired by Colgan Air on October 22, 2002, and assigned to the Beech 1900D. His most recent proficiency check was completed on November 3, 2002. The first officer had accumulated a total flight time of 2,489 hours; of which, 689 hours were in a Beech 1900D.

Quality Assurance Inspector

The quality assurance inspector received an airframe and powerplant certificate in 1986. He worked for several companies within the aviation industry and was hired by Colgan Air in June, 2002. The quality assurance inspector had no prior experience on the Beech 1900 before his employment at Colgan Air.    He received 40 hours of formal training for the Beech 1900, and on the job (OJT) training as well.

Lead Maintenance Technician

The lead maintenance technician that replaced the elevator trim tab cable received his airframe and powerplant certificate in September, 2001.    He was hired by Colgan Air on October 2, 2001. He received approximately 94.5 hours of formal training on the Beech 1900, and OJT. The lead maintenance technician had previously replaced a forward elevator trim tab cable on a Beech 1900C with a former employer.

Lead Maintenance Technician

The second lead maintenance technician that assisted in replacing the elevator trim tab cable received his airframe and powerplant certificate in September, 2001. He was hired by Colgan Air on October 2, 2001. He received approximately 72 hours of formal training on the Beech 1900, and OJT.

AIRCRAFT INFORMATION

RAC 000206

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 |
|---|---|
| FACTUAL REPORT AVIATION | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

Narrative    (Continued)

The airplane was manufactured in 1993, and equipped with two Pratt & Whitney PT6A engines. On January 3, 2003, Colgan Air leased the airplane from Raytheon Aircraft Credit Corporation, and it entered service on January 4, 2003.

At the time of the accident, the airplane had accumulated 16,503.5 hours of operation; of which, 1,219.1 hours were generated by Colgan Air. The airplane had accumulated a total of 24,637 cycles; of which, 1,765 cycles were generated by Colgan Air. The left engine had accumulated 15,245 total hours of operation, and 3,120 hours since the last overhaul. The right engine had accumulated 16,180 total hours of operation, and 3,120 hours since the last overhaul.

The accident flight was the first flight after maintenance had been performed on the airplane, which included replacement of the forward elevator pitch trim tab cable.

METEOROLOGICAL INFORMATION

At 1556, the reported weather at HYA was: winds variable at 6 knots; visibility 10 miles; sky clear; temperature 78 degrees Fahrenheit; dew point 68 degrees Fahrenheit; altimeter 29.86 inches of mercury.

FLIGHT RECORDERS

Cockpit Voice Recorder

The airplane was equipped with a Fairchild model A-100A CVR. The CVR was transported to the NTSB, Office of Research and Engineering, on August 27, 2003. A CVR group convened on August 28, 2003, and a transcript was prepared of 17 minutes 17 seconds of the approximate 34-minute recording. Recordings prior to the flightcrew entering the cockpit were not transcribed.

According to the CVR Group Chairman's report, the exterior of the CVR showed evidence of structural damage. The interior of the recorder and the tape were found intact and in good condition. The recording consisted of four channels of "poor to good" quality audio information.

Flight Data Recorder

The airplane was equipped with a L3COM (Fairchild) Model F1000 (S/N 00505) DFDR. The DFDR was transported to the NTSB Office of Research and Engineering on August 27, 2003. A DFDR readout was then performed.

The DFDR recorded data in a digital format using solid-state Flash Memory as the recording medium. Although the recorder was damaged by impact forces, the memory module was not damaged. The timing of the DFDR data was correlated to air traffic control and CVR timing.

A total of 96.7 hours of data on the DFDR was referenced to compare previous flights to the accident flight. As a result of the recent maintenance performed on the airplane, the pitch trim values and elevator position values for the DFDR were out of calibration, and the DFDR was noted as inoperative on the maintenance records. However, the DFDR recorded data for the accident flight. Although the exact pitch trim and elevator position values were not known, the data provided trend information.

There was no DFDR data recovered that indicated an operational check of the elevator trim system was performed after maintenance. However, the DFDR required 115 volts of AC current to operate. The electric trim system could operate using the 28-volt DC bus, without having the 115-volt AC bus powered.

RAC 000207

This space for binding

| National Transportation Safety Board FACTUAL REPORT AVIATION | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Narrative      (Continued)**

The DFDR values recorded for the pitch trim control position, at the beginning of the flight, were approximately 2 degrees negative. Shortly after takeoff, the pitch trim control values changed to approximately 3 degrees negative, where they remained for a period of about 10 seconds. The pitch trim control values then moved to approximately 7 degrees negative, where they remained for the duration of the flight. The data also revealed that after takeoff, the airspeed continued to increase to approximately 210 knots, and then to 250 knots during the descent.

The digital flight data recorded (DFDR) indicated that shortly after declaring an emergency, the airplane began a left turn while climbing to 1,100 feet. Engine torque was reduced, and the airplane remained at 1,100 feet while maintaining an airspeed of approximately 207 knots and 30 degrees of left bank for 15 seconds. The airplane then pitched down to 8 degrees negative (nose down) and the airspeed increased to 218 knots. The airplane rolled right and left due to control inputs, and the pitch attitude decreased to 30 degrees negative.

AIRCRAFT PERFORMANCE

A performance study was completed to evaluate radar and DFDR data. For the purpose of the study, the un-calibrated DFDR values were corrected to known values during ground operations, and assumed values during the accident flight.

Specifically, the elevator pitch trim was shifted 2.07 degrees nose-up based on a maximum nose down value of approximately -5 degrees, rather than -7 degrees.

The performance study was completed in conjunction with a DFDR study. They revealed that during the takeoff roll, the elevator did not leave the trailing edge down stop as soon, and did not move in the trailing edge up direction as rapidly, as during previous takeoffs. A kinematics extraction revealed that approximately 60 pounds of control column pull force was required immediately after rotation, which was greater than previous flights.

Once airborne, the airplane performance was consistent with the elevator pitch trim moving to the full nose down position. The airplane climbed to approximately 1,100 feet msl, before descending into the water. As the airspeed exceeded 200 knots during the flight, and approached 250 knots during the descent, the control column forces increased to approximately 250 pounds.

WRECKAGE INFORMATION

The investigative team arrived near the accident scene on August 26 and 27, 2003. The airplane came to rest in approximately 18 feet of water, about 300 feet from the Yarmouth shore. The majority of the wreckage, including both engines, was recovered on August 28. The team examined wreckage, operational records; maintenance records, and DFDR data on-scene from August 27 through August 31.

The left engine exhibited impact and salt-water immersion damage. The engine was recovered stripped of the cowling, right engine mount, and right exhaust stub. The shroud and guide vane inner and outer drums were circumferentially scored at the second stage power turbine. The first stage compressor blades were bent forward and opposite the direction of rotation, and the shroud exhibited circumferential scoring.

The right engine exhibited impact and salt-water immersion damage. The engine was recovered with some portions of the cowling attached. The shroud and guide vane inner and outer drums were circumferentially scored at the second stage power turbine. The first stage compressor blades were bent forward and opposite the direction of rotation, and the shroud exhibited circumferential scoring.

Portions of both wings, the cockpit, and fuselage were recovered, and exhibited impact damage. The

This space for binding

| National Transportation Safety Board FACTUAL REPORT AVIATION | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

Narrative    (Continued)

empennage was recovered partially intact. Approximately all of the right elevator was recovered, except for the outboard edge. The inboard portion of the right elevator remained attached to the horizontal stabilizer at the two inboard hinge locations. About 5 feet of the left elevator was recovered, and attached at one inboard hinge. Both elevator balance weights were recovered. An approximate 7-foot section of left horizontal stabilizer was found intact, and an approximate 5-foot section of right stabilizer spar was visible. The rudder remained attached to the vertical stabilizer.

The right and left elevator trim tabs were found attached to the elevator. The right and left elevator trim actuators were found near the full nose-down elevator trim position. The electric right trim tab servo was found attached to the base of the horizontal stabilizer. The left and right trim tab cables remained wrapped around their respective trim actuator drums. Elevator trim continuity was confirmed from the elevator trim tabs to the cargo door area. Due to fragmentation forward of the cargo door area, trim cable continuity could not be confirmed from the elevator to the cockpit pedestal. However, the cockpit pedestal with elevator trim drum and manual trim wheel was recovered. Further examination of the manual trim wheel revealed that it was found near the 6.5 units of nose-up trim position.

MAINTENANCE

Colgan Air employed its own maintenance technicians that performed all of the necessary scheduled and phase maintenance on its fleet. The fleet was maintained under a continuous airworthiness maintenance program (CAMP), which was developed by Colgan Air and approved by the FAA. The CAMP was a series of checks and inspections, which incorporated guidance from the Beech 1900D airliner maintenance manual (AMM). The various inspections included in the CAMP were: Preflight Inspections, Routine Inspections, Detail Inspections, and Structural Inspections. The Preflight Inspections were due every 4 flight-days, and the Routine Inspections were due every 8 flight-days. The Detail Inspections were divided into six phases, and each phase was performed every 220 flight-hours, which resulted in a completed Detail Inspection after every 1,320 flight hours. The Structural Inspections were set forth by the manufacturer.

Each Detail Inspection focused specifically on a certain part of the airplane. They were: Wings, Powerplant and Nacelles, Flight Compartment/Cabin, Environmental Systems, Landing Gear, and Aft Fuselage/Empennage.

On August 23, 2003, the accident airplane underwent a Detail Six phase check (Aft Fuselage/Empennage). The phase check was interrupted, and the remaining work was deferred on the morning of August 24, per the general maintenance manual (GMM). Ten revenue flight legs were completed that day, and the Detail Six phase check resumed on the evening of August 24, and concluded on August 26.

A maintenance technician conducted a free play check of the left and right elevator trim actuators as part of the Detail Six phase check. Both actuators failed the check, and the failure required replacement of the actuators. During the replacement of the actuators, the technician did not remove the elevators as required by the CAMP and AMM. Additionally, the technician did not maintain pressure on (block) the elevator trim tab cables, nor did the AMM require that the cables be blocked. Subsequently, the cable unwound off the forward drum. On August 25, during the operational check of the system, the forward elevator trim tab cable "fell off" the forward drum, seized, and kinked.

A new forward elevator trim tab cable was ordered. Due to an incorrect right elevator trim actuator part number, a new right elevator trim actuator was also ordered. That evening, two lead maintenance technicians replaced the forward elevator trim tab cable, and two other maintenance technicians replaced the right elevator trim actuator. The forward elevator trim tab cable drum had already been removed by personnel on the dayshift, but no turnover notes were forwarded. The

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 |
| FACTUAL REPORT AVIATION | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

Narrative    (Continued)

AMM and Colgan Air policies did not require turnover notes from one shift to another.

The two lead maintenance technicians that replaced the forward elevator trim tab cable did not use a lead wire as instructed by the AMM. They marked the topmost pulleys with a "T" instead. A lead maintenance technician and the quality assurance inspector stated that following the maintenance; a successful operational check of the system was completed. They added that the operational check included running the manual and electric elevator trim several times, with the quality assurance inspector at the cockpit and tailbone during different phases of the operational check.

The two lead maintenance technicians that installed the new cable stated that they referred to the AMM, and were not confused handling the drum or interpreting the drum illustration.

The airplane was returned to service on August 26.

Review of the Beech AMM Chapter 27-30-04, "Elevator Trim Tab Cables - Maintenance Practices," revealed that the trim drum was depicted backwards. Although the drum could not be installed backwards, it was possible to mis-route the cable around the drum, and reverse the trim system. The depiction in the maintenance manual showed the nose-up trim tab cable emanating from the aft end of the drum, rather than the forward end. It also showed the nose-down cable emanating from the forward end of the drum, rather than the aft. However, the "FORWARD AS INSTALLED" arrow included in the depiction would have to be ignored, and the cables would have to be crossed once along the cable run, to reverse the system and secure the cable ends into the turnbuckles.

Further review of the Beech AMM revealed that there was no procedure for an operational check contained in Chapter 27-30-04. Nor was there a referral to Chapter 27-30-09, "Elevator Trim - Maintenance Practices...Elevator Trim Operational Check;" which did contain a procedure for an operational check of the elevator trim system.

MEDICAL AND PATHOLOGICAL INFORMATION

An autopsy was performed on the pilots by The Commonwealth of Massachusetts, Department of Health, Office of the Chief Medical Examiner, Boston, Massachusetts.

Toxicological testing was conducted on the pilots at the FAA Toxicology Accident Research Laboratory, Oklahoma City, Oklahoma.

TESTS AND RESEARCH

Elevator Trim System

The cockpit controls consisted of a manual trim wheel; and two switches on each yoke, which activated an electric elevator trim motor. When moved in the nose up direction, and using "0" as a point of origin, the manual wheel was indexed "0, AFT, 3, FWD, 6, -, UP, -, -, 10, -, UP," and terminated at a white box. When moved in the nose down direction, using "0" as a point of origin, the manual wheel was indexed "0, -, DN, -, 3," and terminated at a white box. The trim wheel connected to a sprocket, driving a chain to a second sprocket, connected to the elevator trim cable drum. The sprockets, chain, and trim drum were located inside the cockpit pedestal. One side of the drum had a slotted side or key way, which connected to the sprocket, and prevented the drum from being installed backwards. The approximate 55-foot long forward elevator trim cable was wrapped around the drum and secured with a cable lock pin.

According to a representative from Raytheon Aircraft, the electric trim system could be disconnected in any of four ways: depressing the trim disconnect switch located on each control wheel, moving the ELEV TRIM switch located on the pedestal to the OFF position, pulling the ELEV

This space for binding

| National Transportation Safety Board FACTUAL REPORT AVIATION | NTSB ID: NYC03MA183 |
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

Narrative    (Continued)

TRIM circuit breaker, or positioning the BAT, L GEN, R GEN switches to OFF. Additionally, the representative added that the electric trim could be overridden by manually rolling the trim wheel.

When the 55-foot cable was routed correctly and wrapped around the drum, it resulted in two approximate equal portions of cable emanating from the trim drum. Both portions of cable proceeded downward below the floor of the cockpit. The nose-up cable portion was the forward cable originating from the drum, and approximately 27 feet 5 inches long. It traveled through sets of pulleys as it proceeded downward, and became the right cable traveling aft underneath the floor of the airplane cabin. The nose-up cable then crossed over a final pulley, becoming the left cable, before mating with the left turnbuckle. The end of the nose-up cable had left hand threads, which screwed into the left hand threads of the left turnbuckle. The left hand threads could not be screwed into the right turnbuckle, as it had right hand threads. The turnbuckles were located near the mid-point of the airplane.

The nose-down cable was the aft cable originating from the drum, and approximately 27 feet 2 inches long. It traveled through sets of pulleys as it proceeded downward, and became the left cable traveling aft underneath the floor of the airplane cabin. The nose-down cable then crossed over a final pulley, becoming the right cable, before mating with the right turnbuckle. The end of the nose-down cable had right hand threads, which screwed into the right hand threads of the right turnbuckle. The right hand threads could not be screwed into the left turnbuckle, as it had left hand threads.

From the turnbuckles, additional cables continued to travel aft and upward, terminating at the elevator trim actuators, which were attached via pushrods to the elevator trim tabs located at the inboard portion of the right and left elevator. The electric trim motor was installed at the base of the vertical stabilizer, beyond the first set of turnbuckles.

