# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>      Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>      Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>      Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>      Defendants. | DOCKET NO: 05cv10364 PBS |

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

1

Defendants, Raytheon Company, Raytheon Aircraft Company, Raytheon Aircraft Credit Corporation, Raytheon Airline Aviation Services, LLC and Raytheon Aircraft Parts Inventory and Distribution Company, LLC ("defendants"), pursuant to Fed. R. Civ. P. 56, hereby submit their Memorandum in Support of Their Motion for Summary Judgment.  In support of their motion, defendants state as follows.

## I.    INTRODUCTION

This case arises out of the crash of a Beech 1900D aircraft, serial No. N240CJ ("subject aircraft").  Plaintiffs' claims against the defendants center on the Aircraft Maintenance Manual ("AMM") for the subject aircraft.  It is the plaintiffs' position that the AMM was defective and misleading and that the AMM's deficiencies caused Colgan's mechanics to reverse the elevator trim system in the subject aircraft, resulting in the accident.  However, plaintiffs' contention is unsupported by the facts and the law, and cannot survive summary judgment.

This is not a standard product physical defect claim involving the manufacturer and an ordinary consumer.  To the contrary, Colgan Air, Inc. ("Colgan") is a part 121 operator with significant knowledge and expertise in the aviation industry.  Similarly, Colgan's mechanics and pilots are highly trained individuals with above-average knowledge and sophistication.  Colgan and its employees were all sophisticated users of aircraft and, in particular, the subject aircraft. They not only appreciated the dangers with the subject aircraft, they possessed full knowledge of the dangers because of their familiarity with the product.  Because of Colgan's, Colgan's mechanics and the pilots' level of sophistication and knowledge, defendants were not required by Massachusetts law to warn them of dangers which they were already aware.  Furthermore, the sophisticated users were expected to apply their training and expertise in the use of the AMM and the law rightfully shields manufacturers from liability when the sophisticated users fail to do

so. Indeed, the sophisticated user defense acts as a complete bar to plaintiffs' claims against the defendants.

Plaintiffs' claims also rest on the premise that Colgan's mechanics relied on an erroneous illustration in the AMM, which caused the mechanics to mis-rig the elevator trim cables in the subject aircraft. Plaintiffs make this argument even though the uncontroverted facts demonstrate that Colgan's mechanics failed to follow other portions of the AMM, which if followed, would have prevented the accident. Plaintiffs cannot argue that Colgan's mechanics relied on one portion of the AMM in replacing the cables when they completely ignored other critical instructions. Because the plaintiffs cannot prove that Colgan's mechanics reasonably relied on the AMM in its entirety, the lack of reliance disposes of plaintiffs' claims.

Further, plaintiffs are unable to overcome the fact that Colgan's mechanics and pilots committed a series of errors and omissions which broke the causal connection. In fact, the undisputed evidence is that the mechanics made significant errors before, during and after the replacement of the trim cables, then failed to detect the errors during two separate and distinct post-maintenance checks. As if that were not enough, the pilots themselves failed to perform their own pre-flight checks which would have also detected the mis-rigging. Consequently, defendants' actions were not the proximate cause of the accident, which is yet another basis for summary judgment.

Although all of plaintiffs' claims should be dismissed as a matter of law, if the Court concludes otherwise, other individual causes of action and claims for damages should be dismissed. For instance, plaintiffs have asserted claims against separate and distinct Raytheon entities which had no involvement in the case. The peripheral Raytheon defendants, such as

Raytheon Company and Raytheon Aircraft Parts and Inventory Distribution Company, LLC, are not proper parties to this litigation and should be dismissed.

Additionally, plaintiffs have attempted to assert a claim for breach of express warranty. However, there is no evidence that any express warranty was ever provided, let alone that the purported warranty became part of the basis of the bargain. Accordingly, this claim should not survive summary judgment. And, because plaintiffs cannot prove negligence or breach of warranty, their claim for unfair practice under Mass. Gen. Laws c. 93A should also be dismissed.

Although the Court has already ruled that plaintiffs' purported claim and instruction for res ipsa loquitor, and their claim for pre-impact damages, have been dismissed, defendants anticipate that the plaintiff will not quietly accept the Court's ruling. Thus, to the extent plaintiffs continue to argue that these claims have not been entirely disposed of, the defendants provide the Court with Massachusetts law which indicates otherwise. These claims are unsupported by the law and should not be allowed to resurface in this case.

Finally, defendants have also moved for summary judgment on plaintiff Weiler's loss of consortium claim and both plaintiffs' claims for grief, anguish, bereavement and emotional trauma. Since plaintiff Weiler was not married to pilot Scott Knabe at the time of the accident, she is not entitled to loss of spousal consortium. Likewise, plaintiffs' claimed damages for grief, anguish, bereavement and emotional trauma are not allowed under Massachusetts law and should also be dismissed.

## II.    DEFENDANTS' UNCONTROVERTED STATEMENT OF FACTS

**The Skill, Knowledge And Level Of Sophistication Of Colgan And Its' Employees**

1.    Colgan is a Part 121 operator and a domestic carrier operator and, at the time of the incident, was operating under certificate number NSVA 519S.  [NTSB Report dated March 16, 2004 at p. 10 (RAC000409 – 424), Ex. 1].

2.    A Part 121 operator, such as Colgan, operates in the highest level of air transportation and is required by the FAA to have an internal analysis and surveillance system to provide continual internal auditing and analysis of the performance and effectiveness of its maintenance programs.  [Leonelli[1] Dean Dep. p. 26 – 29, Ex. 2].[2]

3.    Colgan employs licensed A & P mechanics, quality assurance inspectors, maintenance technicians and lead technicians.  The lead technicians are delegated quality assurance inspectors.  [NTSB Report dated March 16, 2004 at p. 11, Ex. 1].

4.    Colgan provides extensive classroom and on the job training for its maintenance personnel.  [NTSB Report dated March 16, 2004 at p. 12 – 13, Ex. 1].

5.    The Colgan mechanics that performed the actuator replacement on the subject aircraft prior to the accident were licensed A & P mechanics.  [Desmond[3] Dep. pp. 10 – 24, Ex. 3; Battaglia[4] Dep. pp. 6 – 10, Ex. 4; Vallejo[5] Dep. pp. 6 – 26, Ex. 5].

6.    The Colgan mechanics that installed a new forward elevator trim cable in the subject aircraft prior to the accident were licensed A & P mechanics.  [Kinan[6] Dep. pp. 8 – 19, Ex. 6; Servis[7] Dep. pp. 7 – 20, Ex. 7].

---

[1] Leonelli is plaintiffs' regulatory expert regarding maintenance.
[2] "Dean" Dep refers to deposition testimony from the subject case.  This witness' deposition was previously taken in the *Colgan Air v. RAC* case filed in Virginia.  This Court has ruled that deposition testimony from that case may be used in the present case.  All deposition testimony from Colgan's mechanics comes from the *Colgan Air v. RAC* case.
[3] Desmond is Colgan's mechanic who approved the paperwork package on the maintenance on the subject aircraft.
[4] Battaglia is one of Colgan's mechanics who replaced the actuators.
[5] Vallejo is Colgan's maintenance inspector involved in the replacement of the trim cable.

7.    The pilots who were operating the subject aircraft at the time of the accident were properly licensed, certified and trained.  [NTSB Report dated December 29, 2003 at pp. RAC000280 – 283, RAC000293 – 328, Ex. 8].

8.    The pilots were also type rated and had hundreds of hours in the 1900D aircraft. [NTSB Report dated December 29, 2003 at pp. RAC000280 – 283, RAC000293 – 328, Ex. 8].

**Colgan's Maintenance Errors And Omissions**

### Maintenance Error Which Required Replacement Of The Cable

9.    On August 24, 2003, the trim tab actuators in the subject aircraft were replaced by Colgan mechanics.  [Battaglia Dep. pp. 19 – 28, Ex. 4].

10.    When performing cable maintenance procedures, it is necessary to "block" the cable(s) affected to keep them from being moved during the procedure.  [Law[8] Colgan Dep. p. 125, ll. 13 - p. 126, l. 1, Ex. 9; Battaglia Dep. p. 28, ll. 3 – 12, Ex. 4; Goglia[9] Dep. pp. 152 – 153, Ex. 10].

11.    Cables also can be damaged during cable maintenance procedures if they are not "blocked."  [Goglia Dep pp. 151 – 152, Ex. 10; Law Colgan Dep. pp. 134 – 135, Ex. 9].

12.    The Colgan mechanics who performed the actuator replacement on August 24, 2003, did not "block" the cables during the maintenance procedure.  [Battaglia Dep. p. 28, ll. 3 - p. 29, l. 1, Ex. 4;  Vallejo Dep. pp. 43 – 44, Ex. 5; NTSB Aircraft Maintenance and Records Group Factual Report dated March 16, 2004 at p. 14 (RAC000409 – 424), Ex. 1].

