UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, RAYTHEON AIRLINE AVIATION SERVICES, LLC, Kansas Corporation, and RAYTHEON AIRCRAFT PARTS INVENTORY AND DISTRIBUTION, COMPANY, LLC, a Kansas Corporation<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) DOCKET NO: 05cv10155 PBS<br>)<br>)<br>) **ALLOWED BY THE COURT**<br>) **ON <u>NOVEMBER 29, 2006</u>**<br>)<br>)<br>)<br>)<br>) |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, RAYTHEON AIRLINE AVIATION SERVICES, LLC, Kansas Corporation, and RAYTHEON AIRCRAFT PARTS INVENTORY AND DISTRIBUTION, COMPANY, LLC, a Kansas Corporation<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) DOCKET NO: 05cv10364 PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' REPLY MEMORANDUM
## <u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Defendants, Raytheon Company, Raytheon Aircraft Company, Raytheon Aircraft Credit

Corporation, Raytheon Airline Aviation Services, LLC and Raytheon Aircraft Parts Inventory

and Distribution Company, LLC (the "Raytheon Defendants") hereby submit this reply

memorandum in support of their previously filed Motion for Summary Judgment.

1

## I.  Plaintiffs Did Not Controvert Raytheon Defendants' Statement Of Undisputed Facts

As with all summary judgment motions, the Court should pay particular attention to the plaintiffs' handling of the statement of facts.  Of the 75 statements of uncontroverted facts supported by the record in Raytheon Defendants' motion, plaintiffs do not even purport to dispute 32 of them.  These are a combination of facts that the plaintiffs overtly omit as "undisputed,"[1] and those that the plaintiffs have not disputed but for which they offer additional commentary or argument, sometimes with accompanying record cites but more often not.[2]  Most if not all of this latter category represent attempts at justifying or rationalizing the fact that the fact statement itself as articulated by the Raytheon Defendants is true.  Many of this grouping contain no record cite for the surplus language offered and are thus further revealed as ineffective.[3]  Where there are record cites, the statements are generally not supported by the content of the cite.  Given that there is not even an attempt to dispute any of these 32 facts, however, they are conclusively deemed established both for purposes of this motion and trial, if necessary.

Of the 43 fact statements plaintiffs attempt to dispute, however, three categories emerge. First, many of these responses purport to dispute the stated fact, but the statements offered to support the dispute simply do not meet the substance of the fact itself and therefore are ineffective in establishing an actual dispute.[4]  For example, fact number 1 merely established that Colgan is a Part 121 operator and held Certificate No. NSVA519S at the time of the incident. While Colgan purports to dispute this, all they do is restate the fact in other words and add that the flight plan during the accident flight was actually filed under Part 91.  This information does

---

[1] 5, 6, 9, 13, 15, 18, 19, 20, 21, 37, 44, 45, 51, 53, 58, 62.
[2] 2, 3, 4, 7, 14, 27, 28, 33, 39, 42, 47, 52, 55, 56, 65, 67.
[3] 2, 3, 4, 7, 28, 39, 52, 55, 67.
[4] 1, 4 (in part), 10, 11, 16, 24, 25, 29, 34, 35, 43, 47, 48, 49, 54, 59, 60, 61, 63, 64, 66, 68, 69.

2

nothing to dispute the fact as stated and is ineffective. This is just an example, but this approach is repeated over and over throughout the responses, and thus these facts should likewise be conclusively established for purposes of the present motion.

There is substantial overlap between this first category of attempted but ineffective disputes of the Raytheon Defendants' facts to the second category, which are those that simply have no record support.[5] Fact number 1 is again a good example of this second category and the overlap with the first. Failure to support with evidentiary record support makes any attempted dispute ineffective and thus these facts must also be deemed conclusively established for purposes of this motion.

The third category includes those where plaintiffs purport to dispute the facts and cite some record excerpts but the attempted dispute is substantively ineffective or the record cited does not support the proposition asserted.[6] For example, fact number 22 (which establishes that the left-hand threaded end of the cable should come off of the forward end of the drum as it is installed in the aircraft) is an admitted fact by both of the Colgan mechanics who performed the procedure and experts in the case. Plaintiffs attempt to dispute this and cite only the manual diagram itself and an Airworthiness Directive, the first of which proves the fact, and the second of which does nothing to rebut it in relation to the "forward as installed" arrow in the diagram. This is patently ineffective and the fact must be deemed established. No one can or will dispute that the correct installation has the left hand threaded end of the cable coming off the forward end of the drum as it is installed in the aircraft.

Fact number 23 serves as another example of this category in that plaintiffs' own expert admitted that for the operation of the system to be reversed, the "forward as installed" arrow of

---

[5] 1, 17, 31, 36, 40, 41, 68, 69, 71, 72, 73, 74, 74, 75.
[6] 10, 11, 12,  16, 22, 23, 25, 26, 29, 30, 32, 35, 38, 46, 48, 49, 54, 57, 59, 60, 61, 63, 66, 68, 69, 70.

Figure 201 had to be ignored and the right-hand threaded end of the cable had to come off the front of the drum as installed in the aircraft.  In an attempt to dispute this fact, plaintiffs only cite the same NTSB Factual Report excerpt that  the Raytheon Defendants cite to support it, along with testimony of plaintiffs' human factors expert, Michael Maddox, who, not an aircraft mechanic himself, admitted that even he would disregard the "forward as installed" arrow when he stated on page 106 "why would I care what the words say?".

None of this does anything to controvert the fact as stated.  Again, no one can dispute the fact that the only way to get the elevator trim system to work in reverse is to both wrap the cable so that the right hand threaded end comes off the front of the drum as installed and cross the cables before the connection point is reached at the turn buckle.  Plaintiffs seek to avoid admitting this only by intentional efforts to confuse the record.  This is ineffective and improper.  There again is overlap in this category of attempted disputes to those with no record support or which simply do not meet the substance of the fact stated.  Accordingly, there is virtually no material fact in the Raytheon Defendants' motion that can be considered properly disputed.[7]

Plaintiffs engage in another interesting tactic relating to the facts when they seek to circumvent their own experts' key admissions.  For example, in fact number 30, plaintiffs' causation expert, John Goglia, admitted that had the mechanics used the lead lines, the cables would not have been crossed and the accident would not have happened.  This is very plainly what he said and the record support provided establishes it.  Plaintiffs admit that he said it but then seek to obscure it in other irrelevant commentary that does nothing to meet the substance of

---

[7] To be fair, plaintiffs did effectively controvert one aspect of one fact statement where they pointed out that First Officer Dean was in fact not type rated in a 1900D aircraft.  See Statement of Fact 8.  Defendants recognize that plaintiffs may have disputed Fact No. 50 but their arguments are not material to the disposition of this motion.

