UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) DOCKET NO: 05cv10155 PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) DOCKET NO: 05cv10364 PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' EXPERT JOHN GOGLIA

NOW COME the defendants and hereby move the Court for an order disqualifying plaintiffs' expert, John Goglia. Defendants have filed an accompanying Memorandum of Law in support of this motion.

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 19, 2007.

/s/ Tory A. Weigand
_____

RAYTHEON DEFENDANTS,
By Counsel,

/s/ Tory A. Weigand
_____

Peter C. Knight, BBO # 276000
Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Phone: 617-439-7500

-AND-

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS 67202
Phone: (316) 265-9311

2

# EXHIBIT "1"

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 | Aircraft Registration Number: N240CJ |
|---|---|---|
| | Occurrence Date: 08/26/2003 | Most Critical Injury: Fatal |
| | Occurrence Type: Accident | Investigated By: NTSB |

## Location/Time

| Nearest City/Place Yarmouth | State MA | Zip Code 02675 | Local Time 1540 | Time Zone EDT | |
|---|---|---|---|---|---|
| Airport Proximity: Off Airport/Airstrip | | Distance From Landing Facility: 4 | | Direction From Airport: 180 | |

## Aircraft Information Summary

| Aircraft Manufacturer Beech | Model/Series 1900D | Type of Aircraft Airplane |
|---|---|---|
| Sightseeing Flight: No | Air Medical Transport Flight: No | |

## Narrative

Brief narrative statement of facts, conditions and circumstances pertinent to the accident/incident:

HISTORY OF FLIGHT

On August 26, 2003, at 1540 eastern daylight time, a Beech 1900D, N240CJ, operated by Colgan Air Inc. as flight 9446 (d.b.a. US Airways Express), was destroyed when it impacted water near Yarmouth, Massachusetts. The certificated airline transport pilot and certificated commercial pilot were fatally injured. Visual meteorological conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA), Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New York. An instrument flight rules flight plan was filed for the repositioning flight conducted under 14 CFR Part 91.

According to data from Federal Aviation Administration (FAA) air traffic control (ATC), the flight departed runway 24 at Hyannis about 1538. Shortly after takeoff, the flightcrew declared an emergency and reported a "runaway trim." The airplane flew a left turn and reached an altitude of approximately 1,100 feet. The flightcrew subsequently requested to land on runway 33, and the air traffic control tower (ATCT) controller cleared the flight to land on any runway. No further transmissions were received from the flightcrew.

Witnesses observed the airplane in a left turn, with a nose-up attitude. The airplane then pitched nose-down, and impacted the water "nose first."

According to the cockpit voice recorder (CVR), the flightcrew completed the Before Start checklist between 1523 and 1530; however, there was no record of the First Flight Of The Day checklist being completed after engine start.

At 1523:30, the captain called for the Before Start checklist.

At 1523:43, the first officer stated, "preflight's complete. cockpit scan complete." The captain replied, "complete."

At 1523:58, the first officer stated, "maintenance log, release, checked the aircraft." The captain replied, "uhhhh. maintenance and release on aircraft. The captain subsequently identified that the DFDR was inoperative, and confirmed that the minimum equipment list (MEL) was still open.

At 1525:11, the captain began to start the right engine, before being interrupted. Approximately 1 minute later, after a conversation with maintenance personnel over the radio, the captain resumed the starting of the right engine.

At 1529:29, as the captain was starting the left engine, the flightcrew began non-pertinent conversation, which lasted about 30 seconds.

---

FACTUAL REPORT - AVIATION                                                    Page 1

| National Transportation Safety Board | NTSB ID: NYC03MA183 | |
| FACTUAL REPORT AVIATION | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

**Narrative**     (Continued)

At 1530:04, the captain called for the After Start checklist. After completing the After Start checklist items, the first officer announced the checklist "complete."

At 1530:21, the captain continued the previous non-pertinent conversation, followed 10 seconds later with, "all right we're ready to taxi with HOTEL."

At 1530:50, the flightcrew began a conversation about the flight plan to ALB, taxiing the airplane, and which pilot would fly the airplane. The conversation lasted for about 4 minutes.

At 1535:14, during the Taxi checklist, the first officer stated, "...three trims are set." The first officer then called the Taxi checklist "complete."

At 1535:26, the flight crew began a non-pertinent discussion about a landing airplane. The discussion lasted about 1 minute and 27 seconds.

At 1537:00, the airplane was holding short of runway 24.

At 1537:17, the captain stated, "all right. forty six is ready." The flightcrew then began to announce several items, which were identified as being on the Before Takeoff checklist; however, the checklist was not called for.

At 1538:07, the controller cleared Colgan flight 9446 for takeoff on runway 24.

At 1538:08, the flightcrew initiated a takeoff on runway 24.

At 1538:40, the first officer stated "V1...rotate."

At 1538:46, the captain stated, "...we got a hot trim..." At that time, according to the digital flight data recorder (DFDR), the elevator trim moved from approximately -1.5 degrees (nose down) to -3 degrees at a speed consistent with the electric trim motor.

At 1538:48, the captain stated, "kill the trim kill the trim kill the trim."

At 1538:50, the captain stated, "roll back...roll back roll back roll back roll back." According to the DFDR, the elevator trim then moved from approximately -3 degrees to -7 degrees at a speed greater than the capacity of the electric trim motor.

At 1538:56, the captain stated, "roll it back roll my trim..."

At 1539:00, the captain stated, "do the electric trim disconnect..."

At 1539:04, the captain instructed the first officer to, "go on the controls" with him.

At 1539:14, the captain instructed the first officer to retract the landing gear.

At 1539:18, the captain instructed the first officer to retract the flaps. The first officer responded that they were "up."

At 1539:21, the captain declared an emergency regarding a runaway trim and requested to return to the airport. The controller acknowledged the emergency and offered the option of the left or right downwind for runway 24.

At 1539:33, the captain instructed the first officer to reduce the engine power.

From 1539:49 to 1540:03, the captain instructed the first officer to "pull the breaker." The first

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Narrative**     (Continued)

officer queried the captain as to its location.

At 1540:30, the captain requested to land on runway 33.   The controller acknowledged the transmission and cleared the flight to land on runway 33.

The recording ended at 1540:47.

The accident occurred during the hours of daylight; located approximately 41 degrees, 37 minutes north longitude, and 70 degrees, 15 minutes west latitude.

PERSONNEL INFORMATION

Captain

The captain held an airline transport pilot certificate, with a rating for airplane multiengine land, and was type rated in the Beech 1900D. His most recent FAA first class medical certificate was issued on March 18, 2003. The captain was hired by Colgan Air on July 16, 2001, and initially flew as a first officer on the Beech 1900D. He received a Beech 1900D type rating on January 8, 2003.   The captain's most recent proficiency check was completed on June 5, 2003. The captain had accumulated a total flight time of 2,891 hours; of which, 451 hours were as pilot in command of a Beech 1900D, and 913 hours were as second in command of a Beech 1900D.

First Officer

The first officer held a commercial pilot certificate with ratings for airplane single engine land, airplane multiengine land, and instrument airplane.   His most recent FAA first class medical certificate was issued on August 22, 2003. The first officer was hired by Colgan Air on October 22, 2002, and assigned to the Beech 1900D. His most recent proficiency check was completed on November 3, 2002. The first officer had accumulated a total flight time of 2,489 hours; of which, 689 hours were in a Beech 1900D.

Quality Assurance Inspector

The quality assurance inspector received an airframe and powerplant certificate in 1986. He worked for several companies within the aviation industry and was hired by Colgan Air in June, 2002. The quality assurance inspector had no prior experience on the Beech 1900 before his employment at Colgan Air.   He received 40 hours of formal training for the Beech 1900, and on the job (OJT) training as well.

Lead Maintenance Technician

The lead maintenance technician that replaced the elevator trim tab cable received his airframe and powerplant certificate in September, 2001.   He was hired by Colgan Air on October 2, 2001.   He received approximately 94.5 hours of formal training on the Beech 1900, and OJT. The lead maintenance technician had previously replaced a forward elevator trim tab cable on a Beech 1900C with a former employer.

Lead Maintenance Technician

The second lead maintenance technician that assisted in replacing the elevator trim tab cable received his airframe and powerplant certificate in September, 2001. He was hired by Colgan Air on October 2, 2001. He received approximately 72 hours of formal training on the Beech 1900, and OJT.

AIRCRAFT INFORMATION

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID:  NYC03MA183 | |
|---|---|---|
| | Occurrence Date:  08/26/2003 | |
| | Occurrence Type:  Accident | |

**Narrative**     (Continued)

The airplane was manufactured in 1993, and equipped with two Pratt & Whitney PT6A engines. On January 3, 2003, Colgan Air leased the airplane from Raytheon Aircraft Credit Corporation, and it entered service on January 4, 2003.

At the time of the accident, the airplane had accumulated 16,503.5 hours of operation; of which, 1,219.1 hours were generated by Colgan Air. The airplane had accumulated a total of 24,637 cycles; of which, 1,765 cycles were generated by Colgan Air. The left engine had accumulated 15,245 total hours of operation, and 3,120 hours since the last overhaul. The right engine had accumulated 16,180 total hours of operation, and 3,120 hours since the last overhaul.

The accident flight was the first flight after maintenance had been performed on the airplane, which included replacement of the forward elevator pitch trim tab cable.

METEOROLOGICAL INFORMATION

At 1556, the reported weather at HYA was: winds variable at 6 knots; visibility 10 miles; sky clear; temperature 78 degrees Fahrenheit; dew point 68 degrees Fahrenheit; altimeter 29.86 inches of mercury.

FLIGHT RECORDERS

Cockpit Voice Recorder

The airplane was equipped with a Fairchild model A-100A CVR. The CVR was transported to the NTSB, Office of Research and Engineering, on August 27, 2003. A CVR group convened on August 28, 2003, and a transcript was prepared of 17 minutes 17 seconds of the approximate 34-minute recording. Recordings prior to the flightcrew entering the cockpit were not transcribed.

According to the CVR Group Chairman's report, the exterior of the CVR showed evidence of structural damage. The interior of the recorder and the tape were found intact and in good condition. The recording consisted of four channels of "poor to good" quality audio information.

Flight Data Recorder

The airplane was equipped with a L3COM (Fairchild) Model F1000 (S/N 00505) DFDR. The DFDR was transported to the NTSB Office of Research and Engineering on August 27, 2003. A DFDR readout was then performed.

The DFDR recorded data in a digital format using solid-state Flash Memory as the recording medium. Although the recorder was damaged by impact forces, the memory module was not damaged. The timing of the DFDR data was correlated to air traffic control and CVR timing.

A total of 96.7 hours of data on the DFDR was referenced to compare previous flights to the accident flight. As a result of the maintenance performed on the airplane, the pitch trim values and elevator position values for the DFDR were out of calibration, and the DFDR was noted as inoperative on the maintenance records. However, the DFDR recorded data for the accident flight. Although the exact pitch trim and elevator position values were not known, the data provided trend information.

There was no DFDR data recovered that indicated an operational check of the elevator trim system was performed after maintenance. However, the DFDR required 115 volts of AC current to operate. The electric trim system could operate using the 28-volt DC bus, without having the 115-volt AC bus powered.

| National Transportation Safety Board | NTSB ID: NYC03MA183 | |
| FACTUAL REPORT AVIATION | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

**Narrative** (Continued)

The DFDR values recorded for the pitch trim control position, at the beginning of the flight, were approximately 2 degrees negative. Shortly after takeoff, the pitch trim control values changed to approximately 3 degrees negative, where they remained for a period of about 10 seconds. The pitch trim control values then moved to approximately 7 degrees negative, where they remained for the duration of the flight. The data also revealed that after takeoff, the airspeed continued to increase to approximately 210 knots, and then to 250 knots during the descent.

The digital flight data recorded (DFDR) indicated that shortly after declaring an emergency, the airplane began a left turn while climbing to 1,100 feet. Engine torque was reduced, and the airplane remained at 1,100 feet while maintaining an airspeed of approximately 207 knots and 30 degrees of left bank for 15 seconds. The airplane then pitched down to 8 degrees negative (nose down) and the airspeed increased to 218 knots. The airplane rolled right and left due to control inputs, and the pitch attitude decreased to 30 degrees negative.

AIRCRAFT PERFORMANCE

A performance study was completed to evaluate radar and DFDR data. For the purpose of the study, the un-calibrated DFDR values were corrected to known values during ground operations, and assumed values during the accident flight.

Specifically, the elevator pitch trim was shifted 2.07 degrees nose-up based on a maximum nose down value of approximately -5 degrees, rather than -7 degrees.

The performance study was completed in conjunction with a DFDR study. They revealed that during the takeoff roll, the elevator did not leave the trailing edge down stop as soon, and did not move in the trailing edge up direction as rapidly, as during previous takeoffs. A kinematics extraction revealed that approximately 60 pounds of control column pull force was required immediately after rotation, which was greater than previous flights.

Once airborne, the airplane performance was consistent with the elevator pitch trim moving to the full nose down position. The airplane climbed to approximately 1,100 feet msl, before descending into the water. As the airspeed exceeded 200 knots during the flight, and approached 250 knots during the descent, the control column forces increased to approximately 250 pounds.

WRECKAGE INFORMATION

The investigative team arrived near the accident scene on August 26 and 27, 2003. The airplane came to rest in approximately 18 feet of water, about 300 feet from the Yarmouth shore. The majority of the wreckage, including both engines, was recovered on August 28. The team examined wreckage, operational records, maintenance records, and DFDR data on-scene from August 27 through August 31.

The left engine exhibited impact and salt-water immersion damage. The engine was recovered stripped of the cowling, right engine mount, and right exhaust stub. The shroud and guide vane inner and outer drums were circumferentially scored at the second stage power turbine. The first stage compressor blades were bent forward and opposite the direction of rotation, and the shroud exhibited circumferential scoring.

The right engine exhibited impact and salt-water immersion damage. The engine was recovered with some portions of the cowling attached. The shroud and guide vane inner and outer drums were circumferentially scored at the second stage power turbine. The first stage compressor blades were bent forward and opposite the direction of rotation, and the shroud exhibited circumferential scoring.

Portions of both wings, the cockpit, and fuselage were recovered, and exhibited impact damage. The

| National Transportation Safety Board | NTSB ID: NYC03MA183 |
| **FACTUAL REPORT** | Occurrence Date: 08/26/2003 |
| **AVIATION** | Occurrence Type: Accident |

**Narrative**      (Continued)

empennage was recovered partially intact. Approximately all of the right elevator was recovered, except for the outboard edge. The inboard portion of the right elevator remained attached to the horizontal stabilizer at the two inboard hinge locations. About 5 feet of the left elevator was recovered, and attached at one inboard hinge. Both elevator balance weights were recovered. An approximate 7-foot section of left horizontal stabilizer was found intact, and an approximate 5-foot section of right stabilizer spar was visible. The rudder remained attached to the vertical stabilizer.

The right and left elevator trim tabs were found attached to the elevator. The right and left elevator trim actuators were found near the full nose-down elevator trim position. The electric elevator trim servo was found attached to the base of the horizontal stabilizer. The left and right trim tab cables remained wrapped around their respective trim actuator drums. Elevator trim continuity was confirmed from the elevator trim tabs to the cargo door area. Due to fragmentation forward of the cargo door area, trim cable continuity could not be confirmed from the elevator to the cockpit pedestal. However, the cockpit pedestal with elevator trim drum and manual trim wheel was recovered. Further examination of the manual trim wheel revealed that it was found near the 6.5 units of nose-up trim position.

MAINTENANCE

Colgan Air employed its own maintenance technicians that performed all of the necessary scheduled and phase maintenance on its fleet. The fleet was maintained under a continuous airworthiness maintenance program (CAMP), which was developed by Colgan Air and approved by the FAA. The CAMP was a series of checks and inspections, which incorporated guidance from the Beech 1900D airliner maintenance manual (AMM). The various inspections included in the CAMP were: Preflight Inspections, Routine Inspections, Detail Inspections, and Structural Inspections. The Preflight Inspections were due every 4 flight-days, and the Routine Inspections were due every 8 flight-days. The Detail Inspections were divided into six phases, and each phase was performed every 220 flight-hours, which resulted in a completed Detail Inspection after every 1,320 flight hours. The Structural Inspections were set forth by the manufacturer.

