UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

|  |  |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries, Plaintiff, <br><br> v. <br><br> RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express, Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries, Plaintiff, <br><br> v. <br><br> RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express, Defendants. | DOCKET NO: 05cv10364 PBS |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFF'S EXPERT, JOHN GOGLIA**

Defendants, Raytheon Company, Raytheon Aircraft Company, and Raytheon Aircraft Credit Corporation ("Raytheon" or "defendants") hereby submit their Memorandum in Support of their Motion to Disqualify Plaintiff's Expert, John Goglia. In support of their motion, defendants state as follows.

## NATURE OF THE MOTION

This case arises out of the crash of a Beech 1900D aircraft, serial No. N240CJ ("subject aircraft"). At the time of the accident, the subject aircraft was leased to Colgan Air, d/b/a US Airways Express ("Colgan"), which maintained the aircraft in its exclusive custody and control. The subject aircraft was one of many aircraft Colgan operated and maintained as part of its business as a regional air carrier. In fact, Colgan employed its own maintenance personnel and professional pilots to assist with the day to day operations. The decedents were professional pilots employed by Colgan and were flying the subject aircraft at the time of the accident.

In the course of litigation, plaintiffs designated John Goglia as an expert witness. Mr. Goglia is a former member of the National Transportation Safety Board ("NTSB") who served on the NTSB at the time of the accident. Acting in his official capacity for the NTSB, Mr. Goglia visited the on-scene investigation of the wreckage. After visiting the wreckage site while the accident investigation was ongoing, Mr. Goglia made numerous onsite visits to Colgan's maintenance facility in Hyannis in connection with his NTSB responsibilities. During these visits, Mr. Goglia watched Colgan personnel perform checks and/or inspections.

Mr. Goglia has provided an expert report and expert opinion testimony regarding the cause of the accident. His opinions and conclusions are based on his onsite inspection of the wreckage site, his onsite visits to the maintenance facility at Colgan, as well as his review of numerous documents. Federal regulations expressly prohibit former NTSB employees from

giving any expert or opinion testimony.  Because Mr. Goglia is a former NTSB member whose expert opinions and conclusions are based on information obtained in connection with his official responsibilities with the NTSB, Mr. Goglia should be excluded as an expert witness pursuant to federal regulations.

Additionally, Mr. Goglia bases his opinions and report on his service as the NTSB Board Member on the scene at the accident investigation of a Beech 1900D in Charlotte, North Carolina in January, 2003 ("Charlotte accident").  Throughout his testimony and expert report, Mr. Goglia references the Charlotte accident investigation and the NTSB's probable cause findings regarding that accident.  Because Mr. Goglia was directly involved in the Charlotte accident, federal regulations require that Mr. Goglia be excluded from providing any expert testimony regarding the Charlotte accident.[1]

## STATEMENT OF RELEVANT FACTS

### Factual Background

1.    On August 26, 2003, plaintiffs Steven Dean and Scott Knabe were killed while onboard a Beech 1900D, registration number N240CJ ("the aircraft") operated by Colgan Air d/b/a US Airways Express ("Colgan").

2.    The aircraft crashed into the water off the coast of Yarmouth, Massachusetts shortly after takeoff from Barnstable Municipal Airport, Hyannis, Massachusetts.  (See NTSB Factual Report, attached hereto as Exhibit 1.)

3.    Plaintiffs allege claims of negligence, punitive damages, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose against Raytheon, and seek prejudgment interest.  (Petition.)

---

[1] Any mention of the Charlotte accident is also improper and will be the subject of a separate motion in limine.

4.      On August 23, 2003, Colgan maintenance personnel performed a Detail Six inspection on the accident airplane, which is a maintenance check involving the aft fuselage and empennage.  (See Goglia Report, at 6, attached hereto as Exhibit 2.)  As part of the Detail Six phase check, a free play check of the left and right elevator trim actuators was conducted.  (See Goglia Report, at 6.)  Both of the actuators failed the check and, as a result, needed to be replaced.  (See Goglia Report, at 6.)

5.      When the actuators were being replaced, the cable unwound off the forward drum. (See Goglia Report, at 6.)  On August 25, during an operational check, the forward elevator trim tab cable "fell off" the forward drum, seized, and kinked.  (Goglia Report, at 6.)

