UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>        Defendants. | DOCKET NO: 05cv10364 PBS |

**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE ANY REFERENCE TO A PIECE OF MASKING TAPE FOUND IN AN EXEMPLAR BEECH 1900D AIRCRAFT COCKPIT AT AN INSPECTION OF THE SAME.**

1043132v1

The defendants hereby respectfully move for an order *in limine* precluding any plaintiffs from offering any evidence, photographic or otherwise, regarding a piece of masking tape, or making any reference to the piece of masking tape at any time in the trial of this matter, that was allegedly found on an exemplar Beech 1900D during an aircraft inspection in this case.

In the plaintiffs' reply papers to Raytheon's motion for summary judgment, the plaintiffs provided the court with the plaintiffs' "Top Ten Factual Issues." Number three in the plaintiffs' Top Ten Factual Issues is an enlargement of the piece of masking tape that appears in a photograph of pulleys and cables and may say "upper pulley TAPE is Right." The plaintiffs' human factors expert witness, Mr. Michael E. Maddox, Ph.D, references this piece of tape on numerous occasions in his report and deposition placing significant relevance on the piece of masking tape. In his opinion, the unidentified piece of masking tape is, "from a human factors perspective…a 'smoking gun'."

In his expert disclosures Mr. Maddox states that he took photographs of the exemplar aircraft and trim tab components and the alleged piece of masking tape: "clearly show[s] a piece of masking tape that had <u>apparently</u> been placed there during prior maintenance to assist Raytheon's own maintenance mechanics in understanding the routing of the pitch trim control cable…This type of reminder is typical of *ad hoc* information reminders placed on or near equipment by people who find the configuration of the equipment confusing." Mr. Maddox acknowledges in his deposition, as he must, that he does not know who wrote the notation, why it was written, when it was written or by whom it was written. He can only opine on what he "think[s] that mean[s]." <u>See</u> deposition of Michael E. Maddox, Ph.D. at pp. 208-215, attached as Ex. 1. Further, Mr. Maddox did his inspection of the exemplar Beech 1900D in 2006, three

years after the accident, and has no way of knowing whether this masking tape note was done before the accident or years later.

The masking tape note is a writing upon which the plaintiffs intend to offer to prove the matter asserted, and, as such, is hearsay in its most basic form. Worse, it is hearsay for which there is no known declarant, no evidence as to when it was asserted and no evidence as to the motivation for whoever may be responsible for its presence or its content. As such, the masking tape notations cannot be admissible and plaintiffs should be precluded from introducing such evidence at trial. Fed. R. Evid. 801.

WHEREFORE, the defendants respectfully request that this Court enter an order *in limine* precluding the plaintiffs from introducing the masking tape notations at trial.

RAYTHEON DEFENDANTS,
By Counsel,

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 26, 2007.

/s/ Peter C. Knight

/s/ Peter C. Knight
_____
Peter C. Knight, BBO # 276000
Gary W. Harvey, BBO #547993
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Phone: 617-439-7500

-AND-

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
  & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS 67202
Phone: (316) 265-9311

3

1043132v1

Case 1:05-cv-10155-PBS    Document 168-2    Filed 01/26/2007    Page 1 of 10

# EXHIBIT 1

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 1

```
 1            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    YISEL DEAN, et al.,

 4         Plaintiffs,

 5      vs.              Case No. 05-CV-10155-PBS

 6    RAYTHEON COMPANY, a Delaware
      Corporation, RAYTHEON AIRCRAFT
 7    HOLDINGS, INC., a Delaware
      Corporation, RAYTHEON AIRCRAFT
 8    COMPANY, a Kansas Corporation,
      RAYTHEON AIRCRAFT CREDIT
 9    CORPORATION, a Kansas Corporation,

10         Defendants.

11

12    LISA A. WEILER, et al.,

13         Plaintiffs,

14      vs.              Case No. 05-CV-10364-PBS

15    RAYTHEON COMPANY, a Delaware
      Corporation, RAYTHEON AIRCRAFT
16    HOLDINGS, INC., a Delaware
      Corporation, RAYTHEON AIRCRAFT
17    COMPANY, a Kansas Corporation,
      RAYTHEON AIRCRAFT CREDIT
18    CORPORATION, a Kansas Corporation,

19         Defendants.

20

21    DEPOSITION OF: MICHAEL E. MADDOX, Ph.D., CHFP

22    DATE:          October 4, 2006

23    TIME:          8:59 a.m.

24

25
```

