UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONSOLIDATED UNDER
CASE NO. 05-10155 PBS

| | |
|---|---|
| YISEL DEAN, Independent Administratrix of the Estate of STEVEN DEAN, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10155 PBS |
| LISA A. WEILER, Administratrix of the Estate of SCOTT A. KNABE, deceased, and on behalf of all statutory beneficiaries,<br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY, a Delaware corporation, RAYTHEON AIRCRAFT COMPANY, a Kansas Corporation, RAYTHEON AIRCRAFT CREDIT CORPORATION, a Kansas Corporation, COLGAN AIR, INC., a Virginia Corporation d/b/a US Air Express,<br>Defendants. | DOCKET NO: 05cv10364 PBS |

**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF FAA SERVICE DIFFICULTY REPORTS**

1042852v1

The defendants hereby respectfully move for an order *in limine* precluding the plaintiffs from introducing any FAA Service Difficulty Reports ("SDR's") related to the Beech 1900, or from any of plaintiffs' experts testifying about SDR's related to the Beech 1900.[1]  In his expert report, plaintiffs' expert, Donald E. Sommer, states that he reviewed SDR's for the accident aircraft.  Specifically, eighty-two reports were reviewed using the key words "cable" and "B1900."  According to Mr. Sommer's report, numerous incidents were found with elevator and trim control cable problems, jams, and malfunctions.  He also notes that in one report, it was noted that the ailerons had been hooked up in reverse.

At his deposition, Mr. Sommer was questioned about his reference to SDR's in his expert report.  Mr. Sommer testified that he had his staff search the Internet for SDR's using the words "cable" and "B1900."  (Deposition of Donald Sommer, pp. 129-130, attached hereto as **exhibit 1**).  SDR's are typically made by a mechanic, or someone else out in the field, and are generally used for trend data.  (**Exhibit 1** at p. 132.)  The form on which an SDR appears provides only a few lines for the reporter to describe a problem.  Mr. Sommers looked only at printouts of SDR's, not the SDR itself, when compiling reports that he believed were relevant to this action.  (**Exhibit 1** at pp. 133-134).  Other than reading the problem descriptions, Mr. Sommers did not do any additional investigation to determine the causes of each of the events contained in the SDR's.  (**Exhibit 1** at p. 134).  Mr. Sommers did not attempt to analyze only SDR's that predate the subject accident, and as such, many of the SDR's he relies upon relate to incidents after this accident.  (**Exhibit 1** at pp. 134-135).

Under Massachusetts law, in order for a party to offer evidence of a previous incident, it must be shown that a "substantial identity of the circumstances" exists between the prior incident

---

[1] Service Difficulty Reports are submitted to the FAA by certificate holders and certificated repair stations, and provide the FAA with airworthiness data necessary for planning, directing, controlling, and evaluating certain assigned safety-related programs.

2

and the incident at issue.  Robitaille v. Netoco Community Theaters of North Attleboro, Inc., 305 Mass. 265, 267, 25 N.E.2d 749, 750 (1940).  Massachusetts courts employ the "substantially identical" standard, enunciated in Robitaille, in ruling on the admissibility of prior accidents. See e.g., Kromhout v. Commonwealth, 298 Mass. 687, 500 N.E.2d 789 (1986); Croall v. Massachusetts Bay Transportation Authority, 26 Mass. App. Ct. 957, 526 N.E.2d 1320 (1988); Read v. Mt. Tom Ski Area, Inc., 37 Mass. App. Ct. 901, 639 N.E.2d 391 (1994).  The Massachusetts Court of Appeals has stated that evidence of similar accidents is admissible "to prove a defendant's knowledge of a dangerous condition only upon a showing, by its proponent, that the circumstances of the other accidents were 'substantially identical' and the danger of confusion, undue waste of time, or unfairness appears small."  Read, 37 Mass. App. Ct. at 902.

Here, any evidence of SDR's, including print-outs of reports, reports themselves, or any testimony regarding SDR's must be precluded.  There has been no showing of a substantial identity of circumstances of any incidents described in the SDR printouts reviewed by Mr. Sommers and the subject accident.  Although Mr. Sommers claims that he found numerous incidents involving elevator and trim control cable problems, he did no further research to determine any additional circumstances regarding the incidents.  There is no evidence that any of the incidents involved a purported erroneous pictograph of the trim tab cable drum or that a REPS did not list the operational check in the table of contents or provide a link to the operational check.  Indeed, there could be no such evidence given that Mr. Sommers merely relied on a few sentences describing a problem without delving further into the events and circumstances surrounding the incidents reported in the SDR's.  As such, there is no evidence of substantial identity of any of the circumstances surrounding the events leading to the SDR's filed

before the accident and the subject accident, and thus, any evidence regarding those SDR's must be precluded.