On the accident airplane, although the approximate 55-foot elevator trim cable was fragmented due to impact forces, five sections were recovered (assuming that the forward and aft cable emanating from the drum are counted as two sections). Three sections corresponded to the nose-up cable portion, and two sections corresponded to the nose-down cable portion. Cable marks made by the cable lock pin and digital flight data recorder bridle were used for orientation points, as was the intact elevator trim cable removed and replaced before the accident flight. Using those points and the intact elevator trim cable as a reference, the three sections of the nose-up portion of the accident cable measured to within 1.2 inches of the intact cable. However, the three sections resulted in the forward cable emanating from the trim drum terminating in the right turnbuckle, rather than the left turnbuckle (see Airworthiness Group Chairman's Factual Report for more detail and depictions).

An approximate 7-foot section of cable, which corresponded to the middle section of the nose-down portion of cable, was not recovered.

A mis-rigging demonstration was conducted at Raytheon Aircraft, Wichita, Kansas, on October 14 and 15, 2003. During the demonstration, the manual trim wheel was indexed to "0" when the elevator trim tabs were placed in the neutral position. Although the system was purposely mis-rigged, an operational check of the elevator trim system revealed the error. When the cockpit trim wheel was positioned nose down, the elevator trim tabs moved in a nose-up direction. When the cockpit trim wheel was positioned nose-up, the elevator trim tabs moved in a nose-down direction. When the electric trim motor was activated in one direction, the elevator tabs moved in the corresponding correct direction, but the trim wheel moved opposite of the commanded electric trim direction.

The mis-rigging demonstration also revealed that when the manual trim wheel was in the nose-down direction, the trim indicator in the cockpit moved well past the nose down limit, and the trim tabs were in the full nose up position. When the manual trim wheel was moved in the nose-up direction,

FACTUAL REPORT - AVIATION                RAC 000211

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 | |
| FACTUAL REPORT | Occurrence Date: 08/26/2003 | |
| AVIATION | Occurrence Type: Accident | |

| Narrative | (Continued) |

the trim indicator did not reach the nose up limit. Rather, the indicator stopped near positive "3" units, and the trim tabs were in the full nose down position.

Flight Simulator

The Operations Group convened at Flight Safety International, Flushing, New York, on November 25, 2003. Using an FAA certified Level "D" Beech 1900 full motion simulator, the group attempted six simulations of the accident flight. The chief pilot of Colgan Air and an FAA inspector manipulated the controls during the flight simulations.

During all simulations, the elevator trim was positioned full nose-down shortly after takeoff. The simulator pilot attempted to maintain aircraft control using different power settings to obtain different airspeeds. Five of the six simulations resulted in an uncontrolled descent into terrain. On the sixth test, the simulator pilot was able to partially maintain control of the airplane by gradually reducing engine power and maintaining an airspeed of approximately 170 knots. However, he had to return to the airport area at 170 knots, and touchdown at 180 knots. The airplane did not land on a runway, and subsequently impacted terrain.

ADDITIONAL INFORMATION

Sterile Cockpit Concept

Review of the Colgan Air flight operations policy and procedures manual (FOPP), revealed that during the periods of taxiing, takeoff, and altitudes below 10,000 feet indicated, the "flight crewmembers will not participate in any activity which could distract any flight crewmember from the performance of their duties or which could interfere in any way with the proper conduct of those duties." Examples given by the manual, of activities that were to be avoided, included "engaging in non-essential conversations."

Aircraft Maintenance and Flight Log

The FOPP also detailed the captain's responsibilities for determining the airworthiness of the airplane. It stated:

"Review/Verify the Aircraft Maintenance & Flight Log back to the latest valid Airworthiness Release and ensure that all discrepancies between that Airworthiness Release and the current log page are corrected or properly deferred. If the Captain determines that the aircraft status is other than listed on the release, the Captain will inform System Control and correct the inconsistency."

Review of the Aircraft Maintenance and Flight Log form for the accident flight revealed a discrepancy, which stated, "Flt. Data Recorder needs downloading due to mx. Replacement of Elevator trim cable (Fwd. Most)." The discrepancy was signed by a maintenance technician. The discrepancy was released and signed by the same maintenance technician, in accordance with an approved minimum equipment list, and supporting control number.

The captain noted to the first officer that the DFDR was an open item on the MEL; however, there is no record of the captain mentioning the replacement of the forward elevator trim cable.

Checklists

Review of Colgan Air's Beech 1900 Company Flight Manual revealed that it was FAA approved and contained the expanded normal checklist procedures, as well as abnormal and emergency procedures, and policies; all of which applied to Colgan Air flight operations.

The manual had specific guidance on the use of normal checklists and procedures, and was to be used

RAC 000212

This space for binding

| National Transportation Safety Board FACTUAL REPORT AVIATION | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

| Narrative     (Continued) |
|---|

to "ensure all safety items are accomplished." All of the checklists were to be accomplished using a challenge and response method (except for the climb and after landing checklists). The manual also gave guidance in the event that the checklist flow was interrupted. It stated;

"Interruptions to checklists increase the possibility of items being missed, which in turn may create hazards to flight operations. When interruptions occur, the crew must give consideration to restarting the checklist from the beginning, taking into consideration such factors as the length and type of interruption."

The following checklist excerpts were to have been accomplished by the accident flightcrew. The details of the checklists are focused on the elevator trim system and its related components and systems.

Preflight Checklist

The Preflight Checklist included, "Elevator, Elevator Tab, Static Wicks (4 each side) - Check & Verify Tabs are in Neutral Position."

Before Start Checklist

The Before Start Checklist required that the captain review the dispatch release and sign it. He was also required to review the maintenance release and the dispatch release with the first officer.

First Flight of the Day Checklist

After the engines had been started the checklist required that a "First Flight of the Day" check be performed by the flightcrew. The expanded items of the "Electric Pitch Trim" check included;

ELEV TRIM Switch...........................................................ON
Pilot's and Copilot's Trim Switches.....................................CHECKED

        1) Pilot's trim will override copilot's trim.
        2) Movement of only half switch will not activate trim.

Trim Disconnect Switch.........................................PRESS TO 2ND LEVEL AND RELEASE

        1) PITCH TRIM OFF Annunciator - ILLUMINATED
        2) Electric Pitch Trim - DEACTIVATED

ELEV TRIM Switch.......................................................OFF then ON

        PITCH TRIM OFF Annunciator - EXTINGUISHED

Electric Pitch Trim.................................................SET FOR TAKEOFF

Taxi Checklist

The expanded items of the Taxi Checklist included;

**RAC 000213**

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

## Landing Facility/Approach Information

| Airport Name | Airport ID: | Airport Elevation | Runway Used | Runway Length | Runway Width |
|---|---|---|---|---|---|
| Barnstable Municipal Airport | HYA | 55 Ft. MSL | 33 | 5252 | 150 |

Runway Surface Type: Asphalt

Runway Surface Condition: Dry

Type Instrument Approach: NONE

VFR Approach/Landing: None

## Aircraft Information

| Aircraft Manufacturer | Model/Series | Serial Number |
|---|---|---|
| Beech | 1900D | UE-40 |

Airworthiness Certificate(s): Transport

Landing Gear Type: Retractable - Tricycle

| Homebuilt Aircraft? No | Number of Seats: 21 | Certified Max Gross Wt. | 17060 LBS | Number of Engines: 2 |
|---|---|---|---|---|

| Engine Type: Turbo Prop | Engine Manufacturer: Pratt & Whitney | Model/Series: PT6A-67D | Rated Power: 1214 HP |
|---|---|---|---|

### - Aircraft Inspection Information

| Type of Last Inspection | Date of Last Inspection | Time Since Last Inspection | Airframe Total Time |
|---|---|---|---|
| Continuous Airworthiness | 08/2003 | 0 Hours | 16503 Hours |

### - Emergency Locator Transmitter (ELT) Information

| ELT Installed? Yes | ELT Operated? No | ELT Aided in Locating Accident Site? No |
|---|---|---|

## Owner/Operator Information

| Registered Aircraft Owner | Street Address 9709 East Central | | |
|---|---|---|---|
| Raytheon Aircraft Credit Corporation | City Wichita | State KS | Zip Code 67206 |
| Operator of Aircraft | Street Address 10677 Aviation Lane | | |
| Colgan Air Inc. | City Manassas | State VA | Zip Code 20110 |

| Operator Does Business As: US Airways Express | Operator Designator Code: NSVA |
|---|---|

### - Type of U.S. Certificate(s) Held:

Air Carrier Operating Certificate(s): Flag Carrier/Domestic

| Operating Certificate: | Operator Certificate: |
|---|---|

Regulation Flight Conducted Under: Part 91: General Aviation

Type of Flight Operation Conducted: Positioning

FACTUAL REPORT - AVIATION          RAC 000214          Page 2

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |  |
|---|---|---|
|  | Occurrence Date: 08/26/2003 |  |
|  | Occurrence Type: Accident |  |

## Narrative    (Continued)

Trims.................................................................
................................SET

Verify proper trim indicator positions (UP 2 Units UC & 3 Units UE, ROLL 0, YAW 0) and state "SET."

**Weight and Balance**

Review of all available data revealed that the airplane was within the center of gravity envelope for the flight.

**Safety Results**

As a result of the Colgan Air flight 9446 investigation, and the investigation into Air Midwest flight 5481 (DCA03MA022), the Safety Board issued fourteen recommendations to the FAA pertaining to FAR Part 121 air carrier maintenance. One of the recommendations was specific to maintenance procedures for the Beech 1900.

During the course of the Colgan Air investigation, Raytheon Aircraft released Temporary Revision 27-9 of the AMM on September 12, 2003, titled "Manual Elevator Trip Operational Check." Raytheon then released Safety Communiqu 234 on September 24, 2003, and Temporary Revision 27-10 on October 22, 2003, which revised AMM 27-30-04 and updated the depiction of the forward trim drum. The FAA issued Airworthiness Directive (AD2003-20-10), which instructed operators to incorporate TR-27-9, and provided a change to the maintenance illustration depicting the forward trim drum.

Following the accident, Colgan Air issued an alert to its employees regarding possible trim problems. Colgan Air also expanded the trim check procedure on the First Flight of the Day and the Taxi checklists.

**Wreckage Release**

The wreckage was released to a representative of the owner's insurance company on August 31, 2003.

**RAC 000215**

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

## First Pilot Information

| Name | | City | | State | Date of Birth | Age |
|---|---|---|---|---|---|---|
| On File | | On File | | On File | On File | 39 |

| Sex: M | Seat Occupied: Front | Principal Profession: Civilian Pilot | Certificate Number: On File |
|---|---|---|---|

| Certificate(s): | Airline Transport; Commercial |
|---|---|

| Airplane Rating(s): | Multi-engine Land; Single-engine Land; Single-engine Sea |
|---|---|
| Rotorcraft/Glider/LTA: | None |
| Instrument Rating(s): | Airplane |
| Instructor Rating(s): | None |

| Type Rating/Endorsement for Accident/Incident Aircraft? Yes | Current Biennial Flight Review? 06/2003 |
|---|---|
| Medical Cert.: Class 1 | Medical Cert. Status: Valid Medical--w/ waivers/lim. | Date of Last Medical Exam: 03/2003 |

| - Flight Time Matrix | All A/C | This Make and Model | Airplane Single Engine | Airplane Multi-Engine | Night | Instrument Actual | Simulated | Rotorcraft | Glider | Lighter Than Air |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Time | 2891 | 1364 | | | | | | | | |
| Pilot In Command(PIC) | | 451 | | | | | | | | |
| Instructor | | | | | | | | | | |
| Last 90 Days | 211 | 211 | | 211 | | | | | | |
| Last 30 Days | 76 | 76 | | 76 | | | | | | |
| Last 24 Hours | 7 | 7 | | 7 | | | | | | |

| Seatbelt Used? Yes | Shoulder Harness Used? Yes | Toxicology Performed? Yes | Second Pilot? Yes |
|---|---|---|---|

## Flight Plan/Itinerary

| Type of Flight Plan Filed: IFR | | | | |
|---|---|---|---|---|
| Departure Point | | State | Airport Identifier | Departure Time | Time Zone |
| Hyannis | | MA | HYA | 1538 | EDT |
| Destination | | State | Airport Identifier | | |
| Albany | | NY | ALB | | |

| Type of Clearance: | IFR |
|---|---|
| Type of Airspace: | Class D |

## Weather Information

| Source of Briefing: | Company |
|---|---|

RAC 000216

| Method of Briefing: | |
|---|---|

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 | |
|---|---|---|
| | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

## Weather Information

| WOF ID | Observation Time | Time Zone | WOF Elevation | WOF Distance From Accident Site | Direction From Accident Site |
|---|---|---|---|---|---|
| HYA | 1556 | EDT | 55 Ft. MSL | 4 NM | 180 Deg. Mag. |

| Sky/Lowest Cloud Condition: Clear | Ft. AGL | Condition of Light: Day |
|---|---|---|

| Lowest Ceiling: None | Ft. AGL | Visibility: 10 | SM | Altimeter: 29.86 | °Hg |
|---|---|---|---|---|---|

| Temperature: 23 °C | Dew Point: 20 °C | Wind Direction: Variable | Density Altitude: Ft. |
|---|---|---|---|

| Wind Speed: 6 | Gusts: | Weather Condtions at Accident Site: Visual Conditions |
|---|---|---|

| Visibility (RVR): Ft. | Visibility (RVV): SM | Intensity of Precipitation: |
|---|---|---|

Restrictions to Visibility: None

Type of Precipitation: None

## Accident Information

| Aircraft Damage: | Aircraft Fire: | Aircraft Explosion |
|---|---|---|

Classification:

| - Injury Summary Matrix | Fatal | Serious | Minor | None | TOTAL |
|---|---|---|---|---|---|
| First Pilot | 1 | | | | 1 |
| Second Pilot | 1 | | | | 1 |
| Student Pilot | | | | | |
| Flight Instructor | | | | | |
| Check Pilot | | | | | |
| Flight Engineer | | | | | |
| Cabin Attendants | | | | | |
| Other Crew | | | | | |
| Passengers | | | | | |
| - TOTAL ABOARD - | 2 | | | | 2 |
| Other Ground | | | | | |
| - GRAND TOTAL - | 2 | | | | 2 |

RAC 000217

This space for binding

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Administrative Information**

Investigator-In-Charge (IIC)

Robert J. Gretz

Additional Persons Participating in This Accident/Incident Investigation:

Floyd A James
FAA AAI-100
Washington, DC

Robert  Ramey
Raytheon Aircraft Company
Wichita, KS

Dave  Vance
Colgan Air Inc.
Manassas, VA

Richard  Bunker
MA Aeronautics Commission
Boston, MA

Thomas  Berthe
Pratt & Whitney Canada
South Burlington, VT

RAC 000218

# EXHIBIT 19

ORIGINAL
(w/Fax Signature)

# THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

COLGAN AIR, INC.,                          )
                                           )
      Plaintiff,               )
                                           )
                                           )
RAYTHEON AIRCRAFT COMPANY,                 )       CIVIL ACTION NO. 1:05 cv 213
                                           )
      Defendant.               )

## COLGAN AIR, INC. RESPONSES TO DEFENDANT'S
## FIRST SET OF REQUESTS FOR ADMISSION

COMES NOW Colgan Air, Inc. and responds to Defendant's Requests for

Admission as follows:

1.    Admit that the aircraft was not defective in design.

**RESPONSE:** Denied.

2.    Admit that your claims against Raytheon do not involve an assertion that the

aircraft was defective in design.