13.    The Colgan mechanics who performed the actuator replacement understood that the cables had to be kept tight during cable maintenance procedures to prevent the cables from

---

[6] Kinan is one of Colgan's mechanics who replaced the trim cable.
[7] Servis is one of Colgan's mechanics who replaced the trim cable.
[8] Law is Raytheon's maintenance expert.
[9] Goglia is plaintiffs' maintenance expert

falling off the pulley. [Vallejo Dep. pp. 43 – 44, Ex. 5; Battaglia Dep. pp. 28 – 29, Ex. 4; Desmond Dep. pp. 26 – 28, Ex. 3; Servis Dep. p. 16, Ex. 7; Goglia Dep. pp. 152 – 153, Ex. 10].

14.    During the operational check following the replacement of the actuator, the elevator trim tab system seized and the cable fell off the drum. [NTSB Report dated March 16, 2004 at p. 14, Ex. 1]. This necessitated the replacement of a new forward elevator trim cable. [Law Colgan Dep. pp. 128 – 129, Ex. 9; NTSB Report dated March 16, 2004 at p. 15, Ex. 1].

15.    Plaintiffs contend that the cables fell off the drum and were damaged because of a mis-pairing of the actuators. [Maddox[10] Dep. pp. 222-23, Ex. 11; Sommer[11] Expert Report, p. 12, Ex. 12].

16.    In replacing the trim tab actuators, Colgan's mechanics used actuator part numbers 129-526033-6 and 129-526033-7 because it had these parts available at the time. [Sarluca Dep. pp. 66-69, Ex. 13].

17.    Since there is no differential pull between the 129-526033-6 and 129-526033-7 actuators, the pairing of the actuators could not have caused the damage to the elevator trim cables. [Affidavit of Willard Crowe, Ex.14].

18.    After the cable fell off the drum, Colgan ordered a new trim cable and Colgan received and installed both the new trim cable and new actuators, replacing the 129-526033-6 and 129-526033-7 actuators it had originally installed. [Battaglia Dep. pp. 19-21, Ex. 4; Kinan Dep. pp. 45-48, Ex. 6; Ratliff Dep. pp. 16-17, Ex. 15; Vallejo Dep. pp. 51-53, Ex. 5; Sarluca Dep. pp. 98-102, Ex. 13].

---

[10] Maddox is one of plaintiffs' experts.
[11] Sommer is one of plaintiffs' experts.

7

19.    The 129-526033-6 and 129-526033-7 actuator pairing was not in the aircraft at the time of the accident.  [Rodriguez Dep. p. 40, Ex. 16; NTSB Report dated March 16, 2004, p. 15 (RAC000423), Ex. 1].

**Maintenance Errors During The Replacement Of The Cable**

20.    On August 25, 2003, just one day prior to the accident, Colgan mechanics installed a new forward elevator trim cable in the aircraft.  [Servis Dep p. 66, ll. 5 – 10, Ex. 7; Battaglia Dep. pp. 81, ll. 14 – 22, 82, ll. 1 – 2, Ex. 4; NTSB Report dated March 16, 2004, at pp. 15 – 16, Ex. 1].

21.    Plaintiffs allege that the accident occurred because the forward elevator trim tab cable on the subject aircraft was misrigged causing the elevator trim system to operate backward.  [Goglia Dep. p. 78, ll. 12 – 24, Ex. 10; Dean's Second Amended Complaint; Weiler Amended Complaint].

22.    When properly installing the forward elevator trim cable in the aircraft, the cable end with the left hand threads should come off the forward end of the drum as it is installed in the aircraft.  [REPS, 27-30-04, Figure 201, Ex. 17[12]; Law Dep. p. 82, Ex. 9; Kinan Dep. pp. 99-102, Ex. 6; Servis Dep. pp. 139-141, Ex. 7].

23.    In order for the operation of the trim tab system to be reversed, the mechanics must have ignored the "forward as installed" arrow in Figure 201 and the right hand threaded end had to come off the front of the drum.  [Goglia (Plaintiffs' Expert) Dep. p. 193 – 194, Ex. 10; NTSB Factual Report at page 1f (RAC000210), Ex. 18].

24.    The drum cannot be installed as depicted in Figure 201.  [Law Colgan Dep. p. 152, Ex. 9; Goglia (Plaintiffs' Expert) Dep. p. 194, Ex. 10].

---

[12] Although the chapters of the REPS Manual are attached as separate exhibits for the Court's convenience, the REPS Manual itself, including its many chapters, is one document and must be considered in its entirety.

25.    Protocol in the industry, as well as Colgan's General Maintenance Manual, requires that the mechanics resolve any discrepancy in the maintenance manual before continuing with the work.  [Desmond[13] Dep. pp. 42-43, Ex. 3].

26.    In order for Colgan to connect the trim cable and operate backward, Colgan also had to cross the cables along the run before the cables would have connected to the system. [Goglia (Plaintiffs' Expert) Dep. p. 275, Ex. 10; NTSB Factual Report at p. 1f (RAC000210), Ex. 18].

27.    Colgan's mechanics failed to use lead lines in the installation of the elevator trim cable as required by the REPS manual.  [Colgan's Responses to Requests for Admissions, No. 20, *Colgan Air v. RAC* Case,  Ex. 19; REPS, 27-30-04, Figure 202, Ex. 17; Servis Dep. p. 131, Ex. 7; Kinan Dep. pp. 115-116, Ex. 6; Law Colgan Dep. pp. 139, 163, Ex. 9; NTSB Report dated March 16, 2004 at p. 15, Ex. 1; Goglia (Plaintiffs' Expert) Dep. pp. 158-159, Ex. 10].

28.    Colgan's General Maintenance Manual provided that "Each person performing maintenance or preventive maintenance functions for the certificate holder will have on hand, and follow, the instructions prescribed in the current manufacturers maintenance manuals, workcards, or other data acceptable to administrator."  [Colgan's General Maintenance Manual, p. 3-3, Ex. 20].

29.    The mechanics' failure to follow the REPS manual is a violation of federal law. [Goglia (Plaintiffs' Expert) Dep. p. 123, Ex. 10].

30.    Plaintiffs' own expert admits that had the mechanics used lead lines, the cables would not have been crossed and the accident would not have happened.  [Goglia (Plaintiffs' Expert) Dep. pp. 158-159, Ex. 10].

---

[13] Desmond is Colgan's mechanic who approved the paperwork package on the maintenance on the subject aircraft.

31.     Instead of using lead lines to keep the left hand thread cable and right hand thread cable straight before removing the cable, Colgan mechanics marked each pulley that the trim cable passed through with a "T," which was used to designate the top cable.  [Kinan Dep. p. 86-95, Ex. 6; Servis Dep. p. 108-119, Ex. 7; REPS, 27-30-04, Ex. 17; NTSB Report dated March 16, 2004 at p. 15 – 16, Ex. 1].

32.     The letter "T" was used to denote the top cable at the first pulley position.  And, at each subsequent pulley, one mechanic would pull on one end of the cable and the other mechanic would pull on the other end to confirm that they were moving the same cable, then, they would put a "T" next to that pulley.  [Kinan Dep. p. 86-95, Ex. 6; Servis Dep. p. 108-119, Ex. 7; REPS, 27-30-04, Ex. 17; NTSB Report dated March 16, 2004 at p. 15 – 16, Ex. 1].

33.     Plaintiffs' own expert admits that he does not understand the "T" marking system Colgan's mechanics utilized when they removed the trim cables.  [Maddox Dep. p. 133 – 134, Ex. 11].

34.     Colgan's mechanics failed to write down what the "T" marking system meant and could not explain how the "T" marking system helped distinguish between the left hand thread cable and the right hand thread cable.  [Servis Dep. pp. 111-115, Ex. 13].

**Maintenance Errors In Failing To Discover The Mis-rigging**

35.     The mechanics' rigging error resulted in a trim system that operated backward, which would have been evident by the trim wheel movement.  [Leonelli Dean Dep p. 118 – 125, Ex. 2].

36.     Colgan's mechanics failed to first realize the mis-rigging in the post-maintenance rigging check pursuant to REPS, 27-30-05.  [Kinan Dep. pp. 120-125, Ex. 6; Vallejo Dep. pp.

70, 77-82, Ex. 5; REPS, 27-30-05, Ex. 21; Maddox (Plaintiffs' Expert) Dep pp. 184 – 185, Ex. 11].

37.    The rigging check is the procedure for determining certain factors of the cable and the cable tension, and to check the proper angles of deflection.  [Maddox (Plaintiffs' Expert) Dep. pp. 91 – 92, Ex. 11; REPS, 27-30-05, Ex. 21].

38.    The mis-rigging would have been discovered had the mechanics performed the post-maintenance rigging check.  [Maddox (Plaintiffs' Expert) Dep. pp. 167 – 168, Ex. 11; REPS, 27-30-05, Ex. 21].

39.    In addition to the post-maintenance rigging check, Colgan's mechanics knew that they had to do a separate operational check after working on the flight controls of the subject aircraft. [Kinan Dep. p. 11, Ex. 6; Desmond Dep. p. 25, Ex. 3; Servis Dep. pp. 157 – 158, Ex. 7; REPS, 27-30-09, Ex. 22].

40.    A & P mechanics are taught and should know the relationship between tab movement on a trim tab for the elevator and nose up or nose down.  [Leonelli Dean Dep. pp. 118, 143 – 144, Ex. 2; Desmond Dep. pp. 109-110, Ex. 3].