4

the fact. Note that they do this with a number of their experts' admissions, of which there are many.[8]

In sum, none of the Raytheon Defendants' material statements of uncontroverted facts are effectively disputed, and each material fact is established for purposes of this motion. Accordingly, summary judgment in the Raytheon Defendants' favor should be granted as a matter of law as discussed more fully below.

## II.    Figure 201 Was Not The Cause Of The Accident As A Matter Of Law

As set forth above, it is undisputed that:

1.  The cable drum depicted in Figure 201 in the AMM has a sprocket or keyed side and a flat side and can only be installed in the 1900D aircraft one way and was, in fact, correctly installed by the Colgan mechanics.

2.  Figure 201 in the AMM makes clear that the cable is to be wrapped around the drum so when the drum is attached the left handed end of the trim cable comes off the forward side of the drum.

3.  The Colgan mechanics, in performing repairs to the 1900D aircraft mis-wrapped the cable on the drum by running the right hand threaded end of the front of the drum directly contrary to the "forward as installed" arrow in Figure 201.

4.  Even when mis-wrapped the only way the mis-wrapping could cause the elevator trim system to work in reverse is for the mechanics to have crossed the cable as the cable was routed through the aircraft by the mechanics.

5.  The Colgan mechanics, separate and independent from Figure 201, did not utilize lead lines in the installation of the cable as required by the AMM.

6.  The failure to use lead lines resulted in the cables crossing.

7.  According to plaintiff's own expert had the Colgan mechanics used lead lines as required by the AMM, the crossing of the cables would have not occurred and the accident would not have happened.

These undisputed/material facts are dispositive of plaintiffs' claims. They establish that Figure 201, even assuming it is erroneous in that it is shown sprocket side facing out in the

---

[8] 2, 10, 11, 13, 21, 23, 24, 26, 27, 29, 30, 33, 35, 36, 37, 38, 40, 43, 46, 47, 49.

diagram instead of the opposite flat side facing out in the diagram, was not the but-for and/or proximate cause of the accident as a matter of law.

Plaintiffs contend that Figure 201 is erroneous because it shows the sprocket or keyed side of the drum facing out in the diagram instead of the flat side of the drum facing out in the diagram thereby, according to the plaintiffs, causing the mechanics to wrap the trim cable around the drum in the wrong direction. However, none of the mechanics testified that they were mislead by Figure 201. Moreover, it is undisputed that the drum depicted in Figure 201 can only be installed one way. There is no dispute that the drum depicted in Figure 201 was, in fact, correctly installed by the Colgan mechanics during the maintenance repair. Accordingly, the Colgan mechanics were not in anyway mislead by Figure 201. Rather, Figure 201 makes clear that the cable is to be wrapped around the drum so when the drum is attached the left handed end of the trim cable comes off the forward side of the drum. Accordingly, it is undisputed that the Colgan mechanics mis-wrapped the cable on the drum by running the right hand threaded end on the front of the drum directly contrary to the "forward as installed" instructions accompanying Figure 201. The Colgan mechanics simply did not follow Figure 201 as depicted and the fact that Figure 201 is shown sprocket or keyed side facing out in the diagram instead of the flat side facing out did not cause the accident as a matter of law.

Secondly, it is undisputed that even assuming Figure 201 somehow caused the mechanics to mis-wrap the cable it could not have caused the accident. Specifically, it is undisputed that the accident could only have happened if the Colgan mechanics failed to follow an additional and independent instruction of the manual which was to use lead lines in routing the cables through the aircraft. It is undisputed that the mechanics did not use lead lines as directed by the manual; that the use of lead lines prevents the trim cables from crossing during installation; and that the

6

cables had to be crossed in order for the trim system to have operated in reverse as contended by plaintiffs. Accordingly, the mechanics separate and independent failure to use the lead lines was the but for and proximate cause of the accident as a matter of law. Not only are the mechanics sophisticated users but the Raytheon Defendants cannot be liable for the mechanics' failure to follow the manual instructions in their entirety. Absent the failure to use lead lines the accident would not have happened. (SOF ¶ 30).

In their opposition, plaintiffs do not and cannot deny the undisputed facts regarding the mechanics' failure to use the lead lines. Rather, they reference one of their expert's testimony that when certain pulleys are removed the lead lines are ineffective. Plaintiffs fail to cite to any competent testimony that the pulleys were, in fact, removed by the mechanics during their repair. Moreover, the mechanics were not excused from the clear procedures and manual instruction to use lead lines. The manual's directive to utilize lead lines is, in fact, mandatory and has the force and effect of federal law. It is undisputed that had Colgan's mechanics used lead lines as required by the AMM, the cable crossing would not have occurred and the accident would not have happened. (SOF ¶ 30).

Additionally, it is undisputed that the mechanics failed to follow other portions of the manual in that they failed to perform the post-rigging check and the separate operational check. Had either required check been properly performed, as the mechanics expressly acknowledged, they would have discovered that the trim tabs were moving in the wrong direction. (SOF ¶¶35-43).

Plaintiffs' sole response to these undisputed facts is their assertion that the failure to include a hyperlink in its manual to the operational check provision denied the Colgan mechanics an opportunity to remedy the mis-rigging. This assertion is not only unresponsive to the relevant

7

undisputed facts but is misplaced. As a matter of law and undisputed fact, there was no duty to include a hyperlink to the operational check provision, as the mechanics testified that they were fully aware of the need to conduct an operational check and had a proper operational check been performed the mis-rigging would have been found.[9] There is no duty to warn or instruct, where the pertinent party (a sophisticated user no less) was fully aware of the warnings, danger or instruction.