Each Detail Inspection focused specifically on a certain part of the airplane. They were: Wings, Powerplant and Nacelles, Flight Compartment/Cabin, Environmental Systems, Landing Gear, and Aft Fuselage/Empennage.

On August 23, 2003, the accident airplane underwent a Detail Six phase check (Aft Fuselage/Empennage). The phase check was interrupted, and the remaining work was deferred on the morning of August 24, per the general maintenance manual (GMM). Ten revenue flight legs were completed that day, and the Detail Six phase check resumed on the evening of August 24, and concluded on August 26.

A maintenance technician conducted a free play check of the left and right elevator trim actuators as part of the Detail Six phase check. Both actuators failed the check, and the failure required replacement of the actuators. During the replacement of the actuators, the technician did not remove the elevators as required by the CAMP and AMM. Additionally, the technician did not maintain pressure on (block) the elevator trim tab cables, nor did the AMM require that the cables be blocked. Subsequently, the cable unwound off the forward drum. On August 25, during the operational check of the system, the forward elevator trim tab cable "fell off" the forward drum, seized, and kinked.

A new forward elevator trim tab cable was ordered. Due to an incorrect right elevator trim actuator part number, a new right elevator trim actuator was also ordered. That evening, two lead maintenance technicians replaced the forward elevator trim tab cable, and two other maintenance technicians replaced the right elevator trim actuator. The forward elevator trim tab cable drum had already been removed by personnel on the dayshift, but no turnover notes were forwarded. The

| National Transportation Safety Board | NTSB ID: NYC03MA183 | |
| FACTUAL REPORT | Occurrence Date: 08/26/2003 | |
| AVIATION | Occurrence Type: Accident | |

**Narrative**    (Continued)

AMM and Colgan Air policies did not require turnover notes from one shift to another.

The two lead maintenance technicians that replaced the forward elevator trim tab cable did not use a lead wire as instructed by the AMM. They marked the topmost cable pulleys with a "T" instead. A lead maintenance technician and the quality assurance inspector stated that following the maintenance; a successful operational check of the system was completed. They added that the operational check included running the manual and electric elevator trim several times, with the quality assurance inspector at the cockpit and tailbone during different phases of the operational check.

The two lead maintenance technicians that installed the new cable stated that they referred to the AMM, and were not confused handling the drum or interpreting the drum illustration.

The airplane was returned to service on August 26.

Review of the Beech AMM Chapter 27-30-04, "Elevator Trim Tab Cables - Maintenance Practices," revealed that the trim drum was depicted backwards. Although the drum could not be installed backwards, it was possible to mis-route the cable around the drum, and reverse the trim system. The depiction in the maintenance manual showed the nose-up trim tab cable emanating from the aft end of the drum, rather than the forward end. It also showed the nose-down cable emanating from the forward end of the drum, rather than the aft. However, the "FORWARD AS INSTALLED" arrow included in the depiction would have to be ignored, and the cables would have to be crossed once along the cable run, to reverse the system and secure the cable ends into the turnbuckles.

Further review of the Beech AMM revealed that there was no procedure for an operational check contained in Chapter 27-30-04. Nor was there a referral to Chapter 27-30-09, "Elevator Trim - Maintenance Practices...Elevator Trim Operational Check;" which did contain a procedure for an operational check of the elevator trim system.

MEDICAL AND PATHOLOGICAL INFORMATION

An autopsy was performed on the pilots by The Commonwealth of Massachusetts, Department of Health, Office of the Chief Medical Examiner, Boston, Massachusetts.

Toxicological testing was conducted on the pilots at the FAA Toxicology Accident Research Laboratory, Oklahoma City, Oklahoma.

TESTS AND RESEARCH

Elevator Trim System

The cockpit controls consisted of a manual trim wheel; and two switches on each yoke, which activated an electric elevator trim motor. When moved in the nose up direction, and using "0" as a point of origin, the manual wheel was indexed "0, AFT, 3, FWD, 6, -, UP, -, -, 10, -, UP," and terminated at a white box. When moved in the nose down direction, using "0" as a point of origin, the manual wheel was indexed "0, -, DN, -, 3," and terminated at a white box. The trim wheel connected to a sprocket, driving a chain to a second sprocket, connected to the elevator trim cable drum. The sprockets, chain, and trim drum were located inside the cockpit pedestal. One side of the drum had a slotted side or key way, which connected to the sprocket, and prevented the drum from being installed backwards. The approximate 55-foot long forward elevator trim cable was wrapped around the drum and secured with a cable lock pin.

According to a representative from Raytheon Aircraft, the electric trim system could be disconnected in any of four ways: depressing the trim disconnect switch located on each control wheel, moving the ELEV TRIM switch located on the pedestal to the OFF position, pulling the ELEV

---

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Narrative**    (Continued)

TRIM circuit breaker, or positioning the BAT, L GEN, R GEN switches to OFF. Additionally, the representative added that the electric trim could be overridden by manually rolling the trim wheel.

When the 55-foot cable was routed correctly and wrapped around the drum, it resulted in two approximate equal portions of cable emanating from the trim drum. Both portions of cable proceeded downward below the floor of the cockpit. The nose-up cable portion was the forward cable originating from the drum, and approximately 27 feet 5 inches long. It traveled through sets of pulleys as it proceeded downward, and became the right cable traveling aft underneath the floor of the airplane cabin. The nose-up cable then crossed over a final pulley, becoming the left cable, before mating with the left turnbuckle. The end of the nose-up cable had left hand threads, which screwed into the left hand threads of the left turnbuckle. The left hand threads could not be screwed into the right turnbuckle, as it had right hand threads. The turnbuckles were located near the mid-point of the airplane.

The nose-down cable was the aft cable originating from the drum, and approximately 27 feet 2 inches long. It traveled through sets of pulleys as it proceeded downward, and became the left cable traveling aft underneath the floor of the airplane cabin. The nose-down cable then crossed over a final pulley, becoming the right cable, before mating with the right turnbuckle. The end of the nose-down cable had right hand threads, which screwed into the right hand threads of the right turnbuckle. The right hand threads could not be screwed into the left turnbuckle, as it had left hand threads.

From the turnbuckles, additional cables continued to travel aft and upward, terminating at the elevator trim actuators, which were attached via pushrods to the elevator trim tabs located at the inboard portion of the right and left elevator. The electric trim motor was installed at the base of the vertical stabilizer, beyond the first set of turnbuckles.

On the accident airplane, although the approximate 55-foot elevator trim cable was fragmented due to impact forces, five sections were recovered (assuming that the forward and aft cable emanating from the drum are counted as two sections). Three sections corresponded to the nose-up cable portion, and two sections corresponded to the nose-down cable portion. Cable marks made by the cable lock pin and digital flight data recorder bridle were used for orientation points, as was the intact elevator trim cable removed and replaced before the accident flight. Using those points and the intact elevator trim cable as a reference, the three sections of the nose-up portion of the accident cable measured to within 1.2 inches of the intact cable. However, the three sections resulted in the forward cable emanating from the trim drum terminating in the right turnbuckle, rather than the left turnbuckle (see Airworthiness Group Chairman's Factual Report for more detail and depictions).

An approximate 7-foot section of cable, which corresponded to the middle section of the nose-down portion of cable, was not recovered.

A mis-rigging demonstration was conducted at Raytheon Aircraft, Wichita, Kansas, on October 14 and 15, 2003. During the demonstration, the manual trim wheel was indexed to "0" when the elevator trim tabs were placed in the neutral position. Although the system was purposely mis-rigged, an operational check of the elevator trim system revealed the error. When the cockpit trim wheel was positioned nose down, the elevator trim tabs moved in a nose-up direction. When the cockpit trim wheel was positioned nose-up, the elevator trim tabs moved in a nose-down direction. When the electric trim motor was activated in one direction, the elevator tabs moved in the corresponding correct direction, but the trim wheel moved opposite of the commanded electric trim direction.

The mis-rigging demonstration also revealed that when the manual trim wheel was in the nose-down direction, the trim indicator in the cockpit moved well past the nose down limit, and the trim tabs were in the full nose up position. When the manual trim wheel was moved in the nose-up direction,

| National Transportation Safety Board | NTSB ID: NYC03MA183 | |
|---|---|---|
| **FACTUAL REPORT AVIATION** | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

**Narrative**    (Continued)

the trim indicator did not reach the nose up limit. Rather, the indicator stopped near positive "3" units, and the trim tabs were in the full nose down position.

Flight Simulator

The Operations Group convened at Flight Safety International, Flushing, New York, on November 25, 2003. Using an FAA certified Level "D" Beech 1900 full motion simulator, the group attempted six simulations of the accident flight. The chief pilot of Colgan Air and an FAA inspector manipulated the controls during the flight simulations.

During all simulations, the elevator trim was positioned full nose-down shortly after takeoff. The simulator pilot attempted to maintain aircraft control using different power settings to obtain different airspeeds. Five of the six simulations resulted in an uncontrolled descent into terrain. On the sixth test, the simulator pilot was able to partially maintain control of the airplane by gradually reducing engine power and maintaining an airspeed of approximately 170 knots. However, he had to return to the airport area at 170 knots, and touchdown at 180 knots. The airplane did not land on a runway, and subsequently impacted terrain.

ADDITIONAL INFORMATION

Sterile Cockpit Concept

Review of the Colgan Air flight operations policy and procedures manual (FOPP), revealed that during the periods of taxiing, takeoff, and altitudes below 10,000 feet indicated, the "flight crewmembers will not participate in any activity which could distract any flight crewmember from the performance of their duties or which could interfere in any way with the proper conduct of those duties." Examples given by the manual, of activities that were to be avoided, included "engaging in non-essential conversations."

Aircraft Maintenance and Flight Log

The FOPP also detailed the captain's responsibilities for determining the airworthiness of the airplane. It stated:

"Review/Verify the Aircraft Maintenance & Flight Log back to the latest valid Airworthiness Release and ensure that all discrepancies between that Airworthiness Release and the current log page are corrected or properly deferred. If the Captain determines that the aircraft status is other than listed on the release, the Captain will inform System Control and correct the inconsistency."

Review of the Aircraft Maintenance and Flight Log form for the accident flight revealed a discrepancy, which stated, "Flt. Data Recorder needs downloading due to mx. Replacement of Elevator trim cable (Fwd. Most)." The discrepancy was signed by a maintenance technician. The discrepancy was released and signed by the same maintenance technician, in accordance with an approved minimum equipment list, and supporting control number.

The captain noted to the first officer that the DFDR was an open item on the MEL; however, there is no record of the captain mentioning the replacement of the forward elevator trim cable.

Checklists

Review of Colgan Air's Beech 1900 Company Flight Manual revealed that it was FAA approved and contained the expanded normal checklist procedures, as well as abnormal and emergency procedures, and policies; all of which applied to Colgan Air flight operations.

The manual had specific guidance on the use of normal checklists and procedures, and was to be used

| National Transportation Safety Board<br>FACTUAL REPORT<br>AVIATION | NTSB ID: NYC03MA183 | |
|---|---|---|
| | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

**Narrative**     (Continued)

to "ensure all safety items are accomplished." All of the checklists were to be accomplished using a challenge and response method (except for the climb and after landing checklists). The manual also gave guidance in the event that the checklist flow was interrupted. It stated;

"Interruptions to checklists increase the possibility of items being missed, which in turn may create hazards to flight operations. When interruptions occur, the crew must give consideration to restarting the checklist from the beginning, taking into consideration such factors as the length and type of interruption."

The following checklist excerpts were to have been accomplished by the accident flightcrew. The details of the checklists are focused on the elevator trim system and its related components and systems.

Preflight Checklist

The Preflight Checklist included, "Elevator, Elevator Tab, Static Wicks (4 each side) - Check & Verify Tabs are in Neutral Position."

Before Start Checklist

The Before Start Checklist required that the captain review the dispatch release and sign it. He was also required to review the maintenance release and the dispatch release with the first officer.

First Flight of the Day Checklist

After the engines had been started the checklist required that a "First Flight of the Day" check be performed by the flightcrew. The expanded items of the "Electric Pitch Trim" check included;

ELEV TRIM Switch....................................................................................................ON
Pilot's and Copilot's Trim Switches..........................................................................CHECKED

                    1) Pilot's trim will override copilot's trim.
                    2) Movement of only half switch will not activate trim.

Trim Disconnect Switch.........................................................PRESS TO 2ND LEVEL AND RELEASE

                    1) PITCH TRIM OFF Annunciator - ILLUMINATED
                    2) Electric Pitch Trim - DEACTIVATED

ELEV TRIM Switch..............................................................................................OFF then ON

                    PITCH TRIM OFF Annunciator - EXTINGUISHED

Electric Pitch Trim.............................................................................................SET FOR TAKEOFF

Taxi Checklist

The expanded items of the Taxi Checklist included;

---

FACTUAL REPORT - AVIATION

| National Transportation Safety Board **FACTUAL REPORT AVIATION** | NTSB ID: NYC03MA183 |
|---|---|
| | Occurrence Date: 08/26/2003 |
| | Occurrence Type: Accident |

**Narrative**    (Continued)

Trims......................................................................................................
...............................SET

Verify proper trim indicator positions (UP 2 Units UC & 3 Units UE, ROLL 0, YAW 0) and state "SET."

Weight and Balance

Review of all available data revealed that the airplane was within the center of gravity envelope for the flight.

Safety Results

As a result of the Colgan Air flight 9446 investigation, and the investigation into Air Midwest flight 5481 (DCA03MA022), the Safety Board issued fourteen recommendations to the FAA pertaining to FAR Part 121 air carrier maintenance. One of the recommendations was specific to maintenance procedures for the Beech 1900.

During the course of the Colgan Air investigation, Raytheon Aircraft released Temporary Revision 27-9 of the AMM on September 12, 2003, titled "Manual Elevator Trip Operational Check." Raytheon then released Safety Communiqu 234 on September 24, 2003, and Temporary Revision 27-10 on October 22, 2003, which revised AMM 27-30-04 and updated the depiction of the forward trim drum. The FAA issued Airworthiness Directive (AD2003-20-10), which instructed operators to incorporate TR-27-9, and provided a change to the maintenance illustration depicting the forward trim drum.

Following the accident, Colgan Air issued an alert to its employees regarding possible trim problems. Colgan Air also expanded the trim check procedure on the First Flight of the Day and the Taxi checklists.

Wreckage Release

The wreckage was released to a representative of the owner's insurance company on August 31, 2003.