6.      Two lead maintenance technicians replaced the forward elevator trim tab cable and two other maintenance technicians replaced the right elevator trim actuator.  (Goglia Report, at 6.)  The forward trim tab cable had been removed by personnel from the dayshift.  (Goglia Report, at 6.)

7.      A lead maintenance technician and the quality assurance inspector stated that following the maintenance, a successful operational check of the system was completed.  (Goglia Report, at 6-7.)

## Mr. Goglia's Expert Opinions

8.      Plaintiffs designated John J. Goglia as their expert witness.  (Plaintiff's Expert Disclosures).

9.      Mr. Goglia is a former member of the National Transportation Safety Board ("NTSB" or "Board").  Mr. Goglia served on the Board from 1995 to 2004.  (See Deposition of John Goglia, 17:23-24, 18:1, attached hereto as Exhibit 3.)

10. In his expert report, Mr. Goglia states that his opinions and report are based on, *inter alia,* his review of various documents relating to the aircraft and accident, as well as "an inspection of the wreckage of [the] aircraft," "onsite visits to the maintenance facility at Colgan Air," and his "service as the NTSB Board Member on the scene at the January 2003 crash of a Beech 1900D in Charlotte, North Carolina." (Goglia Expert Report, attached hereto as Exhibit 2, at p. 1.)

11. Mr. Goglia testified that the documents that he has referred to in his expert report included the full NTSB report. (Goglia Depo., 144:3-5.) Mr. Goglia was asked, "Now, the documents that you have referred to included the full NTSB report?" (Goglia Depo., 144:3-4.) Mr. Goglia responded, "That's correct." (Goglia Depo., 144:5.) Mr. Goglia was further asked, "And particularly the report on probable cause; is that right?" (Goglia Depo., 144:6-7.) Mr. Goglia responded that he had read the probable cause report once. (Goglia Depo., 144:8.)

12. Mr. Goglia testified that he went to Hyannis while the on-scene investigation of the aircraft wreckage was still going on. (Goglia Depo., 97:10-11.) Mr. Goglia further testified that he went to the on-scene accident investigation within five days of the accident. (Goglia Depo., 204:1-4; 104:9-16.)

13. After visiting the on-scene accident investigation, Mr. Goglia made numerous onsite visits to Colgan's maintenance facility located in Hyannis. (Goglia Depo., 97:17-20; 99:24, 100:1-3; 100:17-19.)

14. Mr. Goglia testified that after going to Hyannis to visit the on-scene accident investigation, he returned to Hyannis to look at rigging of the airplane. (See Goglia Depo., 97:17-22.) Mr. Goglia testified that Colgan let him know when they were going to do a Detail Six, and Mr. Goglia watched them and what they did. (Goglia Depo., 98:3-6.) Mr. Goglia

explained that he called Colgan and asked permission to come visit them, and they said they would let Mr. Goglia know when they were going to be doing work. (See Goglia Depo., 98:3-12.)

15.   Mr. Goglia testified that the next time he went back to Hyannis was "sometime after" he went to watch Colgan perform work. (See Goglia Depo., 99:24, 100:1-2.) Mr. Goglia testified that he went back to Hyannis under "very similar circumstances," meaning that he was going to Hyannis to see Colgan do another check. (Goglia Depo., 100:2-7.) Mr. Goglia testified that he believed he went to Hyannis to see Colgan do another Detail Six check. (Goglia Depo., 100:6-10.)

16.   When asked why he would want to see Colgan perform the same check twice, Mr. Goglia responded, "Because I know that you need to look at things more than once sometimes to get a feel for them." (Goglia Depo., 100:13-16.) Mr. Goglia further testified that he watched Colgan perform a check at least twice, and maybe again a third time. (See Goglia Depo., 100:17-19.)

17.   Mr. Goglia testified that his onsite visits to the maintenance facility at Colgan were all made in his capacity as an NTSB member. (See Goglia Depo., 204:8-13.)

18.   In his report, Mr. Goglia states his expert opinion regarding the cause of the accident. (See Goglia Report.) In his report, Mr. Goglia states that certain errors or omissions in the manual caused the accident. (Goglia Report, pp. 7-10.)

19.   In his report, Mr. Goglia states that the cause of the accident was the misrouting of the cable around the drum as a result of the backwards depiction of the trim drum in the maintenance manual. (See Goglia Report, at 7.) His report further states that the elevator trim system was reversed. (See Goglia Report, at 7.)