1    Q.    Do you have a criticism there, or is
2  that an observation that it's hard to see?
3    A.    It's an observation that it's difficult
4  to see.  And so when things are difficult to see,
5  the odds of not seeing something improper has
6  increased.  Also --
7    Q.    But you're not criticizing Raytheon for
8  that design, are you?
9         MS. SCHIAVO:  Objection.
10        THE WITNESS:  It's part of Raytheon's
11 design, so to the extent that it's hard to see
12 stuff, that's part of Raytheon's design.
13 BY MR. JONES:
14   Q.    What I'm getting at, though, is whether
15 you're going to be presenting an opinion in this
16 case that there is another alternative design, as
17 it relates to access or routing of this cable, that
18 should have been employed in the design of this
19 aircraft.
20   A.    I'm not going to be testifying to that,
21 no.
22   Q.    That's beyond your expertise, isn't it?
23   A.    That is correct.  There is also a
24 photograph that figures prominently in this area.
25 One of the photographs I took shows an ad hoc label

Michael E. Maddox, Ph.D., CHFP    October 4, 2006

Page 209

1  that was placed in this area by some -- presumably
2  some maintenance technician in the past attempting
3  to clarify the routing of the control cables in
4  this area.
5       Q.   Now, you mention that on page 20 of
6  your report?
7       A.   That's correct.
8       Q.   Do you have that picture?
9       A.   Sure.  It's also on the DVD, but I can
10 show it to you.  This is a better view of it.
11 Okay, here is the other view.  This is the
12 zoomed-out version.  This is looking up into the
13 pedestal.
14      Q.   From underneath the belly of the
15 aircraft?
16      A.   Correct.  Correct.  This is a piece of
17 tape that's been placed there presumably during
18 some prior maintenance.
19      Q.   You don't know why or when it was
20 placed there, though, right?
21      A.   I do not.  If I zoom in on it --
22      Q.   Let's try, for the record, to give this
23 some sort of a name or way to identify it.  Is it
24 numbered somehow?
25      A.   Yes.  In fact, it has a title.  It's

Page 210

1    called looking up into pedestal four.
2         Q.   Does it have a suffix?  Is it a --
3         A.   A JPEG file.
4         Q.   It's amongst the photographs that are
5    on the DVD that you're producing here today?
6         A.   Correct.  If I zoom in on it, the tape
7    says:  Upper pulley, tape is right.
8         Q.   Is right?
9         A.   I believe that's what that says.
10        Q.   What does that mean or what do you
11   think that means?
12        A.   What I think that means is somebody was
13   trying to keep straight which pulley which cable
14   went through.  Notice there is a set of pulleys.
15   These two pulleys shown in the picture are for the
16   pitch trim control cables.  This is where they come
17   down and then go across the cockpit floor to the
18   left side --
19        Q.   Which pulley is that on Detail F of
20   Figure 202 on Exhibit 98?
21        A.   It's this one right here.  (Indicating)
22        Q.   It's the fourth pulley?
23        A.   It's either the fourth or the third.  I
24   can't really tell, but it looks like one that
25   goes -- as you can see -- well, me zoom out a