Similarly, any evidence relating to SDR's filed after the subject accident must also be excluded. As an initial matter, there has been no showing that any of the SDR's filed after the subject accident relate to incidents which bear any resemblance to the accident. Nonetheless, any incidents described in such SDR's cannot be used to establish a dangerous or defective condition, or notice of knowledge of a dangerous or defective condition by Raytheon. Evidence of SDR's filed after the date of the subject accident will only serve to prejudice Raytheon and confuse the jury. Additionally, there is no probative value to any of those SDR's, as they are completely irrelevant to the merits of this case. Fed. R. Evid. 403.

Additionally, the SDR's contain descriptions of problems and incidents by mechanics or other persons in the field, and thus, constitute inadmissible hearsay, and therefore, all SDR's must be excluded on that basis as well. Fed. R. Evid. 802.

WHEREFORE, the defendants hereby respectfully move for an order *in limine* precluding the plaintiffs from introducing any FAA Service Difficulty Reports related to the Beech 1900, or from any of plaintiffs' experts testifying about SDR's related to the Beech 1900.

RAYTHEON DEFENDANTS,
By Counsel,

I hereby certify that this document(s) filed through
the ECF system will be sent electronically
to the registered participants as identified on the
Notice of Electronic Filing  (NEF) and paper
copies will be sent to those indicated as
non registered participants on January 26,  2007.

/s/ Peter C. Knight
_____

/s/ Peter C. Knight
_____

Peter C. Knight, BBO # 276000
Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Phone: 617-439-7500

-AND-

4

William L. Oliver, Jr. Esquire
Michael G. Jones, Esquire
MARTIN, PRINGLE, OLIVER, WALLACE
    & BAUER, L.L.P.
100 North Broadway, Suite 500
Wichita, KS  67202
Phone:  (316) 265-9311

5

# EXHIBIT 1

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MASSACHUSETTS
 2    CONSOLIDATED UNDER CASE NO. 05-10155 PBS

 3    _____

      DEPOSITION OF:    DONALD E. SOMMER
 4    EXAMINATION DATE:  October 24, 2006

 5    _____

      YISEL DEAN, et al.,
 6
      Plaintiffs,
 7
      v.                          Case No. 05 CV 10155 PBS
 8
      RAYTHEON COMPANY, a Delaware
 9    corporation, RAYTHEON AIRCRAFT HOLDINGS,
      INC., a Delaware Corporation, RAYTHEON
10    AIRCRAFT COMPANY, a Kansas Corporation,
      RAYTHEON AIRCRAFT CREDIT CORPORATION,
11    a Kansas Corporation,
12    Defendants.

13    _____

      LISA A. WEILER, et al.
14    .
      Plaintiffs,
15
      v.                          Case No. 05 CV 10364 PBS
16
      RAYTHEON COMPANY, a Delaware
17    corporation, RAYTHEON AIRCRAFT HOLDINGS,
      INC., a Delaware Corporation, RAYTHEON
18    AIRCRAFT COMPANY, a Kansas Corporation,
      RAYTHEON AIRCRAFT CREDIT CORPORATION,
19    a Kansas Corporation,
20    Defendants.