**RESPONSE:** Denied, but admits that the claims asserted in the Complaint are based on
the defective REPS Manual.

3.    Admit that the aircraft was not defective in manufacture.

**RESPONSE:** Denied.

4.    Admit that your claims against Raytheon do not involve an assertion that the

aircraft was defective in manufacture.

**RESPONSE:** Denied, but Colgan admits that the claims asserted in the Complaint are
based on the defective REPS Manual.

**RESPONSE:** Denied.

18.    Admit that there were no handoff or shift notes from the day crew to the night crew regarding the cable replacement job.

**RESPONSE:** Denied.

19.    Admit that the aircraft maintenance manual instructed the Colgan mechanics to use a lead wire in connection with the replacement of the forward elevator trim tab cable.

**RESPONSE:** Denied, but it is admitted that the REPS Manual, Chapter 27-30-04, called for attachment of lead lines to the forward trim tab cable during removal.

20.    Admit that the Colgan mechanics did not use a lead wire in connection with the replacement of the forward elevator trim tab cable.

**RESPONSE:** Admitted.

21.    Admit that the maintenance manual directed Colgan's mechanics to rig the cable per Chapter 27-30-05 ELEVATOR TAB CONTROL RIGGING-MAINTENANCE PRACTICES.

**RESPONSE:** Denied.

22.    Admit that both the installation procedure and the rigging procedures instruct the mechanic it may be necessary to re-index the manual trim wheel to 0, when the elevator trim tabs are in neutral.

**RESPONSE:** Denied, but it is admitted that the REPS Manual, Chapter 27-30-04, states that "[i]f necessary, adjust the indicator in the flight compartment to 0 while the tabs are neutral to the elevator."

23.    Admit that the Colgan mechanics did not re-index the manual trim wheel to 0, when the elevator trim tabs were in neutral.

**RESPONSE:** Denied.

4

59.    Admit that if the flight crew had properly performed the first flight of the day checklist, the mis-rigging would have been detected.

**RESPONSE:** Denied.

60.    Admit that Colgan does not specifically require its mechanics to refer to the Maintenance Manuals when performing repairs.

**RESPONSE:** Denied.

61.    Admit that all Colgan's claimed damages are economic damages.

**RESPONSE:** Denied.

Date: 6/10/05                              Colgan Air, Inc.

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Responses to Defendan's First Set of Request for Admission was served this 10th day of June 2005, by fax and email on the following:

Robert T. Hall, Esquire VSB #4826
Holly Parkhurst Essing, Esquire VSB #17538
HALL, SICKELS, FREI & KATTENBURG
12120 Sunset Hills Road, suite 150
Reston, VA 20190

Michael G. Jones, Esq.
Martin Pringle
100 N. Broadway
Suite 500
Wichita, KS 67202

Date: _June 10, 2005_

# EXHIBIT 20





# GENERAL MAINTENANCE
# MANUAL

C00087

 **GENERAL MAINTENANCE MANUAL**

VOL X

**3.1.0    General Maintenance Policies**

A.  Colgan Air, Inc. will maintain safe and airworthy aircraft that are in compliance with the standards and procedures mandated by the FAR(s). All Colgan Air, Inc. personnel are responsible for the enforcement of a basic policy of safety. Essential elements of safety include, but are not limited to, high quality condition of aircraft with meticulous inspection before flight, thorough training and motivation of personnel, scrupulous attention to duty, sound operational planning, efficient use of resources, and highest caliber of judgment in the conduct of all ground and air operations. Colgan Air, Inc. operations are based on the concept that safety comes first.

B.  Each person employed by Colgan Air, Inc. who is directly in charge of maintenance, preventive maintenance, or alteration, and each person performing required inspection must hold an appropriate airman certificate. Each person who holds a certificate shall notify the Director of Maintenance immediately upon any suspension or revocation of that certificate and shall not perform any duties which require the certificate while under suspension or revocation.

C.  Each person performing maintenance or preventive maintenance including inspection personnel shall be trained to ensure that each person who determines the adequacy of work done is fully informed about procedures and techniques and new equipment in use and is competent to perform their duties. Colgan Air, Inc. training procedures can be found in Volume XIII of this manual.

D.  Each person performing maintenance or preventive maintenance functions for the certificate holder will be relieved from duty for a period of at least twenty four (24) hours during any seven (7) consecutive days, or the equivalent thereof within any calendar month.

E.  Colgan Air, Inc. will operate a Continuing Analysis and Surveillance System Program (CASP) to evaluate the performance and effectiveness of its own inspection program and the program covering other maintenance, preventative maintenance, and alterations and for the correction of any deficiencies in those programs, regardless of whether those programs are carried out by Colgan Air or by other maintenance personnel. The CASP is detailed in Volume XV.

F.  Each person performing maintenance or preventive maintenance functions for the certificate holder will have on hand, and follow, the instructions prescribed in the current manufacturers maintenance manuals, workcards, or other data acceptable to the administrator.

**3.1.1    Responsibilities For Maintenance - FAR 121.363(a)(2)**

A.  All persons in the management structure of maintenance are responsible for familiarity with:

    1.  This manual and its defined maintenance policies.

    2.  The pertinent FAR's

    3.  The C.A.M.P.

B.  Maintenance personnel are responsible for familiarizing themselves with all sections of this GMM which pertain to their job description.

**3.1.2    Maintenance Forms General**

A.  It is imperative that maintenance/inspection forms and records be properly and uniformly completed by appropriate personnel to ensure that no work action is overlooked or misunderstood. No maintenance action may take place until an appropriate entry is made in the aircraft records called out in this section. Good maintenance recording practices are essential to clearly identify the work performed assisting other personnel in evaluating the condition of the aircraft. The following procedures apply to all forms used in Colgan Air, Inc. maintenance and inspection operations:

# EXHIBIT 21



Beech 1900D Airliner Maintenance Manual (UE-1 and After)
## Elevator Tab Control Rigging - Maintenance Practices



1/16" ELEVATOR TAB CABLE TENSION GRAPH

ELEVATOR TAB TRAVEL
5 1/2° TO 6 UP
16 1/2° TO 17 1/2° DOWN

TOLERANCE
+3, -2 POUNDS
OF TENSION

TEMPERATURE IN °F

**Elevator Trim Tab Cable Tension Graph (Effectivity: All)**     C9101041



**Figure 201**

Printed from REPS Airliner Revision 9 - May 2003
(P/N 129-590000-15 Revision A30 October 26 2002)

**REPS**
raytheon electronic publication system

Beech 1900D Airliner Maintenance Manual (UE-1 and After)
**Elevator Tab Control Rigging - Maintenance Practices**

# ELEVATOR TAB CONTROL RIGGING - MAINTENANCE PRACTICES (EFFECTIVITY:

*ELEVATOR TRIM TAB RIGGING - MAINTENANCE PRACTICES*
*(EFFECTIVITY: ALL)*
*(FIGURE 201)*

> NOTE: Before attaching cable clamps and cables to the elevator trim cables, ensure that all twist is removed from the elevator trim cables by operating the system at least six (6) times from stop to stop.

> NOTE: The elevator control system must be properly rigged before the elevator tab system can be rigged.

a.  Place the elevators in neutral and install the rig pin in the aft elevator bellcrank. Access to the aft elevator bellcrank is through an access plate (331AL, 6-00-00) in the left side of the vertical stabilizer, just below the horizontal stabilizer.

b.  Rig the cables to the proper tension as shown in Figure 201.

c.  Set the control wheel on the pedestal so the tab indicator reads 0.

d.  Adjust the turnbuckles to maintain the 3.07-inch dimension shown in Chapter 27-30-04, Figure 201.

e.  Adjust the push-pull rods by loosening the two jam nuts on the adjustment stud and rotating the adjustment stud to bring the elevator tab to 0° position. Adjust each push-pull rod separately to match each other.

After adjustment, each end of each adjustment stud must be visible through the inspection holes. Tighten the jam nuts, taking care not to alter push-pull rod adjustments and install .032-inch safety wire through the jam nuts and adjustment studs. Install the push-pull rod attaching fasteners and tighten the outer clevis jam nuts.

f.  Using the travel board (6, Chart 1, 27-00-00), adjust the elevator trim tab for a deflection of 5 1/2° + 1/2° -0° up from neutral and 16 1/2° + 1° -0° down from neutral with the cable stops in the aft fuselage section. Torque the stops to 40-50 inch-pounds and safety as shown in Figure 201, Detail C, Chapter 27-30-04.

g.  Check the movement of the elevator trim tab. A servo travel of 4 1/2° ±1° down at full up elevator and 1 1/2° ±1/2° up at full down elevator is permissible. Maximum allowable servo travel differential (lagging tab) between the left tab and the right tab is to be 1° at full up elevator and 1/2° at full down elevator. If servo adjustment is required, a maximum of one laminated shim (P/N 130-524031-3) may be placed between the adapter and the actuator flange. Adjustment of the actuator is accomplished by removing laminations from the shim as required to obtain the correct servo tab travel.

> NOTE: To increase servo (lag), install shims under the bottom actuator flange. To decrease servo (lag), install shims under the top actuator flange. Add or remove shims under only the top or bottom of the actuator flange.

[OTE: If you have chosen a 'selected text' print out, from REPS (Raytheon Electronic Publication System) - The selection may not include all relevant data, such as; process specifications, Warnings, Cautions & Notes that may be found elsewhere in the complete document or in other applicable service information documents. Make sure you have read and understood all associated information before performing any maintenance on the aircraft. It is the responsibility of the mechanic, repairman or inspector to understand the current instructions of the manufacturer and the manuals, for the specific operation concerned.

# EXHIBIT 22

**REPS**
raytheon electronic publication system

Beech 1900D Airliner Maintenance Manual (UE-1 and After)
**Elevator Trim - Maintenance Practices**

# ELEVATOR TRIM - MAINTENANCE PRACTICES

## *ELEVATOR TRIM OPERATIONAL CHECK*

a. Perform the APPLYING GROUND POWER procedure. Refer to Chapter 24-40-00.

b. Set the elevator trim switch, located on the pedestal, to the "ON" position.

c. Actuate each switch of the dual trim switch, on the pilot's and copilot's control wheel, independently to the "NOSE DOWN" and the "NOSE UP" position and verify that the trim system does not activate.

      CAUTION: WHILE PERFORMING THIS PROCEDURE DO NOT KEEP THE TRIM BUTTONS (SWITCHES) DEPRESSED AFTER THE TRIM TAB HAS REACHED ITS FULL LIMIT OF TRAVEL.

d. Actuate both trim switches on the pilot's control wheel to the "NOSE UP" position and note the trim wheel movement in the proper direction as well as full travel. Verify visually that the trim tab itself travels to the proper position (trim tab full down).

e. Actuate both trim switches on the pilot's control wheel to the "NOSE DOWN" position and note the trim wheel movement in the proper direction as well as full travel. Verify visually that the trim tab itself travels to the proper position (trim tab full up).

f. Repeat steps d and e on the copilot's control wheel.

      NOTE: Review steps g and h before proceeding with this procedure. Time critical actions are involved.

g. Actuate both trim switches on the copilot's control wheel to the "NOSE UP" position, the trim wheel begins moving. After 3-5 seconds perform step h.

h. Actuate both trim switches on the pilot's control wheel to the "NOSE DOWN" position. As soon as the trim wheel reverses its direction of travel, release ALL trim buttons. This verifies pilot override.

i. Actuate both trim buttons on the pilot's control wheel to the "NOSE UP" position and while trim tab is in travel depress the red disconnect switch on the control wheel to the second detent position and release. Note the "PITCH TRIM OFF" annunciator is illuminated and the elevator trim system is deactivated.

j. Reactivate the elevator trim system by setting the elevator trim switch it to "OFF" then "ON" and repeat step f on the copilot's control wheel.

k. Set the elevator trim switch to the "OFF" position and manually rotate the elevator trim wheel to the stops in both directions to check for freedom of movement. Repeat this step with the elevator trim switch set to the "ON" position and verify freedom of movement.

l. Perform the REMOVING GROUND POWER procedure. Refer to Chapter 24-40-00.



EXHIBIT
97

PENGAD 800-631-6989

NOTE: If you have chosen a 'selected text' print out, from REPS (Raytheon Electronic Publication System) - The selection may not include all relevant data, such as; process specifications, Warnings, Cautions & Notes that may be found elsewhere in the complete document or in other applicable service information documents. Make sure you have read and understood all associated information before performing any maintenance on the aircraft. It is the responsibility of the mechanic, repairman or inspector to understand the current instructions of the manufacturer and the manuals, for the specific operation concerned.

# EXHIBIT 23

# ORIGINAL

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

3    - - - - - - - - - - - - - - - - - -x
:
4    COLGAN AIR, INC.,                      :
:
5                        Plaintiff,         :
:
6              vs.                          :   Civil Action
:   No. 1:05 cv 213
7    RAYTHEON AIRCRAFT COMPANY,             :
:
8                        Defendant.         :
:
9    - - - - - - - - - - - - - - - - - -x

10

11                              McLean, Virginia

12                              Friday, September 9, 2005

13

14        Videotaped deposition of FREDERICK J. LEONELLI,

15   witness, called for examination by counsel for the

16   defendant, pursuant to notice, at the offices of

17   Thomas B. Almy, Esq., Dombroff & Gilmore, P.C.,

18   1676 International Drive, Penthouse, McLean, Virginia,

19   before Malynda D. Whiteley, a Registered Professional

20   Reporter and a notary public in and for the State of

21   Virginia, beginning at 10:17 a.m., when were present on

22   behalf of the respective parties:

52

1    control wheel to the nose up position" --

2        A    Right.

3        Q    -- "and note to trim wheel moves in the proper

4    direction," first of all; correct?

5        A    Yeah.  As long as they know what the proper

6    direction is; right.

7        Q    Well, that's even marked on the trim wheel, isn't

8    it?

9        A    Yeah, yeah.

10        Q    It tells the average bear that up is up and down

11    is down, doesn't it?

12        A    Yeah.  We're assuming, though, they had this

13    procedure, which they didn't, as far as I read, because it

14    wasn't in the table of contents.  So I don't know.  I mean

15    you can speculate on it (inaudible) what the depositions

16    are now, and I'm hearing that they didn't know there was

17    this operational chapter.

18        Q    It's indicated in your report that you

19    understood -- specific quote, you --

20        A    Uh-huh.

21        Q    -- I'm trying to find it.

22            -- on page 4 first, full paragraph, an elevator

53

1    trim operational check, 27-30-09, did exist in the manual;

2    correct?

3         A    Right, right.

4         Q    It was there?

5              Your criticism is there is no reference link to

6    it?

7         A    Right.

8         Q    And it was not listed in the table of contents --

9         A    Right.

10        Q    -- correct?

11             Have you -- and you have not looked at the paper

12   copy of the manual to see whether it's in the table

13   contents of the paper manual?

14        A    No.

15        Q    All right.  If you did so, would you be surprised

16   to learn that it's in the table of contents of the -- of

17   the paper manual?

18        A    I would think.  And then I would -- I would

19   question which is the most reliable current manual.  I mean

20   if you got a REPS manual that I'm supposed to use, or is it

21   the hard copy?  And if the hard copy has it, why doesn't

22   the automated copy have it?