41.    The mechanics claim to have performed an operational check as extensive as REPS, 27-30-09 when they allegedly ran the system from limit to limit, both electrically and manually several times to ensure both proper tab deflection and proper direction of movement. [Kinan Dep. pp. 131 – 138, Ex. 6; Battaglia Dep. pp. 42 – 51, Ex. 4; Vallejo Dep. p. 78, 82, Ex. 5].

42.    Colgan's mechanics also failed to realize the mis-rigging in the separate operational check.  [Vallejo Dep. p. 70, Ex. 5; Kinan Dep. 131 – 132, Ex. 6].

43. The mis-rigging would have been discovered had the mechanics done a proper operational check. [REPS, 27-30-09, Ex. 22; Leonelli Colgan Dep. p. 52-56, Ex. 23; Leonelli Dean Dep. pp. 124 – 125, 215 – 216, Ex. 2; Goglia (Plaintiffs' Expert) Dep. p. 181, Ex. 10; Maddox (Plaintiffs' Expert) Dep. pp. 190 – 191, Ex. 11; Law Dep. p. 180, Ex. 9].

**The Pilots' Errors And Omissions**

44. Colgan required its pilots to perform a first flight of the day check. [NTSB Report dated December 29, 2003 at pp. RAC000286 – 287, Ex. 8; Colgan Air's First Flight of the Day Checklist, Ex. 24; Law Colgan Dep pp. 193 – 195, Ex. 9].

45. The first flight of the day check would have included a check of the electric pitch trim. [NTSB Report dated December 29, 2003 at p. RAC000286, Ex. 8].

46. The pilots know that when they actuate the electric pitch trim during the check, the manual trim wheel, which is the only indicator of what the trim is doing, is supposed to move in the same direction as the electrical switch input. [Goglia (Plaintiffs' Expert) Dep. pp. 172-73, Ex. 10].

47. Since the cables were mis-rigged on the subject aircraft, the manual trim wheel would have moved in the opposite direction as the electrical switch input during the check, instead of the same direction as the electrical switch input. [NTSB Report dated December 29, 2003 at p. RAC000286, Ex. 8; Leonelli Dean Dep. pp. 119 – 120, Ex. 2].

48. There is no evidence that the pilots performed the first flight of the day check on the subject aircraft the day of the accident. [NTSB Group Chairman's Factual Report, Cockpit Voice Recorder, RAC000373 – 408, Ex. 25].

49. Had the pilots performed the first flight of the day check on the subject aircraft, the check would have revealed that the manual trim wheel was traveling in the opposite direction

and, thus, mis-rigged. [Report of Defendants' Expert, Richard Nelson, at pp. 4-5, Ex. 26; NTSB's Probable Cause Report, Ex. 27; Leonelli Dean Dep. pp. 115 – 116, Ex. 2].

50.     The pilots could have likely controlled and landed the subject aircraft or made survivable crash landing if they had left the trim alone. [Report of Defendants' Expert, Richard Nelson, at p. 6, Ex. 26].

**Parties Involved And Peripheral Parties Not Involved**

51.     Plaintiff Weiler has never been married to Scott Knabe and was not married to Scott Knabe at the time of the accident. [Weiler Dep. pp. 10, ll. 15 – 16, 17, ll. 7 – 22, Ex. 28].

52.     Plaintiff Weiler was not eligible for and did not receive life insurance benefits arising out of Mr. Knabe's death. [Weiler Dep. pp. 48 – 49, Ex. 28].

53.     Raytheon Company ("RC") is a corporation incorporated under the laws of the State of Delaware, with its principal executive office located in the Commonwealth of Massachusetts. [Wallace Affidavit, Ex. 29].

54.     RC is the parent company of RAC and is a defense and commercial electronics firm. [Wallace Affidavit, Ex. 29].

55.     RAC, formerly known as Beech Aircraft Corporation ("BAC"), designs, manufactures, assembles, certifies, markets, sells, and distributes special mission and commercial aircraft. [Wallace Affidavit, Ex. 29].

56.     In 1993, BAC manufactured the subject aircraft. [Wallace Affidavit, Ex. 29].

57.     RAC is a wholly-owned subsidiary of Raytheon Aircraft Holdings, Inc. ("RAHI"), a Delaware Corporation. RAHI is a wholly-owned subsidiary of RC. [Wallace Affidavit, Ex. 29].

58.    RAC is a corporation incorporated under the laws of the State of Kansas, with its principal office in Wichita, Kansas. [Wallace Affidavit, Ex. 29].

59.    RAC maintains formal corporate records and financial records of itself at its principal place of business in Wichita, Kansas. [Wallace Affidavit, Ex. 29].

60.    RC and RAC operate as separate and individual corporations with separate boards of directors. [Wallace Affidavit, Ex. 29].

61.    RAC drafts, edits, publishes, and revises the FAA-approved AMM for the 1900D Airliner and has done so since the Airliner series aircraft was first certified by the FAA in the early 1980s. [Wallace Affidavit, Ex. 29].

62.    Since 2001, RAC has also published the AMM in electronic form on CD-ROM. The electronic form of the AMM is known as "REPS," which stands for Raytheon Electronic Publications System. [Wallace Affidavit, Ex. 29].

63.    RC does not design, manufacture, assemble, certify, market, sell or distribute special mission or commercial aircraft, or any component parts thereof, and RC did not do so with respect to the subject aircraft. [Wallace Affidavit, Ex. 29].

64.    RC is not and has never been involved in the drafting, editing, publishing, or revising of the FAA-approved RAC AMM. [Wallace Affidavit, Ex. 29].

65.    Raytheon Aircraft Parts and Inventory Distribution Company, LLC ("RAPID") is a wholly-owned subsidiary of RAC. [Wallace Affidavit, Ex. 29].

66.    RAPID and RAC are separate and distinct entities with separate boards of directors. [Wallace Affidavit, Ex. 29].

67.    RAPID is a parts company, and its function is to maintain a parts inventory and distribute those parts to the owners and operators of the existing fleet of RAC aircraft. [Wallace Affidavit, Ex. 29].

68.    RAPID does not and has never designed, manufactured, assembled, certified, marketed, sold or distributed special mission or commercial aircraft. [Wallace Affidavit, Ex. 29].

69.    RAPID is not and has never been involved in the drafting, editing, publishing, and revising of the FAA-approved AMM. [Wallace Affidavit, Ex. 29].

70.    RAPID does not and has never given maintenance advice and did not do so with respect to the subject aircraft. [Wallace Affidavit, Ex. 29].

**Plaintiffs' Purported Express Warranty Claims**

71.    There is no evidence that the defendants made any affirmation of fact or promise related to the subject aircraft to create an express warranty.

**Plaintiffs' Purported Res Ipsa Loquitor Claims And Claimed Damages**

72.    On October 16, 2006, the Court entered an electronic order denying plaintiffs' motion to assert claims, or request an instruction, for res ipsa loquitor against the defendants.

73.    On October 16, 2006, the Court entered an electronic order denying plaintiffs' motion to assert claims for pre-impact damages, including any claims for pre-impact conscious pain and suffering.

74.    Plaintiffs' claims for grief, anguish, bereavement and emotional trauma arise out of the injuries sustained by the pilots. [Dean's Second Amended Complaint; Weiler Amended Complaint].

75.    Plaintiffs did not witness the accident, did not witness the injuries to the pilots and did not sustain any physical harm related to the accident.  [Dean's Second Amended Complaint; Weiler Amended Complaint].

## III.    ARGUMENT AND AUTHORITIES

### A.    Standard For A Motion For Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is proper and the moving party is entitled to judgment as a matter of law where there is no genuine issue of material fact, as demonstrated by the pleadings, depositions, answers to interrogatories, admissions and affidavits.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  While the facts must be viewed in a light most favorable to the non-moving party on summary judgment, the non-moving party must set forth specific facts showing that there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A primary purpose of summary judgment is to dispose of factually unsupported claims.  Celotex Corp., 477 U.S. at 323-24.

### B.    Massachusetts Law Is Applicable To Plaintiffs' Claims

The law of the forum state, including its conflict of law rules, is applicable in actions based on diversity of citizenship.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Borden v. Paul Revere Life Ins. Co., 935 F. 2d 370, 375 (1st Cir. 1991).  Not only has this Court already concluded that Massachusetts law applies (Memorandum and Order of November 16, 2005-Saris, J.), plaintiffs have expressly recognized that its claims of negligence, wrongful death, breach of warranty and unfair practices are governed by Massachusetts law. (Plaintiffs' Proposed Second and Third Amended Complaints).  Moreover, Massachusetts has the most significant contacts and interests with respect to plaintiffs' claims, including, but not limited to, the fact that Massachusetts was the location of Colgan's Hyannis facility, the Colgan

16

mechanics' base of operations, the plaintiffs' base of operations at the time of the incident, the location of the improper maintenance and repair on the aircraft, the location where the AMM was utilized by Colgan's mechanics, the location of the aircraft crash, and the location of the airport from which the aircraft departed on the day of the crash.  Consequently, Massachusetts law governs plaintiffs' purported causes of action.