Plaintiffs' inability to satisfy the necessary but for/proximate causal element is further demonstrated by the undisputed fact that the plaintiff pilots failed to conduct the necessary pre-flights. Not only did the pilots know that the there had been maintenance by Colgan on the trim and that they were required to do pre-flight checks, including the first flight of the day check, but they were required to do so by Colgan's manual and FAA regulations and that had such pre-flights checks been properly performed the accident would not have happened. (SOF ¶ 44-50).

The contention by plaintiffs that the pre-flight checks did not require the pilots to observe which direction the trim wheel was moving but only that it was moving is unavailing.[10] It is undisputed that the only method to determine the electric trim override on the first flight of the day check is to have the pilot's electric trim reverse the direction of the trim generated by the co-pilot. Necessarily, the pilot must observe the trim wheel at his right knee in order to see that the override works which is shown by the trim cable reversing direction. This would tell the pilot he was able to reverse the trim changes inputted by the right seat first officer. For example,

---

[9] See also Colgan v. Raytheon Aircraft Co., 404 F. Supp. 2d 893, 896 (E.D. Va. 2005).
[10] Again, as set forth *supra*, plaintiffs' record references in response to the defendants' statement of undisputed facts do not support the plaintiffs' assertion. For example, plaintiffs cite to Feith and Conway testimony (Exs. 27 & 30 of P.'s opposition) for the assertion that the pre-flight checks did not require the pilots to look at the trim wheel to determine the direction of the trim. A fair and careful reading of the testimony shows that Conway skirted the issue while Feith testified that the pilots during the preflight check would look at trim wheel to see which way it was moving. (Exh. 30 of P.'s opp. at 226). In fact, the manual specifically instructs the pilots to determine if the trim wheel reverses itself upon the override check which can only be determined by looking at the direction of the trim wheel. See Exh. 22 to defendant's motion.

8

if the trim wheel was turning backward, for a nose up attitude the pilot would input forward trim nose down to test the override. With a mis-rigged trim, the backward movement would continue (instead of stopping and reversing) and the pilot would realize that the check revealed an anomoly.

**III.    The Sophisticated User Defense Precludes Plaintiffs' Claims**

Plaintiffs' attempt to escape the clear applicability of the sophisticated user defense ("SUD") by asserting (a) the SUD is inapplicable to its defective product claims; (b) the mechanics were not sophisticated users as they were not aware that Figure 201 was erroneous or "the severity of the risk it posed"; and (c) that the Colgan mechanics reasonably relied upon the manual resulting in the accident.

### a.    The SUD Applies To Plaintiffs' Claims

All of plaintiffs' claims, however couched, are all based on the assertion that Figure 201 was erroneous and that "this depiction induced the Colgan mechanics to route the cable incorrectly … causing the trim system to be reversed" and that "[t]his defect was a proximate cause of the plane crash." As the claims are all premised on the manual and the assertion that the defective or faulty instructions and/or warnings were given as to maintenance, the gravamen of the action is failure to warn or instruct rendering the SUD a viable and proper defense to all claims. Indeed, SUD defeats plaintiffs' claims as a matter of law.

### b.    The Mechanics Were Sophisticated Users

Plaintiffs contend that the Colgan mechanics were not sophisticated users as neither Colgan nor its mechanics "were aware of the defective diagram [Figure 201] located within the AMM or the severity of the risk it posed." The legal contention misses the mark.[11]

---

[11]    Plaintiffs do not address nor contest the federal part 121 air carrier operator status of Colgan or that the Colgan mechanics were highly trained and federally regulated and licensed A&P mechanics.

9

For purposes of the SUD, "[i]t is not necessary that the user know the exact characteristics of the product that make it dangerous. It is enough that the user knew or reasonably should have known of the particular danger to be guarded against, in which case an additional warning would have been superfluous." Carrell v. National Cord & Braid Corp., 447 Mass. 431, 445 (2006); see Koken v. Black & Veatch Construction, Inc., 426 F. 3d 39, 45 (1st Cir. 2004) (no duty to warn sophisticated user of dangers obvious to reasonable sophisticated users). Contrary to plaintiffs' contention, it is not Colgan's appreciation or knowledge that the specific diagram [Figure 201] was partially (and allegedly) in error, but the appreciation of the danger of rigging the trim cable and control system backward. There is and can be no dispute that the A&P Colgan mechanics were well aware of the risk and danger in not properly rigging the flight control system (i.e. trim cable) or following the manual. The mechanics so testified. See **Exhibit A** attached. The suggestion that the mechanics had to or needed to be told the dangers of mis-installing the trim rigging system in order for the SUD to be applicable is belied by their extensive training, experience, testimony and the undisputed material facts.

Plaintiffs' reliance upon Shuras v. Integrated Project Service, Inc., 190 F. Supp. 2d 194 (D. Mass. 2002) is similarly misplaced. There, the plaintiff-calibrator was injured after she attempted to calibrate a certain tank containing scalding hot water. The court acknowledged that a sophisticated user such as the plaintiff in that case cannot recover where she was aware of the alleged danger. The court denied summary judgment, however, as the plaintiff did produce evidence that she did not know of the danger attendant to calibrating the tank. Notably, the Court in Shuras specifically acknowledged that a manufacturer is not liable where the sophisticated user was aware of the danger at issue. Shuras, 190 F.Supp. at 203. Here, unlike in Shuras, however, there is and can be no material issue in dispute as to Colgan's and its

mechanics' knowledge of the danger in mis-rigging the trim cable. The Colgan mechanics are A&P mechanics of an air carrier both licensed and regulated under federal law and who, as discovery revealed (unrebutted by any evidence to the contrary), were fully aware of the danger posed in mis-rigging the aircraft. Indeed, given the sophisticated user status of the mechanics as well as the evidence put forth by the Raytheon Defendants, it was the plaintiffs' burden (as in Shuras) to proffer evidence to the contrary which they have failed to do and which they cannot do. See also Koken, 426 F.3d at 45.