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 |
| **FACTUAL REPORT** | Occurrence Date: 08/26/2003 |
| **AVIATION** | Occurrence Type: Accident |

## Landing Facility/Approach Information

| Airport Name | Airport ID: | Airport Elevation | Runway Used | Runway Length | Runway Width |
|---|---|---|---|---|---|
| Barnstable Municipal Airport | HYA | 55 Ft. MSL | 33 | 5252 | 150 |

Runway Surface Type: Asphalt

Runway Surface Condition: Dry

Type Instrument Approach: NONE

VFR Approach/Landing: None

## Aircraft Information

| Aircraft Manufacturer | Model/Series | Serial Number |
|---|---|---|
| Beech | 1900D | UE-40 |

Airworthiness Certificate(s): Transport

Landing Gear Type: Retractable - Tricycle

| Homebuilt Aircraft? No | Number of Seats: 21 | Certified Max Gross Wt.    17060 LBS | Number of Engines: 2 |
|---|---|---|---|

| Engine Type:<br>Turbo Prop | Engine Manufacturer:<br>Pratt & Whitney | Model/Series:<br>PT6A-67D | Rated Power:<br>1214 HP |
|---|---|---|---|

### - Aircraft Inspection Information

| Type of Last Inspection | Date of Last Inspection | Time Since Last Inspection | Airframe Total Time |
|---|---|---|---|
| Continuous Airworthiness | 08/26/2003 | 0 Hours | 16503 Hours |

### - Emergency Locator Transmitter (ELT) Information

| ELT Installed? Yes | ELT Operated? No | ELT Aided in Locating Accident Site? No |
|---|---|---|

## Owner/Operator Information

| Registered Aircraft Owner | Street Address<br>9709 East Central | | |
|---|---|---|---|
| Raytheon Aircraft Credit Corporation | City<br>Wichita | State<br>KS | Zip Code<br>67206 |

| Operator of Aircraft | Street Address<br>10677 Aviation Lane | | |
|---|---|---|---|
| Colgan Air Inc. | City<br>Manassas | State<br>VA | Zip Code<br>20110 |

| Operator Does Business As: US Airways Express | Operator Designator Code: NSVA |
|---|---|

### - Type of U.S. Certificate(s) Held:

Air Carrier Operating Certificate(s): Flag Carrier/Domestic

| Operating Certificate: | Operator Certificate: |
|---|---|

Regulation Flight Conducted Under: Part 91: General Aviation

Type of Flight Operation Conducted: Positioning

FACTUAL REPORT - AVIATION    Page 2

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 |
|---|---|
| FACTUAL REPORT | Occurrence Date: 08/26/2003 |
| AVIATION | Occurrence Type: Accident |

## First Pilot Information

| Name | City | State | Date of Birth | Age |
|---|---|---|---|---|
| On File | On File | On File | On File | 39 |

| Sex: M | Seat Occupied: Front | Principal Profession: Civilian Pilot | Certificate Number: On File |
|---|---|---|---|

Certificate(s):    Airline Transport; Commercial

Airplane Rating(s):  Multi-engine Land; Single-engine Land; Single-engine Sea

Rotorcraft/Glider/LTA: None

Instrument Rating(s):  Airplane

Instructor Rating(s):  None

Type Rating/Endorsement for Accident/Incident Aircraft? Yes     Current Biennial Flight Review? 06/05/2003

| Medical Cert.: Class 1 | Medical Cert. Status: Valid Medical--w/ waivers/lim. | Date of Last Medical Exam: 03/18/2003 |
|---|---|---|

| - Flight Time Matrix | All A/C | This Make and Model | Airplane Single Engine | Airplane Mult-Engine | Night | Instrument Actual | Instrument Simulated | Rotorcraft | Glider | Lighter Than Air |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Time | 2891 | 1364 | | | | | | | | |
| Pilot In Command(PIC) | | 451 | | | | | | | | |
| Instructor | | | | | | | | | | |
| Last 90 Days | 211 | 211 | | 211 | | | | | | |
| Last 30 Days | 76 | 76 | | 76 | | | | | | |
| Last 24 Hours | 7 | 7 | | 7 | | | | | | |

| Seatbelt Used? Yes | Shoulder Harness Used? Yes | Toxicology Performed? Yes | Second Pilot? Yes |
|---|---|---|---|

## Flight Plan/Itinerary

Type of Flight Plan Filed: IFR

| Departure Point | State | Airport Identifier | Departure Time | Time Zone |
|---|---|---|---|---|
| Hyannis | MA | HYA | 1538 | EDT |

| Destination | State | Airport Identifier |
|---|---|---|
| Albany | NY | ALB |

Type of Clearance:  IFR

Type of Airspace:   Class D

## Weather Information

Source of Briefing:      Company

Method of Briefing:

| FACTUAL REPORT - AVIATION | Page 3 |
|---|---|

This space for binding

| National Transportation Safety Board | NTSB ID: NYC03MA183 | |
|---|---|---|
| **FACTUAL REPORT** **AVIATION** | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

## Weather Information

| WOF ID | Observation Time | Time Zone | WOF Elevation | WOF Distance From Accident Site | Direction From Accident Site |
|---|---|---|---|---|---|
| HYA | 1556 | EDT | 55 Ft. MSL | 4 NM | 180 Deg. Mag. |

| Sky/Lowest Cloud Condition: Clear | Ft. AGL | Condition of Light: Day |
|---|---|---|

| Lowest Ceiling: None | Ft. AGL | Visibility: 10 | SM | Altimeter: 29.86 | "Hg |
|---|---|---|---|---|---|

| Temperature: 23 °C | Dew Point: 20 °C | Wind Direction: Variable | Density Altitude: Ft. |
|---|---|---|---|

| Wind Speed: 6 | Gusts: | Weather Condtions at Accident Site: Visual Conditions |
|---|---|---|

| Visibility (RVR): Ft. | Visibility (RVV) SM | Intensity of Precipitation: |
|---|---|---|

Restrictions to Visibility: None

Type of Precipitation: None

## Accident Information

| Aircraft Damage: | Aircraft Fire: | Aircraft Explosion |
|---|---|---|

Classification:

| - Injury Summary Matrix | Fatal | Serious | Minor | None | TOTAL |
|---|---|---|---|---|---|
| First Pilot | 1 | | | | 1 |
| Second Pilot | 1 | | | | 1 |
| Student Pilot | | | | | |
| Flight Instructor | | | | | |
| Check Pilot | | | | | |
| Flight Engineer | | | | | |
| Cabin Attendants | | | | | |
| Other Crew | | | | | |
| Passengers | | | | | |
| - TOTAL ABOARD - | 2 | | | | 2 |
| Other Ground | | | | | |
| - GRAND TOTAL - | 2 | | | | 2 |

This space for binding

| National Transportation Safety Board<br>**FACTUAL REPORT<br>AVIATION** | NTSB ID: NYC03MA183 | |
|---|---|---|
| | Occurrence Date: 08/26/2003 | |
| | Occurrence Type: Accident | |

**Administrative Information**

Investigator-In-Charge (IIC)

Robert J. Gretz

Additional Persons Participating in This Accident/Incident Investigation:

Floyd A James
FAA AAI-100
Washington, DC

Robert  Ramey
Raytheon Aircraft Company
Wichita, KS

Dave   Vance
Colgan Air Inc.
Manassas, VA

Richard  Bunker
MA Aeronautics Commission
Boston, MA

Thomas   Berthe
Pratt & Whitney Canada
South Burlington, VT

FACTUAL REPORT - AVIATION

# EXHIBIT "2"

John Goglia
73 Auburn Street
Saugus, MA 01906
(781) 233-3675 fax (781) 233-7777
gogliaj@yahoo.com

July 21, 2006,

Mary Schiavo
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Re:    Dean v. Raytheon et al., 05cv10155

REPORT

Dear Ms. Schiavo,

I, John Goglia, I have in excess of 47 years of experience in aviation, including as Member of the Board of the National Safety Transportation Board (NTSB), and mechanic at US Airways. My resume and fee schedule are appended.

This report encompasses observations and opinions related to an aircraft accident occurring on August 26, 2003 involving N240CJ, a Beech (Raytheon) 1900D Airliner operated by Colgan Air, Inc., as flight number 9446.

My opinion and report are based on my reviewing the items in the attached list, an inspection of the wreckage of this aircraft, onsite visits to the maintenance facility at Colgan Air, the inspection of a Beech 1900 at Raytheon Aircraft in Wichita, Kansas, my service as the NTSB Board Member on the scene at the January 2003 crash of a Beech 1900D in Charlotte, North Carolina and my over 47 years of experience.

OBSERVATIONS:

On August 26, 2003, at 1540 eastern daylight time, a Beech 1900D, N240CJ, operated by Colgan Air Inc. as flight 9446 (d.b.a. US Airways Express), was destroyed when it impacted water near Yarmouth, Massachusetts. The certificated airline transport pilot and certificated commercial pilot were fatally injured. Visual meteorological conditions prevailed for the flight that departed Barnstable Municipal Airport (HYA), Hyannis, Massachusetts; destined for Albany International Airport (ALB), Albany, New York. An instrument flight rules flight plan was filed for the repositioning flight conducted under 14 CFR Part 91.

**EXHIBIT 5**

According to data from Federal Aviation Administration (FAA) air traffic control (ATC), the flight departed runway 24 at Hyannis about 1538. Shortley after takeoff, the flightcrew declared an emergency and reported a "runway trim." The flightcrew flew a left turn and reached an altitude of approximately 1,100 feet. The flightcrew subsequently requested to land on runway 33, and the air traffic control tower (ATCT) controller cleared the flight to land on any runway. No further transmissions were received from the flightcrew. Witnesses observed the airplane in a left turn, with a nose-up attitude. The airplane then pitched nose-down, and impacted the water "nose first."

According to the cockpit voice recorder (CVR), the flightcrew completed the Before Start checklist between 1523 and 1530. At 1523:30, the captain called for the Before Start checklist. At 1523:43, the first officer stated, "preflight's complete. Cockpit scan complete." The captain replied, "complete." At 1523:58, the first officer stated, "maintenance log, release, checked the aircraft." The captain replied, "maintenance and release on aircraft." The captain subsequently identified that the DFDR was inoperative, and confirmed that the minimum equipment list (MEL) was still open.

At 1525:11, the captain began to start the right engine, before being interrupted. Approximately 1 minute later, after a conversation with maintenance personnel over the radio, the captain resumed the starting of the right engine. At 1529:29 the captain began to start the left engine. At 1530:04, the captain called for the After Start checklist. After completing the After Start checklist items, the first officer announced the checklist "complete."

At 1530:50, the flightcrew began a conversation about the flight plan to Albany, NY, taxiing the airplane, and which pilot would fly the airplane. The conversation lasted for about 4 minutes. At 1535:14, during the Taxi checklist, the first officer stated, "...three trims are set." The first officer then called the Taxi checklist "complete." At 1537:00, the airplane was holding short of runwqy 24. At 1537:17, the captain stated. "all right. Forty six is ready." The flightcrew then began to announce several itmes, which were identified as being on the Before Takeoff checklist.

At 1538:07, the controller cleared Colgan flight 9446 for takeoff on runway 24. At 1538:08, the flightcrew initiated a takeoff on runway 24. At 1538:40, the first officer stated "V1...rotate."

At 1538:46, the captain stated, "...we got a hot trim..." At that time, according to the digital flight data recorder (DFDR), the elevator trim moved from approximately -1.5 degrees (nose down) to -3 degrees at a speed consistent with the electric trim motor. At 1538:48, the captain stated, "kill the trim kill the trim kill the trim." At 1538:50, the captain stated, "roll back...roll back roll back roll back roll back." According to the DFDR, the elebator trim then moved from approximately -3 degrees to -7 degrees at a speed greater than the capacity of the electric trim motor.

At 1538:56, the captain stated, "roll it back roll my trim..." At 1539:00, the captian stated, "do the electric trim disconnect..." At 1539:04, the captain instructed the first officer to, "go on the controls" with him. At 1539:14, the captain instructed the first office to retract the flaps. The first officer responded that they were "up."

At 1539:21, the captain declared an emergency regarding a runaway trim and requested to return to the airport. The controller acknowledged the emergency and offered the option of the left or right downwind for runway 24. At 1539:33, the captain instructed the first officer to reduce the engine power. From 1539:49 to 1540:03, the captain instructed the first officer to "pull the breaker."

At 1540:30, the captain requested to land on runway 33. The controller acknowledged the transmission and cleared the flight to land on runway 33.

The recording ended at 1540:47. The accident occurred during the hours of daylight; located approximately 41 degrees, 37 minutes north longitude, and 70 degrees, 15 minutes west latitude.

PERSONNEL INFORMATION

The captain held an airline transport pilot certificate, with a rating for airplane multiengine land, and was type rated in the Beech 1900D. His most recent FAA first class medical certificate was issued on March 18, 2003. The captian was hired by Colgan Air on July 16, 2001, and initially flew as a first officer on the Beech 1900D. He received a Beech 1900D type rating on January 8, 2003. The captian's most recent proficiency check was completed on June 5, 2003. The captain had accumulated a total flight time of 2, 891 hours; of which, 451 hours were as pilot in command of a Beech 1900D, and 913 hours were as second in command of a Beech 1900D. In my opinion, his experience behavior and operation of this flight was excellent and met or exceeded the the FAA and aviation industry requirements and standards.

The first officer held a commercial pilot certificate with ratings for airplane single engine land, airplane multiengine land, and instrument airplane. His most recent FAA first class medical certificate was issued on August 22, 2003. The first officer was hired by Colgan Air on October 22, 2002, and assigned to the Beech 1900D. His most recent proficiency check was completed on November 3, 2002. The first officer had accumulated a total flight time of 2,489 hours; of which, 689 hours were in a Beech 1900D. In my opinion, his experience behavior and operation of this flight was excellent and met or exceeded the the FAA and aviation industry requirements and standards.

The quality assurance inspector received an airframe and powerplant certificate in 1986. He worked for several companies within the aviation industry and was hired by Colgan Air in June, 2002. He received 40 hours of formal training for the Beech 1900, and on the job (OJT) training as well. His training and experience is typical for the regional industry and this typical industry experience should be known to planned for and adapted to by Raytheon and other industry providers.

The lead maintenance technician that replaced the elevator trim tab cable received his airframe and powerplant certificate in September, 2001. He was hired by Colgan Air on October 2, 2001. He received approximately 94.5 hours of formal training on the Beech 1900, and OJT. The lead maintenance technician had previously replaced a forward elevator trim tab cable on a Beech 1900C with a former employer. His training and experience is typical for the regional industry and this typical industry experience should be known to, planned for and adapted to by Raytheon and other industry providers.

The second lead maintenance technician that assisted in replacing the elevator trim tab cable received his airframe and powerplant certificate in September, 2001. He was hired by Colgan Air on October 2, 2001. He received approximately 72 hours of formal training on the Beech 1900, and on the job training. His training and experience is typical for the regional industry and this typical industry experience should be known to, planned for and adapted to by Raytheon and other industry providers.

AIRCRAFT INFORMATION

The airplane was manufactured in 1993, and equipped with two Pratt & Whitney PT&A engines. The engines are not at issue herein. On January 3, 2003, Colgan Air leased the airplane from Raytheon Aircraft Credit Corporation, and it entered service on January 4, 2003. However the airplane was originally designed as a general aviation aircraft, the Queen Air and the King Air. The manuals and in particular the maintenance manuals were written for general aviation usage. The standards for manuals developed for commercial, scheduled passenger service are far more exacting than manuals for general aviation. In 1997 regional airlines had to meet Part 121 standards, but 1900 manuals were produced under the old less exacting standards. In particular manuals for commercial series should be able to be used by persons with a wide range of skills by mechanics early in their career to those with years of experience. This is especially true with regional aircraft such as the Beech 1900. Mechanics often start their careers on regional aircraft and then progress on to larger planes and engines. A manufacturer must take the skill levels of the workforce into consideration when writing, editing or changing their manuals. Raytheon failed to do so. This failure is further evidenced by the fact that Beech 1900 flight manuals changed and became more extensive over time, but the 1900 maintenance manuals did not. Raytheon did not provide sufficient effort to validate the process contained in manuals to ensure they were adequate to guide individual mechanics through the process.

METEOROLOGICAL INFORMATION

At 1556, the reported weather at Hyannis was: winds variable at 6 knots; visibility 10 miles; sky clear; temperature 78 degrees Fahrenheit; dew point 68 degrees Fahrenheit; altimeter 29.86 inches of mercury. There are no issues relative to the weather nor did the weather contribute to this crash.

FLIGHT RECORDERS

The airplane was equipped with a Fairchild model A-100A Cockpit Voice Recorder (CVR). Transcripts from the NTSB were prepared. Plaintiff's experts also prepared a more complete transcript and provided to me. I have had access to the actual recording. The audio information is poor to good.

The recording of the pilots' communication reveals professional communications, good work skills and excellent crew resource management. There is very, very little extraneous communications. I have worked on many crashes over my long career and these communications were among the "cleanest" meaning containing among the least extraneous discussions of any I have heard or read. The pilots in my opinion complied with cockpit communication rules.

The airplane was equipped with a L#COM (Fairchild) Model F1000 (S/N 00505)Digital flight Data Recorder (DFDR). A DFDR readout was taken from the recorder. The DFDR recorded data is in a digital format. Although the recorder was damaged by impact forces, documents state the memory module was not damaged. The timing of the DFDR data was correlated to air traffic control and CVR timing and this information was provided to me.