20.    At his deposition, Mr. Goglia gave his expert opinion regarding the cause of the accident. (See Goglia Depo., pp. 273-275.) He testified that the backwards depiction of the trim drum was a factor that caused the crash. (Goglia Depo., 273:12-24; 274:1-5.)

21.    Mr. Goglia was asked, "But the cause was really maintenance, what the maintenance people did?" (Goglia Depo., 274:18-19.) Mr. Goglia responded, "It's a collective maintenance failure." (Goglia Depo., 274:22.)

22.    Mr. Goglia agreed that there were probably five or more errors committed by maintenance that caused this crash. (Goglia Depo., 275:2-7.)

### Charlotte, North Carolina Accident Investigation

23.    On January 8, 2003, a Beech 1900D, registration number N233YV, crashed shortly after takeoff from Charlotte-Douglas International Airport in Charlotte, North Carolina ("Charlotte accident"). (See NTSB Accident Report, attached hereto as Exhibit 4.) According to the NTSB Accident Report, "[t]he 2 flight crewmembers and 19 passengers aboard the airplane were killed, 1 person on the ground received minor injuries, and the airplane was destroyed by impact forces and a postcrash fire." (NTSB Accident Report, Exhibit 4.)

24.    The NTSB determined that the probable cause of the Charlotte accident was a loss of pitch control as a result of incorrect rigging of the elevator system. (See Exhibit 4.) The NTSB also concluded that various maintenance issues contributed to the cause of the accident. (See Exhibit 4.)

25.    Mr. Goglia served as the "NTSB Board Member on the scene at the January 2003 crash of a Beech 1900D in Charlotte, North Carolina." (Goglia Report, at 1.)

26.    Mr. Goglia testified that with regard to the Charlotte accident, he was the board member on the scene, meaning that he was "the official spokesman for the board." (Goglia

Depo., 74:17-21.)  Mr. Goglia went down to the accident scene in Charlotte on the day of the

accident.  (Goglia Depo., 76:15-21; 80:24, 81:1-3.)

   27. In preparing his report, Mr. Goglia reviewed, *inter alia*, the NTSB Safety

Recommendation for the N233YV incident at Charlotte-Douglas International Airport.  (See

Goglia Report.)

   28. In his report, Mr. Goglia makes numerous references to the Charlotte accident in

discussing his opinions regarding the accident at issue.  (See Goglia Report, at 7, 8.)  In his

report, Mr. Goglia states:

> After the fatal crash of a Beech 1900D in January 2003, a Raytheon representative
> told me he was shocked to find out that Raytheon/Beech did not validate their
> procedures.  The fact that once they discovered this deficiency they did not fully
> review and correct the AMM after the fatal January 2003 accident is further
> indication of the deficiency of their manuals and the deficiency and disarray of
> their system to correct and identify and find these errors.  Raytheon was at
> meetings or concerning meetings of the January 2003 crash in January 2003 when
> we identified a critical flight system with erroneous maintenance instructions and
> the fact that they did not shows that they did not comply with their obligations of
> continuing airworthiness.

(Goglia Report, at 7.)

   29. Mr. Goglia states in his report:

> [a]fter a fatal crash in Charlotte, NC, in January 2003 of this same type of plane,
> just seven months before this fatal crash, Raytheon officials stated to me they
> realized their maintenance manuals had problems, and represented that they were
> starting a validation procedure on the manual.  However, at the time of this crash,
> they had not finished it. . . . Most tragic is the fact that Raytheon discovered, after
> the Charlotte crash and before the Hyannis crash that they neglected or failed to
> included [sic] the operational check procedure in Chapter 27-30-04, 'Elevator
> Trim Tab Cables.'

(Goglia Report, at 8.)

30.    Mr. Goglia testified that he officially spoke with Mike Scheidt regarding the Charlotte and Hyannis investigations.  (Goglia Depo., 95:9-12; 95:18-24, 96:1-3; 100:20-25; 101:1-2; 113:2-8; 137:9-19; and 206:11-17.)

31.    Mr. Goglia's report states: "After the fatal crash of the Beech 1900 in January 2003, a Raytheon representative told me he was shocked to find out that Raytheon did not validate their procedures."  (Goglia Report, at 7.)  With regard to this portion of his report, Mr. Goglia testified that Mike Scheidt was the Raytheon representative he spoke to.  (Goglia Depo., 285:18-24.)