Page 211

```
 1    little bit.  Actually, I can show you another
 2    picture that will make it clearer.  What I'm
 3    looking for is the bottom of this pulley.  Here you
 4    go.
 5         Q.    Let's first identify the name of the
 6    file.
 7         A.    This is looking up into pedestal two
 8    dot JPG.
 9         Q.    Okay.  We see two sets of pulleys?
10         A.    Right.  See where they're crossed,
11    these cables change planes?
12         Q.    They're not crossed, they just change
13    planes?
14         A.    They just twist from that upper pulley.
15    They twist down here.
16         Q.    It's a 90 degree plane change?
17         A.    Right, and then they shoot through a
18    little bulkhead area here towards the left side of
19    the aircraft.
20         Q.    And you're saying that's the third or
21    the fourth pulley set?
22         A.    Yeah.  I can't really tell from this
23    diagram which one it is.
24         Q.    But it's either the one you've circled
25    or the one on either side of it?
```

```
 1          A.   Yeah.  Because here, once it passes
 2   this pulley, it actually has a straight shot down
 3   the left side of the aircraft.  So for all I know,
 4   it could actually be this one and there could be
 5   another pulley in there.  As you can see, there is
 6   very limited visual access past this pulley.  There
 7   is a bulkhead in the way.  There is a piece of
 8   metal in the way, so I don't know what's on the
 9   other side of this thing.
10          Q.   So what do you take that tape to mean?
11          A.   I take that tape to mean that it was
12   put there by a mechanic to help them keep straight
13   which cable went into which pulley.  I think what
14   they did was they taped a cable and they said that
15   the -- coming off the upper pulley there is a taped
16   cable, there is a taped cable with some tape on it
17   and it goes through the right pulley here.  I think
18   that's what they mean.  I'm interpreting for them.
19               But this type of what I would call a
20   job aid is fairly classic in the human factors
21   world.  When we go into a situation to examine or
22   evaluate a system or a product, the very first
23   thing we look for are sticky notes or download
24   labels or taped messages or marks where somebody
25   wrote on it with a pen or something like that
```

```
 1   because it's ambiguous; they don't have the
 2   information that they need in the world.  In other
 3   words, there is not enough information just by
 4   looking at this, perhaps the procedure is not
 5   clear, so they make a note for themselves to help
 6   them out.
 7        Q.   So do you read that to implicate a
 8   human factors problem originating from the design
 9   of the aircraft?
10        A.   From both the design of the aircraft
11   and the instructions.  It's probably a combination
12   of both, that there is not enough information
13   either in their view of this pulley and cable
14   system or in the procedures themselves to make it
15   unambiguous what they should do with this cable,
16   how they should route the cable.  So they have done
17   two things:  Tape is right.  Either they have done
18   something to code one of the cables, they have put
19   a piece of tape on it or they've done something
20   else and then they've written themselves a note to
21   let them know which pulley it goes through.
22        Q.   But you don't know what the mechanics
23   were doing --
24             MS. SCHIAVO:  Objection.
25
```

1   BY MR. JONES:
2       Q.   -- when this was created?
3            MS. SCHIAVO:  Objection.
4            THE WITNESS:  I can't say for sure.
5   The fact that the tape is there is a telltale sign
6   that they needed more information and they wrote
7   themselves a note.
8   BY MR. JONES:
9       Q.   And you're assuming it was mechanics
10  who did that?
11      A.   I'm assuming it was.  I don't know who
12  else would be in this area to do that.
13           Actually, this is very difficult to
14  access, there is very little room in here, so this
15  would have to be in a situation where there was
16  light from the outside.  This was taken with a
17  flash.  The ambient light from the outside is not
18  enough to illuminate this area.  You really can't
19  see very much in here just from the ambient light.
20  So somebody had a flashlight or a shop light or
21  something like that.
22      Q.   But you don't know who it was?
23      A.   No.  I have no idea.
24      Q.   Was there anything else, as it relates
25  to the design of the aircraft, that impacts your

1   opinions in this case beyond what we've already
2   talked about?
3       A.   You mean as far as the routing for the
4   cable -- the trim tab system?
5       Q.   Right.  What I'm doing is driving the
6   discussion based upon your section, pages 18
7   through 20, that speak of the complex design of the
8   pitch control system.
9       A.   No.  I think we've discussed pretty
10  much all that.
11      Q.   On page 20 of your report you start a
12  new section.  It says:  Role of other maintenance
13  tasks.  You start off by saying:  Errors typically
14  do not have happen in a vacuum or in isolation from
15  the overall maintenance environment.  What do you
16  mean by that?
17      A.   Well, we tend to look at individual
18  actions that turn out to be errors as sort of
19  happening in isolation, that somebody did this
20  particular thing which turned out to be wrong, but
21  the fact of the matter is that action took place in
22  an overall environment of other tasks and other
23  things that are going on in communication and
24  procedures, et cetera.  And so it's a mistake,
25  actually, to look at these tasks or these actions