21    _____

              PURSUANT TO NOTICE, the deposition
22    of DONALD E. SOMMER was taken at 8:55 a.m., on
      October 24, 2006, at 1700 Broadway, Suite 1020,
23    Denver, Colorado 80290, before Patricia S.
      Newton, Registered Professional Reporter and
24    Notary Public in and for the State of Colorado,
      said deposition being taken pursuant to the
25    Federal Rules of Civil Procedure.
```

1    expect an operational check would be performed.

2           Q    (BY MR. JONES)  Did you have

3    access to Colgan's CAMP data that would reflect

4    the detail of logbook maintenance entries?

5           A    I would have to research that

6    question a little more.  It may be on one of

7    these CDs that I have had supplied to me.  I just

8    don't remember whether it was actual CAMP data or

9    whether it was secondary data derived from the

10   CAMP data.

11          Q    What type of secondary data

12   derived from CAMP data are you thinking of?

13          A    Well, other people's report of

14   what the CAMP data says.

15          Q    For example, if an NTSB report

16   had said, "We found this in the CAMP data,"

17   that's what you're talking about?

18          A    Yes, exactly.

19          Q    The next paragraph on page 6

20   speaks of "FAA Service Difficulty Reports."

21   What's the source of that info?

22          A    The FAA.

23          Q    And those are available online,

24   aren't they?

25          A    Yes.

Page 130

1          Q      So you reviewed those why?

2          A      Because I wanted to find out if

3     there was any other problems similar to the

4     accident problem.

5          Q      And the way you went about doing

6     it is just searching for cable and B1900?

7          A      Yes, sir.

8          Q      Is that some work you did or your

9     staff did?

10         A      My staff did that per my request.

11         Q      And what was your purpose in

12    reporting these Service Difficulty Reports?

13         A      Well, anytime you investigate an

14    accident, you like to look and see what, if any,

15    previous history of similar problems exist in the

16    field.  And we typically do these type of

17    searches for many of the airplane crashes that we

18    investigate.

19         Q      Do you have a file in your Red

20    Rope here that's specific to that inquiry?

21         A      Yes.

22         Q      I'm marking your folder marked

23    "Colgan Air SDR's" as 117.  The top three pages

24    seem to be a typewritten listing of SDRs found.

25    Is that something your staff put together?

Page 132

1    Beech 1900 fleet.

2            Q       And you're getting that from

3    reviewing those SDRs on the FAA's Website?

4            A       Yes, in part.

5            Q       And an SDR is just a report from

6    someone in the field that, on this form that the

7    FAA provides, you can say what happened with your

8    particular aircraft, correct?

9            A       Well, a Service Difficulty Report

10   is a report from usually a mechanic, although it

11   doesn't have to be a mechanic, of specific

12   problems related to specific systems with

13   specific aircraft.  It's generally used for trend

14   data; and it's used to determine, A, where to

15   look when one has the types of problems that are

16   relevant to the SDRs; and, B, what the cause and

17   effect of some of those problems in aircraft

18   operation has been in the past.

19           Q       May I see that file?

20           A       Sure.

21           Q       The form itself just provides one

22   field to describe what really happened, doesn't

23   it: Field No. 4?

24           A       Yeah, it provides, under Item 4,

25   "Problem Description."

Page 133

1          Q     So for each one of these SDRs, we

2     have a few lines for each event of a mechanic or

3     whoever the reporter is describing what happened?

4          A     Not necessarily.  I've seen whole

5     pages written on SDRs before.

6          Q     On these?

7          A     This isn't the SDR; this is the

8     printout of the SDR itself.  The SDR is on a

9     small piece of paper, about maybe 4 inches by 8

10    1/2 inches.  And it's also noted on the SDR, per

11    my recollection, that if you need additional

12    space, you attach a piece of paper to it.

13         Q     Did you get the fuller version of

14    these particular SDRs for your work on this

15    case --

16         A     Well --

17         Q     -- or are they in this file?

18         A     -- for instance, there's a

19    readout here that has six lines in the Problem

20    Description.

21         Q     But this file contains --

22         A     Here's one that has 10 lines or

23    so on the "Problem Description."  This is just a

24    computer printout; this isn't a form.

25         Q     But this is the extent of the SDR

1    study you did for purposes of your work, right?

2              MS. SCHIAVO:  Objection, for the

3    record.  Go ahead.

4              A    Yes.

5              Q    (BY MR. JONES)  You didn't dig

6    behind each one of these events to learn any more

7    about them besides reading what's on these forms?

8              A    Correct.

9              Q    But nonetheless, from your review

10   of a description ranging anywhere from two to 10

11   lines, you identify a trend of problems with

12   elevator trim in the 1900D?

13             A    What I identified is what it says

14   in the report: that numerous incidences were

15   found with elevator and trim control cable

16   problems, jams, and malfunctions.

17             Q    But you didn't undertake to

18   determine what the reasons for each of those

19   events were, did you?

20             A    Other than what it indicates in

21   the Problem Description; I didn't go further than

22   that.

23             Q    May I have it?

24             Just looking at the listing of them,

25   would you agree with me that half of those you

1    reference postdate the accident in this case?

2              A     I haven't done the study, but I

3    can do it real quick, if you like.

4              Q     Well, the document, I guess, will

5    speak for itself.

6              A     Sure.

7              Q     But let me, I guess, come at the

8    it this way:  Did you undertake, in your analysis

9    of SDRs, to focus only on those that predated

10   this accident?

11             A     No.

12             MR. JONES:  I think now is

13   probably as good a time as any to break for

14   lunch.

15             THE DEPONENT:  I was just going

16   to second that.

17             (Recess from 12:08 to 1:29 p.m.)

18             Q     (BY MR. JONES)  During the break,

19   I took some time to slap some stickers on more of

20   your stuff you brought with you just so that we

21   can identify them and copy them as needed.

22             So to cover some housekeeping matters,

23   I've got two stacks of CDs:  One I could just

24   give back to you.  We don't need any of those.

25   The other one I put stickers on, and I want to