54

1      Q      So I understand, then, your opinion is based on

2   the assumption that the mechanics used the REPS version --

3      A      Right.

4      Q      -- and not the paper version?

5      A      Right.

6      Q      That using the REPS version, there was no link to

7   the operational check in it --

8      A      Right.

9      Q      -- correct?

10     A      Yes.

11     Q      And that the mechanics, therefore, did no

12  operational check?

13     A      They -- according to their depositions now, they

14  did the operational check; but they didn't have this

15  procedure in front of them because they didn't have it.

16     Q      It's there, is it not?  It's just not in the

17  table of contents?

18     A      Well, you need to know it's there.  Yeah, sure.

19     Q      And, sir, if they had run the operational check

20  with the point that you and I have spent some time on, they

21  would have observed two things about the performance of

22  subpart D, would they not; that when they activated the

55

1    electric trim nose up, the manual wheel went nose down?

2        A    Yeah.  They would have had the information to

3    actually validate what they were supposed to be looking at.

4        Q    If you can, if they did part D, electric trim

5    nose up, they would have observed that the manual wheel

6    went nose down; correct?

7        A    They should have, yeah.

8        Q    As well as full travel; they would have observed

9    that this the manual wheel went way beyond its nose down

10   limits; correct?

11       A    Yeah.

12       Q    And would also have observed that it fell far

13   short of and seeming jammed in nose up many units before

14   its nose up range?

15       A    Well -- yeah, right.  Yes.

16       Q    And then it says, "Verify visually that the trim

17   tab itself travels to the proper position"; correct?

18       A    Yes.

19       Q    And in parentheses, "Trim tab full down".

20       A    (The witness moves head up and down.)

21       Q    Correct?

22       A    Right.

56

1       Q    Trim tab full down is full nose up, isn't it?

2       A    Yes; that's what it says.

3           Again, though, we're assuming -- I mean if they

4 had this, this may not have been an issue.  But according

5 to them, they didn't have this procedure; so they're doing

6 it from memory or their knowledge, again, without having

7 this to go by.

8       Q    E that follows D is to run the switches and the

9 system through its nose down --

10      A    Right.

11      Q    -- trim; correct?

12      A    That's correct.

13      Q    And in F is to repeat those steps on the

14 copilot's control wheel.

15      A    Right.

16      Q    Did you in the course of preparing your report

17 look at any of the pilot check lists?

18      A    No.

19      Q    Do you know what the first flight of the FAA

20 checklist for this Beech 1900D includes with respect to the

21 trim system?

22      A    No.

# EXHIBIT 24

## FIRST FLIGHT OF THE DAY (CONT'D)
## (UE Series Aircraft)

| | |
|---|---|
| **Environmental System** .......................................... | **CHECKED** |

▸    Envir Mode Control .......................................... "T" Test

       L and R ENVIR FAIL, L and R ENVIR OFF Annunciators - ILLUMINATED

▸    Envir Mode Control .......................................... AUTO
▸    Bleed Air Valves .......................................... ENVIRONMENTAL OFF

       L and R ENVIR FAIL Annunciators - EXTINGUISHED

▸    Bleed Air Valves .......................................... OPEN

       L and R ENVIR OFF Annunciators - EXTINGUISHED

▸    Blowers .......................................... AS DESIRED
▸    Temp Control .......................................... AS DESIRED

**Electric Pitch Trim** .......................................... **CHECK**

▸    ELEV TRIM Switch .......................................... ON
▸    Pilot's and Copilot's Trim Switches .......................................... CHECKED

       1)    Pilot's trim will override copilot's trim.
       2)    Movement of only half of switch will not activate trim.

▸    Trim Disconnect Switch .......................................... PRESS TO 2ND LEVEL AND RELEASE

       1)    PITCH TRIM OFF Annunciator - ILLUMINATED
       2)    Electric Pitch Trim - DEACTIVATED

▸    ELEV TRIM Switch .......................................... OFF then ON

       PITCH TRIM OFF Annunciator - EXTINGUISHED

### *WARNING*

*Operation of the electric trim system should occur only by movement of pairs of switches. Any movement of the elevator trim wheel while depressing only one switch denotes a system malfunction. The elevator trim switch must then be turned OFF and flight conducted only by manual operation of the trim wheel.*

**Electric Pitch Trim** .......................................... **SET FOR TAKEOFF**

**Engine Anti-Ice & Other Systems Used For Icing In Flight** .......................................... **CHECKED**



EXHIBIT A2
109

Confidential:  Subject to Protective Order, Case Nos. 05 CV10155 PBS & 05 CV10364 PBS       RAC200118

# EXHIBIT 25

**NATIONAL TRANSPORTATION SAFETY BOARD**
**Vehicle Recorders Division**
**Washington, D.C.  20594**



# GROUP CHAIRMAN'S FACTUAL REPORT OF INVESTIGATION

## Cockpit Voice Recorder

## NYC03MA183

by

**Douglass P. Brazy**
**Mechanical Engineer (CVR)**

---

**Warning**
The reader of this report is cautioned that the transcription of a CVR tape is not a precise science but is the best product possible from an NTSB group investigative effort. The transcript, or parts thereof, if taken out of context, could be misleading. The attached CVR transcript should be viewed as an accident investigation tool to be used in conjunction with other evidence gathered during the investigation. Conclusions or interpretations should not be made using the transcript as the sole source of information.

---

RAC 000373

**NATIONAL TRANSPORTATION SAFETY BOARD**
Vehicle Recorders Division
Washington, D.C. 20594

October 3, 2003

# Cockpit Voice Recorder

**Group Chairman's Factual Report**
**by Douglass P. Brazy**

## A. ACCIDENT

| | |
|---|---|
| Location: | Yarmouth, MA |
| Date: | August 26, 2003 |
| Time: | 1540 Eastern Daylight Time |
| Aircraft: | Beech (Raytheon) 1900D, N240CJ |
| Operator: | Colgan Air Inc. |

## B. GROUP

Chairman:     Douglass P. Brazy
              Mechanical Engineer (CVR)
              National Transportation Safety Board

Member:       Stephen M. Demko
              Air Safety Investigator
              National Transportation Safety Board

Member:       L.I. "Lou" Johansen
              Engineering Test Pilot
              Raytheon Aircraft Company

Member:       Daniel P. Diggins
              Air Safety Investigator
              Federal Aviation Administration

Member:       LaDonn James Nunn
              VP Operations
              Colgan Air Inc.

RAC 000374

## C. SUMMARY

On August 26, 2003, at 1540 eastern daylight time, a Beech 1900D, N240CJ, operated by Colgan Air Inc. as flight 9446 (d.b.a. US Airways Express), was destroyed when it impacted water near Yarmouth, Massachusetts. The certificated airline transport pilot and certificated commercial pilot were fatally injured. Visual meteorological conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA), Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New York. An instrument flight rules flight plan was filed for the repositioning flight conducted under 14 CFR Part 91.

The Cockpit Voice Recorder (CVR) contained approximately thirty-four minutes of audio. The first fifteen minutes of the recording contained some conversations amoung maintenance personnel and sounds consistent with maintenance work. Relatively loud banging sounds similar to hammering can be heard repeatedly throughout this portion of the recording. Subsequently, several sounds similar to electrical power interruptions occur, followed by the first conversations between the flight crew. The CVR group transcribed the latter half of the recording, beginning at the time the flight crew can first be heard, and continuing to the end of the recording. The transcript can be found in Attachment II.

## D. DETAILS OF INVESTIGATION

### Recorder Examination

The NTSB Vehicle Recorders Division received a Fairchild[1] model A100A, serial number 61870 magnetic tape CVR. The exterior of the CVR showed evidence of substantial structural damage.

---

[1] Fairchild is now known as L[3] Communications.

**Recorder Disassembly, Tape Removal and Preparation**

The recorder was disassembled using normal tools. An optional DC to AC inverter was found installed in the recorder chassis. The internal tape spool dustcover was easily removed, and the tape and spool were found to be intact and in good condition. The only notable damage inside the crash case was some corrosion of the various metallic parts. The tape and spool were found to be wet, but otherwise intact.

The tape spool cover was removed with normal tools. The endless tape was then cut with a scissors, adjacent to the tape head assembly on the "oldest data" side of the head assembly. The tape and spool were removed from the recorder. A leader tape was spliced to each end. The tape and spool were then immersed in a bath of distilled water for cleaning. While underwater, the tape was spooled to a conventional reel for use with the CVR lab's tape playback equipment. After rinsing, the tape was removed from the water bath for further cleaning and drying. This process is done by manually spooling the tape back and forth between two reels while gently wiping the tape clean with a gauze cloth soaked in a cleaning solvent. During this process, a visual examination of the tape revealed no mechanical damage. Once cleaned and dried, the tape was played back normally and without difficulty using the CVR lab's playback equipment.

**Readout**

The tape was played back at the nominal speed of 1-7/8 inches per second. Typically, a 400 Hz tone (and its harmonics) heard on many CVR recordings as "background noise" can be used to fine tune the playback speed in attempt to play back the tape back at a speed as close as possible to the speed at which it was recorded. This tone was not readily apparent on this recording, which is typical of recorders fitted with an optional DC to AC inverter, as this one was.

The audio on the tape was recorded to a digital computer based audio system, to preclude any undue wear on the original tape. This digital recording was then used for subsequent evaluation by NTSB staff and the CVR group.

**CVR Channels**

The recording consisted of four channels of audio information, with the quality of the audio ranging from Poor to Good[2]. One channel contained the cockpit area microphone (CAM) audio information. The CAM is mounted in the cockpit, in the overhead panel between the two pilots. It is designed to capture sounds and conversations in the cockpit area whenever the CVR system is powered. The CAM channel quality was Good.

Two of the channels contained audio information obtained from the Captain's and First Officer's audio panels, respectively. The audio panels are essentially an interface between the pilot's headsets (or the cockpit speaker) and the airplane's radio communication equipment. Radio transmissions (both transmitted and received), are captured on these channels. Additionally, "hot" microphone signals (when used) are captured through the audio panels on these channels. Hot microphones are the same microphones in the pilot's headsets that can be used for making radio transmissions. The "hot" means that they are intended to always be on and recorded by the CVR, whether or not a radio transmission is being made. However on this recording, it appears that the microphone signals captured by the CVR (from both the Captain's and First Officer's headsets) were voice activated. This is evident by the squelching of the hot microphone audio than can be heard (and seen in waveforms of the signal) numerous times after the pilots finish speaking a word or phrase. This is most noticeable whenever the background ambient noise is at a relatively low level.

Federal Aviation Administration regulations require that large turbine powered airplanes be equipped with CVR systems that record uninterrupted audio signals

---

[2] See Attachment I for a CVR Quality Ranking Scale.

received by boom microphones.[3] This CVR installation may not have been in compliance with those regulations.

The First Officer's channel was recorded at a much lower volume than the other 3 channels. No incoming radio transmissions could be heard on this channel, though the First Officer did communicate with the Air Traffic Control Tower. It appears that the Captain and First Officer were using an intercom, however the Captain's voice could not be heard at all on the First Officer's Channel. A CVR test tone that can be heard briefly on this channel when the Captain performs the CVR test at 1423:51. The volume of the tone is significantly lower on this channel than it is on the Captain's channel. The quality of this channel was rated Poor.

Low signal level (volume) for VHF radio – as recorded by the CVR – is a historical problem for the Beech (Raytheon) 1900 airplanes. In 1997, after experiencing a number of similar problems with B1900 airplanes, the NTSB issued a recommendation[4] to the Federal Aviation Administration (FAA) to address the problem. Additionally, Raytheon developed a Service Bulletin (S/B 23-3094) that outlined the replacement of an amplifier in the airplane's audio system. In 2000, the FAA issued Airworthiness Directive AD 2000-20-07, which required that all applicable B1900 airplanes comply with the tasks outlined in the Raytheon Service Bulletin.

According to the airplane's maintenance records, AD 2000-20-07, S/B 23-3094 was complied with on this airplane on December 19, 2002.

The audio from the Captain's channel was significantly louder than the audio from the First Officer's channel. The CVR test tone appeared normal. The hot mic signals and radio transmissions could both be heard relatively clearly except during the few times that they occur simultaneously. The First Officer could be heard on the Captain's channel as is typical when an intercom is used. The quality of this channel was rated as Good.

---

[3] See 14 CFR 121.359(g).The relevant portion of this regulation applies to airplanes manufactured after October 11, 1991. The accident airplane (serial number UE-40) was manufactured in March of 1993.
[4] NTSB Recommendation A-97-036 was Closed – Acceptable Action in January 2001

The fourth channel is typically wired to the airplane's Public Address System in the B1900. There were no PA announcements made by the crew. This channel contains some audio from both pilots' hot mics as well as incoming and outgoing radio transmissions. The volume of this audio is slightly lower than the audio on the Captain's Channel, but louder than any audio of the First Officer's Channel. The presence of this audio suggests that this CVR channel is possibly configured to capture audio from a 3rd audio panel, such as an observer's panel.

**Group Activities**

The CVR group convened on August 28, 2003.  The group reviewed the tape and prepared a partial transcript of the recording. Each channel was reviewed individually as well as in combination with the other channels. There was little difficulty identifying the sources of each comment, and the group agreed on the content of each comment and characterization of each sound in the attached transcript.

**Timing and Correlation**

The times reported in the attached CVR transcript are Eastern Daylight Time (EDT).  The Flight Data Recorder Group Chairman provided the correlation of the CVR elapsed time with the Flight Data Recorder time. The Aircraft Performance Specialist provided the correlation of the Flight Data Recorder time with to the recorded radar data provided by the Federal Aviation Administration's Boston Air Route Traffic Control Center (ARTCC).  The times in this report reflect the clock used by Boston ARTCC, converted to the local time zone.

The times represent the beginning of the phrase or sound, and were generally measured and reported to the nearest 1 second. However, certain comments or sounds, such as the microphone clicks heard before and after each outgoing radio transmission, were measured and reported to the nearest 1/10 of a second.

Douglass P. Brazy

Mechanical Engineer (CVR)

RAC 000380

## Attachment I
## CVR Quality Rating Scale

The levels of recording quality are characterized by the following traits of the cockpit voice recorder information:

**Excellent Quality**   Virtually all of the crew conversations could be accurately and easily understood. The transcript that was developed may indicate only one or two words that were not intelligible. Any loss in the transcript is usually attributed to simultaneous cockpit/radio transmissions that obscure each other.

**Good Quality**   Most of the crew conversations could be accurately and easily understood. The transcript that was developed may indicate several words or phrases that were not intelligible. Any loss in the transcript can be attributed to minor technical deficiencies or momentary dropouts in the recording system or to a large number of simultaneous cockpit/radio transmissions that obscure each other.

**Fair Quality**   The majority of the crew conversations were intelligible. The transcript that was developed may indicate passages where conversations were unintelligible or fragmented. This type of recording is usually caused by cockpit noise that obscures portions of the voice signals or by a minor electrical or mechanical failure of the CVR system that distorts or obscures the audio information.

**Poor Quality**   Extraordinary means had to be used to make some of the crew conversations intelligible. The transcript that was developed may indicate fragmented phrases and conversations and may indicate extensive passages where conversations were missing or unintelligible. This type of recording is usually caused by a combination of a high cockpit noise level with a low voice signal (poor signal-to-noise ratio) or by a mechanical or electrical failure of the CVR system that severely distorts or obscures the audio information.