### C.    Plaintiffs' Claims Are Barred Because Colgan And The Pilots Were Sophisticated Users Whose Actions Broke The Chain Of Causation

The purpose of the sophisticated user defense is to shield manufacturers from liability arising out of dangers which a sophisticated user is presumed to appreciate because of their familiarity with the product.  Carrel v. Nat'l Cord & Braid Corp., 447 Mass. 431, 2006 WL 2337595 (2006); Johnston v. Hartford Ins. Co., 623 So. 2d 35 (La. App. Ct. 1993).  In other words, the defense allows a manufacturer to avoid liability for failing to warn of dangers which a sophisticated user was already aware or should have been aware because of their level of sophistication.  Id.  If the end user was, or should have been, aware of the dangers with the product, then any warning pertaining to those dangers is superfluous and not required by Massachusetts law.  Id.

Application of the sophisticated user defense in this case furthers its intent and purpose.  Indeed, there is no better case for this rule to be applied than the one at hand.  The nature of plaintiffs' claim, i.e., that the AMM was faulty, is particularly suited for application of the sophisticated user doctrine, as opposed to a standard product physical defect claim.  Colgan, Colgan's mechanics and the pilots were all sophisticated users with significant knowledge and expertise in the aviation industry and, in particular, with the subject aircraft.  Defendants should not be held responsible for failing to warn of dangers which the sophisticated users were already aware and appreciated because of their high level of sophistication.  Furthermore, defendants

17

have a legitimate expectation that the sophisticated users would employ their training and expertise in the use of the AMM and the law supports this expectation.

### 1.    The Sophisticated User Defense Acts As A Complete Bar To Plaintiffs' Claims

The Supreme Judicial Court of Massachusetts has unequivocally adopted the sophisticated user defense in product liability actions.  Carrel v. Nat'l Cord & Braid Corp., 447 Mass. 431, 2006 WL 2337595 (2006).  In fact, the doctrine has been adopted "as a defense to claims of both negligent failure to warn and of failure to warn under breach of warranty."  Id. And, because plaintiffs' claims for unfair and deceptive acts and practices arise out of the same circumstances, it too should be barred by the sophisticated user defense.  Just as in Carrel, Colgan's level of sophistication with the subject aircraft bars plaintiffs' claims.

Application of the sophisticated user defense turns on the end user's level of sophistication.  Carrel, 447 Mass. 431 (citing Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 751 N.E. 2d 848 (2001)).  Although Colgan itself is the end user for purposes of measuring the skill, knowledge and level of sophistication involved, the end result is the same regardless of which "user" is examined.  Carrel, 447 Mass. 431 (the purchaser of the product, and not the plaintiff who was injured by the product, was considered the end user for purposes of the sophisticated user defense).  See also, Marques v. Bellofram Corp., 28 Mass. App. Ct. 277, 278-80, 550 N.E. 2d 145 (1990) (employer of injured employee was considered to be end user of product in measuring level of sophistication); Morgan v. Brush Wellman, Inc., 165 F. Supp. 2d 704, 718 (E.D. Tenn. 2001) (U.S. government considered end user for purposes of sophisticated user defense where employees were injured by product).

Colgan, its mechanics and the pilots were all sophisticated users who knew or reasonably should have known of the product's dangers and the law unequivocally supports this conclusion.

18

See e.g., First Nat'l Bank & Trust Corp. v. American Eurocopter Corp., 378 F.3d 682 (7th Cir. 2004) (helicopter manufacturer granted summary judgment because professional pilots were sophisticated users/intermediaries); Emory v. McDonnell Douglas Corp., 148 F.3d 347 (4th Cir. 1998) (aircraft manufacturer granted summary judgment because the Navy and its pilots were sophisticated users); In re Air Crash Disaster v. Northwest Airlines, Inc., 86 F.3d 498 (6th Cir. 1996) (jury instruction which allowed jury to consider commercial airline's level of sophistication for manufacturer's sophisticated user defense upheld); Johnston v. Hartford Ins. Co., 623 So. 2d 35 (La. App. Ct. 1993) (mechanics were sophisticated users); Ramsey v. Bell Helicopter Textron, 717 F. Supp. 1178 (E.D. La. 1989) (pilots were sophisticated users who were required to use visual inspections and pre-flight checks and procedures to ensure aircraft properly functioned).

Colgan is a regulated part 121 operator and operates in the highest level of air transportation safety. [SOF[14], ¶¶1, 2].  As a part 121 operator, Colgan is required to comply with the federal aviation regulations and is required to have knowledge of, and follow, the requisite rules and procedures outlined in the regulations.  In fact, part 121 operators, such as Colgan, are required by the FAA to maintain internal oversight systems for the performance and effectiveness of their maintenance programs.  [SOF, ¶2].  As a part 121 operation and regional air carrier, Colgan is well versed in the industry and its knowledge and expertise with respect to aircraft is unmatched by anyone other than the aircraft manufacturers.  It was unnecessary, and illogical, for defendants to be expected to warn Colgan, or its employees, of the dangers involved with mis-rigging the elevator trim tab cable when Colgan already possessed this knowledge.  Colgan was well aware that if the elevator trim tab cable was reversed on the aircraft and not

---

[14] "SOF, ¶__" refers to paragraphs from Defendants' Uncontroverted Statement of Fact section above.

installed as depicted in Figure 201, the trim system would operate backward.  Colgan knew of the dangers involved and cannot circumvent application of the sophisticated user doctrine.

Colgan's level of sophistication is based in part on its highly trained and licensed employees.  In fact, Colgan's employees, including its mechanics and pilots, are themselves sophisticated users separate and apart from Colgan.  See e.g.,  Johnston v. Hartford Ins. Co., 623 So. 2d 35 (La. App. Ct. 1993) (mechanics were sophisticated users).  The mechanics that performed the actuator replacement, and installed the new forward elevator trim cable, on the subject aircraft just prior to the accident were highly trained and licensed A & P mechanics.  [SOF, ¶¶3, 5, 6].  In addition to its A & P mechanics, Colgan employs quality assurance inspectors, maintenance technicians and lead technicians, and provides extensive classroom and on the job training for its maintenance department.  [SOF, ¶¶3, 4].  Not only were Colgan's mechanics knowledgeable about aircraft in general, they possessed specialized knowledge with respect to the subject aircraft.  In fact, the mechanics performed repair work on the subject aircraft just one day before the accident and knew that if the elevator trim tab cable was mis-rigged, the elevator trim system would operate backward. [SOF, ¶20].

The pilots were also sophisticated users of the subject aircraft.  See e.g.,  Ramsey v. Bell Helicopter Textron, 717 F. Supp. 1178 (E.D. La. 1989) (pilots were sophisticated users who were required to use visual inspections and pre-flight checks and procedures to ensure aircraft properly functioned).  The pilots were properly licensed, highly trained, individuals who had years of experience navigating aircraft.  [SOF, ¶¶7, 8].  Indeed, the pilots were type rated and had hundreds of hours in the 1900D aircraft alone.  [Id.].  Their level of sophistication is highlighted by the fact that they were heavily regulated by the FAA in connection with pilot certification, pilot pre-flight duties, pilot flight responsibilities and flight rules.  See e.g., 14

20

C.F.R. §§61.3 (required all pilots to possess current pilot certificates), 91.7 (mandated the discontinuance of flights when unairworthy conditions existed and required pilots to verify the aircraft's airworthiness), 91.13 (regulated proper flight responsibilities of pilots), 91.101 (governed flight rules within the United States), 91.103 (governed pre-flight duties and checks), 91.107 (regulated pre-flight briefing of passengers) (1996). Not only did the pilots know they were required to perform pre-flight checks, they were required to do so by the FAA regulations. The pilots knew or should have known of the dangers involved with the subject aircraft and did not need to be warned. As such, the plaintiffs' claims against the defendants are also barred because the pilots were sophisticated users of the aircraft.

Because of the knowledge and level of sophistication of Colgan, Colgan's mechanics and the pilots, defendants should be relieved from liability as a matter of law for failing to warn of existing dangers with the aircraft. Any warning by defendants with respect to the subject aircraft or dangers with mis-rigging the elevator trim cable was unnecessary and not required by the law.

### 2.  Plaintiffs' Claims Fail As A Matter Of Law Because The Plaintiffs Cannot Prove Reasonable Reliance On The AMM

The entirety of the plaintiffs' claims rests on the proposition that the AMM was defective and misleading such that it caused the Colgan mechanics to reverse the trim system, resulting in the accident. Specifically, the plaintiffs allege that the Colgan mechanics relied on an erroneous drawing of the trim drum, which caused the mechanics to mis-route the cable around the drum and caused the trim system to be reversed. The plaintiffs assert that but for the depiction of the trim drum in Figure 201, the accident would not have occurred. [Plaintiffs' Second and Third Amended Complaints].