## IV.    The Express Warranty Claim Fails As A Matter Of Law

In their opposition, plaintiffs assert that the Raytheon defendants made affirmations of fact or promise and that the aircraft was leased in reliance of these affirmations thus establishing a breach of express warranty claim. More specifically, plaintiffs claim that the lease proposal by RAAS to Colgan contained the "affirmation" that it would have a "valid" certificate of airworthiness and that because of the allegedly faulty Figure 201, the failure to have a link to the operational check, and that the aircraft did not allegedly meet 14 CFR §23.677, the aircraft did not have a "valid" airworthiness certificate.[12] As to reliance, plaintiffs simply state that since the aircraft was leased, Colgan must have relied on these "purported representations."

Plaintiffs' assertions do not make out a claim for breach of express warranty. There is no dispute that plaintiffs were provided the aircraft pursuant to the lease together with a certificate of airworthiness. There was no express warranty concerning the certificate of airworthiness. In fact, the aircraft was expressly leased "as is" with a specific disclaimer of any express warranty as to, inter alia, the condition, design, fitness and "airworthiness" of the aircraft. See, Colgan,

---

[12] Notably, the Federal District Court in Virginia in the earlier action specifically held that the only valid express warranty was the 30/90 day repair and replace warranty and that all other express warranties were disclaimed. Colgan, 404 F.Supp. 2d at 902 ("Colgan has no [express] warranty rights against Raytheon except the 90 day express warranty (which had expired by the time of the crash)". Even under plaintiffs' theory, it is only RAAS that is claimed to have made an "express warranty" requiring summary judgment for all the other Raytheon Defendants as to this breach of express warranty claim.

11

404 F. Supp. 2d at 898; see also Jones Walter Kidde Portable Equip., Inc., 183 F. 3d 67, 70 (1st Cir. 1999) *citing* M.G.L. c. 106, 2-316(c)("words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other").  Further, while the aircraft was provided with a certificate of airworthiness, the certificate of airworthiness was issued by the FAA. Consequently, any claim that it is "invalid" or improperly issued is subject to the exclusive jurisdiction of the FAA.  See generally, Rocky Mountain Helicopters, Inc. v. Bell Helicopter, 24 F. 3d 125, 131 (10th Cir. 1994)(representations to FAA for purposes of certification do not give rise to an express warranty between manufacturer and purchaser); Ellsworth v. Beech Aircraft, Corp., 195 Cal. Rptr. 226, 229 (1983)("the statute governing the FAA provide a remedy against improper certification... that certification may not be attacked in state court").

Moreover, to the extent plaintiffs are claiming a "design flaw" rendering the aircraft non-compliant with 14 CFR § 23.677 it also is not a basis for a breach of express warranty claim. The claimed design flaw is premised entirely on the fact that the trim was mis-rigged by the mechanics.  There was no design flaw violating the regulation at the time it was leased.  In sum, there was no promise or affirmation of fact upon which plaintiffs relied defeating any breach of express warranty claim.

**V.    Res Ipsa Has No Applicability to The Undisputed Facts**

Plaintiffs concede that *res ipsa loquitur* is not a claim but a basis to request a jury instruction.  Accordingly, there can and is no claim for *res ipsa*, entitling Raytheon Defendants to summary judgment on Count VI of Weiler's Second Amended Complaint and Dean's Third Amended Complaint.

Plaintiffs agree that a *res ipsa loquitur* charge requires that the circumstances establish that the accident be of the type which ordinarily does not occur in the absence of negligence and

12

that *res ipsa* has no applicability where there is evidence of "any voluntary action or contribution on the part of the plaintiffs." Here, *res ipsa* has no applicability as the evidence supports the finding that there are many reasons for the accident other than the claimed faulty manual and, in fact, there is substantial, if not dispositive, evidence of the plaintiffs action and contribution. Plaintiffs misapprehend *res ipsa's* requirement that the accident be of the type which ordinarily does not occur absent negligence as it is the negligence of the <u>defendant</u> that is operative. <u>See e.g.</u>, <u>Vivas v. Sun Alliance Ins. Co.</u>, 807 F.2d 1102, 1105 (1st Cir. 1986). Similarly, plaintiffs' argument that the control requirement has been found not to literally mean exclusive is of no moment as the purpose of the requirement is to "eliminate the possibility that the accident was caused by a third party." <u>Id</u> at 1106 citing <u>Giacalone v. Raytheon Co.</u>, 222 F.2d at 249, 252 (1st Cir. 1955); <u>see also</u> <u>Ricci v. Alternative Energy</u>, 211 F. 3d 157, 161 (1st Cir. 2000)(reasonable alternative explanations for causation precluded application of *res ipsa* entitling defendant to summary judgment on issue). As set forth above, the failure of the pilots to conduct a proper preflight and/or the mechanics lead line failure and failure to conduct the rigging and operational checks all were negligent acts explaining the accident. Indeed, the mechanics had a non-delegable duty to provide proper maintenance including to follow the manual instructions. <u>Id</u>.

Plaintiffs' contention that the plaintiff pilots' actions did not constitute "voluntary action or contribution" to the accident is baseless. Under the applicable manuals and regulations, the pilots were charged with conducting the proper pre-flight checks which if properly conducted would have revealed the mis-rigging of the trim cable. There is no basis for any *res ipsa* instruction as a matter of law and undisputed fact.

## VI.     Massachusetts Law Applies To Plaintiffs' Claims Including Damages

Plaintiffs assert that the law of Texas and Florida control as to compensable damages. They contend that they are entitled to recover for their respective decedents' pre-impact conscious pain and suffering as well as for the survivor's grief, anguish, bereavement and emotional trauma under Florida and Texas law respectively.  Plaintiffs' belated efforts fail.

### a.     Plaintiffs Specifically Plead and Claim Damages Under Massachusetts Law

This court previously invoked the conflicts analysis and held that Massachusetts law applies.[13]  Further, in all of their multiple and respective complaints filed in this action (a total of five), plaintiffs specifically pleaded and invoked their purported rights, including damages under the Massachusetts wrongful death statute.[14]   See Weiler Second Amended Complaint ¶ 9 ("plaintiff claims damages pursuant to Massachusetts General Laws Chapter 229, § 2 for the wrongful death").  Dean Third Amended Complaint (same).  Having specifically alleged and pleaded damages under the Massachusetts' wrongful death statute (as well as G.L. c. 93A) plaintiffs cannot now seek to avoid certain Massachusetts' rules as to recoverable damages by resort to another state's laws perceived to be more favorable.