AIRCRAFT PERFORMANCE

Available information indicates the elevator pitch trim was shifted 2.07 degrees nose-up based on a maximum nose down value.

Performance studies provided to me reveal that during the takeoff roll, the elevator did not leave the trailing edge down stop as soon, and did not move in the trailing edge up direction as rapidly, as during previous takeoffs. The data indicates a kinematics extraction revealed that approximately 60 pounds of control column pull force was required immediately after rotation, which was greater than previous flights.

The data indicates that once airborne, the airplane performance was consistent with the elevator pitch trim moving to the full nose down position. The airplane climbed to approximately 1,100 feet above sea level, before descending into the water. As the airspeed exceeded 200 knots during the flight, and approached 250 knots during the descent, the control column forces increased to approximately 250 pounds which is impossible for the pilots to counteract and sustain with human force.

MAINTENANCE

Colgan Air employed its own maintenance technicians that performed all of the necessary scheduled and phase maintenance on its fleet. From my own experience I am familiar with Colgan's maintenance and operations. The FAA inspected and approved Colgan's maintenance facilities and procedures. Raytheon also inspected, audited and reviewed Colgan's maintenance of Raytheon's aircraft. Furthermore, U.S. Air audited and

approved Colgan's operations.   The fleet was maintained under a continuous airworthiness maintenance program (CAMP), which was developed by Colgan Air and approved by the FAA.   The CAMP was a series of checks and inspections, which incorporated guidance from the Beech 1900D airliner maintenance manual (AMM).   The various inspections included in the CAMP were: Preflight Inspections, Routine Inspections, Detail Inspections and Structural Inspections.   The Preflight Inspections were due every 4 flight-days and the Routine Inspections were due every 8 flight-days.

The documents herein indicate the Detail Inspections were divided into six phases, and each phase was performed every 220 flight-hours, which resulted in a completed Detail Inspection after ever 1,320 flight hours.   The Structural Inspections were set forth by the manufacturer.   Each Detail Inspection focused specifically on a certain part of the airplane.   They were: Wings, Powerplant and Nacelles, Flight Compartment/Cabin, Environmental Systems, Landing Gear, and Aft Fuselage/Empennage.

Records indicate On August 23, 2003, the accident airplane underwent a Detail Six phase check (Aft Fuselage/Empennage).   The remaining work was deferred on the morning of August 24, per the general maintenance manual (GMM).   Ten revenue flight legs were completed on that day.   The Detail Six phase check resumed on the evening of August 24, and concluded on August 26.

A maintenance technician conducted a free play check of the left and right elevator trim actuators as part of the Detail Six phase check.   Both the actuators failed the check, and the failure required replacement of the actuators.   During the replacement of the actuators, the cable unwound off the forward drum.   On August 25, during the operational check of the system, the forward elevator trim tab cable "fell off" the forward drum, seized and kinked.   There is some discussion about why this occurred and this is further indication that the manual is deficient and fails to provide adequate guidance to line mechanics, but, it is irrelevant to the cause of the crash, because once the cable came off and the kinking occurred, the cable had to be replaced.

A new forward elevator trim tab cable was ordered.   Due to an incorrect right elevator trim actuator part number, a new right elevator trim actuator was also ordered.   There was difficulty obtaining the proper parts because they were not available.   Two lead maintenance technicians replaced the forward elevator trim tab cable and two other maintenance technicians replaced the right elevator trim actuator.   The forward elevator trim tab cable drum had already been removed by personnel on the dayshift. No turnover notes were forwarded because.   Neither the Raytheon/Beech AMM nor Colgan Air policies required turnover notes from one shift to another.

The two lead maintenance technicians that replaced the forward elevator trim tab cable did not use a lead wire but instead, they marked the topmost cable pulleys with a "T". Industry standards and practice expect the mechanics will develop practical procedures and practice; in their work.   This is an accepted industry practice of which the FAA is aware and allows.   A lead maintenance technician and the quality assurance inspector stated that following the maintenance a successful operational check of the system was

completed. They added that the operation check included running the manual and electric elevator trim several times, with the quality assurance inspector at the cockpit and tailbone during different phases of the operations check.

It is my opinion that it is indeed possible for the mechanic to have checked the system several times with personnel in the cockpit and at the tail, yet still have misrigged the system because of defective and deficient design of the aircraft. The trim wheel system has contradictory wording on the wheel and the pedestal. The wheel says [aft] and the pedestal says [forward]. Depending on which you are looking at, you get opposing results. This conflicting and confusing marking is defective and does not meet industry standards. I know of no other series of other planes marked in this confusing manner.

Review of the Beech AMM Chapter 27-30-04, "Elevator Trim Tab Cables – Maintenance Practices," revealed that the trim drum was depicted backwards. Although the drum could not be installed backwards, the backwards depiction caused the mechanics to mis-route the cable around the drum, and reverse the trim system. The depiction in the maintenance manual showed the nose-up trim tab cable coming from the aft end of the drum, rather than the forward end. It also showed the nose-down cable coming from the forward end of the drum, rather than the aft. These errors were the cause of this crash. Maintenance personnel are visual and the backward depiction was a trap. The erroneous drawing could and did cause the mechanic to misroute the cable around the drum. By relying on the erroneous drawings, the trim system could easily be reversed, and it was.

Diagrams are included in airliner maintenance manuals when the procedures are confusing, difficult and not adequately explainable by words alone. Diagrams, when included, are almost always looked at and relied upon by mechanics, just as the old saying goes, "A picture is worth a thousand words." This is especially true in aviation. Raytheon/Beech were responsible not only to make sure the diagram was correct in the first place, but they should have had a process in place to continuously review the manuals, for errors and not wait on operators to discover problems for Raytheon or to find and correct errors plane crash by plane crash. Finding their mistakes only after fatal crashes is clearly contrary to Raytheon's airworthiness requirement. They were obligated to review the manual and validate the procedures for critical flight systems before providing those instructions to the operators.

After the fatal crash of a Beech 1900D in January 2003, a Raytheon representative told me he was shocked to find out that Raytheon/Beech did not validate their procedures. The fact that once they discovered this deficiency they did not fully review and correct the AMM after the fatal January 2003 accident is further indication of the deficiency of their manuals and the deficiency and disarray of their system to correct and identify and find these errors. Raytheon was at meetings or concerning meetings of the January 2003 crash in January 2003 when we identified a critical flight system with erroneous maintenance instructions and the fact that they did not shows that they did not comply with their obligations of continuing airworthiness. The Raytheon/Beech 1900D is among the weakest AMM's for continued airworthiness I have ever seen in my 47 years of experience. Scheduled airlines (those operating under part 121) are required to operate at

the highest levels of safety. The deficient instructions in this manual made it much, much more difficult to operate safely.

The Beech AMM was also fatally flawed because there was no procedure for an operational check contained in Chapter 27-30-04. Another fatal flaw is the fact that there was no referral to Chapter 27-30-09, "Elevator Trim – Maintenance Practices…Elevator Trim Operational Check," which did contain a procedure for an operational check of the elevator trim system. However, airliner maintenance manuals are thousands of pages, if using the paper version, or billions of data bytes if using the electronic version. You cannot scan or "flip the pages" in an electronic version unless you know the specific reference. Electronic items can be difficult or impossible to find.

The failure to include the operational check with the maintenance procedures, or to include a reference or referral to the operational check, is also an unacceptable defect in the manual which can and did cause this accident. The mechanics were left to improvise and cannot be faulted for doing so. More shocking than these defects is that Raytheon never completed a validation procedure on their manual to discover just such defects and errors. After a fatal crash in Charlotte, NC, in January 2003 of this same type of plane, just seven months before this fatal crash, Raytheon officials stated to me they realized their maintenance manuals had problems, and represented that they were starting a validation procedure on the manual. However, at the time of this crash, they had not finished it. At no time did they warn Colgan, or its mechanics or its pilots of the prolems with its manuals, despite knowing of Colgan's and others' reliance on the maintenance manuals and procedures. Most tragic is the fact that Raytheon discovered, after the Charlotte crash and before the Hyannis crash that they neglected or failed to included the operational check procedure in Chapter 27-30-04, "Elevator Trim Tab Cables." However, despite the fact that Raytheon had many, many calls with Colgan mechanics to guide, direct and assist Colgan over the three days Colgan mechanics worked on the trim tab cables, they did not inform the Colgan mechanics of the missing check procedures or reference to the operational check procedures. Instead, according to the sworn deposition of a Raytheon employee, they mailed to Colgan, the day of this crash, via surface U.S. "snail mail," the amended manual pages including a reference to the check procedures. Raytheon's failure to inform the mechanics of these errors, though they had discovered them, and then putting the corrections in the mail the day of the crash, is unacceptable and with the backwards drawings and other manual defects, caused this crash and the deaths of these two pilots. Flawed, erroneous or incorrect maintenance manuals and instructions can, and did, render unworthy the Beech 1900D.

MEDICAL AND PATHOLOGICAL INFORMATION

I reviewed the autopsy performed on the pilots by The Commonwealth of Massachusetts, Department of Health, Office of the Chief Medical Examiner, Boston, Massachusetts, and the toxicological testing conducted on the pilots at the FAA Toxicology Accident Research Laboratory, Oklahoma City, Oklahoma. I find absolutely no indication of any physical impairment of the pilots. There were no substances in their systems.

TESTS AND RESEARCH

Quoting from information provided in this case, the cockpit controls consisted of a manual trim wheel; and two switches on each yoke, which activated an electric elevator trim motor. When moved in the nose up direction, and using "0" as an point of origin, the manual wheel was indexed at "0, AFT, 3, FWD, 6, -, UP, -, -, 10, -, UP," and terminated at a white box. When moved in the nose down direction, using "0" as a point of origin, the manual wheel was indexed at "0, -, DN, -, 3," and terminated at a white box. The trim wheel connected to a sprocket, driving a chain to a second sprocket, connected to the elevator trim cable drum. The sprockets, chain and trim drum were located inside the cockpit pedestal. One side of the drum had a slotted side or key way, which connected to the sprocket, and prevented the drum from being installed backwards. The approximate 55-foot long forward elevator trim cable was wrapped around the drum and secured with a cable lock pin.

Raytheon Aircraft documents in the case indicate the electric trim system could be disconnected in any of four ways but that the electric trim would be overridden by manually rolling the trim wheel. I reviewed mis-rigging demonstration information from demonstrations conducted at Raytheon Aircraft, Wichita, Kansas, on October 14 and 15, 2003. When the cockpit trim wheel was positioned nose down, the elevator trim tabs moved in a nose-up direction. When the cockpit trim wheel was positioned nose-up, the elevator trim tabs moved in a nose-down direction. But, when the electric trim motor was activated in one direction, the elevator tabs moved in the corresponding correct direction, but the trim wheel moved opposite of the commanded electric trim direction. Therefore, the electric trim still worked and the electric trim indicators would have appeared normal to the pilots.

The mis-rigging demonstration established that when the manual trim wheel was in the nose-down direction, the trim indicator in the cockpit showed nose down, but the trim tabs at the back of the plane were in the full nose up position. When the manual trim wheel was moved in the nose-up direction, the trim indicator moved in the nose-up direction, but the trim tabs on the back of the plane were in the full nose down position.

Flight Simulator

I reviewed the simulator recreations of the flight convened at Flight Safety International, Flushing, New York, on November 25, 2003. Using an FAA certified Level "D" Beech 1900 full motion simulator, the group attempted six simulations of the accident flight. The chief pilot of Colgan Air and an FAA inspector manipulated the controls during the flight simulations. Raytheon was also present.

During all simulations, the elevator trim was positioned full nose-down shortly after takeoff. The simulator pilot attempted to maintain aircraft control using different power settings to obtain different airspeeds. Five of the six simulations resulted in an uncontrolled descent into terrain.

On the sixth test, the simulator pilot was able to partially maintain control of the airplane by gradually reducing engine power and maintaining an airspeed of approximately 170 knots. However, he had to return to the airport area at 170 knots, and touchdown at 180 knots. The airplane did not land on a runway, and subsequently impacted terrain.

ADDITIONAL INFORMATION

Aircraft Maintenance and Flight Log

I reviewed information concerning the FOPP which detailed the captain's responsibilities for determining the airworthiness of the airplane. It stated:

> "Review/Verify the Aircraft Maintenance & Flight Log back to the latest valid Airworthiness Release and ensure that all discrepancies between that Airworthiness Release and the current log page are corrected or properly deferred. If the Captain determines that the aircraft status is other than listed on the release, the Captain will inform System Control and correct the inconsistency."

Review of the Aircraft Maintenance and Flight Log form for the accident flight revealed a discrepancy, which stated, "Flt. Data Recorder needs downloading due to mx. Replacement of Elevator trim tab cable (Fwd. Most)." The discrepancy was signed by a maintenance technician. The discrepancy was released and signed by the same maintenance technician, in accordance with an approved minimum equipment list, and supporting control number.

It is my opinion that the Captain met his responsibilities and reviewed the log because he specifically mentioned the open Minimum Equipment List item (MEL) which is the reason they were moving the plane to Albany for further maintenance on the open MEL list. Such flights are common in the industry and the MEL items are completed and signed off on after the repositioning flight with no impact on or without affecting the airworthiness of the aircraft.

CORPORATE STRUCTURE AND SUPPORT OF THIS AIRCRAFT

The provision of this aircraft to Colgan, as well as to other aircraft operators, is not limited to the aircraft only – not just the wings, engines, fuselage, landing gear, seats, instruments etc. When a manufacturer designs and produces an aircraft for sale or lease, particularly for scheduling passenger service (Part 121 operations), the design and production of an aircraft includes, as part of the plane, the maintenance manuals and maintenance support and advice.

In my opinion, not only were the maintenance manuals defective, in that they contained hundreds of errors, including the fatal errors that caused this crash, but they were defective because Raytheon/Beech failed to complete a validation and verification procedure on their manuals. In layman's terms that means Raytheon never themselves

tested the maintenance manuals to see if mechanics of the skills and training in the industry could perform the repair and maintenance procedures as described in the manuals. Instead, Raytheon relied upon operators, meaning airlines, to find and report mistakes in Raytheon's manuals.

In the real world of flight operations that means Raytheon in some cases did not find the mistakes in the manuals until people died. Raytheon, as amply demonstrated by its responsibility under continuous airworthiness management under requirements, must provide instruction to operators to maintain the plane, review its procedures and find and correct its own errors. That is an obligation and a responsibility a manufacturer cannot shirk or seek to push off on operators. The maintenance manual is part and parcel of the plane. This manual was clearly defective, Raytheon before this crash knew the manual had problems. Raytheon has started, but had not yet finished, finding and correcting errors in the manuals and maintenance instructions. Even when it knew of errors in the manual pertaining to the repair on which Raytheon representatives were advising Colgan during August 24 – 26, 2003, it failed to warn or even advise Colgan mechanics of the problems in the manual, or even extend proper advice and assistance. Raytheon instead mailed a correction on the morning of the crash. It is not reasonable to expect Colgan maintenance and Colgan pilots to discover mistakes made by Raytheon, when Raytheon, while supposedly assisting the mechanics through the procedures, failed to detect and correct Raytheon's mistakes.

The corporate structuring, or rather frequent restructuring, and the rapid turnover of Raytheon management also contributed to cause this crash. The frequent changing of senior management is a negative event, and prevented necessary monitoring and repair of the problems and deficiencies. There was no continuity of process to improve instructions to operators.

An internal Raytheon memo among the material produced in this case summarized the plight of Colgan in relying on Raytheon for support. Colgan was "jumping through hoops." Raytheon failed to provide the proper management and support of the 1900D, and this lack of corporate responsibility directly caused or contributed to this fatal crash.

I reserve the right to correct or edit this report or opinion as new information and reports become available and I anticipate responding to other experts' opinions when they are provided.