32.    Mr. Goglia, as a former NTSB member, has knowledge regarding the probable cause of the Charlotte accident.  (See Goglia Depo, 78:12-21.)  Mr. Goglia was asked with regard to the Charlotte accident:

> Q:    And eventually, the probable cause of the accident was
>        determined by the NTSB?
> A.    Yes, yes.
>
> Q.    What was the probable cause?
>
> A.    Oh, it was misrigging the airplane, as a broad statement.  I
>        don't remember verbatim what it said.
>
> Q.    Do you know what portion of the tail was misrigged?
>
> A.    It was an elevator.

(Goglia Depo., 78:12-21.)

33.    Mr. Goglia testified that the Hyannis accident involved "elevator trim," while the Charlotte accident involved "elevator rigging."  (Goglia Depo., 79:19-24, 80:1.)  Mr. Goglia testified that these are "different cables."  (Goglia Depo., 80:3.)

34.    Mr. Goglia testified that the probable cause of the Charlotte accident focused on mistakes made by the maintenance employees.  (Goglia Depo., 85:24, 86:1-3.)  Mr. Goglia was further asked with regard to the Charlotte accident:

Q:    And, as you say, it had to do with rigging of the elevator?

A:    Yes.

Q.    Not the trim on the elevator, right?

A.    Right.

(Goglia Depo., 86:4-8.)

## ARGUMENT AND AUTHORITIES

Federal regulations prohibit former NTSB employees from providing expert or opinion testimony.  See 49 C.F.R. § 835 et seq.  49 C.F.R. § 835.3(a) explains that certain federal laws "preclude the use or admission into evidence of Board accident reports" in a suit arising from an accident, and that these sections were intended to keep the NTSB from becoming entangled in or exerting undue influence on such litigation.  Id. § 835.3(a).  This section further states that the purposes of these laws would be defeated if the expert testimony of NTSB employees, which may be reflected in the views of the NTSB as stated in its reports, were admitted into evidence in litigation arising out of an accident.  49 C.F.R. § 835.3(a).

In this case, Mr. Goglia was a member of the NTSB at the time of the accident, was directly involved in the accident investigation of the subject aircraft while serving as a member of the NTSB, made numerous onsite visits to Colgan's maintenance facility in connection with his responsibilities with the NTSB, and bases his expert opinions on information he obtained in connection with his official duties for the NTSB.  Allowing his testimony would undermine the

purposes of the federal regulations prohibiting expert testimony by former NTSB members. Thus, Mr. Goglia should be excluded as an expert witness pursuant to federal regulations.

Likewise, Mr. Goglia should be excluded from providing any testimony and opinions relating to the Charlotte accident. Mr. Goglia bases his testimony and expert opinions regarding the instant accident on his service as the NTSB Board Member on scene at the Charlotte accident investigation. Because of his direct involvement in the Charlotte investigation as an NTSB member, federal regulations require that Mr. Goglia be excluded from providing any testimony regarding the Charlotte accident. Allowing Mr. Goglia's testimony would clearly undermine the stated purposes of the federal regulations prohibiting expert testimony by former NTSB members. Furthermore, any testimony regarding or opinions based on the Charlotte accident is simply irrelevant and unduly prejudicial.[2] For these reasons, any testimony or opinions by Mr. Goglia regarding the Charlotte accident should be excluded.

**A.     Because Goglia's Opinions Were Formulated Based On Information Obtained As Part Of His Official Duties With The NTSB, His Opinions Are Prohibited By 49 C.F.R. § 835.7.**

49 C.F.R. § 835 et seq. establishes the scope of permissible testimony by current and former NTSB employees. The purpose of these regulations is to, inter alia, "preserve the impartiality of the Board, and to prohibit the discovery of opinion testimony." 49 C.F.R. § 835.1. Section 835.7 specifically addresses testimony by former Board employees and provides that the "scope of permissible testimony continues to be constrained by all the limitations set forth in § 835.3 and § 835.4." Id. § 835.7.