**Unusable**   Crew conversations may be discerned, but neither ordinary nor extraordinary means made it possible to develop a meaningful transcript of the conversations. This type of recording is usually caused by an almost total mechanical or electrical failure of the CVR system.

## Attachment II – Transcript

Partial transcript of a Fairchild A100A cockpit voice recorder (CVR), s/n 61870, installed on a Beech (Raytheon) B1900D, Registration N240CJ. The airplane was operated by Colgan Air Inc. as flight 9446 on a repositioning flight when it crashed off the coast of Yarmouth, MA on August 26th, 2003.

**LEGEND**

| | |
|---|---|
| **RDO** | Radio transmission from accident aircraft, Colgan Air 9446 |
| **CAM** | Cockpit area microphone voice or sound source |
| **HOT** | Hot microphone voice or sound source |

For RDO, CAM, and HOT comments:
- **-1**    Voice identified as the Captain
- **-2**    Voice identified as the First Officer
- **-3**    Voice of unidentified ground personnel
- **-?**    Voice unidentified

| | |
|---|---|
| **STN** | Radio transmission from station agent |
| **MX** | Radio transmission from Colgan maintenance facility at Hyannis |
| **GND** | Radio transmission from ground control at Hyannis |
| **TWR** | Radio transmission from Air Traffic Control Tower at Hyannis |
| **Ch1** | Audio heard on the First Officer's CVR Channel |
| **Ch2** | Audio heard on the PA CVR channel |
| **Ch3** | Audio heard on the Captain's CVR channel |
| **\*** | Unintelligible word |
| **&** | Third party personal name (see note 5 below) |
| **@** | Non-pertinent word |
| **#** | Expletive |
| **- - -** | Break in continuity or interruption in comment |
| **( )** | Questionable insertion |

[  ]          Editorial insertion

...            Pause

Note 1:  Times are expressed in Eastern Daylight Time  (EDT).

Note 2:  Generally, only radio transmissions to and from the accident aircraft were transcribed.

Note 3:  Words shown with excess vowels, letters, or drawn out syllables are a phonetic representation of
         the words as spoken.

Note 4:  A non-pertinent word, where noted, refers to a word not directly related to the operation, control or
         condition of the aircraft.

Note 5:  Personal names of 3rd parties not involved in the conversation are generally not transcribed.

Note6:   At times, some sounds may be heard on more than one channel. For example, the CAM may also
         capture speech captured by a HOT microphone. Comments are generally annotated as coming
         from the source from which the comment was easiest to hear and discern.

RAC 000383

## INTRA-COCKPIT COMMUNICATION

**TIME and SOURCE**

**CONTENT**

????:??    [Start of Recording - Due to electrical
          power interruption(s), neither the time
          of day nor the date could established prior
          to 1412:30. The recording contained a total
          of approximately 15 minutes and 20 seconds
          of audio prior to this time. The nature of
          this audio was consistent with maintenance
          work occurring inside the airplane's cockpit
          and/or cabin.]

1423:30    [Start of Transcript]

1423:30    [sound similar to power interruption]
CAM

1423:31    [sound of unidentified tone]
CAM

1423:39    all right before start.
CAM-1

1423:41    parking brake?
CAM-2

1423:42    its set.
CAM-1

1423:43    preflight's complete. cockpit scan complete.
CAM-2

1423:45    complete.
CAM-1

1423:46    oxygen system check?
CAM-2

## AIR-GROUND COMMUNICATION

**TIME and SOURCE**

**CONTENT**

RAC 000384

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1423:47 CAM-1 | uhhh... it was checked. |
| 1423:48 CAM-2 | circuit breakers check? |
| 1423:51 CAM-1 | checked. |
| 1423:51 CAM-2 | CVR tested? |
| 1423:51.5 Ch3 | [sound similar to CVR test tone for 1.4 seconds onds seconds] |
| 1423:52 CAM-1 | its tested. |
| 1423:52.8 Ch1 | [sound similar to CVR test tone for 0.5 second, at significantly lower volume than the tone heard on channel 3] |
| 1423:53.3 Ch2 | [sound similar to CVR test tone for 0.03 seconds at a volume comparable to the tone heard on channel 1] |
| 1423:53 CAM-2 | FDR test and set? |
| 1423:55 CAM-1 | test and set. |
| 1423:55 CAM-2 | flight control rudder lock? |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript· Page 13 of 37

RAC 000385

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1423:57 CAM-1 | removed. |
| 1423:58 CAM-2 | maintenance log, release, checked the aircraft. |
| 1423:59 CAM-1 | uhhhh. maintenance and release on aircraft. |
| 1424:02 CAM-2 | fuel (quantity)? |
| 1424:04 CAM-1 | uhhh. thirty two. |
| 1424:06 CAM-2 | thirty two. |
| 1424:07 CAM-2 | cabin signs on. |
| 1424:09 CAM-1 | on. |
| 1424:09 CAM-2 | seatbelts shoulder harnesses on. |
| 1424:11 CAM-1 | uhhhh duh duh duh. (we have a little) F D R. ok flight data recorder... and make sure. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

RAC 000386

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1424:21 CAM-1 | it says flight data recorder's inop, I just wanna make sure...thirty one dash three... thirty one dash three three A...uhhhh twenty seven...twenty eight...thirty one dash three three. ok...up here. done. |
| 1424:46 CAM-2 | ok. |
| 1424:47 CAM-1 | (eighty) one seventy three... let me check that MEL number... eighty one seventy three is still open... * * open... item. |
| 1425:02 CAM-1 | all right. clear on two? |
| 1425:04 CAM-2 | clear on two with a cap. |
| 1425:05 CAM-1 | all right. beacon is on. (put my master on) beacon is- |
| 1425:11 CAM-3 | stay on the radios. [voice in background] |
| 1425:14 CAM-2 | what did he say? |
| 1425:15 CAM-1 | stay on the radio. |
| 1425:17 CAM-1 | clear on two? |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 15 of 37

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1425:18 CAM-2 | clear on two with a cap. |
| 1425:20 CAM | [unidentified tone duration 0.27 second similar to tone heard when avionics master switch is operated] |
| 1425:21 CAM-1 | well lets talk to 'em right now before we even spin up. |
| 1425:43 CAM-1 | all right I got no radios over here... do you have anything out of your headset? |
| 1425:51 CAM-2 | check check check. |
| 1425:53 CAM-1 | all right, hold on. |
| 1425:54 CAM/ch3 | [sound similar to altitude alerter] |
| 1425:55 CAM-2 | check check check check check check. |
| 1425:57 CAM/ch3 | [sound similar to blowing breath] ok. MAN tie's closed. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1425:29.3 RDO-1 | hey &, how do you hear? [RDO or HOT] |

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 16 of 37

RAC 000388

## INTRA-COCKPIT COMMUNICATION

**TIME and SOURCE**

**CONTENT**

1425:59
CAM-2
check check check check check check check check check.

1426:00
HOT-2
[sound similar to static] check check.

1426:25
HOT-1
all right clear on two.

1426:27
HOT-2
with a cap.

1426:28
ch3
[sound similar to engine igniter electrical noise]

1426:29
HOT-1
what a cluster.

## AIR-GROUND COMMUNICATION

**TIME and SOURCE**

**CONTENT**

1425:57.8
RDO-1
and Hyannis maintenance Colgan ninety four forty six.

1426:08.0
RDO-1
Hyannis maintenance, ninety four forty six.

1426:14.4
RDO-1
&, &, anybody in the office there?

1426:20
STN
hey Scott I'll try to get a hold of them on the phone.

1426:22.3
RDO-1
thanks &.

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1426:31 HOT-2 | [sound of laughter] |
| 1426:36 CAM | [sound similar to engine noise increasing in speed] |
| 1426:40 HOT-2 | whats our weight? |
| 1426:41 HOT-1 | uhhh. I calculated lets see we got thirty two hundred, and we weigh ten seven, so uh fourteen thousand. |
| 1426:49 HOT-2 | thirteen for landing? |
| 1426:50 HOT-1 | uhhh, burn yeah, fourteen thirteen's fine. |
| 1427:01 CAM | [sound similar to altitude alerter] |
| 1427:19 CAM | [GPWS] bank angle. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1427:03.2 RDO-1 | and Hyannis maintenance Colgan ninety four forty six. |
| 1427:27 MX | * * * |

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 18 of 37

RAC 000389

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1427:28.4<br>RDO-1 | hey &, uh.& told me keep my radios on... uh just per normal or per uh, I mean... uh. I mean does he want us to communicate the whole way or what's going on. |
| 1427:40<br>MX | & might call ya and turn you back cause they did find a problem but I don't know for sure, he doesn't know either, *. |
| 1427:46.8<br>RDO-1 | ok tell ya what I'll be monitoring ARINC, I'll check in with Providence OPS also and LaGuardia OPS on the way and uh Bradley OPS in with company tell them. so I'll keep checkin make sure I don't get anything on your pickup truck, you wanna come over and move her over so I don't uh scratch your paint with any dust or anything? |
| 1428:03<br>MX | uh I'll come out. |
| 1428:04.6<br>RDO-1 | allrighty. |

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1428:21<br>HOT-2 | they might turn us back, huh? |

RAC 000390

## INTRA-COCKPIT COMMUNICATION

**TIME and SOURCE**

**CONTENT**

**1428:31**
**CAM-1**

hey * its Scott * I got *'s message about just keeping in touch with you guys as we're heading to Albany on this ferry flight in case they wanna turn us back, so I'm gonna I'm gonna check in with uh, uh, obviously I'm gonna * check in as (long) as I can check in, then I'll check in with Providence * * check in uh with Bradley, and Hartford on and on ok? [appears to be a cellular telephone conversation]

**1428:56**
**CAM-1**

well uh we got so many stations along the route that's not a problem. I'll just have to call down on the phone and just uh say ninety four forty seven or-ninety four forty six continue to Albany or you know, go back. All right, see ya *, bye. [appears to be a cellular telephone conversation]

**1429:15**
**HOT-2**

[sound of cough]

**1429:23**
**HOT-1**

all right, beacon's on door lights out, avionics master's off clear on one, starting one.

**1429:29**
**HOT-2**

did that old man say he has a King Air one hundred?

**1429:32**
**HOT-1**

yeah... that one's what a two or three?

## AIR-GROUND COMMUNICATION

**TIME and SOURCE**

**CONTENT**

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 20 of 37

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1429:35 HOT-2 | that's a three fifty. |
| 1429:36 HOT-1 | ok, but he also has a King Air one hundred. |
| 1429:39 HOT-2 | that's his? |
| 1429:40 HOT-1 | uh, he's the chief pilot for 'em. |
| 1429:42 HOT-2 | ahhh, now that'd be a good job. |
| 1429:44 HOT-1 | I guess, I don't know, this company's based out of Bedford, or New Bedford, wherever that is around here, but they let him fly up and put an extra flight cycle on him because he want's to live here. So apparently- |
| 1429:55 HOT-2 | ohhh. |
| 1429:56 HOT-1 | -the company's like- |
| 1429:57 CAM | [sound similar to altitude alerter] |
| 1430:00 HOT-1 | -I mean he's driving the blue Vette over there so somethin's goin right. |
| 1430:04 HOT-1 | all right, after start. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| | |

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 21 of 37

RAC 000392

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 22 of 37

## AIR-GROUND COMMUNICATION

TIME and
SOURCE

CONTENT

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1430:07 HOT-2 | external power? |
| 1430:08 HOT-1 | it is removed. |
| 1430:09 HOT-2 | CWPs checked? |
| 1430:10 HOT-1 | checked. |
| 1430:10 HOT-2 | ice protection? |
| 1430:11 HOT-1 | uhhhoh level one. |
| 1430:15 HOT-2 | EFIS standby attitude indicator on? |
| 1430:16 HOT-1 | on. |
| 1430:17 HOT-2 | TCAS (tested) standby? |
| 1430:18 HOT-1 | on. |
| 1430:19 HOT-2 | after start checklist complete. |
| 1430:21 HOT-1 | yeah I think he's a member of the QB's that's why he's got the license plate like that. |

RAC 000393

## INTRA-COCKPIT COMMUNICATION

**TIME and SOURCE**          **CONTENT**

1430:31
HOT-1          all right we're ready to taxi with HOTEL.

1430:39
HOT-1          interesting.

1430:50
HOT-2          we goin VFR or IFR?

1430:53
HOT-?          (IFR). [on captains channel, obscured by ra-
               dio transmission]

1430:54
HOT-1          that's our clearance.

1431:13
HOT-1          north ramp.

## AIR-GROUND COMMUNICATION

**TIME and SOURCE**          **CONTENT**

1430:42.8
RDO-2          ground Colgan uh, ninety four forty six
               ready to taxi, HOTEL, goin to Albany.

1431:05
GND            and Colgan ninety four forty six say it
               again you were stepped on.

1431:07.9
RDO-2          uh yeah we're ready to taxi with information
               HOTEL.

1431:12
GND            ok where are you?

1431:12.7
RDO-2          uhh we're over at the north ramp.

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 23 of 37

RAC 000394

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
| --- | --- |
| 1431:34 HOT-1 | basically Providence... and uh it'll be out of Providence......... Providence, GALES, one fifty one Providence, four ninety five Bradley, one thirty four Albany. |
| 1431:52 HOT-2 | Providence , GALES, you said? |
| 1431:54 HOT-1 | uhh, yeah. GALES is the one fifty four radial off of Boston... its nineteen miles but we won't get that. |
| 1432:01 HOT-2 | we're gonna get the Victor one six seven, right? |
| 1432:03 HOT-1 | yes, (you'll) get Providence, and then, on course. |
| 1432:06 HOT-2 | ok. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
| --- | --- |
| 1431:15 GND | roger runway two four taxi hold short one five, Colgan ninety four forty six. |
| 1431:19.2 RDO-2 | taxi to two four hold short of one five, Colgan ninety four forty six. |
| 1432:08 GND | (Colgan) ninety four forty six cross runway one five. |

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 24 of 37

RAC 000395

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1432:16 HOT-2 | watch out for the sandwich box. |
| 1432:17 HOT-1 | yeah. |
| 1432:22 HOT-1 | cross one five crossing- |
| 1432:23 HOT-2 | crossing one five, clear right. |
| 1432:25 HOT-1 | clear left. |
| 1432:28 HOT-2 | speeds are gonna be one oh four, one oh four, one fourteen, one fourteen. |
| 1432:32 HOT-1 | four fourteen fourteen me I guess uh... or do you want the one with the rig problems coming back? |
| 1432:37 HOT-2 | oh uhhh I prefer not to fly something if its broken... and I'd rather you do it because you're the pilot-in-command. |
| 1432:47 HOT-1 | all right. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1432:11.5 RDO-2 | cross runway one five, Colgan ninety four forty six. |

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1432:48 HOT-2 | and a broken airplane I wouldn't wanna... screw it up. |
| 1432:57 HOT-1 | well it'll be a standard Colgan if it gets spooky on the runway about it un- |
| 1433:00 HOT-2 | yeah. |
| 1433:01 HOT-1 | -tuh. |
| 1433:03 HOT-2 | its up to you it really doesn't matter to me. |
| 1433:05 HOT-1 | I'll drive up. |
| 1433:06 HOT-2 | ok. |
| 1433:11 HOT-1 | like I said, as long as its * up on the prop governor none of these airplanes get spooky, I don't think. |
| 1433:16 HOT-2 | uuuh es you know. just a matter of take it easy, go slow. |
| 1433:21 HOT-1 | pretty much. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