Plaintiffs' assertions, however, are flawed in that the uncontroverted evidence establishes that the Colgan mechanics did not rely on the totality of the AMM section regarding trim

maintenance.    In essence, the plaintiffs want to place sole reliance by the mechanics on one figure in the AMM that purportedly contained an error to establish the cause of the accident, even though the evidence establishes that the mechanics did not follow other portions of the very same AMM section, specifically 27-30-04, relating to the use of lead lines in trim tab cable replacement.  [SOF, ¶¶27-34].  The plaintiffs cannot have it both ways.  They cannot argue that reliance on one depiction in the AMM caused the accident when the undisputed evidence shows that they did not rely on other critical components of the AMM, which if followed, would have avoided the accident.  [Id.].

As an initial matter, the only claimed error contained in Figure 201 is that it shows the sprocket side of the drum rather than the flat side of the drum.  The critical issue is the "forward as installed" depiction, and that the left-hand threaded end of the cable must come off the forward side of the drum.  [SOF, ¶¶22-24].  Given the clear forward as installed arrow, a more accurate picture would have shown the flat side.  However, since the drum only goes in the aircraft one way and cannot be installed backward, mechanics should recognize the proper direction in which to wrap the cable around the drum.  [Id.].  Here, the mechanics wrapped the cable around the drum in the wrong direction.

Just one day before the accident, Colgan's mechanics proceeded to replace the forward elevator trim tab cable.  [SOF, ¶20].  During the replacement of the cable, the mechanics mis-wrapped the cable on the drum by running the right hand threaded end off the front of the drum directly contrary to the "forward as installed" arrow in Figure 201.  [SOF, ¶¶21-24].  The Colgan mechanics chose not to use lead lines in the installation of the elevator trim cable as required by 27-30-04 of the AMM, the same section of the AMM that contains Figure 201.  [SOF, ¶¶27-34].  Instead of using lead lines, Colgan concocted a different marking system to keep the cables

straight, which the plaintiffs' own expert does not even understand. [Id.]. The mechanics themselves could not even explain how the different marking system was intended to work and they admittedly failed to document what the "T" marking meant. [SOF, ¶34].

Nonetheless, the only way the mis-wrapping caused a reversal in the operation of the trim system was for the mechanics to have made another error elsewhere along the cable run by crossing the cables as they were routed back through the aircraft. [SOF, ¶26]. Otherwise, the cables could not have been connected and the earlier error would have been detected. [SOF, ¶26]. Had the mechanics followed the AMM and used lead lines to remove and replace the cable, the crossing never would have occurred. [SOF, ¶30]. The crossing of the cable has absolutely no relation to Figure 201.

John Goglia, plaintiffs' causation expert, testified that if the Colgan mechanics had used lead lines as required by the AMM, the crossing of the cables would not have occurred, and the accident would not have happened. [SOF, ¶30]. In other words, had the mechanics followed the AMM section regarding trim maintenance in its totality, the accident would not have occurred.

In addition to failing to use lead lines, the undisputed evidence shows that the mechanics failed to follow other key sections of the AMM. Specifically, the evidence shows that they failed to properly perform the post-maintenance rigging check and the separate operational check. [SOF, ¶¶36-43]. The mechanics claim to have performed an operational check as extensive as REPS, 27-30-09. [SOF, ¶41]. Yet, as acknowledged by the mechanics, had they properly performed the rigging check and operational check, which they knew they were required to perform, they would have discovered that the trim tabs did not move in the correct direction. [SOF, ¶¶38-43]. This evidence establishes that the Colgan mechanics ignored other sections of the AMM. Furthermore, the pilots were required to perform a first flight of the day check.

[SOF, ¶44]. Included within this check is a test of the electric pitch trim. [SOF, ¶45]. However, there is absolutely no evidence that the pilots performed the first flight of the day check as they were required. [SOF, ¶48]. Had the pilots performed the first flight of the day check, they too would have detected the mis-rigging of the cable. [SOF, ¶49].

Damages are assessed on a defendant for the production of a defective manual when a plaintiff relies on its misleading representations. See Sharton v. J. H. Westerbeke Corp. 11 Mass.App.Ct. 925, 926, 415 N.E.2d 880, 881 (1981) ("The plaintiff, relying on the defendant's manual in changing the engine's oil filter, never discovered the neoprene gasket [which the instruction manual erroneously omitted]. Because that gasket was missing when the plaintiff next used his boat in the spring of 1977, the engine lost all of its lubricating oil and was damaged beyond repair."). In the context of reliance on a manual to establish causation, cases regarding failure to warn are instructive. If an adequate warning is supplied, under Massachusetts law there is a presumption that it will be read. Wayslow v. Glock, Inc., 975 F.Supp. 370, 378 (D.Mass. 1996), citing, Wolfe v. Ford Motor Co., 6 Mass.App.Ct. 346, 349 (1991). Failure to warn will not constitute negligence if it is not the proximate cause of the plaintiff's injuries. Wayslow, 975 F.Supp. at 378, citing, Laaperi v. Sears Roebuck & Co., 787 F.2d 726, 729 (1st Cir. 1986).

For example, in Wayslow, the plaintiff alleged various counts including failure to warn as constituting negligence and breach of warranty against the defendant, a gun manufacturer, after the plaintiff shot himself in the stomach while storing his weapon at home. The Court granted the defendant's motion for summary judgment as to all counts. In its decision, the Court noted the plaintiff's deposition testimony in which he admitted to not reading the instructional manual, and indicated that if he had followed the instructions and warnings in the manual, the accident

would not have happened.  The Court noted that the plaintiff's deliberate indifference to the warnings constituted the cause-in-fact as well as the proximate cause of the plaintiff's injuries, and therefore, the plaintiff could not sustain a claim of negligence or breach of warranty based upon failure to warn.  Wayslow, 975 F.Supp. at 378-379.  In this case, the Colgan mechanics' deliberate indifference to certain portions of the AMM, particularly the requirement for the use of lead lines, was the cause-in-fact of the accident.  [SOF, ¶30].  Plaintiffs' own causation expert admits this.  [Id.].

Other jurisdictions have squarely addressed the issue of failure to follow certain warnings, but not other warnings, when a plaintiff complains that a defective warning caused an injury.  See Henry v. General Motors Corp., 60 F.3d 1545 (11th Cir. 1995) (citing Georgia law, and holding that an unread warning label cannot be the proximate cause of an accident, even if the warning was inadequate).

In the case of Scassa v. Dye, 2003 WL 21500292 *9 (Ohio App. 7 Dist. 2003) (internal citation omitted), summary judgment on behalf of a defendant on a negligent failure to warn claim was upheld, as the plaintiff failed to rebut the evidence that a camper-trailer lacked a warning label where propane tanks were attached, which if plaintiff had followed, would have led to his discovery of a disconnected gas line which caused the trailer to explode.  Specifically, the warning advised the plaintiff to test the gas piping for leakage by conducting a soapy water test.  If the plaintiff had done a soapy water test, he would have discovered the leak and the accident would not have occurred.  The Court found that the plaintiff also failed to produce any evidence that he would have heeded additional warnings that the defendant might have provided. "Even if it be proved that a manufacturer failed to warn of a product-related danger, 'it is relevant

25

to show whether the user of the product would have acted in the same manner had a proper warning been given.'" Id. (citing, Whiston v. Bio-Lab, Inc., 85 Ohio App.3d 300, 305 (1993)).

Here, in addition to failing to follow the AMM regarding the use of lead lines, the Colgan mechanics also failed to perform the proper rigging and operational checks. [SOF, ¶¶38-43]. Had they done so, they would have discovered that the trim moved in the wrong direction. [Id.]. Similarly, had the pilots preformed the pre-flight check, they too would have discovered the mis-rigging of the trim. [SOF, ¶49]. The plaintiffs cannot as a matter of law establish that any alleged inaccuracies of Figure 201 were the proximate cause of the accident. The plaintiff must prove that the Colgan mechanics relied on the entirety of the AMM regarding trim and rigging and operational checks, and that as a result, the accident occurred. This burden of proof cannot be met as a matter of undisputed fact and law.

As an additional matter, in failing to follow the procedures outlined in the AMM, the Colgan mechanics violated §121.367(a) of the Federal Aviation Regulations. Plaintiffs' expert John Goglia concedes that the mechanics' failure to follow the AMM is a violation of federal law. [SOF, ¶29]. Compliance with the AMM regarding replacement of trim cables is a mandatory procedure. FAR § 121.367(a). Colgan maintenance personnel admittedly did not comply with the AMM and therefore, as a matter of law, the element of reliance in warranty theory or causation in negligence theory cannot be proven.

### 3.    Defendants Are Not Liable As A Matter Of Law Because The Actions Of The Sophisticated Users Broke The Chain Of Causation

As detailed above, Colgan, Colgan's mechanics and the pilots were sophisticated users. Even assuming, *arguendo*, defendants were required to provide a warning, which is disputed, Colgan's, Colgan's mechanics' and the pilots' level of sophistication and expertise rendered any warning with respect to the subject aircraft superfluous because they all appreciated the very

26

danger the warning would have described. See e.g., Laaperi v. Sears, Roebuck & Co., 787 F.2d 726, 732 (1st Cir. 1986) (applying Massachusetts law) (plaintiff's expertise is relevant to whether defendants' conduct caused plaintiff's damages). Because of the above-average knowledge of Colgan and its employees, there was absolutely no connection between defendants' actions and the plaintiffs' damages. Id. See also, Jackson v. United States of America, 983 F. Supp. 273 (D. Mass. 1997) (failure to warn was not proximate cause of accident because pilot knew of dangers); Vadala v. Teledyne Industries, Inc., 44 F.3d 36 (1st Cir. 1995) (evidence failed to establish that airplane crash was caused by actions of manufacturer).