### b.     There Can Be No Loss of Consortium or Pain and Suffering in the Weiler Action

Regardless of any conflicts analysis, plaintiffs concede that Florida does not permit recovery for the decedent's pre-impact pain and suffering.  Indeed, Florida's wrongful death statutory scheme specifically eliminates claims of pain and suffering of the decedent from time of injury until time of death.  See Fla. Stat. Ch. 768.21; Florida Clarklift Inc. v. Reutimann, 323

---

[13]  See Dean v. Raytheon Aircraft Co., 399 F. Supp. 2d 27, 32 (D. Mass. 2005)("No other state [than Massachusetts]has a more significant relationship to the parties and the tragic accident").
[14]  Plaintiffs likewise seek compensatory and punitive damages under M.G.L. c. 93A

14

So. 2d 640 (Fla App. 1975) *citing* <u>Martin v. United Sec. Servs.</u>, 314 So. 2d 765 (Fla. 1975). Nonetheless, plaintiffs assert that pre-impact pain and suffering is "contemplated as an element of the survivor's pain and suffering" relying on <u>Martin</u>.

Nowhere in <u>Martin</u> does the court remotely hold that a survivor may, as part of recovery of his or her mental suffering under Florida's wrongful death statute, include mental anguish based on the decedent's purported pain and suffering. It is mental suffering based on the decedent's death alone. Accordingly, even if Florida wrongful death damages apply as to the Weiler action, Florida (as in Massachusetts) does not permit recovery of pre-impact pain and suffering entitling defendants to summary judgment on this claim.

Further, plaintiffs do not oppose Raytheon Defendants' assertion that plaintiff Weiler cannot recover for loss of consortium as she was not married to the decedent Knabe at the time of his death. This is established law and plaintiffs make no opposition entitling the Raytheon Defendants to judgment as to any such claim.

**c.    *Conflicts Analysis Mandates That Massachusetts Law
        Applies to Damages***

Plaintiffs base their assertion that the law of Texas (as to Dean) and Florida (as to Weiler) governs compensatory damages on the grounds that it is generally recognized that the state of a complainant's domicile has a general interest in having its residents compensated for injuries suffered in another state. They rely on <u>Cohen v. McDonnell</u> Douglas, 450 N.E.2d 581 (1983) and assert that application of Texas and Florida law "would meet the needs of the interstate system, not offend the laws of the forum state, and protect the expectations of all parties."

15

To be sure, the state of plaintiff's domicile does have an interest in ensuring that its citizens are adequately compensated for injuries suffered.[15]  However, it is far from controlling on the issue of damages and is not controlling here. See Audlee v. New England Tank Industries of N. H., 1985 U.S. Dist. LEXIS 12400 *6 (D. Mass. 1985); Schulhof v. Northeast Cellulose, Inc. 545 F. Supp. 1200, 1205 (D. Mass. 1982); see also Ricci, 211 F. 3d at 166 (fact that decedent was from Rhode Island and that death "will be most felt there" insufficient to overcome place of injury and alleged negligence on issue of damages).  This court has already determined that Massachusetts has a significant interest in this action. Dean, 399 F. Supp 2d 27.  It is the forum state selected by the plaintiffs themselves; the location of Colgan's local base of operations; the site of the use of the AMM at issue; the place of the operative maintenance and repair at issue as well as the operating, pilot and maintenance checks; the site of the accident; the site of Dean's and Knabe's deaths; the airport of departure prior to the incident, Dean's and Knabe's place of employment at the time of the accident; and the site of Dean's and Knabe's worker's compensation benefits.   Important is that Massachusetts is where the plaintiff decedents were working and they thus subjected themselves to Massachusetts law.  Massachusetts is the state where the injury (i.e. death) and the conduct causing the injury occurred which is the source of the right of the plaintiffs' right to compensation. See Petrokehagia v. JNP Construction, Inc., 1998 U.S. Dist LEXIS (E.D. Penn. 1998)(determining that Massachusetts law applied both to liability and damages even though plaintiffs domiciled in Pennsylvania).[16]

---

[15] Notably, Knabe, the decedent in the Weiler action, was a resident of Ohio (as is Weiler) NOT Florida or Texas while Dean was an resident of Texas.

[16] Plaintiffs' reliance on Cohen is misplaced.  There the court did not address compensatory damages for wrongful death.  Further, the claimant filed suit in Massachusetts, learned of her son's death in Massachusetts, and suffered her fatal heart attack in Massachusetts.  Not surprisingly, the Court found Massachusetts law to apply to the breach of warranty claim.

16

The Restatement conflicts of law principles and interests including the needs of the interstate system, the policies of the forum Massachusetts, protection of justified expectations, the policies underlying wrongful death statutory scheme, interests of certainty, predictability, and uniformity and ease in application of law all militate toward the applicability of Massachusetts law. Restatement (Second) Conflicts of Law  sec. 6.  The Massachusetts wrongful death statute "is a comprehensive statute serving compensatory and deterrent purposes." Schulhoff, 545 F. Supp. at 120; Audlee, supra at *6..  Accordingly, aside from any compensatory purpose the statute is designed to serve as a deterrent regardless of its punitive damages provision. Massachusetts thus has a compelling interest in application of its law on compensatory damages.[17]

Notable also is that to accept plaintiffs' contention and base compensatory damages on the domicile of the beneficiaries or plaintiffs is to apply varying rules of compensation to the two sets of plaintiffs and/or beneficiaries.  For instance, Dean might be entitled to pre-impact pain and suffering under Texas law but Weiler for the benefit of Knabe would not under Florida law. Any mental suffering of the appropriate beneficiary would be defined under both Texas and Florida law while plaintiffs would jointly seek punitive damages under Massachusetts law.  Such mixing and matching of the laws of different states "can readily lead to a result 'that neither state would allow..[since when] a court combines elements of the laws of different states it may upset the delicate balance achieved by legislative compromise." Schulhof, 545 F .Supp. at 1207-08; see also Audlee supra at *7 ("plaintiffs too optimistically believe that the inevitable and

---

[17] Massachusetts also has a compelling interest in (a)  not allowing nonresidents a greater recovery than its law allows its own residents; (b) precluding forum shopping; and (c) protecting defendants who do business or operate a business from paying for excessive damages or damages not recoverable under Massachusetts law.  Notably, Raytheon Aircraft Company does business in Massachusetts while its parent Raytheon Company is headquartered here.