Respectfully submitted,

John Goglia

## Materials Reviewed

**Depositions from Colgan v Raytheon:**

| Colgan Employees | Raytheon Employees |
|---|---|
| ▪ Barrett, John <br> ▪ Barth, Patti <br> ▪ Battaglia, Dominick <br> ▪ Desmond, James <br> ▪ Gonzales, Kevin <br> ▪ Kinan, Daniel Robert <br> ▪ Ratliff, Larry <br> ▪ Rodriguez, Miguel <br> ▪ Sarluca, Perry <br> ▪ Servis, Scott <br> ▪ Vallejo, Thomas Jeffery <br> ▪ Vance, David | ▪ Crowe, Willard Vol. 1 & 2 <br> ▪ Ernzen, Kimberly <br> ▪ Green, Tim <br> ▪ Jaerger, Ronald <br> ▪ Jolicoeur, Mike <br> ▪ McCarthy, Matthew <br> ▪ Peay, Tom <br> ▪ Pedroja, Robert <br> ▪ Ramey, Robert Vol. 1 & 2 <br> ▪ Rosenberg, David <br> ▪ Scheidt, Michael |
| Colgan Experts | Raytheon Experts |
| ▪ Irvin, James <br> ▪ Leonelli, Fred <br> ▪ Michaels, Paris | ▪ Law, Dwight <br> ▪ Nelson, Richard |

**Depositions from Dean v. Raytheon:**
1. Havnen, Donovan
2. Root, Monty
3. Crowe, Willard – Vol. 1 & 2
4. Peay, Tom
5. Scheidt, Michael

## Documents

- National Transportation Safety Board (NTSB) Factual Report for N240CJ Incident
- Mr. Don Havnen, VP of Operation Raytheon Aviation Services, letter dated 9/29/2003
- FAA Airworthiness Directive 2003-20-10
- NTSB Safety Recommendation for N233YV incident at Charlotte-Douglas International Airport
- Raytheon Aircraft Safety Communiqué No. 234 dated September 2003
- David L. Kohlman of Engineering Systems Inc., report on testing of Beech 1900D
- Raytheon Aircraft Mandatory Service Bulletin 27-3032 issued July 2003
- Yarmouth Police Department, Lieutenant Raul J. Rooney witness report
- Patrick M. Armstrong witness report
- Richard Bunker statement regarding fuel truck inspection
- Bryan Moore witness statement
- Tim Bischoff telephone interview
- Jim Kittredge telephone interview
- FAA Final Forensic Toxicology Fatal Accident Report
- NTSB Colgan Air Flight 9446 Airplane Performance Study
- NTSB Flight Data Recorder (FDR) Study
- NTSB Group Chairman's Factual Report of Investigation, Cockpit Voice Recorder (CVR).
- NTSB Aircraft Maintenance and Records Group Factual Report
- Raytheon Aircraft Company (RAC) letter by Robert Ramey (Ramey), dated May 6, 2004

- Colgan Air Party of Submission of Colgan Air to the NTSB
- RAC letter by Ramey, dated 8.12.04
- Colgan Air Beech 1900 Checklist
- Chronology of contact between Colgan Air and RAC during period August 23-26, 2003
- RAC (Ramey) letter dated 10.07.03, 10.27.03, 11.04.03, 11.06.03, 11.14.03, 11.20.03, 12.01.03, 12.22.03, FAA Compliance Review by Riddle 01.09.04, FAA letter re: Aileron and Rudder Trim System Controls (Riddle) 1.13.04, RAC (Ramey) letter dated 01.14.04, 01.23.04, 04.05.04, 04.21.04, 04.22.04, 05.04.04, 05.11.04, 05.21.04, 05.27.04, 06.02.04, 09.22.04
- Raytheon Aircraft Beech 1900D Airline Maintenance Manual (AMM) – Elevator Trim-Maintenance Practices, Elevator Trim Operational check 27-30-09.
- RAC Temporary Revision No. 27-9, dated 9.12.03
- RAC Temporary Revision No. 27-10, dated 10.22.03
- RAC Temporary Revision No. 27-12, dated 12.18.03
- Raytheon Aircraft Beech 1900D Airliner Maintenance Manual (AMM) – Elevator Control Rigging – Maintenance Practices – 27-30-02
- RAC Beech 1900D AMM – Elevator Trim Tab Cables – Maintenance Practices, Forward, Aft, Vertical & Horizontal – Elevator Trim Tab Cable Removal & Installation – 27-30-04
- RAC Beech 1900D AMM – Elevator Trim Tab Control Rigging – Maintenance Practices, Elevator Trim Tab Rigging – 27-30-05
- RAC Beech 1900D AMM – Elevator Tab Actuators – Maintenance Practices – 27-30-02
- RAC Beech 1900D AMM – Elevator Trim Tab Indicator – Maintenance Practices – 27-30-08
- RAC Beech 1900D AMM – Elevator Trim – Maintenance Practices  - 27-30-09
- RAC Beech 1900D AMM – Sixth 200-Hour Interval Detailed Inspection – 5-20-07
- RAC Publication To Be Changed, No. 2003Pcr08-05
- RAC Publication To Be Changed, No. 2003Pcr09-01.
- FAA Field Notes for the Elevator Trim System Evaluation
- NTSB Airworthiness Group Chairman's Field Notes, dated 09.05.03
- NTSB Airworthiness Group Chairman's Field Notes, dated 10.22.03
- NTSB Airworthiness Group Chairman's Factual Report of Investigation, dated 04.12.04
- Raytheon Electronic Publication System (REPS) 27-30-01-201, Revision 9, dated May 2003
- REPS 27-30-04-2001, Revision 21, dated May 2005
- Transcript of Dominick Battaglia, dated August 27, 2003.
- Transcript of Dan Kinan interview, dated 8.27.03
- Transcript of Jeff Vallejo interview, dated 8.27.03
- Videotape and still photos of a 1900D trim system
- Report of Colgan Expert, James Irvin
- Report of Colgan Expert, Paris Michaels
- Report of Colgan Expert, Frederick Leonelli
- Report of Raytheon Expert, Dwight Law
- Report of Raytheon Expert, Richard Nelson
- Table of Contents (TOC) for the NTSB Docket on this accident
- 2003 CFR Title 14 Part 21 – Certification Procedures for Products & Parts
- 2003 CFR Title 14 Part 23 – Airworthiness Standards: Normal, Utility, Acrobatic, and Commuter Category Airplanes
- 2003 CFR Title 14 Part 39 –  Airworthiness Directives
- 2003 CFR Title 14 Part 43 – Maintenance, Preventative Maintenance, Rebuilding, and Alteration
- 2003 CFR Title 14 Part 65 – Certification: Airmen Other than Flight Crewmembers
- 2003 CFR Title 14 Part 91 – General Operating and Flight Rules
- 2003 CFR Title 14 Part 121 – Operating Requirements: Domestic, Flag, & Supplemental Operations
- NTSB Docket Contents

# EXHIBIT "3"

6JWS-YX

Vol. 1, Pgs. 1-328          Exhibits 1-11

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - CONSOLIDATED UNDER

YISEL DEAN, et al.              CASE NO. 05-10155 PBS

      Plaintiffs

v.                              CA No. 05 CV 10155 PBS

RAYTHEON COMPANY, a Delaware

corporation, et al.

      Defendants

- - - - - - - - - - - - -

LISA A. WEILER, et al.

      Plaintiff

v.                              CA No. 05 CV 1034 PBS

RAYTHEON COMPANY, a Delaware

corporation, et al.

      Defendants

- - - - - - - - - - - - -

     DEPOSITION of JOHN J. GOGLIA

Monday, September 18, 2006 - 9:20 a.m.

Dwyer & Collora, LLP

600 Atlantic Avenue

Boston, Massachusets

Reporter:  Jill K. Ruggieri, RMR/CRR

EXHIBIT
3

EPPLEY  COURT  REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 14

1  A   I had interest in all of them, but I really
2      had interest in the visuals, because it's
3      such a powerful way to deliver a message, in
4      its infancy, at NTSB in its infancy, so any
5      work they do, it's curiosity more than
6      anything else.
7  Q   Okay.
8          And were you one of the people that
9      was promoting the use of visuals at the
10     NTSB?
11 A   I don't know that anybody really promoted
12     them, the lab, they were going that way
13     anyway.  If someone asked me if I thought it
14     was a good idea, I would have said yes, but
15     I don't know that I was ever asked.
16 Q   While you were with the NTSB, there were
17     five members of the NTSB?
18 A   Well, it would vary, you know, when.  There
19     is a five-member board.  Sometimes the
20     numbers diminish because people leave.
21 Q   You were one, at least one?
22 A   I was one of the five.
23 Q   And while you were there, was your level or
24     your responsibilities to the NTSB focussed

Page 15

2  A   We all have areas of interest.
3  Q   That's what I'm getting at.
4  A   Yes, my area is naturally, coming out of the
5      maintenance community, maintenance was very
6      high on my list.  Birds around the airport,
7      wildlife around the airport was a great
8      interest of mine.
9          Firefighting, which those two kind of
10     flow together, airport rescue and
11     firefighting.
12 Q   So if there were an issue of maintenance in
13     an accident or an issue of wildlife, bird
14     strike or firefighting, you would naturally
15     be involved in that investigation?
16 A   No, not in -- you need to define the word
17     "involved."
18         Let me help you, maybe.  The staff
19     are the experts.
20 Q   Right.
21 A   So the board members, you would make -- ask
22     them questions, ask them what's the status,
23     you know, in general, what's going on, but
24     you would not be participating in any

Page 16

1      meaningful way within the investigation, so
2      you would sort of be an interested observer.
3  Q   Overseeing?
4  A   Too strong a word, I think, at least the way
5      I would think overseeing.
6  Q   Okay.
7          I premarked what is referred to as
8      Goglia 2.
9  A   Mm-hmm.
10 Q   Is that a copy of your resume?
11 A   It certainly looks like it.
12 Q   Is it complete and accurate as of today?
13 A   Actually, I think there's more to be added
14     to this, but -- can you give me a minute to
15     look at it?
16 Q   Please.
17         (Witness read document.)
18 A   Mm-hmm, yes, I think -- there need to be
19     some additions, but, yes.
20 Q   Could you give us the additions?
21 A   Well, for example, I just finished a roughly
22     three-month piece of employment with a
23     company called CJ Services as their vice
24     president, 135 schedule, 135 operator, as

Page 17

1      their vice president of safety while they
2      found a replacement.  That's one jumps right
3      out.
4  Q   So you worked there for three months?
5  A   Mm-hmm.
6  Q   That's a yes?
7  A   Yes, I'm sorry.
8          I don't like this one, but the
9      professional awards is left off many, many,
10     many of them.
11 Q   Well, the professional awards, in what area
12     did you receive those awards?
13 A   Oh, I've been recognized across -- the
14     Society of Automotive Engineers, SAE, has
15     given me a number of awards for management,
16     for all the work that I did trying to raise
17     the bar and connect engineering and
18     maintenance together.
19 Q   Were these awards while you were a member of
20     the NTSB?
21 A   Yes.  They may have been something that fell
22     off the bottom in '04, but basically yes.
23 Q   For what period of time were you a member of
24     the NTSB?

5 (Pages 14 to 17)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 18

1  A  From 1995 to 2004.
2  Q  Did you resign in 2004?
3  A  My term was up.  The board members
4     receive --
5  Q  And you were not reappointed?
6        MR. BUNIS:  Wait for a question.
7  Q  Go ahead.  What were you going to say?
8  A  The board members are nominated by the
9     President for five-year terms and you're
10    confirmed by the Senate, and so I received
11    two nominations to the board.
12 Q  So in 2004, did you then go to work for CJ
13    Services?
14 A  No, CJ Services was just recently.
15 Q  Okay.
16 A  When I left the NTSB, I was recruited by
17    St. Louis University to come be a professor.
18    I really didn't want to give them full time,
19    so we negotiated a less-than-full-time
20    agreement so that I was free to do other
21    things.
22       And at that point, sometime in that
23    couple, three-month time frame after I left
24    the board, I ended up working for, loose

Page 19

1     term -- becoming involved with JDA Aviation
2     Technology Solutions in Washington, DC, to
3     do some consulting.
4  Q  So three months after you left the NTSB, you
5     were doing consulting with JDA Aviation
6     Technology?
7  A  Yes.
8  Q  What does JDA stand for?
9  A  That's Joe Del Balzo Associates.  Joe Del
10    Balzo is a former FAA administrator, ten
11    years ago.
12       And I also might add that they call
13    me the vice president of government affairs
14    for the Professional Aviation Maintenance
15    Association.  It's a $1 a year position,
16    just to -- which I'm still waiting to get my
17    first dollar.
18 Q  Okay.
19 A  Funny how that works.
20 Q  When did you go to work at St. Louis
21    University?
22 A  That was pretty quick after I left the
23    board.
24 Q  How long did you work there?

Page 20

1  A  I'm still employed there.
2  Q  Okay.
3        And you're a professor?
4  A  I'm a professor.
5  Q  What do you teach?
6  A  Right now, I teach the NTSB stuff, policy,
7     procedures, how it works.  Essentially
8     guest-lecturing in other people's classes.
9        My role there was to build the Center
10    for Integrated Emergency Response, the
11    management thereof, and trying to tie
12    together the good processes that we use in
13    airports in the event of emergencies with
14    the communities.
15       Most large airports are very good at
16    what the fire department calls mutual aid,
17    but they cross that mutual aid over areas
18    that aren't very good at mutual aid, if you
19    will, the principals, like the police, like
20    emergency responders.
21       Sometimes the -- and the politics
22    there of -- you know, it gets very
23    geographical, people get territorial.
24       So after 9/11 it really needs to be

Page 21

1     much more integrated, so that's the goal,
2     especially when you move to smaller
3     communities, away from metropolitan areas
4     like we have here, those processes are not
5     bad.  Move out to western Massachusetts, for
6     example, and it gets to be difficult for
7     them to respond to big events.
8        So we've been trying to focus on
9     taking the lessons learned and best
10    practices from the bigger communities and
11    figure out ways to integrate them into the
12    smaller communities.
13 Q  As an example, would that be a problem that
14    New York had on 9/11 when the police
15    commissioner realized that he didn't have an
16    air force but he was being attacked from the
17    air and who did he call?
18       Is that --
19 A  Similar, yes, yes.
20 Q  Yes.
21 A  Actually, it comes all the way back to TWA
22    800 and before, you know?
23       TWA 800 was way out on the end of
24    Long Island.  These little communities have

6 (Pages 18 to 21)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 74

1  A  Mm-hmm.
2  Q  You stand by that statement?
3  A  Mm-hmm.
4        But now --
5  Q  That's a yes.
6  A  Yes.
7        But now I'm no longer there to look
8    at those, so --
9  Q  Right.
10       The Charlotte accident involving the
11   Beech 1900 was January of 2003; is that
12   correct?
13  A  That's correct.
14  Q  You were with the NTSB at the time; is that
15   right?
16  A  That's correct.
17  Q  What was your role or responsibility in the
18   Charlotte accident?
19  A  I was the board member on scene, as it's
20   called, so I am the official spokesman for
21   the board.  That means for the five board
22   members.
23  Q  Is there always one member of the NTSB that
24   is designated to be the NTSB member on

Page 75

1    scene?
2  A  There is always just one.  They don't go to
3    every accident.
4  Q  No, I understand.
5  A  But, yes, there's always one.
6  Q  So you were designated for Charlotte?
7  A  Yes.
8  Q  What about the Hyannis accident?
9  A  No, I wasn't.  I believe that was member --
10   actually, I don't think we had anybody in
11   Hyannis.
12  Q  They didn't designate anyone?
13  A  No.
14  Q  Why would that be?
15  A  Ferry flight, no passengers, just a crew.
16   Could be one reason.  I'm not sure that I
17   know.
18  Q  Okay.
19       The Charlotte accident in January of
20   2003, again, you were designated as the
21   official member of the NTSB on scene, so you
22   would be the spokesman, among other things?
23  A  Correct.
24  Q  What else was your responsibility?