49 C.F.R. 853.3(a) explains that federal laws "preclude the use or admission into evidence of Board accident reports in any suit or action for damages arising from accidents," and

---

[2] Testimony regarding or opinions concerning the Charlotte accident will be the subject of a separate motion in limine.

that the purposes of those federal laws "would be defeated if expert opinion testimony of Board employees, which may be reflected in the views of the Board expressed in its reports, were admitted in evidence or used in litigation arising out of an accident." For these reasons, NTSB members may "only testify as to the factual information they obtained during the course of an investigation," but "shall decline to testify regarding matters beyond the scope of their investigation, and they **shall not give any expert or opinion testimony.**" Id. § 835.3(b) (emphasis added). These provisions apply to testimony by former employees as section 835.3 is specifically incorporated into section 835.7, which governs the scope of permissible testimony by former NTSB employees.

In determining the admissibility of testimony by former NTSB employees, courts have focused on the former employee's involvement with the accident and whether the employee's opinions could reflect the NTSB's views on probable cause. See Campbell v. Keystone Aerial Surveys, Inc., 138 F.3d 996 (5th Cir. 1998); Loftleidir Icelandic Airlines, Inc. v. McDonnell Douglas Corporation, 158 Cal. App. 3d 83 (1984).

The court in Loftleidir ruled that because the plaintiff's expert, a former NTSB member, derived his conclusions and opinions after he left the NTSB and had no active participation in the accident investigation, section 835.3 did not prohibit the expert's testimony. See 158 Cal.App.3d at 93. In that case, the court agreed that if the expert had formulated his opinions or conclusions as part of his official duties with the NTSB, then his testimony would be excluded. See id. However, under the facts of the case, the court found that the expert did not actively participate in the investigation while he was employed with the NTSB. Id. The court also noted that the expert testified that his knowledge of the "specific facts of the accident was based on his independent investigation conducted after he was retained by [the plaintiff] as an expert

12

consultant." Id. Ultimately, the court in Loftleidir concluded that because the expert's "own opinions and conclusions were derived after he left the NTSB, his opinions could hardly reflect the NTSB's views on probable cause," and, therefore, section 853.3 did not exclude his testimony. Id.

Similarly, the court in Campbell concluded that because the plaintiff's expert did not have "any connection whatsoever with the investigation of [the] accident during his tenure at the NTSB," and because the expert "developed his expert opinions after his retirement from the NTSB from an independent review of sources other than the NTSB accident report," allowing the expert's testimony would not "undermine any of the stated purposes of the regulations." 138 F.3d at 1002.

Mr. Goglia's direct involvement in the accident investigation and his onsite visits to Colgan's maintenance facility while serving as a member of the NTSB distinguish this case from the decisions in Loftleidir and Campbell, and warrant his exclusion as an expert witness in accordance with federal regulations. In this case, Mr. Goglia is a former member of the NTSB who served on the Board from 1995 to 2004. The accident giving rise to plaintiffs' claims occurred in August, 2003, while Mr. Goglia was a member of the NTSB. Mr. Goglia has been retained by plaintiffs and has given his expert opinion regarding the cause of the accident. Mr. Goglia's opinions and conclusions are based upon significant information that Mr. Goglia obtained while serving in his official capacity for the NTSB.

Specifically, Mr. Goglia bases his opinions and conclusions about the accident on his inspection of the aircraft wreckage. While he was a member of the NTSB, Mr. Goglia went to the on-scene accident investigation within five days of the accident. Mr. Goglia also bases his opinions and conclusions about the accident on his onsite visits to Colgan's maintenance facility

13

in Hyannis.  Mr. Goglia testified that after going to Hyannis to visit the on-scene accident investigation, he returned to Hyannis to visit Colgan's maintenance facility to watch Colgan personnel perform inspections.  Mr. Goglia testified that he made two to three visits to Colgan's maintenance facility to watch such work.  He further testified that those visits were made in connection with his official responsibilities for the NTSB.  Mr. Goglia also testified that while serving in his official capacity as an NTSB member, he had conversations with Mike Scheidt regarding the Hyannis and the Charlotte investigations.  Also, Mr. Goglia's report states that his opinions and conclusions are based on his review of the NTSB Factual Report for N240CJ Incident, and Mr. Goglia testified that he also reviewed the NTSB probable cause report.