RAC 000397

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| HOT-1 | these things have been blowin a lot lately I had to reset one on uh... L V... Uniform last night. |
| 1433:42 HOT-2 | oh really? |
| 1433:44 HOT-1 | cause they're spiking, so. |
| 1433:46 HOT-2 | I thought it was cause people keep on switchin it you know MAN cool, back to AUTO. |
| 1433:51 HOT-1 | eh. well. &'s thing says ten minutes or less taxi you don't even (bother with it). |
| 1434:15 HOT-1 | Bradley OPS is one thirty point zero also, isn't it? I believe. |
| 1434:20 HOT-1 | * from memory. |
| 1434:20 HOT-2 | thirty nothing... that sounds familiar. |
| 1434:22 HOT-1 | yeah. *. |
| 1434:24 HOT-2 | I've never actually flown in there. |
| 1434:27 HOT-1 | oh. ok. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 27 of 37

RAC 000398

INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1434:29 HOT-1 | yeah. |
| 1434:48 HOT-1 | all right, run the checklist. [sound similar to belch] oh my. |
| 1434:52 HOT-2 | ok takeoff data brief... we got the speeds, and I guess- |
| 1434:56 HOT-1 | it'll be me, standard Colgan red light and emergency speeches we've done many times be- fore, questions, comments additions? |
| 1435:02 HOT-2 | no. |
| 1435:02 HOT-1 | all right- |
| 1435:02 HOT-2 | complete. |
| 1435:03 HOT-1 | -complete. |
| 1435:03 HOT-2 | altimeter set to... two nine eight seven? |
| 1435:08 HOT-2 | set?... set and cross checked. flight in- struments radios set checked. |
| 1435:13 HOT-2 | auto feather? |

AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 28 of 37

RAC 000399

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1435:14 HOT-2 | flaps are zero indicating zero, three trims are set. |
| 1435:18 HOT-1 | roger. |
| 1435:18 HOT-2 | cabins ready PA not required. taxi check complete. |
| 1435:24 CAM-1 | *. |
| 1435:26 HOT-2 | nice airplane. |
| 1435:28 HOT-1 | yup. somebody's got money. |
| 1435:31 HOT-2 | Lear thirty one? |
| 1435:33 HOT-1 | not my color, but. |
| 1435:35 HOT-2 | no. |
| 1435:35 HOT-1 | I woulda gone a dark blue, but, oh well. |
| 1435:37 HOT-2 | I'd still fly it. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 29 of 37

RAC 000400

## INTRA-COCKPIT COMMUNICATION

### AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1435:38 HOT-1 | oh yeah, I'd still own it too but... oh well. |
| 1436:12 HOT-1 | that's not a forty five? |
| 1436:13 HOT-2 | no. |
| 1436:41 HOT-2 | actually..... maybe it is. |
| 1436:52 HOT-1 | I can't tell 'em apart. |
| 1436:53 HOT-2 | I can't remember how many windows the thirty one has. |
| 1437:17 HOT-1 | all right. forty six is ready * *. |
| 1437:25 HOT-1 | bottom's check. |
| 1437:26 HOT-2 | top's check. |
| 1437:28 CAM-1 | ice protection (level 1). |
| 1437:30 HOT-2 | props forward condition levers set transponder and TCAS are on, environmentals and bleeds are off, CWP's checked. |

| TIME and SOURCE | CONTENT |
|---|---|
|  |  |

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 30 of 37.

RAC 000401

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1437:36 HOT-1 | * |
| 1437:37 HOT-2 | external lights? holding. |
| 1437:40 HOT-1 | hold on the lights. |
| 1437:43 HOT-2 | eighteen- |
| 1437:44 HOT-1 | nineteen five. |
| 1437:45 HOT-2 | -nineteen five. |
| 1438:08 CAM | [sound similar to increase in engine/propeller speed] |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1437:48.1 RDO-2 | tower Colgan uh ninety four forty six, ready to go, two two four. |
| 1438:04 TWR | Colgan ninety four forty six after departure fly heading two seven zero, runway two four cleared for takeoff. |
| 1438:08.4 RDO-2 | cleared for takeoff two four Colgan... ninety four forty six two seventy on the heading. |

CVR Group Chairman's Factual Report
Attachment II - Transcript- Page 31 of 37

NYC03MA183

RAC 000402

## INTRA-COCKPIT COMMUNICATION

**TIME and SOURCE**　　**CONTENT**

1438:35
HOT-1　　and... set the power.

1438:35.6
HOT-2　　power's set.

1438:37.3
HOT-2　　eighty knots.

1438:40.4
HOT-2　　V1... rotate.

1438:46.3
HOT-1　　* we got a hot trim, Steve.

1438:48
HOT-1　　kill the trim kill the trim kill the trim.

1438:50.6
HOT-1　　roll back Steve roll back roll back roll
　　　　　back roll back-

1438:53
HOT-2　　I got it.

1438:54
HOT-1　　-(pull) back

1438:54
HOT-2　　hold on- hold on.

1438:55
HOT-1　　she's heavy buddy.

1438:56
HOT-1　　roll it back * roll my trim Steve.

## AIR-GROUND COMMUNICATION

**TIME and SOURCE**　　**CONTENT**

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 32 of 37

RAC 000403

## INTRA-COCKPIT COMMUNICATION

### AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT | TIME and SOURCE | CONTENT |
|---|---|---|---|
| 1439:00 HOT-1 | do the electric trim disconnect... hold- | | |
| 1439:02 HOT-1 | -all right, Steve. | | |
| 1439:04 HOT-1 | hold back Steve. | | |
| 1439:04.7 HOT-1 | no. go on the controls with me Steve. | | |
| 1439:06 HOT-2 | I got it. | | |
| 1439:07 HOT-1 | all right. | | |
| 1439:11 HOT-1 | all right. | | |
| 1439:13 HOT-1 | all right. | | |
| 1439:14 HOT-1 | put our gear up. | | |
| 1439:14.8 CAM | [sound similar to landing gear motor noise, duration 5.5 seconds] | | |
| 1439:16 HOT-1 | all right. | | |
| 1439:18 HOT-1 | gimme flaps up. | | |

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 33 of 37

RAC 000404

## INTRA-COCKPIT COMMUNICATION

### TIME and SOURCE          CONTENT

1439:19
HOT-2     flaps are up.

1439:20
HOT-1     flaps are up.

1439:33
HOT-2     you want power back?

1439:33.9
HOT-1     pull the power back. pull the power back.

1439:36
HOT-2     slowly.

1439:36.4
ch2       [sound similar to decrease in en-
          gine/propeller speed]

1439:40
HOT-1     all right, were gonna need both of us on
          this Steve.

1439:48
HOT-2     (could) I pull the breaker?

## AIR-GROUND COMMUNICATION

### TIME and SOURCE          CONTENT

1439:21.7
RDO-1     ninety    four    forty    six    requestin'
          uh...'mergency back sir, we got a... runaway
          trim.

1439:28
TWR       Colgan ninet * * six roger, right or left
          downwind your choice, and report midfield.

1439:32.6
RDO-1     (midfield). [HOT or RDO]

RAC 000405

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript - Page 35 of 37

## AIR-GROUND COMMUNICATION

### TIME and SOURCE

### CONTENT

## INTRA-COCKPIT COMMUNICATION

### CONTENT

| TIME and SOURCE | CONTENT |
|---|---|
| 1439:49 CAM | [sound similar to altitude alerter] |
| 1439:49 HOT-1 | pull the breaker Steve. |
| 1439:51 HOT-1 | pull the breaker. |
| 1439:53 HOT-1 | I got it if you've got the trim baby. |
| 1439:54 HOT-2 | where is it? |
| 1439:56 HOT-1 | find it *. |
| 1439:58 HOT-1 | look left of the silver thing, Steve. look left of the silver thing. |
| 1440:02 HOT-2 | left of the silver thing? |
| 1440:03 HOT-1 | left of the silver thing Steve. |
| 1440:05 HOT-1 | don't let go of the st- control Steve, just stay with me. |
| 1440:17 HOT-1 | you pull back for all your worth, baby. |

RAC 000406

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1440:28 HOT-1 | just keep (pulling/holding) back for all your worth. |
| 1440:34 HOT-1 | Steve (pull/hold) back. |
| 1440:35 HOT-2 | ahhh. |
| 1440:36 HOT-1 | (pull/hold) back. |
| 1440:37 HOT-1 | ahhh. |
| 1440:39 ch3 | [GPWS] terrain terrain. * pull up. |
| 1440:42 HOT-1 | Steve keep- |
| 1440:42 HOT-2 | I'm pullin. |

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1440:31.0 RDO-1 | * ninety four forty six is requesting three three sir. |
| 1440:35 TWR | * * four forty six sir, roger- |
| 1440:37 TWR | -runway three three- |
| 1440:38 TWR | -uh * cleared to land |

RAC 000407

## INTRA-COCKPIT COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|
| 1440:44 HOT-2 | #. |
| 1440:45 HOT-1 | Steve, hold on. |
| 1440:46 HOT-2 | uhh. |
| 1440:46 HOT-1 | oh no. |
| 1440:47 HOT-1 | [sound similar to scream] |
| 1440:47 ch3 | [GPWS woop woop pull up pull- ] |
| 1440:47.4 CAM | [end of recording] |

[End of Transcript]

## AIR-GROUND COMMUNICATION

| TIME and SOURCE | CONTENT |
|---|---|

NYC03MA183
CVR Group Chairman's Factual Report
Attachment II – Transcript- Page 37 of 37

RAC 000408

# EXHIBIT 26

Richard J. Nelson
PO Box 20724
719 Ridgeland Street
Cheyenne, WY 82003
970-218-6211 fax 307-634-4633
E-mail: Dnelson729@aol.com

August 24, 2006

Mr. Michael G. Jones
Martin, Pringle, Oliver
Wallace & Bauer, LLP.
100 N. Broadway, Suite 500
Wichita, KS 67202

Dear Mr. Jones,

The attached addendum to my expert report date August 5, 2006, is provided
concerning Dean/Weiler v. Raytheon.

Respectfully Submitted

Richard J. Nelson

**Dean/Weiler v. Raytheon**

**Addendum to Expert Report dated August 5, 2006**
**RE: Colgan v. Raytheon**

I provided an expert report, dated August 5, 2005, regarding facts and my opinions associated with the August 26, 2003, accident of N240CJ, a Beech 1900D, operated by Colgan Air, Inc. concerning Colgan v. Raytheon . Since that report I have provided deposition testimony in the matter on September 12, 2005, and I have recently reviewed the following expert reports associated with this accident.

1. John Goglia, dated July 21, 2006
2. Michael A. Conway, dated July 21, 2006
3. Gregory A. Feith, dated July 21, 2006
4. Michael E. Maddox, dated July 20, 2006
5. Donald E. Sommer dated July 20, 2006

My opinion(s) stated in the August 5, 2005, report remain unchanged by any information provided by the listed experts' reports.   Notwithstanding that statement, some of those experts' opinions warrant challenge.

*Pilot Qualifications:*

Mr. Feith states that:   "Although the F/O was unsuccessful during two practical examinations, this is not uncommon in the aviation industry and had [sic] relevance to this accident."  On the contrary, receiving a notice of disapproval for a Commercial Pilot Certificate, followed by an *unsuccessful* reexamination for Commercial Pilot, is not at all common to this industry.  As a former pilot examiner, the few instances I can recall of such performance are associated not with the commercial pilot certificate but with the attempted acquisition of a CFI (certificated flight instructor), which is more a test of teaching ability than it is of flying ability.

As cited by Mr. Feith, according to Paragraph 4.4.0 of Colgan's simulator training program, Lesson 4, Appendix 4-15 Revision 17, dated 01 November 02, item 6 of Emergency Procedures specifies training for trim failure.

The training program rightly appears to differentiate between trim failure and trim runaway.  One element of training for pitch trim failure is a jammed trim tab system, where the trim tab cannot be moved either with electric trim or the manual system.  In such instances, pilots are trained to mitigate stick or yoke control forces by managing airspeed.  Such knowledge would have prepared the

accident flight crew for sustaining controlled flight to a successful landing or survivable forced landing, had they not "rolled in" manual trim.

In another citation by Mr. Feith, Item 3 of the same training program provides for training for trim runaway. It should be evident that this training would instruct flight crewmembers on how to identify trim runaway. Available evidence shows that this crew misidentified their circumstances as trim runaway.

*Crew fatigue and crew scheduling:*

Mr. Feith states that: "There is no evidence that fatigue or any other physiological or psychological factors relevant to either crewmember caused or contributed to this accident." On the contrary, a call-back can induce frustration to flight crewmembers, particularly after completion of a duty day, when the crew could be expected to be fatigued. The NTSB has determined fatigue to be a contributing factor in aviation accidents.

For his part, Mr. Conway suggests that this (call-backs after long duty days) is normal to the industry and that he has had many long duty days. It is my experience that call-backs are not normal and are many times prohibited by union contracts. It is also my experience to be fatigued at the end of a long duty day.

This crew accepted a call-back (apparently turned down by other flight crews) for this flight after completion of two consecutive long duty-days. Initiating this flight as they did after call-back and their long duty days, this flight crew was demonstrably casual about preflight, first-flight-of-the-day aircraft checklist protocols, and sterile cockpit practices.

*Preflight Actions:*

Mr. Conway asserts that the flight crew knew the mechanics at the airport, but it does not necessarily follow—as he suggests—that they would have an established level of confidence in the maintenance performed on the aircraft.

Several of the experts believe that it is impossible to verify trim tab position from a position on the ground, as the horizontal stabilizer is about 15 feet above the ground, or about nine or ten feet from a flight crewmember's eyes.

For the sake of review, the Raytheon Aircraft 1900D Airliner checklist, Section IV -- Normal Procedures (FAA Approved August 2001) requires, during preflight inspection, expressly for the first flight of the day, setting the elevator trim to 1 ½ units nose up. During walk-around inspection, the flight crew is required to check and verify that the tabs [elevator] are in neutral position, and there is a note that:

The elevator trim tab neutral position is determined by observing that the trailing edge of the elevator trim tab aligns with the trailing edge of the elevator, when the elevator is resting against the downstops with the elevator trim wheel set 1 ½ units up." (Note cited from normal procedures checklist page, FAA approved October 1999).

Dr. Maddox asserts that "it is simply not possible to verify the trim tab deflection angles from the ground." He participated in an exercise with a representative example of a Beech 1900D, saying that participants repeatedly adjusted the elevator trim to various values, and efforts were undertaken to associate the trim tab position with respect to the vertical stabilizer upper fairing, either removed or with it in place.

This writer notes that Raytheon checklists *do not* refer to viewing trim tab position in relationship to a fairing, but in relationship with the trailing edge of the elevator. Furthermore, the flight crew is not expected to make a quantitative determination of the number of degrees or units the tab may be displaced, as Dr. Maddox suggests, but only to determine if the tab is "in trail" with the trailing edge of the elevator(s). It is my opinion, having visited a representative Beech 1900D that it is possible to determine if the pitch trim tab is in trail with the trailing edge of the elevator(s) from a position on the ground, where my eyes were within nine or ten feet of the trim tab.