Colgan and its highly trained and certified mechanics and pilots knew of, and appreciated, the dangers which allegedly caused the accident. Contrary to plaintiffs' argument, there is nothing defendants did or did not do that caused the accident at issue in this case. In fact, there were a series of errors committed by the mechanics and pilots which acted as intervening and superseding causes of the accident in which a warning by defendants would not have prevented.

The need to replace the trim cables in the first place could have been avoided had Colgan's mechanics properly replaced the trim tab actuators in the subject aircraft. Although Colgan's mechanics knew that it was necessary to block the cables during the replacement of the actuators, they failed to do so. [SOF, ¶¶10-13]. And, the failure to block the cables lead to the cables falling off the drum and necessitated their replacement. [SOF, ¶¶12-14]. To the extent plaintiffs suggest that the need to replace the cables was somehow caused by mis-pairing of the actuators, their argument is misplaced. It is uncontroverted that there is no differential pull between the -6 and -7 actuators. [SOF, ¶17]. As such, a mis-pairing of the actuators could not have caused the cables to be replaced. [Id.].

In any event, the elevator trim tab cables were replaced by Colgan's mechanics just one day before the accident. [SOF, ¶20]. And, as addressed above in Section C. 2., which is hereby incorporated by reference, Colgan's mechanics ignored the instructions in the AMM and committed a number of errors before, during and after the replacement of the cables. Not only did the mechanics make a number of errors and fail to discover the mis-rigging in two separate and distinct checks, the pilots failed to perform their own pre-flight checks, which if done, would have also caught the mis-rigging error.

The level of sophistication and expertise of the mechanics and pilots, combined with the significant errors and omissions of each, undoubtedly broke the chain of causation. Accordingly, the actions of the defendants were not the proximate cause of the accident and, thus, plaintiffs' claims should also be dismissed on this ground.

### D. The Peripheral Raytheon Defendants Should Be Dismissed Because They Are Not Proper Parties To This Lawsuit

Plaintiffs include in their complaint claims against Raytheon Company ("RC") and Raytheon Aircraft Parts and Inventory Distribution, LLC ("RAPID"). However, these defendants have no relationship to this case and should be dismissed.

RC is the parent company of RAC and is a defense and commercial electronics firm. [SOF, ¶54]. RC and RAC are separate and distinct corporations with separate boards of directors. [SOF, ¶60]. RC has no involvement in the case or with plaintiffs' contentions. It is undisputed that RC does not design, manufacture, assemble, certify, market, sell or distribute special mission or commercial aircraft, nor did it design, sell or manufacture the subject aircraft. [SOF, ¶63]. Moreover, it is undisputed that RC was never involved in the drafting, revision, editing or publishing of the AMM. [SOF, ¶64]. Accordingly, RC should be dismissed from the case because it is not a proper party to this action.

Similarly, RAPID is not a proper party. Plaintiffs' basis for adding RAPID as an additional defendant is the statement by Michael Scheidt, a Raytheon employee, that RAPID was "the entity charged with maintaining an adequate parts inventory to support the parent fleet of the accident aircraft." Plaintiffs' Motion for Leave, at p. 3. No other explanation or basis was provided and there is no evidence to support a cause of action against RAPID.

RAPID is a parts distributor and its function is to maintain a parts inventory to distribute to owners and operators of RAC aircraft. [SOF, ¶67]. While a wholly-owned subsidiary of RAC, RAPID is a separate entity with separate boards of directors. [SOF, ¶¶65-66]. RAPID does not, and has never, designed, manufactured, assembled, certified, marketed, sold or distributed special mission or commercial aircraft. [SOF, ¶68]. Further, RAPID had no role in the drafting, revision, editing or publishing of the AMM, nor has RAPID ever given maintenance advice with respect to the subject aircraft. [SOF, ¶¶69-70]. This is undisputed and there is no evidence to the contrary.

The only reference in plaintiffs' amended complaints to any aircraft parts is in their purported G.L. c. 93A count. There, they allege, as to all the Raytheon defendants, that the Colgan mechanics that repaired and replaced the trim to the aircraft prior to the accident were advised to use actuator parts which were not approved for use in the aircraft and purportedly did so because the proper actuator part was not yet available. See e.g., Dean Second Amended Complaint. There is and can be no cognizable claim against RAPID.

First, plaintiffs do not and cannot allege that any employee of RAPID advised the Colgan mechanics to use actuator parts not approved for the aircraft. Second, there is no allegation – nor can there be based on the undisputed facts – that any purported advice as to the actuator parts caused the accident. The undisputed facts are as follows:

- Colgan mechanics during a check of the aircraft determined that the left and right elevator trim actuators required replacement.  [SOF, ¶9].

- Colgan installed certain actuators it had on hand.  [SOF, ¶16].

- During a subsequent operational check the trim cable came off the trim drum and kinked.[15] [SOF, ¶14].

- Colgan therefore ordered a new trim cable and Colgan received and installed both the new trim cable and new actuators, replacing the actuators it had installed. [SOF, ¶18].

Accordingly, even assuming that there is a fact question over whether Colgan was told by any agent or employee of defendants that it could use the actuators it had on hand (which it was not), and that those actuators could not be used on the aircraft, Colgan subsequently replaced these actuators and ordered, received and installed different and proper actuators prior to the accident.  [SOF, ¶18].  Accordingly, plaintiffs have no viable claim relative to the actuators because the correct and proper actuators were ordered, supplied and installed.  As such, plaintiffs' claims against RAPID are unsupported by the facts and the law, and should be dismissed accordingly.

### E.    Plaintiffs' Breach Of Express Warranty Claim Is Barred Because Defendants Did Not Provide Any Express Warranty To Plaintiffs

As addressed above, all of plaintiffs' claims should be dismissed as a matter of law based on the sophisticated user defense, lack of reliance and/or lack of causation.  However, if the Court concludes otherwise, individual causes of action and claims for certain damages should be dismissed on separate grounds, one of which is plaintiffs' breach of express warranty claim.

Express warranties under Massachusetts law are governed by M.G.L.A. 106, §2-313, which mirrors UCC §2-313 ("§2-313").  M.G.L.A.  106, §2-313; Jones v. Walter Kidde Portable

---

[15] Notably, plaintiffs' own expert agrees that the reason that the trim cable line sprung off the cable drum and kinked requiring replacement was because the mechanics did not block the cable to keep it tight.

Equipment, Inc., 183 F.3d 67 (1st Cir. 1999).  Pursuant to §2-313(1), express warranties are created by:

> (a)  Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b)  Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

M.G.L.A. 106, §2-313.  Plaintiffs baldly assert that statements within defendants' aircraft certification process, its sales and leasing documents, and its advertising created express warranties.  This argument fails as a matter of law.

### 1.    Plaintiffs' Breach of Express Warranty Claim Fails As A Matter Of Law Because No Affirmation Of Fact Or Promise Was Made

Although plaintiffs assert a cause of action for breach of express warranty, they have failed to present any evidence to support such a claim.  [SOF, ¶71].  Plaintiffs' vague assertion that defendants created an express warranty through statements in the certification process or in its sales and leasing documents is meritless.  Because there is no evidence of a purported express warranty, plaintiffs' claim fails as a matter of law.

Even assuming, *arguendo*, plaintiffs can present some evidence of a statement relating to the aircraft, plaintiffs' express warranty claim fails.  An affirmation merely purporting to be the seller's opinion or commendation of the goods does not create an express warranty.  Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 434 N.E. 2d 611 (1982).  Furthermore, every statement included in advertising material for a product does not create an express warranty.  Id. at 823.  Indeed, seller's talk or puffing does not rise to the level of an affirmation of fact or promise.  Id.

In <u>Hannon</u>, the plaintiff contended that the representation by the seller of a swimming pool that it designed and constructed to the highest quality specifications amounted to an express warranty.  <u>Hannon</u>, 385 Mass. at 822-23.  The Court concluded that the statement by the seller was, at most, an affirmation merely of the value of the goods and failed to create an express warranty.  <u>Id</u>.  <u>See also</u>, <u>Knapp Shoes, Inc. v. Sylvania Shoe Manufacturing Corp.</u>, 72 F.3d 190 (1st Cir. 1995) (applying Massachusetts law) (statements failed to create express warranty that shoes would be entirely free of defects); <u>Axion Corp. v. G.D.C. Leasing Corp.</u>, 359 Mass. 474, 269 N.E. 2d 664 (1971) (no affirmation of fact or promise was made and there was no evidence the statements became part of the basis of the bargain); <u>Jacquot v. Wm. Filene's Sons Co.</u>, 337 Mass. 312, 149 N.E. 2d 635 (1958) (statement that product was wonderful did not rise to the level of an affirmation of fact or promise; <u>Ireland v. Louis K. Liggett Co.</u>, 243 Mass. 243, 137 N.E. 371 (1922) (statements relating to the quality of the product did not create an express warranty).  Consequently, any "statements" the plaintiffs may rely on to support their express warranty claim do not amount to affirmations of fact or promise.