17

unavoidable overlaps between liability and damages could be neatly sorted out for the fact-finder"). Massachusetts law applies to both liability and damages.

### d.    *Massachusetts Precludes Recovery of Pre-Impact Terror, Bereavement and Grief*

Plaintiffs contend that if Massachusetts law applies to compensatory damages, it permits recovery of "pre-impact" terror of the decedents and bereavement and grief of the statutory beneficiaries. Plaintiffs are wrong.

It is black letter law in Massachusetts that "grief, anguish, bereavement and/or mental suffering" of the decedent's beneficiaries is not recoverable under the Massachusetts wrongful death statute. See MacCuish v. Volkswagenwerk A.G., 22 Mass. App. Ct. 380 (1986), aff'd 400 Mass. 1003 (1987); Mitchell v. United States, 141 F. 3d 8, 21 (1st Cir. 1998); DaSilva v. American Brands, Inc., 845 F. 2d 356, 362 (1st Cir. 1988); see also Laaperi v. Sears, Roebuck & Co., Inc., 787 F. 12d 726 (1st Cir 1986)(jury not permitted to award decedents beneficiaries damages for grief or mental suffering). Plaintiffs do not and cannot refute this established and controlling case law precluding any claim for their respective statutory beneficiaries' or survivors' mental suffering, grief, anguish, and/or bereavement.

Plaintiffs also attempt to skirt the Massachusetts rule that bars recovery for pre-impact pain and suffering by asserting that since the rule has not been stated by the Supreme Judicial Court it is not-binding on this Court. Plaintiffs do not and cannot dispute that the 1989 Massachusetts Appeals Court decision in Gage v. City of Westfield, 26 Mass. App. Ct. 681 made clear that Massachusetts does not permit recovery for pre-impact pain and suffering. Indeed, this holding is consistent with the express statutory language of the survival statute incorporated into the wrongful death statute which expressly limits damages for conscious pain and suffering to

18

that "resulting from the same injury." G.L. c. 229. s. 6[18]; see also Stecyk v. Bell Helicopter Textron, 1998 U.S. Dist. LEXIS 16772, *22-24 (E.D. Penn. 1998)(as Pennsylvania and Delaware statutes limit pain and suffering from time of injury to time of death no recovery for pre-impact fright available).

   While plaintiffs rely on Judge Lindsay's decision in McIntrye v. United States, 447 F. Supp. 2d 54, 117 (D. Mass. 2006) in which he disagreed with the rule stated in Gage, his discussion was dicta and does not alter the fact that the holding in Gage remains the law of Massachusetts.  Gage was not only decided by the highest intermediate court in Massachusetts but the Supreme Judicial Court declined to provide any further review.[19] See 404 Mass. 1103 (1989); see also, West v. American Telephone & Telegraph Co., 311 U.S. 223, 237 (1940)(federal court cannot disregard law announced by state intermediate appellate especially where the highest court has refused to review the lower court's determination); Noviello v. City of Boston, 398 F. 3d 76, 91 (1st Cir. 2005)(following Massachusetts Appeals Court decision although no Supreme Judicial Court opinion on point); McCoy v. Providence Journal Co., 190 F. 2d 760, 765 (1st Cir. 1951)("an intermediate state court in declaring and applying state law is acting as organ of State and its determination, in the absence of more convincing evidence of what state law is, should be followed by a federal court deciding  a state question").  This court is not free to disregard the considered judgment and holding in Gage and certainly not the language

---

[18] The statute provides in relevant part:
       In any civil action brought under [wrongful death statute], damages may be
       recovered for conscious suffering resulting from same injury …
G.L. c. 229, § 6

[19] Also notable is that the Massachusetts legislature in the 17 years since Gage has not saw fit to amend the statute to allow pre-impact pain and suffering under the statute.

19

of G.L. c. 229, s. 6 expressly incorporated into the wrongful death statute which precludes recovery of pre-impact pain and suffering.[20] Defendants are entitled to summary judgment.

CONCLUSION

WHEREFORE, the defendants, Raytheon Company, Raytheon Aircraft Company, Raytheon Aircraft Credit Corporation, Raytheon Airline Aviation Services, LLC and Raytheon Aircraft Parts Inventory and Distribution Company, LLC, respectfully request that the court **ALLOW** its Motion for Summary Judgment.

Raytheon Defendants,
RAYTHEON COMPANY,
RAYTHEON AIRCRAFT COMPANY,
RAYTHEON AIRCRAFT CREDIT
CORPORATION,
RAYTHEON AIRLINE AVIATION SERVICES,
LLC and
RAYTHEON AIRCRAFT PARTS INVENTORY
AND DISTRIBUTION COMPANY, LLC
By Counsel,

/s/ Tory A. Weigand

Peter C. Knight, BBO # 276000
Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Phone: 617-439-7500

-AND-

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
   & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS 67202
Phone: (316) 265-9311

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on **December 15, 2006**

/s/ Tory A. Weigand

---

[20] The reasoning for not allowing recovery of pre-impact pain and suffering is clear. Such a claim would invite speculation by a jury as to the effect of a specific event on the plaintiff where there is no evidence.

1035837v1

# EXHIBIT "A"

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - - -x

                            :

COLGAN AIR, INC.,                 :

                            :

          Plaintiff,       :

                            :

      vs.               :  Civil Action

                            :  No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,    :

                            :

         Defendant.       :

                            :

- - - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Thursday, June 23, 2005

Videotaped deposition of SCOTT SERVIS, witness, called

for examination by counsel for the defendant, pursuant to

notice, at the offices of Mark A. Dombroff, Esq., Dombroff

& Gilmore, P.C., 1676 International Drive, Penthouse,

McLean, Virginia, before Malynda D. Whiteley, a Registered

Professional Reporter and a notary public in and for the

State of Virginia, beginning at 9:14 a.m., when were

present on behalf of the respective parties:

**Page 14**

1   A   I'm not a pilot, no.

2   Q   You're a mechanic.

3       You have airelons; you have rudders, elevators —

4   A   Elevators and trim tabs.

5   Q   — and trim tabs?

6   A   Different surfaces.

7   Q   And trim tabs could be on the tail or on the

8   wings; right?