Page 76

1  A  To keep the family members briefed, make
2    sure that there was no obstacles in the way
3    of the IIC and the team.
4  Q  IIC?
5  A  Investigator in charge.  You know, that
6    could mean political obstacles, you know, if
7    they need to expend resources and maybe they
8    can't reach the chairman and through their
9    own chain, they don't talk to the chairman
10   directly.
11       So the board member can bring to bear
12   other resources or influences to help make
13   the job go the way it should go.
14  Q  Okay.
15       Did you actually go down to the
16   accident scene?
17  A  Oh, yes.
18  Q  More than once?
19  A  No, just once to the scene.  I was there for
20   I think three days.  You know, multiple
21   days.
22  Q  Did you meet with or communicate with
23   anybody from Raytheon?
24  A  I don't believe so.

Page 77

1        What time frame are we talking about?
2  Q  At the time you went to the scene.
3  A  At the scene?  I don't believe so.
4  Q  Okay.
5        Was anybody from Raytheon at the
6    scene?
7  A  I'm sure -- there's always the investigators
8    from the manufacturer, yes, and I'm sure
9    that we have to go back up with that
10   communication statement.  I read that to be
11   that I talked directly to somebody from
12   Raytheon.
13  Q  Right.
14  A  And that was -- that's a no, that I know of.
15  Q  All right.
16  A  But in the room full of investigators that
17   we have, I'm sure there was at least one or
18   maybe more Raytheon representatives from the
19   accident investigation area, and I may have
20   actually even said something to them, but
21   not knowing that they were from Raytheon.
22  Q  Okay.
23       The investigation focused on what
24   part of the airplane?

20  (Pages 74 to 77)

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 78

1    A    Ultimately?
2    Q    Yes.
3    A    We went to the tail, because the airplane
4         was having control problems. The flight
5         data recorder, while we were still on scene,
6         gave us some valuable information that led
7         us back there.
8    Q    Okay.
9    A    So while all the other things continued to
10        be done, a special focus will start zeroing
11        in on that area.
12   Q    And eventually, the probable cause of the
13        accident was determined by the NTSB?
14   A    Yes, yes.
15   Q    What was the probable cause?
16   A    Oh, it was misrigging the airplane, as a
17        broad statement. I don't remember verbatim
18        what it said.
19   Q    Do you know what portion of the tail was
20        misrigged?
21   A    It was an elevator.
22   Q    Not elevator trim?
23   A    Well, it could have been the trim. I don't
24        remember.

Page 79

1    Q    You don't remember?
2    A    (Witness shakes head.)
3    Q    And in connection with your investigation in
4         this case, did you ever go back and look at
5         the Charlotte accident?
6    A    No. Other than what my memory provided.
7    Q    Well, this case involves elevator trim?
8    A    Mm-hmm.
9    Q    Which is certainly different rigging from
10        elevator trim, right?
11        MR. BUNIS: Objection. I think you
12        may have misspoken.
13   A    Yes, you said the same thing twice.
14        MR. BUNIS: I think you said this
15        case involves elevator trim which is
16        certainly different from elevator trim.
17        MR. KNIGHT: Oh, did I say that?
18        Well, let me correct it.
19   Q    The case involving Hyannis involves elevator
20        trim, right?
21   A    Yes.
22   Q    The case involving Charlotte, do you know
23        whether or not that involved elevator
24        rigging as opposed to trim?

Page 80

1    A    I believe it was elevator rigging.
2    Q    So that's a different set of system?
3    A    Different cables. Related but different.
4    Q    Well, it's in the -- it's connected to the
5         elevator, but it's --
6    A    Yes.
7    Q    It works differently?
8    A    Yes.
9    Q    And you indicated that you were responsible
10        for that investigation as the designated
11        NTSB member for Charlotte?
12   A    Responsible's not the right word, probably.
13   Q    Okay.
14        Why don't you --
15   A    Because the IIC is responsible for the
16        investigation.
17   Q    Right.
18   A    The board member is responsible for
19        communications in a number of different
20        areas, and in a general sense to ensure that
21        the IIC has everything necessary to
22        accomplish the job.
23   Q    Okay.
24        You went down to Charlotte once?

Page 81

1    A    Correct.
2    Q    Do you remember when that was?
3    A    The very day of the accident. That happened
4         in the morning, and I believe we left
5         Washington, DC at noontime.
6    Q    As part of the Go Team?
7    A    As part of a Go Team.
8    Q    And you stayed down there for three days?
9    A    Roughly.
10   Q    Following that, do you ever remember having
11        conversation with anybody from Raytheon
12        about any aspect of the Charlotte accident?
13   A    Oh, yes.
14   Q    Okay.
15        Who did you talk to?
16   A    I think very early on, it was Mike Scheidt.
17   Q    Do you remember what conversation you had
18        with him?
19   A    It was just in a general sense about the
20        accident. I had -- I consider Mike Scheidt
21        to be a friend. We had developed a
22        relationship because of my work with
23        Raytheon around the accident at Quincy,
24        Illinois where when that accident

21 (Pages 78 to 81)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 82

1  investigation was presented to the board, I
2  had a feeling that there was some
3  inaccuracies in what was presented to the
4  board. I -- I never went to the scene. I
5  didn't participate in anything with the
6  Quincy, Illinois accident, but my gut told
7  me that there was -- there was some pieces
8  that weren't right.
9       I called out to Art Wagner, who I
10  knew from Washington, and asked him if I
11  could come out and look at an airplane and
12  look at some pieces of it.
13      It was during that visit that I've
14  come to know Mike and for whatever reason,
15  he and I hit it off very well together. I
16  considered him to be a -- a term that I
17  would call stand-up guy, and we got along,
18  we worked through that issue and made some
19  changes.
20  Q  What were the changes that were made to the
21  report?
22  A  Essentially, Beech was being impeached, I
23  guess, or blamed for the door, propensity
24  for that door to jam, and I was able to --

Page 83

1  to ascertain through my mechanical
2  experience that it could not have been the
3  door. It was not the door, and we ended up
4  getting the report changed somewhat.
5       And as a result of that, we had --
6  that work didn't take two minutes. That
7  work took a little time. We had
8  conversations together, he and I. In fact,
9  I actually think I have all his numbers, not
10  just work numbers, all his numbers, and I
11  should say had, past tense.
12      And then -- so we developed a
13  relationship, one that you could call
14  somebody up and not have to be necessarily
15  very formal.
16  Q  Okay.
17      MR. BUNIS: Peter, can we just take a
18  break if you're done with that question? I
19  just want to consult with the witness for a
20  second.
21      (Recess.)
22  BY MR. KNIGHT:
23  Q  Is it fair to say that you spoke to Mike
24  Scheidt a number of times after the

Page 84

1  Charlotte accident?
2  A  Yes.
3  Q  By telephone?
4  A  Yes, or some --
5  Q  In person?
6  A  (Witness nods.)
7  Q  Where else did you see him in person?
8  A  In Washington.
9  Q  At a meeting at the NTSB?
10  A  Yes. More than once.
11  Q  More than one meeting at the NTSB with Mike
12  Scheidt?
13  A  More than one visit to me. I don't know --
14  I don't recall why he was in town.
15  Q  Well, this was not a personal meeting?
16  A  It was one that was personal as well.
17  Q  You said there was more than one meeting at
18  the NTSB with Mike Scheidt?
19  A  And by meeting, I mean he came by my office
20  on more than one occasion.
21  Q  Okay.
22      Now, Mr. Scheidt obviously worked for
23  Raytheon. Do you know what his title was?
24  A  No. When I was reading his deposition, I

Page 85

1  thought he was general counsel, but I didn't
2  see that in there. So I don't know what his
3  title was until he became president.
4  Q  In any event, in connection with the
5  Charlotte accident and his meeting with you
6  at the NTSB, he was there in an official
7  capacity; is that right?
8  A  At one time, yes.
9  Q  Okay.
10      And you were discussing what subject
11  area?
12  A  I think the official visit he was explaining
13  to me his coming to town to actually brief
14  us on the maintenance manual issues.
15  Q  What were the maintenance manual issues?
16  A  What the level of understanding, whether or
17  not the word constructions were adequate,
18  that --
19      These are going to be my words now --
20  I don't necessarily remember his -- but the
21  whole -- the whole reason why -- the whole
22  area around why people would be making
23  mistakes.
24  Q  In the Charlotte accident, the probable

22 (Pages 82 to 85)

Page 86

1  cause focused on mistakes made by the
2  maintenance employees; is that correct?
   A  Mm-hmm.
4  Q  And, as you say, it had to do with rigging
5  of the elevator?
6  A  Yes.
7  Q  Not the trim on the elevator, right?
8  A  Right.
9  Q  Have you exhausted your memory with respect
10  to any conversations you had with Mike
11  Scheidt following the Charlotte accident?
12  A  No.
13  Q  Okay.
14     Could you tell us whatever other
15  conversations you can recall?
16  A  Yes, but they may not be in order.  Okay?
17     He came -- we had a discussion, and
18  I'm not sure if -- it may have been over the
19  phone.
20     I know there was one in the office,
21  where he discovered somebody within his
22  organization that came from the military and
23  talked about validating manuals, and we
24  talked about how we got manuals that had

Page 87

   procedures in them that weren't validated
2  and what that meant, and he -- and he and I
3  discussed about what he could do about that
4  or what he intended to do about it is maybe
5  a better word -- way of saying that.
6     And we've had -- we had more than one
7  discussion around that subject after
8  Charlotte and before Hyannis.
9  Q  You say you had -- before the Charlotte
10  accident you had a conversation?
11  A  After Charlotte, before Hyannis.
12  Q  Do you remember when the conversation was
13  before Hyannis?
14  A  No, I honestly can't say.
15     MR. BUNIS:  Don't guess.
16  A  Yes, okay.
17  Q  Do you remember Mike Scheidt visiting you
18  with Dean Thompson?
19  A  I remember him visiting with another
20  individual who I never could remember the
21  name.
22  Q  You don't know Dean Thompson?
23  A  He came with somebody.  I don't know who he
24  is.

Page 88

1  Q  Okay.
2     A chief accident investigator from
3  Raytheon?
4  A  You know, if he introduced him to me that
5  way I would have remembered that.  Maybe not
6  the name, but I would have remembered that.
7     I don't remember that.
8  Q  Okay.
9     Do you remember meeting with Mike
10  Scheidt and another individual from
11  Raytheon?
12  A  Yes, I did have a meeting.
13  Q  Okay.
14     And when was that?  Was that before
15  or after Hyannis?
16  A  I can't be sure.  I don't know.
17  Q  Do you remember a meeting with you and Mike
18  Scheidt on or about December 10, 2003?
19  A  In Washington?
20  Q  Yes.
21  A  I don't remember the date, but, like I said,
22  we had -- we had more than one meeting.
23  Q  And were there -- do you recall at a meeting
24  in December that the subject of travel

Page 89

1  boards came up?
2  A  Yes.
3  Q  Do you remember when that discussion was?
4  A  No, but I remember having that discussion
5  with him.
6  Q  What's a travel board?
7  A  It's a fixture that you can put onto the
8  airplane that makes it relatively easy to
9  see the travel that a -- flight control,
10  what is going up and down.
11  Q  And see the degrees of deflection?
12  A  Most of them are just marked in lines, so
13  they don't reference the degrees.  It would
14  be a protractor that would give you the
15  actual degrees.
16  Q  Mm-hmm.
17  A  But it's a quick way when you're rigging an
18  airplane in particular that you can see
19  which direction it's going.
20  Q  Do you remember whether or not another
21  member was present during a meeting when
22  travel boards were discussed?
23     Maybe I can suggest --
24  A  Well, Dick Healing was around.

23 (Pages 86 to 89)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 94

1    controls, elevators, ailerons, you should
2    have a certain amount of --
     A    Should be trained on --
4    Q    -- experience even past getting your A&P,
5    right?
6    A    Yes.
7         Well, the requirement -- you know,
8    A&P is basic training. It's not the last
9    piece of training. It's basic skill. It
10   teaches you how to use the manual, teaches
11   you how to think in aviation, so before you
12   do anything else, you need to have
13   additional training.
14   Q    Probably like anything, isn't it?
15   A    Mm-hmm.
16   Q    That is kind of a license, whether it's a
17   law license or a medical license or a
18   mechanic's license?
19   A    I was going to put the reference to law
20   license in there, but I decided not to.
21   Q    Yes.
22        Everybody gains from experience?
23   A    Yes.
24   Q    But to your knowledge, there is no

Page 95

     manufacturer of any airplane has designated
2    a certain level of experience before you can
3    work on a particular area of the airplane;
4    is that fair to say?
5    A    That's fair to say.
6    Q    But anyway, you had this discussion with
7    Mr. Scheidt at some point?
8    A    Correct.
9    Q    Do you remember talking to Mr. Scheidt about
10   industry experts who could help develop
11   maintenance procedures?
12   A    In a general sense, I do.
13   Q    Did you indicate to Mr. Scheidt that you
14   would provide those names to him?
15        Maybe I could refresh your
16   recollection here.
17   A    Yes, I don't remember.
18   Q    Do you recall advising Mr. Scheidt that you
19   would give him the names of true industry
20   experts in the development of maintenance
21   procedures, but he would have to call you
22   every day beginning Monday, December 15, to
23   make sure he gets the names, anything like
24   that?

Page 96

1    A    I think --
2    Q    You do recall that?
3    A    I do recall that, yes.
4    Q    So that would have been -- this conversation
5    we're talking about is probably in December?
6    A    Yes.
7    Q    And so going back to all the questions that
8    I've asked you about your conversation with
9    Mr. Scheidt with respect to the Class of
10   '86, the minimum level of training for
11   maintenance people to work on flight control
12   systems, and experts that could help develop
13   a maintenance manual, that all those
14   conversations were probably in December of
15   2003?
16        MR. BUNIS: Objection.
17   A    Well --
18        MR. BUNIS: You can answer the
19   question if you understand it.
20   A    No, they were -- they were earlier.
21   Q    Well, certainly the one about the experts --
22   A    That was at that point, yes.
23   Q    That was December.
24   A    Right.

Page 97

1    Q    Did you ever give him the names?
2    A    I honestly don't remember.
3    Q    During -- during this visit in December, do
4    you recall telling him that you had actually
5    gone to Hyannis and talked to some of the
6    mechanics there?
7    A    I don't remember saying that, but I did
8    that.
9    Q    When did you go to Hyannis?
10   A    I went to Hyannis while the on-scene was
11   still going on, but at the very end; so I
12   don't know how many days I spent down there,
13   but it was at the very end of it.
14        And then I went a couple of times
15   after that.
16   Q    Yes.
17        What -- the next time you went to
18   Hyannis, what was the purpose of that visit?
19   A    To look at rigging of the airplane, what
20   they did.
21   Q    Are you talking about wreckage?
22   A    No, I'm talking about in the hangar.
23   Q    So you took apart another airplane, another
24   1900?