Mr. Goglia's opinions and conclusions are clearly based on significant information obtained in his official capacity as a member of the NTSB.  Unlike the experts considered in Loftleidir and Campbell, Mr. Goglia obtained information during his tenure on the NTSB which he used in formulating his conclusions and opinions regarding this accident.  Unlike the experts in Loftleidir and Campbell, Mr. Goglia was involved in the accident investigation as he was present at the on-scene investigation of the wreckage within five days of the accident.  Indeed, Mr. Goglia's own expert report expressly states that his opinion and report are based on "an inspection of the wreckage" of the aircraft.  Also, unlike the experts in Loftleidir and Campbell, Mr. Goglia's knowledge of the specific facts of the accident is not based on an independent investigation conducted after he left the NTSB and after he was retained by plaintiffs to serve as an expert consultant.  Rather, his knowledge of the specific facts of the accident is based on his inspection of the wreckage during the on-scene accident investigation, his multiple onsite visits to Colgan's maintenance facility in Hyannis, and his review of the full NTSB report.

14

Section 835.3 evidences an intent to protect against the admission of expert testimony by former NTSB employees even if the former NTSB employee's opinions are not actually reflected in an NTSB report. Because Mr. Goglia's expert opinions are based on information he obtained while serving in his official capacity for the NTSB, allowing Mr. Goglia's expert opinions regarding this accident would undermine the stated purposes of the federal regulations that prohibit former NTSB employees from providing expert or opinion testimony. *See* 49 C.F.R. §§ 835.3(a)-(b). Because Mr. Goglia is a former NTSB member – not simply an NTSB employee – a very critical, strict application of the federal regulations is necessary. As such, Mr. Goglia's direct involvement in the accident investigation while serving as a member of the NTSB and the numerous onsite visits to Colgan's maintenance facility he made in connection with his responsibilities for the NTSB warrant the exclusion of his expert opinions in accordance with federal regulations. For all these reasons, defendants request that Mr. Goglia be excluded as an expert witness.

**B.     Mr. Goglia Should Be Precluded From Giving Any Expert Testimony Regarding The Charlotte Accident.**

Throughout his report and testimony, Mr. Goglia makes numerous references to the accident investigation of a Beech 1900D conducted in Charlotte, North Carolina in January, 2003. Indeed, Mr. Goglia bases his opinions and his report on his service as the NTSB Board Member on the scene at the Charlotte accident investigation. Federal regulations, however, expressly prohibit expert or opinion testimony by former NTSB employees in civil litigation. Due to Mr. Goglia's direct and extensive involvement in the Charlotte accident investigation as a member of the NTSB, Mr. Goglia should be excluded from providing any testimony regarding the Charlotte accident investigation pursuant to federal regulations. Furthermore, any such

opinions or testimony is irrelevant to the accident at issue and is unduly prejudicial to defendants.

**1.     Federal Regulations Preclude Mr. Goglia From Giving Any Testimony About The Charlotte Accident.**

Due to Mr. Goglia's direct and extensive involvement in the Charlotte accident investigation as an NTSB member, Mr. Goglia should be excluded from providing any expert or opinion testimony regarding the Charlotte investigation in accordance with federal regulations. Former NTSB members may "only testify as to the factual information they obtained during the course of an investigation," but "shall decline to testify regarding matters beyond the scope of their investigation, and they **shall not give any expert or opinion testimony**." Id. § 835.3(b) (emphasis added); see also id. § 835.7 (specifically incorporating the restrictions in section 835.3(b) and applying those restrictions to former NTSB employees.)

In this case, Mr. Goglia served as the NTSB Board Member on the scene at the Charlotte accident investigation.  Mr. Goglia was at the accident scene in Charlotte on the day of the accident and served as the official spokesman for the Board.  In preparing his expert report, Mr. Goglia reviewed the NTSB Safety Recommendation for N233YV incident at Charlotte-Douglas International Airport and in his deposition, Mr. Goglia provided information regarding the NTSB's investigation and probable cause determination in the Charlotte accident.

Mr. Goglia's opinions and conclusions regarding the accident at issue are based on Mr. Goglia's experience and service as the NTSB Board Member on the scene at the Charlotte accident.  Unlike the experts considered in Loftleidir and Campbell, Mr. Goglia obtained information during his involvement in the Charlotte investigation which he has used in formulating his conclusions and opinions regarding the accident at issue.  Unlike the experts in Loftleidir and Campbell, Mr. Goglia was involved in the accident investigation as he was present

at the on-scene investigation at Charlotte as the Board Member on scene. Also, unlike the experts in Loftleidir and Campbell, Mr. Goglia's knowledge of the specific facts of the Charlotte accident and his knowledge of the Board's views as to the probable cause of that accident is not based on an independent investigation conducted after he left the NTSB and after he was retained by plaintiffs to serve as an expert consultant. Rather, his knowledge of the Charlotte accident is based on his direct involvement in the NTSB's investigation of that accident. Indeed, due to being an NTSB member, Mr. Goglia knows that the probable cause of the Charlotte accident involved elevator rigging. Allowing Mr. Goglia to testify regarding the Charlotte accident investigation, in which he was directly involved as a member of the NTSB, would clearly undermine the stated purposes of the federal regulations. As such, federal regulations prohibiting expert testimony or opinions by former NTSB members warrant the exclusion of any testimony by Mr. Goglia concerning the Charlotte accident.