Mr. Feith states that "although the physical movement of the trim tab was opposite to that of the cockpit-mounted trim wheel, the contrasting visual cues (elevator trim tab and cockpit trim wheel) necessary for the pilot to readily determine that the commanded input utilizing the trim switch was counter to that of the wheel movement was non-existant [sic]." I was unable to discern the logic of this statement. However, the fact that the trim wheel moves in an improper direction (when driven by the electric pitch trim system), by his own admission, is clear evidence of an anomaly that demands further flightcrew action.

After providing a verbatim copy of a salient portion of the "first flight of the day" checklist, which includes the item: ***Electric pitch trim....SET FOR TAKEOFF,"*** Mr. Feith asserts that "regardless of whether or not the flightcrew performed the "First Flight of the Day" [checklist] they were not provided with sufficient information to determine whether or not the elevator trim system had been misrigged." Positioning the pitch trim tab for takeoff while using the electric pitch trim requires observing the manual pitch trim position scale, where the manual pitch trim wheel would be in motion. The flight crew—had they performed this required check—was certainly provided by the opportunity to observe the improper direction of pitch trim wheel travel while the electric pitch trim was being set for takeoff. Properly discerning an anomaly, the crew would be expected to

refer it to maintenance personnel, whose responsibility would be to determine that the system was misrigged.

Later in his report, Mr. Feith asserts that "the operation of the elevator trim system appeared normal because the electric trim was moving the trim in the proper corresponding direction." The electric trim was moving the **trim tab** in the proper direction; however the manual pitch trim wheel would move in the improper direction of rotation, which would be readily apparent to an observing crewmember, and it clearly would not "appear normal."

Mr. Conway tells us that, knowing that "the mechanics had worked on the trim system, a good practice would have been for the flight crew to check for free movement of the trim wheel to ensure that there was no binding." It is likely that Mr. Conway can describe an industry-standard control check of the yoke or rudder pedals for freedom of travel of the elevator and ailerons or rudder where the practice is to move the control yoke or pedals throughout their entire range of travel to assure freedom of movement. Since that is a standard operating procedure inculcated from basic training, his suggestion to ensure free movement of the trim wheel similarly and logically includes checking its freedom of movement throughout its range of travel after trim system maintenance, which would have revealed that its indicated range was improper and constrained. It is my opinion that a conscientious flight crew would have checked freedom of motion throughout the range of pitch trim when retuning an aircraft to service after pitch trim system maintenance. In this instance they would have discovered the constraints on trim system range and the improper direction of rotation and travel of the manual pitch trim wheel.

*Sterile cockpit procedures:*

Several of the experts suggest that failure to abide by sterile cockpit protocols as this crew did while operating the subject aircraft is tolerable and is a mark of acceptable professionalism. Several suggest that not complying with the company's "First Flight of the Day" protocols is prudent and is a mark of acceptable professionalism. I strenuously disagree.

Mr. Feith asserts that that the flight crew's failure to observe sterile cockpit procedures below 10,000 feet "did not create a distraction nor cause a diversion attention [sic] from the crews' flight-related duties." I consider non-compliance with sterile cockpit procedures to be unprofessional conduct.

*Accident flight:*

Mr. Sommer's conclusions number 8 and 9 suggest that flight manuals should "discuss methods to be utilized when the aircraft is grossly out of trim, that is, that

the airspeed needs to be minimized." As discussed elsewhere in this addendum, this fact can easily be construed as basic pilot knowledge that does not need to be inserted in approved flight manuals in order to inform flight crewmembers.

One expert suggests that this was an unpreventable accident once the airplane lifted off the runway, notwithstanding the fact that several opportunities were earlier available to the crew to discern problems with the trim control system and the improper direction of rotation of the cabin pitch trim control wheel, and a number of actions were available to the flight crewmembers after becoming airborne to mitigate the effects of nose down trim.

None of the experts appear to recognize that the aircraft was most likely controllable either to a successful landing or survivable crash landing if the crew had simply left the trim alone after rotation and had flown as if the aircraft had had a jammed pitch trim, instead of increasing control loads by inputting increasing amounts of trim (in the wrong direction, due to the misrigged manual trim control system). Elevator pitch force at rotation for takeoff was calculated to be about 50 pounds, and the crew did not declare that the aircraft was "heavy" until they had accelerated to about 128 knots. Every action they took after that determination aggravated their situation:

    1) They continued to accelerate, increasing nose-down pitch control loads
    2) They retracted the landing gear, reducing drag, further increasing airspeed and increasing pitch control loads
    3) They retracted flaps, again reducing drag, further increasing airspeed and again increasing pitch control loads.
    4) They continued increasing nose-down pitch trim by rolling in manual pitch trim without observing that control forces *increased* during motion of the manual pitch trim control wheel (and the associated trim tabs).

Properly trained flight crewmembers are cognizant of the effect of airspeed changes on pitch control forces. They are also sensitive to control loads as trim changes are made. Basic procedures are to apply whatever control pressure is necessary to hold the desired flight attitude, and to then relieve that control pressure by use of the associated trim system. Improper airmanship is to use trim systems like power steering, using trim travel to attain a desired flight attitude without using pilot control pressures. If proper airmanship procedures were followed, the pilot manipulating the controls had an opportunity to sense that control forces increased as the manual pitch trim wheel was moved. When in an undesired hole, the first rule is to stop digging.

*Simulation:*

Dr. Maddox concludes that "a number of simulated flight tests conducted by the NTSB showed conclusively that the flight crew could not be reasonably expected

to recover from reverse-operating pitch trim." This statement is both misleading and abbreviated. The simulated flight tests attempted to replicate the accident flight profile. They **did** include setting or operating the manual pitch trim to its maximum available nose-down limits (considering the misrigged manual trim cables), as was the apparent action of this crew, with successful outcome of the flight improbable. The simulated flight tests **did not** include operating the aircraft with the trim position unchanged from where it was at rotation during takeoff, before manual trim was "rolled in," or rolling the trim back as soon as increased control forces were sensed and identified.    Additionally, the simulated flight tests did not include operating the aircraft without changing configuration, and by controlling airspeed so that that the aircraft did not accelerate to an airspeed where control forces exceeded the pilots' capabilities.

There is a very high probability that this flight crew could have flown this aircraft to a successful landing or survivable forced landing with reverse-operating manual pitch trim if:

1) They had they not "rolled in" that same malfunctioning trim travel without even sensing its aggravating effect.

2) They had mitigated the gross increase nose-down pitch force by minimizing configuration changes (retracting the landing gear and flaps)

3)  They had reduced power and operated at "slow flight", not permitting the aircraft to continue accelerating beyond the airspeed where they determined that the aircraft was "heavy."

*Final opinion(s):*

This was an avoidable accident.  The issues identified herein and in my report of August 5, 2005 articulate the lack of professionalism and questionable airmanship that unfortunately culminated in the flight crewmembers' fatalities.

Richard J. Nelson
August 23, 2006

*Dean vs. Raytheon Aircraft Company, Case No. 05-CV-10155-PBS*
*Defendants' Memorandum in Support of Motion for Summary Judgment*

# EXHIBIT 27

National Transpo... ...on Safety Board
Washington, DC 20594

**Brief of Accident**

Adopted 08/31/2004

NYCO3MA183
File No. 16160

08/26/2003                    Yarmouth, MA                    Aircraft Reg No. N240CJ                    Time (Local): 15:40 EDT

EXHIBIT

Ceylio lo
9 18 03 72

Make/Model: Beech / 1900D
Engine Make/Model: Pratt & Whitney / PT6A-67D
Aircraft Damage: Destroyed
Number of Engines: 2
Operating Certificate(s): Flag Carrier/Domestic
Type of Flight Operation: Positioning
Reg. Flight Conducted Under: Part 91: General Aviation

Last Depart. Point: Hyannis, MA
Destination: Albany, NY
Airport Proximity: Off Airport/Airstrip

Crew    Fatal    Serious    Minor/None
         2        0          0
Pass             0          0

Condition of Light: Day
Weather Info Src: Weather Observation Facility
Basic Weather: Visual Conditions
Lowest Ceiling: None
Visibility: 10.00 SM
Wind Dir/Speed: Variable / 006 Kts
Temperature (°C): 23
Obstr to Vision: None
Precipitation: None

Flight Time (Hours)

Total All Aircraft: 2891
Last 90 Days: 211
Total Make/Model: 1364
Total Instrument Time: UnK/Nr

Pilot-in-Command                    Age: 39

Certificate(s)/Rating(s)
Airline Transport; Commercial; Multi-engine Land; Single-engine Land; Single-engine Sea
Instrument Ratings
Airplane

The accident flight was the first flight after maintenance personnel replaced the forward elevator trim cable. When the flightcrew received the airplane, the captain did not address the recent cable change noted on his maintenance release. The captain also did not perform a first flight of the day checklist, which included an elevator trim check. Shortly after takeoff, the flightcrew reported a runway trim, and manually selected nose-up trim. However, the elevator trim then traveled to the full nose-down position. The control column forces subsequently increased to 250 pounds, and the flightcrew was unable to maintain control of the airplane. During the replacement of the cable, the maintenance personnel skipped a step in the manufacturer's airliner maintenance manual (AMM). They did not use a lead wire to assist with cable orientation. In addition, the AMM incorrectly depicted the elevator trim drum, and the depiction of the orientation of the cable around the drum was ambiguous. The maintenance personnel stated that they had completed an operational check of the airplane after maintenance. The Safety Board performed a mis-rigging demonstration on an exemplar airplane, which reversed the elevator trim system. An operational check on that airplane revealed that when the electric trim motor was activated in one direction, the elevator trim tabs moved in the correct direction, but the trim wheel moved opposite of the corresponding correct direction. When the manual trim wheel was moved in one direction, the elevator trim tabs moved opposite of the corresponding correct direction.

Brief of Accid... (Continued)

NYC03MA183
File No. 16160          08/26/2003          Yarmouth, MA          Aircraft Reg No. N240CJ          Time (Local): 15:40 EDT

Occurrence #1:    LOSS OF CONTROL - IN FLIGHT
Phase of Operation: EMERGENCY LANDING AFTER TAKEOFF

Findings
    1. FLT CONTROL SYST,ELEVATOR TRIM/TAB CONTROL - REVERSED
    2. (C) MAINTENANCE,REPLACEMENT - IMPROPER - COMPANY MAINTENANCE PERSONNEL
    3. (F) CONDITION(S)/STEP(S) IN ERROR - MANUFACTURER
    4. (C) MAINTENANCE,INSPECTION - INADEQUATE - COMPANY MAINTENANCE PERSONNEL
    5. (F) CHECKLIST - NOT FOLLOWED - FLIGHTCREW

Occurrence #2:    IN FLIGHT COLLISION WITH TERRAIN/WATER
Phase of Operation: DESCENT - UNCONTROLLED

Findings
    6. TERRAIN CONDITION - WATER

Findings Legend: (C) = Cause, (F) = Factor

The National Transportation Safety Board determines the probable cause(s) of this accident as follows.
The improper replacement of the forward elevator trim cable, and subsequent inadequate functional check of the maintenance performed,
which resulted in a reversal of the elevator trim system and a loss of control in-flight. Factors were the flightcrew's failure to
follow the checklist procedures, and the aircraft manufacturer's erroneous depiction of the elevator trim drum in the maintenance manual.

*Dean vs. Raytheon Aircraft Company, Case No. 05-CV-10155-PBS*
*Defendants' Memorandum in Support of Motion for Summary Judgment*