**2.      Although No Affirmation Of Fact Or Promise Was Made, Even If The Court Concludes Otherwise, Any Such Affirmation Was Not Part Of The Basis Of The Bargain**

As noted in the Massachusetts Comment to §2-313, in subsections (1)(a), (b) and (c), there is a common phrase that the affirmation, description or sample be "'part of the basis of the bargain.'  This is much like ... the concept of 'reliance' ...."  <u>See also</u>, <u>Axion Corp. v. G.D.C. Leasing Corp.</u>, 359 Mass. 474, 269 N.E. 2d 664 (1971) (no affirmation of fact or promise was made and there was no evidence the statements became part of the basis of the bargain); <u>O'Connell v. Kennedy</u>, 328 Mass. 90, 101 N.E. 2d 892 (1951) (affirmation of fact or promise creates an express warranty only if the buyer relies on the affirmation); <u>Sebago, Inc. v. Beazer</u>

32

East, Inc., 18 F. Supp. 2d 70, 99, 101-02 (D. Mass. 1998) (plaintiff must demonstrate that it relied on the warranty in order to show the express warranty constituted part of the basis of the bargain).  Even assuming, *arguendo*, that an affirmation of fact or promise was made by defendants, plaintiffs cannot show that the statements were "part of the basis of the bargain."

In Shreve, the plaintiff relied on language in an owner's manual for its express warranty claim.  Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378 (D. Md. 2001).  In addition to concluding that no affirmation of fact or promise created an express warranty, the Court concluded that the plaintiff failed to demonstrate that the representations in the manual became part of the basis of the bargain.  Id.  "The Owner's Manual that [the plaintiff] received was not viewed prior to his purchasing the snow thrower, nor did it contain any affirmations that supplemented another promise made to him prior to, and with the hope or expectation of, inducing him to complete the sale."  Id. at 421.  Consequently, the Court dismissed the express warranty claim because the statements referenced by the plaintiff could not have been part of the basis of the bargain, nor could the plaintiff have relied on the statements prior to his purchase.  Id.  See also, Williams v. Dow Chemical Co., 255 F. Supp. 2d 219 (S.D. N.Y. 2003) (representation was not part of the basis of the bargain in that plaintiffs did not hear, see or rely upon the representation prior to their purchase of the pesticide); Murrin v. Ford Motor Co., 756 N.Y.S. 2d 596, 303 A.D. 2d 475 (N.Y. App. 2003) (plaintiff failed to show that the advertisements were part of the basis of the bargain because he was unaware of the advertisements prior to his purchase).

Similarly, plaintiffs cannot demonstrate that any affirmations of fact or promise were made, let alone that any purported statements were relied upon or became part of the basis of the

bargain.  Obviously, this essential element is lacking and, as in <u>Shreve</u>, the lack of reliance is fatal to plaintiffs' express warranty claim.

**F.    Plaintiffs' Unfair Practice Claims Under Mass. Gen. Laws c. 93A Should Be Dismissed**

The plaintiffs cannot be entitled to a claim under M.G.L. c. 93A where they cannot prove negligence or breach of warranty.  Their claims as to each of these counts fail as a matter of law, and, therefore, their claim for unfair and deceptive practices must also fail.  <u>Maillet v. ATF-Davidson Co., Inc.</u>, 407 Mass. 185 (1990).

As previously stated, given that the plaintiffs' claims rest on the proposition that the AMM was defective and that the Colgan mechanics' reliance on the defective manual caused the accident, such claims fail as a matter of law when the undisputed evidence shows that the Colgan mechanics' choice not to use lead lines as required by the AMM was the actual cause of the accident.  Given that the actual cause of the accident was not the mechanics' reliance on the alleged defective Figure 201, as conceded by plaintiffs' causation expert, the essential element of causation is lacking from the plaintiffs' claims for negligence and breach of warranty.  Additionally, the errors and omissions made by both the Colgan mechanics and the pilots constitute superseding acts which break the causal chain for plaintiffs' negligence and breach of warranty claims.

Given that the plaintiffs' negligence and breach of warranty claims fail as a matter of law, their claims for violations of Chapter 93A must also fail.  Therefore, summary judgment is appropriate on plaintiffs' Chapter 93A counts.

G. **Although Plaintiffs' Purported Claim And Instruction For Res Ipsa Loquitor Has Already Been Dismissed By The Court, If The Plaintiffs Contend Otherwise, They Are Mistaken**

Plaintiffs recently filed a Motion for Leave to File Amended Complaints attempting to add "claims" for res ipsa loquitor. On October 16, 2006, the Court entered an electronic order denying plaintiffs' motion to assert claims for res ipsa loquitor and effectively dismissing any purported claim of res ipsa loquitor previously propounded by plaintiffs. [SOF, ¶72]. Accordingly, it is defendants' understanding and position that the Court has concluded that any claim or instruction of res ipsa loquitor has been dismissed and is inapplicable. To the extent plaintiffs continue to erroneously assert that res ipsa loquitor is still applicable either as a claim or jury instruction, defendants demonstrate below the fallacy of the plaintiffs' anticipated argument.

Res ipsa loquitor or "the thing speaks for itself" is not a cause of action or claim but a "rule of circumstantial evidence." Alperin & Shubow, Summary of Basic Law Massachusetts Practice, 20.224, p. 166 (West 1996); see also Shaw v. Pimental, 2000 Mass. Super LEXIS 309 (Giles, J.) (motion to amend complaint to add "claim" of res ipsa loquitor denied as "the term res ipsa loquitor mean[s] circumstantial proof of negligence and is not a cause of action").

It allows, in certain limited circumstances, for a claimant to obtain a jury instruction informing the jury that they "may" infer from the accident or occurrence itself that the alleged injuries were caused by the defendant's negligence. Id. at 167 (citing Roscigno v. Colonial Beacon Oil Co., 294 Mass. 234 (1936); Garrett v. M. McDonough Co., 297 Mass. 58 (1937); Ginsberg v. Metropolitan Bottling Co., 333 Mass. 514 (1956)). Res ipsa loquitor thus operates where there is no direct evidence of specific acts of negligence by the defendant. As such, the doctrine, if applicable, "is merely a method of indirect proof of negligence." Alperin & Shubow,

supra, at 166 citing Prosser & Keeton, Law of Torts, 5th Ed. (West Pub. Co., 1984), s. 40; Wilson

v. Colonial Air Transport, Inc., 278 Mass. 420, 425 (1932) (res ipsa is doctrine of "evidence ...

not ... substance"); see also Lamkin v. Braniff Airlines, Inc., 853 F. Supp. 30, 33 (D. Mass. 1994)

(holding that plaintiffs reliance on res ipsa loquitor did not save negligence claim from summary

judgment); Enrich v. Windmere Corp., 416 Mass. 83, (1993) (res ipsa loquitor doctrine did not

save plaintiffs lack of proof as to negligence of defendant); Makuc v. American Honda Co., Inc.,

835 F. 2d 389, (1st Cir. 1987) (res ipsa instruction properly excluded at trial).    Accordingly,

plaintiffs cannot and do not have a "cause of action," count or claim for "*res ipsa loquitor.*"

Accordingly, plaintiffs' claim was properly dismissed by the Court and should not be allowed to

resurface. See Shaw, 2000 Mass. Super Lexis 309.

Further, plaintiffs cannot invoke the circumstantial evidence rule of *res ipsa loquitor*

because they cannot, by their own evidence and admission, establish the conditions necessary for

its application.  Specifically, for the doctrine to apply the plaintiffs must establish that the act or

occurrence which caused the injury must be one which ordinarily does not happen in the absence

of someone's negligence; that the injury was caused by an agency or instrumentality within the

exclusive control of the defendant; and that the injury was not the result of any cause for which

the defendant was not responsible.  Shubow & Alperin, *supra*, at 166; see McNamara v. Boston

& Maine Railroad, 202 Mass 491 (1909); Wilson v. Honeywell, 409 Mass. 803, 806 (1991);

Boston & Maine Railroad v. Jesionowski, 154 F. 2d 703 (1st Cir. 1946); Enrich v. Windmere

Corp., 416 Mass. 83 (1993).

Here, even assuming that it could be found that the accident could only result due to

negligence, it is undisputed that the aircraft or the manual was not in the exclusive control of the

defendants.  There is and can be no dispute that the pilots of the aircraft were in sole control of

the aircraft at the time of the accident. Similarly, there is and can be no dispute that the manual was in Colgan's hands at the time of the accident and that the mechanics failed to follow its instructions.