9   A   Right.

10  Q   Those are typically control surfaces?

11  A   Right.

12  Q   And a control system is those surfaces attached

13  to the different components of the plane that move them; is

14  that fair?

15  A   Correct.

16  Q   In your training as an A and P, are you told that

17  the control systems of an aircraft are especially critical?

18  A   Yes.

19  Q   What do they tell you about that?

20  A   It means it's obviously a critical — a part of

21  the aircraft is what controls your — it's the only control

22  you have of the aircraft so —.

**Page 15**

1   Q   So are you taught that whenever you do repairs to

2   a flight control system on an airplane, you want to make

3   sure when you're done that it functionally works the way

4   it's supposed to?

5   A   Yes.

6   Q   So you know as an A and P going in, without

7   having been told in a given manual, that you're supposed to

8   do a functional check of that control system after working

9   on it; right?

10  A   That sounds right.

11  Q   And where do you go to decide what functional

12  check to do once you work on a control system?

13  A   To the maintenance manual for that type of

14  aircraft.

15  Q   In a 1900 the flight controls are typically moved

16  by cable and pulley systems, aren't they?

17  A   Yes.

18  Q   Mechanical systems?

19  A   Yes.

20  Q   And from time to time you have to disconnect some

21  of the those cables to do work on the systems?

22  A   Yes.

**Page 16**

1   Q   Are you taught in A and P school that there's

2   some value when you disconnect cables to keep tension on

3   the rest of the cable system when you disconnect them so

4   that you don't cause problems elsewhere down the line?

5   A   Yes.

6   Q   They — they teach that at the very beginning,

7   huh?

8   A   That's — they might have.  It's a — it's a

9   general thing.  I mean it's — if you ask me specifically

10  do I remember from A and P school 15 odd years ago, no I

11  don't.  But —

12  Q   Well, I'm sure?

13  A   — I mean it's a general practice.

14  Q   But it makes sense?

15  A   Yeah —

16  Q   You —

17  A   — you don't want cables —

18  Q   You don't want cables loose elsewhere along the

19  run?

20  A   Right.

21  Q   What can happen, for example, if they are loose

22  along the run?

**Page 17**

1   A   It could come off a pulley theoretically.

2   Q   So what's the process that you use to keep the

3   tension on the cable?  Let's say if you're working the far

4   back of plane on a cable that runs all the way to the

5   front.  You need to disconnect it back here to do

6   something.  What's the process you use to keep the tension

7   toward the front of the plane on the cable?

8   A   You have to — you — you pinch of cables in

9   between usually two wooden or phenolic type blocks.  You —

10  Q   Phenolic?  Could you tell us what that is?

11  A   It's — it's a material that's — I don't even

12  know.  I couldn't tell you the chemical composition.

13  It's — it's —

14  Q   Well —

15  A   — it's kind of like plastic, but it's not.  I

16  really don't know what it is.  You know, it's a — it's

17  phenolic.

18  Q   Just in a very basic level.

19  A   It —

20  Q   We're using terms here that the —

21  (Proceedings participants speaking at the same time.)

22  A   It looks —

62003-25

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - -x

                            :

COLGAN AIR, INC.,                 :

                            :

          Plaintiff,      :

                            :

       vs.               :  Civil Action

                            :  No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,     :

                            :

         Defendant.      :

                            :

- - - - - - - - - - - - - - - - - - -x

McLean, Virginia

Friday, June 24, 2005

Videotaped deposition of JAMES DESMOND, witness,

called for examination by counsel for the defendant,

pursuant to notice, at the offices of Thomas B. Almy, Esq.,

Dombroff & Gilmore, P.C., 1676 International Drive,

Penthouse, McLean, Virginia, before Malynda D. Whiteley, a

Registered Professional Reporter and a notary public in and

for the State of Virginia, beginning at 9:21 a.m., when

were present on behalf of the respective parties:

Page 110

1   Q   -- direction --
2   A   You know, I don't know how the book states that.
3   Does the book state that, or does to book say, "Up travel,
4   up tab travel"? I think the book -- I think your book --
5   you represent Beech. I think your book states, "Up tab
6   travel". It doesn't state, "nose up", "nose down". I
7   think it just relates to --
8   Q   The tab itself?
9   A   -- the relative degrees that you were taking of
10  whatever you are doing. It doesn't revert to the aircraft
11  itself.
12  Q   But as a part of your check, having done some
13  work on a control surface, you want to -- you want to be
14  sure, don't you, that when you turn the wheel to go nose
15  up, the control surface is moving in the correct
16  direction to go nose up?
17  A   Oh, yeah.
18  Q   Okay. So you try and do that as a part of
19  your -- your check?
20  A   If my ass is sitting in the seat in here.
21  Absolutely.
22  Q   But you did not participate at all in the checks

Page 111

1   of the --
2   A   No.
3   Q   -- trim tab system following this --
4   A   No, sir --
5   Q   -- service?
6   A   -- I did not.
7   Q   You relied upon Mr. Kinan, Mr. Battaglia,
8   Mr. Servis, and others who were involved in that; correct?
9      MR. ALMY: Object to the form.
10  But you can answer, if you can.
11  A   Did I reply upon them?
12     BY MR. JONES:
13  Q   In your process of approving -- --
14  A   I --
15  Q   -- the package.
16  A   -- I don't really rely -- in approving the
17  package, yes.
18  Q   Okay. Did you later become aware of what the
19  NTSB's finding was as to why the aircraft accident
20  occurred?
21  A   Did I become aware of it? Yeah, at some point I
22  did, yes.