25 (Pages 94 to 97)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 98

1   A   I did not take apart.  I watched them.
2   Q   Okay.
3   A   They let me know when they were -- Colgan
4       let me know when they were going to do
5       Detail 6, I think it was, whatever the check
6       was, and I watched them, what they did.
7   Q   So somebody from Colgan called you and told
8       you that they were going to do this?
9   A   I called them and asked permission to come
10      visit them, and they said they would let me
11      know when they were going to be doing work,
12      similar work, maybe not -- and it wasn't
13      replacing that cable, just --
14  Q   But it --
15          You went to Hyannis?
16  A   I went to Hyannis.
17  Q   Did you speak with Mike Colgan?
18  A   I have.  I don't know if I did during this
19      or not.
20  Q   Okay.
21          Anyway, you called and asked if you
22      could visit and see this?
23  A   Yes.
24  Q   And this was not a personal request, this

Page 99

1       was NTSB?
2   A   Well, it's tough to separate personal from
3       the NTSB.
4   Q   Well, when you called, you said this is John
5       Goglia --
6   A   Yes.
7   Q   -- from the NTSB calling?
8   A   They knew who I was.
9   Q   Right.
10          And they obviously agreed to allow
11      you to see that?
12  A   Mm-hmm.
13  Q   And you went and you looked at it, right?
14  A   Yes.
15  Q   And what did they do while you were there?
16  A   They were doing their normal routine.
17  Q   Yes.
18  A   Nothing different.  And I was just watching
19      how they worked, and --
20  Q   Okay.
21  A   -- nothing special was done.  We didn't take
22      anything apart.
23  Q   All right.
24          And when is the next time you went to

Page 100

1       Hyannis?
2   A   Sometime after that, very similar
3       circumstances.
4   Q   What do you mean by that, similar
5       circumstances?
6   A   Just going down to see them do another
7       check.
8   Q   Oh, it was another Detail 6 check?
9   A   I think so.  I'm not 100 percent sure of
10      that, but I think so.
11  Q   So you saw the same thing twice?
12  A   Yes.
13  Q   Why would you want to do that?
14  A   Because I know that you need to look at
15      things more than once sometimes to get a
16      feel for them.
17          Actually, I think I did it again yet
18      a third time.  It was at least twice.  May
19      have been a third time.
20  Q   Do you recall in this meeting in December of
21      2003 that -- telling Mr. Scheidt that you
22      were disappointed during a visit at Colgan
23      in Hyannis to hear mechanics and inspectors
24      arguing about the proper method of

Page 101

1       installing flight control rig pins?
2   A   Yes.
3   Q   And do you recall stating to Mr. Scheidt
4       words to the effect that they still don't
5       know what they're doing?
6   A   No, I don't recall saying that.
7   Q   What did you say?
8   A   Well, I shared with him the experience of
9       the folks trying to follow the manual for
10      rigging the elevator, and when it came time
11      to insert the rig pin at the rear up on the
12      tail of the airplane, two of the most senior
13      people there disagreed on which way the rig
14      pin should be installed.  In the manual, it
15      was not clear in explaining which way the
16      rig pin should be installed, so I felt that
17      was a noteworthy item.
18  Q   So what did they do?
19  A   Since it wasn't a real job at that point,
20      they were -- I was asking them about steps
21      in it.  They didn't have to do anything, so
22      just left it there, just said forget it.
23  Q   Do you recall what they eventually did?
24  A   No.

26 (Pages 98 to 101)

EPPLEY COURT REPORTING

Page 102

1  Q  Cal l Raytheon?
2  A  Probably.
     I'll tell you, the Raytheon phone
4  number was known by every one of those guys
5  there without having to look it up, because
6  I asked that -- that came up during the
7  course of what we just said, and I noted
8  that they could rattle the phone number off,
9  and that told me that these guys are calling
10  all the time.
11  Q  As far as maintenance practices, it's fair
12  to say that whenever you as a maintenance --
13  as a -- as a maintenance mechanic had any
14  question or any doubt about a procedure, the
15  correct thing to do is to stop?
16  A  Correct.
17  Q  The correct thing to do is to stop and
18  either call a supervisor, somebody with more
19  knowledge, more experience, or call
20  Raytheon; fair to say?
21  A  Or the manufacturer.
22  Q  Well --
23  A  You need to -- if you don't know, you need
24  to stop.

Page 103

1  Q  You need to stop?
2  A  You need to stop and get further guidance.
3     We now know that may not always be
4  the best practice in how you handle that,
5  but that is what you're supposed to do, yes.
6  Q  That is the best practice, isn't it, to
7  stop?
8  A  To stop is the best practice. After the
9  stop is when you get in trouble.
10  Q  Okay.
11     But stop if there's any doubt
12  whatsoever.
13  A  Stop, yes.
14  Q  It's one of the first rules of maintenance,
15  right?
16  A  You're taught that right in the beginning in
17  A&P school.
18  Q  Do you recall any other conversations with
19  Raytheon employees after the Charlotte
20  accident and before Hyannis that you haven't
21  told us about?
22  A  None that I recall, because the number of
23  folks that I know from Raytheon is very
24  limited from the Beech Aviation side.

Page 104

1  Q  Okay.
2     So then the Hyannis accident occurred
3  on August --
4  A  26th.
5  Q  26th. and you've told us you went to the
6  scene that day?
7  A  No.
8  Q  The next day, three --
9  A  The on-scene investigations typically go
10  three to five days.  I don't remember how
11  long this one went, but it just so happened
12  that when I went down there, they were
13  finishing the on-scene.
14  Q  So you were there within --
15  A  Within five days.
16  Q  Yes.
17     And then you went back to Hyannis, I
18  think you told us, two or three our times to
19  look at Colgan maintenance personnel
20  doing --
21  A  Work.
22  Q  -- work on rigging, right, or an inspection?
23  A  Inspection, yes.
24  Q  And did you ever participate in a simulation

Page 105

1  of misrigging a Beech 1900 for its elevator
2  trim?
3  A  No, I don't believe so.
4  Q  You've never seen what happens when a Beech
5  1900 is misrigged in its elevator trim?
6     MR. BUNIS:  Objection.  Objection.
7  Q  Okay.
8  A  I'm a little bit confused over that
9  question, so maybe you can clarify it a
10  little bit.
11  Q  Well --
12     (Pause.)
13  Q  Did you ever go to -- have you ever been to
14  Wichita other than in June of this past
15  year?
16  A  Yes.
17  Q  And did you ever go to Wichita in connection
18  with either the Charlotte accident or the
19  Hyannis accident?
20  A  Other than the one you and I went together.
21  Q  That was June?
22  A  Other than June.
23  Q  Other than June?
24  A  No.

27  (Pages 102 to 105)

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 110

1  Q   And this misrigging information had to do
2      with the elevator trim system?
3  A   Yes.
4  Q   Okay.
5         When did you first review that
6      information?
7  A   I don't remember, but it wasn't that long
8      ago.
9  Q   Well, at some point in the fall of 2003, you
10     suspected that the 1900 that crashed in
11     Hyannis was misrigged in its elevator trim
12     system?
13 A   Yes, well, the -- right.
14 Q   Right.
15        And you had to have been aware that
16     there was going to be a misrigging
17     demonstration in Wichita to determine what
18     would happen if it's misrigged in certain
19     ways?
20 A   I was probably aware that they were going to
21     do some follow-on activity. Just what that
22     was, I -- I would say that I probably wasn't
23     involved with that and knew in advance of
24     that, but I would expect that they would

Page 111

1      have done that.
2  Q   Yes.
3         You wouldn't -- you didn't go to it?
4  A   Correct.
5  Q   But it was certainly important to that
6      investigation?
7  A   Yes.
8  Q   And the probable cause of the Hyannis
9      accident referenced the misrigging of the
10     elevator trim system?
11 A   Yes.
12 Q   There was -- did you ever determine how the
13     elevator trim system was misrigged? Did
14     you --
15 A   Personally? Me personally?
16 Q   Yes.
17 A   No.
18 Q   You don't remember --
19 A   No.
20 Q   Well, you went two or three times to Hyannis
21     to watch them working on the inspection?
22 A   Right.
23 Q   So you were fairly familiar with the manner
24     in which the trim estimate operated?

Page 112

1  A   Yes, but the real focus for my -- for going
2      to Hyannis was actually follow-on to the
3      talk that -- work that -- discussions with
4      Mike Scheidt, the process.
5         I wasn't as much concerned about the
6      process of accomplishing maintenance as I
7      was with the actual mistake, because the
8      mistake has already happened. I can't
9      change that.
10 Q   Right.
11 A   But if I can identify problems in the
12     process, I can stop anything from happening
13     in the future, so I'm being driven in there
14     to find out why did otherwise good people
15     make a mistake.
16 Q   And at some point, your attention was drawn
17     to the maintenance manual and a figure in
18     the maintenance manual regarding the drum
19     upon which the cable is wrapped that
20     operates the elevator trim system; is that
21     correct?
22 A   Yes, that was before the visits.
23 Q   Before your visits?
24 A   Yes.

Page 113

1  Q   You knew that was the focus --
2  A   Right, of the investigation. And, in fact,
3      I think Mike Scheidt and I actually talked
4      about that at one point.
5  Q   That it was miswrapped?
6  A   (Witness nods.)
7  Q   Yes?
8  A   That there was a problem.
9  Q   Okay.
10 A   That there was a problem with it. At that
11     point in time, I'm not sure that I knew that
12     it was miswrapped or installed backwards,
13     because there was lots of confusion around
14     that.
15        I just knew that the process was
16     disconnecting.
17 Q   But having reviewed the work done on
18     misrigging out at Wichita, I take it you had
19     to have known that the -- in order to do
20     what the maintenance people did in this
21     case, they had to not only miswrap the drum
22     but cross the wires, cross the cables?
23 A   They have them crossed someplace, yes.
24 Q   They had to do that independently of the

29 (Pages 110 to 113)

EPPLEY COURT REPORTING

Page 134

1 airplane is built. They use engineering and
2 assembly drawings to create them. And then,
like you say, they run through the
4 validation process, which is all done in an
5 office some place.
6 If you're not out there actually
7 accomplishing the task step by step looking
8 at the paperwork, you cannot be certain that
9 it's accurate.
10 Q Well, even with the validation process, some
11 procedures may still contain an inaccuracy,
12 true?
13 A Human nature being what it is, I would agree
14 with that, but it would be considerably
15 less.
16 Q Okay.
17 So with the validation that you're
18 talking about, which you referred to as the
19 super-find that was discussed with Mike
20 Scheidt, how is that any different from the
21 validation procedure that was involved with
22 the procedure of the Beech 1900 that was
23 involved in the actual accident aircraft,
24 which was built in 1993?

Page 135

A The -- I'll base this only on the
2 discussions that I had with Mike Scheidt.
3 What I left with, the takeaway from
4 those discussions was the fact that these
5 procedures were not validated.
6 Q You don't think the procedures ever went
7 through the vetting process when they were
8 first drafted?
9 A Not vetting. Validation. I'm reading what
10 you said to me as validation, meaning
11 someone that did it while we were watching
12 it.
13 My conversations with Mike led me to
14 believe that that didn't take place.
15 Q Well --
16 A Vetting -- vetting, I'm sure, did take
17 place.
18 Q Let me ask you this:
19 You don't know -- the procedure that
20 was involved for the elevator trim system
21 involved in the accident aircraft, you don't
22 know how it was drafted or under what
23 circumstances; is that fair to say?
24 A That is correct.

Page 136

1 Q And you don't know to what extent there was
2 any vetting or consultation with either
3 maintenance or engineering or any other
4 discipline?
5 A Correct.
6 Q All right.
7 All you know is your opinion is that
8 there's an error in it; is that correct?
9 A That's correct.
10 Q All right.
11 And even with the validation process
12 that you've discussed, you can't avoid all
13 errors reasonably?
14 A One hundred percent certainty, no.
15 Q Human nature being what it is?
16 A But you should be able to eliminate most.
17 Q Okay.
18 MR. BUNIS: Two-minute break?
19 One-minute break?
20 MR. KNIGHT: Huh?
21 MR. BUNIS: Can I take a one-minute
22 break?
23 MR. KNIGHT: Sure.
24 MR. BUNIS: Be right back.

Page 137

1 (Recess.)
2 BY MR. KNIGHT:
3 Q There is no product, airplane, that can be
4 accident-proof?
5 A That's correct.
6 Q Human nature being what it is, there is no
7 manual that can be 100 percent accurate?
8 A That might be a little too strong, but, yes.
9 Q In working with Mike Scheidt following
10 Charlotte and following Hyannis, you
11 understood that Raytheon was attempting to
12 improve the manual; is that correct?
13 A That's correct.
14 Q And you've talked about discussions that
15 you've had with Mike Scheidt, not all that
16 you can remember, but some of which you've
17 testified about, leading up to a
18 conversation in December of 2003, right?
19 A Yes.
20 Q And how about after 2003, did you have any
21 further conversations with Mr. Scheidt?
22 A I don't know, I -- I don't remember.
23 Q All right.
24 The probable cause was determined

35 (Pages 134 to 137)

Page 142

1  A  Yes.
2  Q  So Exhibit 3 lists all the depositions,
      experts and so forth, right?
4  A  Mm-hmm, yes.
5  Q  One of the Raytheon experts is Dwight Law.
6      Do you know him?
7  A  No.
8  Q  Never heard of him?
9  A  No.
10 Q  Okay.
11     What about an expert by the name of
12     Vallerand, Don Vallerand?  Do you know who
13     Don Vallerand is?
14 A  Is he the A&P instructor?
15 Q  Yes.
16 A  Okay.  I don't know him.  I just remember
17     reading his --
18 Q  From counsel or --
19 A  No, it's on the disk.
20 Q  On the disk?  Which disk?
21 A  Did he not testify, give expert testimony
22     someplace?
23 Q  Not yet.
24 A  There's a deposition for him.

Page 143

       He's the guy that lives in
2      Tyngsborough, Massachusetts?
3  Q  Yes.
4  A  Yes, there's a deposition for him.
5  Q  You've read his deposition?
6  A  I have.
7  Q  What -- what did it involve?
8  A  He talks about -- he was asked questions
9      around A&P schools and mechanics, what they
10     teach in school.
11 Q  Oh, you may be talking about his expert
12     report as opposed to deposition?
13 A  Oh, yes -- well, maybe that's what it is.
14 Q  Okay.
15     So do you know who he is?
16 A  No.
17 Q  Not familiar with him?
18 A  No.  We went to the same school but
19     different times.
20 Q  All right.
21     Dick Nelson, do you know who he is?
22 A  No.
23 Q  Any of the experts listed by Raytheon, are
24     you familiar with any of them?

Page 144

1  A  None.  Mike Scheidt.
2  Q  Yes, okay.
3      Now, the documents that you have
4      referred to included the full NTSB report?
5  A  That's correct.
6  Q  And particularly the report on probable
7      cause; is that right?
8  A  I read the probable cause once, but I
9      didn't -- early on, and never went back to
10     it.
11     I really wasn't interested in the
12     probable cause.
13     (Exhibit No. 10 marked for
14     identification.)
15 BY MR. KNIGHT:
16 Q  Probable cause states in part, anyway -- it
17     says the National Transportation Safety
18     Board determines the probable causes of this
19     accident as follows:
20     "The improper placement of the
21     forward elevator trim cable and subsequent
22     inadequate functional check of the
23     maintenance performed which resulted in a
24     reversal of the elevator trim system and a

Page 145

1      loss of control in flight.  Factors were the
2      flight crew's failure to follow the
3      checklist procedures and the aircraft
4      manufacturer's erroneous depicture of the
5      elevator trim drum in the maintenance
6      manual."
7      MR. BUNIS:  Do you see that?
8  Q  Was that fairly read?
9  A  Yes.
10 Q  All right.
11     Do you agree with that?
12 A  Do I agree with that?
13 Q  Yes.
14 A  Am I through --
15 Q  Yes.
16     A little while ago I asked you if you
17     knew how many -- having reviewed all this
18     material, if you knew how many cables were
19     sold to repair the elevator trim system
20     prior to this accident, and you indicated
21     you had no idea?
22 A  Correct.
23 Q  Okay.
24     The number of cables sold or the

37 (Pages 142 to 145)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 202

```
 1  Q   And you've seen the analysis of this thing.
 2  A   Yes.
    Q   They did nothing but increase airspeed?
 4  A   Yes.
 5  Q   When they already had adequate airspeed to
        fly the airplane, right?
 7  A   Right.
 8  Q   Well, what was the maneuvering speed of this
 9      airplane; do you know?
10  A   No, I don't know.
11  Q   Well, certainly brought it from 170 knots.
12      It was climbing out to well over 200, by
13      increasing that speed, by taking off the
14      flaps and the landing gear?
15  A   Right, and he's calling, Pull, pull up, pull
16      up, pull with me.
17  Q   So you don't have any thoughts or opinions
18      about that, except that you know it's
19      absolutely the wrong thing to do?
20  A   Especially now in hindsight. I'm a good
21      Monday morning quarterback.
22  Q   But you know from having flown with trim
23      that's out of trim that the faster you go,
24      the worse it gets?
```