**2.     Any References Or Testimony Concerning The Charlotte Accident Is Irrelevant And Unduly Prejudicial.**[3]

Any references and opinions concerning the Charlotte accident from Goglia or other sources are irrelevant to the issues presented in the instant action. Mr. Goglia's testimony regarding the Charlotte investigation would only confuse the jury and divert its attention away from the real issues in this case. As such, the prejudice of allowing any such testimony would outweigh any probative value it may have.

Mr. Goglia makes several references to the Charlotte accident in rendering his opinions regarding the instant accident. For example, Mr. Goglia asserts in his report that once Raytheon

---

[3] As noted above, this will be the subject of a separate motion in limine to be filed by defendants.

discovered a deficiency[4] in the manual following the Charlotte accident, Raytheon did not "fully review and correct the AMM," which is "further indication of the deficiency of their manuals and the deficiency and disarray of their system to correct and identify these errors." Similarly, Mr. Goglia states in his report that while Raytheon had learned of problems in their maintenance manuals after the Charlotte accident and before the Hyannis accident, Raytheon had "failed to included [sic] the operational check procedure in Chapter 27-30-04, 'Elevator Trim Tab Cables.'" Even if these assertions are taken as true (and they are not), Mr. Goglia's testimony fails to specifically identify the defect in the manual at issue in the Charlotte investigation. In other words, Mr. Goglia's testimony fails to demonstrate that any alleged defect in the manual involved in the Charlotte accident is the same alleged defect involved in the accident at issue. As such, this testimony is irrelevant to the accident at issue. In fact, the Charlotte investigation involved the elevator system whereas the accident at issue involves the elevator trim.

In sum, Mr. Goglia's testimony and opinions regarding the Charlotte accident are irrelevant to the accident in issue. While Mr. Goglia states generally that as a result of the Charlotte accident, Raytheon had learned of deficiencies in their manuals, Mr. Goglia fails to identify the specific defect that was found in the manuals. The probable cause in the Charlotte accident focused on the elevator system, whereas the elevator trim is at issue in the instant case. The Charlotte accident simply is not substantially similar to the accident at issue. Any testimony regarding the Charlotte accident would serve only to confuse the jury and to unduly prejudice the defendants.

---

[4] Whether any manual deficiency existed regarding the Charlotte maintenance was hotly contested in litigation involving the Charlotte case, and allowing any discussion of it here would require trying all of those unrelated issues. Also, the Charlotte litigation against RAC was voluntarily dismissed by the plaintiffs.

## CONCLUSION

Pursuant to federal regulations, former NTSB employees are prohibited from giving any expert or opinion testimony. In determining whether a former NTSB employee may provide any such testimony, courts have analyzed the former NTSB employee's involvement in the accident investigation and whether any such expert or opinion testimony may reflect the NTSB's views on probable cause. In this case, Mr. Goglia's expert opinion testimony should be excluded because Mr. Goglia was directly involved in the accident investigation. Mr. Goglia's knowledge of specific information is not based on an independent review conducted after he was retained as an expert; rather, much of his knowledge of the specific facts was obtained in connection with his official duties for the NTSB. For the reasons set forth above, Mr. Goglia's conclusions and opinions regarding this accident should be excluded pursuant to federal regulations. Likewise, federal regulations require that Mr. Goglia be excluded from providing any expert testimony regarding the Charlotte accident. Any such testimony regarding the Charlotte accident is irrelevant to the accident at issue and would serve only to unduly prejudice the defendants.

RAYTHEON DEFENDANTS,
By Counsel,

/s/ Tory A. Weigand

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 19, 2007.

/s/ Tory A. Weigand
_____

_____
Peter C. Knight, BBO # 276000
Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Phone: 617-439-7500

-AND-

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
   & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS  67202
Phone:  (316) 265-9311