# EXHIBIT 28

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
------------------------------------
                                    :
YISEL DEAN, et al.,                 :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             : CASE NO.
                                    : 05 CV 10155 PBS
RAYTHEON COMPANY, et al.,           :
                                    :
        Defendants.                 :
                                    :
------------------------------------
------------------------------------
                                    :
LISA WEILER, et al.,                :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             : CASE NO.
                                    : 05 CV 10364 PBS
RAYTHEON COMPANY, et al.,           :
                                    :
        Defendants.                 :
                                    :
------------------------------------
```

| | |
|---|---|
| Deposition of: | LISA WEILER |
| Taken: | By the Defendants<br>Pursuant to Notice |
| Date: | May 3, 2006 |
| Time: | Commencing at 10:15 a.m. |
| Place: | Ace-Merit, LLC<br>30 Garfield Place, Suite 620<br>Cincinnati, Ohio  45202 |
| Before: | Susan M. Gee, RMR, CRR<br>Notary Public - State of Ohio |

COPY

**Page 10**

1  period of time or have you taken breaks in there?
2      A.  I've worked continuously since I was 18
3  years old.
4      Q.  And planned to continue working during
5  your adult life, I presume?
6      A.  Yes.
7      Q.  Do you have family here locally?
8      A.  Yes, I do.
9      Q.  Who were they?
10      A.  I have a mother, and I have a brother who
11  is a little older than me.  He has his family,
12  married with children.  I have a sister who's a year
13  younger than me who's handicapped, and she lives with
14  my mother.
15      Q.  Have you ever been married?
16      A.  No.
17      Q.  No kids?
18      A.  No.
19      Q.  Tell me about your first meeting with Mr.
20  Knabe.
21      A.  I met Scott when I went to work for the
22  Cincinnati income tax office January of '90.  He was
23  an examiner there, and basically, the first day or
24  two, went around, learned office procedures,
25  introduced to everyone on the staff, couldn't

**Page 11**

1  remember most of the people's names.
2          And he was actually out on an outside
3  assignment, and he came back like a day or two later.
4  He had been working at the desk that I was
5  assigned to now.  So he came over, and he had to get
6  some paperwork and things, and he introduced himself
7  and welcomed me on board and told me if I ever needed
8  any help to feel free to ask.
9      Q.  And this was your first day at work?
10      A.  I think it was probably like the second or
11  third day.  Yeah.
12      Q.  Explain that a little bit about how your
13  relationship progressed with him.
14      A.  Just casual, seeing him in the break room,
15  passing him in the office.  At that point, there were
16  a lot of younger people in the office, I'd say mid to
17  late twenties.  They had a group that would go out on
18  Fridays after work or they'd go to ball games or
19  something like that.  He was kind of involved with
20  that group a little bit, and then I just, you know,
21  kind of joined in.
22      Q.  You started hanging out with this group
23  from the office?
24      A.  Yeah.
25      Q.  Got to know him better from having done

**Page 12**

1  that?
2      A.  Yep.  Yeah.
3      Q.  Was he, at that point in time when you
4  were just getting to know him, into flying?
5      A.  Yes.  I believe he had just started
6  working on his private license.
7      Q.  As we talk today, I'm going to use a
8  letter that your counsel has written to us that
9  explains some background issues, sort of as a guide.
10  In part of it, it mentions he took his first flying
11  lesson in August of 1989, which would have been
12  before you met him?
13      A.  Right.
14      Q.  What did you first learn about his flying
15  when you got to know him better?  What kind of things
16  would he tell you?
17      A.  That he enjoyed flying.  He loved just
18  being up in the clouds, and it was relaxing, and his
19  father had enjoyed flying, and he wanted to get
20  his -- initially, he wanted to get his private
21  license.  He was a type of person that did all kinds
22  of different things.
23      Q.  Was he also, by this point in time,
24  involved in Indy racing?
25      A.  Yes.  He was very involved with that.

**Page 13**

1      Q.  In terms of what he would talk about on
2  these outings with this group --
3      A.  Mostly the racing.
4      Q.  So flying was part of it but not the
5  bigger part of it at that point in time?
6      A.  Correct.
7      Q.  So he hadn't completed his pilot's
8  training yet when you first met him?
9      A.  No.
10      Q.  When did he complete that, if you know?
11      A.  I think a few years later.  '93, '94,
12  something like that.
13      Q.  Can you identify a time frame when you
14  first started dating?
15      A.  I would say about early '93.
16      Q.  So within two and a half, three years
17  after your beginning work?
18      A.  Yeah.  We mostly hung around with this
19  group for about a year, and some of those people left
20  the office.  Other people went off and did other
21  things.  It kind of just ended up he and me.
22      Q.  What kind of things did you do in your
23  early days of dating?
24      A.  We'd go to movies, we'd go out to dinner,
25  we'd go on little weekend trips.  He was involved

4 (Pages 10 to 13)

## Page 14

1  with the racing.  If the races were within 100, 200
2  miles of Cincinnati, I usually went with him.  If the
3  races were, like, on the West Coast or whatever, you
4  know, I didn't go.
5       Q.  By the time you started actually dating in
6  '93 or so, had he completed his pilot's training?
7       A.  No.
8       Q.  Still taking classes?
9       A.  Yes, I believe so.
10      Q.  How often was he doing that?  Was it just
11  sort of a once-in-a-while thing or was it on a
12  regular schedule?
13      A.  I'm not really sure.
14      Q.  In this earlier time frame, when he was
15  completing his initial pilot training over time, was
16  he indicating to you that it was something he was
17  just doing because he had an interest in it or for a
18  career path?  At this point, I'm just focusing in on
19  that early time frame.
20      A.  I would say he just had an interest in it,
21  but it was always a possibility.  He had an interest
22  in the racing, too, and there was always a
23  possibility of a career change to that, too.  He
24  liked both of them equally.
25      Q.  So he did talk about trying to get a

## Page 15

1  long-term career in racing as well?
2       A.  Yeah.
3       Q.  How realistic of a goal did that seem to
4  be for you and him in talking about it?  In other
5  words, getting into the racing business, I don't know
6  how hard that is.  In some industries, it's really,
7  really difficult, and others, you can get there
8  ultimately.
9       A.  Okay.
10      Q.  Did you have a sense of that as you were
11  talking about that as a career path for him, how hard
12  that was going to be, how likely?
13      A.  Very likely.
14      Q.  Really?
15      A.  Very likely.  When I met him, he was
16  already involved with a race team working for them on
17  the weekends.  He would fly out of Cincinnati on
18  Friday, go to the race venue, work for them the whole
19  weekend and come back, and he did the whole season.
20      Q.  So what ultimately diverted him from
21  taking that career path and instead moving toward
22  aviation as a career path?
23      A.  I think eventually, when he did get his
24  pilot's license, it was an accomplishment.  Around
25  that time, he was also taking classes at Cincinnati

## Page 16

1  State for his A and P license, so he was involved
2  with, getting more involved with the environment,
3  aviation environment.
4       Q.  Let's talk a little bit about that time at
5  Cincinnati State Technical and Community College.
6  From some things I've read, it suggests to me that he
7  initially started there in the automotive program.
8       A.  Correct.
9       Q.  Was that to try and further, potentially,
10  his racing work?
11      A.  No, just to acquire more general knowledge
12  about the automotive.
13      Q.  Just because he has an interest in it or
14  was he thinking about yet a different career?
15      A.  No, not a different career.
16      Q.  What caused him to stop in the automotive
17  program and shift over, if that's what happened, to
18  the airframe and power plant training?
19      A.  Because he had gotten his private license,
20  both of the programs were kind of intermingled.  A
21  lot of the classes that he took in the automobile
22  aspect of it carried over into the racing, such as
23  electricity and physics and things like that.
24      Q.  So when he made decisions to begin, for
25  example, taking the automotive classes and then

## Page 17

1  change over to A and P school, was that something he
2  would do on his own, decide on his own and let you
3  know about or something you would talk about together
4  and decide together?
5       A.  He would ultimately decide, but he would
6  discuss things with me.
7       Q.  At the time he was going to Cincinnati
8  State, how far had your relationship with him
9  progressed?  Were you still friends?  Were you
10  dating?  Were you dating seriously?  Living together?
11  I don't know how you best describe that, but in your
12  own words, tell me what the state of your
13  relationship was.
14      A.  When he started?
15      Q.  Yes, when he started the automotive
16  program.
17      A.  I'd say dating seriously.
18      Q.  At some point in time, you moved in
19  together?
20      A.  Yes.
21      Q.  When was that?
22      A.  '95, '96.
23      Q.  Was he done with his A and P school by
24  then?
25      A.  No.  He had actually left the City of

**5 (Pages 14 to 17)**

© Ace-Merit, LLC  2006 / (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202

**Page 46**

1  if you're able to answer. The answer provided is an
2  objection and a reference to the funeral and burial
3  expenses. My question for you is: Are you able to
4  tell me today what damages you're seeking in this
5  case, the types of components of damages?
6      MS. SCHIAVO: Again, objection for the
7    record concerning any legal theories or legal
8    issues concerning legal damage theories or any
9    kind of legal arguments or legal issues.
10   That's, obviously, something that counsel does
11   and calls for a legal conclusion. And subject
12   to the objection, you may go ahead and answer.
13     **A. Could you restate the question again?**
14     Q. I'm asking if you're able to tell me what
15  types of things you're seeking damages for in this
16  case.
17     **A. Loss of his life.**
18     Q. Any particular, let's say, for example,
19  out-of-pocket expenses that you incurred as a result
20  of that that you're seeking reimbursement for? Let's
21  start with that as an example of the type of loss.
22  Are you able to tell me, number one, if you're
23  seeking that type of thing and, if so, what
24  components go into that?
25     **A. You mean dollar amounts or what?**

**Page 47**

1      Q. Yes. I mean, for example, funeral
2  expenses, let's say.
3      **A. Okay.**
4      Q. Are you seeking reimbursement of that?
5      **A. Yes, I am.**
6      Q. And do you know the amounts or have
7  documents?
8      **A. I have submitted an invoice, yes.**
9      Q. Any other types of categories or
10  components of damages that you can identify for me
11  that you're seeking in the case?
12     MS. SCHIAVO: I'm going to object for the
13   record. I'll let her go ahead and try to
14   answer. She already said she's seeking
15   recompense for the loss of his life, and
16   according to the law, there are many items that
17   go into that. She may not be aware of what the
18   law allows.
19      If you have specific issues that you want
20   to ask her about, specific items, in terms of
21   what damages are you seeking, I think that's a
22   legal conclusion, and she probably is not
23   familiar with those kinds of terms.
24      If you have specific questions about
25   specific items, that would be a factual issue

**Page 48**

1      that she could answer, but I think asking her
2    about damages is a legal conclusion, so for the
3    record, I once again will object to anything
4    that calls for a legal conclusion, but on, you
5    know, individual items, as I said, you may
6    answer subject to the objection.
7      Q. I'm not asking for any legal conclusions.
8  I'm just asking whether you're able to describe for
9  me the components of damages that you believe you're
10  seeking in this case.
11     **A. I'm not able to answer that.**
12     Q. Let's look at Page 9. Do you remember
13  having received insurance benefits following Mr.
14  Knabe's death in this case?
15     MS. SCHIAVO: Again, I'm going to object
16   for the record. You'll be able to answer this
17   subject to objections, but collateral offsets
18   and information concerning collateral offsets
19   is not allowable in court in Massachusetts. I
20   object to counsel's question and form of the
21   question as being beyond the scope of
22   discovery, not reasonably calculated to lead to
23   discoverable information and not admissible in
24   courts in this litigation. Subject to that,
25   you may answer.

**Page 49**

1      **A. I did not receive insurance.**
2      Q. Did his other family members, to your
3  knowledge?
4      **A. Yes.**
5      Q. Who did receive?
6      MS. SCHIAVO: And, again, can I have a
7    standing objection on the collateral source
8    issue?
9      MR. JONES: Sure.
10     MS. SCHIAVO: Okay. You may go ahead.
11     **A. Either his mother. Probably his mother.**
12     Q. Let's talk about that a little bit, and
13  I'll refer you -- I'll ask this question to the next
14  document that will be marked in the stack, and that
15  is 21. It's a probate court document appointing you
16  as Mr. Knabe's administrator for his estate.
17     **A. Correct.**
18     Q. And you have served in that capacity?
19     **A. Yes.**
20     Q. Is the estate proceeding concluded or
21  still ongoing?
22     **A. Concluded.**
23     Q. Who handled what aspects of the
24  post-accident business? For example, I understand
25  you handled the estate. There were some life

**13 (Pages 46 to 49)**

# ERRATA SHEET FOR THE TRANSCRIPT OF:

## Lisa Weiler

I have read the entire transcript of my deposition taken on May 3, 2006, or the same has been read to me.  I request the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

| Page | Line | Correction |
|------|------|------------|
| 8 | 18 | Change "dome terminal" to "dumb terminal" |
| 9 | 8 | Change "MCSC" to "MCSE" |
| 9 | 24 | Change "for the individual staff" to "for the individual staff members" |
| 10 | 11 | Change "He has his family" to He has his own family" |
| 10 | 24 | Change "went around" to "I went around" |
| 10 | 25 | Change "introduced to everyone" to "was introduced to everyone" |
| 11 | 3 | Put a period after "day or two later." (New sentence) |
| 11 | 4 | Change "and he had been working" to "He had been working" (new sentence) |
| 12 | 21 | Change "He was a type of person" to "He was the type of person" |
| 13 | 11-12 | "I think a few years later. '93, '94, something like that." ***(Scott received his private license in 1995).*** |
| 16 | 20 | Change "intermingled" to "related" |
| 22 | 1-2 | "Then he got on with T.W. Smith Engine.  I'm thinking '96, still in school, but I think by that point…" ***(Scott began his employment at T.W. Smith in March 1995).*** |
| 25 | All | ***(During my deposition, I was confused with Scott's work history at Kentucky Aeromotive.  Scott worked for Kentucky Aeromotive from October 1998 until March 2000.  The flying season for fire patrols was full-time from March through December.  He started near the end of the season in 1998.  When he was scheduled to return in March 1999, he fell at home and broke his leg.  He did not return to Kentucky Aeromotive until August 1999.  Then, he flew from August through December 1999, and returned again to fly for them from February until March 2000).*** |
| 27 | 1 | Change "It was a commercial rating" to "There was a commercial rating" |

8/1/2006
_____
Date

*Lisa Weiler* (signature)
_____
Lisa Weiler

## ERRATA SHEET FOR THE TRANSCRIPT OF:

### Lisa Weiler

I have read the entire transcript of my deposition taken on May 3, 2006, or the same has been read to me. I request the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

| Page | Line | Correction |
|------|------|------------|
| 31-32 | All | **(Explained above for page 25 notes).** |
| 33 | 5 | Change "airport" to "airline" |
| 36 | 7-9 | "I think until the end of that flying season, so roughly close to the first of the year, the year 2000." **(Scott worked for Kentucky Aeromotive until March 2000).** |
| 36 | 17-23 | QUESTION:<br>"So it sounds as though he would have had a full off season."<br>**(Scott worked for Kentucky Aeromotive until March 2000. He started working for Flight Trac in May 2000).** |
| 38 | 8 | Change "Sterling, Kentucky" to "Mt. Sterling, Kentucky" |
| 40 | 1 | Change "Dutchess" to "Duchess" |
| 40 | 4 | Change "Dutchess" to "Duchess" |
| 63 | 17-22 | QUESTION:<br>"What was he trying to do to get his ATP during this time frame? Self study? Classes?<br>**(Scott was not pursuing his ATP at the time of furlough from Colgan Air. He had only worked there for two months as a First Officer. First Officers were required to fly for one year before they became eligible for upgrade to Captain; thus, requiring the ATP.** |
| 64 | 1-2 | Change "because he was called in" to "because it has Colgan" |
| 90 | 10-12 | QUESTION:<br>"Do you have anyone in particular that you blame for this accident?"<br>**(I answered "No." I interpreted the question to imply a specific person who I blame for the accident).** |
|  |  |  |
|  |  |  |
|  |  |  |

8/1/2006
_____
Date

_Lisa Weiler_ (signature)
_____
Lisa Weiler

# EXHIBIT 29

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CONSOLIDATED UNDER**
**CASE NO. 05-10155 PBS**

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10364 PBS |

## AFFIDAVIT OF WAYNE W. WALLACE

I, Wayne W. Wallace, hereby depose and state:

1

1.    I am Vice President–General Counsel, Corporate Secretary & Director of Raytheon Aircraft Company ("RAC"). I am of legal age and competent to testify. I make this Affidavit based upon personal knowledge and in support of the Raytheon defendants' motion for summary judgment in the above-referenced action. The matters contained in this Affidavit are true and correct.

2.    Raytheon Company ("RC") is a corporation incorporated under the laws of the State of Delaware, with its principal executive office located in the Commonwealth of Massachusetts. RC is a defense and commercial electronics firm.

3.    RAC, formerly known as Beech Aircraft Corporation ("BAC"), designs, manufactures, assembles, certifies, markets, sells, and distributes special mission and commercial aircraft. In 1993, BAC manufactured the 1900D Airliner aircraft, serial number UE-40, that is involved in this litigation.

4.    RAC is a wholly-owned subsidiary of Raytheon Aircraft Holdings, Inc. ("RAHI"), a Delaware Corporation. RAHI is a wholly-owned subsidiary of RC. RAC is a corporation incorporated under the laws of the State of Kansas, with its principal office in Wichita, Kansas. RAC maintains formal corporate records and financial records of itself at its principal place of business in Wichita, Kansas. RC and RAC operate as separate and individual corporations, with separate individual boards of directors.

5.    RAC drafts, edits, publishes, and revises the FAA-approved Airliner Maintenance Manual ("AMM") for the 1900D Airliner and has done so since the Airliner series aircraft was first certified by the FAA in the early 1980s. Since 2001, RAC has also published the AMM in electronic form on CD-ROM. The electronic form of the AMM is known as "REPS," which stands for Raytheon Electronic Publications System.

6.    RC does not design, manufacture, assemble, certify, market, sell or distribute special mission or commercial aircraft, or any component parts thereof, and RC did not do so with respect to the 1900D Airliner, serial number UE-40. Also, RC is not and has never been involved in the drafting, editing, publishing, or revising of the FAA-approved RAC AMM.

7.    Raytheon Aircraft Parts Inventory and Distribution Company, LLC ("RAPID") is a wholly-owned subsidiary of RAC. RAPID and RAC are separate entities, with separate boards of directors.

8.    RAPID is a parts company, and its function is to maintain a parts inventory and distribute those parts to the owners and operators of the existing fleet of RAC aircraft.

9.    RAPID does not and has never designed, manufactured, assembled, certified, marketed, sold or distributed special mission or commercial aircraft.

10.    RAPID is not and has never been involved in the drafting, editing, publishing, and revising of the FAA-approved AMM.

11.    RAPID does not and has never given maintenance advice and did not do so with respect to the 1900D Airliner, serial number UE-40.

FURTHER AFFIANT SAITH NAUGHT.

Executed this 26th day of October, 2006, at Wichita, Kansas.

Wayne W. Wallace
Vice President–General Counsel, Corporate
Secretary & Director, Raytheon Aircraft Company

SUBSCRIBED AND SWORN to before me, a Notary Public in and for said county and state, on this 26th day of October, 2006.

Notary Public

My appointment expires: 8-16-2009

PAULA M. LEATHERMAN
Notary Public - State of Kansas
My Appt. Expires 8-16-2009

3