Further, plaintiffs' own evidence and allegations preclude any finding that there were no other possible responsible causes except for the defendants. Indeed, plaintiffs have previously asserted claims against a third party, Colgan, claiming Colgan was negligent and responsible for the incident. Specifically, plaintiffs alleged that Colgan, through its mechanics, were not just negligent but "grossly negligent" in the maintenance and repair of the aircraft and, in particular, the repair and maintenance of the forward elevator pitch trim tab cable, elevator trim activator and trim drum. According to the plaintiffs, "Colgan breached its duty [to plaintiffs] by requiring [them] to fly an aircraft that was defective, unreasonably dangerous, improperly maintained; improperly repaired, unairworthy, and/or used procedure and parts not approved for use in this aircraft." Dean Second Amended Complaint, at p.88.[16] Most recently, plaintiffs' liability expert expressly testified that the mechanics' failures caused the accident. Plaintiffs' expert also noted critical failures of the pilots. Since there is abundant and material evidence of other possible causes, there can be no reliance or invocation of the res ipsa loquitor doctrine.

Accordingly, the doctrine of res ipsa loquitor has no applicability to the facts of this case and the Court properly dismissed the purported cause of action and instruction.

### H. Plaintiff Weiler's Loss Of Consortium Claim Fails As A Matter Of Law Because She Was Not Married At The Time Of The Incident

Massachusetts law prohibits unwed plaintiffs from recovering for loss of consortium. Fitzsimmons v. Mini Coach of Boston, Inc., 440 Mass. 1028, 799 N.E. 2d 1256 (2003)

---

[16] Colgan filed a motion to dismiss on grounds that the claim was barred by the Massachusetts Worker's Compensation Act. Notably, in Dean's opposition it was asserted that Colgan used improper and unapproved parts, performed unauthorized repairs, and "violated myriad federal aviation laws."

(unmarried cohabitant was not entitled to loss of spousal consortium); Feliciano v. Rosemar Silver Co., 401 Mass. 141, 514 N.E. 2d 1095 (1987) (loss of consortium claim not allowed even though plaintiff was involved in twenty year de-facto marriage).  There is no exception to this rule.  In fact, the Supreme Judicial Court of Massachusetts has emphasized that the social institution of marriage would be thwarted if the Court were to recognize the right of a person to recover for loss of a spouse's consortium if he/she has not accepted the correlative responsibilities of marriage.  Feliciano, 401 Mass. at 142.

In Feliciano, plaintiff asserted a claim for loss of consortium arising out of personal injuries sustained by Marcial, her de-facto husband.  Id. at 141-42.  Plaintiff and Marcial had lived together as husband and wife for twenty years as a "de-facto married couple," and eventually married two years after the accident giving rise to the claim.  Id. at 142.  Although the plaintiff had used Marcial's surname, they held themselves out as husband and wife, had joint savings accounts, filed joint tax returns, jointly owned their home and maintained an exclusive sexual relationship, the plaintiff was not allowed to recover for loss of consortium because the plaintiff and Marcial were not legally married.  Id.  In so holding, the Court further stated that it was unaware of any other state court of last resort concluding otherwise.  Id. at 142-43.

It is uncontroverted that plaintiff Weiler was not married to pilot Scott Knabe at the time of the accident.  [SOF, ¶51].  It is further uncontroverted that plaintiff Weiler was not eligible for life insurance benefits from Mr. Knabe's death because they were not married.  [SOF, ¶52].  As such, plaintiff Weiler is precluded from recovering for loss of spousal consortium and her claim should be dismissed.

I.    **Although Plaintiffs' Claims For Pre-Impact Conscious Pain And Suffering Have Been Denied By The Court, The Claims Are Further Barred By Massachusetts Law**

Plaintiffs assert claims for damages for the pilots' conscious pain and suffering prior to death.  Specifically, plaintiffs allege that they are entitled to damages for the pilots' "fear of impending death" and/or "decedent's conscious pain and suffering before death."  On October 16, 2006, the Court entered an electronic order denying plaintiffs' motion to add new claims for pre-impact damages as untimely.  [SOF, ¶73].  Accordingly, plaintiffs are prohibited from asserting damages for pre-impact conscious pain and suffering.  To the extent plaintiffs contend that these types of damages were already included, which is vigorously disputed, they should still be dismissed as a matter of law because Massachusetts has expressly rejected such claims for pre-impact pain and suffering.

The leading and controlling case on this issue in Massachusetts is <u>Gage v. City of Westfield</u>, 26 Mass. App. Ct. 681, review denied, 404 Mass. 1103 (1989).  <u>Gage</u> involved wrongful death and conscious pain and suffering claims brought on behalf of two teenagers who were struck and killed by a train.  The Court rejected the contention that the plaintiffs could recover for the pre-impact conscious pain and suffering of the decedents, and specifically held that:

> It is not at all uncommon for victims of sudden fatal accidents to experience momentary fright prior to impact such as the plaintiffs' decedents' experience.  **Yet, the relevant period for purposes of measuring compensation for conscious pain and suffering has consistently been defined in our appellate decisions commencing with the impact of fatal injury.  Assuming that limitation to have been intentional we hesitate to extend the right to recover for conscious pain and suffering to pre-impact fear.**

Gage, 26 Mass. App. Ct. at 696 (Emphasis added). A request for further appellate review from the Supreme Judicial Court was denied. As such, the holding in Gage is controlling.[17] Gage has not been overturned and establishes that plaintiffs' claims for the pilots' pre-impact conscious pain and suffering are not allowed under Massachusetts law. See also, Royal Indemnity Co. v. Pittsfield Electric Co., 293 Mass. 4, 199 N.E. 69 (1935) (pre-impact pain and suffering is not recoverable). Consequently, although plaintiffs' claims for pre-impact pain and suffering have already been dismissed, to the extent the Court concludes otherwise, the claims should nevertheless be dismissed on summary judgment.

### J.    Plaintiffs' Claims For "Grief, Anguish, Bereavement And Emotional Trauma" Are Not Recoverable As A Matter Of Law

The available damages for beneficiaries under the Massachusetts wrongful death statute are well-established. Such damages include "fair monetary value of the decedent … loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice of the decedent," as well as "funeral and burial expenses." G.L. c. 229, §2.

Plaintiffs seek recovery for "grief," "anguish," "bereavement" and "emotional trauma." However, these claims and damages are not recoverable under Massachusetts law. MacCuish v. Volkswagenwerk A.G., 22 Mass. App. Ct. 380, 494 N.E. 2d 390 (1986), aff'd, 400 Mass. 1003 (1987); Mitchell v. United States, 141 F.3d 8, 21 (1st Cir. 1998). See also, DaSilva v. American Brands, Inc., 845 F.2d 356, 362 (1st Cir. 1988) (wrongful death action in Massachusetts does not permit recovery for "grief, anguish, [or] bereavement of the survivors"); Laaperi v. Sears, Roebuck & Co., Inc., 787 F.2d 726 (1st Cir. 1986) (jury not permitted to award compensation for

---

[17] Indeed, the Massachusetts Wrongful Death statute specifically provides that "damages may be recovered for conscious pain and suffering resulting from the same injury…" G.L. c. 229, s. 6 (emphasis added). By expressly linking damages for conscious pain and suffering to that "resulting from the same injury," the statute does not allow for pre- impact conscious pain and suffering but only that resulting and existing after the injury or impact.

grief and mental suffering).  Thus, plaintiffs' request for damages for grief, anguish, bereavement and emotional trauma should be dismissed as a matter of law.

Furthermore, plaintiffs' recovery for emotional distress and anxiety should also be dismissed because plaintiffs did not sustain actual physical harm from defendants' conduct. [SOF, ¶75].  Payton v. Abbott Labs, 386 Mass. 540, 437 N.E. 2d 171 (1982).  See also, Santuna v. Registrars of Voters, 398 Mass. 862, 867 (1986) ("a person cannot recover for negligently caused emotional distress absent physical injuries").

In Payton, the Court addressed the issue of whether a right of action for emotional distress is recognized by Massachusetts absent physical harm.  Id. at 544.    The Court unambiguously concluded that in order for a plaintiff to recover for emotional distress, "evidence must be introduced that the plaintiff has suffered physical harm."  Id. at 555-57.  Additionally, the physical harm to the plaintiff must either cause or be caused by the emotional distress, and the physical harm must be manifested by objective symptomatology.  Id.  See also, Anderson v. W.R. Grace & Co., 628 F.Supp. 1219 (D. Mass. 1986) (although plaintiffs witnessed death of family member, they could not recover for emotional distress because the plaintiffs did not suffer any physical harm from defendants' negligence).

It is undisputed that the plaintiffs' claims for emotional distress arise out of the injuries sustained to the pilots.  [SOF, ¶74].  It is further undisputed that the plaintiffs themselves did not witness the accident, did not witness the injuries and did not sustain any physical harm in connection with the accident.  [SOF, ¶75].  As such, plaintiffs are not allowed to recover for emotional distress under Massachusetts law and their claims should be dismissed.

## IV.    CONCLUSION

For the reasons stated above, defendants respectfully request that this Court grant defendants' motion for summary judgment.

Raytheon Defendants,
By Counsel,

/s/ Peter C. Knight

_____

Peter C. Knight, BBO # 276000
Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Phone: 617-439-7500

and

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS  67202
Phone:  (316) 265-9311

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on   **October 27, 2006**.

/s/ Peter C. Knight

_____

00336395