Page 112

1   Q   And what's your understanding of the NTSB's --
2   A   They're --
3   Q   -- findings?
4   A   -- saying that the cable was in backwards or the
5   drum was in backwards, causing the deflection to work
6   opposite of what it should. I believe. I guess.
7      I don't really like to read that. I have the
8   whole report at home I took off the Internet, but I don't
9   really like to read that because you just saw me break
10  down. And, you know I'm going to do -- you -- you keep
11  this up, I'm going to break down again.
12  Q   I certainly don't mean to have that happen.
13  A   You know, I mean it was a rough thing, you know.
14  Q   If --
15  A   I take things pretty hard sometimes. People
16  don't think I do, but I do.
17  Q   If the cable was rigged such that the system was
18  operating in the opposite direction, should the checks we
19  just discussed have caught it?
20  A   No, because, like, what I'm saying to you -- I
21  don't -- as far as if the book does say just relative to
22  the tab -- I don't know the verbiage in the book. I'm not

Page 113

1   sure of the verbiage, how -- what they're saying in the
2   book. Are they saying, "tab up," or "nose up," or -- you
3   know. I'm not sure what they're saying -- how they're
4   stating it in the book.
5      Like, they'll give you, let's say, six degrees up
6   travel limit for you to check, up tab travel limit. I
7   believe that's way the book is written. They're not
8   stating -- I don't think they're stating, "up travel limit
9   nose down". I don't think they're saying it like that.
10  Q   Well, didn't we just agree that part of the
11  process of checking the flight control system after having
12  worked on it is to be sure that the control surfaces are
13  moving in the correct direction for the input given?
14  A   I would, yeah. I said I would.
15  Q   So if -- if this --
16  A   But I'm not referring to the book. I'm not
17  quoting out of the book. I don't know what the book says.
18  I don't the book here in front of me. I would have to
19  refer to book to see that what the book says to answer that
20  specific question the way you're asking it.
21  Q   You just --
22  A   You know, what I'm saying?

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - -x

                              :

COLGAN AIR, INC.,            :

                              :

            Plaintiff,     :

                              :

       vs.              : Civil Action

                         : No. 1:05 cv 213

RAYTHEON AIRCRAFT COMPANY,   :

                              :

          Defendant.     :

                              :

- - - - - - - - - - - - - - - - - -x

                       McLean, Virginia

                       Thursday, June 23, 2005

    Videotaped deposition of DANIEL ROBERT KINAN, witness,

called for examination by counsel for the defendant,

pursuant to notice, at the offices of Mark A. Dombroff,

Esq., Dombroff & Gilmore, P.C., 1676 International Drive,

Penthouse, McLean, Virginia, before Malynda D. Whiteley, a

Registered Professional Reporter and a notary public in and

for the State of Virginia, beginning at 1:07 p.m., when

were present on behalf of the respective parties:

**Page 10**

1   Q  And did you pick that place because it was close
2  by?
3   A  Yes.
4   Q  And just generally what types of things did you
5  learn at your — your aviation mechanics school?
6   A  Pretty much every -- every system in a -- in a
7  general sense as far as hydraulics; pneumatics;
8  electronics; air frame; you know, you name it. In a
9  generally sense as far as aircraft go, they cover a little
10  bit of everything.
11   Q  But it's generally all aircraft, not just
12  specific to a given model; right?
13   A  Correct.
14   Q  And they teach you how to follow maintenance
15  manuals, for example, when you do repair work?
16   A  Yeah, they -- they definitely do, yes.
17   Q  You learn about flight controls on an airplane?
18   A  Yes.
19   Q  What they are and what they do?
20   A  Sure do.
21   Q  Were you taught that flight controls are a
22  critical aspect of an aircraft?

**Page 11**

1   A  The most critical.
2   Q  Is it part of that when you trained that every
3  time you do some work on a flight control of an aircraft,
4  that you do an operational check afterward?
5   A  That's -- yeah, absolutely.
6   Q  It makes sense?
7   A  Makes -- it just makes perfect sense.
8   Q  And you're trying to determine that the flight
9  surfaces travel their complete distance of travel; right?
10   A  Yeah.
11   Q  And that they're traveling the right direction;
12  right?
13   A  Correct.
14   Q  Those are the two critical things you're trying
15  to figure out when you do operational checks after work on
16  a flight control system?
17   A  Oh, you're -- you're basically trying to see that
18  everything works as it is -- as it was when it came in; or
19  if not, to its altered state. I mean, just -- it -- it
20  needs to be absolutely correct.
21   Q  And when you completed that course, did you have
22  to take a test?

**Page 12**

1   A  Yes, I did.
2   Q  To get your A and P?
3   A  Yes, I did.
4   Q  And you took that?
5   A  I sure did.
6   Q  Passed it the first time?
7   A  Yes.
8   Q  When did you receive your A and P?
9   A  The exact date --
10   Q  Roughly.
11   A  Is probably -- I want to say August of '01.
12   Q  A month before 9/11?
13   A  Correct.
14   Q  Where did you go to work?
15   A  Colgan Air was -- actually I had applied to a few
16  places. I was going to go to American Eagle; and they
17  called me after 9/11 and said, "Sorry. No way."
18      So I called up Velma Valentine, who was the
19  hiring manager at that time. And she said, "No, we're not
20  hiring; but yes, we have a spot in Hyannis, because we
21  can't get anyone to work down there." And I said, "Well,
22  I'd love to work there; and I do not mind working on the

**Page 13**

1  Cape. I'd like to work on the Cape." And so it worked out
2  great. So --
3   Q  And you were from where originally?
4   A  I was from Pembroke, Massachusetts. That's about
5  half an hour south of Boston.
6   Q  What did you do when you started at Colgan?
7   A  I worked as a mechanics' helper, the first thing.
8  They call you to work as a mechanics' helper for a certain
9  period of time -- I don't recall what it is -- before you
10  can actually sign anything off.
11   Q  But you were already an A and P when you became a
12  mechanics' helper?
13   A  Yes.
14      MR. JONES: Let's mark that.
15      (The training report was marked Defendant's
16      Exhibit No. 8 for identification.)
17      BY MR. JONES:
18   Q  Mr. Kinan, we're handing you what we've marked as
19  Exhibit 8. This is a document that was produced by
20  Colgan's counsel in response to a request that we had made
21  to receive information about the mechanics that were
22  involved, and this appears to be a table of training that