Page 203

```
    A   Yes.
 2  Q   So all you need to do is slow down, and it
 3      gets a lot easier, right?
 4  A   Right.
 5  Q   Do you have any explanation for that?
 6  A   No.
 7  Q   Well --
 8  A   Except maybe -- I can't say that.
 9          I was going to say the anxiety level
10      is going up pretty fast, so --
11  Q   Root cause analysis might look into why the
12      pilots made some incorrect decisions, right?
13  A   Yes, and that's exactly the same --
14  Q   And root cause analysis might also look into
15      why so many mechanics on this airplane made
16      so many bad decisions, right?
17  A   Correct, correct.
18  Q   Now, getting to your opinion, if we could.
19      It is Exhibit 3?
20  A   I've got it, yes.
21  Q   On the third paragraph, you're -- you state
22      that the opinion is based on reviewing the
23      attached list?
24  A   Mm-hmm.
```

Page 204

```
 1  Q   And inspection of the wreckage, which you
 2      did, I think, five days after as a member of
 3      the NTSB, right?
 4  A   Correct.
 5          MR. ELBERG:  I'm sorry, what page are
 6      we on?
 7  A   Third. I'm answering questions for you.
 8  Q   Onsite visits to the maintenance facility at
 9      Colgan Air, that's what you talked about?
10  A   Yes.
11  Q   Those are in connection with your
12      responsibilities for the NTSB, right?
13  A   Mm-hmm.
14  Q   The inspection of the 1900 Raytheon
15      aircraft -- the inspection of 1900 Raytheon
16      aircraft in Wichita, that was in June 2006,
17      right?
18  A   Yes, I think so.
19  Q   And you're also basing it on your service as
20      the NTSB board member on scene January --
21  A   '03.
22  Q   -- '03, as well as what you learned, I take
23      it, in connection with your investigation in
24      the Hyannis crash, personal information,
```

Page 205

```
 1      right?
 2  A   Yes.
 3  Q   That you learned in connection with your
 4      official investigation?
 5  A   Hyannis officially I didn't have a lot to do
 6      with.
 7  Q   You went there three times?
 8  A   Right. But it really isn't part of what
 9      ends up in that paper, the probable cause
10      that you showed me.
11  Q   You left the NTSB --
12  A   No.
13          I was still at the board, but what I
14      observed did not become part of that record,
15      if you will. It was part of --
16  Q   It became part of the investigation, though?
17  A   No, it didn't.
18          I did not go back to the NTSB and
19      say -- write out a report or even verbally
20      say to somebody I visited the hangar last
21      night and I observed the following. That's
22      not how it works.
23  Q   I understand.
24          But you did it anyway?
```

52 (Pages 202 to 205)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 206

1   A   I did.
2   Q   And you were working -- until you left, you
3       were working on that investigation?
4   A   You're going to have to help me out here and
5       say what working means. I didn't touch it.
    Q   There were designated experts in certain
        fields, but --
8   A   In fact, I can tell you after the first of
9       the year, I probably did nothing with this.
10  Q   Okay.
11          But you had already spoken to Mike
12      Scheidt and somebody else from Raytheon?
13  A   Yes.
14  Q   As an official NTSB board member?
15  A   Right.
16  Q   About the Hyannis crash?
17  A   Yes.
18  Q   Okay?
19  A   Yes.
20  Q   Okay.
21          Now, when you went out to Raytheon in
22      Wichita this last June, apparently you
23      learned something, because you're basing
24      your opinion in part on that inspection.

Page 207

1           What was it that you learned?
2   A   Clarification of cable runs, of adjustment
3       points, sat in the cockpit, moved the
4       control column, played with the trim, cable
5       routings under the pedestal, up in the nose
6       when we stuck our head up in there, looked
7       at what was going on.
8           That's -- clarification of all the
9       runs and looking at what needed to be
10      accomplished.
11          The seat was out -- in Hyannis, I
12      never got down on the floor and underneath
13      the pedestal and did any of that.
14          I could see some of it, because I had
15      the seat out, but this time I got down and
16      looked.
17  Q   Going to the final paragraph, page 1 of your
18      report, you say that instrument -- an
19      instrument flight-plan rules flight plan was
20      filed for reposition flight conducted under
21      14 CFR Part 91.
22          What is the significance to it
23      being -- that flight being a Part 91 flight
24      as opposed to a 121 flight in terms of your

Page 208

1       opinion that you've advanced in this case?
2   A   I didn't really look at that. This is just
3       an observation.
4   Q   So --
5   A   The fact that it was a ferry flight, the
6       significance there is that it's under a less
7       stringent set of rules.
8   Q   Rules as far as what?
9   A   Almost across the board. Not so much in the
10      flight -- from the pilot's point of view but
11      from the maintenance point of view.
12  Q   What's the difference from maintenance?
13  A   Well, maintenance elevates. Part 91 I guess
14      could be called basic maintenance.
15          And as you move up through 135, the
16      requirements grow. When you get to 135-10
17      or more, the requirements grow even further;
18      and when you get up to 121, you're at the
19      top of the -- what industry may call the
20      burden of --
21  Q   The expectation of competency of maintenance
22      personnel doesn't change?
23  A   No.
24  Q   So no matter what the flight rule is being

Page 209

1       conducted under, the expectation of the NTSB
2       or the FAA or of a manufacturer would not
3       change, right?
4           They expect -- you have to answer
5       audibly.
6   A   Yes, there is expectation from above and
7       down, which is the way you just said it, and
8       there is expectation from below up as well.
9   Q   Okay.
10          But in terms of the competence of
11      maintenance personnel, that doesn't change
12      no matter how the flight is being conducted?
13  A   That's correct.
14  Q   And the rules that we were talking about of
15      when in doubt, stop, or follow the manual,
16      or do an operational check, those rules
17      don't change whether it's a Part 91, Part
18      121 or 135 flight, is it? Is that correct?
19  A   That's correct.
20          But I would like to make one
21      clarification on what you said. You -- when
22      you got to the part that said operational
23      check, there are many different types of
24      operational checks.

53  (Pages 206 to 209)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 270

1   A   We're talking about maintenance.
2   Q   Maintenance, yes.
3          And, again, if they didn't understand
4   it, they should check before they proceed,
5   right?
6   A   They should check, but where would you --
7   where do you go --
8          See, that's the other piece that's
9   not said here. To get the instructions that
10  you need -- we're not -- there's not an
11  orderly flow through the sections in the
12  manual. In fact, Crow mentions that in his
13  testimony, and he viewed that as
14  dumbing-down the job.
15         But you don't dumb the job down. In
16  fact, everybody is rewriting their manuals
17  now because we're using up to 45 repair
18  stations which are made up predominantly of
19  noncertificated people, so we have to
20  rewrite all our manuals.
21  Q   But certainly all trim wheels work the same
22  way.
23         When you push them forward, you're
24  going nose-down?

Page 271

1   A   Yes.
2   Q   You go aft, wheel it aft, then it's -- then
3   it's tail-down?
4   A   You and I as pilots understand that.
5   Q   Maintenance people understand that.
6   Everybody understands it.
7          If you're working on a manual trim
8   wheel, you have to understand that, right?
9   A   I agree.
10  Q   And Raytheon would be reasonable in
11  expecting that people understand that,
12  right?
13  A   Yes.
14  Q   So how is it that the maintenance people --
15  if the wheel says aft as opposed to, you
16  know, tail-down or nose-up, how would they
17  possibly confuse that?
18  A   They're probably looking at that time, and
19  if he looked inside the window to see what
20  the electric trim indicator is, I mean, they
21  would just -- they would start getting
22  this -- is it tab up, tab down?
23         You could lead yourself in all sorts
24  of places. So if you're not --

Page 272

1   Q   That's not referring to the tab?
2   A   No, but now they're going to add that to it.
3   Because why are they moving that trim
4   system? Because somebody is back there
5   checking the tab, so now you've entered a --
6   Q   You're right.
7          They may not coordinate what they're
8   actually doing between the two of them, but
9   you cannot fault Raytheon for that lack of
10  coordination between the two of them?
11  A   No, I don't fault Raytheon for that. I
12  fault Raytheon for not having the proper
13  reference to send them into the full rigging
14  check in the manual.
15  Q   Which they should know anyway?
16  A   They should know that they need to do a full
17  check. They shouldn't know where to find
18  it.
19  Q   No, but they should know how to do it
20  anyway?
21  A   Not a memory item. It's not a memory item.
22  You need to have the checklist.
23         Unlike pilots, you know, this is --
24  my shot back at you, unlike pilots,

Page 273

1   mechanics don't have memory items.
2          The authority to do maintenance on an
3   airplane in a 121 environment comes from the
4   maintenance manual or from the engineering
5   department.
6          We don't do memory items. When we
7   do, we get in trouble.
8   Q   In the next paragraph, you're talking about
9   the figure, I believe, which we've got
10  marked at least in part --
11  A   Yes, that's it.
12  Q   At least comes out of another document, but
13  we have the figure depicted here, do we not,
14  on Goglia 11?
15  A   Yes.
16  Q   And you say it showed -- it also showed the
17  nose-down cable coming from the forward end
18  of the drum rather than the aft. These
19  errors were the cause of this crash?
20  A   Mm-hmm.
21  Q   There were other things that certainly
22  caused the crash, weren't there?
23  A   Well, there are a chain of events where it
24  starts.

69 (Pages 270 to 273)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

**Page 274**

1  Q   When you say "these errors were the cause of
2      this crash," perhaps you'd like to modify
3      that statement?
4          It was a factor.
5  A   I can say that it was a factor. It was
       probably one of the leading ones, but it was
       a factor. You're going to make me rewrite a
8      probable cause contributing to this?
9  Q   Well, the probable cause, actually -- it
10     stated what the probable cause was.
11         And then it said, "Factors were the
12     flight crew's failure to follow the
13     checklist procedures and the aircraft
14     manufacturer's erroneous depiction of the
15     elevated trim drum in the maintenance
16     manual," right?
17 A   Right.
18 Q   But the cause was really maintenance, what
19     the maintenance people did?
20 A   It's --
21         MR. ELBERG: Object.
22 A   It's a collective maintenance failure.
23 Q   They didn't do the operational check, most
24     important?

**Page 275**

   A   Properly, didn't do it properly.
   Q   You could add up the number of errors made
3      by maintenance, and you probably --
   A   More.
5  Q   -- five or more errors done by maintenance
6      that really caused this crash?
7  A   (Witness nods.)
8  Q   In your -- the next sentence or two, you
9      say, "The erroneous drawing could and did
10     cause the mechanic to misroute the cable
11     around the drum."
12         But, again -- and I think I've
13     already asked you about this -- they had to
14     have made the next error, which was crossing
15     the cables, in order to do this?
16 A   Right, to get it to line up.
17 Q   But you didn't mention that next error in
18     your report, did you?
19 A   I don't believe I did.
20 Q   And they have tagged, according to what you
21     said in the report and the deposition
22     testimony, they tagged the cables with tape?
23 A   Mm-hmm.
24 Q   And they still misrouted them?

**Page 276**

1  A   They may have routed them right up to the
2      end.
3          Remember I mentioned to you about
4      going to the -- going down there to look at
5      where they crossed them, trying to determine
6      where they crossed them?
7  Q   Yes.
8  A   They may have -- they may have crossed them
9      right there at the end, although there's
10     some feeling that that's not the case. But
11     it's all -- it just depends on who looks at
12     it.
13 Q   But they had to have crossed them?
14 A   They crossed them somewhere.
15 Q   So even with this tape that they used, it
16     clearly was an inadequate method to ensure
17     that you didn't cross them. They crossed
18     them?
19 A   Right, they crossed them.
20         And that gets to the instructions in
21     the maintenance manual not being detailed
22     enough to mitigate all the possible mistakes
23     that people make.
24 Q   Well, you can't write a manual that will

**Page 277**

1      have all the possible mistakes that somebody
2      might make?
3  A   I would say that you can in the areas that
4      are critical to flight. I wouldn't want a
5      manual, you know -- we don't want -- a
6      coffee maker is not going to bring an
7      airplane down, but flight controls certainly
8      are.
9          So you want to make sure that your
10     instructions are as detailed as they humanly
11     possibly can be and as clear and concise as
12     you can make them.
13 Q   Okay.
14         But the more things you say in a
15     manual, the less likely that it will be read
16     and understood?
17 A   Today, I think I might agree with that.
18 Q   So if you tried to foresee every possible
19     mistake that somebody might make, you're
20     going to have much too much language in
21     order to ensure that they properly
22     understand the basic steps to carry out the
23     procedure; isn't that true?
24 A   Well, routinely across the board, I would

70 (Pages 274 to 277)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2

Page 282

1   and one of your experts talks about this as
2   well -- where -- and I was really shocked
3   and appalled to read this from somebody from
4   Raytheon, but where they write the manuals
5   and send them out, and I'm -- these manuals
6   have now gone through all that verification
7   process you talked about, engineering
8   sign-off and all that stuff, they send them
9   out knowing that there's problems with them
10  and they expect the mechanics to call back
11  so they can correct them.
12          That's in a deposition, and I
13  couldn't believe that this individual said
14  that.
15  Q   Do you know who said that?
16          (Pause.)
17  A   No, but I can narrow it down a little bit.
18  It could have been Crow, could have been
19  Nelson, and there's one other guy in the
20  middle of this...
21  Q   Well, let me ask you this:
22          And you may have said this before,
23  but certainly with any manufacturer who
24  designs and produces an airplane, part of

Page 284

1   manuals at this point.
2   Q   Right.
3   A   The manuals should be accurate.
4          Now, I would not criticize anybody
5   if, again, the coffee maker manual had
6   deficiencies in it.
7   Q   Right?
8   A   But certainly flight controls, landing gear,
9   propeller require the utmost care not only
10  after the airplane is in service by guys
11  like me but also before we get it by guys
12  like Raytheon to make sure that what they
13  tell me to do is accurate.
14          So I would expect there to be many,
15  many less findings of problems in Chapter 27
16  in a manual, which is flight controls, than
17  I would in Chapter, you know, 32. No,
18  that's landing gear. I wanted to say
19  lights. I wanted to say lights. 21, air
20  conditioning. You know, less writeups in
21  the critical systems than --
22  Q   There are a number of systems, though, are
23  certainly critical to flight, right?
24  A   Yes.

Page 283

2   that is producing the maintenance manual,
    right?
3   A   Right, 2150, I believe it is.
4   Q   And undoubtedly, there are going to be some
5   errors in that as when it's first drafted?
6   A   Mm-hmm.
7   Q   And customers will advise of errors or other
8   people will advise the company of errors,
9   and corrections will be made over a period
10  of time, right?
11  A   Yes.
12  Q   And the less frequently used areas of the
13  manual will be less likely to be subject of
14  any comment or criticism over a period of
15  time, right?
16  A   Yes.
17  Q   So where you say here, "Finding their
18  mistakes only after fatal crashes is clearly
19  contrary to Raytheon's airworthiness
20  requirement," you're simply saying that the
21  maintenance manual and the airplane should
22  be reasonably safe for what they're
23  intended, right?
24  A   And the -- in the sense we're talking about

Page 285

1   Q   Pressure systems, right?
2   A   Well, pressurization -- yes, yes.
3   Q   And on and on?
4   A   Right.
5   Q   I mean, this is not -- it's not coffee
6   makers versus flight controls.
7          There are many, many other very
8   critical systems on board an airplane?
9   A   Yes, and we need -- and we need to have
10  instructions on how to maintain them of
11  that -- the detail in them and written to
12  the level that they are understood by the
13  person that we expect to do the work.
14  Q   The -- when you say, "After the Charlotte
15  crash" -- this is the next paragraph.
16  A   The last paragraph?
17  Q   Yes.
18          "After the fatal crash of the Beech
19  1900 in January 2003, a Raytheon
20  representative told me he was shocked to
21  find out that Raytheon did not validate
22  their procedures."
23          Who was that that you spoke to?
24  A   That was Mike Scheidt.

72  (Pages 282 to 285)

EPPLEY COURT REPORTING

7a12d1e8-0180-4dbb-808c-f31ebff863a2